THE COMPANY FOR ERECTING AND SUPPORTING A TOLL BRIDGE
WITH LOCKS FROM ENFIELD TO SUFFIELD *against*
THE CONNECTICUT RIVER COMPANY.

On the petition of *A., B.* and others, for liberty to erect a toll bridge across *Connecticut* river, at a certain place between *Enfield* and *Suffield,* shewing that a bridge might be erected there, without injury to the boat navigation.

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

provided two locks should be made on the *East* side of the river, the General Assembly, in 1798, incorporated the petitioners, and granted them liberty to erect a toll bridge, at the place referred to, and to collect from passengers certain rates of toll, also to collect from all persons using said locks thirty-four cents per ton, for the term of one hundred years. The corporators were required, by the charter, to give bonds for the completion of the bridge within a limited time ; and it was then provided, that the locks should be completed in six years from the rising of the General Assembly in *May*, 1799, or, on failure thereof, the grant should be null and void. The grant was accepted by the corporators ; and the corporation was organized under it. On the application of the company, reciting their grant of a bridge, the General Assembly, in *May* 1805, extended the time for erecting and completing the bridge until the 1st of *June* 1808, still requiring them to give bonds to finish the bridge. Upon another application of the company, in *May* 1806, the time was further extended to three years from that time, with the same rights and subject to the same regulations as were granted and provided originally. Before the expiration of this time, *viz.* in *May* 1808, the General Assembly, on the petition of the company, authorized them to make a shore channel, in lieu of the locks provided in their original grant to be erected. In the same act, the General Assembly declared, that the company were not thereby, in any respect, excused or restrained from making locks and canals, at any time during the continuance of their grant, if this provision of a shore channel should be found insufficient for the navigation of the river. At the same session, the General Assembly appointed a committee to examine the bridge, and the locks and canals, or shore channel, thereto annexed, one accept the same, and authorize the proprietors to take toll. In *October* 1808, the General Assembly, on the petition of the company, stating that a shore channel could not be made but at an enormous expense, and that its utility was very doubtful, appointed another committee to report what, in their opinion, was the best mode of erecting the locks so as to subserve the public interest in relation to the navigation of the river, without sacrificing the rights of the petitioners. In *October*, 1809, that committee made their report to the General Assembly, suggesting the expediency of permitting the postponement of any further proceedings in relation to the navigation of the river, at the place originally designated, until a corporation should appear to undertake the erection of locks both at that place and below the bridge. This report was accepted, by the General Assembly, so far as regarded the facts found by the committee. At the same session, the General Assembly, on the petition of the company, resolved, that the building of the locks be suspended, and the company discharged from the obligation to build the same, until the further order of the General Assembly ; at the same time, authorizing the petitioners to take the toll prescribed by their charter, for passing the bridge, *that* being finished, and having been approved by the committee appointed for that purpose. In *May* 1824, the General Assembly incorporated *The Connecticut River Company*, authorizing them to remove obstructions from the channels and bars of said river from *Hartford* to *Springfield*, and to lock the falls at *Enfield* on said river, and to make channels to aid them, and to construct a canal on either bank of said river near said falls, &c. Provision was made, by the charter of incorporation, for the assessment and payment of damages done to individuals, by the canal or other works of said corporation. *The Connecticut River Company* accepted their grant ; and

*Hartford,*
June, 1828,

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

were collecting materials and were preparing to construct a canal and locks on or near the bank on the *West* side of *Connecticut* river passing directly opposite to the place designated for the erection of the locks of the other company, but extending several miles up and down the river. The company first incorporated never gave bonds pursuant to their charter; had never constructed any locks, or other work for improving the navigation of the river; nor would the locks or other works, which they were authorized to construct, benefit the navigation; they had suffered their bridge to go down, and sold the piers; and had suffered their agent to buy up the stock of the company, for sinister purposes. In this state of things, the company incorporated in 1798, brought a bill in chancery for an injunction against the operations of the *Connecticut River Company.* Held,

1. That the right of constructing locks, granted by the act of 1798, did not expire at the end of six years from *May* 1799, but was preserved, in conjunction with the right of erecting a bridge, by the subsequent acts of the General Assembly;

2. That the failure of the plaintiffs to give the bond directed by the act of 1798, and afterwards by the acts of 1805 and 1806, did not defeat their charter, or cause the right granted by it to cease;

3. That the right of the plaintiffs to construct locks, had not become extinct, by the surrender;

4. That it had not been lost, by non-user or misuser;

5. That the plaintiffs could not be divested of their franchise, on the ground of its inutility;

6. That the right granted to the plaintiffs, was exclusive, and exhausted the power of the General Assembly in relation to that subject;

7. That the grant to the defendants, as it interfered with and violated the plaintiffs' right, was void;

8. That the grant to the defendants was not authorized, on the ground that it provided an indemnity to the plaintiffs;

But 9. that the construction of locks was required by the General Assembly, and considered by the plaintiffs, as a burden, from which the plaintiffs sought relief, and obtained it, by the act of 1809, suspending the building of such locks, and discharging the plaintiffs from the obligation to build the same, until the further order of the General Assembly; and consequently, that the plaintiffs cannot now exercise the right of erecting locks, without legislative interposition;

10. That the plaintiffs not being in the possession and enjoyment of any right, which the defendants are attempting to infringe, the court will not decree an injunction.

This was a bill in chancery, praying for an injunction against the defendants to desist from proceeding to erect locks and canals, or any other structure for the passage of boats and rafts, on the falls or rapids in *Connecticut* river, called *Mad Tom* and *Surf* bars.

The cause was heard on the bill and answer, at *Hartford,* *February* term, 1828, before *Hosmer,* Ch. J.

*John Reynolds* and his associates, inhabitants of the towns of *Enfield* and *Suffield,* preferred a petition to the General As-

sembly of this state, in *October,* 1798, praying for liberty to erect a toll bridge across *Connecticut* river, near the place called *Mad Tom Bar ;* shewing, that a bridge might be erected there, without injuring the navigation up and down the river with boats, rafts, &c., provided that two locks be made on the *East* side of the river, one to carry the boats over *Mad Tom Bar,* and the other over *Surf Bar.* On this petition the General Assembly, at the same session, passed an act or resolve, constituting the petitioners a corporation, by the name of *The Company for erecting and supporting a Toll Bridge with Locks from Enfield to Suffield,* and granting them liberty to erect a bridge at the place above-mentioned, and to collect from all persons passing over or using such bridge certain rates of toll, " and also to collect from all persons passing said locks thirty-four cents *per* ton ;" which toll they were authorized to collect, for their own use and benefit, for the term of one hundred years, or until they should receive the cost of erecting said bridge and an interest of twelve *per cent.* It was also resolved : " That the said *John Reynolds* and his associates shall give bonds to the treasurer of this state in the sum of twenty thousand dollars, with good and sufficient surety, to the acceptance of said treasurer, that said bridge shall be erected within the time limited in this grant or resolve ; which said bridge so to be erected shall not be less than twenty-five feet wide ; and said locks shall be at least thirty feet wide, so as to admit the passage of rafts and boats, and shall be completed within the term of six years from the rising of the General Assembly in *May,* 1799, or on failure thereof, this grant shall be null and void." It was further resolved : " That during said term of one hundred years, said company shall keep said bridge and said locks in good repair, subject to the inspection of the General Assembly, as often as they shall think proper, by their committee to be appointed for that purpose ; and that no person or persons shall have liberty to erect another bridge any where between the *North* line of said *Enfield* and the *South* line of *Windsor.*"

At a legal meeting of the company, held soon afterwards, they accepted the charter, and were organized as a corporation under it, by the choice of a president and directors, and other officers necessary to carry into effect the objects of the grant.

On the application of the company, referring to their grant,

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

*Hartford,*
*June, 1828.*

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

so far as it related to the bridge, the General Assembly, in *May*, 1805, passed the following resolve : " That the petitioners be, and they are hereby, authorized to erect and finish said bridge, on or before the 1st day of *June*, 1808, any thing in the former act of this Assembly, granting to them the privilege aforesaid, notwithstanding ; and the petitioners, upon finishing said bridge, by the 1st day of said *June*, shall have the same rights and privileges, and be subject to the same regulations, and shall have a right to collect the same toll, as are vested in and belonging to them, by the original grant of this Assembly : Provided, That before the petitioners proceed to erect said bridge, they shall give bond to the treasurer of this state, in the sum of twenty thousand dollars, to the acceptance of said treasurer, conditioned that said bridge shall be finished agreeably to the provisions of said original grant."

On another application of the company, in *May*, 1806, stating that there was not sufficient time limited, by the last mentioned grant, to build and finish the bridge, and praying for a further extension of the time, the General Assembly authorized the petitioners " to erect and finish said bridge within three years from the rising of the Assembly, at their [then] present session," any thing in the former acts notwithstanding ; declaring, that the petitioners, upon finishing said bridge within the time thereby limited, should have the same rights and privileges, and be subject to the same regulations, and should have a right to collect the same toll, as were vested in and belonged to them, by their original grant.    To this resolve was annexed a proviso requiring a bond, in the same words as the one annexed to the resolve of *May*, 1805.

In *May*, 1808, the company preferred their petition to the General Assembly, shewing that " to a grant of the Assembly to said company of a right to erect a bridge from *Enfield* to *Suffield* there was annexed a proviso, that the said company shall make two locks on the *East* side of the river, one to carry boats over *Mad Tom Bar*, and the other over *Surf Bar ;* that the petitioners had begun to erect said bridge, and, on examination, found, that the public would be better accommodated, if a channel were made in the water, near the *Eastern* shore, in lieu of one or both of the locks provided to be erected in the original grant."    The General Assembly thereupon resolved, "That the aforesaid corporation be, and are hereby authorized and empowered to make a shore channel, by excavating the

bed of the river, or in such other way as they shall deem prop-
er, over the aforesaid rapids, in lieu of the locks provided in
said grant to be erected.    And the said corporation shall have
the right to demand and receive of all persons passing through
said channel the same toll as is granted to them to be taken on
passing said locks.    The said corporation are not, by this re-
solve, in any respect, excused or restrained from making locks
and canals as aforesaid, at any time during the continuance of
their said grant, and receiving the toll to them granted for
passing the same, if the present provision shall be found in-
sufficient for the navigation of said river."

In the course of the same session, the General Assembly
appointed *Oliver Mather, Josiah Bissell* and *Shubael Griswold*
a committee to examine and inspect the bridge then erecting
between the towns of *Enfield* and *Suffield,* and the locks and
canals, or shore channels, thereto annexed, and accept the same,
and authorize the proprietors thereof to take toll of all persons,
who should pass said bridge, locks or channel, and make re-
port to some future session of the Assembly.    To this resolve,
however, was annexed a proviso, that the right of examining
and finally determining, whether the aforesaid locks and canals,
or shore channel, be sufficient to answer the purpose intended
by the grant to the proprietors, should be reserved to the
General Assembly.

In *October,* 1808, the company preferred another petition to
the General Assembly, representing, that they had nearly com-
pleted the building of the bridge ; that it would be finished and
ready to be opened in *November* then ensuing ; but that on
proceeding to build said locks &c. for aiding the navigation of
boats &c. over said falls, they met with unforeseen difficulties,
which were of a nature to render advisable the delay thereof
until the order and direction of the Assembly could be had
thereon ; that upon a careful examination of the falls, it was
found that a shore channel could not be made but at an enor-
mous expense, and that its utility was very doubtful ; that the
engineers united in recommending the building of a lock or
locks, instead of making a shore channel, and in order to fill
the locks, either to erect a dam across the river, or to make
wing dams ; that the petitioners entertained doubts whether
they had a right to erect a dam of any kind, without a special
grant for that purpose ; praying for the appointment of a skil-

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

ful and judicious committee to view and examine, at the expense of the petitioners, the said falls, and report to the General Assembly, at their next session, what, in their opinion, is the best mode of erecting said locks &c. in order to subserve the public interest as to the navigation of said river by boats &c., without sacrificing the rights and interests of the petitioners ; and that the General Assembly, at their next session, would order and direct, that as soon as said bridge should be finished, and approved by the committee appointed for that purpose, the petitioners be authorized to take the toll prescribed by their grant of passengers.    On this petition, the General Assembly appointed *Asher Miller, Shubael Griswold* and *Eli Whitney* a committee, at the expense of the petitioners, to view and examine said falls, and hear all persons concerned, and report to the Assembly in *May* then next, what, in their opinion, is the best mode of erecting said locks, &c. in order to subserve the public interest, as to the navigation of said river by boats &c., without sacrificing the rights and interests of the petitioners.    The General Assembly also authorized the petitioners, as soon as they should have finished the bridge, and the same should be approved by the committee appointed for that purpose, to take the toll prescribed by their grant, until the rising of the Assembly in *May* then next.

In *May,* 1809, *Asher Miller, Eli Whitney* and *Shubael Griswold* were reappointed a committee, for the same purposes and with the same powers, as before ; and were directed to report to the then next session of the General Assembly ; and in the mean time, the petitioners were authorized to take toll of passengers crossing the bridge.

In *October,* 1809, this committee made their report to the General Assembly, expressing their opinion, that the most eligible method of rendering the navigation over *Surf* and *Mad Tom Bars* safe and easy, was by one lock only on the *Eastern* bank of the river ; and that the only practicable method (within any reasonable bounds of expense) of erecting such lock, was by extending a dam across the river at or near *Mad Tom Bar,* of such height as to overcome the rapids at the top of *Surf Bar.*    In the same report, the committee further say, that they had become satisfied, that the erection of a lock, which would enable boats and rafts to pass over *Surf* and *Mad Tom Bars,* with ease and safety, would become an object of much greater public utility, provided a similar lock was, at

the same time, erected at the falls below the bridge. They
conclude the report thus : " Having viewed the falls below the
bridge, we perceive no difficulty in constructing a lock there,
in the same manner as proposed for making the lock above ;
and we believe, that erecting a lock at each fall, at the same
time, would lessen the aggregate expense of navigating the
river, and be a work of public utility.   Your committee, there-
fore, beg leave respectfully to suggest, whether it may not be
expedient to permit the postponement of any further proceed-
ings relative to the improvement of the navigation at *Surf* and
*Mad Tom Bars*, until a corporation shall appear to undertake
the erection of locks at both the upper and lower falls."   This
report was accepted and approved, by the General Assembly,
so far as regards the facts found by the committee.

On a petition of the company, stating their charter of incor-
poration, the subsequent extensions of the time limited for
building the bridge, the resolve of *May* 1808, the appointment
and re-appointment of the committee, in *October* 1808 and *May*
1809, and the report of this committee, with the vote of ac-
ceptance thereof, the General Assembly, in *October* 1809,
resolved as follows : " That the building of locks upon said
falls, called *Mad Tom Bar* and *Surf Bar*, by said company,
be suspended, and said company discharged from the obligation
to build the same, until the further order of this Assembly :"
" That the petitioners be authorized to take the toll prescribed
by their charter, of passengers crossing said bridge, the same
being finished, and having been approved by the commitee
appointed by this Assembly for that purpose."

In *October*, 1818, the General Assembly, on the petition of
*John L. Sullivan* and his associates, passed an act, incorporating
them, by the name of *The Proprietors of the Enfield Locks and
Channels*, for the purpose of constructing locks, dams and
channels at *Enfield* falls.   The 2nd section of this act provi-
ded : " That the proprietors of *Enfield* bridge shall be again
authorized and empowered to lock the upper part of *Enfield*
falls, called *Mad Tom* and *Surf Bars ;* provided a majority of
the proprietors shall, within thirty days from the rising of this
present Assembly, pass a vote, and take measures to carry the
same into effect without delay ; or otherwise, shall, at their
option, have a right to subscribe in proportion to their present
ownership, for one half the shares in the locks and channels :
Provided they shall subscribe within thirty days from the time

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

Hartford,
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

that public notice shall be given by said *Sullivan*, in two news-papers printed in *Hartford*, that such subscription is opened." The 6th section contained the following provisions : " If the said proprietors, whether at the upper or lower falls, shall suffer them to fall into decay and become useless, and the same shall so continue during two successive summer seasons, this act shall cease and be void. And if the said falls shall not be rendered conveniently navigable within three years from the passage of this act, the same shall be null and void."

In *May* 1824, the General Assembly, on the petition of *John T. Peters* and others, constituted them, with all such persons as might be associated with them, a corporation, by the name of *The Connecticut River Company*, for the purpose of improving the boat navigation of that river. The 7th section of this act has the following provisions : " That said corporation, for the purpose of widening the channel of said river, and deepening the same, shall have power to dig, cleanse and remove obstructions from the channels and bars of said river, from and above the bridge at *Hartford*, to *Springfield*, and to erect and build wharves and piers and hedges in said river, or on the banks thereof, as they may judge necessary. And said corporation are empowered to lock the falls at *Enfield* on said river, and to make channels to aid them, and to construct a canal on either bank of said river, near said falls, and to construct a dam or dams, for the purpose of entering and leaving the locks in still water ; provided the extensions and form thereof shall be such as not to prevent the convenient passage of boats and lumber down the river, nor obstruct the passage of fish. And said corporation shall have right to procure and possess any steam boat or boats, which they may judge necessary to increase commerce on said river." The 11th section authorized the corporation to purchase and hold so much real estate for making said locks, canal and dams as might be necessary or convenient ; also, to purchase and hold such mill or mill-seat or manufactories upon or adjacent to *Enfield* falls, as they might judge expedient, and the same to lease or alien. The 12th section contained the following provision : "And the commissioners (after notifying the parties, if practicable) shall assess the damages done to individuals, by the canal or other works of said corporation, and make regular entries of all their determinations or appraisals under this act, in a book to be kept for that purpose : which damages, thus assessed, shall be paid

by said corporation, within six months after the same shall be finally established."

The plaintiffs exhibited in evidence a certificate of the committee appointed in *May* 1808, accepting the bridge. They also exhibited a vote of the company appointing *Rufus Granger* an agent to prosecute the present suit against *The Connecticut River Company*; also, to receive a deed or deeds of land to enable the plaintiffs to rebuild their bridge. The plaintiffs likewise adduced in evidence a deed, dated *June* 20, 1827, of a piece of land opposite *Mad Tom* and *Surf Bars*, for the purpose of proving, that they had made, and were making preparations for the building of said locks.

*The Connecticut River Company* accepted the grant of the General Assembly, and organized themselves under it. When this suit was brought, they were collecting materials and preparing to construct a canal and locks, on or near the bank on the *West* side of *Connecticut* river, directly opposite to the place granted and designated for the erection of the locks by the plaintiffs; but it appeared, that the canal and works of *The Connecticut River Company*, although in part opposite to the place for erecting the locks by the plaintiffs, were of several miles extent, up and down the river.

To sustain averments of the same effect in the defendants' answer, they offered evidence to prove, 1. That the plaintiffs never complied with their grant or charter, by giving bond to the treasurer to build the bridge; and hence the defendants contended, that the grant was annulled. The court was of opinion, that the bridge having been accepted, this evidence was irrelevant.

2. The defendants offered to prove a sale of the piers of the bridge, and a non-user of the plaintiffs' right. This evidence the court rejected, on the ground that it was not competent to the court, in this suit, to repeal or annul the plaintiffs' grant, or decree a forfeiture of the right, and hence that such evidence was irrelevant.

3. That the locks to be erected by the plaintiffs would be of no public use or benefit. This evidence also the court rejected, on the ground that the General Assembly had decided, and was alone competent to decide, that question.

4. That the bridge in question has not been in existence for ten years past. This evidence also the court rejected, on the ground that it had no bearing on the rights of the plaintiffs, nor

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River ⌣o.

on the legal propriety of an injunction, founded on an exclusive right, and to prevent irreparable injury.

5. That *Rufus Granger* had purchased in the shares of stock in the company, by false and fraudulent representations to the stockholders, for sinister purposes, without any intention of proceeding in the accomplishment of the objects of the grant to the plaintiffs. This evidence also the court rejected, on the ground that the facts, which it conduced to prove, were irrelevant to the questions on trial.

6. That neither the locks authorized by the act of 1798, nor any works for improving the navigation of the river, had been built ; and that such locks, if built, would not benefit the navigation. This evidence also the court rejected, on the ground that it was irrelevant, until the plaintiffs should endeavour to prove the converse of it ; that their right was not affected, by the omission ; and that any enquiry concerning the utility or benefit of the locks, was inadmissible.

The case, comprising the matters above stated, was reserved for the advice of this court, on all the questions arising thereon—particularly, whether the determinations of the court in rejecting the evidence offered by the defendants, was correct ; and whether the plaintiffs are entitled to any decree ; and if any, what the decree shall be.

*N. Smith* and *W. W. Ellsworth*, for the plaintiffs, contended, 1. That the plaintiffs had an indefeasible right to the privileges claimed by them, by virtue of their charter of incorporation and the subsequent acts of the General Assembly. The grant constituted a *contract*, the parties to which were the State, on the one hand, and the individuals who accepted the act of incorporation, and assumed the liabilities incident thereto, on the other. That the right of constructing locks and taking toll, at *Enfield* falls, was granted to the plaintiffs originally, is undeniable, and will not be controverted. What, then, has taken place since, to defeat their right? It is said, that certain conditions were annexed to the grant, which have not been performed. The conditions were, 1st, that a bond should be given to secure the erection of the bridge, in a limited time ; 2ndly, that the bridge and locks should be built by *May* 1805.

With regard to the bond, the substance of the condition has been performed, by the completion of the bridge itself, and by the acceptance of it, by the General Assembly, in full perform-

ance.   And with respect to the erection of locks, the company were, by the act of 1809, discharged from the obligation of the condition " until the further order of the General Assembly ;" and consequently, may proceed to build them now, or at any time during their corporate existence, unless the General Assembly shall fix upon some particular time for their erection. Besides, the bridge and locks are considered throughout as one thing ; and the extension of time as to one, is an extension as to the other.

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

But, if these conditions have not been performed, the grant is not of course determined   A franchise can only be determined, 1st, by limitation of time; 2ndly, by surrender under the corporate seal; or 3rdly, by judgment or process of *quo warranto.   Slee* v. *Bloom,* 5 *Johns. Chan. Rep.* 379.   None of these things have taken place.

Further, the grantor alone may take advantage of a condition broken ; and this must be done by an entry, or some act of equal solemnity.   *Chalker* v. *Chalker,* 1 *Conn. Rep.* 79   The grantor may also *waive* the breach of a condition.   *The Commonwealth* v. *The Union Fire and Marine Insurance Company,* 5 *Mass. Rep.* 230   A stranger cannot make this objection.

2.   That the right granted to the plaintiffs was *exclusive ;* and the act of 1824, granting the same right to the defendants, is void, being an infringement of the contract made with the plaintiffs.   The object of both grants is the same, *viz.* to improve the boat navigation of the river, and the exercise of the right granted to one party, will necessarily impair the value of that granted to the other.   The fact that the defendants' works are to be *the most extensive,* taking in boats and rafts above and below the plaintiffs' works, only shews, that they will be the more injurious to the plaintiffs.   Their right is like that of a fair, market or ferry, at a particular place.   It is, in its nature, exclusive.   It follows, that the grant to the defendants, is utterly void.   They are acting without the authority of the General Assembly.   *The King* v. *Amery,* 2 *Bro. Parl. Ca.* 336. (*Toml.* ed.)   *Dartmouth College* v. *Woodward,* 4 *Wheat.* 518.   *The Newburgh and Cochecton Turnpike Company* v. *Miller* & al. 5 *Johns. Chan. Rep.* 101.   2 *Swift's Dig.* 140, 1.

3.   That the plaintiffs are entitled to the relief sought.   If the charter of the defendants is void, it is clear, that they are guilty of a statute offence   Their works are also a private nuisance.   In such cases, courts of equity will interpose, by in-

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

junction.    *Livingston* & al. v. *Van Ingen* & al. 9 *Johns. Rep.* 506.    *The Newburgh and Cochecton Turnpike Company* v. *Miller* & al. 5 *Johns. Chan. Rep.* 101.    2 *Swift's Dig.* 140, 1.

The defendants cannot set up any equitable reason why they should be permitted to enjoy the privilege of erecting a nuisance, in violation of a legal private right.    Nor can these works be justified, on account of their affording to the public a benefit.    The public have no interest in supporting a nuisance. Suppose the individuals, who are constructing these works, did not offer any charter, (and a void charter is no charter) but merely claimed that they were acting for the public benefit ; could there be any pretence of a justification on this ground, or any doubt of the propriety of the court's interfering ?

4.  That the evidence offered by the defendants, was properly excluded.

That which related to the bond, has already been considered.

As to non-user : In the first place, the General Assembly acquiesced in the delay.    But aside from this, the non-user did not work a forfeiture of the grant ; and even if it might have that effect, this is not the way to get at it.

Similar remarks are applicable to the alleged misuer, and to *Granger's* speculation in the stock of the company.    These facts, if proved, would not authorize a court of chancery, on an application for an injunction, to vacate the plaintiffs' charter ; and if the plaintiffs' right remains, they are clearly irrelevant.

As to the inutility of the plaintiffs' franchise : Does their *right* depend upon the question whether their franchise is more or less valuable.    Is this the test of a man's title to his farm ? Can the legislature take *A* 's property from him, and give it to *B.,* because *B.* would make a better use of it ?    If this enquiry could be made, there could be no possible case where the legislature might not impair and defeat its own contract.—It is enough for the plaintiffs to say, "this franchise is *ours.*"

*Sherman* and *T. S. Williams,* for the defendants, contended, 1.  That no right was ever legally vested in the plaintiffs to make the locks.    The petitioners asked for a *bridge ;* and they wanted nothing else.    The General Assembly were apprehensive, that a bridge might injure the navigation, and to guard the public interest, in this respect, they subjected the company to

the burden of constructing locks for the passage of boats and rafts. No *liberty* is given to make locks ; but the plaintiffs are *required* to make them ; an onerous condition is imposed ; and a small toll is allowed as a partial remuneration.

2. That if the grant in question was the grant of a *right,* it was still a *limited* one, which expired in 1805, or at farthest, in 1809. The same act which conferred the grant, declared, that if the locks should not be completed within six years from *May* 1799, the grant should be *null* and *void.* No stronger language could be used, to signify, that the privilege granted should *cease.* " Void" means absolutely void, and not merely voidable. Nothing short of this will satisfy the plain import of the terms used, or effect the object of the legislature. The acts of 1805 and 1806 extending the time, related to the *bridge* only ; but if the locks are to be considered as included, the extension went no further than 1809.

3. That the grant to the plaintiffs became void, on their failure to comply with the condition on which it was made, *viz.* of giving bonds to the treasurer of the State. The facts must now be taken to be what the evidence offered by the defendants would have proved, if it had been received. The bond was required to secure the public against the damage, which might result, from obstructing the passage in a navigable river. It is apparent from the nature and object of the provision, that this was intended as *a condition precedent.* The plaintiffs had no right to put a stone into *Connecticut* river, without having complied with this condition.

4. That subsequently to 1805, there was no origination of right to construct locks. This appears from an inspection of the acts of the General Assembly. To effect the grant of a franchise, something more is necessary than the assumption of its existence.

5. That if any right in relation to the locks remained in the plaintiffs until *October* 1809, it was then, on the application of the plaintiffs, *suspended* until the further order of the General Assembly. By the application for this act of suspension, the plaintiffs offered to make at least a qualified surrender of their grant ; and the General Assembly accepted the offer. This is the most favourable aspect of the case for the plaintiffs. The exact truth is, that the General Assembly had imposed a burden upon them ; they petitioned to be relieved from it ; and the

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

General Assembly relieved them accordingly.   In either point of view, they now have no right, which they can exercise, without legislative interposition.

6. That the grant to the defendants is not void.   In the first place, it is not a direct interference with, or an invasion of, the right of the plaintiffs; but was fairly made, for the accomplishment of great public objects, which would otherwise be unattainable.   Here it may be admitted, that the thing granted to the plaintiffs, is granted to them exclusively, and cannot be granted to any one else.   But the General Assembly do not guaranty a monopoly in every grant.   A monopoly is never to be taken by construction.   So far as the express terms of the grant go, it is exclusive ; but no further.   If the legislature grant a bank, a lottery, or a turnpike road, the grantees become vested with an indefeasible and exclusive right to the thing granted ; but this will not preclude the legislature from granting other banks, lotteries or turnpike roads, though the value of former grants will thereby be considerably impaired. Secondly, the grant to the defendants provides *compensation* for damages done by their works.   Admitting, then, the grant to the defendants to be an infringement of the plaintiffs' right, it is a case of private property taken for public use, by making just compensation, or, it is, at least, within the *principle* of such a case.

7. That as the right claimed by the plaintiffs is at best doubtful, depending upon questions of fact as to a surrender by them of their grant, and as to the public importance of the grant to the defendants, which can be tried only by a jury ; as the defendants are doing no irreparable injury, and indeed no legal injury at all, to the plaintiffs ; and especially, as the plaintiffs are not in the actual possession and enjoyment of the franchise claimed by them ; this is not a proper case for the summary relief by injunction.   *Whitchurch* v. *Hide*, 2 *Atk.* 391. *Storm* v. *Mann*, 4 *Johns. Chan. Rep.* 21, 2.   *The Attorney General* v. *The Utica Insurance Company*, 2 *Johns. Chan. Rep.* 371.   *Hill* v. *Thompson*, 3 *Meriv.* 622.   *Harmer* v. *Plane*, 14 *Ves.* 132.   *The Croton Turnpike Company* v. *Ryder*, 1 *Johns. Chan. Rep.* 615.   *Eden on Injunc.* 167. 187.

8. That the evidence of nonuser, inutility, *laches* and fraud, offered, by the defendants, was relevant and proper, to shew, that the plaintiffs were not entitled to an injunction, if not to shew a forfeiture or abandonment of their right.

HOSMER, Ch. J.   The first enquiry in the case regards the *Hartford,* title of the plaintiffs averred in their bill.   As they were ex- June, 1828. plicitly authorized, by their charter of incorporation, to erect  Enfield Toll locks and to collect toll, it is only necessary, in conducting this  Bridge Co. enquiry, to consider the objections made by the defendants.  *v.* Connecticut River Co.

In the first place, they say, that the locks, by the original grant, were to be executed within six years from the rising of the General Assembly, in *May,* 1799 ; and that the prolonga- tion of this period afterwards, had relation to the *bridge* only. This objection is manifestly without any foundation.

It is admitted, that the resolves alluded to, literally had ref- erence to the bridge only ; but in their spirit and meaning, they equally extended to the locks.    From the act of *October,* 1798, it appears, that the erecting of a toll bridge was connected with the erection of locks in subserviency to it, in order *to avoid injuring the navigation of the river.*   It was stated to the General Assembly, that the otherwise pernicious effects of the bridge on the navigation, would be effectually prevented, provided the two locks were made ; and hence the building of the locks was a material motive for the grant of the bridge. The General Assembly never intended to hazard the great interests of navigation, by permitting the erection of a bridge only.    The locks were designed to be coexistent with the bridge, in order to correct any ill consequences resulting from this measure.    Hence, when the period for building the bridge was extended, the erection of the locks, as an indispensable adjunct, was likewise extended.

The whole of the proceedings of the General Assembly ex- hibit the most incontrovertible evidence of this truth.    Upon the construction of the defendants, the right to erect the locks expired in *May,* 1805 ; and yet in 1808, we find the General Assembly authorizing the excavation of the river *in lieu of the locks.*   Of what locks, it may be asked.    Of those locks, the right to erect which, on the defendants' construction, had ex- pired three years before.    Nor is this all.    In the same act, it is declared, by the General Assembly, that "the said corpora- tion are not, by this resolve, in any respect, *excused* or restrain- ed from making locks and canals as aforesaid, *at any time during the continuance of their said grant,* and receiving the toll to them granted for passing the same, if the present provis- ion [by excavation] shall be found insufficient for the naviga- tion of said river."    This is a clear recognition of the right to

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

erect the locks, as existing at that time.   But, if it did exist, it was only by force of the resolve extending the time for building the bridge.   At the same session of the General Assembly, *Oliver Mather* and others were appointed to inspect the bridge and *the locks and canals,* or shore channel, thereto annexed, and to accept the same.   This is another recognition of the plaintiffs' right to build and enjoy the locks.   We find the General Assembly afterwards, in *October* of the same year, on the request of the plaintiffs, appointing *Asher Miller* and others a committee to report what, in their opinion, was the best mode of *erecting the locks* to subserve the public interest, without sacrificing *the rights and interests* of the plaintiffs.   If it is asked, what rights, the answer is obvious ; the rights of the plaintiffs *to build the locks,* derived from the act of 1798 ; for they had no other.   The committee reported the erection of another lock, at a different place, and that instead of the locks over *Mad Tom* and *Surf* bars, there should be one lock only on the *Eastern* bank of the river.   This report was, so far as relates to the facts found by the committee, accepted ; and it was resolved, that the building of locks upon the falls, by the said company, *be suspended,* and that the said company be discharged from the obligation to build the same *until the further order of the Assembly.*   Thus, in *October,* 1809, the right of the plaintiffs to erect the locks, was again acknowledged, and the building of them, for a time, was *suspended ;* but neither their right, nor the obligation, to build, was discharged. The argument of the defendants on the resolve just cited, is founded on a departure from the plain words used by the General Assembly.   Had the expression been, the *right* of the company is suspended, until the further order of the General Assembly, the comment would have been just, if the Assembly had authority to pass the resolution.   But the words are, that the *building*—not the right to build—be intermitted ; and were obviously intended, in view of the existing doubts as to the best mode of erecting the locks, to relieve from an obligation, and not to terminate a right.   The General Assembly had no authority, innate or derived, to impair the rights of the plaintiffs ; nor have they attempted it.   No order to build the locks has yet been issued ; and the rights of the plaintiffs remain, unless some other consideration may affect them, precisely what they were in 1809.   They have authority to build the locks, originating by grant in 1798 ; preserved by repeated

acts, prolonging the period for erecting them; recognized, by the General Assembly, over and over again, until the year 1809; and then the actual exercise of the right by building, was permitted to be in suspense until further direction.

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

It was objected, in the next place, that the plaiatiffs did not give bond to erect and finish the bridge pursuant to the charter; that this was a condition precedent; and that, by reason of this omission, the plaintiffs have acquired no right, or at least, have forfeited the right before acquired.

This objection has been argued for the defendants, by the application of an inapplicable legal position, and by a recurrence to the most technical principles of the common law. The condition, (if such it may be called,) was not precedent to the plaintiffs' right. The charter constituted them a corporation, and conferred on them a franchise. Before they could proceed to the actual exercise of that part of the right conferred, they were to give bond; but the bond was to be given subsequently to the title granted. Besides, no person could take advantage of the omission to give bond but the General Assembly; and *per se* it worked no forfeiture; the effect of a subsequent condition broken being only to render an estate defeasible at the option of the grantor. Vid. *Chalker* v. *Chalker,* 1 *Conn. Rep.* 79. The breach may always be waived; and this may always be done expressly, or by implication. In this case, the breach of the supposed condition was constructively waived, by the acceptance of the bridge, as well as by the various resolves prolonging the time for the erection of it. Thus the case would stand at common law; but in chancery, the breach of a condition, whether precedent or subsequent, is always relieved against, if compensation can be made. *Hayward* v. *Angell,* 1 *Vern.* 222. 2 *Cruise's Dig.* 40. & seq. *Walker* & al. v. *Wheeler* & al. 2 *Conn. Rep.* 299. If, therefore, there had been no waiver of the breach of the condition, and a bridge had been built, in all respects, pursuant to the charter, a court of chancery would not hear an objection so inequitable as the one made concerning the locks.

It has been also urged for the defendants, that the plaintiffs have extinguished their franchise, by surrendering it to the General Assembly. That a corporation may be dissolved, and its franchises relinquished, by a surrender of record, is not disputed; (2 *Kent's Comm.* 250.) but the surrender must be accepted by government. In this case, there has neither been

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

a surrender, nor the acceptance of a surrender.   The applica-tion by the plaintiffs to the General Assembly, praying the ap-pointment of a committee to view and examine, at their ex-pense, the falls in the river, and to report their opinion as to the best mode of erecting the locks, was made with this express reservation, that *their rights and interests were not to be sacri-ficed.*   And on the coming in of the report, the General As-sembly merely *suspended* the building of the locks, and relieved the company from an obligation to build until their further order.   But their right to build the locks remained, and was exercisable at their pleasure.

The objection of waiver by the plaintiffs, in another part of the case, may be very essential ; but though a corporation may be dissolved, by non-user or misuser, and its franchises lost, yet the default must be judicially determined in a suit in-stituted for that purpose.   *The King* v. *Amery,* 2 *Term Rep.* 515.   *Slee* v. *Bloom* & al. 5 *Johns. Ch. Rep.* 366. 379. 380. *Terrett* & al. v. *Taylor* & al. 9 *Cranch* 51.   *The Common-wealth* v. *The Union Fire and Marine Insurance Company in Newburyport,* 5 *Mass. Rep.* 230.   So far as this Court can enquire, that nothing has been done or omitted to impair or destroy the plaintiffs' title under the charter, I hold to be ex-tremely clear.   Assuming the right of the plaintiffs to the franchise before mentioned, I am brought to consider the sec-ond point in the case.

2. The defendants were incorporated, in *May,* 1824, with power to lock the *Enfield* falls, and have organized themselves. They are collecting materials, and preparing to construct a canal and locks, on or near the bank, on the *West* side of *Con-necticut* river, directly opposite to the place granted and desig-nated for the erection of the locks, by the *Enfield Bridge Company.*   They claim a right to do this, on several distinct grounds.   Two of them have already been disposed of, *viz.* that the plaintiffs have no title, and that they have forfeited their grant by non-user or misuser.

The defendants assume it as clear, that the locks are no privilege to the plaintiffs, but a burden imposed on them ; and that a prior act of the General Assembly to incorporate *John L. Sullivan* and his associates, in subversion of their franchise, received their assent.

It belongs to the plaintiffs to determine, whether the erec-tion of the locks, which they are empowered to erect, will, or

will not, be a burden ; nor are there materials before the court, if the enquiry were relevant, fully to decide on this point. It is a part of their franchise ; and from all persons passing through their locks, they are authorized to take toll. *Prima facie,* it is a privilege, and may be very valuable ; and in all events, it is a right with which they are invested. As to *Sullivan's* incorporation, it was a transaction to which the plaintiffs are strangers ; to which, so far as the facts found authorize an opinion, they never assented ; and which appears to have been unconstitutional and void.

*Hartford, June,* 1828.

Enfield Toll Bridge Co. *v.* Connecticut River Co.

It is contended by the defendants, as the superior court rejected the testimony offered, to prove, that the locks of the plaintiffs would be of no public use or benefit, that this fact should now be taken for granted, so far as relates to the determination of this court. The principle is sound, but of no effect ; as it matters not whether the public will, or will not, derive an advantage from the plaintiffs' grant. The plaintiffs stand on their right to a franchise duly conferred ; and to rescind or impair it, the General Assembly is not authorized. Such considerations, said the late Chancellor *Kent,* in *The Newburgh and Cochecton Turnpike Company* v. *Miller* & al. 5 *Johns. Chan. Rep.* 109. I shall lay out of view, as altogether inapplicable to the question of right ; the plaintiffs are in possession of a franchise or statute privilege, of which they cannot be divested, by such considerations.

That the bridge has not been in existence for ten years past, is made a further objection ; but it has no bearing on the title of the plaintiffs. This non-user, if it is claimed to be a forfeiture, as has already been shewn, must be judicially determined in a suit instituted for that purpose. It is not the subject of enquiry, so far as regards the plaintiffs' title, in the case before us. The same answer is applicable to the misuser, by the speculation of *Granger,* in the purchase of stock, and to the other facts offered in proof, to shew an abuse of the plaintiffs' privilege.

It has been insisted, that the charter to the *Connecticut River Company* is constitutional ; that it does not interfere with the plaintiffs' grant, or at least, only in a degree so remote, that the General Assembly, in promotion of the public good, was authorized to make the grant ; and even that the franchise of the plaintiffs may be taken away, on sufficient indemnity.

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

To each of these suggestions I will briefly reply.

It is quite too late to maintain, that a state, by its law or charter, can impair the obligation of a contract. The prohibitory clause in the constitution of the *United States,* is conclusive on this subject. A grant is a contract within the meaning of the constitution. The point is fully settled, that a legislative grant, competently made, vests an indefeasible and an irrevocable title. Nor can the legislature repeal statutes creating private corporations, and by such repeal, or by grant without such repeal, vest the property in others, without the consent or default of the corporators. Both the letter and the spirit of the constitution of the *United States* are violated, by such a proceeding, as well as the fundamental principles of natural justice and of the social compact. Thus far, there exists no controversy. *Fletcher* v *Peck,* 6 *Cranch,* 87. *The State of New-Jersey* v. *Wilson,* 7 *Cranch,* 164. *Terrett* & al. v. *Taylor* & al. 9 *Cranch,* 43. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 518.

But a legislative grant is open to construction; and its obligation must be ascertained, by the plain meaning of its expressions, in reference to the subject matter of the contract. Every grant is exclusive within the boundary of its obligation and extent, and may not be impaired, in the minutest degree. It is not a principle, that a grant may be infringed upon, if the variation be not great. As every variation violates, small injuries are as much prohibited as larger ones; and the least right is as anxiously protected as the greatest. *Green* & al. v. *Biddle,* 8 *Wheat.* 1 When, however, a grant of any franchise is made, it will be carried no further than a just construction of it will warrant. Hence, a turnpike or a ferry may be granted at such distance from one that is prior in time, as the public good requires; if it appears on a just exposition of the first grant, that there is no interference within its limits. In *The Newburgh and Cochecton Turnpike Company* v. *Miller* & al. 5 *Johns. Chan. Rep.* 101. it was justly said, by Chancellor *Kent,* "that no rival road, bridge, ferry, or other establishment of a similar kind, and for like purposes, can be tolerated so near to the other, as materially to affect or take away its custom. It operates as a fraud on the grant, and goes to defeat it. The consideration, by which individuals are invited to expend money upon great, expensive and hazardous public works, as roads or bridges, and to become bound to keep them in con-

stant repair, is the grant of the right to *an exclusive toll.* This right, thus purchased for a valuable consideration, cannot be taken away, by direct or indirect means, devised for the purpose, both of which are unlawful." These principles, emanating from high authority, are equally just and sound, and their application is clear and obvious. If the works contemplated by the *Connecticut River Company* are constructed, they cannot fail to be injurious to the plaintiffs' franchise ; and at least, must materially affect and take away their custom, and diminish the toll they otherwise would receive. The point is too clear to stand in need of remark. I will only observe, that the grant to the plaintiffs was intended to confer on them a right to all the toll for facilitating the passage across the bars before-mentioned ; and the subsequent grant to the *Connecticut River Company* was for the same purpose. The latter grant, from its extent, receiving persons into the canal proposed to be made, at a superior point, would engross the custom, and nearly annihilate the toll receivable, by the *Enfield Bridge Company*

Whether the grant to the plaintiffs may be taken away, on suitable indemnity, in order the better to accommodate the public, is a point on which no opinion is necessary. No legal indemnity has been provided ; nor have the public a right, where there is no existing law obligatory on the person invested with property, to take away his estate, on their own ideas of a fit indemnity. In such case, the public is only an individual treating with an individual ; and a provision, in some just and adequate manner, for compensation, is a necessary attendant on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property without his consent. *Gardner* v. *Newburgh* & al. 2 *Johns. Chan. Rep.* 162. Vid. 2 *Kent's Comm.* 275.

Now, what is the supposed indemnity ? It is in the act incorporating *Sullivan* and others, if any where. This act affects to consider the right of the plaintiffs at an end, and proposes to reinvest them with the franchise of locking *Enfield* falls, if within thirty days from the rising of the General Assembly, a majority of the proprietors should pass a vote, and take measures to carry the same into effect without delay. If this new grant is not accepted, the plaintiffs have the option given them of subscribing for one half of the shares in the new

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

*Hartford,*
*June, 1828.*

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co,

corporation.   In effect, the plaintiffs, in lieu of their franchise, are permitted to purchase the *moiety* of an equivalent franchise, and to become associates with strangers.   If the grant to *Sullivan* and others were of any validity, to call the above provision an indemnity, would be an abuse of language.

On the whole, I entertain no doubt, that the title of the plaintiffs exists ; and that under the charter of 1824, the defendants acquired no right to do the acts they contemplated.

3. The question then arises, whether a court of chancery will, on the facts in this case, decree an injunction.

I put out of consideration the argument founded on irreparable mischief.   The acts contemplated by the defendants cannot be destructive of the plaintiffs' franchise, or injure it beyond reparation, but is susceptible of a perfect pecuniary satisfaction.   So long as the intended canal should exist, and be in operation, the franchise of the plaintiffs, when in actual enjoyment, would be of little worth.   But when the operation of the canal should be made to cease, an event entirely practicable, the damage of the plaintiffs would cease likewise.

An injunction is not *ex debito justitiæ* for an injury threatened or done to the estate or rights of a person ;  but the granting it must always rest in sound discretion, governed by the nature of the case.   *Roberts* v. *Anderson,* 2 *Johns. Chan. Rep.* 202. If the right is not doubtful, an injunction will always be granted to secure the enjoyment of a statute privilege, *of which the party is in the actual possession.   Livingston* & al. v. *Van Ingen* & al. 9 *Johns. Rep.* 507. 587.   *The Croton Turnpike Company* v. *Ryder* & al. 1 *Johns. Chan. Rep.* 611.   *The Newburgh and Cochecton Turnpike Company* v. *Miller* & al. 5 *Johns. Chan. Rep.* 101.   *Ogden* v. *Gibbons,* 4 *Johns. Chan. Rep.* 150.   On a careful examination of all the cases cited by counsel, and of others bearing on the same point, I do not find, that chancery has gone beyond this limit.   To prevent or suppress an act, in the cases alluded to, that by possibility may be injurious in future, short of irreparable damages, I am not aware that chancery has ever interposed.   In the case of *The Newburgh and Cochecton Turnpike Company* v. *Miller* & al., of *The Croton Turnpike Company* v. *Ryder* & al., of *Ogden* v. *Gibbons,* of *Belknap* & al. v. *Belknap* & al , 2 *Johns. Chan. Rep.* 463., of *Livingston* & al. v. *Van Ingen* & al. 9 *Johns. Rep.* 507. and those referred to in the 2nd vol. of *Swift's*

*Digest* 140, 1., all of which were cited for the plaintiffs, the *Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.
injunctions were for damage to the persons, who were in the
*actual enjoyment* of the estate affected. To the same effect
there have been other determinations. *Bush* v. *Western,*
*Prec. Chan.* 530. *Anon.* 1 *Ves.* 476. *Harrier* v. *Plane,* 14
*Ves.* 132. *Hill* v. *Thompson* & al. 3 *Meriv.* 622. These de-
cisions are all highly just and reasonable. To restrain multi-
plicity of suits, and prevent immediate damage to a statute pri-
vilege, is the exercise of a sound discretion. But to prevent
future damage that by possibility may arise, when the plaintiff
is not in the possession or enjoyment of a franchise, and perhaps
never may be, a court of equity is not called upon to exercise
its extraordinary powers. On the same principles, it was ob-
served by Lord *Hardwicke,* in the case of *Coulson* v. *White,* 3
*Atk.* 21., that every common trespass is not a foundation for
an injunction, when it is only *contingent* and temporary.

In an anonymous case in 1 *Ves.* 476. an injunction was de-
nied, to restrain the defendants from using ferry-boats on the
river *Tyne,* because the plaintiffs had not shewn, that they had
kept up a sufficient number of ferry-boats. *Eden* 165. And
where a party has been guilty of great laches, the court has
refused to interpose against the erection of a nuisance. 2 *Eq.*
*Ca. Abr.* 522. Injunctions are sometimes granted to quiet the
possession ; but, in such cases, the party applying must have
had peaceable possession of the premises by the space of three
years, before the filing of the bill. *Eden* 240.

In the case before the court, the several grounds of denying
an injunction before-mentioned, conspire.

The plaintiffs are not in the possession or enjoyment of their
franchise ; and whether they ever will be, is matter of contin-
gency.

The public have a deep interest in the commodious naviga-
tion of *Connecticut* river, and it is peculiarly inequitable, that the
rights of a community should be sacrificed, to insure the fran-
chise of the plaintiffs from all possible damage, while they are
in the actual enjoyment of it, and have taken no measures to pay
the price of their charter. This, however, is not all. Twenty
years have elapsed, and nothing has been done, by the plaintiffs,
to benefit the navigation of *Connecticut* river. For this extra-
ordinary degree of laches no apology is derived from the omis-
sion of an order, by the General Assembly. No application
has been made to them, by the plaintiffs, to turn their attention

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

to this subject.   Nor does it appear, that any effectual meas- ures have been taken, or are even contemplated, to bring this lethargy to a termination.   A small piece of ground has been purchased, and this is all ; except the declarations now made of an invisible intention to do what might and ought to have been done long since.

For the interposition of the court, I discern no justifiable ground, and advise that the plaintiff's bill be not granted.

DAGGETT, J.   There are some points presented, in this case, about which I entertain no doubt ; as

1. Did the failure of the plaintiffs to give the bond directed by the several acts of *October* 1798, *May* 1805 and *May* 1806, or their neglect to erect the bridge and locks within the time limited, defeat the charter, or cause it to cease ?   I think not. These acts are not in the nature of conditions precedent or lim- itations.   They are not dependent on the doing of certain acts, or to cease upon the happening of certain events, like a grant to a certain person, tenant of the manor of *Dale,* or to a widow until married.   They are more like conditions subse- quent, of a breach of which the grantor only, or the state, could take advantage.   If this be so, then the charter is valid, this objection notwithstanding ; for the state has not only not sought to resume the grant directly, but has, in the resolves of *May* 1808, *October* 1808, *October* 1809 and *October* 1818, re- cognized this franchise of the plaintiffs—to a certain extent, at least.

2. I see no proof of a direct surrender of the right of the *Enfield Bridge Company,* if such it may be called, to construct locks.   There is evidence of a desire of the company to modi- fy it, and perhaps to be relieved from it as a burden.   Of this I shall speak more fully for another purpose.

3. Was the grant to this company exclusive ?   On this point I have no doubt.   It is not like cases put at the bar of grants of turnpike companies, of ferries, of banks, &c.   A grant to a company to construct locks around the bars at the upper falls, exhausts the power of the legislature of locking those falls   A grant to another company to lock the same falls, would be a palpable infringement of the first grant.   In its nature, it would be to strip the first grantees of essential rights, the power of reimbursing themselves for necessary and heavy expenditures. Such an act would be void, as opposed to common right, and

to the constitution of the *United States ;* and it would be the clear duty of the court to disregard it.

*Hartford,*
June, 1828.

Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

4. Could the legislature resume this grant, upon compensation ? I perceive nothing in the case to warrant such an assumption of power. The use of land may be taken for public purposes, by common law, by the constitution of this state, and that of the *United States ;* but I am not aware, that the vested rights of a corporation in a franchise, in the possession and execution of which the public interest may be as well subserved, by one company as by another, can be thus taken. Could the state of *Connecticut* divest the several banks of their chartered rights, to make room for a state bank ;—unless, indeed, the power be reserved in the grant, as is the fact in relation to some of them. Nor am I satisfied, that the act of 1824, under which the defendants claim, does make provision for compensation to the *Enfield Bridge Company.*

Still important questions remain to be considered ; as

1. On a fair view of the acts of the legislature, can this company proceed to erect locks, without legislative interposition ? I think not. The power given in 1798, so far as it authorizes the construction of locks, imposes it as a burden. This appears by the proviso ; and the power now so strenuously claimed is only noticed as to the taking of tolls ; nor is it noticed at all, in the subsequent acts of *May* 1805 and *May* 1806. The object of the petitioners for the grant, was a *bridge ;* and the act is conversant only about a *bridge.* Locks are noticed only in the acts of 1808 and 1809 with the same view ; and in the latter act, the building of locks was *suspended,* and the company discharged "until the further order of the Assembly." Obvious, then, is it from the face of the petitions of the *Enfield Bridge Company,* and the acts of the General Assembly consequent thereon, that the company considered the locks as a burden, from which they sought, and obtained, relief. Hence there appears

2. A reason for their total neglect of these locks ; and hence they are not in the *exercise* and *enjoyment* of any right or privilege in relation to locking these falls. This right was indeed granted, or rather, this burden was imposed, thirty years ago, and twenty-six years before a direct grant for this great public object, to the defendants. It lay dormant in the plaintiffs from 1809 to 1824, a period of fifteen years, unless the grant to *Sullivan* and others, in 1818, can be deemed to revive it. That

*Hartford,*
*June, 1828.*
───────
Enfield Toll
Bridge Co.
*v.*
Connecticut
River Co.

act was not made at the request of this company, or designed at all for their benefit. It treated this company as not opera‑ ting under their grant.

In this very brief view of the case, it appears to me, that to grant the injunction prayed for, will be to permit the *Enfield Bridge Company* to lie by, hold this franchise, and prevent the legislature from authorizing any other company to do what in 1809 was expected, by the state and the plaintiffs, *viz.* locking both the upper and lower falls. It would be an unwarrantable exercise of power in a court of chancery, under these circum‑ stances, to grant an injunction. The plaintiffs are not in the *exercise* and *enjoyment* of any right, which the defendants are attempting to infringe. If they have a strict legal right, let them establish it in a court of law.

Without adverting to many other topics, discussed at the bar, I entirely concur in refusing the injunction

PETERS, J. concurred in the views of Judge *Daggett.*

BRAINARD, J. was absent.

LANMAN, J. concurred in the result ; but what were his views upon the particular points discussed, the reporter has not been able to ascertain.

Bill to be dismissed.

───────

THE STATE OF CONNECTICUT *against* SHEPARD.

A former conviction on an indictment for an attempt to commit a rape, is a good bar to an indictment for a rape ; the former offence being necessarily included in the latter.

Therefore, proof of a rape, will sustain an indictment for an attempt to com‑ mit a rape.

This was an indictment for an assault on the body of *Rebecca Sloper*, with an intent to commit a rape.

The prisoner was tried on the plea of *Not guilty*, at *Hartford, September* term, 1827, before *Daggett*, J.

On the trial, *Rebecca Sloper* testified, that the prisoner had carnal knowledge of her body, contrary to her will, and without

any consent on her part : That she was asleep, when he entered her bed about midnight, having been deprived of her sleep the night before, and being much fatigued, by taking care of her young children : That she did not discover the fact until he had violated her person, and that her first impression, on discovering the fact, was that it was her husband : That as soon as she awoke, and became sensible of her situation, the prisoner sprang from her bed.

<div style="float:right"><em>Hartford,</em> June, 1828.<br><br>State <em>v.</em> Shepard.</div>

The counsel for the prisoner contended, that, if there was a carnal knowledge of her body, it was a rape ; and that the prisoner could not, therefore be convicted on this indictment, as the less crime was merged in the greater. The judge instructed the jury, that if they were satisfied with the proof, the prisoner might be convicted on the indictment, although he had actual carnal knowledge of her body.

The jury returned a verdict of *Guilty;* and the prisoner moved for a new trial, on the ground of a misdirection.

*T. S. Williams*, in support of the motion, contended, That rape and an attempt to commit a rape were distinct offences, requiring distinct indictments. It has never been known in *Connecticut*, that a man has been convicted of an attempt to commit a rape on an indictment for a rape. One offence does not include the other, as murder includes manslaughter. If so, then a conviction of this offence would be no bar to an indictment for a rape ; and consequently, if the prisoner can be convicted and punished, on this indictment, he may be convicted and punished *twice*, for the same act.

*Toucey* and *J. Griswold*, contra, insisted, That a conviction or acquittal of an attempt to commit a rape, though a rape may in fact have been committed, will bar a prosecution for the rape, the former being *necessarily* included in the latter. *Foster's Cr. L.* 328, 9. 1 *Chitt. Cr. L.* 639. (*1st Lond. ed.*) 2 *Hale's P. C.* 246. *Wrote* v. *Wigges*, 4 *Rep.* 45. *b.* *Holcroft's* case, cited 4 *Rep.* 46. *b.* *The Commonwealth* v. *Cooper*, 15 *Mass. Rep.* 187. *Hawk. P. C. lib.* 2. *c.* 23. *s.* 47. *The State* v. *Evans*, Superior Court, *Tolland* county, 1803.

**Daggett, J.** In support of the motion, the counsel for the prisoner relies solely on this position, *viz.* that he may *now* be

indicted for a rape ; and therefore, may be *twice* punished for one offence.

At the trial at the circuit, the only point urged, was, that the less crime was merged in the greater,—*the attempt to commit a rape*, merged in the *actual rape*    In support of this position, 1 *East's Crown Law*, 411. 440. was cited    It is indeed there said, that Mr. Justice *Buller* so decided, in a case before him, at the *Winchester Spring Assizes*, 1787.

With all deference for the opinion of that learned Judge, it is doubtful, if the doctrine by him laid down, can be supported. There would seem to be little reason for the acquittal of a prisoner, because the offence *proved* is more aggravated, than the one *charged*, if it be of the same nature ; nor, in such case, could the prisoner have just cause of complaint—nor is this opinion upheld by any other authority.    It is, therefore, now abandoned in the argument, and a more rational position assume ; a position, which, if well founded, is of great weight, and ought to vacate the judgment of conviction in the court below.    If the conviction there cannot be pleaded in bar of an indictment for a rape, then he may be tried again ; and, as he has already suffered, and is still enduring a punishment for the less crime, and may be condemned and suffer for the greater, he may be twice punished for the same fact,—a doctrine repugnant to well established principles of law.    I am satisfied, that had the prisoner been acquitted on this trial, he could have availed himself of the acquittal, on an indictment for rape ; and since he has been *convicted* for the *attempt*, the conviction is a good bar to a prosecution for a rape.

He has been convicted of an *assault, with an attempt to commit a rape ;* for this he has been punished.    Of these facts he has been found guilty ; and they must be alleged, and proved, to convict him of a rape.    But, for these facts he cannot be tried again ; otherwise, he might be twice punished for the same fact.    In *The Commonwealth* v. *Cooper*, 15 *Mass. Rep.* 187. the supreme court decided, that, " where one is indicted for a rape, and the jury cannot agree to convict him, they may find him guilty of an assault with intent to commit a rape," as *that* was necessarily included in the greater crime.

The law is well settled, that upon an indictment for petit treason, in a servant's killing his master, for example, an acquittal on conviction of murder for the same killing, is a good bar.    2 *Hale's P. C.* 246.    So, if a man be acquitted upon an

indictment for murder, it is a good plea to an indictment for manslaughter of the same person ; or, *e converso,* if he be indicted of manslaughter, and be acquitted, he shall not be indicted for the same death or murder, for they differ only in degree, and the fact is the same. *Holcroft's* case, 4 *Co. Rep.* 46. *b.* So, if a person be on trial for theft, and by the proof, it should appear, that the theft was accompanied with such facts as would constitute robbery, an acquittal or conviction of the larceny, would be a bar to an indictment for robbery. The same fact of stealing, is, in both cases, the subject of enquiry, and in both cases, essential.

In this view of the case, there appears no sufficient ground for a new trial. The prisoner cannot be again indicted for the facts charged ; and had he been acquitted, it must have been a bar to any future prosecution. He therefore would escape punishment, not because he was innocent, but for the very strange reason, that he was too guilty.

The rule for a new trial, must be discharged.

The other Judges were of the same opinion, except BRAINARD, J., who was absent.

> New trial not to be granted.

<div style="margin-left:2em; float:right;">
*Hartford,*
June, 1828.

State
*v.*
Shepard
</div>

---

## COOK *against* BRADLEY :

### IN ERROR.

A mere written contract is upon the footing of a parol contract, and requires a consideration to support it.

A subsisting legal obligation to do a thing, is a sufficient consideration for a promise to do that thing.

A son of sufficient ability is under no legal obligation to pay for past expenditures, made for the relief of an indigent parent.

A moral obligation is available as a consideration for an express promise, in those cases, and in those only, where a prior legal obligation has existed, which, by reason of some statute, or stubborn rule of law, cannot now be enforced.

Therefore, where *A.* had furnished necessaries to *B.,* who was indigent, and in need of relief, and *C.,* the son of *B.,* who was of sufficient ability, signed and delivered to *A.* a writing in these words : " This may certify, that the debt now due from my father *B.* to *A.,* I acknowledge to be for necessaries *of* life, and *of* such a nature, that I consider myself hereby obligated to pay *A.* 60 dollars towards said debt now due, provided my father does not settle with *A.* in his life-time ;" it was held, that this contract was void, for want of consideration, and consequently, that no action could be supported on it.

*Litchfield,*
*June, 1828.*

Cook
*v.*
Bradley.

THIS was a bill in chancery, brought by *Bradley* against *Han-nah Cook*, administratrix of *Henry Cook*, deceased, praying for the correction of a mistake in a discharge given by *Bradley* to *Henry Cook*, or for an injunction against the use of that discharge in an action at law, pending in the superior court.

The bill stated the following case.   On the 18th of *February*, 1808, *Jonathan Cook* was indebted to *Bradley*, in the sum of 60 dollars, for goods necessary for his sustenance, before that time furnished, by *Bradley*, to him, at his request, he being then poor, and needing relief, and unable to provide for himself.   *Henry Cook*, the only child of *Jonathan*, was possessed of a large estate, and was of sufficient ability to support his father.   On the day above mentioned, he signed and delivered to *Bradley* a writing in these words : " This may certify, that the debt now due from my father, *Jonathan Cook*, to *Joel Bradley*, I acknowledge to be for necessaries of life, and of such a nature that I consider myself hereby obligated to pay said *Bradley* sixty dollars towards said debt now due, provided my father does not settle with said *Bradley* in his life-time; and it is agreed by said *Bradley*, that he will take any kind of produce or stock that is not old, at their value, or as they are going in the neighbouring towns.   Witness my hand, this 18th day of *February*, 1808.                    *Henry Cook.*"

*Jonathan Cook* died on the 1st of *September*, 1821, without having paid or settled for any part of said debt ; and about two years afterwards, *Henry Cook* died.   The debt remaining still unpaid, in *September*, 1824, *Bradley* brought an action of *assumpsit* on the writing given by *Henry Cook*, against *Hannah Cook*, his administratrix ; who pleaded in bar the following discharge : " Received, *Litchfield, January* 5th, 1820, of *Henry Cook*, ten dollars in full of all claims and demands to this date.                    *Joel  Bradley.*"

This discharge had been given under these circumstances. *Bradley* had previously brought an action of book debt against *Henry Cook ;* but said debt of 60 dollars formed no part of the claim in controversy.   This suit was settled by the parties, each agreeing to give the other a discharge from all claims and demands in such suit ; but from inadvertence, and contrary to the intention of the parties, the discharges were drawn so as to extend to all claims and demands whatever, and were so executed.    Within ten minutes after the discharges were delivered, *Bradley* discovered the mistake, and requested of *Cook* that he would suffer it to be corrected ; which he refused to do.

On a demurrer to this bill, the superior court adjudged the *Litchfield,* bill sufficient, and passed the decree sought.　On motion of June, 1828. the defendant, the record was transmitted to this Court for revision.

Cook
*v.*
Bradley.

*S. Church* and *T. Smith,* for the plaintiff in error, contended, 1. That it appears from the bill, that the contract upon which the plaintiff's action at law is founded, is invalid, for want of consideration ; and therefore, the relief sought, if granted, would be unavailable.　The necessaries were furnished to *Jonathan Cook,* upon *his* credit, and at *his* request, and without expectation of recourse to *Henry Cook.*　The consideration is, therefore, not only liable to the objection of being past and ex-ecuted, but *Henry Cook* was an entire *stranger* to it.　*Bulkley* & al. v. *Landon* & al. 2 *Conn. Rep.* 404. 410. 416.

It will be said in reply, that *Henry Cook* was under a moral obligation to pay the debt in question ; and that this was a suf-ficient consideration to support the contract.　But it is not universally true, that a mere moral obligation will constitute a consideration sufficient to support a promise.　From an exam-ination of all the cases, it will appear, that a moral obligation will furnish a legal consideration for a contract, in two classes of cases only : 1st, where there has been an antecedent legal lia-bility, which cannot now be enforced—*e. g.* a debt discharged by a certificate of bankruptcy, or barred by the statute of lim-itations ; 2ndly, where an act has been done at the request, or for the benefit, of the person making the promise, but under such circumstances as to create no legal liability—*e. g.* infan-cy, coverture with a separate maintenance, usury after the taint has been removed.　3 *Bos. & Pull.* 249. n.　*Smith* v. *Ware,* 13 *Johns. Rep.* 257.　*Mills* v. *Wyman,* 3 *Pick.* 207. *Edwards* & ux. v. *Davis,* 16 *Johns. Rep.* 281. 283. n.　*Yelv. Rep.* 41 b. *(Metcalf's ed.)*　*Frear* v. *Hardenbergh,* 5 *Johns. Rep.* 272.　*Early* v. *Mahon,* 19 *Johns. Rep.* 147.　*Barnes* & al. v. *Headly,* 2 *Taun.* 184　This case falls within neither of the classes specified.　*Henry Cook* was never liable to pay for the goods ; nor were they furnished at his request, or for his benefit.　Even a legal obligation in one right, is no foundation of a promise to pay in another.　*Rann* v. *Hughes* & al. 7 *Term Rep.* 350. n.

2. That the instrument pleaded in bar may be avoided at law, as well as in chancery, by shewing the mistake.　3 *Stark.*

*Evid.* 1272. & n.   Consequently, the plaintiff has adequate remedy at law.

*J. W. Huntington* and *D. C. Sanford*, for the defendant in error, contended, 1. That the consideration stated in the bill, was sufficient.   The parent was poor, and needed the relief furnished ; the son was of sufficient ability to support him ; and the plaintiff relieved the parent's necessities.   Under these circumstances, the son, in the first place, was under a *moral* obligation to pay for the supplies furnished.   1 *Bla. Comm.* 453. 3 *Conn. Rep.* 511.   And this was a sufficient consideration for his promise.   It was declared to be, by Lord *Mansfield*, in *Atkins* & ux. v. *Hill, Cowp.* 288, 9. by the same and *Buller*, J. in *Hawkes* & ux. v. *Saunders, Cowp.* 290, 1. by Lord *Mansfield* again, in *Trueman* v. *Fenton, Cowp.* 544. 548. by Lord *Ellenborough,* in *Atkins* & al. v. *Banwell,* 2 *East,* 505. and by the whole court of common pleas, in *Lee* v. *Muggeridge* & al. 5 *Taun.* 36.   The same doctrine has been advanced as undoubted law, by every *English* elementary writer, since the determination of *Atkins* & ux. v. *Hill.*   See 2 *Bla. Com.* 445, and *Christian's* note (3).   *Bull. N. P.* 129. 147.   1 *Esp. Dig.* 95.   1 *Selw. N. P.* 1.   *Com. on Contr.* 24. 3 *Wooddes. Lect.* 143.   1 *Fonb. Eq.* 336.   2 *Evans' Poth.* 20. And in an anonymous case, in 2 *Show.* 184. and in *Scott* v. *Nelson,* cited *Esp. Dig.* 95. it was expressly decided.   This doctrine was never questioned in *England,* until *Bosanquet* and *Puller* published their note to *Wennall* v. *Adney,* 3 *Bos. & Pull.* 249, more than thirty years after the determination of *Atkins* and ux. v. *Hill ;* and it was expressly repudiated in the case of *Lee* v. *Muggeridge* & al.   In *Massachusetts,* the same general principle, in the words of Lord *Mansfield,* was advanced by *Parsons,* Ch. J. in *The Andover and Medford Turnpike Corporation* v. *Gould,* 6 *Mass. Rep.* 43. ; by the whole court, in *Salem* v. *Andover,* 3 *Mass. Rep.* 438. ; by *Wilde,* J., in *Davenport* v. *Mason,* 15 *Mass. Rep* 94. ; and was never questioned until the determination of *Mills* v. *Wyman,* 3 *Pick.* 207.   In the state of *New-York,* the same language has been uniformly held, by their ablest judges.   *Stewart* v. *Eden,* 2 *Caines* 152. *per Kent,* Ch. J.   *Tioga* v. *Seneca,* 13 *Johns. Rep.* 382. *per Spencer,* J.   *Doty* v. *Wilson,* 14 *Johns. Rep.* 381.   *Bentley* v. *Morse,* 14 *Johns. Rep.* 468. *per Curiam.*   In our own state, it has ever been considered as established law.   1

*Swift's Dig.* 204, 5. But if it were otherwise, it is so consonant to natural justice, that it ought now to receive the sanction of this court.

Secondly, the defendant was under a *legal* obligation to provide for the support of his father. *Stat.* 369. The consideration stated, therefore, comes within the principle of the note in 3 *Bos. & Pull.* 249. It makes no difference, that the *remedy* prescribed by the statute, for enforcing this duty, is a peculiar one. It is enough that by law the duty exists. In what form, or by what proceeding, the duty is to be enforced, is a matter foreign to this question. The necessaries furnished, by the plaintiff, to the suffering father, relieved the affluent son, and thus the latter *received a benefit.*

2. That the plaintiff had not adequate remedy at law. First, the instrument pleaded, though not in form a technical *release,* is one in legal effect, and will be so regarded, by our courts. Instruments of this kind have, in *Connecticut*, always been treated as releases. *Carter* v. *Bellamy, Kirby,* 291. *Tryon* & al. v. *Hart,* 2 *Conn. Rep.* 120. 1 *Swift's Dig* 300. They must be pleaded as releases under our statute ; and in practice always are. *Brace* v. *Catlin,* 1 *Day,* 275.

Secondly, this instrument is *conclusive,* and cannot be explained at law. *Carter* v. *Bellamy, Kirby* 291. *Pierson* & al. v. *Hooker,* 3 *Johns. Rep.* 68, 70. A *seal* to instruments of this kind, has never, in *Connecticut,* been deemed material. 1 *Swift's Dig.* 300. *Bacon* v. *Norton,* 5 *Day* 128. *Tryon* & al. v. *Hart,* 2 *Conn. Rep.* 120. It is an established rule, that you cannot shew a mistake in a written instrument, in a court of law. The invariable practice has been to go into chancery, in such cases ; and no evil has resulted from this practice. No good can result from a change.

DAGGETT, J. The question presented on this record for discussion, arises on the validity of the promise of the deceased, *Henry Cook,* stated in the bill. If no action can be supported on that contract, then the interference of the court to exercise its chancery power, to explain or invalidate the discharge, would be useless ; and the examination of other points suggested in argument, unnecessary I am satisfied, on a full view of the case, that the contract is void, for want of consideration ; and therefore, that no action can be supported on it.

1. The contract is not a specialty, though in writing ; nor

is it governed by the law merchant applicable to negotiable paper. Were it of the the first description, by the rules of the common law, the consideration would be locked up, and could not be enquired into. Were it a note or bill of exchange, the law merchant would give to it the same force in relation to third persons. It is true, that in *Pillans & Rose* v. *Van Mierop & Hopkins*, 3 *Burr*. 1663. a suggestion was made by *Wilmot*, and the judges who sat with him in the King's Bench, that mere want of consideration could not be alleged in avoidance of a contract *in writing*. This suggestion was never established as law : and in the case of *Rann* v. *Hughes*, 7 *Term Rep.* 350. *n.* the true doctrine of the common law was laid down. A mere written contract is upon the footing of a parol contract, and a consideration must be proved. This is an inflexible rule of law ; and the court is not at liberty, if it had the disposition, to subvert it. *Ex nudo pacto non oritur actio.*

2. What is a consideration sufficient to uphold a contract ? Here too, the common law furnishes the answer ; a benefit to the party promising, or a loss to the party to whom the promise is made. The quantum of benefit, on the one hand, or of loss on the other, is immaterial. *Powell* on *Contracts*, 343, 344. To multiply authorities on this point, is quite unnecessary.

Let us now apply these uncontroverted principles to the case before us. Could *Henry Cook* possibly receive any benefit from this contract ? He gained nothing—nothing was renounced hereby. Was he induced, by any loss to the promisee ? He advanced nothing ;—he became liable for nothing ;—he did not forego any thing, by or on the ground of it. He had before, *not at the request of Henry Cook*, but of *Jonathan Cook*, furnished the latter with necessaries for his support. It is impossible to discover, thus far, any consideration known to the law.

3. The defendant in error still insists, that the father being poor and unable to support himself, and the son being possessed of large property, a legal obligation rested on him to pay for these necessaries thus furnished ; and a legal obligation is a good consideration for a promise. The conclusion is just, if the premises are true. But was there this legal obligation ? If it exist, it is to be found in our statute providing for the support of paupers. *Stat.* 369. *tit.* 73. *c.* 1. Provision is there made, that poor and impotent persons, unable to support themselves,

shall be supported by their children, if of sufficient ability. *Litchfield,* The manner in which they shall be compelled to furnish this <sup>June, 1828.</sup> support, is prescribed. The select-men of the town, where the poor persons reside, or one or more of their relations, may make application to the county court, and the court may order such support to be supplied, by the relations of the poor persons, from the time of such application. The facts are to be ascertained by the court. The provision is *prospective* only. It regards no supplies already furnished, or expenses already incurred ; and the liability, the legal obligation, is precisely as extensive as the law establishes it, and no greater. By this statute, then, for these reasons, the legal obligation alleged in support of this contract, does not appear.

Cook
*v.*
Bradley.

That such is the construction of this statute, I cite the opinion of the supreme court of *Massachusetts,* in *Mills* v. *Wyman,* 3 *Pick. Rep.* 207. 212. as to a similar statute of that state ; and especially, I rely on the decision of this court, in *Wethersfield* v. *Montague* & al. 3 *Conn. Rep.* 507. One of the points settled in that case, was, that " no assessment could be made, by virtue of this statute, for *past expenditures,* the provisions of the statute being exclusively prospective." The principle then is, that there is no *legal* obligation to pay past expenditures ; which exonerates the son in this case from all legal liability for the expenditures for the father.

4. This opens to us the only remaining point. The counsel for the defendant in error urge, that the son was under a *moral* obligation to support the father ;—that this is a *sufficient consideration* to uphold the promise ; and that, therefore, the son is liable.

It cannot be successfully contended, that in every case where a person is under a moral obligation to do an act, as, to relieve one in distress, by personal exertions, or the expenditure of money, a promise to that effect would be binding in a court of law. Such an idea is unsupported, by principle or precedent. It is a just rule of morality, that a man should do towards others what he might reasonably expect from others, in like circumstances. This rule is sanctioned by the highest authority, and is very comprehensive. An affectionate father, brother or sister has taken by the hand the youngest son of the family, given him an education, and placed him in a stuation to become, and he has become, affluent. The father, brother or sister, by the visitation of Providence, has become poor, and

impotent, and houseless.    The son, rolling in riches, in the over-
flowings of his gratitude, for kindness experienced, contracts *in*
writing to discharge some portion of the debt of gratitude, by
giving to his destitute relative some one of his numerous houses
for a shelter, and a thousand of his many thousand dollars for
his subsistence ;—can such a promise be enforced in any judi-
cial tribunal ?    Municipal laws will not decide, what honour
or gratitude ought to induce the son to do, in such a case, as
Dr. *Blackstone* remarks, (2 *Bla. Com.* 445.) but it must be left
to the forum of conscience.

It cannot be denied, that many distinguished judges have
laid down the principle, that moral obligation is alone a suffi-
cient consideration to support a contract.    Thus did Lord
*Mansfield,* in *Cowper* 288. 544.    He was followed by Mr.
Justice *Buller,* by Lord *Ellenborough* and other judges, in
other cases.    But it is an obvious remark, that the cases cited
in illustration of those positions, were all cases where a prior
legal obligation had existed, but by reason of some statute, or
stubborn rule of law, it could not be enforced : as a promise to
pay a debt barred by bankruptcy, or the statute of limitations,
or a promise by an adult to pay a debt contracted during mi-
nority.    In all these instances, a good consideration existed ;
for each had received a benefit.

All the cases on this subject are carefully, and with just dis-
crimination, revised, in a note in 3 *Bos. & Pull.* 249. and the
true distinctions taken.    The law of this note has been recent-
ly adopted in the supreme court of *New-York,* in the cases of
*Smith* v. *Ware,* 13 *Johns. Rep.* 257. 289. and *Edwards* & ux.
v. *Davis,* 16 *Johns. Rep.* 281. 283. n., and in a still later case
(in the year 1826) in *Massachusetts, viz. Mills* v. *Wyman,* 3
*Pick. Rep.* 207.—a case referred to above for another purpose.
No stronger case of *moral* obligation can be found.    " A son
who was of full age, and had ceased to be a member of his fa-
ther's family, was suddenly taken sick among strangers, and
being poor and in distress, was relieved by the plaintiff, and
afterwards the father wrote to the plaintiff, promising to pay
him the expenses incurred ; it was held, that such promise
would not sustain an action."    I am well satisfied with the
very able and sound reasoning of the court, delivered by Chief
Justice *Parker,* on that occasion.

I will now advert to the particular decisions of the *English*
courts, cited at the bar and relied on.    *Watson* v. *Turner.*

*Bull. Nisi Prius,* 147. It is no longer doubted, that the defendants in that case, the overseers of the poor, were under a legal obligation to furnish the support for which the promise was made. It is a case, therefore, within the rule in 3 *Bos. & Pull.* 249. n. The case of *Scott* v. *Nelson,* cited *Esp. Dig.* 95. and an anonymous case in 2 *Shower* 184. *seem* to imply, that a father was holden liable on a promise to pay for supplies for his bastard child ; but in my opinion, it may be safely inferred from the facts, that the supplies were furnished on request ; which would make a material difference. In *Wing* v. *Mill,* 1 *Barn. & Ald.* 104. the whole court held, that a legal and moral obligation existed. In the case of *Barnes* v. *Hedley* & *Conway,* 2 *Taun.* 184. the court held, that when the parties to usurious securities stripped them of all usury, and the securities were given up and cancelled, by agreement of the parties, and the borrower of the money promised, in consideration of having received the principal, to pay the same, with legal interest, the promise was binding. This case rests upon the same principles, which were recognized by this court, in the case of *Kilbourn* v. *Bradley,* 3 *Day* 356. where the court decided, that if a usurious security be given up, and a new security be taken for the principal sum due and legal interest, the latter security will be good. This case bears not at all upon the case under consideration. The money advanced was a good consideration of the promise to repay it, the usury being expunged. In the case of *Lee* v. *Muggeridge* & al. executors of *Mary Muggeridge,* deceased, 5 *Taun.* 36. it was held, that a feme covert having given a bond for money advanced to her son-in-law, *at her request,* was bound by a promise made by her, after she became discovert. *Mary,* the obligor in that case, had a large estate settled to her separate use. In this condition she executed a bond for money advanced to her son-in-law, at her request. After the death of the husband, and while single, she wrote a letter promising to pay the amount thus advanced. The court, in giving their opinion, say, this is a promise founded on a moral obligation, and that it is a good consideration. I should say, the promise was founded on the advancement of the money, at her request, to her son-in-law, and as she was incapacitated to bind herself, by reason of the coverture, when she received the benefit, and is therefore protected from liability by a stubborn rule of law ; yet if when this rule of law

VOL. VII.                    9

*Litchfield,*
June, 1828.

Cook
*v.*
Bradley.

ceases to operate upon her, she will promise to pay, it will bind her.

On the whole, I am not satisfied, that a case can be found in the *English* books, in which it has been held, that a moral obligation is a sufficient consideration for an express promise, though there are many to the contrary, but that it is limited in its application to cases where a good and valuable consideration has once existed, as laid down by the supreme court in *Massachusetts,* once and again adverted to.

I am therefore of opinion, that there is error in the decree complained of, and that the judgment be reversed.

HOSMER, Ch. J. was of the same opinion.

PETERS and LANMAN, Js. dissented.

BRAINARD, J. was absent.

Judgment reversed.

---

ATWOOD *against* WELTON.

A witness, on his cross-examination, may be enquired of, whether he has not had a controversy with the party against whom he testifies, and whether he has not threatened to be revenged on him, for the purpose of discrediting his testimony ; and if his answer is in the negative, it may be contradicted by other witnesses.

A person who disbelieves in any punishment in a future state, though he believes in the existence of the Supreme Being, and that men are punished in this life for their sins, is not a competent witness.

THIS was an action *qui tam,* for taking usury, brought on the statute, to recover the value of the money alleged to have been loaned by the defendant, to one *Hezekiah Scott,* on a corrupt and usurious agreement.

The cause was tried, on the general issue, at *Litchfield, February* term, 1828, before *Peters, J.*

On the trial, *Hezekiah Scott,* named in the declaration as the borrower of the money, was offered as a witness by the plaintiff, to prove the alleged usury. An objection was made to his testimony, on the ground that he was not a believer in divine revelation. This objection was overruled. It was then

objected, that he did not believe in the existence of a Supreme *Litchfield,* Being, nor in future rewards and punishments, nor in a future June, 1828. state; and to these points several witnesses were examined, ——— by whom it was proved, that "said *Scott* professed to believe Atwood in the doctrine of the *Universalists,* and in the existence of the *v.* Supreme Being; that men were punished, in this life, for their Welton. sins, but would all be made happy, immediately after death, by their Creator." The judge admitted the witness, this objection notwithstanding. Upon his cross-examination, he was asked, by the defendant's counsel, whether he had not been in a controversy with the defendant, and whether he had not threatened, that he would be revenged on him for collecting of him the note mentioned in the plaintiff's declaration; to each of which enquiries, *Scott,* the witness, answered in the negative. And thereupon the defendant offered *Richard Bryan* and others, as witnesses, to prove, that *Scott* had been in a controversy with the defendant, and had threatened, that he would be revenged on him for collecting said note. These witnesses were objected to, by the plaintiff; and the judge rejected them. The counsel for the defendant then requested the judge to instruct the jury, that the facts proved respecting the opinions and belief of *Scott* ought to discredit him as a witness. The judge refused to give the instructions requested, but instructed the jury, that the credibility of the witness depended on his character; of which they, the jury, were the proper judges. The plaintiff obtained a verdict; and the defendant moved for a new trial, on the ground that these decisions of the judge were erroneous.

*Bacon* and *O. S. Seymour,* in support of the motion, contended, 1. That one who disbelieves in a future state of rewards and punishments, is not a competent witness. *Scott,* the witness in this case, believed in neither. He believed, that he received reward and punishment *in this life,* but that immediately after death, he should be happy, whatever his conduct might be here. His faith was as inoperative upon his conduct, as if he did not believe in any future state at all. Such a person, according to nearly all the authorities, is an incompetent witness. *Omychund* v. *Barker,* 1 *Atk.* 45. *The King* v. *Taylor, Peake's Rep.* 11. *Strong* v. *Curtiss,* 4 *Day* 51. *Jackson* d. *Tuttle* v. *Gridley,* 18 *Johns. Rep.* 98. 106. 1 *Phill. Ev.* 18. *Swift's Ev.* 48. 1 *Swift's Dig.* 739.

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

2. That if the witness were competent, his disbelief of future punishment ought to go to his credit.   1 *Atk.* 45.   *Hunscom* v. *Hunscom,* 15 *Mass. Rep* 184.

3. That after having asked *Scott* whether he had not had a controversy with the defendant, and had threatened revenge, and after *Scott's* answer in the negative, the defendant had a right to enquire concerning these facts from other witnesses. For, in the first place, testimony to these facts was proper and relevant, and such as the defendant had a right to produce, in some shape or another.   Though you cannot, for the purpose of impeaching the general character of a witness, shew particular facts affecting that general character; yet you may shew a *bias,* either of partiality or prejudice, of the witness, in a particular case, which renders him unworthy of credit, by the proof of particular facts and declarations.   In this way, and for this purpose, it is the daily practice, to shew, that the witness has an interest in the question; that he is related to the party in whose favour he testifies; that he has had a quarrel with the party against whom he testifies; that he has been active in the preparation of the cause, &c.   Wherever the testimony fairly conduces to prove such bias, the enquiry is proper.   Secondly, the defendant's having put this question to the witness and obtained his answer in the negative, did not preclude enquiry of other witnesses.   There are cases where the answer of the witness on cross-examination, is conclusive on the party putting the question; but the rule on this subject is confined to *irrelevant* questions—*i. e.* to such questions as might have been objected to as irrelevant.   *Spenceley* q. t. v. *De Willott,* 7 *East* 108   *Yewin's* case, cited 2 *Campb.* 638. 1 *Stark. Ev.* 135.   3 *Stark. Ev.* 1755.   This question being relevant and material, why may not the truth be shewn?   Why is *Scott's* answer conclusive?   He who attempts to shackle the enquiry, should shew some good reason for it   It may be said, that to allow this enquiry, would be to multiply issues, and confound the jury.   But if the testimony is relevant, this can be no objection.   Besides, it will be conceded, that we might have put this question to other witnesses, had we not asked *Scott.*   How then, are the issues multiplied?

*Benedict* and *J. W. Huntington,* contra, contended, 1. That the witness ought not to have been excluded as incompetent, for want of religious belief.   In the first place, it is perfectly

consistent with every fact stated in the motion, that the witness <span style="float:right">*Litchfield.*</span> believed in a *limited* punishment in a future state.    He was an <span style="float:right">June, 1828.</span> *Universalist* : he believed in the existence of the Supreme Be- ing ; that men are punished here for their sins ; and that hereafter they will be happy.    How much more he believed, does not appear.    The objector takes on him the burden of proof.    All that the witness did believe, is consistent with a limited future punishment.

<div style="text-align:right">Atwood<br>*v.*<br>Welton.</div>

Secondly, if he disbelieved in any future punishment, it would not exclude him.    The test is, belief in the obligation of an oath.    This implies belief in the existence and providence of God.    If the witness believes there is a God, who will punish the false witness, it is enough : whether the punish- ment is to be inflicted in this world or the next, is not material. Such a person has a tie on his conscience ; and acts under a religious sanction.    The extent of the sanction is never the subject of enquiry, for the obvious reason, that human legisla- tures and human judges can never determine the extent of it. Hence, *Gentoos*, and *Pagans* generally, *Mahometans* and *Jews*, whose ideas of a future state are known to be very indistinct and loose, are admitted as witnesses, without investigating their particular views.    *Willes' Rep.* 549. 550, 1.    1 *Atk.* 40, 1, 2. 44.    *Morgan's* case, *Leach's Cro. L.* 58. (*Dub.* ed.)    *The People* v. *Matteson,* 2 *Cowen* 433.    *The Queen's* case, 2 *Brod. & Bing.* 284.

The *Universalists* are *Christians.*    They believe in and worship, not only God, but the Saviour.    They believe in an atonement ; not indeed a limited, but an universal one.    In what way *Scott* believed his salvation would be brought about, does not appear.    He might have believed, with many pious *Christians,* that he was among the *elect*, and that he should be saved through the sanctification of the *Spirit* and the truth, without the deeds of the law.    If this was not *Scott's* belief, it is the belief of many conscientious men, and the same principle that excludes him, will exclude them.    They believe, that they shall certainly be happy immediately after death.    Is the Court prepared to say, that such men are incompetent witnesses ?

2. That if the opinions of *Scott* did not render him incompe- tent as a witness, they ought not to affect his credit.    The law never permits an enquiry into the peculiar faith of a competent witness for the purpose of affecting his credit.    To allow this to be done, would be to open a door for the influence of secta-

rian prejudices or partialities, most unfavourable to the administration of justice.

3. That the defendant could not disprove the answer of the witness, that he had not had a controversy with the defendant, and had not threatened to be revenged on him.   It is well settled, that you cannot contradict a witness with respect to matters *purely collateral.*   1 *Stark. Ev.* 145, 6. 134. *Rex* v. *Watson,* 2 *Stark. Rep.* 149.   *Harris* v. *Tippett,* 2 *Campb.* 637. The next question is, what is meant by being collateral?   The answer is, " irrelevant to the issue on the record ;"— *i. e.* any acts or declarations of the witness, not relating directly to the issue on the record, or to the suit in which he is called as a witness.   1 *Stark Ev.* 134. 141. 2 *Campb.* 638.   It is obvious, that the former controversy of *Scott* with the defendant and his threats of revenge, had no relevancy to the question of *usury* put in issue in this case.

The rule, by which the judge was governed, on the trial, is well settled, and is in perfect analogy to another of constant application in practice, in respect to the manner of proving the interest of a witness ; which may be done, by calling on the witness himself, or by proving his interest, by other witnesses ; but both methods cannot be resorted to.   *Swift's Ev.* 109. *Butler* v. *Butler,* 3 *Day* 214.   *Mallet* v. *Mallet,* 1 *Root* 501. *Coit* & ux. v. *Bishop,* 2 *Root* 222.   *Stebbins* v. *Sackett,* 5 *Conn. Rep.* 258.   *Chance* v. *Hine,* 6 *Conn. Rep.* 231.

The practice in this state, has been, to invalidate the testimony of the witness, by proving that he has, on other occasions, given a different account of the subject matter of his evidence, without first calling upon him ; but if the enquiry be first made of him for that purpose, his answer is to be taken as conclusive.

DAGGETT, J.   It is very clear, that a witness, on his cross-examination, may be questioned as to his being in a controversy with the party against whom he testifies, and whether he has not threatened to be revenged on him.   If he should answer affirmatively, it would show a bias on his mind, which ought to be weighed by the jury, in considering his testimony.   To such a witness as full belief will not be readily yielded as to one who feels no such hostility.   If the witness should answer in the negative, it is equally clear, he may be contradicted by other proof.   A witness may always be asked any question relative to the issue, for the purpose of contradicting him, if his

answer be one way, by other witnesses, in order to discredit *Litchfield,* his whole testimony    "*Falsus in uno, falsus in omnibus,*" has June, 1828. become a familiar maxim.    Such has been the invariable rule in our country ; and such is the rule of the common law.    In upwards of forty years practice, I have not known it to be doubted.    It is true, a witness may not be interrogated as to any *collateral* independent fact.    This would be to try as many issues as a party might choose to introduce, and which the other party might not be prepared to meet.    *Spencely* qui tam, v. *De Willott,* 7 *East* 108.    The question whether the defendant had a controversy with the witness, and had threatened to be revenged, surely was relevant to the issue ; for it tended to prove such a state of mind towards the defendant, as might well be submitted to the jury to discredit his testimony as to material facts.    There is hardly a point about which there can be less doubt.    *Swift's Ev.* 148.    16 *Mass. Rep.* 185.    17 *Mass. Rep.* 160    2 *Camp. Rep.* 630.    1 *Stark. Ev.* 135.    " In such a case, (says the learned Commentator,) the enquiry is not collateral, but most important to show the motives and temper of the witness in the particular transaction."

It is also insisted, by the defendant, that the court should have told the jury, that the proof of the witness' unbelief in a future state of rewards and punishments, might impeach his testimony ; for that a person of this religious opinion might not feel the same obligation to speak the truth as if he believed in the denunciations against " perjured persons "    This point might deserve much attention, were it necessary to decide it ; for such is the decision in *Hunscom* v. *Hunscom,* 15 *Mass. Rep.* 184. so far as the brief report of that case may be considered as bearing on this case :—so too are the decisions cited from 2 *Cowen* 432. 572.    But in the view which I take of the condition of this witness, he should not have been admitted.    This supersedes the necessity of an enquiry as to the credit, to which his testimony was entitled

The question is not, whether a person who believes in *any* future punishment, though not endless, may be admitted as a witness ;—but, whether a person who denies *all* punishment after this life, and who, in the language of the motion, believes that men will be punished in this life for their sins, but immediately after their death, be made happy, be a competent witness.

Nor is it necessary to ask or to answer, whether an oath shall be refused to any one, on the ground of his religious opinions.

*Litchfield,* June, 1828.

Atwood
*v.*
Welton.

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

No objection is or can be made, in many such cases; nor are the rights of any individual particularly affected.  Of this description are the oaths administered to electors under our constitution, oaths to support that constitution and the constitution of the *United States,* and oaths taken by judges, magistrates, &c. of all grades.  But the question is, if a person denying all future accountability, is offered as a witness in a court of justice, in a case where life, liberty, property or reputation are to be affected, by his testimony, he may not be objected to, by the party against whom he is about to testify ; and whether, in such case, he is a competent witness ?

Nor has the statute in this state relative to the people called *Quakers,* who decline to take the oath by reason of scruples of conscience, and for whom a substitute is provided, by affirmation, under the pains and penalties of perjury, any bearing on this question.  This is a legislative enactment in alteration of the common law, which courts are bound to obey, and without which enactment, they could not dispense with the common law oath.  Besides, the pains and penalties of perjury comprised in the oath, are not limited to the statute punishment, but extend, it is believed, to the future punishment denounced against false witnesses.  It is doubted whether the legislature would consent to amend that oath, by adding this qualification next after the words " pains and penalties of perjury"—" *to be inflicted in this life only.*"

It is also true, that no declaration can be received in a court of justice without oath.  The casuistical position, that an oath does not increase the obligation to speak the truth, is not yet a maxim of the common law.  A man of the most exalted virtue, though judges and jurors might place the most entire confidence in his declarations, cannot be heard in a court of justice, without oath.  This is a universal rule of the common law, sanctioned by the wisdom of ages, and obligatory upon every court of justice, whose proceedings are according to the course of the common law.  One credible *witness* is required to establish any fact.  3 *Bla. Com.* 370.

" Where," said the greatest and best of men, " is the security for property, for reputation, for life, if the sense of *religious obligation* desert the oaths, which are the instruments of investigation in courts of justice ?  And let us with caution indulge the supposition that morality can be maintained without religion." *Wash. Farewell Address.*

Let us now examine the oath, which a witness must take, before he can be heard in a court of justice. This oath is an appeal to God, by the witness, for the truth of what he declares, and an imprecation of divine vengeance upon him, if his testimony shall be false. All law writers agree substantially in this definition, from the earliest to the latest. 1 *Phil. Ev.* 18. and cases there cited. The witness must believe in the existence of God ; for it would be absurd to hear an appeal made to a being whose existence is denied. I am not aware of any doubt on this point. Many of the ablest commentators carry the principle much farther. Thus, Lord *Coke* says, generally, that an *infidel* cannot be a witness ; (4 *Co. Rep.* 6. *b.*) and under this he included *Jews,* as well as heathen. 2 *Inst.* 506. 3 *Inst.* 165. Mr. Sergeant *Hawkins* thought it a sufficient objection to a witness, that he believed neither the old nor the new testament. *Hawk. Pl. C. b.* 2.—*c.* 48. *sect.* 148. Lord *Hale* denied this rigid rule ; (2 *Hal. Pl. C.* 279.) and it is now exploded.

The doctrine, as now established, in this country and in *England,* is, that if a person believes in a God, the avenger of falsehood, and in a future state of rewards and punishments, he may be a witness, and not otherwise. In the case of *The King* v. *Taylor, Peake's Rep.* 11. a witness was called for the prosecution. The counsel for the defendant asked him, if he believed in *Jesus Christ.* This question was objected to ; and *Buller,* J. overruled it, saying, it should not be put. He was then asked, if he believed in the holy gospels of God. *Buller,* J. said, that was not the proper question ; and asked him, if he believed in God, the obligation of an oath, *and a future state of rewards and punishments ;* and on his answering in the affirmative, he was admitted.

I am aware, that this question may not now be put to a witness, but the course is to enquire of other witnesses as to his belief on those points, and to decide the question of admissibility on such proof. This is manifestly proper ; because a man ought not to be questioned respecting his religious opinions, as the enquiry may subject him to reproach, if he should confess his infidelity ; and moreover, it would seem absurd to enquire of him *under oath,* whether he does not entertain such opinions as would show that he was unfit to be sworn. If, on enquiry of witnesses, it is satisfactorily proved, that the person does not believe in a future state of *rewards* and *punishments,* there

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

is not that tie upon his conscience, and of course, that sanction, which the law requires; and therefore, he ought not to be sworn.

This is the rule of the common law; and there is no adjudged case, nor hardly a *dictum* in the *English* books, against it. In *Jackson* d *Tuttle* v. *Gridley*, 18 *Johns. Rep.* 98. *Curtiss* v. *Strong*, 4 *Day* 51. *Swift's Ev.* 48. 1 *Swift's Dig.* 739. this doctrine is laid down, and the reasoning is very satisfactory. In 3 *Bla. Com.* 389. the editor, Mr. *Christian*, remarks in a note, that he has known a witness rejected and hissed out of court, who said, that he doubted the existence of a God and a future state. Mr Justice *Story*, in a case which occurred before him and the District Judge in *Rhode-Island*, in *November*, 1827, gave the following opinion : " We think these persons are not competent witnesses. Persons who do not believe in the existence of God, or a *future state*, or who have no religious belief, are not to be sworn as witnesses. The administration of an oath supposes, that a moral and religious accountability is felt to a Supreme Being ; and this is the sanction which the law requires upon the conscience, before it admits him to testify." One of those witnesses did not believe in the existence of a God ;—the other did not believe in a state of future rewards and punishments here or hereafter,—indeed did not seem to have any settled religious belief. Both were rejected. The opinion of this learned judge expressly excludes a witness, who denies the existence of God, who denies a future state, or has no religious belief. Can it be seriously contended, that a person who believes he shall be made immediately happy after death, without any regard to his conduct in this life, would feel any stronger obligation to speak the truth, than one who disbelieves in a future state ?

But the decision in *Connecticut, Curtiss* v. *Strong*, 4 *Day* 51. must be the guide to this Court. That case was elaborately discussed ;—it was decided by the unanimous opinion of the nine judges of the Supreme Court of Errors within the last twenty years ; and the decision has been acquiesced in. No murmurs have been heard respecting it. The reasons should be cogent to compel a departure from such a decision.

Nor am I satisfied, that there is any principle, or precedent of high authority, opposed to it  Two of the judges of the circuit court in *New-York*, at *Nisi Prius*, held, that persons of this description might testify. 2 *Cowen* 432. 572. We

are told, by the reporter, there are *many persons* in those
counties where these decisions were had, who deny all future punishment.   Why this is mentioned, it is not easy to per-
cieve, unless to suggest a reason for a departure from the rule of the common law, in obedience to public opinion.   On these decisions I remark, that they are directly opposed to that of the Supreme Court of the state of *New-York*, in *Jackson* d. *Tuttle* v. *Gridley*, 18 *Johns. Rep.* 98.   The court there say, with much force : " Religion is a subject on which every man has a right to think according to the dictates of his understanding. It is a solemn concern between his conscience and his God, with which no human tribunal has a right to intermeddle.   But in the developement of facts, and the ascertainment of truth, human tribunals have a right to interfere.   They are bound to see, that no man's rights are impaired or taken away, but through the medium of testimony entitled to belief; and no testimony is entitled-to credit, unless delivered under the solemnity of an oath, which comes home to the conscience of the witness, and will create a tie arising from his belief that false swearing would expose him to punishment in the life to come. On this great principle rest all our institutions, and especially the distribution of justice between man and man."   In this opinion I entirely concur.

The judges above mentioned at the circuit, in commenting on this case, say, that the opinion was *obiter ;* that the witness rejected did not believe in the existence of a God, *or a future state*, and therefore was incompetent according to all the decisions.   It is true, there was this farther objection to his testimony ; but still, the court, in giving its opinion, expressly decides on his disbelief in future punishment, and declares it to be a disqualification, quoting, with high approbation, the decision of *Curtiss* v *Strong*, 4 *Day* 51.

It is also said, that this decision rests, for much of its support, on the case of *Omychund* v. *Barker*, reported in *Willes* 549. and 1 *Atk.* 45. ; and that the report of the case by *Atkyns* is incorrect, and that by *Willes* gives the true state of the case. To this I would observe, that *Atkyns* furnished the case from the judges themselves, and when the decision was pronounced. With his accuracy as a reporter, it is not credible, that he should have omitted what is now deemed important in the opinion of *Willes*.   On the other hand, *Willes'* Reports were not published in more than half a century after the decision :

*Litchfield,* and the manuscript was furnished by his grandson. But the
June, 1828. point in decision, in that case, was not, whether the disbelief

Atwood    in future punishment disqualified the witness.    It was, whether
*v.*       the depositions of certain *Gentoos,* sworn according to their
Welton.    religion, should be admitted, in relation to transactions,
which took place in their country, between a native thereof
and the defendant, an *Englishman.*   All the judges, in giving
their opinion, lay stress upon that fact ; and there was no proof
as to the point of the belief or unbelief of the deponents in fu-
ture punishment.

There was a consideration presented by the counsel for the
plaintiff, which, by their ingenuity, was rendered plausible ;
and therefore, is deserving of attention. It was urged, that
there are certain religionists, denominated *Antinomians,* who
hold that the Gospel releases Christians from all the obligations
of morality, and in close connection with this doctrine is that of
the *faith of assurance, absolute election,* and the *final persever-
ance of the saints.*  And it is hence said, that if a person is
*fully assured* of his own election to eternal life, and of his *per-
severing* in that state, he can have no fear of future accounta-
bility or punishment, and therefore will not feel the obligation
arising therefrom, in his testimony.  This is not the place for
considering that subject.  I will, however, say, that if it should
be proved respecting any person offered as a witness, that he
believed his own happiness secure at death, *regardless of his
conduct in this life,* he ought not to be sworn ; nor would it be
any recommendation of him as a witness, that he entertained
this opinion of *himself and his own sect only.*  He should be
excluded as not feeling the obligation of an oath.

It is urged again, that courts have no right to interfere with
religious opinions.  It is said, faith is a matter between men
and their God, and ought not to be examined by courts or the
legislature.  But it is declared, by the judges in *England,* that
Christianity is a part of the common law of the land.  Our
ancestors brought it with them to this state, and there is no
statute abrogating it.  Nay, our statute (*p.* 164.) punishes, by
fine, imprisonment, and binding to good behaviour, persons guil-
ty of blasphemy against God, either person of the Trinity,
the christian religion, or the holy scriptures ; and in *p.* 165.
profane swearing, and in *p.* 385. violations of the Sabbath, are
punished by fine    Our constitution declares it to be the duty
of all men to worship the Supreme Being according to the dic-

tates of their consciences.   These provisions do not look like *Litchfield*, annulling Christianity.   The law does not, indeed, prescribe <span>June, 1828.</span> any rules of faith, nor mode of worship, nor attempt to enforce <span>Atwood</span> practical piety :—it simply recognizes the great doctrines of <span>*v.* Welton.</span> Christianity, and preserves them from the open assaults of their enemies.   This is all a legislature or court can rightfully do. But it is not easy to see how there is any interference with religious faith, in deciding a person professing certain opinions to be unfit to be sworn.   What if a man should claim the right of making his *simple declaration*, and that it should be received *without oath*, because his conscience told him that an oath did not add to the obligation to speak the truth ; shall such a declaration be received to affect important rights ?   What if a witness should declare, that there was no God ;—that he believed in no God, and worshipped none ;—shall he be permitted to appeal to God, and imprecate his vengence if he speak falsely ?   This would be the first-born of absurdities !—Yet belief in God lies at the foundation of all true religion.   Hence, the court may, as it is universally conceded, ascertain the religious belief of a witness.   And surely it must be done, by enquiring into the religious faith.

   It has been said, however, that this decision in excluding the witness, is a violation of the constitution of the state.   I presume this argument rests on the 3rd and 4th sections of the declaration of rights.   The 3rd section is :  " The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in this state."   The 4th section is:  " No preference shall be given by law to any *Christian* sect or mode of worship."   It is less difficult to see, that neither of these sections can have any possible bearing on the point in judgment, than it is to answer such mere vagaries of the imagination.   The plain meaning of these provisions, is, to secure an entire freedom in religious profession and worship, and an entire exclusion by law of any preference to any sect or mode of worship.   No man shall be prohibited from professing what religion he pleases, or worshipping in any manner he pleases ; nor shall there be any religious establishment, or approximation towards it, by any law giving any preference to any sect or mode of worship.   We know, that it had been insisted by many, that formerly our laws conferred certain privileges on the located societies, and thus gave a preference to certain *Christian* sects beyond what was conceded

to other denominations of *Christians*. It cannot be material to enquire whether such preference *was given*, or not. The constitution designed to remove every possibility of legislative interference in future.

But cannot a person be free in his profession and worship, who is excluded from giving testimony, on the ground of his denial of all liability to future punishment ? How does his exclusion affect his belief, profession or mode of worship ? It has no possible bearing on either.

But his rights are infringed, or he is disturbed in the exercise and enjoyment of them    What right ? Doubtless the right of giving testimony. This is a new right, privilege or franchise, unknown, and therefore, undefined, and I may add, unheard of before, by any lawyer or judge. Suppose an elector of *Connecticut* was to appear in a court, and claim the *privilege* of testifying in a cause on trial. Neither the plaintiff nor the defendant has called him as a witness, or desires his testimony. He persists, however, in the exercise of what he calls his *franchise*, until the court, in the exercise of its discretion, is obliged to commit him for contempt, for thus disturbing the rights of the court and of the parties.

The party may be injured, by the improper rejection of a witness, on the ground of his principles ; so he may in a thousand other instances ; but it is incomprehensible how the proposed witness can be, in any way, affected. If a court should reject a witness, because he was not six feet high, (if such a supposition may be made) it might deprive a party of important testimony, and thus injure him ; but it could not affect the witness.

Moreover, if the witness who denies all future punishment, cannot be excluded, without a violation of the constitution, neither can the *Atheist*. His language may be—" *I deny the existence of God,—the immortality of the soul,—and insist, that men die like brutes. This is my religious profession.*" I have before shewn, that it would be the height of absurdity for the court to permit such a person to *appeal to God* for the truth of what he asserts. Yet how can he be excluded, if this objection is to prevail ?

It may be added, that this objection arising out of the constitution, was not suggested, by the able and ingenious counsel, who argued the cause before this Court. It may be presumed, therefore, to have had no weight, in their opinion.

There is an opinion, said to be sanctioned by gubernatorial *Litchfield,* authority, that " *Connecticut* is an asylum for all sorts of con- <sup>June, 1828.</sup> sciences."    Without saying that such an opinion is better suited   Atwood to a festive occasion *ad captandum vulgus*, than to cherish ele-   Welton. vated sentiments of religion, law, or government, I would say, if thereby it is meant, that all sorts of consciences are here *tolerated,* it is doubtless true ; but if it be farther intended, that witnesses *with all sorts of consciences* are equally entitled to credit, it is denied.    There are, at least, two sorts of con- sciences, somewhat variant in their properties.    There is " a conscience void of offence towards God and towards man ;" and there is a conscience " seared as with an hot iron."    The *latter* should not seek an exclusive asylum ; the former should also be *tolerated.*    Shall we be compelled to give equal credit to the man who denies future accountability and punishment, with the man who believes them ?

I come then, necessarily, to the result, that as an oath is an indispensable means of ascertaining truth in a court of justice, so the oath necessarily implies the existence of a God, and a belief in a future state, and a punishment, of some duration, in that future state ; and that a witness who has no belief in these truths, is not a competent witness.

A new trial, therefore, must be granted.

HOSMER, Ch. J. and LANMAN, J., were of the same opinion.

PETERS, J.    I cannot concur in the opinion of Judge *Dag- gett,* in which I understand him to hold, that a person profess- ing to believe in a Supreme Being, and that men are punished for their sins in this life, but are all made happy, by their Crea- tor, immediately after death, is not a competent witness ; though I fully concur in the decisions of the three great cases chiefly relied on, by him, which it was not the intention of the court below to deny or impugn.    If this case cannot be dis- tinguished from them, a new trial ought to be granted.

By the ancient common law, *Christians* only were allowed to be sworn as witnesses ; (*Co. Litt.* 6. *b.* for an oath was con- sidered as of *Christian* institution.   " An oath," says Lord *Coke,* " is an affirmance or denial, by a *Christian* man, of any thing lawful or honest before one or more that have authority to give the same, for the advancement of truth and right, calling Al- mighty God to witness that his testimony is true."    3 *Inst.* 165.

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

cap. 14. And in *Calvin's* case, 7 *Rep.* 17. he informs us, that "all infidels are in law perpetual enemies; for the law presumes not that they will be converted, that being a remote possibility; for between them, as with the devils, whose subjects they be, and the *Christian,* there is perpetual hostility, and can be no peace." Such was toleration in the seventeenth century, "in the reign of the most high and most illustrious king, the fountain of all *piety* and *justice,* and the life of the law!" 7 *Rep. title-page.* This notion, advanced by so great a judge, so contrary to common sense and common humanity, though sometimes doubted, (2 *Hale's P. C.* 279.) was considered as law, until 1744. *Peake's Ev.* 148. *Swift's Ev.* 48. 1 *Atk.* 21, 2. and authorities there cited.

"In the gloomy days of superstition and ignorance," says *Dane,* "a man could not be a witness, who did not believe in the religion of the country, in which he was called to give evidence. Those who did not believe in *Christianity,* and sometimes in *Christianity* of a particular description, were deemed incapable of binding themselves by oath. But an infidel is a witness, if his infidelity extend not to atheism, both in *England* and in the *United States,* though this was not always the case." 3 *Dane's Abr.* 535.

In *Omychund* v. *Barker,* 1 *Atk.* 21 a more liberal principle was recognized and established. In a bill in chancery before Lord *Hardwicke,* assisted by the two Chief Justices and the Chief Baron, the deposition of certain *Gentoos,* who believed in a God, as the creator of the universe, the rewarder of virtue and the avenger of vice, and had been sworn according to the usage of the *Bramins,* by touching the hand and foot of a priest, were offered in evidence; to which two objections were made. 1. that the deponents were not *Christians;* and 2. that they were not sworn upon the *Evangelists.* These objections were argued, by the most eminent advocates of that day; and the judges delivered their opinions *seriatim.* They unanimously agreed, that the testimony of *all infidels who were not atheists,* was to be received; and that upon the principles of the common law, there was no particular form essential to an oath to be taken by a witness, but as the purpose is to bind the conscience, every man of *every religion* should be bound by that form, which he thinks will bind his conscience most. *Peake's Ev.* 149. (ed. 1809.) *Atcheson* v. *Everett, Cowp.* 389.

These were the only points made and decided; and it is re-

markable, that neither of the learned counsel, nor of the more *Litchfield*, learned judges, intimated that a belief in future rewards and June, 1828. punishments was essential to a witness.

Chief Justice *Willes* is, indeed, made to say, that infidels who believe a God, and future rewards and punishments in the other world, may be witnesses; yet if they [infidels] do not believe a God or future rewards and punishments, they ought not to be admitted as witnesses.   1 *Atk.* 45.   But in his own report of his own opinion, he says: " Nothing but the belief of a God, and that he will reward and punish *us* according to our deserts, is necessary to qualify a man to take the oath."   *Willes' Rep.* 545.   Again: " Infidels, who believe a God, and that he will punish them, if they swear falsely, in some cases, and under some circumstances, may and ought to be admitted witnesses, in this, though a *Christian* country.   On the other hand, I am clearly of opinion, that such infidels, if any such there be, who either do not believe a God, or if they do, do not think he will either reward or punish them, in *this world* or the next, cannot be witnesses, in any case, or under any circumstances, for this plain reason, because an oath cannot possibly be any tie or obligation upon them."   *Willes' Rep.* 549.   Again: " Supposing an infidel who believes a God, and that he will reward and punish him, in *this world*, but does not believe a future state, be examined on his oath, as I think *he may*, and, on the other side, to contradict him, a *Christian* be examined, who believes a future state, and that he shall be punished in the next world, as well as in this, if he does not swear the truth, I think the same credit ought not to be given to the infidel as to the *Christian*, because he is plainly not under the same obligation." *Willes' Rep.* 550.

From the remarks of the judges it is apparent, that they concurred in the opinion actually given by Ch. J. *Willes*, and quite certain, that they did not contradict him.   "If my Lord *Coke*," said the Chief Baron, " had, by an infidel, meant a professed atheist, I should have been of opinion, that he could not be a witness."   Again: " As to the *Gentoo* religion, it will appear from the best testimonies, that persons of this religion do believe in God as the creator and governor of the world."   1 *Atk.* 40.   " I agree entirely," said Ch. J. *Lee*, " with Ch. J. *Willes* and Ch. Baron *Parker*, that where it is returned by the certificate, that the witness is *of a religion*, it is sufficient; for the foundation of all religion is the belief of a God."   1 *Atk.*

Atwood
*v.*
Welton.

*Litchfield,*
*June, 1828.*

Atwood
*v.*
Welton.

46. The Lord Chancellor concurred with the judges, and said : " The rule is, that all persons who believe a God, are capable of an oath." 1 *Atk.* 20. Again : " My intention was to be certified, whether these people believed the being of a God and his providence."—" The first author I shall mention is Bishop *Sanderson, De Jurisjuramenti Obligatione. Jurisjuramentum,* saith he, *est affirmatio religiosa.* All that is necessary to an oath, is an appeal to a Supreme Being, as thinking him the rewarder of truth and avenger of falsehood." 1 *Atk.* 48.

The latest *English* writer on this subject, upon a review of all the cases, concludes, by saying : " It seems sufficient, if he [the witness] believes in a God, who will reward or punish him in this world." *Saund. on Plead. & Ev.* 940.

Such is the basis of the modern doctrine, that a belief of *future* rewards and punishments is essential to the competency of a witness ! But, if the foundation fail, where is the superstructure ?

In *Curtiss* v. *Strong,* 4 *Day* 51. it was correctly decided, that a person who did not believe in the obligation of an oath, was not a competent witness. So in *Jackson* v. *Gridley,* 18 *Johns. Rep.* 98. the supreme court of *New-York,* with perfect propriety, rejected the testimony of an atheist ; and so did Judge *Story* in *Wakefield* v. *Ross,* cited by Judge *Daggett.* But if these learned judges had contented themselves with deciding the cases before them, they would have been as silent as Lord *Hardwicke* and his advisers respecting a belief in the administration of justice in a future world. But zeal to establish a favourite dogma seems to have led the mind of a great and learned judge into an error, not only with respect to the *English* law, but with respect to the language of an *English* judge. " By the law of *England,*" says Ch. J. *Spencer,* " which has been adopted in this state, it is fully and clearly settled, that infidels who do not believe in a God, or if they do, do not think that he will either reward or punish them in the world to come, cannot be witnesses in any case, nor under any circumstances, because an oath cannot possibly be any tie or obligation upon them." 18 *Johns. Rep.* 103. This certainly is not the language of the court in *Omychund* v. *Barker,* but is the precise opinion of Ch. J. *Willes,* as reported by him, omitting " this world or the next," and inserting " the world to come." " Infidels," says *Buller,* " cannot be witnesses,—*i. e.* such as profess

no religion that can bind their consciences to speak the truth ;
but when any person professes a religion that will be a tie upon him, he shall be admitted as a witness." *Bul. N. P.* 292.   And
*Wooddeson* says : " The case of men wholly without religion, (if any such there be) may justly be thought a reasonable and lawful objection to bearing testimony in any cause or trial whatsoever." 3 *Wooddes.* 281, 2.   Another writer says : " And in order that persons should be permitted to testify, it is sufficient if they profess a religion and belief in the Deity, which will be a tie upon them to attest the truth." *Esp. Dig.* 726.

In conformity with these principles, in 1804, at the *Old Bailey*, a native of *China*, being examined before Baron *Graham*, on an indictment for felony against *Ann Alsley* and another, was sworn according to the form of the courts in *China*, by holding a saucer in his hand, which he dashed to pieces at the conclusion of the oath, believing, as he stated, that God would cause his body to be cracked as he cracked that saucer, if he did not tell the truth.   *Peake's Ev.* 149. n. (ed. 1809.) When and where did this *Pagan* believe, that the vengeance of Heaven would overtake *the body* of the perjured witness ? Surely, not in the world to come.   Notwithstanding the strong opinion expressed by Ch. J. *Spencer*, his *dicta* have been disregarded, by several learned and respectable judges of that and other states.

Thus, in *Butts* v. *Swartwood*, 2 *Cowen* 431.   *Southerland*, J., in delivering the opinion of the supreme court, said : " The proper test of a witness' competency, on the ground of his religious principles, is, whether he believes in the existence of a God, who will punish him if he swears falsely."

So, in *Matteson's* case, cited 2 *Cowen* 433. n., a witness was offered, who did not believe in any future punishment after this life ; and *Walworth*, Cir. Judge, now Chancellor, said : " I apprehend the true test of the competency of a witness to be this : has the obligation of an oath any binding tie upon his conscience? Or, does the witness believe in the existence of a God, who will punish his perjury ?   If he swears falsely, does he believe he will be punished, by an overruling Providence, in *this world*, or the world to come ?   If he does not believe in the existence of a God ; or if he believes in no punishment, except by human laws ; no obligation or tie can have any binding force upon his conscience.   But if he believes, that he will be punished, by his God, even in *this world*, if he swears falsely, there

*Litchfield,*
June, 1828.

Atwood
*v.*
Welton.

is a binding tie upon the conscience of the witness, and he must be sworn." This judge fully recognized the opinion of Ch. J. *Willes,* as reported by himself, and added : " That part of the opinion of Ch. J. *Spencer,* which relates to punishment in another world, was an *obiter dictum,* and wholly unnecessary to decide the case before the court. In this opinion I am supported, by most, if not all, the circuit judges."

A similar opinion was given, by *Williams,* Cir. Judge, upon the precise question before us, *viz.* whether a person who believes in a God, and in rewards and punishments in *this life only,* may be a witness. 2 *Cowen* 573.

The same opinion upon the same point, was given by Chancellor *Desaussure,* of *South-Carolina,* in *Fernandis* & al. v. *Henderson,* in equity, *Union* district, *August* term, 1827, upon a laborious investigation of all the cases on this subject.

And in the case of *Hunscom* v. *Hunscom,* 15 *Mass. Rep.* 184. the supreme court of *Massachusetts* decided, that a person who did not believe in a future state of existence, was a competent witness.

Finally, there is nothing in the case before the court, to shew, that the creed of this witness is materially variant from that of a considerable class of *Universalists,* who believe in the existence of a God, the authenticity of the scriptures, and the divinity of the Saviour, but deny that there is any punishment for the wicked after this life. 2 *Cowen* 432. n.

A contrary creed on most of these topics was once, by statute, classed among " *capital and other felonies,*" and rendered its possessor not only incapable of holding an office, but of sueing or defending in a court of justice. But this statute has been repealed, because it was repugnant to the constitution. If the legislature cannot disfranchise a citizen, on account of his religious sentiments, *a fortiori* a court of justice cannot, for the same cause, deprive him of the power of vindicating his rights, by his own testimony, in " due course of law." If the principle now sanctioned, by this court, be carried into full effect, the most atrocious crimes may be committed with impunity, unless perpetrated in the presence of an *orthodox* witness. Vid. *Const. Conn. art.* 1. *Stat. tit.* 16. *c.* 1. (ed. 1808.) *lib.* 2. *p.* 425.

2. The remaining questions are of minor consideration ; but they must be disposed of. It is a well settled rule, that a witness cannot be cross-examined concerning a collateral fact ir-

relevant to the issue, for the purpose of impeaching his testi- *Litchfield,* mony, by contradictory evidence. *Spenceley* q. t v. *De Wil-* June, 1828. *lott*, 7 *East* 108. But if he is so examined, his answer is conclusive.

It is also a rule, that a witness cannot be examined concerning any fact, which tends to degrade or disgrace him. 2 *Stark. Ev.* 139. *Cook's* case, 1 *Salk.* 153 *Northrop* v. *Hatch,* 6 *Conn. Rep.* 361. The issue in the case before us, is, usury or not. The evidence in question neither proved nor disproved it. The enquiry certainly tended to disgrace the witness; but the answer ought not to be drawn from him; for, to be suspected of harbouring such vindictive feelings towards another as would induce a commission of perjury for the sake of revenge, is certainly a disgrace. *Peake's Ev.* 136. *Rex* v. *Lewis* & al. 4 *Esp. Rep.* 225. *McBride* v. *McBride,* 4 *Esp. Rep.* 242.

But the practice on this subject seems not to be well settled. *Peake's Ev.* 130 2 *Stark. Ev.* 139. In my opinion, the rule is, or ought to be, the same as in proving a witness interested, *viz.* by examining him on the *voir dire,* or proving his interest by other testimony, but not by both. The election of one mode precludes the other. The reason is the same in both cases. " It is certainly unreasonable," said the court, in *Butler* v. *Butler,* 3 *Day* 204. " that the party should be permitted to sport with the conscience of the witness, when he has other proof of his interest." *Stebbins* v. *Sackett,* 5 *Conn. Rep.* 150. *Chance* v. *Hine,* 6 *Conn. Rep.* 231.

3. The authorities which admit witnesses of the faith in question, seem to take it for granted, that their incredibility is as their infidelity; and that the ratio must be settled by the jury; but they furnish no rule to ascertain the effect of speculative opinions upon the consciences of witnesses. By what standard is their testimony to be weighed? The jury have none but their own sectarian prejudices. What confidence has a *Christian* in the testimony of a *Mahometan,* who believes that paradise is his inevitable portion? What credit will be given, by a *Protestant,* to the testimony of a *Catholic* with an indulgence in his pocket? Or what would be the fate of a *Free-mason,* accused and tried by *Anti-masons,* and *vice versa?* Let the history of parties and persecutions, from the days of *Mather's Magnalia* to our own times, answer these questions.

The moral character of a witness is the only safe criterion:

*Litchfield,*
*June, 1828.*

Atwood
*v.*
Welton.

and, upon this topic, I adopt the sentiment and language of the late Chief Justice : " It may often be difficult to ascertain what are the speculative opinions of men, and how far they influence their conduct.    In the conflict of parties, both religious and political, misrepresentations will often take place ; and it will commonly be safer to rely on *the general character for truth,* which a man has acquired, by his own conduct in society, than on his *mere opinions."    Swift's Ev.* 50.

HOSMER, Ch. J. and LANMAN, J., were of the same opinion.

BRAINARD, J. was absent.

New trial to be granted.

NOTE.    A new trial having been granted, in this cause, it came on again for trial before the Superior Court, in *August,* 1828, *Daggett,* J. presiding   The same witness was offered, and the same objection taken to his testimony   Many witnesses were examined relative to the opinions of the witness as to a future state of rewards and punishments.   Judge *Daggett* was satisfied, in view of the testimony, that he was a believer in future, though not endless punishment.   He was, therefore, admitted.

———◆———

THE GOSHEN AND SHARON TURNPIKE COMPANY *against* SEARS :

IN ERROR.

Though the charter of incorporation of a turnpike company is a private act, which the court will not *ex officio* take notice of, but such parts as may be material must be stated with certainty to a common intent at least ; yet it is enough if it be counted upon, and the substance stated.

And where the law presumes, that the knowledge of the facts is in the opposite party, less certainty is required, because the principal object of pleading, is, to state facts, of which the opposite party is supposed not to have knowledge.

A turnpike company, by accepting the charter of incorporation, making the road, and receiving toll of passengers, becomes bound to keep the road in repair.

He who is chargeable with the first wrongful act or neglect, which occasions, through a connected series of causes and effects, an injury to another without his fault, is responsible for that injury, provided there is no intermediate responsible cause.

Therefore, where the plaintiff brought an action on the statute relating to roads and bridges, against a turnpike company, alleging, that the defendants in *May* 1803, were incorporated, by the General Assembly, with power to sue and be sued, to plead and be impleaded in all courts of record, to ordain

and establish such by-laws, ordinances and regulations as should be neces-
sary for the purpose of carrying into effect the objects of the corporation,
*viz* the construction of a public road from *T.* to ⸱., with power also to
erect gates and take toll on said road ; that the defendants, soon afterwards,
made said road, erected toll-gates thereon and received toll of passengers,
and said road had ever since belonged to the defendants ; that on the 1st of
*October* 1825, while the plaintiff was travelling on said road, which it then
was, and still is, the duty of the defendants to repair, there were, through
the neglect of the defendants, large gullies across said road, and as the
plaintiff was descending a hill in a sulkey, in company with one *P.*, who
was driving a horse in a wagon behind the plaintiff the harness of *P.*'s
horse was broken, by said gullies, and t e horse, by reason thereof, became
unmanageable, and ran upon the plaintiff's vehicle, and overturned it,
though the plaintiff used all possible means to avoid said horse and wagon,
in consequence of which the plaintiff was greatly injured ; after a verdict for
the plaintiff, it was held, 1. that the obligation of the defendants to keep the
road in repair, was sufficiently stated in the declaration ; and 2. that the
defendants were responsible for the plaintiff's injury.

*Litchfield,*
June, 1828.

The Goshen
and Sharon
Turnpike Co.
*v.*
Sears.

THIS was an action, brought by *Sears,* against *The Goshen and Sharon Turnpike Company,* on the statute relating to highways and bridges, to recover damages for an injury sustained by him, through the defects and insufficiency of the defendants' road.

The cause was tried, on the general issue, at *Litchfield, February* term, 1828, before *Peters,* J. The plaintiff obtained a verdict for 166 dollars damages. The defendants then moved in arrest of judgment, for the insufficiency of the declaration. This motion was overruled, and the declaration adjudged sufficient. On motion of the defendants, the record was transmitted to this Court for revision in error.

The declaration, from which the questions agitated arose, was as follows : That at the General Assembly of this state, holden at the city of *Hartford,* on the second *Thursday* of *May,* 1803, the defendants were duly incorporated into a company, by the name of *The Goshen and Sharon Turnpike Company ;* by which name to be known, to sue and be sued, to plead and be impleaded in all courts of record, to ordain and establish such by-laws, ordinances and regulations as may be necessary for the purpose of carrying into effect the objects of said corporation, to wit, the construction of a public road from the *Torrington* turnpike road in *Torrington* through the towns of *Goshen, Cornwall* and *Sharon* so as to intersect the *Dutchess* county turnpike road, at the dividing line between this state and the state of *New-York,* with power to erect gates and take toll thereon : That the defendants, on the 1st of *January,* 1805,

*Litchfield,*
June, 1828.

The Goshen
and Sharon
Turnpike Co.
*v.*
Sears.

were formed into a company, for the purpose of building said road ; and on or before the 1st of *January,* 1807, the said road had been completed, and toll-gates were erected thereon ; and said road has ever since belonged, and now belongs to the defendants, and they have taken toll from the travellers thereon : That on the 1st of *October,* 1825, the plaintiff was travelling on said turnpike road, and while he was descending a certain hill on said road, between the house of *Lewis Lockwood* and the house of *David L. Perry,* in the town of *Sharon,* he sustained great injury through the defect and insufficiency of said road belonging to the defendants as aforesaid, and which it was, on said day, and still is, their duty to repair ; because across said road, at said place in said hill, there were, on the day last aforesaid, large gullies and ditches, and large heaps of earth lying upon and across said road, which were extremely dangerous and difficult to pass, through the neglect and inattention of the defendants to keep said road in repair : That while the plaintiff was descending the said hill as aforesaid, on the day last aforesaid, in his carriage, commonly called a sulkey, in company with one *Alpine Pierce,* who was driving a horse in a wagon behind the plaintiff's said carriage, on said hill, the said *Pierce's* horse became ungovernable, by reason of the breaking of the harness, by which he was attached to said wagon, though said harness was of good and sufficient materials, and was every way good and substantial, but was broken, by means of said gullies and said heaps of earth upon and across said road, and by said horse and wagon passing over and across the same ; and the plaintiff's said carriage was run upon, by said horse and wagon of said *Pierce,* although the plaintiff used all possible means to avoid said horse and wagon, by means whereof the said carriage of the *plaintiff* was overturned, and broken in divers places, and the plaintiff was much bruised and wounded in his leg, thigh, hip, shoulders, head and divers other parts of his body, and was greatly injured in his health and business, and put to great expense.

*A. Sterling* and *S. Church,* for the plaintiffs in error, contended, That the declaration was insufficient, on the following grounds.    1. That neither the statute upon which this action is founded, nor any other public statute, imposes any obligation upon the original defendants to keep this road in repair, nor to maintain it.    By the 1st section of the statute referred to, the

*Litchfield,*
June, 1828.

The Goshen
and Sharon
Turnpike Co.
*v.*
Sears.

inhabitants of the several towns are onerated with the burden of making and keeping in repair all the necessary roads and bridges within the limits of their respective towns, unless it may belong to some particular person, persons or corporation to maintain them. *Stat.* 266. The law was substantially the same, when the defendants' charter was granted. *Stat.* 120. ed. 1808. The defendants are not liable under the 4th section of the revised statute, because this provision was incorporated into the statute since the granting of the defendants' charter ; and it is not to be so construed as to give it a retroactive effect. *Goshen* v. *Stonington,* 4 *Conn. Rep.* 210. 222.

2. That it does not appear from the declaration, that the charter of the defendants imposed on them the burden of keeping this road in repair, or that it " belonged " to them in any way to do it. The charter being a private act, the court can take notice of it no further than as it is disclosed in the pleadings. 1 *Chitt. Plead.* 220. *The Middletown Bank* v. *Russ* & al. 3 *Conn. Rep.* 135. 139. The averment that it was the duty of the plaintiffs to repair this road, is a mere inference of law ; (1 *Chitt. Plead.* 218.) nor is there any fact averred, which shews that this legal inference is just. It does not result from the fact that the road was built by the defendants, and belongs to them. The defendants being a corporation—an artificial person—their rights and duties are precisely what their charter has conferred and imposed, and nothing else. *The New-York Firemen Insurance Company* v. *Ely* & al. 5 *Conn. Rep.* 560. 568.

3 That if the obligation of the defendants to repair, be conceded, still they are not liable in this action, because the neglect of the defendants was not the *proximate cause* of the plaintiff's injury. 1 *Swift's Dig.* 553, 4. *Flower* v. *Adam,* 2 *Taun.* 314. *Scott* v. *Shepherd,* 3 *Wils.* 403. 2 *Stark. Ev.* 873 3 *Stark. Ev.* 985, 6 *Ashley* v. *Harrison,* 1 *Esp. Rep.* 48. *Taylor* v. *Neri,* 1 *Esp. Rep.* 386. *Paine* v. *Partrick, Carth.* 194. In this case, the neglect to repair the road is as remote from the injury sustained by the plaintiff, as was the cause from the effect in any of the cases cited. In the first place, the harness of *Pierce's* horse breaks ; then the horse takes fright and becomes unmanageable ; in consequence of which, he runs upon the plaintiff's sulkey ; in consequence of which, the sulkey is overturned ; in consequence of which, the sulkey is broken and the plaintiff is bruised !

*Litchfield,*
June, 1828.

The Goshen
and Sharon
Turnpike Co.
*v.*
Sears.

4. That the defendants are not liable, because the injury was entirely *accidental,* being not only undesigned, but having no necessary or natural connexion witn the events that prece ded it.    *Aston* v. *Heaven* & al. 2 *Esp. Rep.* 533.    *Christie* v *Griggs,* 2 *Campb.* 79.    1 *Swift's Dig.* 553.

*J. W. Huntington* and *Sedgwick,* for the defendant in error, contended, 1. That it appeared from the declaration, that the defendants below were bound to keep this road in repair.

First, it is averred in the declaration, that the road *belongs* to the defendants ; and by common law, the owners of a road are bound to keep it in repair.    *Wood's Inst.* 100.    *Martyn* v. *Delboe,* 1 *Vent.* 90. n.    *Austin's* case, 1 *Vent.* 183    3 *Bla. Comm.* 357.    *Rex* v. *Great Broughton,* 5 *Burr.* 2700.    *Rex* v. *Weston,* 4 *Burr.* 2507.

Secondly, the declaration avers, that the defendants erected gates and took toll of travellers ; and the taking of toll obliges the defendants to keep the road in repair.    *Riddle* v. *The Proprietors of Locks and Canals on Merrimack River,* 7 *Mass. Rep.* 169.    *The Commonwealth* v. *The Worcester Turnpike Corporation,* 3 *Pick.* 326. 329.

Thirdly, the public statute law of the state imposes upon turnpike companies the obligation to keep their roads in repair; and they accept their charter upon the condition of assuming this obligation.    *Stat.* 266. *tit.* 48. *s.* 1. 4. 5.    *Stat.* 119 *tit.* 29. *s.* 1. ed. 1808.    See also *Stat.* 471. *tit.* 105. *s.* 2.

Fourthly, it is averred in the declaration, that the defendants were bound to keep the road in repair ; and after verdict this will be presumed to have been proved, by competent testimony.    *Macmurdo* & al. v. *Smith* & al. 7 *Term Rep* 518.    *Yarborough* & al. v. *The Bank of England,* 16 *East,* 6.    *Hendrick* v. *Seeley,* 6 *Conn. Rep.* 177.    *Ferry* & al. v. *Williams,* 8 *Taun.* 62.

2. That this action is sustainable, upon the great principle of law, that for every injury the law has provided a remedy against the party causing it ; (3 *Bla. Comm.* 23.    1 *Swift's Dig.* 474.) and by virtue of the positive provisions of the statute.    *Stat.* 266. 7. *tit.* 48. *s.* 5.    That the defendants' road was out of repair; that this caused the carriage of *Pierce* to be driven upon the plaintiff, by which he sustained an injury,— are facts now to be taken as proved ; for the declaration avers them, and the verdict has found them.    Now, against whom is

his remedy? Obviously, against *Pierce*, or the defendants. *Litchfield*, June, 1828. But it cannot be against *Pierce*, because the jury have found, that he was in no fault: He was controuled, by causes which he could not resist, arising out of the neglect of the defendants If *Pierce* is not liable, the defendants must be, or there will be a failure of justice. *Scott* v. *Shepherd*, 1 *Wils.* 411. *Gibbons* v. *Pepper*, 1 *Ld. Raym.* 38. *Jones* v. *Boyce,* 1 *Stark. Rep.* 493. It makes no difference how long the chain of cause and effect may be, or how numerous are its links, if they are properly connected. The law seizes hold of the first responsible cause,—the first misfeasance or culpable nonfeasance,—and makes it the foundation of the right of action. 2 *Bla. Rep.* 899, 900. Per *De Grey*, Ch J. Here, the defendants were guilty of the first wrong. *Pierce* was a mere passive agent,—a machine,—by which the injury was effected. The injury, it is true, must be the *legal* and *natural* consequence of the wrongful act of the defendant. *Butler* v. *Kent* & al. 19 *Johns. Rep.* 223. It is not the *legal* consequence when there is an intermediate responsible cause, or where the proximate cause is the plaintiff's own fault *Vicars* v. *Wilcocks*, 8 *East*, 1. 3 *Stark. Ev.* 986. *Butterfield* v *Forrester*, 11 *East* 60. *Flower* v. *Adam*, 2 *Taun.* 314. It is always the legal cause, where the plaintiff is not in fault, and there is no intermediate responsible cause. It is the *natural* consequence, whenever it follows as the necessary and unavoidable effect of the wrongful act, or whenever the injury could have happened through no other cause than the wrongful act. 3 *Stark. Ev.* 986. 1 *Stark. Rep.* 493. 3 *Wils.* 403. 12 *Mod.* 640. 1 *Ld. Raym.* 479. 2 *Bla. Rep.* 894. 898. 899. Here, the plaintiff's injury is, as the rule requires, the legal and natural consequence of the wrongful act or neglect of the defendants.

The Goshen and Sharon Turnpike Co. *v.* Sears.

PETERS, J. The statute, on which this action is founded, subjects towns to the burthen of making and repairing all necessary roads within their respective limits, unless it belongs to some particular person, persons or corporation to make and repair the same ; and provides, that the town, person, &c. who ought to repair such road, shall pay just damages for all injuries received in body or estate, through, or by means of their neglect. *Stat.* 266. *tit.* 48. *s.* 1. 4. 5. This statute contains general regulations on this subject, but imposes no duty on the defendants, *unless* the facts alleged by the plaintiff evince, that *it belongs* to them to maintain and repair this road.

*Litchfield,*
June, 1828.

The Goshen
and Sharon
Turnpike Co.
*v.*
Sears.

1. It appears by the declaration, that in *May* 1803, the defendants were incorporated, by the legislature, by the name of *The Goshen and Sharon Turnpike Company ;* and by that name to be known ; to sue and be sued, implead and be impleaded, in all courts of record ; to ordain and establish by-laws, necessary to carry into effect the object of their incorporation, *viz.* the construction of a public road from *Torrington* to the *West* line of the state, with power to erect gates and take toll thereon : That on the 1st of *January,* 1805, the defendants were legally formed into a company, for the purpose aforesaid : That on the 1st of *January* 1807, said road was completed, toll-gates were erected, and the same have ever since belonged to the defendants, and they have constantly taken toll of travellers thereon.    These facts have been found, by the jury ; and the question now is, do they bring the defendants within the purview of the statute ?

It is contended, by the defendants, that these matters are not well pleaded ; that their charter, being a private act, ought to have been recited.    The charter is certainly a private act ; and is a contract between the state and the corporation. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 518.    It is a rule in pleading, that the plaintiff should declare on a contract according to its legal effect, and not on *the evidence* of the contract.    *Bacon* v. *Page,* 1 *Conn. Rep.* 404.    " In general," says *Chitty,* " whatever circumstances are necessary to constitute the cause of complaint, or the ground of defence, must be stated in the pleadings, and all beyond is surplusage ; facts only are to be stated, and not arguments or inferences, or matter of law."    Courts will not *ex officio* take notice of private acts of the legislature ; and consequently, such parts of them as may be material to the action or defence, must be stated in pleading."    1 *Chitt. Plead.* 218. 220    But, it is enough if they are counted upon, or the substance stated.    *The Middletown Bank* v. *Russ* & al. 3 *Conn. Rep.* 135. 139    *Hempstead* v. *Reed,* 6 *Conn Rep.* 480.    And they must be set out at least with certainty to a common intent.    3 *Inst.* 303. *a.*    And if greater certainty were requisite, the defect is aided by verdict.    *Hendrick* v. *Seeley,* 6 *Conn. Rep.* 176.    *Bartlett* v. *Crozier,* 15 *Johns. Rep.* 250. 254.    1 *Saund.* 228. *a. Archb. Dig.* 115.    And where the law presumes, that the knowledge of the facts is in the opposite party, less certainty is required ; because the principal object of pleading, is, to state facts, of which the opposite

party is supposed not to have knowledge. Thus, in an action
of the case for not repairing a private road through the defendant's close, the declaration stated, that the defendant, by reason
of his possession, ought to have repaired ; and this was held sufficient, without shewing the right or obligation of the defendant to repair. *Rider* v. *Smith,* 3 *Term Rep.* 766. 1 *Swift's Dig.* 600. 1 *Chitt. Plead.* 369. So, in *Tenant* v. *Golding,* 1 *Salk.* 21. 360. in an action on the case for not repairing a wall, *debuit reparare* was held sufficient. The necessity of reciting the charter, in an action like this, seems not to have occurred to the late Chief Justice, when compiling his *Digest,* as he has given us the form of a declaration merely counting on the statute by its title. 2 *Swift's Dig.* 572. And a similar declaration, in *Williams* v. *The Straits Turnpike Company,* received the sanction of the superior court in *Litchfield* county, *August* term 1806 ; and such is understood to have been the practice.

2. Are the defendants bound to repair the road ? They accepted the charter, made the road, erected gates and received toll of travellers thereon, for nearly twenty years. In *Riddle* v. *The Proprietors of Locks and Canals on Merrimack River,* 7 *Mass. Rep.* 169. a duty was imposed on the defendants in these words : " The said proprietors shall erect, make and forever maintain such dams, canals and locks," &c. By accepting this charter, it was held, the obligation became express and absolute. " When the act of incorporation first passed," said *Parsons,* Ch. J. ( *p.* 184.) it was optional with the proprietors whether they would, or would not, take the benefit of it. But after they had made their election, by executing the powers granted, and claiming the toll, then the duties imposed to make canals, &c. attached." In *The Commonwealth* v. *The Worcester Turnpike Corporation,* 3 *Pick.* 326. the defendants were indicted for not repairing their road, and contended, that this part of the road had not been so made as to be accepted. The court said : "We do not think that the corporation can object, that this part of the road has never been so made as to be accepted. They have established their gates, and have taken toll for many years ; and part of the toll so taken is considered by law as a compensation for making this part of the road." In *Bartlett* v. *Crozier,* 15 *Johns. Rep.* 250. the defendant, being an overseer of highways, was sued for neglecting to repair a bridge, whereby the plaintiff's horse was injured. *Spencer,* J., in de-

*Litchfield,*
June, 1828.

The Goshen
and Sharon
Turnpike Co.
*v.*
Sears.

livering the opinion of the court, remarked (*p.* 255 ) that the principle on which this action rests, was recognized, by this court, in *Townsend* v. *The Susquehannah Turnpike Company,* 6 *Johns. Rep* 90. That was an action," continued he, "founded on an injury done the plaintiff in the loss of a horse, by reason that one of the bridges of the corporation was so ruinous as to fall, when the plaintiff was crossing it with his horses. The court held, that the action was sustained, on the ground that the corporation was bound to bestow ordinary care in the construction and repair of their bridges. The duty of the corporation, in that case, was an *implied* one, resulting from their *ownership of the road,* and *the reception of toll."* Vid *Russell* v. *The Men of Devon,* 2 *Term Rep.* 671. *The Mayor of Lynn* v. *Turner, Cowp.* 86. The case of *Bartlett* v. *Crozier* was indeed reversed, by the court of errors. But say the court : " It is not like the case of an individual, bound by a private statute, or by a certain tenure, to keep a road or a bridge in repair ; nor like the case of turnpike companies There the duty is perfect, and binding at all times, and is founded on a valuable consideration." 17 *Johns. Rep.* 439. 451.

3. But the defendants claim, that they are not responsible for this injury, for two reasons : 1st, Because at the date of their charter, towns and particular persons were bound to repair all roads, and liable for all injuries occasioned by their neglect. 2ndly, That the defects in the road were not the *proximate cause* of the plaintiff's injury.

The statute on which this action is founded, (*Stat. tit.* 29. *p.* 119. n. ed. 1808. *p.* 10. ed. 1702.) has been in force, substantially, for more than a century. The only apparent alteration is the insertion of the word " corporation," *ex abundanti cautela,* in the revision of 1821 But owners of public roads were always bound to repair them, and liable for damages occasioned by their neglect, as already shewn. Corporations are artificial persons, and, for certain purposes, are considered as natural ones ; *e. g.* they have been denominated occupiers of land, deemed inhabitants of cities, &c. and bound to repair bridges *ratione tenuræ suæ terrarum.* They have sued, and have been sued, as citizens. *Rex* v. *Gardner, Cowp.* 79. *United States Bank* v. *Deveaux,* 5 *Cranch* 61.

The defendants claim, that the neglect of the defendants is not laid as the *proximate cause* of the plaintiff's injury. But it is laid and found, that it did not arise from the neglect, folly or

misfeasance of the plaintiff, or of *Alpine Pierce;* and that it was inevitable by them ; and that it did arise entirely from the neglect, folly and misfeasance of the defendants in making and repairing their road ; and it is a well settled principle, that he who does the first wrong, is responsible for the consequences. *Scott* v. *Shepherd,* 3 *Wils.* 403 *Gibbons* v. *Pepper,* 1 *Ld. Raym.* 38. *Dodwell* & ux. v. *Burford,* 1 *Mod.* 24. *Bull. N. P.* 26.

I am, therefore of opinion, that there is nothing erroneous in the judgment complained of.

The other Judges were of the same opinion, except BRAIN-ARD, J. who was absent.

Judgment affirmed.

<div style="text-align:right">

Litchfield,
June, 1828.

The Goshen
and Sharon
Turnpike Co.
*v.*
Sears.

</div>

---

## OVIATT *against* SAGE.

Where a chattel is owned by two persons, as tenants in common, a sale by one, of his interest in such chattel, makes the purchaser and the other co-tenant, tenants in common of the whole.

No act done by one tenant in common of a chattel, in relation to such chattel, short of a destruction of it, will render him liable to his co-tenant in tort.

If the sale of a chattel, by one tenant in common, be authorized or ratified by the other co-tenant, and acquiesced in by the purchaser, this shews that privity between the latter co-tenant and the purchaser, which is necessary in the action of account.

Therefore, where *A.* and *B.* were tenants in common of a quantity of cheese, *A.* owning two thirds and *B* one third; and *B.*, without the consent or knowledge of *A.*, sold the cheese to *C.*, who immediately transported it to market ; *A.* demanded of *C* his share of the cheese, or payment for it, which *C.* refused; and *A.* then told *C.*, that he must pay nobody for the cheese but him ; to which *C.* replied—" Very well—there will be no difficulty about it ;" in an action of account, brought by *A.* against *C.*, for his share of the cheese, it was held, that evidence of the communication between *A.* and *C* was admissible, to shew, that the sale was authorized or ratified by *A.*, and acquiesced in by *B.*, and consequently, that the action was sustainable.

THIS was an action of account to recover the proceeds of a quantity of cheese. The plaintiff alleged, that he was the owner of two third parts of the cheese, and the defendant the other third part ; and that they held as tenants in common; and that the defendant had sold the whole, and refused to account with the plaintiff for the avails.

*Litchfield,*
June, 1828.

Oviatt
*v.*
Sage.

The cause was tried on the plea of *never bailiff and receiver,* at *Litchfield, February* term, 1828, before *Peters*, J.

On the trial, the plaintiff offered testimony tending to prove, that on the 20th of *August*, 1825, he owned two thirds of the cheese, and one *Isaac Cobb* one third ; that *Cobb*, without the knowledge or consent of the plaintiff, sold and delivered the cheese to the defendant *Sage*, who immediately transported it to market ; that on the 22nd of *August*, the plaintiff demanded his share of the cheese of the defendant, or payment therefor, which was refused ; that the plaintiff then told the defendant, that he must pay nobody for the cheese but him ; to which the defendant replied, " Very well—there will be no difficulty about it." This testimony was objected to, on the ground that it did not prove, nor conduce to prove, the issue. The objection was sustained by the judge, and the testimony rejected. The jury returned a verdict for the defendant ; and the plaintiff moved for a new trial.

*P. Miner* and *T. Smith*, in support of the motion, contended, That it was competent to the plaintiff to treat the defendant as his bailiff, and to recover of him in account. It was not in the power of *Cobb* to impair, much less to defeat, the rights of the plaintiff, by a sale to the defendant. This doctrine was recognized as established law, by *Hosmer*, Ch. J., in *Mitchell* v. *Hazen*, 4 *Conn. Rep.* 510. in relation to real estate ; and it is equally true as applicable to personal property. If the plaintiff and *Cobb* were joint-tenants, the only effect of the sale to the defendant, was to convert the joint-tenancy into a tenancy in common. *Co. Litt.* 199. *a.* *Bac. Abr. tit.* Joint Tenant. C. It vested in the defendant the interest of *Cobb ;* and that only. The plaintiff had afterwards, as against the defendant, the same rights, was bound by the same duties, and was entitled to the same remedies, that existed between the plaintiff and *Cobb* before the sale. He had the same rights ; for he might have taken the property out of the hands of the defendant, and would not have been liable in trespass or trover, for a destruction of it  1 *Chitt. Plead.* 157. 172. The condition of the plaintiff and defendant was the same as against strangers : both must join for injuries to the property. 1 *Chitt. Plead.* 55.

It may be said, that we might have brought account against *Cobb*. In the first place, if we have a remedy against *Cobb*, we

are not obliged to look to him : it does not preclude us from resorting to *Sage.* But there is a difficulty in proceeding against *Cobb.* If we sue him in account, and treat him as our agent, we thereby ratify the sale to *Sage.*

But the principal ground of objection to this action, is, that *trover* lies.

In the first place, the objection mistakes the ground of our action. By the sale, *Sage* became co-tenant with the plaintiff. He then disposed of more than the amount of his interest in it. We now call on him for his account in respect to transactions *subsequent* to the sale from *Cobb* to him.

Secondly, trover will not lie. The ground assumed is, that the sale from *Cobb* to *Sage,* was equivalent to a destruction of the property. But this was not so. *Cobb* could sell *his* interest, but nothing more. *Sage* obviously took no greater interest than *Cobb* could convey; and he committed *no tort,* by paying for the whole, when he acquired a title only to one third. The change of custody was no conversion. *Mersereau* v. *Norton,* 15 *Johns. Rep.* 179. *St. John* v. *Standring,* 2 *Johns. Rep.* 468. *Heath* v. *Hubbard,* 4 *East,* 110. *Barnardston* v. *Chapman,* cited 4 *East,* 121. *Fox* & al. v. *Hanbury* & al. *Cowp.* 445. 450. *Smith* & al. v. *Stokes,* 1 *East,* 363. *Holliday* v. *Camsell* & al. 1 *Term Rep.* 658.

Thirdly, if trover will lie, still account will lie also : the remedies are concurrent. If one co-tenant has used and taken benefit of the common property in a greater proportion than his interest therein, account will lie. *Stat.* 34. *tit.* 1. *s.* 4.

It may be said, that account will not lie, in this case, for want of *privity* between the parties. If the *statute* has given this remedy, in the circumstances of this case, the want of privity will not defeat it. But how stands the objection *at common law?* It is true, that upon principles of the common law, it is necessary that the plaintiff in account should have appointed the defendant his bailiff. *F. N. B.* 117. *a.* 118. *b. Co. Litt.* 172. *a.* 200. *b.* But no *actual* appointment is necessary. If a man acts as bailiff, you may treat him as such. *Com Dig. tit.* Accompt. A. 2. 3. 4. If in this case, the defendant recognized the title of the plaintiff, there was a virtual appointment as bailiff, and a privity between the parties. The evidence, then, ought to have gone to the jury, to shew a recognition of title, and an appointment of the defendant as bailiff.

*Benedict* and *J. W. Huntington*, contra, insisted, That the evidence offered by the plaintiff was not competent evidence to support an action of account.

At common law, one tenant in common could not maintain account against his co-tenant, unless the latter was *actually* appointed bailiff or receiver. *Co. Litt.* 200. *b.* *Selw. N. P.* 1. (*Wheat.* ed.) 1 *Swift's Dig.* 579. The action of account was extended to tenants in common by *Stat.* 4 *Ann. c.* 16. *s.* 27 ; but *that* statute has never been adopted in this state.

Our statute does not authorize account in the circumstances of this case ; first, because it contemplates only such a co-tenancy as was created by privity of contract in fact,—not where it was created without the knowledge or consent of the party suing in account ; secondly, because the statute never was intended to authorize account, except as between the original owners.

Account will not lie, in this case, because there was a *conversion* of the property, for which trover might be maintained ; and trover and account are never concurrent.

First, the *sale* by *Cobb* was *ipso facto* a conversion. *Barton & al.* v. *Williams & al.* 5 *B. & A.* 395. *Com. Dig. tit.* Action upon the case upon Trover. E. *Wilson & al.* v. *Reed*, 3 *Johns. Rep.* 174. *Anon.* 2 *Salk.* 655. Taking property by assignment, of one who has no right to transfer it, is a conversion. *Baldwin* v. *Cole*, 6 *Mod.* 212. *McCombie* v. *Davis*, 6 *East* 537. *Bristol* v. *Burt*, 7 *Johns. Rep.* 254.

Secondly, the *transportation of the cheese to market*, constituted such a *destruction* of the property as amounts to a conversion ; the property being in its nature perishable, and made for consumption. 3 *Stark. Ev.* 1496. n. In *Wilson & al.* v. *Reed*, 3 *Johns. Rep.* 176. Ch. J. *Kent* decided, (and his decision was sanctioned by the whole court) that a sale of rum by retail, was in law a destruction, so as to enable one tenant in common to maintain trover against his co-tenant.

Thirdly, the subsequent appropriation, by the defendant, of *all* the cheese, was, at any rate, a conversion. *Jackson* v. *Anderson*, 4 *Taun.* 24. 3 *Stark. Ev.* 1496. n.

To maintain account, the goods must have been originally received rightfully. The relation of bailiff must have been created at the time of the receipt of them. It is the wrongful taking or reception of the goods, which precludes the action of account ; for account is founded on an express or implied pri-

vity. If the receipt of the goods was wrongful, and was of *Litchfield,* itself a conversion, the plaintiff cannot waive it, and treat the June, 1828. defendant as having contracted with him to receive them, any more than if the defendant had clandestinely removed them, or taken them by force.

Oviatt
*v.*
Sage.

**DAGGETT, J.** The testimony offered by the plaintiff, on the trial, was rejected, on the ground, that it shewed that a tort was committed by *Cobb,* in selling the cheese, and that trover, and not account, was the proper remedy. This opinion is erroneous.

1. The part owner of this cheese, being a tenant in common with the plaintiff, had a right to sell his part of it, at any rate ; and it being an article manufactured for sale, he might, for aught which appears, have sold the whole. At least, the plaintiff might authorize him to sell the whole ; and it should have been submitted to the jury as a question of fact, whether the testimony did not so authorize the sale, if not already made, and if made, whether it did not amount to a ratification, upon the well known principle that a subsequent ratification is equal to a prior authority. The sale of the part of a chattel, which belongs to the seller, makes the purchaser and the other co-tenant tenants in common of the whole.

2. It was, however, strenuously urged, that this sale was a destruction of the common interest, and of course, no remedy was left but trover. It is very clear, that nothing short of a destruction of the property will render the co tenant liable in tort ; for he has an equal right with his fellow commoner to the possession and use of the property. This is familiar law. *Cobb* could either sell the whole, and for aught that appears, he might well have so done, or, he might have sold his third part, and made the purchaser tenant in common with the plaintiff. The testimony conduced to prove such to have been the fact, and that the plaintiff and defendant both acquiesced in this disposition of the cheese. In that case, there would exist the privity, which, it is said, is essential to sustain the action of account. But the judge, by rejecting the testimony, would not suffer the assent of the plaintiff to the sale, nor the agreement of the defendant to consider the plaintiff tenant in common with him, to be inferred from the testimony. In this, I think, the decision was erroneous ; and that a new trial should be granted.

The other Judges were of the same opinion, except BRAIN-
ARD, J., who was absent.

New trial to be granted.

---

## The inhabitants of the town of LITCHFIELD *against* The inhabitants of the town of FARMINGTON.

Though the putting of a letter into the mail, is made, by the act for the support
of paupers, sufficient evidence that notice was given ; yet the fact of putting
such letter into the mail is to be proved, and is open for examination, like
any other fact.

Therefore, where the town of *L.*, plaintiffs in an action for the support of a
pauper, against the town of *F.*, introduced a witness, who testified, that on
the 18th of *June*, 1824, he deposited in the post office at *L.*, a letter direct-
ed to the selectmen of *F.*, informing them of the condition of the pauper ;
and to repel this proof, the defendants offered *B.* and others, selectmen of
*F.*, to prove, that no such letter was received by them, during the year 1824 ;
it was held, that the latter evidence was relevant and admissible.

So too, where the defendants, for the same purpose, offered in evidence the
books and accounts of the post offices at *L.* and *F.*, from which it did not
appear, that any letter was sent from the office at *L.* to that at *F.*, or re-
ceived at the office at *F.* from that at *L.*, in the month of *June*, 1824 ; it
was held, that this evidence was relevant and admissible.

Where the plaintiffs in such action, to shew that a tax had been laid against
the pauper, by the town of *L.*, adduced in evidence the list and tax-book of
that town, from which it appeared, that a tax was laid against " *Asahel
Moss 2nd ;*" and it was claimed by the defendants, that the pauper's real
name was *Asahel Morse ;* and the jury, under the direction of the court,
found, that these names designated the same person ; it was held, that the
pauper was thereby sufficiently identified to render him liable for the tax,
and that the evidence was admissible.

By the statute providing for the support of paupers, as revised in 1821, the
non-payment of taxes does not prevent the gaining of a settlement by six
years' residence ; but the resident, for that neglect, is liable to be removed.

THIS was an action of *assumpsit*, brought *December* 5th,
1826. The declaration comprised two counts : the first spe-
cial, for the support of *Asahel Moss* and family, from the 20th
of *May* 1825 to the 1st of *July* 1826 ; the second, general
*indebitatus assumpsit*.

The cause was tried, on the general issue, at *Litchfield*, *Feb-
ruary* term 1828, before *Peters*, J.

*Reuben Webster*, a witness introduced by the plaintiffs,
who, at the time the relief was furnished, was one of the select-
men of the town of *Litchfield*, testified, that on the 18th of
*June* 1824, and within five days after the commencement of

the expenditures for one of the paupers, he deposited in the post office in *Litchfield*, for transmission by mail, a letter, signed by him as such selectman, directed to the selectmen of *Farmington*, informing them of the pauper's condition, stating his name, and that he was chargeable in the town of *Litchfield*. The defendants then offered *George Cowles* and others, selectmen of *Farmington*, for the year 1824, to prove that no such letter as that testified to, by *Webster*, nor any letter relating to this pauper, was received, by them, or either of them, during the year 1824. To this evidence the plaintiffs objected ; and the judge rejected it

The defendants also offered in evidence certain books and papers, which they claimed were records kept at the post office in *Farmington*, by the postmaster, of all letters received at that office ; which records, as the defendants claimed, contained no account of any letter received at that office, from *Litchfield*, during the month of *June* 1824. On the objection of the plaintiffs, the judge rejected this evidence. The defendants then offered to read in evidence certain books and papers, which they claimed were accounts and records kept at the post office in *Litchfield*, by the postmaster, of all mails made up and letters sent from that office ; from which accounts and records, as the defendants claimed, it did not appear, that any letter was sent by mail from that office to *Farmington*, at any time during the month of *June* 1824. This evidence, also, the judge, on the objection of the plaintiffs, rejected.

It was agreed between the parties, that *Asahel Moss*, mentioned in the first count, removed with his family from *Farmington* to *Litchfield* sometime between the 15th and 20th of *April* 1817 ; that at the time of his removal into *Litchfield*, he was a legally settled inhabitant of *Farmington ;* that he resided in *Litchfield* for the full period of six years next after his removal into that town, without becoming chargeable ; that the supplies for which the plaintiffs claimed to recover, were in fact furnished by them, for the support of *Moss* and his family ; that *Moss* and his family, at that time, were paupers, in need of the relief furnished ; that due notice, both of the condition of these paupers, and of the expenditures incurred, had been given to the defendants, and demand of payment made. The defendants did not claim, or offer any testimony to prove, that *Moss* had gained a settlement in *Litchfield*, in any other way than by commorancy. The plaintiffs claimed, that *Moss* had

*Litchfield,*
June, 1828.

Litchfield
*v.*
Farmington.

failed to gain a settlement in *Litchfield*, because he had not paid all the lawful taxes assessed against him, during said period of six years, within the time by law prescribed for payment ; and adduced evidence to prove, that the inhabitants of *Litchfield*, in a town meeting held on the 10th of *November*, 1817, laid a town tax of three cents on the dollar. on the list of 1817 ; and that *Charles Buck* was appointed collector.    And to prove that a town tax was laid against *Moss*, upon the list of 1817, the plaintiffs read in evidence the grand list of the town of *Litch-field* of that year, and also the tax-book and warrant made out thereon and delivered to the collector, in which, as the plaintiffs claimed, a tax was laid against the pauper *Moss*, designated in the list and tax-book by the name of " *Asahel Moss 2nd.*" The plaintiffs also adduced evidence to prove, that at the time when such list and tax-book were made up, there was residing in *Litchfield* another person, by the name of *Asahel Moss*, and that the addition " 2nd " to the name of the pauper, was made for the purpose of distinguishing him from the other person of the same name ; and that the person designated in the list and tax-book as " *Asahel Moss* 2nd," was the same person who removed from *Farmington*, and to whom the supplies were furnished    There was also evidence to shew, that the tax was duly demanded of this person, by the collector, and that he had never paid it.    The defendants introduced evidence to prove, that the pauper's real name was *Asahel Morse ;* and thereupon prayed the judge to charge the jury, that if they should so find, that they must also find, that the tax in question was not a legal tax against the pauper.

The plaintiffs also adduced evidence to prove, that the pauper had neglected to pay, within the time prescribed for payment, after due demand made by the collector, a town tax, laid by the town of *Litchfield*, on the 1st of *November*, 1821, upon the list of 1821, and payable to the collector, on the 1st of *May*, 1822.

The judge charged the jury, that if they should find, that *Asahel Morse* was the same person as *Asahel Moss 2nd*, and that said *Moss* had neglected to pay, within the time prescribed for payment, any lawful tax against him, payable by him within said period of six years from the time of his first removal into the town of *Litchfield*, demand having been duly made, they must find that the pauper had gained no settlement in *Litchfield ;* and as all the other allegations in the first count

were admitted by the defendants, their verdict must be for the
plaintiffs.

The jury returned a verdict for the plaintiffs; and the de-
fendants moved for a new trial, on the ground that the evidence
offered by them, was improperly rejected, and that the charge
was erroneous.

*J. W. Huntington* and *O. S. Seymour,* in support of the
motion, contended, 1. That evidence that no letter was re-
ceived, by the select-men of *Farmington,* and none received
at the post-office in *Farmington,* and none sent from the *Litch-
field* post-office, ought to have been admitted, to shew, that
Mr. *Webster* was mistaken in his testimony. It was not com-
petent to the judge to decide, that that testimony conclusively
proved the fact of notice, or that a letter was put into the post-
office at *Litchfield.* If the evidence was of any weight to dis-
prove, counteract or discredit *Webster's* testimony, it was re-
levant and admissible. Suppose that *A.* swears, that he sent
a letter by *B.* to *C.;* may not *B* be permitted to swear,
that he received no such letter to carry, and that he kept a strict
account of all letters received by him to carry, and that no
such letter appeared in his account. Suppose a merchant in
*New York* swears, that he sent certain goods, previously order-
ed, by the steam-boat *Macdonough;* may not the captain of
the *Macdonough* swear, that such goods were never sent by
him, and that he kept an account of all goods sent by him, and
among them these goods were not to be found?

2. That if *Moss* 2nd and *Morse* are different names, no ev-
idence was admissible to explain the tax books, and shew, that
*Moss* 2nd was *intended* for *Morse;* and of course, the charge
of the judge to the jury, that if they should find that the tax
was *intended* for *Morse,* they might treat it as a legal tax against
him, was incorrect. *Grant* v *Naylor,* 4 *Cranch* 224. 235, 6.
This is not the case of a man having originally one name, shew-
ing that he had gained another name by reputation; but it is
an attempt to shew, by parol, what the tax books *meant.* *Cole*
v. *Hindson* & al. 6 *Term Rep.* 234. *Scandover* & al. v.
*Warne,* 2 *Campb.* 270.

3. That *Morse* and *Moss* 2nd are different names. They
are written differently, and they are not *idem sonans.* *The
King* v. *Shakespeare,* 10 *East* 83. *The King* v. *Westly,* 10
*East* 85. n. The addition of "2nd," if the names were other-

wise alike, would designate a different person.   *De Kentland* v. *Somers*, 2 *Root* 437.   *The Commonwealth* v. *Perkins*, 1 *Pick.* 388.   *Commonwealth* v. *Hall*, 3 *Pick.* 262.   *Morse* might well object to this tax, and say : " My name is *Asahel Morse.*   You have got a tax against *Asahel Moss* 2nd.   Go and collect the tax of him."

4. That the non-payment of taxes, which became due after the 1st of *January* 1822, when the revised statutes took effect, does not prevent a settlement, by six years commorancy.   To this point the express provisions of the 3d and 4th sections of our statute of settlements, are conclusive.   *Stat.* 280.   It is true, that during the commorancy, the pauper is liable to removal.   But the object of giving the power to remove, is, *prima facie,* to prevent a settlement.   Such is the object of the *English* statute of removal.   The inference, therefore, is almost irresistible, that if the pauper is not removed, he gains a settlement.   *Tolland* v. *Lebanon*, 1 *Root* 398.

It may be said, that the power to remove is *indefinite,* and therefore always exists ; and if it always exists, there can be no settlement.   But courts will not strain language to make a statute contradict itself.   The two parts can be construed so as to harmonize, by considering the power of removal to exist until a settlement is gained, and no longer.   Besides, the construction which this objection requires, makes that which is implied and argumentative, destroy that which is express; whereas if there be a contradiction, the contrary is the clear rule.   This construction, moreover, leads to absurdity, as it will go the length of determining, that in case of an estate purchased, &c. no settlement is gained, unless taxes are paid.

It may be urged, that the new statute is *prospective,* and that there must be a residence of six years under that statute, or six years under the old statute ; and that the time before the new statute went into operation and the time since, cannot be tacked together.   But the confirming act (*Stat.* 485 ) has provided for this precise case.   That act provides, that where the new revision literally or substantially corresponds with the old, so far as they do thus correspond, the new shall be considered as *ante-dated,* and to have continued in force from the time when first enacted.   The revision, then, so far as the statutes are the same, operates merely as a continuance of the old law, and so far as they differ, the general repealing clause abrogates the old statute.

*Bacon* and *Sanford*, contra, contended, 1. That the evidence offered by the defendants relative to the transmission of notice, was properly rejected. In the first place, no evidence was produced to shew, that the books and papers offered were in fact what the defendants claimed them to be, *viz.* records containing accounts of all letters sent and received. The *claim* of the defendants, without any evidence to support that claim, did not entitle them to have these papers considered as " records," and still less as records of " all letters sent and received."

Secondly, both the books and the testimony of the selectmen were inadmissible, because both were *irrelevant.* The 5th section of the statute provides, that a letter containing notice put into the mail, shall be sufficient evidence of notice at the time the letter would reach the post-office in the place to which it was directed, in the usual course of the mail. The putting of the letter into the post-office for transmission by mail, was a full compliance with the law. Whether it ever reached the defendants or not, is totally immaterial.

Thirdly, these papers were not the best evidence. They contained the entries of third persons, unsupported by the obligation of an oath. The post-masters ought to have been introduced and sworn ; and they might then have referred to their entries to refresh their memories. 1 *Stark. Ev.* 305.

Fourthly, The evidence in question was inadmissible for the purpose of disproving the fact that the letter was put into the *Litchfield* post-office. This is, if any thing, presumptive evidence. The defendants propose to have the jury infer one fact from another to be proved, *viz.* from the fact that the letter was not entered in the books of the *Farmington* post-office in *June* 1824, nor received by the select-men in the year 1824, that it was never put into the *Litchfield* post-office. But to authorize such an inference, the connexion between these two facts must be shewn. 3 *Stark. Ev.* 1234, 5. There is no natural connexion between them ; and he who claims the benefit of such a presumption, must shew how it arises—must discover the dependence of one fact upon another. But upon this point the motion is entirely silent ; and this court cannot discover it. It does not appear, that the defendants proved, or even claimed, that in the ordinary course of business, any mail for *Farmington* left the *Litchfield* post-office, after the 18th of *June*, during the residue of that month ; or if it did, that it would, in the ordinary course of the mail, reach the *Farming-*

ton post-office in that time ; nor in the residue of the year 1824 ; nor that either of the select-men of *Farmington* ever enquired at the office for letters ; nor that they had, or were in the habit of having, any communication whatever with the post-office. All these are the connecting links between the fact proposed to be proved and the inference to be raised— links without which the connexion fails.

2. That the evidence of the non-payment of the tax of 1821, was properly admitted. The objection to this evidence is founded on a supposed alteration of the law in 1821, in consequence of which payment of taxes, at the time this tax became payable, was not necessary to the gaining of a settlement. But the law was not altered at the revision. The revised act consisted of two separate acts ; the old statute as it existed in the edition of 1808, and the act of 1810. It was the manifest object of the legislature of 1821 to incorperate these two acts in one. Under the statute of 1821, as well as under the former acts, the person removing can gain no settlement without the payment of taxes, because he is liable to be removed. Such is the construction put upon the act, by Judge *Swift.* 2 *Swift's Dig.* 820.

But if the law is materially altered, and if under the statute of 1821 payment of taxes is not necessary to the acquisition of a settlement, still the evidence was not properly admitted, because the statute is *prospective* only, and this case does not fall within the scope of its provisions. The phraseology of the section is expressly and exclusively prospective. But were it otherwise, no act is to receive a retrospective operation by construction. *Goshen* v. *Stonington,* 4 *Conn. Rep* 211.

Further, the statute of 1810 provides, that no such person shall gain a settlement, who shall have neglected to pay any of the lawful taxes which *may have arisen* against him while so residing within the time prescribed for payment thereof. This tax *had arisen* against the pauper before the statute of 1821 went into operation. It was laid on the 1st of *November* 1821, upon the list of 1821. He became immediately charged with it, and could exonerate himself from it in no way but by payment. When it became *payable, by the collector,* into the treasury, is immaterial.

3. That the charge of the Judge was unexceptionable. First, as to the name of the pauper. The question left to the jury was, whether both names designated one and the same

person. This was the proper enquiry, as the only use of a
name is *designatio personarum ;* and being a mere matter of
fact, it was properly referred to the jury. This Court cannot
now know, that the names are different. The addition " 2nd"
is mere description, and no part of the name. It was placed
there merely as a directory to the collector. Then *Morse* and
*Moss* are the same name ;—the same in sound, in origin and in
common use. *Petrie* v. *Woodworth,* 3 *Caines* 219.

<div style="text-align: right;">

*Litchfield,*
June, 1828.

Litchfield
*v.*
Farmington.

</div>

Secondly, The charge is equally unexceptionable upon the
remaining point. The reasoning upon the admissibility of the
evidence relating to the tax of 1821, is applicable also to this
point. If the law was not altered at the revision, non-payment
of any tax within the whole period of six years, would have
prevented the acquisition of a settlement. But if the law was
altered, this case does not fall within the operation of the new
law, for the reasons before suggested.

DAGGETT, J. The first ground stated for a new trial, is,
that the testimony of *George Cowles* and others, selectmen of
*Farmington,* that they had received no letter from *R. Webster,*
during the year 1824, ought to have been admitted.

The 5th sect. of the statute providing for the support of pau-
pers, (*page* 370.) declares it to be the duty of the selectmen of
every town, wherein a person not an inhabitant of such town,
residing therein, shall become poor and unable to support him
or herself, to furnish necessary support ; and if the pauper be-
longs to any other town, to give notice of his condition to such
town within a certain number of days. It also declares, that
*a letter put into the mail* stating the name of the pauper, and
that he is chargeable, signed by one of the selectmen of the
town wherein he resides, directed to the selectmen of the
town where he belongs, shall be *sufficient evidence* that notice
was given, &c. The plaintiffs, on the trial of the issue joined,
introduced *R. Webster,* a selectman of *Litchfield* in 1824, who
testified, that on the 18th of *June* 1824, he deposited in the
post office at *Litchfield,* a letter directed to the selectmen of
*Farmington,* informing them of the condition of one of the
paupers mentioned in the declaration. To repel this proof,
the defendants offered *George Cowles* and others, selectmen
of *Farmington,* to testify, that no such letter was received by
them, or either of them, during the year 1824. An objection
was taken, by the plaintiffs, to the admission of these witnesses.

and they were rejected.    I think the testimony ought to have been received ; and that it was rejected from a misapprehension of the true construction of the act mentioned.    The statute does indeed declare, that a letter *put into the post office* according to the direction therein given, shall be deemed *sufficient evidence* that notice was given of the condition of the pauper, &c. ; but whether such letter *was put* into the post office, is a question of fact, to be ascertained by proof.    It is open for examination, like any other fact ; and being proved, the statute renders it *sufficient evidence.*    The statute does not declare, that if a selectman *shall testify*, that he put a letter into the post office, &c. the other party shall be concluded by his oath.    His oath is not in the nature of evidence by record, " importing absolute verity "

The only doubt that can here arise, is, was the testimony *relevant ?*    Did it tend, *in any degree*, to repel the testimony of *Webster ?*    It surely was not illegal ; and it would be too much to say, that the testimony of these selectmen might not induce a jury to believe, that there was some mistake in relation to putting the letter into the post office ; as in its direction. If so, it was proper to be left to the jury ; and hence improperly rejected by the court.

2. Another ground of new trial, is, the rejection of the proof arising out of the papers, books, &c. of the post offices of *Litchfield* and *Farmington*, that no such letter was sent or received in the month of *June*, 1824.    This evidence was of a still higher nature, and therefore more entitled to the attention of the jury.    But an objection is here raised, that it does not appear, by the motion, that these papers, &c. were accompanied with evidence, that they were the records of these offices of all letters sent and received.    This objection, according to the decision of this court, that he who objects to the opinion of the judge in a question of testimony, ought to show on the face of his motion, that it was proper evidence, is deserving of consideration.    As the first ground, however, is sufficient, it is unnecessary to decide this point.

3. Another reason for a new trial is urged, *viz.* that the taxes mentioned in the motion, were in the tax-books, set against *Asahel Moss*, and not against *Asahel Morse*.    I think the judge placed this point in its proper light to the jury.    He instructed them, that if the pauper was intended by the name, *Asahel Moss*, a name sounding very like *Asahel Morse*, then

the objection ought not to prevail. Great strictness is required *Litchfield,* in the description of records, in names in indictments, and June, 1828. other criminal proceedings, and slight errors are fatal in ques- Litchfield tions of variance. *The King* v. *Shakespeare,* 10 *East,* 83. 85. v. *Gordon* v. *Austin* & al. 4 *Term Rep.* 611. *Coole* v. *Hindson* Farmington. & al. 6 *Term Rep.* 234. But this misnomer, if so it may be called, stands on different ground. If the pauper was suffi- ciently identified to render him liable for the tax, then the sta- tute attached upon him ; and in my opinion, he was so iden- tified.

4 A more important question arises on the construction of the 3d and 4th sections of the statute, *tit.* 51. Inhabitants. *p.* 280. Under that statute, can a person removing from one town to another, gain a settlement in the town to which he has removed, and in which he has resided six years, not having been chargeable to the town, nor removed therefrom, but hav- ing neglected to pay the taxes assessed and demanded ? This act was passed in 1821. In 1810, an act was passed on this subject as follows :—" No person, who is an inhabitant of any town in this state, shall, in virtue of the six years residence in any other town in this state mentioned in the 4th section of the act to which this is an addition, (ed. of 1808. *page* 390 ; gain a legal settlement in the town to which he may have so removed, who shall have neglected to pay any of the lawful taxes which may have arisen against him, while so residing, within the time prescribed for payment thereof; and if any such person shall, at any time before the expiration of said term of six years, and within the time prescribed for the payment of such taxes, de- mand having been first made of him by the collector thereof, neglect or refuse to pay the same, in that case every such per- son, with his or her family, if any be, may be removed to the place of his or her last legal settlement, &c." It is observable, that this statute absolutely forbids the *gaining a settlement,* if the taxes remain unpaid, having been demanded. In 1821, the legislature, with the enactment of 1810 in full view, passed the act under consideration, and repealed that of 1810. By the 3d section of the act now in force, it appears how a legal settlement can be gained, or rather, it declares that a settle- ment shall not be gained, unless the person have some one of the requisites enumerated in the first section, or have been possessed of a real estate of the value of 100 dollars, while he continued in the town to which he has removed, or has sup-

Litchfield, ported himself for six years. His non-payment of taxes, as a
June, 1828. prohibition of gaining a settlement, is dropped, and the lan-
Litchfield guage employed provides only, that he, *for that neglect, may be*
v. *removed*, &c. It thus appears, that the law of 1810 is sub-
Farmington. stantially altered, in this particular, by the law of 1821. By
the latter act, the town must *remove the person* within the six
years, and thus prevent a settlement in cases where taxes are
not paid. I do not feel at liberty to construe the language of
the legislature otherwise. But the counsel for the plaintiffs
insist, that this act is not to be construed so as to have a re-
trospective effect. If *A. B.* had removed from *C.* to *D.*, on
the 1st of *January* 1818, while the act of 1810 was in force,
and there remained till the 1st of *January* 1824, without hav-
ing become chargeable, though he had not paid taxes demand-
ed after *January* 1822, (when the law went into operation,) he
has become settled in *D.* If so, the non-payment by the pau-
per, of the tax of 1821, payable the 1st of *May* 1822, as stated
in the motion, did not affect the question of settlement; and
therefore, the charge of the judge, that if *any* of the taxes, in-
cluding that of 1821, remained unpaid, after demanded, *Morse*,
the pauper, had not gained a settlement in *Litchfield*, was
incorrect. On the first and last ground, I would grant a new
trial.

The other Judges were of the same opinion, except BRAIN-
ARD, J., who was absent.

New trial to be granted.

---

SMITH *against* LOOMIS:

#### IN ERROR.

Where there is a contract for the delivery of specific articles at a time and
place specified, the absence of the promisee at such time and place, does
not dispense with such acts on the part of the promisor, as are necessary to
vest the property in the promisee.

The mere fact that the promisor had the articles, at the time and place ap-
pointed, ready to be delivered, is not sufficient to vest the property in the
promisee.

To constitute a good defence to an action on such contract, the articles must
be set apart and designated, so as to enable the promisee to distinguish
them from others.

Therefore, where the defendant in an action on such contract, pleaded, that *Litchfield,* he had the articles, at the time and place appointed, ready to be delivered, but June, 1828. the plaintiff did not appear to receive them ; after verdict for the defendant on such plea, it was held, that the matt r pleaded constituted no defence ;— that the defendant should have designated the articles intended for the plaintiff and set them apart, so as to vest the property in him ; and that the defect was not cured by verdict.

*Smith*
*v.*
*Loomis.*

THIS was an action brought by *Smith* against *Loomis,* on a note or contract in writing, signed by the defendant, in and by which the defendant promised the plaintiff to pay or deliver to him, or bearer, for value received, 51 dollars worth of good merchantable brick, at five dollars per thousand, to be delivered at his the defendant's brick-yard in *Torrington,* by the 1st of *November,* 1824. The defendant pleaded, 1st, *non-assumpsit :* 2ndly, that on the 1st of *November,* 1824, at the time said note became due, the defendant had ready to be delivered to the plaintiff, at his the defendant's brick-yard in *Torrington,* fifty-one dollars worth of good merchantable brick, *viz.* 10,200 good merchantable brick, well worth five dollars *per* thousand ; which said brick the defendant had then and there ready to deliver to the plaintiff in full satisfaction of said promise ; and the plaintiff did not, at said time and place, or at any other time, appear to receive said brick, or any part thereof ; but the same ever since have been, and now do remain in said brick-yard, ready for the plaintiff, whenever he shall see fit to receive the same on said contract : 3rdly, a tender. Issues being joined on these pleas, the cause was tried in the county court, and the jury found a verdict for the plaintiff on the 1st and 3rd issues, and for the defendant on the 2nd issue. The plaintiff moved in arrest of judgment for the insufficiency of the 2nd plea. This motion the county court overruled, and rendered judgment for the defendant. On a writ of error in the superior court, that judgment was affirmed ; and the record is now transmitted to this court for revision.

*P. Miner* and *J. Miller,* for the plaintiff, contended, 1. That to constitute a sufficient excuse for the non-performance of a contract, the party claiming the benefit of such excuse, whether plaintiff or defendant, must shew, that he has done all that he could do towards performance. 1 *Chitt. Plead.* 318. *Bordenave* v. *Gregory,* 5 *East* 107. 3 *Stark. Ev.* 1397. *West* v. *Emmons,* 5 *Johns. Rep.* 179. *Lancashire* v. *Killing-*

*Litchfield,*
*June, 1828.*

Smith
*v.*
Loomis.

*worth,* 1 *Ld. Raym.* 696.    *Newton* v. *Galbraith,* 5 *Johns. Rep.*
119.    *Thomas* v. *Evans,* 10 *East* 101.    Generally, the party
bound to perform, can either actually perform, or offer to per-
form.    The only cases excepted from this remark, are, where
the party bound to perform cannot do the act, without the
concurrence of the other party; and in those cases, a readiness
to do the act, is sufficient; as to assist *J. S.* to build a house—
or to secure by mortgage the purchase money of property to
be conveyed, &c.    With regard to personal property, to be
delivered at a time and place specified, there is no difficulty in
delivering it absolutely.    The party needs no excuse for non-
performance; for he can actually perform; and having done
his own duty, the absence or negligence of the other party,
will not affect him.    *Fowler* v. *Fowler,* 3 *Conn. Rep.* 348. 353.
1 *Swift's Dig.* 294.    *Avery* & al. v. *Stewart* & al. 2 *Conn.*
*Rep.* 69.    *Nichols* v. *Whiting,* 1 *Root* 443.    The effect of a
delivery is to vest the title in the other party.    But a mere
readiness to perform, does not produce this effect.    In this case
the defendant's 10,200 bricks, in his brick-yard, were as truly
his, after the 1st of *November,* 1824, as they were before.    The
defendant, then, did less than he might have done.    He could
and ought to have transferred the title.

2. That the defect was not cured by the verdict.    It ap-
pears by the verdict, 1st, that the defendant did assume and
promise; 2ndly, that he did not tender; 3rdly, that he was
ready to perform.    Now, all implication of tender, from one
imperfectly stated, is cut off, by the express finding.    *Express-*
*um facit cessare tacitum.*    But further, this is not a case of de-
fective statement, but of the total omission of an independent
necessary fact, which is never cured by verdict.    1 *Swift's*
*Dig.* 777.    *Griffin* v. *Pratt* & al. 3 *Conn. Rep.* 513. 514.    1
*Day* 186, 7. n.

*J. W. Huntington* and *T. Smith,* for the defendant, contend-
ed, 1. That the averment that the defendant had the brick, at
his yard, on the 1st of *November,* 1824, and was then and there
ready to deliver the same to the plaintiff, in full satisfaction of
the note, connected with the averment, that the plaintiff did
not, at said time, appear to receive the brick, and that the same
have ever since remained in said yard, ready for the plaintiff,
whenever he shall see fit to receive the same on said contract, is
sufficient, and would have been good on demurrer.    Original-

ly, payment was to be made in brick, and not in money. The enquiry then arises, how can the promisor legally discharge himself from the obligation into which he has entered? If the contract is unrescinded, only in three ways: 1st, by *actually delivering* the brick to the promisee, at the time and place appointed; 2ndly, by *tendering* it to the promisee, at the time and place appointed; 3rdly, by being ready, at the time and place, with the brick, to discharge the obligation, and the promisee being absent, and not in a situation in which it could either be delivered or tendered to him. Now, it is obvious, that the promisor was not bound to deliver or tender at any other time or place, than the one appointed. Indeed, a tender at any other time or place, would have been bad. What, then, is he to do, when the time arrives, to discharge the obligation, and save the payment of it in money? He is to go to the place appointed, and have the article there. This was done. If the promisee is there, he might offer or tender it to him. If he is not there, he cannot *deliver*. Can he tender? Clearly not; and for the same reason. An obligation to tender, *ex vi termini*, implies there is some one to receive. Now, what else can he do? Absolutely nothing. His readiness at the time and place appointed, is enough, if the promisee is not there. For, in the first place, he has done all he could do, to discharge the obligation, except to declare to the open air. *Lex non cogit ad vana seu impossibilia.* Secondly, if this does not discharge the obligation, then the promisee, by staying away, can convert a promise to pay a collateral article, into a promise to pay money. Thirdly, if this will not do, he must tender to the *person* of the promisee; which makes the contract different from what the parties made it. Fourthly, it was through the *default* of the promisee, that the article was not delivered; for he was bound to be there. *Robbins* v. *Luce*, 4 *Mass. Rep.* 474. 6 *Bac. Abr.* 459. (*Gwil.* ed.) *tit. Tender. G. West* v. *Emmons*, 5 *Johns. Rep.* 179. 1 *Chitt. Plead.* 310. 314. 2 *New Rep.* 240. c. n. (*Day's* ed.) *Hughes* v. *Phillips, Yelv.* 38. *Levy* v. Lord *Herbert,* 7 *Taun.* 314. *Wilt & Green* v. *Ogden,* 13 *Johns. Rep.* 56.

It is said, that the defendant must do an act, which will *vest* the property in the promisee. This is not necessary, if to cause it to vest, the promisee must be *present:* by his wilful default, he has prevented it. But it *did vest,* by having it ready

*Litchfield,*
June, 1828.

Smith
*v.*
Loomis.

*Litchfield,*
June, 1828.

Smith
*v.*
Loomis.

at the time and place. It has ever since been subject to the plaintiff's controul.

2. That the averment that the defendant was ready to deliver the brick, at the time the note became due, is equivalent to the usual allegation of a readiness *at the utmost convenient time of the day. Com. Dig. tit.* Pleader. 2 W. 49. *Porter* v. *Rose,* 12 *Johns. Rep.* 209. 2 *Conn. Rep.* 84. *per Gould,* J.

3. That if there was any defect in the plea, it has been cured, by the verdict given for the defendant. *Rushton* v. *Aspinall, Doug.* 679. *Fuller* v. *Hampton,* 5 *Conn. Rep.* 416. *Rawson* & al. v. *Johnson,* 1 *East* 203. 209. 212. *Spencer* v. *Overton,* 1 *Day* 183. *Pangburn* v. *Ramsay,* 11 *Johns. Rep.* 141. 1 *Chitt. Plead.* 403. 119.

PETERS, J. By the terms of this contract, the defendant was bound to pay or deliver to the plaintiff 10,200 brick, at a certain time and place. But he neither delivered, offered, nor tendered them, though he claims to have done that which was equivalent. He was on the spot, and had the brick ready to deliver, but did not deliver nor tender them, because the plaintiff was absent. He certainly could have designated the brick intended for the plaintiff, and set them apart, and thus have paid the debt, by vesting the property in the plaintiff. Until this was done, the note remained unpaid, and the defendant liable to be sued. The presence of the creditor was not necessary to enable the debtor to fulfil his contract. A tender might as well have been made in his absence as presence. A tender would have been as effectual a bar as payment, and would as effectually have vested the property in the plaintiff. " If," says the late Chancellor *Kent,* " the debtor makes a tender of specific articles, at the proper time and place, according to contract, and the creditor does not come to receive them, or refuses to accept them, the better opinion is, that the debtor is thereby discharged. And the analogies of the law would appear to lead to the conclusion, that on a tender of specific articles, the debtor is not only discharged from his contract, but the right of property in the articles tendered passes to the creditor." 2 *Com.* 400, 1. " Besides," says *Chipman,* (*Essay on Contracts* 158.) " there are cases, where the tender is good and effectual, even to the discharge of the contract, when there never was any thing but a constructive refusal. Such are all the cases of a tender of specific articles, at a time and place

certain, when the creditor, from any cause whatever, does not <span style="float:right">*Litchfield*,</span> attend ; the tender at the time and place is as complete a discharge of the contract, as if the creditor were personally present, and actually refused.    The discharge of the debtor, in this, as in all other cases, goes on the broad ground that he has done all incumbent on him to fulfil his contract."    6 *Bac. Abr.* 459. Has the defendant, in the case before us, done all incumbent on him to fulfil his contract ?    It does not appear, that he set apart the brick intended for the plaintiff, nor did any act to invest him with the property.    In *McConnel* v. *Hall,* in an action on note for a wagon worth 60 dollars, payable at the defendant's store, at a day certain, the defendant pleaded, that he was ready at the time and place to deliver such a wagon to the plaintiff, but he did not attend to receive it.    It was decided, that if the property is delivered according to the contract, or tendered, the contract is discharged, and the property belongs to the creditor.    " The promisor," say the Court, " must perform his contract, as far as is practicable.    Proving that he was able to perform, would be no evidence of his intention to fulfil. Proving that he had made preparations to fulfil, previous to the day, is no evidence of such intention to fulfil on the day.    The promisor, after a fulfilment of his contract, is not bound to keep the property always ready, as in case of a tender of money.    He must, therefore, make such designation of the article, on the day and at the place of payment, as will transfer the property to the promisee, and enable him to pursue the property itself.    The charge of the judge upon the evidence, was incorrect, in this, that if the jury found from the evidence, that the defendant had the property, *i. e* the wagon, ready, on the day and at the place mentioned in the note for the delivery thereof, and of the description specified, it would amount to the fulfilment of the contract on his part."    *Brayton's Rep.* 223.    A similar opinion, upon a similar statement of facts, was expressed by the supreme court of *New-York,* in *Newton* v. *Galbraith,* 5 *Johns. Rep.* 119. and in *Barnes* v. *Graham,* 4 *Cowen* 452.

The margin note beside the above text reads: *Litchfield,* June, 1828. Smith *v.* Loomis.

Though we find much confusion and contradiction in the books on this subject—(vide *Chipman, passim.*) our own practice seems to have been uniform, for nearly sixty years, and establishes these propositions.    1. That a debt payable in specific articles, may be discharged, by a tender of these articles, at the proper time and and place.    2. That the articles must

*Litchfield,*
*June, 1828.*

Smith
*v.*
Loomis.

be set apart and designated so as to enable the creditor to distinguish them from others.    3. That the property so tendered vests in the creditor, and is at his risk.    4. That a tender may be made in the absence of the creditor.    In *Rix* v. *Strong*, 1 *Root* 55. *Bacon* owed *Rix* 24 *l.* 10 *s.* payable in horses, at a certain time and place.    *Bacon* tendered the horses ;    *Rix* refused them, and sued *Bacon*, who pleaded the tender, and prevailed.    *Rix* sued *Strong* in trover for the horses, and recovered.    The court said, as the tender was legal, the property in the horses vested in the plaintiff.    In *Nichols* & al v. *Whiting*, in error, 1 *Root* 443. in an action on note payable in shop-work, at the defendants' (*Nichols'*) shop, they pleaded, that at the time and place the note became payable, they tendered shop-work, such as chairs, bedsteads, &c. sufficient to pay said debt.    The court decided the plea insufficient, because it did not particularize the shop-work, whereby they could be distinguished ; otherwise, the plaintiff would be barred of his action by the tender, and not be able to recover the articles tendered.    In *Gallup* v. *Coit*, at *Norwich, March*, 1808, in an action on note for 20*l.* in rum, the defendants tendered 48 gallons in a hogshead containing 70 gallons.    The court said, the rum must be set apart, and designated, so that he whose property it becomes, by the tender, may bring trover for it. The tenderer ought to be exact as to quantity, and not tender 100 gallons for 48 ; nor one hogshead among 100, by saying here is *one*, take what is your due.    *Mss.* of *Mitchell,* late Ch. Justice.    And such has been the course of decisions. The judgment below was governed by the decision of Chief Justice *Parsons*, in *Robbins* v. *Luce*, 4 *Mass. Rep.* 474 ; but it is certainly erroneous.

The other Judges were of the same opinion, except BRAINARD, J., who was absent.

Judgment reversed.

———◆———

Humphrey *against* Humphrey.

In civil proceedings, unless the character of the party be directly put in issue, by the proceeding itself, evidence of his general character is inadmissible.

And it makes no difference, whether such evidence is offered to rebut positive or presumptive testimony.

Therefore, where the respondent, on the hearing of a petition for a divorce, on the ground of adultery, for the purpose of rebutting presumptive testimony, adduced by the petitioner, to prove that crime, offered evidence that her general character was fair ; it was held, that such evidence was inadmissible.

*Litchfield,*
June, 1828.

Humphrey
*v.*
Humphrey.

THIS was a petition for a divorce, charging the respondent *Hannah Humphrey*, the wife of the petitioner, with having committed the crime of adultery. On the hearing before *Peters, J., Litchfield* county, *February* term 1828, the petitioner, for the purpose of proving the crime alleged in the petition, introduced a witness, who testified, that in *January*, 1827, he and several other persons were in *Virginia*, on business ; that the respondent was with them, in the capacity of a cook ; that they occupied one room only, which was not large ; that in this room, there were eight or nine beds, in view of each other, in which they all slept ; that the bed in which the respondent usually slept, stood in a corner of the room, with curtains about it ; that while the inmates of this apartment were all present and in bed, between 9 and 10 o'clock at night, and while there was so much light that a person might be distinctly seen over the room, the respondent, after remarking that it was a cold night to sleep alone, took off her gown and got into bed, in view of all the persons in the room, with two men, and there remained with them until the witness went to sleep. The witness also testified, that about the 1st of *March* 1827, a man, in the course of the evening, lay down upon the bed of the respondent ; some time after which, she went within the curtains ; and that about an hour afterwards, the man got up and left the bed. To rebut the presumption of the respondent's guilt arising from this testimony, her counsel offered sundry witnesses, to prove, that they had been well acquainted with her for several years ; and that she had always sustained a fair character. To the admission of this evidence, the petitioner objected ; but the court admitted it, and denied the application for a divorce. The petitioner moved for a new trial, on the ground that the evidence adduced by the respondent was improperly admitted.

*J. W. Huntington* and *T. Smith*, in support of the motion.

*P. Miner*, contra.

DAGGETT, J. By the motion, it appears, that the testimony

*Litchfield,*  to the adultery of the respondent, was presumptive rather than
June, 1828.  positive ; and the judge, at the circuit, supposed, that evidence
Humphrey  of general character was properly received to rebut such testi-
*v.*  mony.    It seems quite clear, that the nature of the proof given
Humphrey.  by the petitioner, lays no foundation for the introduction of this
species of evidence.

The question is merely, did the respondent commit adultery ?
If she might be permitted, in this case, to repel proof of that
fact, by showing the goodness of her character, she might, in
any other instance, be the proof positive, or merely presump-
tive.    The court is, therefore, called upon to decide a general
question, applicable to all similar cases.    The rule of law is,
that in civil proceedings, unless the character of the party be
directly put in issue, by the proceeding itself, evidence of his
general character is not admissible.    *Swift's Ev.* 140.    2 *Star-
kie's Ev.* 366.    This rule ever has been regarded in our
courts, and is too firmly established to be shaken, at this day.
More than forty years since, in *Woodruff* v. *Whittlesey, Kirby*
62., on a question whether a conveyance of land was fraudu-
lent, the evidence of the character of the parties to it as to
honesty, was rejected by the court ; and in no instance within
my knowledge, has such evidence been received in any civil
proceeding, unless character was thereby put in issue.    Causes
charging cruelty, gross fraud, and even forgery, are often agi-
tated in suits by individuals ; and the result not unfrequently
deeply affects the property and reputation of the party ; yet no
individual has been permitted to attempt to repel the proof, by
showing a good reputation.

In actions of slander, &c., in which the plaintiff's character
is alleged good, to entitle him to exemplary damages, such en-
quiries are permitted, and for satisfactory reasons :  The com-
pensation for injury to character should be proportioned to its
worth.

The present is a civil suit.    Character is not put in issue by
the proceedings ; and if it can be given in evidence, it may
also be given in evidence, in all in enquiries into facts, affecting
the reputation, in other civil cases.    This principle would lead
to great uncertainty, and be productive of no benefit in the ad-
ministration of justice.

" Formerly, evidence of the defendant's good character, in
criminal proceedings, was admitted in capital cases only, and
that *in favorem vitæ;* but such evidence is now admitted in all

cases, where the character of the defendant is in jeopardy." *Litchfield,* 2 *Starkie's Evid.* 365. But the relaxation of the rule in crim- June, 1828. inal cases, has not affected the rule in civil suits.

It may be sufficient to dispose of this motion, to observe, that the principle adopted by the court below, is unsupported by authority, and has nothing to recommend its adoption. It would make an innovation on the rules of evidence, for which I can see no good reason ; and therefore, it ought not to be sanctioned. A new trial ought, therefore, to be granted.

Hosmer, Ch. J., and Lanman, J., were of the same opinion.

Peters, J., dissented.

Brainard, J., was absent.

New trial to be granted.

*Margin:* Humphrey *v.* Humphrey.

---

WILLIAMS and another *against* CABLE.

An application for a new execution, on the ground that a former execution has been returned satisfied, by a levy on land which was defective, and by which no title was acquired, is substantially a *scire-facias* or action of debt, and must be proceeded with accordingly.

Therefore, where a new execution, in lieu of one so levied and returned, was granted by the court, on motion, without the duty and notice required in civil actions ; it was held, that such execution was void.

THIS was an action of ejectment, tried, on the general issue, at *Fairfield, December* term, 1826, before *Peters,* J.

On the 18th of *March,* 1824, the plaintiffs attached, by a writ in their favour against *Betty Walker,* the demanded premises, which she then owned in fee ; and at the term of the county court in *April,* 1824, they recovered judgment against her for about 350 dollars. On the 10th of *July* 1824, they caused an execution issued on this judgment to be levied on the estate so attached, which was duly appraised and set off to them, so that they acquired thereby a perfect title, unless the title was acquired by another creditor, in consequence of a prior lien.

On the 10th of *March,* 1824, *Sarah Howe* attached the same estate, by virtue of a writ against *Betty Walker,* and at the

*Fairfield,*
*June, 1828.*

Williams
*v.*
Cable.

term of the county court in *April* 1824, recovered judgment against her for 113 dollars, 12 cents.    On the 27th of *April,* this creditor had her execution levied on the premises    The officer's return was as follows : " With this execution I repaired to the debtor's usual place of abode in *Stratford,* and there made demand of money, goods or chattels to satisfy this execution and my fees ; and there being none shewn unto me, by the direction of the creditor, this 27th day of *April* 1824, I levied this execution on a certain piece or tract of land, [describing a tract of land containing twelve acres, which included the premises.]    And the creditor appointed *Elijah Booth,* an indifferent freeholder of said *Stratford,* for an appraiser ; and the debtor appointed *Daniel De Forest,* of said *Stratford,* an indifferent freeholder, for an appraiser ; and the creditor and debtor agreed upon and appointed *Philo Curtiss* of said *Stratford,* an indifferent freeholder, for an appraiser ; and the said three freeholders, so appointed, were sworn according to law, on the 28th of said *April,* by *Daniel Judson,* Esq., a justice of the peace for the county of *Fairfield ;* and a majority of said appraisers did appraise said land, by writing under their hands to be worth to the creditor 27 dollars and 50 cents per acre. I therefore set off to said creditor four acres and two quarters and twenty-one rods of said land, in full satisfaction of this execution and the costs of levying the same, and gave her possession of the same—bounds being erected."    Then followed the endorsement of the officer's fees and the certificate of appraisement.

At a special county court, held at *Fairfield,* on the 17th of *August* 1824, *Sarah Howe* presented a writing, on which no duty had been paid, stating the attachment, judgment, levy and return of the officer, and averring, that the levy was void and of no effect to secure to her a title to the land, and praying the court to direct a new execution to be issued. A citation or notice, signed by the clerk of the court, was thereupon served upon *Betty Walker* to appear before the court, on the next day, *viz.* the 18th of *August,* at 9 o'clock, *A M.,* and shew reason, if any she had, why the motion aforesaid should not be granted.    *Betty Walker* did not appear ; and the court, on full enquiry into the facts stated, found them to be true, and directed a new execution to be issued on the judgment.    It did not appear for what purpose this special county court was called ; nor did it appear, that any order of the chief

judge, or any other person authorized by law to call a special county court, was in fact made.    This new execution was, on the 19th of *August*, duly levied on the demanded premises, which were appraised and set off according to law ; and the execution and the officer's endorsment thereon, were recorded in the town-clerk's office and returned into the office of the clerk of the court, within four months from the rendition of the judgment.    *Sarah Howe's* title, if she obtained any, had been duly conveyed to the defendant, who was in possession, and had refused to give it up, on demand made.

Upon these facts the judge charged the jury, that the plaintiffs were entitled to recover ; and the jury found accordingly. The defendants moved for a new trial, for a mis-direction.

*Sherman,* in support of the motion, contended, That *Sarah Howe's* second execution and the proceedings under it, were valid and legal.    It will be admitted, that if this execution had been obtained on a *scire-facias,* regularly served, and returned to a stated term of the court, it would have been legal.

The first enquiry then, is, whether a *scire-facias* was necessary ?    If a *scire-facias* be not necessary, it will not lie. The cases in which it will lie, are all specially pointed out in the *English* books of practice ; and this is not one of them.    2 *Archb. Prac.* 76.    The former levy was *void ;* and this appeared from the face of the return.    The court could see, upon inspection of the record, that a new execution ought to issue. Wherever *scire-facias* lies, there must be a new judgment.    1 *Archb. Prac.* 256.    But here a new judgment would be absurd.    Nothing was wanted but an instrument, by which the judgment already rendered could be carried into effect.    In *England* and in *New-York*, the practice is, to continue down the judgment until execution is taken out ; and a *scire facias* is never necessary, except where the judgment cannot be continued down.    In a case like this, there would be no difficulty in continuing down the judgment.    If an execution is not necessary, a written motion is its proper substitute.    This is in conformity with our practice.    1 *Swift's Dig.* 794, 5.

Secondly, if a *scire-facias* was required by law, the issuing of the execution without one, was a matter of error, and rendered the execution *voidable* only, and not *void.    Shirley* v. *Wright,* 1 *Salk.* 273.    2 *Archb. Prac.* 78.    The question is not one of jurisdiction ; as the court indisputably had jurisdiction

of the subject matter; and had power to grant execution. They judged it right and proper to issue execution in the manner they did. If they judged wrong, it was error, and must be taken advantage of accordingly. The execution is not, for this reason, void.

Thirdly, the execution is not void, on the ground that it was issued at a *special* session of the court. The statute authorizes the calling, and of course, the holding of a special county court, upon *any* extraordinary occasion. *Stat.* 140. *tit.* 21. *s.* 18. If the court was not regularly called and held, it is incumbent on the party seeking to impeach it, to shew the irregularity. The presumption is, that *omnia præsumuntur rite et solenniter esse acta, donec probetur in contrarium.* But no irregularity appears.

*N. Smith* and *Seeley*, contra, contended, 1. That *Sarah Howe's* lien, created by her attachment, was dissolved, by the levy of the first execution and the subsequent proceedings under it.

This results, in the first place, from the nature of a lien at common law; it not being an interest in or title to land. *Lampet's* case, 10 *Co.* 47. *Barrow* v. *Gray, Cro. Eliz.* 551. *Co. Litt.* 265. 2 *Bac. Abr.* 706. *tit.* Execution. *B.* 7. *Lacey* & al. v. *Tomlinson,* 5 *Day* 77.

Secondly, from uniform practice, authority and sound policy, the election of a creditor as to the mode of service, evidenced by his unequivocal acts, is decisive of the dissolution of a lien created by attachment. The eventual legal sufficiency of the sheriff's doings to procure complete satisfaction of the judgment, is not, and never was, the test; and more especially, as against third persons, subsequent attaching creditors, who can look only at the overt acts of the prior incumbrancer. 2 *Tidd's Prac* 912. *Baldwin* v. *Leavenworth,* 2 *Day* 317 *Loomis* v. *Storrs,* 4 *Conn. Rep.* 440. *Herring* & al. v. *Polley,* 8 *Mass Rep.* 120. *Jackson* v. *Spencer,* 13 *Johns. Rep.* 533.

Thirdly, to extend the lien in the manner claimed by the defendant, would lead to oppression upon debtors, and to frauds upon subsequent creditors and purchasers, and would frustrate our law of attachment. It is, besides, wholly unnecessary, inasmuch as the sheriff is subject to the same liability in this case as in all others, for misfeasance, and for the same reason.

Fourthly, that an insufficient endorsement of service, which fails of producing satisfaction to the creditor, is to be treated as

a *nullity*, if metaphysically correct, is practically false. It is entirely novel, contrary to all usage in this country and in *Great-Britain*, and irreconcileable with principle.

2. That the second execution in favour of *Sarah Howe,* under which the defendant claims, issued irregularly and was void.

First, the special county court, holden on the 17th of *August* 1824, was not legally organized. A special court is not a term court ; it is holden *pro hac vice* ; has a special limited jurisdiction ; is created by a special order, for a special purpose. Its due organization must be shewn, and is not to be presumed. 2 *Inst.* 53. *Crowley's* case, 2 *Swanst. Rep.* 10. *Mills* v. *Martin,* 19 *Johns. Rep.* 34. *Kemp* v. *Kennedy, Wash. U. S. Rep.* 36.

Secondly, if the special court was legally organized for *some* purpose, it does not appear that it was called for the purpose of hearing *Sarah Howe's* application, as it should appear, in order to give jurisdiction.

Thirdly, the process upon which the judges attempted to act, was, on strict technical principles, and by all the authorities and books of entries, both in form and substance, a *scire-facias.* It was also a suit or action, without twelve days notice, and without a duty paid. The court, therefore, could not take jurisdiction of the process. *Litt. sect.* 505. *Co. Litt.* 290. 3 *Bla. Comm.* 421. 2 *Tidd's Prac.* 1043. The judgment on it is the same as on a *scire-facias. F. N. B.* 104. 3 *Bla. Comm.* 424. 1 *Swift's Dig.* 730. 3 *Salk.* 5. 2 *Ld. Raym.* 1048. 2 *Wils* 251.

The *dictum* in 1 *Swift's Dig.* 794, 5. does not intimate, that the lien was *not dissolved* ; and therefore, it is no authority in support of the defendant's title. It is, besides, contrary to usage, opposed to principle, and though specious, on first inspection, is, when analysed, evidently ill-considered and untenable.

DAGGETT, J. The judge who tried this cause at the circuit, instructed the jury, that upon the facts admitted and proved, the plaintiffs were entitled to a verdict. The correctness of the charge is now to be examined.

The counsel for the plaintiffs attempt to vindicate the charge on several grounds, which were discussed at large, and each of which might be deemed deserving of consideration :

but as the court is satisfied on one point, which justifies the charge, an opinion will be given on that point only.    The execution which issued on the 18th *August*, 1824, in favour of *Sarah Howe* against *Betty Walker*, the levy of which on the demanded premises, alone stands in the way of the plaintiffs' title, *was irregular and void*.    It issued from a special county court, *as it is called*, holden on the 17th and 18th of *August* 1824, and on a process called a motion, made by *Sarah Howe*, and dated on the 17th *August*, and of which *Betty Walker* had no other notice than by an attested copy left at her usual place of abode, on the aforesaid 17th day of *August*.    An execution was issued on a judgment of the county court of the county of *Fairfield*, at its term of *April* 1824, in favour of *Sarah Howe* against *Betty Walker*, which had been returned into court endorsed satisfied, by a levy on land, which was defective, and by which no title was acquired.    The object of the motion was, to obtain a new execution on the judgment ; and the motion was granted.    The question now arises, is this proceeding regular and the execution valid ; or is it irregular and void ?

1. It is not shown to the court, that any law or practice of our courts warrants such a proceeding ; nor is it believed, that in a single instance, it has been sanctioned.    Debt on judgment and *scire-facias* (in such cases) are familiar to the profession ; but the same object has not been attained by motion. This alone might well excite strong doubts of the correctness of the proceeding.

2. This motion seems designed to answer every purpose of the action of debt or *scire-facias ;* and so the special court considered it, and issued an execution accordingly.    If then it was of the nature of a *scire-facias*, or action of debt, it follows, that a plea might have been interposed, and the judgment debtor might have shown all those reasons why a judgment should not be rendered and an execution issued, which are permitted by way of defence in those suits.    For a *scire-facias* or debt on judgment the defendant may plead *nul till record*, payment, release, or that the debt and damages were levied on execution, or any matter which could not have been pleaded in the original action.    *Co. Litt.* 290.    *Grey* v. *Jones*, 2 *Wils.* 251.    2 *Tidd's Prac.* 1043.    Many other authorities to the same effect might be cited.

3. If then, this motion, as it is called, is substantially an action of debt or *scire-facias*, could the court legally render a

judgment, and issue an execution, with only 12 or at most 24 hours notice, against the defendant in the suit? It is against first principles, as well as the positive provisions of law, that a judgment can be effectual without the notice prescribed by law, unless indeed, notice be waived. The doctrine of waiver, however, need not be considered; for here was no appearance on the part of *Betty Walker*, nor is there any pretence of waiver. The only authority cited from our books is found in 1 *Swift's Dig.* 795. The commentator there places a motion like the present and a *scire-facias* on the same ground. He was not considering the subject particularly;—his remarks are quite general; no authority is cited; and the opinion, therefore, cannot be deemed obligatory. In the absence of any enactments of our legislature, and there being no practice of courts in *Connecticut* to sustain this proceeding, it must be considered irregular and void.

The charge then was correct; and the rule for a new trial must be discharged.

HOSMER, Ch. J., and LANMAN, J., were of the same opinion.

PETERS and BRAINARD, Js., were absent when the case was argued.

<div align="center">New trial not to be granted.</div>

*Fairfield,*
June, 1828.

Williams
*v.*
Cable.

---

<div align="center">BEARDSLEE *against* FRENCH.</div>

The limits of a highway must be defined with reasonable certainty.

Therefore, where a survey designated only the line of a highway, without specifying its width; it was held, that such survey was inadmissible to prove the existence of a highway.

The non-user of a highway, for many years, is *prima facie* evidence of a release of the public right to the owner of the soil.

Therefore, where bars across a highway had been kept up, by the owner of the soil, for about ninety years, it was held, that evidence of this fact was admissible to prove an extinguishment of the public right.

If a person, in removing obstructions from a highway, wantonly and unnecessarily destroy the property of another, he is liable in trespass.

THIS was an action of trespass *quare clausum fregit*, alleging the throwing down and the removing of the plaintiff's

posts and bars; tried at *Fairfield, December* term, 1826, before *Peters*, J.

On the trial, on the general issue, the plaintiff proved the acts complained of in his declaration. The defendant justified, on the ground that there was a public highway, leading from the *Rocky-Hill* road through the plaintiff's close to a lot called the *Hubbell* land; and that said posts and bars were across and upon such highway. To prove that there was such a highway, the defendant offered in evidence the following votes of the proprietors of the town of *Stratford*:

"At a proprietors' meeting in *Stratford*, on the 2nd *Monday* of *March* 1735—Voted and agreed, that *Edmund Lewis*, &c. [eight others being named] be a committee to survey and lay out the said division; and that they also lay out and rectify all such highways as are absolutely necessary in the aforesaid division."

"At a proprietors' meeting on the 2nd *Tuesday* of *April* 1735—Voted, that any three of the committee chosen at a proprietors' meeting in *Stratford*, on the 2nd *Monday* of *March* last, shall be deemed to be a number sufficient to lay out or survey any lands granted at said meeting to be surveyed and laid out."

The defendant then offered in evidence the following survey or laying-out:

"*Stratford, Dec.* 27, 1737.

"Then we, the subscribers, surveyed and laid out a highway out of the grand highway, through *Rocky-Hill*, beginning, &c. [describing the courses and distances.]

<div style="text-align: right">

*Joseph Booth,* } Proprietors'
*Joseph Blackbach,* } Committee."
*Theophilus Nichols,* }

</div>

To the admission of this evidence the plaintiff objected, on the ground that the defendant had not shewn, that such committee were authorized, by the proprietors, to survey and lay out highways, and on the ground that the survey was, on the face of it, void, as the highway was not bounded out, nor was it of any definite width; and also on the ground, that the defendant had not accompanied such survey by any evidence that it was ever accepted by the proprietors. The judge overruled these objections, and admitted the evidence.

The plaintiff then offered evidence to prove, that ever since the laying out of said highway, a period of about ninety years,

bars had been constantly kept up across the way, where it comes into the *Rocky-Hill* road, and at the place where they were removed and destroyed by the defendant; and that both the bars and the way were maintained by the plaintiff, and those under whom he claimed, as the only protection from the highway to a large tract of land owned and occupied by them. To the admission of this evidence the defendant objected; and the judge sustained the objection, and excluded the evidence.

The plaintiff claimed to have proved, that in removing said bars the defendant conducted unreasonably, and unnecessarily destroyed the property of the plaintiff, and thereupon contended, that although here was a highway, yet if in removing the obstructions thereon, the defendant had wantonly and unnecessarily destroyed the property of the plaintiff, he must be found guilty; and prayed the judge so to instruct the jury. But the judge omitted to instruct the jury on that point. In opposition to the claim of the plaintiff, that the survey was, on the face of it, void, he instructed the jury, that it was not void, but was a valid laying-out of a highway of convenient width.

The defendant obtained a verdict; and the plaintiff moved for a new trial.

*Beardsley,* in support of the motion.

*Sherman,* contra.

HOSMER, Ch. J 1. From the survey received in evidence, it appeared, that the supposed highway was a line, extending in length, but without breadth, or any limits bounding its surface. A highway, which is a public right of passage over another man's ground, like a grant from an individual, must be defined with reasonable certainty The public must have the means of knowing how far they may travel, without becoming trespassers, and the individual, to what extent his land may be occupied by others. But in the survey above mentioned, there are no limits to the rights of passage, nor to the incumbrance on the land of another, nor any possibility of ascertaining the extent of either. A mathematical point is as fit a representation of a tract of land conveyed, as a mathematical line is, of a highway.

' The survey, for these reasons, was incompetent evidence.

2. Evidence to prove a highway often consists in showing

*Fairfield,*
June, 1828.

Beardslee
*v.*
French.

that the public have used and enjoyed the road ; and the uninterrupted use of it, for a considerable space of time, affords a strong presumption of a grant    On the other hand, the non-user of an easement of this kind, for many years, is *prima facie* evidence of a release of the right to the person over whose land the highway once ran ; and although the precise limit of time in respect of the public, in such cases, has not been established, there can be no doubt that the desertion of a public road for nearly a century, is strong presumptive evidence that the right of way has been extinguished.   After a long possession in severalty, even a partition may be presumed.   *Hepburn & al.* v. *Auld,* 5 *Cranch* 262.

The evidence should have been received, by the court ; and the rejection of it was, unquestionably, an error.

3. The omission of the court to instruct the jury, that the wanton and unnecessary destruction of the posts and bars, by the defendant, in removing them, was a trespass, was an unquestionable error.   If the plaintiff had erected posts and rails across a highway, or on the defendant's land, the defendant might legally remove them, doing no *unnecessary* damage ; but the law admits of no wanton spoil or waste, even in such cases. It is sufficient, that a person may put out of the way all impediments to the enjoyment of his rights, without inflicting unnecessary injury on the ri hts of others.   *Welch* v. *Nash,* 8 *East* 394.   Vid. 2 *Phill. Ev.* 138.

A new trial, in this case, must be granted.

LANMAN and DAGGETT, Js., were of the same opinion.

PETERS and BRAINARD, Js., were absent when the case was argued ; and, of course, gave no opinion.

New trial to be granted.

———————

WEED and another, executors of *Jonas Weed, against* BISHOP :

### IN ERROR.

In an action of book debt, the plaintiff is not a competent witness to prove an acknowledgment and promise of the defendant, to take the case out of the statute of limitations.

The admission of illegal evidence, which might have influencd the triers in *Fairfield,* their decision, is ground of error, though it may not appear, that it had in June, 1828. fact, any influence.

Weed
*v.*
Bishop.

An action of book debt, pending in the superior court, was referred to auditors. An award was made, and returned to court and accepted. A remonstrance was filed, by the defendants, (plaintiffs in error,) to the acceptance of the report, wherein it appeared, that before the auditors, the plaintiff (defendants in error) offered in evidence his book, and that it thereby appeared, that about 50 dollars of the account demanded had been charged more than eight years before the commencement of the suit. The defendants interposed the statute of limitations. To remove this objection, the plaintiff offered himself as a witness, to testify, that the defendants' testator, while living, and within six years, had acknowledged the debt, and promised to pay it. The defendants objected to this proof, insisting, that the party in book debt could not, by law, testify to that fact. The auditors overruled the objection, and admitted the testimony. The plaintiff, in answer to this remonstrance, alleged, that the testator, in and by his last will, duly proved and approved since his death, directed, that all his just debts and funeral expenses should be paid out of his estate ; and hence insisted, that the debt in question was thereby revived. The court accepted the award, and judgment was rendered for the plaintiff. The defendants then brought the present writ of error, to reverse that judgment.

*Bissell,* for the plaintiffs in error, contended, 1. That the plaintiff was not a competent witness to prove an admission of the testator, to revive a debt barred by the statute of limitations. The statute concerning book debts is in derogation of the common law ; it is founded on the supposed necessity of the case ; and it is not to be extended, by construction, to cases where no such necessity exists. No case has gone farther in admitting the testimony of the party in book debt than *Bryan* v. *Jackson,* 4 *Conn. Rep.* 288. ; but that case limits it to *the support or confutation of the account.* Thus far the reason of the statute may extend. Thus far the book is a check upon the witness. But, in this case, the correctness of the account was not in controversy. The testimony was directed

neither to its support, nor to its confutation ; but to remove the bar to a recovery which the statute interposed.

2. That a clause in a will directing the just debts of the testator to be paid, does not revive a debt barred by the statute of limitations. *Baxter* v. *Penniman,* 8 *Mass. Rep.* 134. *Lord* v. *Shaler,* 3 *Conn. Rep.* 134. *Bangs* v. *Hall,* 2 *Pick.* 374. *Marshall* v. *Dalliber,* 5 *Conn. Rep.* 486. *Clementson* v. *Williams,* 8 *Cranch* 72. 2 *Stark. Ev.* 895. n. *Hellings* v. *Shaw,* 7 *Taun.* 608. *Beale* v. *Nind,* 4 *Barn. & Ald.* 568. *Anon.* 1 *Salk.* 154. Executors of *Fergus* v. *Gore,* 1 *Sch. & Lef.* 107· Ex parte *Dewdney,* 15 *Ves.* 479. *Burke* v. *Jones,* 2 *Ves. & Bea.* 275 *Roosevelt* v. *Mark,* 6 *Johns. Chan. Rep.* 266. 293. *Smith* v. *Porter* & al. 1 *Binn.* 209.

*Hawley,* for the defendant in error, contended, 1. That a general provision in a will for the payment of the testator's debts, takes the case out of the statute of limitations. *Lovelass on Wills,* 203. *Toll. L. Ex.* 288. *Trueman* v. *Fenton, Cowp.* 548. The words " to be paid out of my estate," create a devise for the payment of debts. 1 *Madd. Chan.* 483, 4. This is a debt in conscience ; and the court will not allow a man to sin in his grave.

2. That the plaintiff in book debt is a competent witness to testify to an acknowledgment of indebtedness, or a promise to pay, by the defendant ; and it makes no difference whether the account be more than six years old, or not ; nor whether the statute of limitations be in the way, or not. The statute provision on this subject is expressed in the most comprehensive terms ; that " in *all actions* of debt on book," " the evidence of the *parties* and of *any other persons interested,*" " may be admitted." *Stat.* 93. *tit.* 9. *s.* 1 The plaintiff is, at any rate, competent to prove the *origin* of the indebtedness, and its *continued existence* at any time. This evidence is clearly within the rule in *Bryan* v. *Jackson,* 4 *Conn. Rep.* 292. It relates to the *book debt,* shewing its *present existence.*

3. That the judgment ought not to be reversed, because the plaintiffs in error have not shewn, that they have sustained any injury, by the admission of the evidence. It does not appear, that it influenced the auditors in making up their award ; or that the award embraced any part of the account in controversy. None but a party *aggrieved* can sustain a writ of error ; and he must shew clearly, that he is aggrieved. 2 *Tidd* 774. 1030. 1073.

DAGGETT, J. It is understood that the judge at the circuit *Fairfield,* ruled both the points in the case in favour of the plaintiff. As *June, 1828.* the question whether such a clause in a will can revive a debt, against which the statute of limitations has run, is to be raised, and argued, and definitively settled, in the case of *Peck* v. *Botsford*, (a), to be decided this term, I forbear now to express an opinion upon it, especially as the other point arising on this record is sufficient, in my opinion, to reverse the judgment. That point only, therefore, will be considered.

Weed
*v.*
Bishop.

Is the plaintiff in an action of debt by book a competent witness to prove an acknowledgment and promise to take a debt out of the statute of limitations ? The judgment is attempted to be vindicated, on the ground that the statute on this subject, in general terms, authorized the admission of the evidence of the parties and of other *persons interested.*

In construing this statute, it is to be borne in mind, that so far as the parties are permitted to testify *at all*, it is a departure from a plain rule of the common law,—that no person shall be a witness in his own cause. In the construction of this statute, thus adopting a principle repugnant to the general rule of the common law, it has never been judged before, that a party was a competent witness to any fact which might come under examination. This exception to the general rule has been construed with some limitation, according to maxims applicable to statutes in derogation of the common law. It is true, no precise rule as to the extent to which a party may testify, has been established ; but there is no authority for saying that he is an unlimited witness. In *Phenix* v. *Prindle, Kirby* 209. a very great judge expresses the following opinion on the point how far the testimony of a party might be received in the action of debt by book :—" Regularly, it goes no farther than to the quantity, quality, and delivery of the articles charged." Were this a new question, perhaps such a limitation might be well adopted, as comporting with the necessity for the departure from the common law ; but it is not to be concealed, that a more extended construction has been given to the statute.

In the late case of *Bryan* v. *Jackson, 4 Conn. Rep*. 288. the court went as far in allowing the testimony of the party, as in any former case reported. It is understood, that some general expressions in the opinion of the Chief Justice, have been pressed into an authority for making the party an unlimited

(a) *Vide post.*

*Fairfield,*
June, 1828.

Weed
*v.*
Bishop.

witness.   The opinion warrants no such conclusion.   On the contrary, it is limited thus : " Where proper articles are charged on book, the parties, *quoad the book debt*, are admissible, like all other witnesses, to testify freely and fully, in *support* or *confutation of the account.*"   It would be doing violence to the language employed, to say, that it is hence to be implied, that a party may testify on an issue formed on a *release* or *tender* pleaded ; nor within the knowedge of the court has such a principle ever been recognized.   Testimony on such issues, surely, is not " *quoad the book debt,*" nor in " *support or confutation of the account.*"   The testimony in this cause was not in *support of the book debt,* but to do away the effect of a beneficial statute, positively declaring it barred.

The evidence, then, was illegal; it might have influenced the auditors to allow the charge; and therefore, the judgment is erroneous.

HOSMER, Ch. J. was of the same opinion.

LANMAN, J., dissented ; thinking, that the statute had made the party a witness, and that it was not competent to the court to exclude him.

BRAINARD and PETERS, Js., having been absent when the case was argued, gave no opinion.

Judgment reversed.

***

KNAPP *against* HANFORD and another.

To render executors liable for the payment of a legacy, it must be shewn, that the testator left assets, which came to their hands.

To shew that a feme covert died possessed of property sufficient to pay a legacy given by her, evidence of property owned by her, at the time of her marriage, and during the coverture, is admissible.

Evidence that assets came to the hands of one of two joint executors, is admissible in an action for a legacy against both.

The omission of executors, who have received *any* property of the testator, to make and exhibit an inventory, is evidence of assets in their hands sufficient to pay all the legacies.

THIS was an action of debt for a legacy, given to the

plaintiff, *Hannah Ann Knapp*, by *Lucy Ann Weed*, in her last *Fairfield,*
will. (*a*)                                                    June, 1828.

The cause, which had been previously tried, and a new trial    Knapp
granted, was tried again, at *Fairfield, December* term, 1826,   *v.*
before *Peters*, J                                             Hanford.

On this trial, these facts were agreed to, by the parties.    On
the 15th of *July*, 1816, *Lucy Ann Weed* made her will, be-
queathing a legacy of 100 dollars to the plaintiff, and appoint-
ing *Seth Weed* her executor    He accepted the trust ; and af-
terwards died, having made his will, and appointed the defend-
ants, *Thaddeus Hanford* and *Ralph Hoyt*, his executors ; who
took upon themselves the executorship of the latter will, as well
as that of *Lucy Ann Weed*.    The plaintiff's legacy had been
demanded of them ; but it had never been paid.    *Lucy Ann
Weed*, at the time of her death, and for several years before,
was the wife of *Seth Weed*.    Previous to her intermarriage
with him, and in contemplation of that event, an agreement
was executed under their hands and seals, giving her the entire
controul and ownership of all the property she owned at the
time of the intermarriage, and authorizing her to dispose of it
at her pleasure.

The plaintiff claimed, that all the legacies given by Mrs.
*Weed*, in her will, (of which there were several) except that
given to the plaintiff, had been paid.    For the purpose of
shewing, that Mrs. *Weed* died possessed of property sufficient
to pay the legacy in queston, which came to the hands of the
defendants, the plaintiff offered, 1st, the testimony of *Henry
Hoyt*, jun., that he, by *Seth Weed's* direction, while the latter
was executor, paid a legacy given by Mrs. *Weed's* will to the
*Stanwich* society, and also one given to himself, out of moneys
belonging to her estate, at the time of her death ; 2ndly, the
testimony of *Benjamin Brush*, jun. that *Benjamin Brush*, during
the executorship of *Seth Weed*, and by his direction, received
payment of a legacy given by said will to himself, and paid a
legacy given by the same will to *Rachel Brush*, out of moneys
due on certain notes belonging to the estate of Mrs. *Weed*, up-
on which there were endorsements made by *Seth Weed*, in his
hand-writing, and subscribed by him, stating, that they were
the property of his wife ; 3rdly, the testimony of *Nathan Olm-
sted*, that he owed Mrs. *Weed*, at the time of her marriage, 500

(*a*) See a statement of the declaration, and of the case, as it appeared on the
first trial, 6 *Conn. Rep.* 170.

Knapp
*v.*
Hanford.

dollars, which he paid to her shortly afterwards.  To this evidence the defendants objected ; but the judge admitted it.

To prove that the defendants had received a part of Mrs. *Weed's* estate, the plaintiff offered the testimony of *Nathan Chichester ;* that during Mrs. *Weed's* life, he owed *Seth Weed* a note for 100 dollars, which he paid with money that he borrowed of Mrs. *Weed ;* that for the money so borrowed, he gave a note payable to her, which he delivered to *Seth Weed* for her ; that he paid the interest to her, during her life ; that after her death, he paid *Seth Weed*, as her executor, 75 dollars, and the balance remained unpaid until after *Seth Weed's* death; and that this note then coming into the hands of the defendants, he paid to *Ralph Hoyt*, one of the defendants, the balance due thereon, *viz.* 36 or 38 dollars.  To this evidence the defendants objected ; but the judge admitted it.

The plaintiffs also offered testimony to prove, that *Seth Weed*, while executor, made no inventory of his wife's estate ; and that the defendants had never made one.  To this evidence the defendants objected ; but the judge admitted it.

The plaintiff claimed, that if the defendant had received any part of Mrs. *Weed's* estate, as her executors, for the payment of legacies, and there were other legacies than hers unpaid, she was entitled to recover a proportionable part of such assets. But she claimed that she had proved, that the defendants had received enough to pay the whole of her legacy and of all others that remained unpaid ; and that the jury, from the facts tesstified to, by *Chichester*, and the fact that no inventory had been made, by the defendants, had right to presume, until the contrary should be shewn, that the defendants had received assets of Mrs. *Weed's* estate enough to pay her legacy and all others that remained unpaid.  These claims were resisted, by the defendants.  The judge instructed the jury, that from the facts testified to, by *Chichester*, if found by them to be true, together with the neglect of the defendants to make an inventory, they had right, in the absence of evidence to the contrary, to presume that the defendants had received sufficient assets to pay all legacies remaining unpaid. The jury returned a verdict for the plaintiff ; and the defendants moved for a new trial.

*Sherman* and *Bissell*, in support of the motion, contended, I. That the evidence offered by the plaintiff, and admitted by

the judge, was not admissible. It is to be remarked in the
outset, and kept in mind, that the defendants are liable only as executors of *Lucy Ann Weed*, and only so far forth as they have assets. They are not liable, in this action, for any *devastavit* of *Seth Weed ;* nor on the ground that they have his assets. The question then is, whether the testimony offered and admitted, was pertinent to prove the fact of assets.

First, as to the testimony of *Brush* and *Hoyt.* The fact that the other legacies were paid, was relevant only for the purpose of shewing, that whatever assets were in the hands of the defendants were to be applied to the payment of the legacy in question. But the evidence was offered not only for this purpose, but also to shew assets, and that they came to the knowledge of the defendants ; and it was admitted generally On this ground, they were the mere admissions of *Seth Weed* that there were assets. It has already been decided, by the court, that such admissions are not evidence. *Knapp* v. *Hanford* & al. 6 *Conn. Rep.* 170.

Secondly, as to the testimony of *Nathan Olmsted.* How does the fact, that many years before her death, Mrs *Weed* had 500 dollars in money, conduce to establish the main fact in the case, *viz.* that the defendants have assets ? The burthen of proof lies on the plaintiff. Can she thus shift it, and call upon the defendants to shew that this money was spent or lost ?

Thirdly, as to the testimony of *Chichester.* So far as it went to prove assets in the hands of *Seth Weed*, it was clearly inadmissible. It is on this ground only, that we object to it.

Fourthly, it was not competent to the plaintiff to prove, that *Seth Weed* neglected to make an inventory. It is difficult to see for what purpose the testimony was offered, unless for the purpose of shewing, that *Seth Weed* had not duly administered. But that fact was surely immaterial in this action Was it admissible for the purpose of excusing the non-production of the inventory ? An inventory by *Seth Weed*, if made and offered, would not have been admissible.

Fifthly, it was not competent to the plaintiff to prove, that the defendants had never made an inventory. If this evidence is admissible, it must be for the purpose of raising a presumption, that assets other than those proved, had been received by the defendants, and of calling on them to repel such presumption. Can this be done ? The mere omission to make an in-

*Fairfield,*
June, 1828.

Knapp
*v.*
Hanford.

ventory, is no evidence of fraud or subtraction.    If there was no estate to be inventoried, there could be no inventory.    To subject the executor, there must be a *wilful neglect;* such as affords evidence of a *concealment of estate.*

2. That the charge was incorrect.    To ascertain the correctness of the charge, it becomes necessary to advert to the testimony of *Chichester.*    Viewing that testimony in the light most favourable to the plaintiff, it only proves that assets to the amount of 36 or 38 dollars actually came to the hands of the defendants ; not that they had sufficient to pay all legacies remaining unpaid    As the action proceeds on the ground of assets, the recovery must be limited to the amount of assets shewn.    On whom lies the burden of proving asset ?    Clearly on the plaintiff.    Does the proof of assets to a certain amount, shift the burden of proof as to the residue of the claim ?    Will it be said, that the jury were to presume, that the 75 dollars in the hands of *Seth Weed,* came to the possession of the defendants ?    This is directly opposed to the former decision of the court in this case    6 *Conn. Rep.* 175.    Were the jury to presume it from the fact that no inventory was made by the defendants ?    There is no evidence, that the defendants *knew,* that this note belonged to the estate of Mrs. *Weed.*    But suppose they had made an inventory of this 36 or 38 dollars ; could they have offered the inventory to repel the presumption of their having more ?

At any rate, there is nothing in the case that authorized the charge as against the defendant *Hanford.*    He had received nothing.    There is a difference between executors and trustees as to joint liability.    2 *Fonb. Eq.* 184.

*N. Smith* and *C. Hawley,* contra, contended, 1. That the testimony offered by the plaintiff, was properly admitted.

First, the testimony of *Hoyt* and *Brush* to prove the payment of other legacies, was offered and admitted, not for the purpose of fixing the defendants with assets, on the ground that *Seth Weed* had paid other legacies, but on the ground that if all the other legacies had been paid, the plaintiff was entitled to recover the whole which remained in their hands, or enough to pay her legacy; and if the legacies were extinguished, it was immaterial whether the notes were the property of Mrs. *Weed* or not.    The entries by *Seth Weed,* being entries against his interest at the time, were admissible to shew property in Mrs

*Weed. Ivat* v. *Finch* & al. 1 *Taun.* 141. 1 *Phil. Ev.* 190. 193, 4. This testimony was offered in connexion with other evidence shewing that the property came to the defendants' hands

Secondly, *Olmsted's* testimony was admissible. Proving property in the testatrix, during her life, raised some presumption that she had property at her death. This presumption might be feeble, and was liable to be rebutted ; but its *weight* is not now under consideration. It belonged to the jury to pass upon *that.*

Thirdly, *Chichester's* testimony was admissible. It directly proved assets in the hands of the defendants. The fact of the payment of 75 dollars to *Seth Weed*, during his life, was not offered to raise a presumption that the defendants had received that money, but was mentioned by the witness *incidentally*, to shew how much remained due on the note, and was paid by him to the defendant *Hoyt ;* it being expressly conceded by the plaintiff, that she could not recover, unless she shewed, that the defendants had received assets ; and nothing was claimed, except upon the ground of the money paid by the witness to *Hoyt.*

Fourthly, *Seth Weed's* neglect to make an inventory was proved, not for the purpose of raising a presumption from such neglect, that the defendants had received assets ; but for the simple purpose of shewing, that no inventory had been made.

2. That the charge was correct. It was the duty of the defendants to have made an inventory ; and their neglect to do it furnished a presumption that they had assets. *Lovelass* 37. *Swinb.* 325. n. *Orr* v. *Kaines*, 2 *Ves.* 194. It is sufficient to shew some property belonging to the estate in the hands of the defendants, to throw upon them the duty of making an inventory. *Walker* v. *Hall*, 1 *Pick.* 20. *The People* v. *Dunlap*, 13 *Johns. Rep.* 437. This was shewn, by *Chichester's* testimony. As the defendants, thus situated, had neglected to make an inventory, the jury had a right to presume they had received enough to pay the whole legacy. The executors are the only persons having the controul or custody of the estate ; the only persons who can know its amount ; and if the law be not as we claim, it would be impossible, in almost every case, for a legatee to shew the receipt of assets sufficient to warrant a recovery.

PETERS, J. 1. To entitle the plaintiff to a verdict, she must have proved, in addition to the facts admitted, that *Lucy Ann Weed* died possessed of property sufficient to pay the legacy in question, and that the same came to the hands of the defendants. To this end the testimony of *Henry Hoyt,* jr., *Benjamin Brush,* and *Nathan Olmsted* was admissible to prove the existence of such property during her coverture ; for if it did not then exist, it could not have been in her possession at the time of her death ; nor come to the hands of the defendants afterwards.

2. The testimony of *Nathan Chichester* was admissible, not only to prove the same facts, but also, that the property came to the hands of *Ralph Hoyt,* one of the defendants.

3. Proving property of the testatrix, in the hands of one of her joint executors, proves it in the hands of both : " For many executors to the same testator, are but as one man ;" (*Godolphin's Orph. Legacy,* 156.) and all the executors, by joining in the bond to the judge of probate, become jointly liable for the default of each. *Babcock* v. *Hubbard* & al. 2 *Conn. Rep.* 536. Co-executors, says the late Chief Justice, are regarded by the law as an individual person ; and of course, the acts of one regarding the administration of the estate, are deemed the acts of all ; a release of one is valid, and binds the rest. 2 *Dig.* 449. Of course, the receipt of property by one, makes the rest accountable.

4. If any property of the testatrix came to the hands of the defendants, as her executors, their omission to make and exhibit an inventory thereof, was evidence of assets sufficient to pay the legacy in question. These facts were properly submitted to the jury, and found by them. If the executor enters upon the testator's goods, without making an inventory, then the presumption of law will be against the executor, that he had goods sufficient, not only to pay the debts, but *all* the legacies also. *Godolph. O. L.* 151. If, says *Swinburne,* (*vol.* I. *p.* 325.) the executor enters to the testator's goods, and will make no inventory thereof, then may every legatee recover his whole legacy at his hands. In this case, the law presumeth, that there is sufficient goods to pay all the legacies, and the executor doth secretly and fraudulently subtract the same. *Orr* v. *Kaines,* 2 *Ves.* 194. *Shep. Touch.* 455. *Lovelass* 37. The same doctrine has been recognized in *Massachusetts,* where in an action on an administration bond, for not returning an inventory

or rendering an account, it was holden to be necessary to aver, that *some* property of the testator came to the hands of the executors.    *Walker* v. *Hall*, 1 *Pick.* 20.

I would not advise a new trial.

<div align="right">
*Fairfield,*
June, 1828.

Knapp
*v.*
Hanford.
</div>

The other Judges were of the same opinion, except BRAINARD, J., who was absent.

<div align="right">New trial not to be granted.</div>

---

### HILLHOUSE *against* DUNNING :

#### IN ERROR.

The statute of *May*, 1823, relating to motions in error, is satisfied, when there is an allowance of the motion and a recognizance for the security of the adverse party, without regard to the order in which these facts succeed each other.

The allowance is implied from the taking of the recognizance.

AN action for a libel having been brought, by *Dunning* against *Hillhouse*, which was tried in the superior court, at *Fairfield*, *December* term, 1824 ; and the plaintiff having obtained a verdict ; the defendant procured the record to be transmitted to this Court, for revision in error ; and after argument, the judgment of the superior court was affirmed.(*a*)    *Hillhouse* then brought the present writ of error, assigning for error, that " said superior court did never grant or deny said motion in error, and said cause, on said motion in error, was never before the supreme court of errors."    The record of the motion and of the proceedings thereon was as follows :    "And now the defendant, within twenty-four hours after final judgment in said cause, moves this court, that the record in said cause may be transmitted to the supreme court of errors, next to be holden at *Danbury*, within and for the county of *Fairfield*, on the fourth *Tuesday* of *June*, 1825 ; for the defendant says, that in said process, record and judgment, there is manifest error in this, *viz.* [assigning errors.]    And the defendant here in court moves for a new trial in said cause, and offers to give sufficient security, by recognizance to the adverse party to pay all damages, if he shall fail to prosecute his motion to effect, and prays for a stay of execution : By *Smith* and *Bissell*."

" Superior court, *December* term, 1824.    The defendant in

(*a*) Vid. 6 *Conn. Rep.* 391. 397, 8. 409.

this cause, with *Nathan Smith,* Esq. of *New-Haven,* as surety, gives bond of 400 dollars, that he will present his motion to the next supreme court of errors, to be holden at *Danbury,* in *June* term next, and answer all damages, if he fail to prosecute the same to effect."

To this writ of error the defendant interposed a plea in bar, setting forth the former proceedings ; to which the plaintiff demurred.

*N. Smith* and *C. Chapman,* for the plaintiff in error, contended, That no foundation was laid in the superior court for the legal transmission of the record to the supreme court of errors ; and as the case was not legally before the latter court, it has not been determined, and is now open for revision, by writ of error.    They remarked, in the first place, that whenever a statute confers a power upon a court to do a particular act, the terms of that statute must be strictly complied with ; otherwise, the act of the court under such power is inoperative. *Stoyel* v. *Westcott,* 3 *Day* 349. 352.    Secondly, the provisions of the statute of *May* 1823, regarding motions in error, have not been complied with.    That statute requires the following procedings : 1st, the filing of a motion, within a limited time, for the transmission of the record ; 2ndly, a finding of the superior court, that the motion is not intended for delay, &c. ; 3rdly, a recognizance, by the party making the motion ; 4thly, an allowance of the motion, by the court ; and these proceedings must appear upon the record.    But it does not appear, that the court decided, or were of opinion, the motion was not intended for delay, &c. ; nor that there was any allowance of the motion.    The allowance of the motion is a judicial act, which can be done by the court alone ; and the authority of the court to do the act, is subject to the condition that a recognizance is *previously* given.    Until a recognizance has been given, the court has no power to act on the motion.    It must, therefore appear, not only that the motion was allowed, but that a recognizance was given before the allowance.

*Sherman,* for the defendant in error, insisted, That it did appear from the record, that the statute requisites had been complied with    The statute authorizes the court to allow the motion or not, according to its discretion.    The circumstances under which this discretion is exercised, need not appear.    In

any event, the court will be deemed to have exercised its discretion soundly.    That the motion was allowed, appears from the taking of the recognizance.   This could not be taken for any purpose but to prosecute the motion ; and as it could not be taken, unless the motion was allowed, the fact of its being taken necessarily shews the  prior or concomitant fact of allowance.   *The Eagle Bank* v. *Smith* and *Parmelee*, 5  *Conn. Rep.* 71.

*Fairfield,*
June, 1828.

Hillhouse
*v.*
Dunning.

Hosmer, Ch. J.   The act of *May* 1823, (*p.* 27.) provides for the  revision of cases, by  motions in error, and  empowers the court to *allow* the motion, if the  party  moving shall give sufficient security for prosecution.

The contest between the parties is merely this.   The plaintiff in error insists, that the law  requires an allowance of the motion *expressly, after* bonds have been given ; while  the defendant contends, that the allowance need not be express ; that it is an  act of the court *prior* to  the reception of bonds ; and that the act of taking bonds, by implication, is an allowance of the motion.

The record of a court, is the act of  the court ; and the clerk is merely a recording officer.   If there appear any mistake of the clerk, in making up the record, the court will direct him to amend it ; and in this, as well as  in his other entries, he is entirely ministerial.   From this it follows indisputably, that the bonds given in court are the act of the court, and that the clerk is only the amanuensis.   When the plaintiff gave bond before the  superior  court, it was  not  taken by the  authority of the clerk, but by the order of the court.   This being admitted, the plaintiff insists, that no implication of a  precedent allowance of the motion results from it, as  the statute has enjoined, that the recognizance shall first be given, and that *after this*, the court may deliberate on the motion and allow it.

This inversion of  the natural  order of events and the known familiar rule of practice, is  supposed to  be founded on the expression of  the statute, which authorizes  the allowance of the motion, if security shall be  given.   The remark is obviously a hypercriticism.   The act in question puts the allowance of the motion  entirely on the  opinion of the judge as to its merits, without  directing the order of  proceeding.   By allowing the motion, the law  merely intends, that the judge shall authorize the transmission of the record ; taking care, however, to secure

the adverse party from damages, by exacting a bond for his security    Not a solitary reason has been, or can be, given, why a recognizance should be taken before the allowance of a motion    It is sufficient that security is taken by bond, before the transmission of the case to the court of revision.

Words are always, if possible, to be construed in avoidance of absurdity, and in reference to their subject matter.    On the just application of these principles, every seeming difficulty vanishes.    It would be most palpably absurd for a court to require the entry of a recognizance, and, as ancillary to it, to determine the amount of the bond and the sufficiency of the surety, and after all this hypothetical procedure, to settle the question whether the motion shall, or shall not, be allowed. The natural order of proceeding, dictated by good sense, is, first to allow a motion. and then it is early enough to take a bond of recognizance.    This course is prescribed by convenience and common sense.    Nor can any reason be discerned for the supposed requisition of the law, that an act in its nature posterior, and necessarily so, should have a priority given to it.    The law is fully observed, when there is an allowance of a motion, and a recognizance for the security of the adverse party ; and it is unreasonable to believe, that the legislature intended to prescribe the order in which these acts should succeed each other.

When the subject matter is considered, this reasoning is irresistible.    It is well known, as a matter of practice, that the taking of a bond, in cases of error or appeal, is the last act of the court ; nor with common decency can it be supposed, that the legislature was unacquainted with this notorious fact    The bond is never taken until a writ of error or an appeal is allowed ; and hence the allowance is clearly implied from receiving the bond.

The analogies on this subject are numerous.

In all appealable cases, the court is enjoined to allow the aggrieved party an appeal ; but the allowance is seldom expressed on the record.    In general, the party appeals ; a recognizance is taken ; and from this act the allowance is implied.

No writ of error is signed until after a careful perusal and allowance by the judge.    But the allowance is never expressed. It is an implication arising from the judge's signature.

On the same principle, it was determined, in *The Eagle Bank* v. *Smith* and *Parmelee*. 5 *Conn. Rep.* 71. that the allowance

of a motion for a new trial, on the ground that the verdict was against the evidence, implied an opinion of the judge that such was the fact.

It certainly is no overstrained presumption, that an act in its nature and in practise posterior to another, should imply it ; and more particularly, when the posterior act is useless and nugatory, if the prior act does not exist

I, then, with entire satisfaction, come to this conclusion ; that the motion in error was allowed, and is so proved to have been, by the taking of the recognizance ; and I know, that the latter is always the last act of the court.

PETERS, J. was of the same opinion.

LANMAN, J. was inclined to dissent.   The statute under which this proceeding was had, requires certain things to be done ; and it must appear from the record, that these requirements have been complied with ; but it does not so appear, that the motion was allowed.

BRAINARD, J. was absent ; and DAGGETT, J. having been of counsel in the cause, gave no opinion.

<p align="right">Plea in bar sufficient.</p>

*Fairfield,*
June, 1828.

Hillhouse
*v.*
Dunning.

---

The inhabitants of the town of READING *against* The inhabitants of the town of WESTON.

Under the revised statutes, it is an indispensable requisite in a deposition, the want of which cannot be supplied by parol proof, that the reason of taking it be stated in the certificate of the magistrate before whom it is taken.

The declarations of a person in the occupation of land, under an absolute deed from the former owner, are not admissible, in a suit *inter alios partes,* to shew the nature and extent of such occupation.

Where an absolute deed of land was executed and delivered to the grantee, on the premises ; and the grantor and grantee afterwards occupied the premises together ; it was held, that the execution and delivery of the deed were equivalent to livery of seisin, and gave the grantee possession ; and the subsequent occupation of the grantor must have been under the grantee, in whom the legal estate was vested.

Where *A.*, immediately after the execution and delivery of a deed to her from *B.*, gave back to *B.* a writing, binding herself, if *B.* should, within three years, bring her a certain sum (the consideration of the deed) with interest,

*Fairfield,*
June, 1828.

Reading
*v.*
Weston.

to deliver up to *B.* such deed, but if *B.* should fail to bring the money, by the time limited, he was to forfeit all claim to such deed; it was held, that this was not a mortgage, as there was no debt to be secured, but a mere contract to reconvey, on certain terms.

THIS was an action of *assumpsit* for supplies furnished to *Harriet,* the wife, and *Sally* and *Lucinda,* the minor children, of *Samuel Darling.*

The cause was tried at *Fairfield, December* term, 1826, before *Peters, J.*

*Samuel Darling* derived his settlement from his mother *Lucy Darling,* who had a legal settlement in *Weston* until *March* 1808. On the 19th of that month, one *Joseph Burr,* being the owner in fee of a tract of land lying in *Reading,* with a dwelling-house standing thereon, of the value of 800 dollars, executed and delivered to her, at said dwelling-house, an absolute deed of these premises. At the same time and place, she executed and delivered to him a writing in these words: " Know all men by these presents, that I, *Lucy Darling* of *Weston, Fairfield* county, am held and firmly bound to *Joseph Burr* of *Reading* in said county, that if within the term of three years from the date of this bond, the said *Joseph Burr* brings me, the said *Lucy Darling,* the 800 dollars, with interest for the three years, that I, the said *Lucy Darling,* am bound, by this bond, to deliver up to the said *Joseph Burr* the deed of land lying in *Reading,* with the buildings thereon, which I received from him, this day, for the consideration of 800 dollars. But if the said *Joseph Burr* fails bringing the said *Darling* the said sum, by the aforesaid time on this bond mentioned, that is, by the 19th day of *March* 1811, the said *Burr* forfeits 'all claim to said deed, and this bond is to be void and of no effect. In witness whereof, I have set my hand, this 19th day of *March,* 1808. [Signed ] *Lucy Darling.*" Immediately after the delivery of said deed and writing, *Lucy Darling,* with her son *Samuel,* then about seven years of age, removed to said dwelling-house, where they lived until the *Spring* of 1813, when she removed to the *Western* part of the state of *New-York,* where she still lives.

The plaintiffs claimed to have proved, that *Lucy Darling* took possession of only a part of the premises, of less value than 100 dollars; and that she took possession of that part under an agreement with *Burr,* that she should occupy that part, and that *Burr* should occupy the residue, and that he

should pay her for the part so occupied by him 48 dollars a year, which was to be applied to pay the interest of the 800 dollars, the consideration of the deed. The defendants claimed, that she went into the possession of the whole of the premises, and that *Burr* occupied a part, by her sufferance and permission.

To shew that she did not occupy the premises as claimed by the plaintiffs, but in her own right, the defendants offered a deposition, taken in the state of *New-York*, of a witness living in that state, on which the justice by whom it was taken, had not certified the cause of taking it; and with this deposition the defendants offered a witness to prove the cause of taking it. The plaintiffs objected to the deposition, on the ground that it was not duly certified, and to the testimony of the witness, on the ground, that the absence of the certificate of the justice, could not be supplied, by parol testimony. The judge sustained the objection, and rejected the witness and the deposition.

The plaintiffs, to shew that *Lucy Darling* did occupy the premises as claimed by them, offered sundry witnesses to prove her declarations made at the time she occupied them. Among these witnesses was one *Meeker*, by whom the plaintiffs offered to prove, that he heard her say, on a certain occasion, at the dwelling-house on the premises, " That the land was not hers ; that she lived like a dog ; that she did not care, if she could only get her money ; that she had no more to do with the land than the witness had." By one *Lyon*, the plaintiffs offered to prove, that while she was in possession, he was in the room occupied by her, and heard her say, " That she was in possession as tenant to *Joseph Burr ;*" and by another witness, that he heard her say, on another occasion, " That she had not bought the premises." To the admission of this evidence the defendants objected ; but the judge admitted it.

The judge instructed the jury, that if they should be satisfied from the evidence before them, that *Lucy Darling*, by herself, or her tenant, was possessed, in her own right in fee, of real estate in the town of *Reading*, of the value of 100 dollars, during the whole or any portion of her continuance in that town, they ought to return a verdict for the defendants ; otherwise, for the plaintiffs. The jury gave a verdict for the plaintiffs ; and the defendants moved for a new trial.

*Fairfield,*
June, 1828.

Reading
*v.*
Weston.

*N. Smith* and *Swift*, in support of the motion, contended, 1. That the witness to shew the cause of taking the deposition, and consequently the deposition itself, ought to have been received. Under the statute previous to the late revision, the same causes were necessary to authorize the taking of a deposition as now, and the general practice was, to insert the reason in the certificate ; but if this was omitted, the omission might be supplied by proof *aliunde. Stat.* 684. ed. 1808. *Swift's Ev.* 114. *Thompson* v. *Stewart,* 3 *Conn. Rep.* 171. That statute required the justice to "*attest*" the taking ; the revised statute requires him to "*certify*" the reason. The phraseology was changed ; but it was not the intention of the legislature to alter the law. *To certify* means *to make certain,* by any evidence.

2. That the declarations of *Lucy Darling* were inadmissible. She was a competent witness ; she was living ; and she might have been had, or her deposition taken. *Nichols* v. *Hotchkiss,* 2 *Day* 126. These declarations do not shew the character of the possession ; neither do they constitute a part of any act in controversy.

3. That *Lucy Darling* became owner of an estate in fee in *Reading,* on the 19th of *March* 1808, notwithstanding the writing given by her to *Joseph Burr,* her grantor.

In the first place, this writing was not a mortgage. It contained no stipulation to pay the money. There was no debt or duty secured. A debt or duty is an essential part of a mortgage ; and this must be described in the condition or defeasance with a reasonable degree of certainty. And to create such a debt or duty, there must be an obligation which can be enforced. *Pow. Mort.* 173. *Com. Dig. tit.* Chancery. 4 A 3. 1 *Mad. Chan.* 516. (ed. 1822.) 2 *Swift's Dig.* 181. But *Lucy Darling* could not enforce payment of the 800 dollars, it being perfectly optional with *Burr* to bring the money or not. There was no contract, express or implied, on which she could found an action. The writing was a mere covenant, on her part, to reconvey, within a limited time, on payment of the purchase money and interest.

Secondly, the deed was delivered, and the title vested in *Lucy Darling,* before the writing in question was given ; and consequently, there was a time when she was possessed in fee of the land. *Barkhamsted* v. *Farmington,* 2 *Conn. Rep.* 600. 603.

Thirdly, if this was a mortgage from the time of the delivery of the deed to *Lucy Darling*, still the fee of the land is in the mortgagee ; and by operation of the statute, she gained a settlement thereby in *Reading*.   This is an action *at law* ; and the case depends on a question of *law*.   The mortgagee is, unquestionably, the *legal* owner of the estate.   *Clark* v. *Beach*, 6 *Conn. Rep.* 142. 354.

4. That the judge should have charged the jury, that from the undisputed facts in the case, *Lucy Darliug* was in *possession* of the property.   She was in the actual occupation of a part, and was entitled to the possession of the whole.   So far as *Burr* was in possession, he was in as her lessee, under an agreement to pay her an annual rent of 48 dollars.   His possession was, therefore, her possession ; and so the jury ought to have been instructed.

*Sherman* and *Booth*, contra, contended, 1.   That the deposition was properly rejected.   The revised statute, under which this deposition was offered, expressly requires, that the justice, before whom the deposition is taken, shall certify the reason of taking such deposition.   *Stat.* 47.   The statute is not complied with, unless 1st, the reason be *certified*—and 2ndly, that this be done *by the justice*.   If the certificate of the justice was indispensable to shew the reason, it is clear, that parol evidence could not be received to prove it.   The former statute did not prescribe these requisites ; but such as it did prescribe, could not be dispensed with.   Could you, under that statute, prove by parol, in the absence of the justice's certificate, that the deponent was *sworn ?*

2. That evidence of the declarations of *Lucy Darling*, while in possession, was properly received, as part of the *res gesta*, and to explain the character of the possession.   The declarations of a tenant in possession are admissible, on the same grounds that his acts are.   1 *Stark. Ev.* 48.   *Phill. Ev.* 201. *Williams* v. *Ensign*, 4 *Conn. Rep.* 456.   *Jackson* d. *Youngs* & al. v. *Vredenbergh*, 1 *Johns. Rep.* 156.

3. That the defendants have no reason to complain of the charge to the jury.

First, the charge submitted the fact of *Lucy Darling's* possession, to the jury, and they have found against it.   In doing this, the judge proceeded on the ground that the conveyance to her was an *absolute* one.

*Fairfield,*
June, 1828.

Reading
*v.*
Weston.

But secondly, the deed given by *Burr* to *Lucy Darling* and the writing given by her to him, taken together, constituted a *mortgage.* In the first place, it appears from these documents, that there was *a debt.* "*The* 800 dollars" refers to the consideration of the deed; it is the purchase money of the land, which is to be specifically returned with interest. But if a debt does not so appear, it might be proved *aliunde. Peterson* v. *Clark,* 15 *Johns. Rep.* 205. *Erskine* v. *Townsend,* 2 *Mass. Rep.* 493. *Taylor* v. *Weld* & al. 5 *Mass. Rep.* 109. *Carey* v. *Rawson,* 8 *Mass. Rep.* 159. *Dey* v. *Dunham,* 2 *Johns. Chan. Rep.* 189. 2 *Swift's Dig.* 163. *Pow. Mort.* 151. which cites *Manlove* v. *Ball* & al. 2 *Vern.* 84. In that case, *A.* made an absolute conveyance of a church lease for three lives to *B.*; and *B.,* the purchaser, by deed under his hand and seal, agreed, that if *A.,* at the end of one year, should pay him 600*l.,* he would reconvey. This was treated as a mortgage, and it was held, after the lapse of twenty years, that the assignee of *A.* was entitled to redeem.

Thirdly, the mortgagor is the owner of the land, and may gain a settlement by virtue of his estate as mortgagor. *The King* v. *Edington,* 1 *East,* 288. 293. *Barkhamsted* v. *Farmington,* 2 *Conn. Rep.* 605. per *Gould,* J. What the mortgagee has is a defeasible interest ;—a mere security for money. The case of *Clark* v. *Beach* has no bearing upon this. The quantity of the mortgagee's interest was not determined. It only decided, that the title of the mortgagee was paramount to that of a stranger.

PETERS, J. 1. The first ground on which the defendants claim a new trial, is, that the deposition of *Lucy Darling* was rejected. This was in obedience to the statute, (*p.* 47.) which directs, that "the magistrate shall certify the reason of taking such deposition." But it was not done; and the omission can no more be supplied by parol, than any other official act of the magistrate.

2. Another ground is, that the declarations of *Lucy Darling,* while occupying the land in *Reading,* were admitted. Such declarations are always admitted to shew the nature and extent of such occupation, and as part of the *res gesta.* But in this case they could have no effect, as she occupied under an absolute deed from the former owner.

3. The defendants claim, that the court ought to have

charged the jury, that from the facts conceded, *Lucy Darling* was possessed, in her own right in fee, of real estate in *Reading*, of the value of 100 dollars, during her continuance therein. The execution and delivery of the deed from *Joseph Burr* to *Lucy Darling*, upon the land in question, were equivalent to livery of seisin, and gave her possession ; and if *Burr* afterwards occupied any part, it must have been under her ; for the legal estate was in her, and they lived peaceably together in the same house.

4. It is claimed, that *Lucy Darling* executed and delivered to *Joseph Burr* a defeasance, which converted his deed into a mortgage. But this defeasance was a contract to *reconvey*, upon certain terms. There was no debt to be secured ; and there was no mortgage in the case.

As the charge of the judge was incorrect, I advise a new trial.

HOSMER, Ch. J. and LANMAN, J. were of the same opinion.

BRAINARD, J. was absent ; and DAGGETT, J., having been of counsel in the cause, gave no opinion.

New trial to be granted.

*Fairfield,*
*June, 1828.*

Reading
*v.*
Weston.

——————

PALMER's administrators *against* MEAD and others.

On a bill of foreclosure, the title of the mortgagee cannot be investigated.

Therefore, where the plaintiff in a bill of foreclosure having proved the execution of the mortgage deed and of the note which it was given to secure, the defendants, who, as creditors of the mortgagor, had attached the mortgaged premises, by way of defence against the bill, offered evidence to shew, that such deed was given to defraud creditors in violation of the statute against fraudulent conveyances ; it was held, that such evidence was inadmissible.

THIS was a bill in chancery to foreclose mortgaged premises.

On the hearing, at *Fairfield, December* term, 1826, before *Peters,* J., the plaintiffs exhibited the mortgage deed, and the note which it was given to secure, and proved the execution of them. Three of the defendants, *Job, Isaac* and *Manoah Mead,*

having proved themselves to be attaching creditors of the land mortgaged, whose suits were pending, by way of defence against the bill, offered testimony to shew, that the deed was executed, by the grantor to the grantee, to defraud the creditors of the grantor, and these defendants among them, in violation of the statute against fraudulent conveyances. This testimony was objected to ; and the court rejected it. To revise this decision, the defendants moved for a new trial.

The case was argued before this Court, in *June,* 1827, by *Sherman* and *Hawley,* in support of the motion, and by *N. Smith* and *Betts,* contra. After some consultation among the Judges, it was continued *to advise.*

In support of the motion, the counsel for the defendants contended, 1. That the mortgage deed in question, having been given to defraud creditors, was, as against those creditors, among whom the defendants were included, *utterly void,* vesting in the grantee *no right* whatever. *Rob. Fr. Con.* 591. *Stat.* 247.

2. That a plaintiff in chancery, who seeks for a decree in his favour, must always shew a right in himself. The rule is universal, that a decree for the plaintiff must be based upon some right in him. 2 *Swift's Dig.* 219. 220. The allegation in a bill of foreclosure, that the plaintiff has title, by a mortgage deed, is a material allegation ; and the general finding in the plaintiff's favour establishes this fact.

3. That on general principles, a finding and decree in the plaintiff's favour, on this bill, would be conclusive against the defendants, in a subsequent action of ejectment. 1 *Phill. Ev.* 262, 3. 223, 4. *Bul. N. P.* 234. *Whately* v. *Menheim* & al. 2 *Esp. Rep.* 608.

4. That if the plaintiff in a bill of foreclosure must allege a title in himself, and must support such allegation by proof, it is competent to the defendant to examine that proof, and to counteract it by opposing evidence. If any evidence, even *prima facie,* may be received in support of the plaintiff's title, it is because his title must be proved. Is this proof to be *ex parte ?* May not the defendant be heard upon it ? If the plaintiff attempts to shew, that he is mortgagee ; why may not the defendant shew, that he is not ? If the plaintiff shews a paper, claiming it to be a deed ; why may not the defendant shew,

that it is not a deed? Why make him a party, if he is not to have the rights of a party? In *Giles* v. *Baremore* & al. 5 *Johns. Chan. Rep.* 545. which was a bill of foreclosure, the defendants relied on a presumption of payment, founded on the lapse of time; and the Chancellor said, (*p.* 550.) he had a right to insist on his ample and complete title, and to rest it upon any of the facts or presumptions warranted by the case. *De Butts* v. *Bacon* & al. 6 *Cranch* 252. before the supreme court of the *United States,* was also a bill of foreclosure; in which the defendant set up the defence of usury; and the court in which the cause was tried, considering the contract to be usurious, decreed the mortgage to be void. This decision was affirmed.

According to Judge *Swift,* usury will constitute a defence to a bill to foreclosure. 2 *Swift's Dig.* 197. Why so? Manifestly, because the deed, in such case, is *void.* But is not a fraudulent conveyance equally void?

The decision in this case, in the court below, was founded on a *dictum* in 2 *Pow. Mort.* 1044. copied by Judge *Swift,* first into his *System* and afterwards into his *Digest.* The foundation of this *dictum* is an anonymous case in 2 *Ch. Ca.* 244. But that case does not support the doctrine. There, in consequence of an order of the côurt, directing possession to be given to the mortgagee, there was a process of contempt for not delivering it accordingly; upon which the heir of the *mortgagor* set forth a title, which the *mortgagee* was not permitted to controvert; and thereupon the contempt was discharged. If the case establishes any general principle, it is, that the mortgagee cannot controvert the title of the mortgagor, under whom he claims.

The reason given for the rule claimed by the plaintiff, is, that the mortgagee, on a bill of foreclosure, cannot *amend* his title. But is not the title of the mortgagee strengthened, by extinguishing the equitable title of the mortgagor?

The counsel for the plaintiff insisted, That the rule was well settled, both in *England* and in this state, that on a bill of foreclosure the title of the mortgagee cannot be investigated; but he will be left to pursue legal means to establish it. 2 *Pow. Mort.* 1044. 2 *Swift's Syst.* 439. 2 *Swift's Digest* 197. In a bill of foreclosure, the plaintiff does not seek for any legal title : but simply, that the mortgagor's equitable right may be

taken away.   The plaintiff's title is not put in issue, by the bill. It is true, that he must establish it *somewhere*, before he can get the land ; but why not try it in a court of *law ?*  The question is not to be litigated *twice ;* and this being the case, it is most proper and consonant to the genius of our jurisprudence, as well as most convenient, that it should be tried at law.   This has been the uniform and well established course of proceeding in *Connecticut.*

A bill of foreclosure may be brought and tried in a different ent county from that in which the land mortgaged lies.  *Broome* v. *Beers,* 6 *Conn. Rep.* 198    This could not be done, if the title of the land could be investigated on such bill.

The defendants have not been injured, by the exclusion of the evidence offered by them. . They do not want to redeem ; if they do, a decree of foreclosure will permit them to do so, within a limited time.   There is a clear right in the defendants to redeem, if they choose to do so ; and this being the case, it is just and proper that the time within which this right is to be exercised, should be limited by a decree.

In reply, it was said, that the  statute requiring suits brought for the trial of land to be tried in the county in which the land lies, is applicable only to actions at law, and not to suits in chancery.

Hosmer, Ch. J.   That the mortgage in question, on the facts offered to be proved, was utterly void in respect of creditors, has not been questioned, nor is it questionable.   The precise enquiry is, whether these facts may be proved *on a bill of foreclosure ;* or whether the plaintiff will be left to pursue legal means in a court of law to establish his title.   The defendants insist, that the defence is admissible against the bill of foreclosure ; and the plaintiff, that it is no defence here, but that the point, by our jurisprudence, is confined to the *law* courts.

The argument of the defendants has principally been founded on the law as established in other countries and states, where the diversities on the subject of mortgages between them and us, in many particulars, are numerous and great ; and where on foreclosure, the land mortgaged is not only decreed to be sold, a proceeding never admitted here, but the possession *is* enforced to the purchaser.   There, the bill of foreclosure is

considered as a proceeding *in rem ; (Kershaw* v. *Thompson & Fairfield,* al *4 Johns Chan. Rep.* 609. and the cases there cited;) and the doctrine of enforcing a delivery of the possession to the purchaser under a decree, is carried so far, that it is done not only when specially decreed, but on motion, when the decree on this subject is silent. The effect of this doctrine on the jurisdiction and enquiries of the court, is obvious ; and it is necessarily different from the law established here, where the proceeding is not *in rem,* as has often been determined, and will be shewn hereafter, and where there is no sale of the mortgaged premises, nor possession enforced.

The ground on which this case has been decided by the court, renders it both unnecessary and improper to investigate the laws of other countries, or to pursue the train of the counsel for the defendants. The court consider the law of *Connecticut,* long and frequently established, and without any diversity of opinon, as having conclusively settled this point, that *on a bill of foreclosure,* the title of the mortgagee cannot be investigated ; but that he will be left to pursue *legal* means to establish it. At the same time, I remark, that of all the cases cited by the defendants, there is *but one* that appears to be in point ; and that is *De Butts* v. *Bacon &* al. 6 *Cranch* 252. This case was brought before the supreme court of the *United States,* on error, from the circuit court of the district of *Columbia.* It was a bill of foreclosure ; and the defence was a plea of usury. The circuit court adjudged the contract to be usurious, and decreed it to be void. The case, most probably, was decided on the local law of the state in which the decision was made. In all events, the grounds of determination, and even the arguments of counsel, are all in the dark. The opinion and act of the court is expressed in these few words : " Which decree, this court, after argument, by *Swann* for the appellant, and *Youngs* for the appellees, affirmed." No person can more highly respect the decisions of this court, than I do. They are to be considered as *precedents,* in all those cases, where an ultimate jurisdiction is given them over the determinations of the state courts ; and in all their proceedings, both at law and in chancery, are justly entitled to high deference. But when their decisions are founded on the local law of another state, they can have no application here ; and when they are based on the principles of the common law or of equity, if without argument of counsel or the citation of a case,

*Fairfield,* June, 1828.

Palmer *v.* Mead.

*Fairfield,*
June, 1828.

Palmer
*v.*
Mead.

or the reasons of the court, I cannot receive them as evidence of the law. The submitting of the mind to the arguments of men of great learning, talent and respectability, is rational; but to the mere *ipse dixit* of any one, such submission is servile.

In all the other cases cited for the defendants, an answer shewing their inapplicability, might easily be given; but as the decision of the case before us, founded on our own law, puts them out of the question, I feel myself neither called on to discuss, nor justified in discussing, them.

The court have assumed two principles as the basis of their determination; that is, that the question between the parties relates to the *legal title* of the plaintiff; and that by our law, on a bill of foreclosure, it is not the subject of enquiry.

1. If the facts offered in evidence, by the defendants, are sustained, they show the mortgage deed, as against creditors, to be utterly void. This proposition has not been questioned; nor is it questionable. On the contrary, it has been insisted on, in the argument, that a determination between the parties on the point of title, is a conclusive bar to any suit at law.

Had the defendants conceded, that the title at law is valid, but that in equity the plaintiff cannot prevail, for want of equitable title, it would present a different question. *Saunders* v. *Dehew,* 2 *Vern.* 271. 2 *Pow on Mort.* 1046. The principle is familiar, and does not require a reference to cases. A court of chancery will leave a person to his remedy at law, if there is injustice or even hardship, in its interference. But the specific objection made in this case, is, that the plaintiff has no legal title; in other words, that his mortgage, in respect of creditors, is a nullity everywhere.

2 The question then arises, whether by the established law of *Connecticut,* the legal title, on a bill of foreclosure, is, or is not, a subject of enquiry. The object of investigation, it must be remembered, is not what ought to be the law of the state. This would lead to an examination and discussion of principles. But it is, whether on this subject, the law has, *in fact,* been settled; and if so, what that fact is.

As far back as the year 1796, in the 2nd volume of his "System of the Laws of *Connecticut,*" (*p.* 439.) it is said, by Judge *Swift,* "That on a bill of foreclosure, the title of the mortgagee cannot be investigated; but he will be left to pursue legal measures to establish it." In 1803, the superior court,

consisting of six judges, on a bill of foreclosure, brought by *Fairfield,* *Ebenezer Hayden* against *John Belden*, on solemn argument, June, 1828. determined to the same effect. The same court, in 1807, in the case of *Owen* v. *Granger*, 2 *Day* 477. again decided, "That the legal title cannot be drawn in question, on a bill to fore- close." No etermination at variance with those I have cited, is even suggested to have taken place ; and on this subject, from an ea ly period of my practice, I have considered the law as settled. In *Swift's Digest, vol.* 2. *p.* 197. first published in 1823, nearly thirty years after he had reported the law on the point in question, the same author recites the expression taken from his *System,* "That on a bill of foreclosure, the title of the mortgagee cannot be investigated ; but he will be left to pur- sue the legal measures to establish it." He then adds : "Of course, it is not necessary that it should be brought in the county where the land lies. All the question that can arise, is, whether the mortgage deed has been properly executed : the validity of the title must be decided at law, and not in chance- ry." Thus far the author must be considered as declaring what the established law of *Connecticut* is. His competency as a witness to the fact in question, will not be controverted, when it is recollected, that he had compiled a system of the laws of this state, as early as the year 1796, in which he stated the established law then as he afterwards did in his *Digest*; that he was appointed a judge of the superior court in 1801, and continued on the bench eighteen years, where he had a peculiar opportunity of being acquainted with the practice ; and that, undoubtedly, he was one of the judges, who declared the law in *Hayden* v. *Belden* and *Owen* v. *Granger.*

To the law as before recited Judge *Swift* subjoined this ob- servation : "Where the obligation secured by the mortgage is void, by the statute of usury, this will constitute a defence against a bill to foreclose ;" and for this law he cited 3 *Atk* 154. It is obvious to every person, who hears the successive passages recited, that the established law of *Connecticut* was declared. until the last sentence referring to *Atkyns.* This change of subject in the *Digest*, from the law of *Connecticut* to the chan- cery law and common law of *England*, is observable on many of his pages, and with no other notice than by a reference to some authority. There is recollected no determination in this state, that usury is a defence to a bill of foreclosure, by the in- validation of the mortgage ; nor has it been pretended. When

*Palmer* *v.* *Mead.*

*Fairfield,*
*June, 1828.*

Palmer
*v.*
Mead.

therefore, the law is supposed, by Judge *Swift*, to be founded on the authority of a decision, made by Lord *Hardwicke*, and reported by *Atkyns*; and when he had, a few sentences before, laid down the law of this state, in the most sweeping terms, and declared, that the *only question* in our courts, is, whether the mortgage deed has been properly executed ; and that the validity of the title must be decided at law, and not in chancery ; it would be unreasonable to infer, that the judge, in the sentence last cited, had reference to any subject but the *English* law.

Although it is unnecessary, I will remark *en passant*, that the case referred to by judge *Swift*, in *Atkyns*, was neither a bill of foreclosure, nor bearing any relation, even in the remotest degree, to the question before the Court.

It is a provision of statute law, that all suits brought for the trial of the title of land, or wherein *the title of land is concerned*, shall be tried in the same county where the land lies, or facts are done concerning which the title of land *may be* in question. Such suits are *local*, and must be brought in the county where the land is situated. Thus, the action of trespass *quare clausum fregit* is as much local as an action of disseisin is, although in the former the title of land is never necessarily in controversy. 1 *Swift's Dig.* 594. But as it *may be* controverted, this gives locality to the suit. Now, if on a bill of foreclosure, the title of the mortgagee *may be* brought into dispute, it clearly is as much a local action as is trespass *quare clausum fregit* or ejectment. The principle has always been admitted ; but on the ground that the title cannot be in question on a bill of foreclosure, it is established law, that it may be brought in one county when the land mortgaged lies in another. 2 *Swift's Dig.* 197. In the case of *Broome* v. *Beers*, 6 *Conn. Rep.* 198., it was recently decided, by this Court, that the title of land was not in question on a bill of foreclosure, and that it need not be brought in the county in which the land lies. It was said, by one of the judges, there being perfect unanimity on this point, that " the title of land is not in question ; and such suits have always been considered transitory." 6 *Conn. Rep.* 215.

It was suggested in the argument of this case, that the statute giving locality to suits, which may involve the title to land, was alone applicable to actions at law. To this observation the answer is without difficulty. In the first place, our courts, without exception, have been of an opposite opinion. It has

*Fairfield.*
June, 1828.

Palmer
*v.*
Mead.

ever been considered, that the statute, either in its expression, or in its reason and spirit, was equally applicable to suits in chancery and at law. In the *Digest* of Judge *Swift*, (*vol.* 2. *p.* 197.) he takes it for granted, and assigns as the reason why a bill of foreclosure may be brought in a county where the lands are not situated, that the title cannot be investigated.  " Of course," says he, " it is not necessary that it should be brought in the county where the land lies ;" clearly implying, that if the title might be questioned, the bill must be instituted there.    In *Broome* v. *Beers,* 6 *Conn Rep* 204. the learned counsel for the defendant in error, evidently proceeded in their argument on this ground.   " The bill," say they, "was brought in the proper county.   Local actions are those in which the title to land may be determined ; but on a bill of foreclosure the title is not in controversy."   The same idea was adopted by the Court, and the suit was decided to be *transitory.*   A second reply to the observation that the statute giving locality to certain suits is inapplicable to bills in chancery, is equally conclusive.   In all the cases cited, the court declare, that the *title* is not in question. It is, therefore, of no importance, whether the statute is, or is not, applicable.   Let it be admitted, that it is not. The opinion of the court alluded to, deprives the remark, in this case, of all its intended force.

It was argued at the bar, that after foreclosure, the title of the mortgagee would be strengthened ; and that for this reason, the point ought to be decided on the plaintiff's bill.   I reply to this remark, that no additional strength is, or can be, given to a title, by a decree, which takes away the equity of redemption only, and in a suit, where the title cannot be, and is not, investigated ;   and when the enquiry concerning it is referred *exclusively* to a court of law.

It has likewise been insisted, that a bill of foreclosure must aver a title to the land mortgaged ; and hence, that it must be proved.   To this I answer, that in bills of this description, the only necessary averment on this point, is, that the defendant *executed a deed on condition.*   2 *Swift's Dig.* 656.   Hence, as has justly been observed, by Judge *Swift,* " all the question that can arise, is, whether the mortgage deed has been properly executed."   2 *Swift's Dig.* 197.   Of consequence, if the execution of the deed is not proved by two witnesses : or if it was forged ; or if it was obtained by duress, or by fraud ; or if it was executed by a feme covert :   in these and similar cases, it

*Fairfield,*
June, 1828.

Palmer
*v.*
Mead.

is *no deed,* and an indispensable averment of the bill is without support.

From the particulars disclosed I consider the fact to be unquestionably proved, that by the law of this state, the legal title of the plaintiff, on a bill of foreclosure, is never the subject of enquiry, but that the point is within the exclusive jurisdiction of the courts of law. And as no decision in opposition to this principle has been referred to, it is a fair inference that none exists.

To authorize the adoption of a new rule in annihilation of the former, uniformly recognized and acted on, for more than thirty years, and probably beyon I the memory of any living practitioner at the bar, some pointed injustice and overwhelming mischief should be made to appear. But what is the mischief; what the injustice? The plaintiff must establish a title, and the defendant may question it, in every possible mode. This, however, must be done in a court of law; and is this an objection? Is not a court of this description as competent to decide on a *legal* title as a court of chancery is?

There is not in the common law a maxim more eminently just, and promotive of the public convenience, than that of *stare decisis.* It was once said, by Mr. Justice *Powell,* emphatically, " Nothing is law that is not reason ;"—" a maxim," observed that eminent lawyer and scholar, Sir *William Jones,* " in theory excellent, but in practice dangerous, as many rules, true in the abstract, are false in the concrete ; for since the reason of *Titi s* may, and frequently does, differ from the reason of *Septimius,* no man, who is not a lawyer, would, in many instances, know what to advise, unless the courts were bound by authority, as pagan deities were supposed to be bound by the decrees of fate " *Jones on Bailment* 84. Besides, if law well established may be annulled, by opinion, a foundation is laid for the most restless instability. The decisions of one court may be overruled by another court ; and those of the latter will only have a transient efficacy, until some future court, dissatisfied with them, shall substitute new principles in their place. No system of inflexible adherence to established law can be as pernicious as such ceaseless and interminable fluctuations.

BRAINARD and LANMAN, Js., were of the same opinion.

PETERS, J. I cannot concur with the Chief Justice, though he relies on my opinion in *Broome* v. *Beers*, 6 *Conn.* ep 198., which is as conclusive as any other *argumentum ad hominem.* In forming that opinion upon the question of jurisdiction, I followed implicitly the decisions of my predecessors, who were probably misled by *Powell's* abridgment of an anonymous case in 2 *Chan. Ca.* 244., which, according to Chancellor *Kent,* is " so briefly and so loosely reported, as to be scarcely deserving of any consideration." *Kershaw* v *Thompson,* 4 *Johns. Chan. Rep.* 616. This point was of minor consideration in *Broome* v. *Beers ;* and, of course, received less attention than the principal point in the case. I have since examined the subject. The consequence is a change of opinion. " With respect to the relief that can be afforded here," says Chancellor *Kent,* " I take the rule to be, that a plaintiff who comes to a court of equity for relief against a judgment at law, or other legal security, on the ground of usury, cannot be relieved, except upon the reasonable terms of paying to the defendant what is really and *bona fide* due to him. On the other hand, if the party claiming under such usurious judgment, or other security, resorts to this court to render his claim available, and the defendant sets up and establishes the charge of usury, the court will decide according to the letter of the statute, and deny all assistance, and set aside every security and instrument whatsoever, infected with usury." *Fanning* v. *Dunham,* 5 *Johns. Chan Rep.* 142. The same point was decided, by the supreme court of the *United States,* in *De Butts* v. *Bacon* & al. 6 *Cranch* 252., upon a bill to foreclose a mortgage, to which usury was pleaded. The court below decided the contract to be usurious, and decreed the mortgage to be void ; which was affirmed by the supreme court. I would, therefore, advise a new trial.

DAGGETT, J. It is understood, that the judge rejected the testimony offered by the defendants, on the authority of several decisions made at the circuit within the last thirty years. It is not pretended, that the question has ever been decided in this court. It is, therefore, open for examination.

Those decisions are founded entirely on the doctrine laid down in 2 *Swift's Dig.* 197. 2 *Chan Cas.* 244. *Pow. on Mort.* 1043 Judge *Swift* says : " On a bill to foreclose, the title of the mortgagee cannot be investigated, but he will be left to pursue the legal measures to establish it. Of course, it is not

necessary to be brought in the county where the land lies. All the question that can arise, is, whether the mortgage deed has been properly executed; the validity of the title must be decided at law, and not in chancery    But when the obligation secured by the mortgage is void by the statute of usury, this will constitute a defence against a bill to foreclose." In support of the first of these positions, *viz.* that the title cannot be investigated on a bill to foreclose, he cites 2 *Chan. Cas.* 244    In that case, " a mortgagee sued to have his money, or that the defendant be barred of his equity of redemption.    It happened, that by subsequent orders, possession was ordered to the mortgagee, and contempt prosecuted for not delivering the possession, and the heir who was so prosecuted, set forth in his examination a title; and now the mortgagee would have debated the title, but was not admitted, because the course of the court is, and the court can go no further in such a bill, but to take away the equity of redemption, and leave the defendant to such title as he hath, but *not to amend it ;* and this was the true and ancient course, though of late sometimes the contrary hath been done.    And now the Lord Chancellor agreed thereto, and discharged the contempt." Judge *Swift* takes his position from the case quoted.    *Powell* also uses the words found in the case    To that case, then, we must look as to the sole authority, that on a bill of foreclosure the title of the mortgagee cannot be investigated    If I understand this case, it may support any thing but the position for which it is introduced.    It is not stated who the parties to the bill were, nor what the decree was, but it seems possession had been ordered (a practice with which we are not familiar, but which is well known in *England,* and has been substantially adopted in *New-York,*) and the heir, who was so prosecuted for a contempt in not obeying the order, set forth in his examination *a title.* The mortgagee would have debated this title; but the court would not permit him, that is, would not suffer him to amend his title;—and thus discharged the heir from contempt for disobeying the order. The court examined and *investigated the title of the mortgagee,* so far as to decide, that it was not sufficient, but would not permit him to amend it, on his bill to foreclose, and therefore decided against him, and discharged the heir from contempt. The case decides, that on a bill to foreclose, the plaintiff must rely on his title, and if he would amend it, must resort to other proceedings to do it; and it decides no more.

Chancellor *Kent*, speaking of this case, (4 *Johns. Chan. Rep.*
516.) observes :—" It is so briefly and loosely reported as to
be scarcely deserving of consideration." It seems too much
to set up the doctrine that a title of a mortgagee cannot be in-
vestigated on a bill to foreclose, upon the authority of this al-
most unintelligible case, especially as it is unsupported by any
case or practice in *Westminster Hall*, or elsewhere.   Yet the
doctrine rests on this case entirely, so far as *British* authorities
are cited.

Judge *Swift* also supposes, that the title is not drawn in
question, because a bill to foreclose is not necessarily brought
in the county where the land lies.   It is admitted, that the bill
may be brought in the county where the mortgagor or mort-
gagee dwells ; but it is believed, that this practice is perfectly
consistent with the construction of the statute, which directs
" that all *suits* wherein the title to land is to be tried and de-
termined, and all actions of trespass *quare clausum fregit*, shall
be tried in the county where the land lies."   This statute re-
gards actions *at law*, and has never been deemed to apply to
bills in equity, wherein the title to land may be decided.   A
bill to redeem, when the mortgagor proceeds on the ground
that the mortgage has been satisfied, and therefore prays for a
restoration of his legal title, and a bill for the specific execution
of a contract to convey land, both involve the question of title ;
and yet it is not necessary, in either case, to bring the bill in
the county where the land lies ; nor is such the practice.   The
statute of our state, like the *English* law, provides for the trial
of titles to land in the vicinity, because the jury who are to
settle titles come from the vicinage ; but surely such a provis-
ion is useless, where the questions are all to be settled by the
judges.   Hence, our superior court held jurisdiction of bills in
equity, wherein the title to land is concerned, lying in our
neighbouring states ; and the notable case of *Penn* v. Lord
*Baltimore*, 1 *Vesey* 444. respecting lands in this country, in
the *English* courts of chancery, is of the same character.

But the latter position of the commentator, *viz.* that usury
is a good defence to a bill of foreclosure, proves that the title
in such bill may be investigated and defeated.   If usury be a
good defence, for the reason assigned by the commentator, *viz.*
that the statute declares the contract void, it is difficult to see,
why *fraud* may not be.   In both cases, the deed is, by statute,
declared *utterly void*.   The authority, however, cited by the

learned commentator, (3 *Atk.* 154.) no more supports this position, than the authority from 2 *Chan. Cas.* 244. supported the other.

Let us now examine the question on principle. It is very clear, that by a decree of foreclosure, the rights of the mortgagee become materially varied and strengthened, and of course, those of the mortgagor and those claiming under him, in an equal degree, diminished. The object of the bill is to appropriate the pledge, and to cut off all right to redeem, and give a perfect title to the mortgagee. The decree effects this object. The mortgagor can never redeem, except by paying the incumbrance. When the time limited for the payment of the mortgage money has expired, the debt is extinguished, and the estate becomes absolute, according to the decision of our court. *Derby Bank* v. *Landon*, 3 *Conn. Rep.* 62.

The bill proceeds on the ground of a debt due, and a valid collateral security, by a mortgage deed. That the deed was forged ;—that it was fraudulently substituted for another ;— that it was obtained by duress; or that the grantor was a feme covert, when the deed was signed, may unquestionally be proved. In the case of *Smith* v. *Chapman*, 4 *Conn. Rep.* 344. this court sustained a bill in equity to validate a mortgage deed, where the wife of the mortgagor was one of the subscribing witnesses, and therefore the deed not duly attested within the requirements of our statute.

If in these cases, the court would permit a defence, and deny to the plaintiff any relief, because he had no valid title, why should not the court uphold a defence, when the deed is declared utterly void by positive law ?—A court of equity will no more enforce a usurious, a fraudulent or a corrupt contract, than a court of law. Such contracts will receive no countenance or support, either at law or in equity. They are, in the words of the law, *utterly void* every where.

Again, it is admitted in this case, that the mortgagor, or his assigns, might show that the debt had been paid, in part or in full. It will also, it is presumed, be acknowledged, that the defendants might show, that the debt, being negotiable, had been assigned, and the interest in the land released to a third person. If then, it may be shewn, that the plaintiff's title was gone, why not show, that he never had one ?

Moreover, it has been decided repeatedly, by the Chief Justice, and by other Judges in conformity thereto, that a

bill to foreclose must *aver a title* in the plaintiff. The bill without such allegation, would be insufficient. The court could not, on a bill destitute of such an averment, decree a foreclosure. Now, it is utterly beyond my comprehension, that in any proceeding, either at law or in equity, a defendant may not show, that a *material* allegation of the plaintiff is untrue. If such is the law in this case, it is a solitary exception to general rules in all analogous cases.

Surely, there can be nothing in the nature of this defence, which should incur the censure of a court of equity ; nor can a fraudulent conveyance ever deserve peculiar favour or protection. Nay, it is a rule in a court of equity, not to interpose and decree a foreclosure, when there is injustice in the case. The court will refuse such a decree. *Powell on Mort.* 1045, 6. 2 *Term Rep.* 271.

But there are not wanting authorities of great weight, bearing directly on this point. In the circuit court of the *United States*, for this district, the late Judge *Livingston*, in the case of *Austin* v. *Lyman*, after a discussion of this question, in which the doctrine of *Swift* and *Powell* was examined, decided in favour of the defence of usury to a bill of foreclosure. H is extensive practice at the bar, and great experience on the bench of the supreme court of *New-York* and of the *United States*, entitle his decision to much respect. In *Fanning* v. *Dunham,* 5 *Johns. Chan. Rep.* 42., Chancellor *Kent* thus observes : " With respect to the relief that can be afforded here, I take the rule to be, that a plaintiff who comes to a court of equity for relief against a judgment at law, or other legal security, on the ground of usury, cannot be relieved, except upon the reasonable terms of paying to the defendant what is really and *bona fide* due to him. On the other hand, if the party *claiming under such usurious agreement or other security, resorts to this court to render his claim available, and the defendant sets up and establishes the charge of usury, the court will decide according to the letter of the statute, and deny all assistance, and set aside every security and instrument whatsoever infected with usury.*" In the present case, the plaintiff resorts to the superior court " to render his claim available," by appropriating the pledge and cutting off the equity of redemption, as was before remarked. Is not, then, the position of this learned Chancellor directly in point ? I am aware, that the case before the Chancellor was a bill to *set aside* a judgment,

and other *legal securities,* on the ground of usury ; but in the remarks above quoted, the Chancellor is laying down the law in cases of a bill *to relieve* against usurious securities, and in a bill to *render them available by foreclosure.* He pointedly shows the difference, which, indeed, he demonstrates from a view of all the authorities, and the result is, that when a plaintiff seeks to enforce such securities—*to render them available,*—usury may be proved, and if proved, the court will deny all assistance. It will not be urged, that *if* usury may be interposed as a defence, *fraud,* when alleged by a third person not party to the fraudulent deed, will not equally avail.

In the case of *De Butts* v. *Bacon* & al. 6 *Cranch* 252. the supreme court of the *United States,* held the defence of usury good on a bill to foreclose, and affirmed the judgment of the circuit court of the *United States* for the district of *Columbia,* which decreed the mortgage void on that ground. The question now made, to be sure, was not raised in that case ; but is not the silence of the learned court and bar on the point, full evidence that it could not be raised with any prospect of success ? In *Baldwin* v. *Norton* & al., 2 *Conn. Rep.* 161. on a bill of foreclosure, brought by a second mortgagee against the mortgagor and the first mortgagee, one question was, whether the plaintiff could introduce proof of usury in the first mortgage. The court decided, that he could not, *because usury was not alleged in the bill.* The nine judges gave their opinions *seriatim* ; and in every instance, the question of usury was resorted to, discussed and answered. No judge suggested any difficulty in this proof to destroy the title of the mortgagee. Judge *Swift,* from whose *Digest* I have quoted above, did not suggest the contrary idea. Judge *Edmond* expressly recognized the doctrine, that usury would defeat the title. Is it not incredible, that neither of the judges should have resorted to an objection, which, it is now alleged, is the familiar practice of our courts ?

It is urged, however, that our courts have constantly sanctioned the ground now taken, by a majority of the court. I am not aware, nor do I believe, that there has ever been a decision on the point now raised—*viz.*—whether fraud may be given in evidence, by a second mortgagee, or an attaching creditor, to defeat the first mortgage. The first time I ever heard a suggestion of the kind, was in *Owen* v. *Granger,* at *Hartford,* in 1802, when the Court, Judge *Swift* presiding,

held, that usury could not be given in evidence on a bill of
foreclosure. This was heard with astonishment, by several
gentlemen of the profession, some of whom lived to witness
his retraction of that opinion in his *Digest* of 1823,—as above
quoted. I believe this opinion was followed at the circuit, in
several cases; but it has never received the sanction of this
Court till now.

The case of *Broome* v. *Beers,* 6 *Conn. Rep.* 198. is also cited
as an authority bearing on this case. The first point decided,
as appears by the condensed view of it, by the reporter, is : "A
bill of foreclosure need not be brought in the county in which
the land lies, as the title of the mortgagee cannot, under such
a bill, be investigated." The land lay in *Litchfield* county ;—
the cause was tried in *Fairfield* county. This was a writ of
error from a decree of Judge *Brainard*. On the trial of the
writ of error, only three judges sat, the judge who tried it be-
ing absent. The Chief Justice and Judge *Lanman* reversed
the judgment, against the opinion of Judge *Peters* and the
Judge who tried it at the circuit. The view of the first point,
as stated by the reporter, is faithfully taken from the opinion of
the Court. That question, however, was not agitated at the
bar, nor even mentioned by counsel. It probably appeared on
their briefs. But I would ask, what point was investigated and
decided ? The only point on the merits was, whether the title
of *Beers*, the plaintiff, was *prior* to that of *Broome*, or whether
it was *contemporaneous* with it. The Court held, that by the
representation, which *Beers* made to *Broome*, prior to his tak-
ing the deed, that the deed to *Minor*, under whom *Beers*
claimed, and the deed to *Wright*, under whom *Broome* claimed,
were contemporaneous, the plaintiff, *Beers,* had no priority
against *Broome*, but that they were tenants in common. The
*title to land* thus lying in *Litchfield* county, was decided, by the
superior court, sitting in *Fairfield* county, or else nothing was
decided.

This decision supports, if it needed support, the position
which I took before, that bills in equity relating to the title of
land, need not be brought in the county where the land lies.
But with all deference, I repeat the question, what was deci-
ded between these parties ? The bill was brought by *Beers*,
a mortgagee, against *Broome*, to *foreclose*. What was inves-
tigated, and what decided ? Obviously, that *Beers* had no
priority of title over *Broome*. To decide that one man has not

*Fairfield,*
June, 1828.

Palmer
*v.*
Mead.

priority of title, is deciding on the title. The superior court decided, that *Beers'* title was *prior*, and granted the bill  The supreme court of errors decided, that *Beers* had no priority, and that, to use the language of the opinion, " it would be contrary to the first principles of equity, often recognized and applied, to give success to the plaintiff's bill." But if I rightly apprehend the doctrine now established, it is, that the title of the mortgagee cannot be investigated on a bill of foreclosure. In the language of Chief Justice *Swift,* " all the question that can arise, is, whether the mortgage deed has been properly executed. The validity of the title must be decided at law, and not in chancery." The mortgage deed was properly executed, as appears in the case of *Beers* v. *Broome;* then the superior court was correct in granting the bill ; and the supreme court of errors could not, consistently with the principles of the case now in judgment, reverse the decision. The marginal note, therefore, in *Beers* v. *Broome,* should read thus : " As the title of the mortgagee cannot be investigated on a bill to foreclose ; therefore the bill need not be brought in the county where the land lies. On this bill to foreclose, *Beers'* title is investigated, and found not prior to *Broome's,* but contemporaneous ; therefore, he has no right to foreclose *Broome.*"

I know not how to escape from this result, unless it be said, that this defect in *Beers'* title could not be investigated in a court of law ; and even then, the title is investigated in a county where the land did not lie. I ask, why not ? Suppose *Beers* to be in possession, and *Broome* to bring ejectment for an undivided part of the land ; could not *Broome* defeat *Beers'* priority, by the same testimony, which would defeat it in a court of chancery ? I can see no difference. I trust, then, that the case of *Beers* v. *Broome* will not add to the weight of authority, which before that was to be found in 2 *Chan. Cas.* 244. which Chancellor *Kent* said was deserving of no consideration. I must be pardoned for saying, that instead of being an authority for any point, it is *felo de se.*

The absurdity of this doctrine may be further illustrated thus. Suppose that *A.* mortgages to *B.* land worth 1000 dollars, to secure a debt of 300. *A.* afterwards mortgages the same land to *B.,* for the security of a debt of 500 dollars, the consideration of which is usurious, and, of course, the security void. *B.* brings his bill to foreclose both mortgages. The title

to neither can be investigated on this bill, and therefore a decree must pass for foreclosure, unless *both debts* shall be paid within a specified time. If *A.* bring his bill to redeem, the law is well settled, that he cannot prevail, except on paying both debts. 5 *Johns. Chan. Rep.* 142. Suppose the mortgagor is in possession, and the mortgagee brings ejectment; the mortgagor cannot defend himself, for the deed first given is good, and the mortgagee has only to shew *that*, to enable him to recover. Or suppose the mortgagee is in possession, and the mortgagor brings ejectment, for a like reason he cannot recover; for there is a valid deed against him. In such case, then, a usurious security for 500 dollars, is enforced, the pledge appropriated, and the equity of redemption cut off, in defiance of a plain statute, which declares it absolutely void.

This case has been under the consideration of the court two terms, having been continued for advisement As the judgment appears to me unfounded in principle, and destitute of all support from authority, I have taken the liberty of examining it with freedom.

This decision embraces the following positions.

1. That a bill in equity to establish or defeat a title to land, must be brought in the county where the land lies.

2. That the title of the mortgagee may not be investigated on a bill of foreclosure; and therefore,

3. That an allegation of title in the plaintiff in such bill is unnecessary; or, if necessary,

4. That it *need not* be proved by the plaintiff, and *cannot be disproved* by the defendant.

5. That a pledge may be appropriated by a bill and decree of foreclosure, when the mortgage deed was usurious or fraudulent, in direct opposition to the statute declaring them *utterly void.*

6. That usury and fraud are thus made the basis of a decree in a court of chancery.

As I cannot admit either of these positions, I feel constrained to dissent from a decision, which, in my judgment, involves them all.

New trial not to be granted.

*Fairfield,*
June, 1828.

Palmer
*v.*
Mead.

Munson and another *against* Baldwin and others :

### IN ERROR.

The right of taking fish in *Ousatonic* river, between the mouth and *Leaven-worth's* ferry, under the 8th section of the act relating to Fisheries, is a personal and unassignable privilege in those who acquired it, by clearing and using the fishing-place, and is limited, in duration, to the enjoyment of it, by the same persons.

Therefore, where *A.* and *B.*, having acquired a right of taking fish, under the statute, by clearing and using a fishing-place, executed a writing, not under seal, by which, for a valuable consideration, they acquitted such fishing-place to *C.* ; it was held, in an action brought by *D.*, claiming under *C.*, against *E.* for a disturbance, that such writing was invalid, as a licence, assignment or transfer of any kind, and consequently, was inadmissible as evidence of title in *C.*

This was an action of trespass, brought by *Baldwin* and others against *Joseph B. Munson* and *Eli Beard*, for entering the fishing-place of the plaintiffs between the mouth of the *Ousatonic* river and *Leavenworth's* ferry, and taking fish.

On the trial before *Hezekiah Marks*, Esq., a justice of the peace, to whom the writ was returned, it appeared, that the fishing-place in question was originally cleared and used, by *John Ford* and others ; and that it had been constantly occupied successively by *Ford* and others, by *Wolcott Hurd* and *Charles F. Van Ostrand* and by the plaintiffs. The plaintiffs claimed title to a part of this fishing-place, by virtue of conveyances derived from *Ford* and others, and from *Hurd* and *Van Ostrand.* To shew the title of *Hurd* and *Van Ostrand*, the plaintiffs offered and read in evidence a writing, not under seal, dated the 3rd of *June*, 1800, by which *Ford* and others, for the consideration of fifty dollars, acquit to *Hurd* and *Van Ostrand* the fishing-place, boat and seine. To the admission of this evidence the defendants objected ; but the court overruled the objection and admitted it. The plaintiffs recovered judgment. The defendants thereupon filed a bill of exceptions, and brought a writ of error in the superior court ; which was reserved for the advice of this court.

*Sherman* and *Bissell*, for the plaintiffs in error, contended, 1. That the right in question was given, by the statute, (*a*) to those *personally*, who cleared the fishing-places, and was not trans-

(*a*) *Stat.* 229. *tit.* 35. *s.* 8. enacted in *January*, 1783.

ferable ; and consequently, that no title passed, or could pass, from *Ford* and others to *Hurd* and *Van Ostrand.*　*Nichols* v. *Gates* & al. 1 *Conn. Rep.* 318.　A grant of this description is not to enure to any greater extent than that which is precisely expressed in the grant ; and if the terms of the grant be doubt. ful, it is to be construed most favourably for the public, and against the grantee.　4 *Cruise's Dig.* 567.　The reason is, that such grant is in derogation of common right.　Between individuals this grant would have created a mere estate at will. Now, what will terminate an estate at will?　An *alienation* will terminate it.　The writing given in evidence, then, so far from establishing the title of the plaintiffs, through *Hurd* and *Van Ostrand,* shewed an extinction of the right.

2. That admitting the right to be transferable, the writing in question was inadmissible for any purpose.　First, this being an incorporeal hereditament lying in grant, it could be conveyed by *deed* only.　Secondly, it did not tend to shew a *licence* to act under the grantees.　The grantees might, undoubtedly, exercise their right by their servants ; but then, if the servants were interrupted, they would have no right of action : the grantees alone could sue.　Thirdly, it did not tend to prove the fact of a continued occupancy.　It furnished no evidence of this fact, it will be conceded, except so far as it shewed a transfer of the right.　This point, then, is resolvable into the question, whether the writing conveyed any right ;—a question, which has been already considered.

*N. Smith,* for the defendants in error, insisted, 1. That this grant established the grantees in the right, so long as they used it, by themselves, or by others, whom they put in under them. The legislature did not intend, that the grantees should always take fish with their own hands.　If they may put in others for a day or a month, may they not for an indefinite period ?　The object of the legislature in limiting the grant to the use specified, is accomplished, in the latter case, as well as in the former. It is only when the grantees *abandon* their exclusive right, that it becomes common.　But if a man assigns or transfers a right, he does not thereby abandon it.　*Ford* and others, who paid a consideration for their grant, have kept up their right, by putting in *Hurd* and *Van Ostrand* under them.

2. That if the writing did not of itself convey a right, it was

not of course to be rejected    The bill of exceptions does not profess to bring up the whole case.   It states, however, that *Ford* and his associates cleared the fishing-place ; that it had been successively occupied by them, by *Hurd* and *Van Ostrand,* and by the plaintiffs ; and that the plaintiffs are in possession.   Now, the plaintiffs want to shew, that they are in *lawfully ;* and the writing shews *how* they came in—*viz.* by permission of *Ford* and his associates ; in other words, it shews the nature and character of the plaintiffs' possession.   It is also proper evidence, as far as it goes, to shew a *continued occupancy ;* and it is not to be excluded, because it does not prove the whole of this part of the case.

Hosmer, Ch. J.   Whether the writing offered in evidence by the plaintiffs below, was admissible, is the question now to be determined.

By the statute for encouraging and regulating Fisheries, it is enacted : " When any person or persons have been at the expence of clearing any fishing place or places in *Ousatonic* river, between the mouth thereof and *Leavenworth's* ferry, and have constantly used the same for taking fish, in the season thereof ; he or they shall be established in the full enjoyment thereof, *so long as he or they continue to use the same for the purpose of fishing,* in the proper season, and shall not be liable to any action for damages below high-water mark." *Stat.* 229. *tit.* Fisheries. *s.* 8.

In construction of this statute, the plaintiffs in the action of trespass, insist, that the provision that the use and enjoyment shall be co-extensive, extends to those only, who have occupied a fishing-place, and then abandoned it,—in which event their right is extinguished ; but that they are not prohibited, by the law, from selling their fishing-place, or from giving to others a right to use it for their advantage.

On the other hand, the defendants contend, that the statute does not authorize the transfer of title, in any manner ; that the right, by virtue of clearing, is strictly *personal ;* and that a deed or licence to others, to use the fishing-place as their own, is an abandonment and forfeiture of the grantor's title.

It was within the competency of the legislature to give to the persons clearing and occupying a fishing-place such a title, as was thought expedient ; and the popular meaning of a plain expression, shows, with infallible certainty, what interest they

acquired.   The court cannot go beyond this principle; for in *Fairfield,* all public grants or licences, the construction is limited, by the June, 1828. precise expression.

The phrase applied to those who clear and occupy a fishing-place in *Ousatonic* river, that they shall enjoy it, " so long as *they* continue *to use* the same, for the purpose of fishing," is so plain and unequivocal, as to admit of one construction only. *They*—*i. e.* those who clear and occupy—are invested with title, so long as they *use* the fishing-place.   By the word " use," the right of the occupier is co-extensive with his customary enjoyment of the fishery; and stops at this point.   The estate is merely a *personal* privilege, and not a transferable property. There are too many established analogies to render this construction questionable.   There is a qualification or condition annexed to the right, inseparable from its continuance.   To acquire and preserve the privilege, a person must *clear* a fishing-place; and *constantly use* it; and then his right continues *so long as he continues the use.*   His right is qualified like that of a person who is invested with a base fee; *i. e.* who has an estate so long as he is tenant of a certain manor; or like that of one who has licence to do any act personally; or like that of a widow, who holds an estate, so long as she remains single.   It is a transient property, such as all property was at the earliest stage of society, when the actual use and right of using were co-extensive, and the right of possession continued for the same time only that the act of possession lasted.   The unassignable licence to *Tallmadge Hall* and *Jacob Brown*, was of the same nature, except that its termination was made to depend on the pleasure of the General Assembly.   *Nichols* v. *Gates* & al. 1 *Conn. Rep.* 318.   The right of *Ford* and others, like that of *Hall* and *Brown*, was an incorporeal hereditament in the nature of a franchise, merely personal, with this difference, that it was forfeited by non-user.

From this view of the law, it clearly results, that *Ford* and others could not convey any title to the fishing-place, by sale or licence, or in any other manner.   The writing to *Hurd* and *Van Ostrand* was on valuable consideration, and intended to convey to them an interest in the fishing-place.   As a grant, it was void.   Incorporeal inheritances or franchises are said to lie in grant, and cannot pass without deed.   2 *Roll. Abr.* 62. *Co. Litt.* 169.   At the same time, notwithstanding the form of the instrument, if a licence were valid, I would construe the

*Fairfield,*
June, 1828.

Munson
*v*
Baldwin.

writing as comprising one.   All deeds and writings should operate according to the intention of the parties, if by law they may ; and if not operative in one form, they must operate in that, which by law will effectuate their intention.   *Goodtitle* d. *Edwards* v. *Bailey, Cowp.* 600.   *Shep. Touch.* 82.   Thus, a deed intended for a release, may amount to a grant of the reversion, an attornment or a surrender *ut res magis valeat.* But a licence, assignment or transfer of any kind, in this case, is equally invalid as a deed, purporting to convey the entire property.

It has been argued for the plaintiffs below, that the writing, if of no legal avail, was admissible as evidence to prove certain essential facts in the case.   The principle implied is not disputed ; but there is no point of controversy on which it has a bearing.   The commencement of the occupancy is not in question ; nor the intention to occupy as early as the year 1800 ; nor the clearing ; nor the actual occupancy since.   It was admitted, that *Ford* and others cleared the fishing-place, and occupied until they attempted to convey their right to *Hurd* and *Van Ostrand ;* and that the " fishing-place had been constantly occupied successively by *Ford* and others, by *Hurd* and *Van Ostrand,* and by the plaintiffs."   Then, as the bill of exceptions declares, " to shew the title of said *Wolcott Hurd* and the said *Charles F. Van Ostrand,* the plaintiffs offered and read in evidence a certain writing."   It is unquestionably clear, that the evidence ought not to have been received ; and that the determination of the court admitting it, was erroneous.

The other Judges were of the same opinion, except BRAINARD, J. who was absent.

Judgment to be reversed.

---

Peck *against* Botsford and another, executors of *Clement Botsford.*

A clause in a will directing all the just debts of the testator to be paid, will not save a debt barred by the statute of limitations from the operation of that statute.

An acknowledgment, by a personal representative of a deceased person, that a demand against the estate of the deceased, barred by the statute of limitations, is due, will not take the case out of the statute.

THIS was an action of book debt, tried at *Fairfield*, December term, 1827, before *Daggett*, J.

After praying oyer of the plaintiff's account and setting it out, the defendants pleaded in bar, that *Clement Botsford* died on the 25th of *July*, 1824, and that the plaintiff's cause of action did not accrue within six years of that time. The last item in the plaintiff's account was charged in 1802.

On the trial, the plaintiff offered in evidence the last will of *Clement Botsford*, made in *January*, 1818, and duly proved and approved soon after his death, which contained this clause : " After my just debts and funeral charges are paid"—inserted previous to the devising part of the will. The plaintiff offered also a witness to testify, that within the time limited for the exhibition of claims against the estate of the deceased, he went with the plaintiff's book, and as his agent, to *J. B. Botsford*, one of the executors and one of the defendants, and shewed him the account, who acknowledged, that there was something due, but not so much as was claimed ; and that soon afterwards, this executor came to the plaintiff's house, and reckoned with the plaintiff, and agreed, that between 65 and 66 dollars was due to him. To the admission of this evidence the defendants objected ; but the objection was overruled, and the evidence was given to the jury. The defendants then prayed the court to charge the jury, that this evidence could not support the issue so as to entitle the plaintiff to recover, because the acknowledgment was made by one only of the defendants, and by him acting as executor, and was not in writing ; and because the clause in the will could not revive the debt. The plaintiff claimed, that the facts proved would authorize the jury to find the issue in his favour ; and the court so instructed the jury ; and they found a verdict for the plaintiff accordingly. This instruction was given, to the end that the damages might be assessed by the jury, and the case reserved for revision, on a motion for a new trial ; which was accordingly done.

*M. B. Whittlesey* and *Sherman*, in support of the motion, contended, 1. That a general clause in a will directing the payment of the testator's just debts, is not sufficient to revive a debt against which the statute of limitations has run, and save it from the operation of that statute. *Roosevelt* v. *Mark*, 6 *Johns. Chan. Rep.* 266. 293. [In consequence of an intima-

*Fairfield,*
June, 1828.

Peck
*v.*
Botsford.

tion from the court, that they were satisfied on this point, the argument to establish it was not pursued.]

2. That an acknowledgment of the debt demanded, by one of the executors, could not save it from the statute, and enable the plaintiff to recover it in this action. It is not within the powers of an executor, *qua* executor, to make such acknowledgment. The promise implied in it could not bind the estate, and could have no effect otherwise than as his *personal* undertaking. An executor is appointed to execute a special trust. This is created, and precisely limited, by the will under which he acts, and the statute. From these sources his executor derived no authority to make the acknowledgment in question. The statute of limitations proceeds on the ground that the debt has been paid, and the evidence lost. The executor knows nothing about such payment. The point has been explicitly decided, in accordance with the claim of the defendants, by the supreme court of the *United States,* in *Thompson* v. *Peter & Johns,* administrators of *Peter,* 12 *Wheat.* 565. It was so decided, also, by Chancellor *Kent,* in relation to another class of trustees, in *Roosevelt* v. *Mark,* 6 *Johns. Chan. Rep.* 292. In the *English* books, there is not a case to be found, where the acknowledgment of an executor has been received in evidence to remove the bar of the statute of limitations, in an action brought to recover the debt out of the testator's estate. On the contrary, the courts, both in that country and in this, have frequently and emphatically expressed their regret, that the letter of this beneficial law had not, in all cases, been strictly adhered to. 11 *Wheat.* 316. n.

*N. Smith* and *Dutton,* contra, insisted, 1. That the clause in the will of *Clement Botsford,* which directs the payment of his just debts, takes the case out of the statute of limitations. In support of this position they relied on *Gofton* v. *Mill,* 2 *Vern.* 141. *Blakeway* v. *Strafford,* 2 *P. Wms.* 373. *Andrews* v. *Brown, Prec. in Ch.* 385. *Jones* v. *Strafford,* 3 *P. Wms.* 89. *Lacon* v. *Briggs,* 3 *Atk.* 107. *Anon.* 1 *Salk.* 154. *Trueman* v. *Fenton, Cowp.* 548. *Shallcross* v. *Finden,* 3 *Ves. jr.* 739. *Toll. Ex.* 288. 1 *Madd. Chan.* 483, 4. The reason is, that a debt barred by the statute of limitations, is still a debt in conscience—a just debt. The statute does not extinguish the debt. It extends its protection to the *remedy* only ; and *that* may be waived. How can this be done more significantly,

than by a direction to pay the debt ? The courts are anxious so to construe a will as to make the testator do that which is morally just. 3 *Ves. jr.* 551.

2. That the acknowledgment proved on the trial, took the case out of the statute.

In the first place, if this acknowledgment had been made by the debtor himself, it would clearly have been sufficient for this purpose. According to some of the earlier authorities, much less—even "the slightest word of acknowledgment"— would have been sufficient. 3 *Esp. Rep.* 157. n. 2. by *Day.* And by all the authorities, ancient and modern, an express acknowledgment of a subsisting debt, is sufficient. *Baillie* & al. v. *Inchiquin,* 1 *Esp. Rep.* 435. 437. n. 1. by *Day. Lord* & al. v. *Shaler,* 3 *Conn. Rep.* 131. *Lord* & al. v. *Harvey,* 3 *Conn. Rep.* 370. and the cases therein cited. At any rate, the evidence offered was proper to go to the jury in proof of such an acknowledgment. *Colledge* v. *Horn,* 3 *Bing.* 119. (11 *Serg. & Lowb.* 59).

Secondly, such an acknowledgment by an executor, in a suit against him as executor, is sufficient. He is a party on the record ; and his admissions must have the same effect in this suit, as they would have against any other defendant. That he is a mere trustee, without personal interest, makes no difference in the case. *Bauerman* & al. v. *Radenius,* 7 *Term Rep.* 663. *Bulkley* & al. v. *Landon* & al. 3 *Conn. Rep.* 76. *Swift's Ev.* 128. An executor stands in the place of his testator. He is designated for the very purpose of settling the estate. An agent may charge his principal by admissions within the scope of his agency. And it has been decided, that the admission of the wife, acting as the agent of her husband in his business, is sufficient to take the case out of the statute of limitations, in an action against him. *Anderson* v. *Sanderson,* 1 *Holt's N. P. Rep.* 591. (3 *Serg. & Lowb.* 190.) But, it is unnecessary to recur to general principles or analogous cases ; for the point has been expressly decided. *Baxter,* administrator, v. *Penniman,* 8 *Mass. Rep.* 133. *Emerson* v. *Thompson* & al. 16 *Mass. Rep.* 429. *Johnson,* administrator, v. *Beardsley* & al. 15 *Johns. Rep.* 4. *Martin* v. *Williams,* executor, in error, 17 *Johns. Rep.* 330. *Mooers* v. *White,* 6 *Johns. Chan. Rep.* 372. *Secar* v. *Atkinson,* administrator, 1 *H. Bla.* 102. 2 *Saund.* 117. c. n. 2.

Daggett, J. The judge at the circuit charged the jury, that the evidence given in support of the issue, would authorize them to return a verdict for the plaintiff, to the end that the questions arising might be reserved for the opinion of this court. This course was peculiarly proper, because it had been decided, by the superior court, in *December*, 1826, when holden by another judge, that a clause in a will, like that shown in evidence on this issue, was sufficient to revive a debt, against which the statute of limitations had run ; and a writ of error was pending when this cause was tried, in the court of errors, seeking to reverse that judgment. (Vide *Weed* v. *Bishop*, ante, *p.* 128.)

Two questions are now to be considered, both of which are open for examination and decision in this court.

1. Will a general clause in a will, directing all just debts to be paid, revive a debt, barred by the statute of limitations ?

2. On an issue formed in the action of debt by book, on the point whether the plalntiff's cause of action accrued within six years, will an acknowledgment of the debt, *by an executor,* support the issue on the part of the plaintiff?

If an affirmative answer be given to *either* of these questions, the verdict ought to stand ;—otherwise, it must be set aside, and a new trial granted.

1. On the first question, were it new, it would, in my view, be difficult to entertain a doubt. The words in the will designate no fund for the payment of debts ;—they contain no provision for the payment of *this* debt out of his estate ;—they are merely formal and introductory to particular directions in regard to the disposition of his property. The clause, " after my just debts and funeral charges are paid," thus inserted, has an importance given to it, by the counsel for the plaintiff, which would never have entered a head, not familiar with the *dicta* of lawyers and judges on this subject. The testator adopts this language, as he does that, commending his body to a decent burial, and his soul to the mercy of his Creator, in compliance with a custom almost universal, and, perhaps, having its origin in the solemnity, which attends a final disposition of his earthly concerns. It is not credible, that he thereby intends to direct the payment of any particular debt ; much less, to deprive his representative of the right of interposing a legal defence, arising under an act of bankruptcy, or the statute of

limitations, or the law against usury, or other illegal conside- *Fairfield*,
ration.                                                           June, 1828.

Again; this is an ancient form, probably introduced from
*English* precedents, and might possibly have had some im-
portance, where it charged the payment of debts out of certain
descriptions of property not otherwise liable for them.    Here,
every kind of property is equally bound for this purpose.

Peck
*v.*
Botsford.

The counsel, however, rely on authorities from the *English*
books, in support of their position.    They cite to this effect,
*Toller* 288.; *Cowp.* 548.; 1 *Salk.* 154.; 1 *Mad. Chan.* 483,
4.; 3 *Vesey* jr. 738, 9.    It is true, in many cases, such a doc-
trine is advanced by able judges; but it will be difficult to find
an adjudged case, going to the extent now contended for.
When mentioned by many distinguished judges and chancellors,
it is either directly denied, or plainly questioned; and in a very
late case, in the year 1813, the question was most elaborately
discussed, and all the cases reviewed, with great discrimination,
by the Vice-Chancellor.    *Burke* v. *Jones*, 3 *Ves. & Bea.* 275.
He decided, that a devise of real and personal estate for the
payment of just debts, did not revive a debt upon which the
statute of limitations had taken effect, by the expiration of the
time, before the testator's death.    In the case before us, the
statute had attached on the debt, more than sixteen years be-
fore the testator's death, and ten years before the date of his
will.

In the year 1818, the question came before the supreme
court in *Pennsylvania*, and, after a thorough discussion, was
decided against the position now taken by the plaintiff's coun-
sel.    *Smith* v. *Porter* & al. 1 *Binn.* 209.    The opinion of the
court, by the late C. J. *Tilghman*, is very satisfactory.

In 1822, Chancellor *Kent* took a critical view of this doc-
trine, and has furnished all the authorities on both sides of the
question.    He arrives at the conclusion, that such a direction in
a will does not revive a debt, barred by the statute of limi-
tations.    *Roosevelt* v. *Mark*, 6 *Johns. Chan. Rep.* 266. 293.

It would savour too much of an affectation of learning, to
pursue the subject farther.—I entertain no doubt, that the evi-
dence arising from the clause in the will of *Clement Botsford*,
is insufficient to authorize a verdict for the plaintiff.

2. The other question now demands consideration.    Will
the acknowledgment and promise of the executor support the
issue ?    To decide this question correctly, it becomes necessa-

ry to examine the powers of an executor under our law.   In *Fairman* v. *Bacon,* 6 *Conn. Rep.* 121. the court declared, that an executor was " an agent or trustee ; and merely such, without any beneficial interest given to him by the will."   He has, indeed, a legal right to the personal property : and it is vested in him, to enable him to pay the debts and legacies of the deceased.   He may also dispose of it under the direction of the court of probate.   In both instances, he acts immediately under the direction of the law, regulating his conduct.   The real estate, not disposed of by will, descends, *eo instanti,* on the death of the testator, to the heir ; and if devised, it goes to the devisees, liable, in both cases, to be taken and sold by the executor, for the payment of debts.   The residue, in both cases, belongs to the heirs or devisees, after deducting the debts, and the expenses of settling the estate.   The executor then, *quasi* executor, can neither give away the property, nor squander it. If a man can do what he will with his own, he cannot take the same liberty with the property of others.   To apply these principles to the case under consideration—Can this executor bind the estate in his hands, real and personal, by an acknowledgment of a debt due from his testator, which had been barred sixteen years before his death ?   His duty as executor is to settle the estate according to law, not to subject it to debts, by his declaration or admissions.

But several authorities are cited.   First, it is said, that an acknowledgment of a debt, will take the case out of the statute.   3 *Conn. Rep.* 132. 372.   1 *Esp. Rep.* 435.   6 *Term Rep.* 189.   3 *Bing.* 119.   (11 *Serg. & Lowb.* 59.)   Doubtless, it is well established, by these cases and others, that when a defendant interposes a plea of the statute of limitations, the plaintiff may repel it, by showing that he shall not avail himself of it, because he has renounced the benefit, by an acknowledgment which is sufficient to support a promise to pay it.   This is not denied.

Secondly, admissions of the party to the record are always received in evidence.   7 *Term Rep.* 663. *Sw. Ev.* 128.   This, also, is not questioned.   But are they always *sufficient* to support the issue ?   The judge in this case charged the jury, that they were *authorized,* by this testimony, to find a verdict for the plaintiff.

Thirdly, it is further said, that the power of recovering a debt, barred by the statute, necessarily results from

the situation and condition of the executor. In proof of this *Fairfield,* position, *Anderson* v. *Saunderson,* 1 *Holt's N. P. Rep.* 591. June, 1828. (3 *Serg. & Lowb.* 190.) is cited. That case decides only, that ——— the confessions of the wife, *she being his agent,* bind the hus- Botsford. band,—a principle too familiar to be doubted.

Fourthly, the plaintiff insists on express decisions on the point. *Baxter* v. *Penniman,* 8 *Mass. Rep.* 134. shows only, that an admission made *to an executor or administrator,* is sufficient to take a case out of the statute of limitations. The debtor himself may certainly waive the statute. In the opinion given, however, the court speak to the following effect : "An admission *by* or *to* an executor or administrator, after the six years, will, &c." So far as that opinion regards an acknowledgment *by* an executor or administrator, the case did not call for it ; and, therefore, it is entirely *obiter.* In *Emerson* v. *Thompson,* 16 *Mass. Rep.* 429. the same doctrine is recognized, on a case, where a new promise was *by an executor,* and the only case cited is that in 8 *Mass. Rep.* 134., which, as has been shown, did not affect the point in controversy. In *Johnson,* administrator of *Johnson* v. *Beardsley and heirs* and devisees of *Beardsley,* 15 *Johns. Rep.* 4. it was decided, that the promise of one joint debtor to pay a debt, barred by the statute of limitations, was sufficient to take the case out of the statute ; and *Whitcomb* v. *Whiting, Doug.* 652. *Jackson* v. *Fairbanks,* 2 *H. Bl.* 340. and *Smith* v. *Ludlow,* 6 *Johns. Rep.* 267. are cited. It was also decided, that in an action against the heirs and devisees of a deceased debtor, a promise by two of the defendants, who were both executors and heirs and devisees, to pay a debt, was sufficient to charge all the defendants. It is easy to see, that this decision establishes nothing applicable to the present case.

The case of *Martin* v. *Williams,* executor of *Williams,* in error, 17 *Johns. Rep.* 330. goes to the point *only,* that, in an action *by an executor,* an acknowledgment of the debt by the debtor within six years, is evidence to support a new promise, and to remove the bar created by the statute. It is a recognition of the doctrine in 8 *Mass. Rep.* 134., before commented on.

In the case of *Mooers* v. *White,* 6 *Johns. Ch. Rep.* 372. the learned Chancellor decided, that "any acknowledgment or admission by an executor or administrator, will not bind the real assets in the hands of an heir or devisee. I view that decision, not only as not affording aid to the plaintiff in the case before us, but as furnishing an argument against him. An ex-

ecutor in *Connecticut* has no more beneficial interest in the personal than in the real estate. He may controul both, as a mere agent, subject to the directions of the court of probate.

The only cases, cited by the counsel for the plaintiff, not already considered, are those in 1 *H. Blk.* 102., and 2 *Saund.* 117. *e.* note 2. They prove only, that a count on an account stated with an executor for money due from the testator, may be joined with a count on a promise made by the testator; and that this is the usual mode of declaring against executors to save the statute of limitations. It is not easy to see, how these cases prove the point, for which they are introduced. If the utmost effect were given to them, they would only shew, that Mr. Justice *Heath* and his commentator, *Williams,* assert, that the object of this mode of declaring is to prevent the operation of the statute of limitations. But were it to be admitted, that the statute might be avoided, by such an acknowledgment, in *Westminster-Hall ;* ought the doctrine to prevail here? I am persuaded, that, if this doctrine exists at all, it has its origin in a principle never adopted in this state, *viz.* that the executor was entitled to the surplus of the personal estate of the deceased, after payment of debts, and that, therefore, such an acknowledgment would directly affect his own interest. I perceive some reason for it, where the executor is thus in fact, and to substantial purposes, the owner of the personal estate, but none where he is a naked trustee.

My opinion in this case is confirmed, by the decision of the supreme court of the *United States,* delivered by Ch. J. *Marshall,* in the case of *Thompson* v. *Peters,* 12 *Wheat.* 565. He there says : " Had this been a suit against the original debtor, these declarations would not have been sufficient to take the case out of the statute. But this is not a suit against the original debtor. It is brought against his representative, *who may have no personal knowledge of the transaction.* Declarations against him have never been held to take the promise of the testator or intestate out of the act. Indeed, the contrary has been held."

In conclusion, I am satisfied, that the charge of the judge (indeed, it was *pro forma* merely, under the circumstances already stated) is not supported, by any adjudged case, except that of *Emerson* v. *Thompson,* 16 *Mass. Rep.* 429. and that rests on *Baxter* v. *Penniman,* 8 *Mass. Rep.* 134. which, in

principle, involves no point now decided.    The doctrine of the charge is directly opposed to the case of *Thompson* v. *Peters*, 12 *Wheat.* 565., which last case is consonant to reason and justice.

*Fairfield,*
June, 1828.

Peck
*v.*
Botsford.

A new trial, therefore, must be granted ; and it is some consolation to reflect, that, by this decision, two grounds of evading the statute, now first attempted in *Connecticut*, are rejected. Neither a clause in a will, directing all just debts to be paid, nor an acknowledgment by a personal representative, that a stale demand is due, will defeat the operation of a beneficial statute, —a statute of repose, already so much impaired, by repeated decisions, as to be divested of much of its importance.

HOSMER, Ch. J. and LANMAN, J. were of the same opinion.

PETERS, J. dissented.

BRAINARD, J. was absent.

New trial to be granted.

———●———

THE STATE OF CONNECTICUT *against* BISHOP :

#### IN ERROR.

An exception to a criminal proceeding, on the complaint of a grand-juror, before a justice of the peace, that the residence of such justice is not in the town where the offence was committed, is unavailable after a plea of *not guilty.*

Where it appeared from the record of such proceeding, that the offender was arrested and brought before the justice, *at his dwelling-house in B.*, it was held, that the residence of the justice in *B.*, was sufficiently shewn.

Where a statute prohibits an act under a penalty, and gives one moiety to the public and the other to a common informer, the state may prosecute for the whole, unless a common informer has commenced a *qui tam* suit for the penalty.

Where an act not criminal before, is prohibited, by a substantive clause in a statute, and in another section, a special remedy is given, an indictment or information will lie on the prohibitory clause.

Therefore, where a miller, on the complaint of a grand-juror for taking excessive toll, in violation of the statute, was found guilty, and sentenced to pay a fine of two dollars to the treasury of the town where the offence was committed ; it was held, that this proceeding was legal.

THIS was a complaint, exhibited by a grand-juror of the of the town of *Branford*, to *Benjamin Page*, Esq., a justice of the peace, against *Amos Bishop*, for taking excessive toll. The complaint alleged, that *Bishop*, being miller of a certain grist-mill, situate in said *Branford*, has, at sundry times, within one year past, taken as toll for grinding different kinds of grain, more than what the law allows ; particularly, on or about the 27th of *November* 1824, *John Russell* of said *Branford*, carried to said mill, and delivered to said *Bishop*, as miller of said mill, six bushels of provender, composed of different kinds of grain and corn ; and said *Bishop*, as miller of said mill, received said six bushels of provender to grind, and did grind the same ; and said *Bishop* did take to himself, as toll for grinding said six bushels of provender, twenty quarts thereof, contrary to the statute, &c. On this complaint a warrant was issued, directing the officer to arrest the body of *Bishop*, and him forthwith have before *Benjamin Page*, Esq., at his dwelling-house in said *Branford*. *Bishop* was accordingly arrested and brought before this magistrate ; and, after a trial, was found *guilty*, and sentenced to pay a fine of two dollars to and for the use of the treasury of the town of *Branford*, and costs of prosecution. On a writ of error, brought by *Bishop*, the superior court reversed this judgment ; and to reverse the judgment of the superior court, the present writ of error was brought.

*Kimberly*, for the defendant in error, and in support of the judgment of the superior court, contended, 1. That it does not appear, that the complaint was made to a justice of the peace in the town where the alleged offence was committed *Stat.* 259. *tit.* 45. *s.* 2.

2. That it does not appear *when* and *where* the offence was committed. The offence consisted in *taking the toll*, not in grinding the provender ; and it is not shewn when or where the toll was taken. [These points were not much pressed.]

3. That the facts alleged do not authorize the institution of criminal process, by an informing officer. Here, it is to be kept in mind, that such facts constitute no offence at common law. The toll was taken as a compensation for service performed ; and if it was excessive, the remedy at common law, if any, would be by a civil action. *Rex v. Channel*, 2 *Stra.* 793. Now, the statute which creates the offence, prescribes the mode of proceeding to recover the penalty, *viz.* by civil

action *qui tam. Stat.* 356. *tit.* 68. *s.* 2. This impliedly ex-
cludes the proceeding by information or indictment. It is a
fair inference, that the legislature did not intend, that the of-
fender should be prosecuted in any other way. *Castle's* case,
*Cro. Jac.* 644. 2 *Burr.* 803. In *Connecticut* especially, it
has always been understood, that where the statute gives a
precise sum, to be forfeited, one half to the party injured or a
common informer, and the other half to some public treasury,
a public prosecution is not sustainable. 2 *Swift's Syst.* 378.
This point was decided in *Converse* v. *The State,* in error, in
the superior court then consisting of six judges, in *Tolland*
county, *July* term, 1804. (*a*) It was admitted also, in *The
United States* v. *Simms,* 1 *Cranch* 252. The expression " who
shall *sue* for," is appropriate to denote a civil action, but is not
applicable to a criminal information.

*N. Smith* and *Seeley,* for the state, contended, 1. That if a
public prosecution was sustainable in this case, the present
complaint was sufficient. After the defendant has pleaded *not
guilty,* and judgment has been rendered against him, every fair
intendment is to be made in favour of the judgment. [The
counsel were proceeding to examine the record with reference
to this point, when the court intimated, that they had no doubt
upon it, and it was not pursued.]
    2. That it was competent to a public officer to prosecute
for the offence charged, and recover the whole penalty for the
public use, if no suit had been previously commenced by a
common informer. First, this is the rule of the common law.
*The King* v. *Hymen,* 7 *Term Rep.* 536. And where an of-
fence is created by statute, and a penalty is annexed to it, by
a separate and substantive clause, a public prosecutor may dis-

(*a*) *Converse* was prosecuted, by a grand-juror, before justice *Alden,* for
keeping a tavern without licence ; was bound over to the county court ; and
after a trial, was found *guilty,* and fined four dollars to the county treasury.
On a writ of error, the superior court reversed this judgment.
    By the Court, unanimously. The offence charged is no crime at common
law ; and the process can be only according to the statute. The statute only
authorizes a complaint or action, by a common informer, for penalties, which
are to be disposed of, one moiety to the informer, and the other to the town
treasurer. The grand-juror, as such, could not prosecute to effect. The
fine is disposed of by statute ; and the court below could not, by law, order it
to be paid to the county treasury.
    *J. T. Peters,* for the plaintiff in error.
    *Gilbert,* for the state.

regard the penalty, and proceed upon the prior clause for a crime or misdemeanor. *The King* v. *Harris,* 4 *Term Rep.* 202. 205. If the legislature do not mean to create an offence, but merely to give a right of action in favour of the individual injured, then indeed such individual alone can sue ; but if the legislature have prohibited certain acts, and have thus made the commission of those acts criminal, the common law will furnish a mode of prosecution, *viz.* by information or indictment. That the taking of excessive toll is a violation of a public statute, and consequently, a public offence, is unquestionable. *Com. Dig. tit* Information. B. Secondly, this mode of prosecution is authorized by statute. By the act of *October* 1814, *ch.* 15. it is provided, " That all penalties recoverable for the breach of any criminal or penal law, may be prosecuted or sued for, by information or action of debt, in the name of this state." In the revised statutes, this provision constitutes a part of the 91st sect. of the act concerning Crimes, *p.* 170. In addition to this, the act relating to grand-jurors makes it their duty to make presentment of *all* crimes and misdemeanors. *Stat.* 259. *tit.* 45. *s.* 2.

HOSMER, Ch. J.    The case before us involves no manner of difficulty.

To the sufficiency of the grand-juror's information, it has been objected, that it does not appear, that it was made to a justice of the peace residing in the town where the offence was committed ; and that there is no allegation, shewing the time or place of its commission.

In respect of the *forum,* the defendant should have pleaded to the jurisdiction of the court. By the plea of *not guilty,* the jurisdiction was admitted. *Co. Litt.* 303. 1 *Chitt. Plead* 425. *Archb Plead.* 290. Besides, the place of the justice's residence is apparent, not only by legal implication, but on the record. The offender was ordered to be arrested, and in fact was arrested, and brought before the justice, *at his dwelling-house in Branford.*

The remaining objection is unsupported by the fact. It is explicitly averred, that " *Bishop* is miller of a certain gristmill, situate in said *Branford,*" at which place the offence was committed ; and that the time of its perpetration was on or about the 27th day of *November,* 1824.

The residue of the case will briefly be disposed of, by the statement and application of a few established principles.

A crime or misdemeanor is an act committed or omitted in *New Haven,* violation of a law forbidding or commanding it, and consists in *1. 1828.* an infringement of the rights and duties due to the whole community. 4 *Bla. Com.* 5. Any offence against the public good and the first principles of justice and common honesty, is a crime ; and that the violation of a statute law, made for the universal protection of the community, and inflicting a penalty for the fraudulent privation of property, is of this description, there exists no doubt. 2 *Hawk. P. C. c.* 26. *s.* 1.

It is a well settled principle, that wherever a new offence is created by statute, and in the clause creating it, a special remedy is prescribed, such remedy is exclusive and must be followed. To this rule there is a qualification equally well established. Where a new created offence is prohibited, by a substantive clause in a statute, and in another section a special remedy is given, an indictment or information will lie on the prohibitory clause. *Com. Dig. tit.* Information. B. *The King* v. *Moor,* 2 *Mod.* 128. *Rex* v. *Wright,* 1 *Burr.* 544, 5. 1 *Show.* 402.

It is likewise indisputably established, without the aid of statute law on this subject, that where a statute prohibits an act under a penalty, and gives one moiety to the public, and the other to a common informer, the state may prosecute for the whole, unless a common informer has commenced a *qui tam* suit for the penalty. *Com. Dig. tit.* Information. A. 3. *Rex* v. *Clark* & al. *Cowp* 610. *Rex* v. *Hymen,* 7 *Term Rep.* 536.

The application of these principles is obvious.

By the 1st section of the statute, the taking of certain toll is prescribed, and all excess prohibited ; and no special remedy was designated. Of consequence, under this section the prohibited act was made criminal, and it was the duty of every grand-juror to prosecute for any breach of this provision. The 2nd section giving a moiety of the penalty to a common informer, to insure an enforcement of the law, did not take away the right of prosecution for the crime, founded on the prior clause. Besides, if the special remedy had accompanied the 1st section of the act, the state might prosecute for the offence, were it not anticipated, by a previous suit, brought by a common informer ; and no such anticipation is pretended.

The other Judges were of the same opinion, except PETERS, J.,

*NewHaven,* who was absent when the case was argued, and therefore,
July, 1828. gave no opinion.

State
*v.*
Bishop.

Judgment reversed.

---

The inhabitants of the town of EAST-HAVEN *against* HEMING-
WAY and others.

On the application of the proprietors and inhabitants of the town of *New-Ha-
ven,* for a patent of confirmation of the lands, both meadow and upland,
with their appurtenances, within certain boundaries particularly specified,
which they had obtained, by purchase, or otherwise lawfully, of the *Indian*
native proprietors, and whereof they had stood seised, and in quiet posses-
sion, for many years then past without interruption, the General Assembly
of the colony of *Connecticut,* in 1685, for a more full confirmation of the
premises unto the said proprietors and inhabitants of the town of *New-Ha-
ven,* in their rightful possession and enjoyment of the same, gave, granted,
ratified and confirmed unto them, their heirs successors and assigns, the
premises so butted and bounded, together with all the meadows, pastures,
swamps, upland and arable land, woods, islands, ponds, ways, waters, wa-
tercourses, havens, ports, rivers, fishings, huntings, fowlings, mines, miner-
als, quarries, precious stones, on or within the premises, and all other com-
modities, privileges, franchises and hereditaments whatsoever thereunto
belonging, or in anywise appertaining to any part or parcel thereof. With-
in the boundaries of the premises was *Dragon* river, an arm of the sea,
where the tide ebbs and flows, and navigable for large vessels. Held, 1.
that this act of the General Assembly was not only a confirmation, but a
grant, of title ; but 2. that the soil between high and low water mark of
*Dragon* river, was not thereby granted.
In 1640, the General Assembly of the colony of *New-Haven* granted to thir-
ty-two individuals, for the purpose of *planting,* a tract of land on the *East*
side of *Dragon* river, to be located, by the grantees, in separate lots, and to
be held by them in severalty. One of these lots was located contiguous to
the river, and bounded *Westerly* on the river, extending over a highway
previously laid out on the *Eastern* bank above high water mark. Held, that
this grant was not subject to a condition or qualification that the lots should
be planted, according to the modern acceptation of that term ; no more
being intended, than that the land was conveyed to the grantees, that they
might make a settlement thereon ; and consequently, that they had good
right to locate the grant in part on a highway, from which they might de-
rive accommodation.
The proprietor of land adjoining to a navigable river, has an exclusive right
to the soil between high and low water mark, for the purpose of erecting
wharves and stores thereon.

THIS was an action of ejectment ; tried at *New-Haven,*
*January* term, 1827, before *Brainard, J.*

OF THE STATE OF CONNECTICUT.

The demanded premises were the soil, with the wharf and *NewHaven,* store standing thereon, built between high and low water mark, <u>July, 1828.</u> on the *East* side of *Dragon* river.   This river is an arm of the East-Haven sea, where the tide ebbs and flows, and is navigable, adjoining Hemingway. the premises, for large vessels.

The title claimed by the plaintiffs, was derived, 1. from the charter of *Charles* II. to the colony of *Connecticut,* in 1662 ; 2. from the patent, given by the colony, to the proprietors of *New-Haven,* in 1685 ;  3. from the act of incorporation of the village of *East-Haven,* in  1707, and the practical division between the proprietors  of *New-Haven* and *East-Haven,* sanctioned in 1756 ;  and 4. from the deed of cession, by the proprietors of *East-Haven,* to the town of  *East-Haven,* in 1797, confirmed by a public act of the General Assembly, in 1825.

By the first-mentioned instrument, *Charles* II. gave, granted and confirmed to the colony all that part of his dominions within certain limits, " together with all  firm lands, soils, grounds, havens, ports, rivers, waters, fishings, mines," &c.

The patent granted  by the  colony to the  inhabitants and proprietors of the  town  of *New-Haven,* was dated the 6th of *January,* 1685,  (a) [1686] and extended on *Long-Island* sound from the  *Western* part of the present town of *Orange* to the *Western* part of the present town of *Branford,* including, of course, the place in question.   This instrument begins with the following recitals :  " Whereas  the General Court of *Connecticut* colony have formerly granted unto proprietors, inhabitants of the town of *New Haven,* in the said colony, all those lands, both meadow and upland, with all their  appurtenances within these abutments ;" [specifying them] " the said lands and premises  having been, by purchase or otherwise, lawfully  obtained of *Indian* native proprietors, by  the said proprietors and inhabitants of *New-Haven :*"

" And  whereas the said proprietors and inhabitants of *New-Haven* have made application to the Governour and Company of the said colony of *Connecticut* assembled in General Court, the 14th of  *May,* 1685, that they may  have a patent for confirmation of the aforesaid  lands and  premises,  so  purchased, and granted unto them as  aforesaid, whereof they have stood seised and  in quiet  possession, for many years past, without interruption."

(a) Our ancestors, at this period, began the year in *March,* and  of course, this date, according to the present mode of reckoning time, would be 1686. *R.*

The patent then proceeds thus : " Now therefore, for a more full confirmation of the aforesaid tract or tracts of land and premises, so butted and bounded as before expressed, unto the said proprietors, the inhabitants of the aforesaid township of *New-Haven,* in their rightful possession and enjoyment of the same, KNOW YE, that the said Governour and Company assembled in General Court aforesaid, according to the power and commission granted unto them, by his late Majesty's gracious charter, have given and granted, and by these presents, do give, grant, ratify and confirm unto *James Bishop,* Esq., *William Jones,* Esq , &c. and to the rest of the present proprietors of the township of *New-Haven,* their heirs successors and assigns forever, all that parcel or tract or tracts of lands and premises, so butted and bounded as aforesaid, together with all the meadows, pastures, swamps, upland and arable land, woods, islands, ponds, ways, waters, water-courses, havens, ports, rivers, fishings, huntings, fowlings mines, minerals, quarries, precious stones on or within the said tracts of land, and all and singular other commodities, privileges, franchises and hereditaments whatsoever, thereunto belonging, or in any ways appertaining to any part or parcel thereof, within the said bounds and limits aforesaid."

On the petition of the inhabitants of the *East-Village* of *New-Haven,* the General Assembly of the colony, in *May,* 1707, enacted. that they should be a village distinct from the township of *New-Haven ;* and invested with all the immunities and privileges proper and necessary for a village, for the upholding the public worship of God, as also their own civil concerns ; and in order thereunto, the General Assembly granted the liberty of all such officers as are proper and necessary for a town, to be chosen by themselves, in the order and form provided by law for any town. *East-Haven,* thus constituted, extends *Westerly* to the channel of *Dragon* river, including the demanded premises within its limits.

Since the incorporation of *East-Haven* into a village, the proprietors of *New-Haven* residing in *New-Haven,* have ceased to exercise any acts of ownership over the common and undivided lands within the limits of *East-Haven ;* and the proprietors in *East-Haven* have, in sundry instances, disposed of the common and undivided lands within their own limits.

By an act or resolve of the General Assembly, in 1756, the proprietors of the common and undivided lands, living in the

village of *East-Haven*, were constituted a proprietary, a body corporate, and, as such, owned, and had a right to dispose of, all the common and undivided lands lying within the limits of that village.

In *January*, 1740, the proprietors in *East-Haven* granted to *Joseph Tuttle*, jr. and others, their heirs and assigns forever the flats at a certain place within the limits of *East-Haven*, sixty feet wide from high water mark down to the channel, provided they should build a wharf, &c. ; also, to *John Woodward* and others, their heirs and assigns forever, the flats at another place, down to the channel, subject to a similar condition. At a meeting held in *February*, 1797, these proprietors granted to *Enos Hemingway* and others the flats, 187 feet in width, to the channel, for certain purposes specified in the grant ; and in *March*, 1797, to the town of *East-Haven* all the remaining right, which the grantors were entitled to in the flats lying within the limits of that town. The latter grant was confirmed by the provisions of the act of 1825, *ch.* 11.

The proprietors in *New-Haven*, from 1710 to 1722, made eight different grants of flats situated between *Tomlinson's* bridge and the long wharf, within the limits of the present town of *New-Haven*. Neither *East-Haven*, nor any of the proprietors living in *East-Haven*, after the year 1707, took any part in any of the proceedings of the proprietors of *New-Haven* in relation to these flats (*a*)

The facts relied on in support of the defendants' title, are the following. The village of *Dragon* is built on each side of the *Dragon* river, and is a place of considerable commerce, having more than twenty vessels employed in trade, going to, and returning from distant parts of the *United States*. For more than forty years past, proprietors of land adjoining *Dragon* river, on each side, have, at pleasure, wharfed out into the river below high water mark, to accommodate the trade of the village and the public ; more than thirty valuable wharves having been so built. Neither the proprietors of *New-Haven* nor of *East-Haven* have ever made any grant of flats, or of the shore, on either side of the channel of *Dragon* river, nor ever

(*a*) There was other evidence of the same general character, introduced by the plaintiffs, for the purpose of shewing a practical construction of the patent of 1685 favourable to their claim, which is omitted, for the two-fold reason, that a detail of it would render the statement inconveniently prolix, and that it is not necessary to present distinctly the points discussed and decided.

*NewHaven,* granted any licence to any person to build any wharf ; nor has
July, 1828. any application ever been made to them, for the purpose of
East-Haven procuring leave to build a wharf on any part of the river ; nor
*v.*
Hemingway. have they, or the ancient proprietors, from the first settlement
of the country, ever exercised any act of ownership upon any
part of the river, or the soil under it, or made any claim to any
part of the shore, until the bringing of the present action.   The
demanded premises have always been an open and public
shore, and used, by the public, for the purpose of navigation
and fishing, excepting only the use which has been made of the
shore in question, by the defendants, and those whose estate
the defendants have.

On the basis of these facts, the defendants claimed, that if
the fee of the demanded premises were ever in the original
proprietors of common and undivided land, or in the plaintiffs,
the plaintiffs' right was long since abandoned and lost ; and the
defendants prayed the judge so to instruct the jury.

In the year 1640, the General Court of the colony of *New-
Haven* allotted to thirty-two individuals, for the purpose of
planting, a tract of land about one mile in length, on the *East*
side of *Dragon* river, extending from the farm of the Rev. Mr.
*Davenport* on the *North* to the *Indian* wigwams on the *South*,
embracing within its limits the land adjoining the demanded
premises, and a considerable tract next thereto above and be-
low.   This land was to be taken up and located, by the gran-
tees, in separate lots, to be held by each of them in severalty,
as his own proper estate in fee ; and the apportionment was to
be so made, that each individual, if single, should have four
acres, if he had a wife, six acres, and one acre more for each
child belonging to his family   The lots so taken and appropri-
ated were called *Dragon* lots.   One of these lots was opposite
the demanded premises, on the *Eastern* side of *Dragon* river,
and bounded *Westerly* on this river; to which the defendants
claim title as heirs to *Gershom Brown*, who purchased it from
the heirs of the original proprietor.

The defendants claimed to have proved, that the location of
the *Dragon* lots, and of the last-mentioned lot particularly,
was made immediately after the order of the General Court
in 1640 ; and that such location was followed by immediate
and uninterrupted possession.   The plaintiffs claimed, that be-
fore the location of any of the *Dragon* lots, a highway was
laid out on the *Easterly* bank of *Dragon* river above high-

water mark ; and that in the original location of these lots, they *NewHaven,* were bounded *Westerly* on such highway, leaving the fee of the highway in the original proprietors of *New Haven;* which had since passed to the town of *East-Haven.* The defendants insisted, that the *Dragon* lots, as originally located, were bounded *Westerly* by the river ; and if there was any highway along the bank of the river, it was laid over their land. In support of the claims of the parties respectively, regarding this highway, much evidence was introduced on each side, which it is not now necessary to state.

The judge instructed the jury, that by the charter of *Charles* II., granted to the colony of *Connecticut,* in 1662, the land between high and low water mark belongs to the adjoining proprietors of the substantial soil. Whoever owns the substantial soil to high water mark, owns the amphibious property between high and low water, as an appurtenance, for wharfing and other purposes of navigation, not obstructing the public accommodation ; and no man, who thus owns the land to high water, can be deprived of the reasonable use of this appendage, unless by his own folly or consent. The king, in his charter, granted *ports* and *havens.*

That the legal import and effect of the patent given by the colony of *Connecticut* to the proprietors and inhabitants of the town of *New-Haven,* in 1685, is a charter of *confirmation* and of *grant;* a confirmation of all they had acquired from the natives, by purchase or otherwise, honestly ;—confirmation of all previous disposition of lands made to individuals, by the General Court of the colony of *New-Haven,* or by those acting under their authority ; and a grant to the proprietors and inhabitants of *New-Haven,* as tenants in common, of the residue of all the lands that had not been previously disposed of, with all the privileges appertaining to property of this character, which were granted to the colony of *Connecticut,* by the charter of *Charles* II.

That consequently, the land in question was vested in the then proprietors and inhabitants of the town of *New-Haven,* unless it had been previously disposed of, by the colony of *New-Haven.*

That by the incorporation of the village of *East-Haven* in 1707 ; by the assumption of the powers of a distinct body corporate by the proprietors of the common and undivided lands lying in that village, in disposing of the common and undivided

*NewHaven,* lands lying within its limits, with at least the tacit acquiescence
July, 1828 of the proprietors of the other section of *New-Haven ;* and
East-Haven especially, by the confirming act of the General Assembly in
*v.* 1756,—the proprietors in *East-Haven* were a body corporate,
Hemingway. and, as such, owned, and had a right to dispose of, all the common and undivided lands within the limits of that village.

That by the votes of the proprietors of *East-Haven* in 1797, in connexion with the confirming act of the General Assembly in 1825, the town of *East-Haven,* the plaintiffs in this action, acquired a valid title to the land in question, unless it had been previously disposed of.

The judge then proceeded to examine the claim of title set up by the defendants. After stating the grant of the colony of *New-Haven* in 1640, he remarked : " Under this grant the defendants claim ; and the question is, whether these rights were taken up, how located and when ? These individuals had the right, within a reasonable and proper time, to make their location of their respective lots on the *Eastern* bank of *Dragon* river ; to fix stakes at high water mark, and extend back *Easterly* until they encompassed their complement ; and all in front of this amphibious ground between high and low water mark, was his or theirs, and nobody could cut off their water-front without their consent. The turning point in the case must be, whether anterior to the year 1685, the lot immediately to the *Eastward* of the land in question, under any of the rights granted to the thirty-two individuals, was taken up and located on the *Eastern* bank of *Dragon* river ; and whether the defendants deduce their title from such locations under any one of these original grantees."

In relation to the highway claimed to have been laid out on the *East* side of *Dragon* river, the judge said: " If there was a highway laid out and established on the *East* side of *Dragon* river, and *Easterly* of high water mark, before the lot, of which the land in question is claimed to be an appurtenance, was located, and that lot was located and bounded *West* on the highway, it follows of course, that the defendants' claim of title fails. But whether there was, or was not, a highway as claimed, if the proprietor of the lot under the grant of 1640, did locate his land on the river, on the *East* bank, the highway is no impediment ; as he or his assigns always have had, and still have, the fee of the highway."

The judge concluded his remarks upon this branch of the

case, by submitting the question of fact thus: "If you find, gentlemen, that any one or more of the thirty-two grantees, under the act of the General Court of the colony of *New-Haven* of 1640, located his or their lot or lots of planting ground on the *East* bank of *Dragon* river, and took the shore or high water mark as the boundary; and that the defendants have deduced their title from that source; you will find, that the defendants have done no wrong," &c.

The jury returned a verdict for the defendants; and the plaintiffs moved for a new trial.

The case was argued before this Court, *July* term, 1827, by *Sherman* and *R. S. Baldwin,* in support of the motion, and by *N. Smith* and *Seeley,* contra; and was continued *to advise.*

The counsel for the plaintiffs contended, 1. That they had shewn a good title to the demanded premises. In support of this general position, they insisted,

First, that by the common law of *England,* the title to the soil under all navigable waters, where the tide ebbs and flows, is vested in the king. He holds the *jus privatum,* subject to the public rights of fishery and navigation. *Hale de Jure Maris, part* 1. c. 4. [*Harg. Law Tracts* 12. & seq.] *Com. Dig. tit.* Navigation. A. B. The case of the *Royal Fishery of the Banne, Davies* 155. (*Dub.* ed. 1762.) *Carter* & al. v. *Murcot* & al. 4 *Burr.* 2162. *The Attorney General* v. *Richards,* 2 *Anstr.* 603. *The King* v. *Smith* & al. *Doug.* 441.

Secondly, that the king may grant this soil to a subject or corporation, subject only to the public rights. *Harg. L. T.* 17. 18. 22. 32. 36. *The Royal Fishery of the Banne, Davies* 149. *Carter* & al. v. *Murcot* & al., 4 *Burr.* 2162. *The Commonwealth* v. *The Inhabitants of Charlestown,* 1 *Pick.* 180. *Angell on Tide Waters,* 33, 4.

Thirdly, that by the charter of 1662, *Charles* II. granted all his interest in the soil under the navigable waters, as well as in the upland, with the powers of government to the colony of *Connecticut,* with reservation of the common right of fishery, " in derogation of which no modern grants can be made." Per *Bailey* J., in *Blundell* v. *Catterall,* 5 *Barn. & Ald.* 268. (7 *Serg. & Lowb.* 108.) See *Cowp.* 213. as to grants of political power. 1 *Pick.* 180.

Fourthly, that the colony of *Connecticut,* by their patent of

*NewHaven,* grant and confirmation, conveyed the *jus privatum* of the soil under navigable waters, to the inhabitants of *New-Haven,*— subject, of course, to the public rights of fishery and navigation. The subjects of the grant are " all lands, soils, hereditaments, rivers, fishings," &c. The words might have passed even the fishery, but for the reservation of that common right in the king's charter.

July, 1828.

East-Haven
*v.*
Hemingway.

Fifthly, that the proprietary interest in the *locus in quo* having passed from the proprietors of *New-Haven* to the proprietors of *East-Haven,* and from them to the town of *East-Haven,* it follows that the plaintiffs own it, unless the defendants can shew a paramount title.

2. That the charge in relation to the title of the defendants was wrong. The defendants claimed title under a location pursuant to an order of the General Court of *New-Haven* in 1640, authorizing certain persons to locate *planting ground East* of *Dragon* river, and subsequent conveyances to themselves bounding *on* the river. The plaintiffs claimed, that anterior to this grant and location there was a *highway* by the side of the river. The judge charged the jury, that under this grant, though the jury should find, that there was a highway previously laid out ; yet the grantees might lawfully locate over the highway to the river ; and that whoever owned the adjoining upland had, as an appurtenance, the right of wharfing out. Both these positions the counsel for the defendants denied.

First, the grant was of *planting ground.* Its construction must be most favourable to the public. It cannot enure to any other intent than that which is *precisely expressed.* 4 *Cruise's Dig.* 567. Even what is necessary to the enjoyment of the thing granted, shall not pass, without express words. *Ibid.* The location over a highway would be unnecessary to the enjoyment of the grant ; foreign to its object ; and inconsistent with the rights of the public, since wherever they might lawfully locate, they might *plant.* Independently of the grant, the defendants have acquired no right to come *to* the river.

Secondly, if the grantees could make a lawful location *to the river,* they could acquire no rights there below high water mark. There is no pretence, that any title to the *locus in quo* has been acquired by possession    It was unoccupied until the defendants entered, and erected their wharf. The legal possession of unoccupied land is always according to the right. The grant of 1640 was made two years after the settlement of

the colony.    Our ancestors brought with them the common law as their birth-right ; and its rules in regard to tide waters, were then well settled and understood.    They have since been repeatedly adopted and sanctioned by our courts.    *Adams* v. *Pease,* 2 *Conn. Rep.* 481.    *The Commonwealth* v. *Charlestown,* 1 *Pick.* 180.    *Cortelyou* v. *Van Brundt,* 2 *Johns. Rep.* 357.    *Storer* v. *Freeman,* 6 *Mass. Rep.* 435.    *Peck* v. *Lockwood,* 5 *Day* 22. 26.    *Hooker* v. *Cummings,* 20 *Johns. Rep* 90. 100.    By the rule of the common law, as adopted in these cases, the adjoining proprietor holds only to high water mark. In *Massachusetts* the common law was altered, by an ordinance in 1641, the year after the defendants' grant.    In *Connecticut,* it has never been altered ; and it cannot be, in reference to our waters, without violating important vested rights. If then, these flats were not granted in 1640, they *remain* to the proprietors, and those who claim under them.    The plaintiffs have, therefore, a right to recover, unless it can be successfully maintained, that the defendants came to the river, the highway notwithstanding; and that adjoining proprietors have necessarily a legal right to wharf out in front of their land. Even in *Massachusetts,* notwithstanding the ordinance of 1641, the courts hold, that the owner of flats and upland *may* grant the one without the other ; and that a deed bounding "*on* the shore," does not convey the flats.    *Storer* v. *Freeman,* 6 *Mass. Rep.* 435. S. C. *Angell on Tide-Waters,* appx. 149.    But the grant of 1640, being confined to *planting ground* beyond the river, and made in reference to the common law rule, is as much *exclusive* of the flats, as if it had been bounded by " the shore," or " to high water mark," or by feet and inches.    See *Harg. L. T.* 12. & seq.    *Pratt* v. *The State,* 5 *Conn. Rep.* 398.

But it may be said, that without acquiring any *title* to the flats, an individual may, as *appurtenant* to his land, wharf out, if he does not erect a nuisance.    This doctrine can never be true, where the flats are owned by one man, and the uplands by another.    In *England,* when the soil of the shore is in the king, such erections by the adjoining proprietor, are *purprestres* —*i. e.* encroachments on his *jus privatum.*    If nuisances, they must be abated ; if not, the king may rent them.    *Harg. L. T.* 13.    2 *Anstr.* 603.    In such case, the owner of the adjoining upland does not, by wharfing, violate the private rights of any individual ; and if his erection is not a nuisance, the public

*NewHaven,* would ordinarily permit it to remain.   The right of wharfing,

in such case, however, has been directly denied, in *Pennsylva-nia ;* (*Respublica* v. *Caldwell,* 1 *Dall.* 150.) and is disallowed, by statute, in *Rhode-Island.*   But allowing it, in its full extent, it does not interfere with the plaintiffs' claim.

The counsel for the defendants, contended, 1. That the charter of *Charles* II., in 1662, did not convey the soil under the tide waters to the grantees ; and much less did the patent of 1685, from *Connecticut* to *New-Haven.*

First, the grant of " ports, havens, rivers," &c., conveys only the use of the water,—not the soil under it   *Co. Litt.* 4. *Harg. L. T.* 33.   *Cro. Car.* 492.   *Yelv.* 143. and n. (1). by *Metcalf.   Shep. Touch.* 97.   3 *Bla. Comm.* 18.   1 *Swift's Dig.* 74.   *Davies* 149.

Seeondly, the king owns the shore of the sea, by virtue of his *royal prerogative ;* and a prerogative right can be passed only by apt, precise, and necessary words.   The first part of this proposition is supported by *Hale* throughout ; by *The Attorney General* v. *Farmen,* 2 *Lev.* 171.   *Davies* 149.   As to the second part of the proposition, see 1 *Plowd.* 310. 336. *Hob.* 243.   17 *Vin. Abr.* 133. and the cases there cited.   *Davies* 149.   *Harg. L. T.* 17. 18. 33.   Now, the patent of 1685 contains neither general words, nor words of particular description sufficiently comprehensive to include the demanded premises.   They are not conveyed by the *sweeping clause ;* the use and object of which, is, to guard against any accidental omission, but still to refer only to estates or things of the same nature and description with those that have been previously mentioned.   *Per* Lord *Mansfield* in *Moore* v. *Magrath, Cowp.* 12.

Thirdly, the patent of 1685, is, in its object, and on the face of it, only a charter of *confirmation.*   It does not purport to convey to the inhabitants of *New-Haven* any lands which they had not before acquired from the *Indians :* it only confirms and ratifies their ancient title to those " lands, both meadow and upland, so purchased and granted to them as aforesaid," (*i. e.* by the *Indians*) whereof they have stood seised, and in quiet possession, for many years past, without interruption."   *Co. Litt.* 295.   *Shep. Touch.* 311. 314. & n.

2. That the title of the proprietors of common and undivided lands in *East-Haven* never passed from them, and has

never been conveyed to the plaintiffs. Such proprietors may divide up the lands among themselves; but a majority of them, by a mere vote, without consideration, cannot pass the title to strangers. The town of *East-Haven*, therefore, has no pretence of title.

3. That if the demanded premises could, in any sense, have been considered as comprised in the terms of the patent of 1685, from the facts of the case it is apparent, that the grant *quoad Dragon* river, was never accepted, by the grantees; and that neither they, nor any person under them, ever claimed title until the bringing of the present action.

4. That if the demanded premises ever belonged to the grantors of the plaintiffs, their title has, long since, been *abandoned* to the public. They have not kept up the evidence of their right; nor taken any measures to guard it; no claim having been ever made or act of ownership *exercised*, on their part, until the commencement of the present action. *Hale, passim. The Attorney General* v. *Richards*, 2 *Anstr.* 603. *Miles* v. *Rose*, 5 *Taun.* 705. *Chad.* v. *Tilsed*, 2 *Brod. & Bing.* 403. (6 *Serg. & Lowb.* 171.)

5. That the charge of the judge to the jury was correct. The substance of the charge is, that the proprietor of land adjoining tide waters has a right to wharf out below high water mark, for the purposes of navigation and commerce. All grants, which may be made of the public interest in tide waters, are necessarily *affected*, as Lord *Hale* expresses it, with this right in adjoining proprietors, for the purposes of navigation. *Harg. L. T.* 22. 85. Such is the common law of *Connecticut*, as evidenced by immemorial usage, founded on the nature of the property and the exigencies of navigation. 1 *Swift's Dig.* 109. In *England*, the law vests the ownership of the soil under tide waters in the king as *trustee* for the benefit of his subjects; a right, which cannot be exercised to their exclusion, either by the king or his grantee, since *magna charta. Hale, passim. Blundell* v. *Caterall*, 5 *Barn. & Ald.* 268. (6 *Serg. & Lowb.* 91. 93. & seq.) *Com. Dig. tit.* Navigation. A. In this country, it is emphatically true, that we acknowledge no right in the sovereignty but what is necessary for public purposes.

HOSMER, Ch. J. The controversy between the parties in this case, regards only the title of the land demanded.

*NewHaven,*    The plaintiffs claim title under the charter of *Charles* II. in
July, 1828.  1662, to the colony of *Connecticut;* by a patent from the colo-
*East-Haven*  ony, in 1685, to the town of *New-Haven;* and by a grant from
*v.*          the proprietors of this town.
*Hemingway.*

There is no doubt concerning the competency of *Charles* II.
to convey the land in question to the colony of *Connecticut.*    A
river, where the tide ebbs and flows, is an arm of the sea ; and
the shore is that space of ground, which is between ordinary
high water and low water mark.    *Hale De Jure Maris, pars*
1. *c.* 4.    *Harg. L. T.* 12.    The title of the king, *prima facie,*
to all ports and arms of the sea to high water mark, and to
the soil thereof, has long been established law ; and, as an un-
doubted consequence, it is settled, that he may grant the pro-
perty of the soil between high and low water mark to a subject
or corporation.    *Harg. L. T.* 12. 17. 32.    5 *Rep.* 107.    *Dyer*
93.    *Com. Dig. tit.* Navigation A. B.    *Davies* 56, 7. 149.
2 *Anstr* 605.

Whether on the legal construction of the charter of *Charles*
II., the shores of navigable waters were granted to the colony
of *Connecticut*, is a question admitting of controversy, on which
it is unnecessary to enter.    Clear I am, that they were not inten-
ded to be conveyed to the proprietors of *New-Haven*, by the
act of 1685.    By this instrument, the General Assembly of
*Connecticut*, gave, granted, ratified and confirmed to the pro-
prietors of *New-Haven*, " all that parcel, or tract or tracts of
land and premises," butted and bounded in such manner as to
comprise the river in question, " together with all the meadows,
pastures, swamps, upland and arable land, woods, islands, ponds,
ways, *waters, water-courses,* havens, ports, *rivers, fisheries,*
huntings, fowlings, mines, minerals, quarries, and precious
stones," within the aforesaid bounds and limits    The sugges-
tion that the act of the General Assembly was only *confirmato-
ry* of a former grant in the town of *New-Haven*, I lay out of
the question.    By the operative words *give, grant* and *ratify,*
it was not only a confirmation, but a *grant.*    1 *Inst. sect.* 515.
531.    *Shep. Touch.* 83    4 *Cruise's Dig.* 301. *sect.* 40.    *Jack-
son* d. *Klock* & al. v. *Hudson,* 3 *Johns. Rep.* 375.    *Jackson* d.
*Troup* & al. v. *Blodget,* 16 *Johns. Rep.* 172. 178.    At the same
time, it must be admitted, that the principal, if not the sole
object of the grant, was, to confirm to the proprietors the title
to their lands purchased of the natives, which *they* had not le-
gal capacity to sell ; (3 *Johns. Rep.* 375.    6 *Cranch.* 87,    8

*Wheat Rep.* 543. 3 *Kent's Comm.* 308. ;) and of which the proprietors had been in the quiet possession for many years. *Vid.* grant of 1685.

In expounding the legislative confirmation and grant, I adopt as the principle of construction the meaning and intention of the General Assembly, derived from a fair interpretation of their expressions. If it were necessary, perhaps, the rule respecting the exposition of royal grants, which are ever construed most favourably for the king, might with propriety be applied in construction of the act of 1685 ; it being matter of record, and proceeding from the bounty of the legislature. *Plowd.* 243. 5 *Cruise's Dig.* 49. But this case does not require any strained principle of interpretation.

In the first place, it has been argued, that the shores of *Dragon* river were granted to the proprietors, the inhabitants of *New-Haven,* as they were included within the general boundaries of the grant. The contrary of this was decided in *Palmer* v. *Hicks,* 6 *Johns. Rep.* 133. on the principle, that a grant to a town extending on both sides of a navigable river, so far as the river extends, is for the purpose of jurisdiction only, and not with intention to convey the soil underneath the water, or below high water mark. It is not presumable, that it was the object of the grant to convey the public right of the colony in the shores of navigable rivers to the purchasers of lands from the natives, requesting the confirmation of their title. A right so important as this is to the public, cannot be considered as parted with, except by words so unequivocal, as to leave no reasonable doubt concerning the meaning. The construction advanced by the plaintiffs, is a novelty, and inconsistent with the conduct of the proprietors adjoining *Dragon* river, for more than a century. The action before the court is the first claim made by the plaintiffs to the shore of this river.

The plaintiffs have insisted, that theirs is the soil of the shore of *Dragon* river, by the express words of the grant to the proprietors of *New-Haven.* After including the river within the general boundaries, a sweeping clause is added, whereby the meadows, pastures, &c. are granted, with the *waters, water-courses, havens, ports, rivers, fishings,* &c. within the bounds before alluded to, and all and singular the other commodities, privileges, franchises and hereditaments whatsoever thereunto belonging, or in any ways appertaining. This

clause was intended to guard against any accidental omission. *Cowp.* 12. Much the greater part of it has not even a remote reference to the subject of controversy ; nor can I discern a word, or expression, that has any essential bearing upon it. The terms " *waters*," " *water-courses*," " *ports*," " *havens*," " *rivers*," and " *fishings*," approach the nearest ; but it is unquestionably clear, that the words *ports* and *havens* are irrelative to the matter in question ; and that by either of the other expressions, the *soil* is never conveyed. *Co. Litt.* 4. *b. Yelv.* 143. 2 *Bla. Com.* 18. *Shep. Touch.* 97. *Com. Dig. tit.* Grant. E. 5. 1 *Swift's Dig.* 74. They are adapted, at most, to the conveyance of a franchise.

By the expressions " commodities, jurisdictions, royalties, privileges, franchises, preeminences, and hereditaments," there is no extension of the grant to the soil in question. The word " hereditaments" is the only one, on this point, meriting attention ; and it is perfectly incredible, that by a term so general, the General Assembly intended to convey the soil of a navigable river, which was unquestionably within the boundaries of the grant, and which, notwithstanding this, was not thereby conveyed. A word or expression precisely to denote a grant so much out of the common course, would have been employed ; and not a general term, which, on the construction contended for, would regrant all that had been granted, and give an exclusive right to the soil under all rivers, ports and havens within the exterior lines of the supposed conveyance.

I am sensible, that too much, already, has been said respecting the word " hereditaments." Taking the entire clause in which this term is found, it is unquestionable, that it was not inserted to convey the soil, but was used synonymously with some of the other general expressions recited. The act, in the first place, grants land within certain boundaries. It next, by a number of terms, supplies any accidental omission of the subjects intended to be granted. It then closes, by conveying " the commodities, privileges, franchises and hereditaments, belonging to or any ways appertaining to any part or parcel" of the land, lying within the specified boundaries. The term " hereditaments," therefore, as well as the words " commodities, privileges and franchises," was never intended to convey the soil, but something appurtenant thereto ; for the thing conveyed by this term, is that " which was *belonging to or in any way appertaining*" to the land granted.

To consider the other documents and testimony exhibited, in establishment of the plaintiffs' title, is unnecessary The whole rests on the grant of 1685, and that failing, it is of course, that the plaintiffs' title must fail also. The judgment below, therefore, is correct.

Whether the defendants have title is an enquiry of no importance, so far as this case is concerned. But as on this point the court have come to a result, I will briefly express their opinion.

The General Assembly of the colony of *New-Haven,* in 1640, granted thirty-two lots of land to certain individuals, for the purpose of planting, to be allotted on the *East* side of *Dragon* river. The grant was located near the *East* bank of that river, in part over a highway, and bounded on high water mark, directly in contact with the shore now demanded. The defendants have traced their title to the land in question to one or more individuals to whom the grant was originally made. This brief statement of the facts is sufficient to estimate the force of the objections made to the defendants' title.

In the first place, it was said, that the lots having been granted for the purpose of *planting,* the grant cannot enure to any other intent ; and that they could not legally be laid out, in part on a highway, as they would, to this extent, be incapable of cultivation. If this view of the subject were sound, it would become a material question, whether any person except the grantors, could take advantage of the breach of contract ; but it is without any foundation.

The fallacy of the argument consists in supposing, that to the grant of the lots there was subjoined the condition or qualification that they should be *planted,* according to the modern acceptation of this term. If the actual planting of the land granted, was the condition on which the land was to be held, the omission of this act would be a breach of the contract, and the grantors might enter. A little reflection will shew, that the grant was not thus qualified.

In order to the construction of the grant or contract, it is necessary to go back to the age when it was made, with a view to ascertain what, at that time, was meant by the words *planting* and *plantation,* when applied to such a subject matter. We are now to investigate the meaning of expressions, used a century and a half since, which then had a peculiar intent, that has become obsolete. By the word to *plant,* was then intend-

ed, when applied to a tract of land, to *settle*, or to *establish*; and a *plantation*, the derivative of planting, denoted sometimes a colony, and sometimes a farm or cultivated estate. Thus, in the charter of 1662, the colony of *Connecticut* was called " a plantation," and its *Northern* boundary was the line of the "*Massachusetts* plantation ;" and in the act of 1685, the township of *New-Haven* was empowered to manage its " plantation affairs,"—meaning, undoubtedly, that it might act in all the concerns of the town.

When the General Court of the colony of *New-Haven* granted to thirty-two individuals a tract of land for the purpose of *planting*, no more was intended, than that it was conveyed to them that they might establish themselves thereon, and cultivate their settlement or small plantation, as they should think proper. Of consequence, they had as good right to locate the grant in part on a highway, from which they might derive accommodation, as they would have, at any subsequent period, to grant a right of passage over their lands.

The defendants are bounded on *Dragon* river at high-water mark ; and they claim, that they have legal right to occupy the shore in front of their land, and for commercial purposes to erect buildings upon it. Whether this position is correct, is the only remaining question in the case. I shall not recur to the various topics expatiated on, in the able and elaborate argument of the learned counsel on both sides, upon the matter in question. I place myself on ground more narrow, but perfectly satisfactory to my mind.

It was laid down as the law of this state, by Judge *Swift*, more than thirty years since, in the first volume of his *System*, (340. 341. 343 ) that all adjoining proprietors on navigable rivers have a right to the soil covered with water, as far as they can occupy it, *i. e.* to the channel, with the exclusive privilege of wharfing and erecting piers in front of their land, but with this qualification, that they do not impede the navigation of the water. By this expression I do not understand, that the proprietors alluded to were *seised*, but that they had a right of occupation, properly termed a franchise. 1 *Swift's Dig.* 109.

In the case of *Peck* v. *Lockwood*, 5 *Day* 22 , the plaintiff claimed title to the shore of navigable water, being flats between high and low water mark, by deeds, one bounding him *South by the water*, and the other *Southerly by the cove*. The action was trespass for the taking of shell-fish between high and

low water mark ; to which the defendant justified, on the *NewHaven,* ground that the fishery was of common right ; and the justifi- July, 1828. cation was sustained. In delivering the opinion of the court, East-Haven *Reeve,* J. said : " The defendant denies, indeed, thet the place *v.* Hemingway. in question was covered, by the plaintiff's deeds, as set forth in the case stated. I shall lay this question out of the case, by only observing, that I entertain no doubt but that the flats were included in the plaintiff's deed so as to convey to him the right of soil." I cite this as the opinion of a respectable judge, and not of the court ; and although the expression is somewhat equivocal, I consider it as equivalent only to the established law, as declared by Judge *Swift*

That the law, as I have stated it, is not now to be question-ed, the usage of the owners of land to high water mark, on navigable streams, in front of their land, to erect wharves, " time whereof the memory of man runneth not to the contra-ry," is conclusive evidencce. It stands on the same ground of general usage, which is at the foundation of the common law.

The right of individuals to use the soil of the shore, subject to the paramount rights of the public, so far as my information extends, has never, until now, been disputed. The exercise of it, in all our towns, bounded on navigable waters, and the en-joyment of estates under it, is known to every one. On the death of a land-owner to high water mark, his estate in the shore and the erections upon it, has descended to his heirs ; and thus estates have been uniformly settled. *Angell* on *Tide Waters, chap.* VIII. *p.* 125 & seq.

On the part of the public, no objection has been made. The interest of navigation has been subserved, and the consequen-ces have been altogether salutary.

It necessarily results, that the defendants have title to the land demanded ; and for this reason, as well for deficiency of title on the plaintiffs' part, the judgment below was correct.

PETERS and LANMAN, Js. were of the same opinion.

BRAINARD, J. having been absent when the cause was argu-ed, and DAGGETT, J., having been of counsel in the cause, gave no opinion.

New trial not to be granted.

JUDD and others *against* BUSHNELL and others.

Where the plaintiff in a bill in chancery, sought to obtain money, founding
his claim on a devise of real estate to be estimated at the appraised value ;
and the bill averred, that the money sought, and the appraised value of the
estate devised, were, respectively, more than 335 dollars ; it was held, on
demurrer, that these averments were sufficient to give the superior court
jurisdiction of the suit.

*A.*, by his will, directed, that one-fourth part of his real estate, appraised ac-
cording to law, should be retained in the hands of his executors, and that
they should pay over annually the interest of that amount to his daughter
*H.*, during the minority of her children, and the principal to the children, as
soon as they should come to full age.    The testator appointed his three
sons-in-law, *B., C.* and *D.*, his executors.   *C.* died before the testator, and *D.*
never accepted the trust.    *B.* accepted the trust, and had an inventory of
the estate taken, and a distribution made, one-fourth part being set to him
as executor.    At different times afterwards, he conveyed, in his individual
capacity and for his private benefit, the estate so set to him, in distinct
parcels, to *E., F.* and *G.*, who had notice of all the facts.    *B.* also became
insolvent, and failed to pay the interest to *H.*, or the principal to her child-
ren as they came to full age.    On a bill in chancery, brought by *H.* and her
children, against *B.* and his several grantees, seeking satisfaction of their
claims from the defendants, or the estate in their hands, it was held, 1.
that as the executors were to pay a gross sum in money, to be ascertained by
an appraisal of the land, an estate *in fee* was given to them ; but 2. that this
estate in fee was not absolute, but *upon condition* that they should perform
the directions of the testator in relation to the plaintiffs ; and 3. that it is
within the power of a court of chancery to compel such performance against
the defendants ; 4. that the plaintiffs had not adequate remedy at law ; 5.
that there was no misjoinder of parties, plaintiffs or defendants.

THIS was a bill in chancery, brought to the superior court,
stating the following case.

On the 4th of *December*, 1807, *Ezekiel Jones* made his will,
by which, after giving to his wife *Hannah* the improvement of
one-third of his dwelling-house, during her life, together with
the whole of his personal estate, and to each of his three
daughters, *Caroline, Lydia* and *Ethelinda,* the sum of 117
dollars, out of his estate, to make them equal with his daughter
*Hannah,* disposed of the remainder of his estate as follows :
" My other estate, being appraised according to law, one-fourth
of the same, as per inventory, shall be retained and holden in
the hands of my executors, who are hereby ordered and direct-
ed to pay over annually to my said daughter *Hannah* the inte-
rest of said fourth, during the minority of her children ; at the
expiration of which, said executors shall pay over said fourth, at
inventory price in money, into the hands of said children, as

soon as they shall come to full age, in equal proportion, who
shall thereupon obligate themselves to pay annually the interest
of such part as may fall to them, to their mother, during the
term of her life.   Further, my will is, that all my real estate,
consisting of lands, buildings, &c., not in this my will above
disposed of, shall be equally divided to and among my three
daughters, *Caroline, Lydia* and *Ethelinda*, to be to them, their
heirs and assigns forever."   The testator then appointed his
three sons-in-law, *William Chapman, Augustus Bushnell* and
*Benjamin Chapman,* to be his executors.

In *January* 1811, the testator died, leaving a large real
estate in *Saybrook*.   His wife had died previously ; but his
four daughters, *Caroline, Lydia, Ethelinda* and *Hannah* sur-
vived him.    *Hannah,* at the time of making the will, had three
children, *viz. Hannah, Jehiel* and *Enoch Judd ;* and has never
had any other children.

*William Chapman,* named as one of the executors, died
before the testator ; and *Benjamin Chapman,* named as ano-
ther, never accepted the trust or acted in that capacity.    *Au-
gustus Bushnell,* the only acting executor, after probate of the
will, caused an inventory to be made of the testator's real es-
tate, which amounted, by the appraisal, to 3903 dollars, 85 cents.
Soon afterwards, he disposed of a part of the real estate to pay
debts and expenses, and procured a distribution to be made of
the residue.    In this distribution, certain parts of the real es-
tate, valued at 852 dollars, 50 cents, were set to each of the
testator's daughters, except *Hannah,* to whom nothing was
distributed ; and what then remained of such estate, valued at
852 dollars, 50 cents, was set to *Augustus Bushnell* as executor.
In *January,* 1814, this executor sold and conveyed two of the
pieces of land set to him, one to *Ira Bushnell,* and the other to
*Daniel Griswold.*   In *August,* 1819, he, with his wife *Ethelin-
da,* mortgaged another parcel of such land to *Elisha Hart,* to
secure the payment of a note for 4500 dollars.   In *September,*
1819, he mortgaged another parcel to *Ira Bushnell* and *Ira
Bushnell,* jun. to secure the payment of certain notes due to
them, amounting to about 400 dollars.   All these conveyances
were made, by *Augustus Bushnell,* in his private and individ-
ual capacity, and for his own benefit exclusively, and not as
executor or trustee : which was well known to the several
grantees, when they took their respective conveyances. They
also knew, that the lands so conveyed to them, were not the

*Middlesex,* lands of *Augustus Bushnell,* and that he had no interest in July, 1828. them, and had no right or authority whatever to convey them ;

Judd
*v.*
Bushnell.

and that he never had any intention of paying over the avails of the lands to those to whom the lands belonged.

*Hannah Judd,* jun. became twenty-one years of age, on the 1st of *January* 1818 ; and *Augustus Bushnell,* soon afterwards, paid her her share of her grandfather's estate. *Jehiel Judd* became of full age, in *January,* 1821, and *Enoch,* in *September,* 1824, and were then entitled to receive their respective shares ; previous to which, *viz.* in *August,* 1819, *Bushnell* became wholly insolvent, and has never paid, or been able to pay them, or either of them, any part of the property devised to them. The interest due to the testator's daughter, *Hannah,* on the property devised to her, was also unpaid.

The bill was brought by *Hannah Judd* and her two sons, *Jehiel* and *Enoch,* praying that the conveyances above stated may be set aside, and the grantees compelled to account for the rents and profits ; and that the executor may be removed, and some suitable person appointed in his place, with power to sell the real estate in question, and from the avails thereof, to satisfy the just claims of the plaintiffs.

The bill averred, that the shares of the plaintiffs, including principal and interest, amounted to 700 dollars ; and that they were without adequate remedy at law.

*Augustus Bushnell, Elisha Hart, Daniel Griswold, Ira Bushnell* and *Ira Bushnell,* jun. were made parties defendants.

To this bill there was a demurrer ; and the case was thereupon reserved for the advice of this Court.

*N. Smith* and *Sherman,* in support of the demurrer, contended, 1. That the plaintiffs could not join in this bill, for want of a joint interest in the subject matter. On the contrary, the interests of *Hannah Judd,* the mother, and of her sons, are perfectly distinct. She is the only person interested in the income of the property in question, until the children come of age ; and such income belongs to her absolutely. When the children come of age, they are entitled to the property ; and of course, they do not need a trustee ; but their rights are several. They then become severally obliged to pay the interest to the mother, during her life. They have, or may have, conflicting interests ; but they have not, and cannot have, any joint interest.

2. That the defendants are not jointly responsible. They are not joint grantees ; and have no joint interest. The conveyances made by *A. Bushnell*, were to different individuals, of separate and distinct portions of the estate. The plaintiffs claim, that each of these conveyances, taken by *itself*, is void ; and the bill seeks to recover the rents and profits from each separately.

3. That there is no allegation in the bill, that will give the superior court jurisdiction of the suit. The land is not averred to be of greater value than 335 dollars.

4. That if the bill has merits, the plaintiffs have adequate remedy at law. *A. Bushnell* is liable, *as executor,* to pay the money sought by the bill ; and it makes no difference that he is insolvent ; for the court can judicially perceive, that he has sufficient surety.

5. That a devise, where the devisee is onerated with a payment or charge, is construed an estate in fee ; and that *A. Bushnell*, therefore, took a fee in the lands distributed to him, though they were not given to him and *his heirs.* *Reed* v. *Halton,* 2 *Mod.* 25. *Collier's* case, 6 *Rep* 16. S. C. *Walker* v. *Collier, Cro. Eliz.* 379. *Smith* v. *Tyndal,* 2 *Salk.* 685. *Com. Dig. tit* Estates by Devise. N. 4. *Hawker* v. *Buckland,* 2 *Vern* 106. In the case before the court, the word *paying,* &c. does not occur, nor any word of *condition.* Therefore, the obligation of the executor to pay *Hannah Judd* and her children, was personal, and his title in the land *not conditional,* but *absolute.* The questions arising in very many cases, whether creditors and legatees can follow the assets into the hands of a purchaser, cannot arise here. The land is *not assets,* but the *absolute estate* of the executor. But if the question could arise, these plaintiffs cannot make it ; as an executor may always sell, and the assets cannot be followed, " in any case whatsoever," by *general* legatees. The right of calling on the purchaser is confined, exclusively, to *creditors* and *specific* legatees. 1 *Madd. Chan.* 228. (*N. Y.* ed. 1817.) *Maddock* says *pecuniary* ; but he means only those pecuniary, which are also specific, as all general legatees are expressly excluded. To shew that not even creditors, nor specific legatees, can come against the purchasers in this case, see *Whale* v. *Booth,* 4 *Term Rep.* 625. n. *Nugent* v. *Giffard* & al. 1 *Atk.* 463. *Mead* v. Lord *Orrery* & al. 3 *Atk.* 235. *Ewer* v. *Corbet,* 2 *P. Wms.* 148.

*Middlesex,*
*July, 1828.*

Judd
*v.*
Bushnell.

*Hungerford* and *Waite,* contra, contended, 1  That the suit was properly brought with respect to the parties.   The subject matter of the suit is one fourth part of the testator's estate, which was to be retained by the executors, and ultimately disposed of according to the directions of the will.   The controversy is with respect to the disposition of this fund.   It is propper, that the persons claiming this fund should unite in calling for it ; and that all the persons holding it, or interested to defeat the claim of the plaintiffs, should be brought before the court as defendants.   This was done in *Lupton* & al. v. *Lupton* & al. 2 *Johns. Chan. Rep.* 614.

2. That the case, as it appears on the face of the bill, is within the jurisdiction of the superior court.   The claim of the plaintiffs is for *money,* to which they say they are entitled under the will ; and the bill avers, that the sum to which they are so entitled, amounts to 700 dollars.   Further, the matter or thing in demand, in this suit, is the appraised value of the estate claimed by the executor ; which the bill avers to be 852 dollars, 50 cents.

3. That the plaintiffs have not adequate remedy at law.   In the first place, if they were to proceed at law, they could not get satisfaction ; for the executor is insolvent, and it does not appear, that he has any responsible surety.   But in the next place, a court of law could not render a judgment, which would do justice either to the plaintiffs, or to the defendants, as between themselves respectively.

4. That the several conveyances, by *Augustus Bushnell,* of the estate devised, by the testator, for the benefit of the plaintiffs, are invalid.

First, the estate thus devised was a *conditional* estate, and not an absolute estate in fee.   The payment of the several sums given by the will to the plaintiffs, was a condition annexed to the devise ; and upon the failure of the devisees to pay these sums, when they became due, they forfeited at law all their interest in the property devised.   *Wheeler* & ux. v. *Walker,* 2 *Conn. Rep.* 196.   *Co. Litt.* 236.*b.*   *Farr* & al. v. *Newman* & al. 4 *Term Rep.* 621.

Secondly, the devise was made to three persons, and only one has attempted to convey.   The most that he could do, if the devisees took a fee, would be to convey one undivided third part of the whole.   *Treadwell* & al. v. *Bulkley* & al. 4 *Day* 395.   1 *Swift's Dig.* 137.

Thirdly, *A. Bushnell* has not even conveyed an undivided share ; but has given to different persons separate deeds of distinct parts of the property ; a mode of conveyance unauthorized by law. *Hinman* v. *Leavenworth*, 2 *Conn. Rep.* 244. n. *Starr* v. *Leavitt*, 2 *Conn. Rep.* 243. *Mitchell* v. *Hazen*, 4 *Conn. Rep.* 495. *Griswold* v. *Johnson*, 5 *Conn. Rep.* 363.

Fourthly, if the executors, as such, had an implied authority, by the will, to sell, still the conveyances are not good, because they were not made by *Bushnell*, *as executor*, but in his *private* and *individual* capacity.

Fifthly, if the devise was to the executors in trust, the conveyances, nevertheless, are not good, because they were made in violation of that trust ; and of this the purchasers had notice. 2 *Swift's Dig.* 114. 115. 118. *Brown* v. *Higgs*, 8 *Ves.* 574.

**DAGGETT, J.** The general question presented is as to the sufficiency of the bill. To this four grounds of demurrer are relied on.

1. It is not alleged, that the superior court, to which the bill was brought, had jurisdiction. This depends on the allegations in the bill, tested by the 10th sect. of the act, *Title* 21. *Courts.* " The superior court shall have jurisdiction of all suits for relief in equity, wherein the value of the matter or thing in demand exceeds the sum of 335 dollars." The object of the bill is to obtain from the defendants certain sums of money alleged to be due to the plaintiffs from the defendants, under the will of *Ezekiel Jones.* They allege, " that their shares amount, with principal and interest, to the sum of 700 dollars, and that they are without any adequate remedy at law." It is difficult to see the force of this objection, when compared with the above recited allegation. Is not the value of the matter or thing in demand more than 335 dollars ? In *Pitkin* v. *Flowers*, 2 *Root*, 42. and in *Newtown* v. *Danbury*, 3 *Conn. Rep.* 553. it was decided, that if the value of the matter or thing in demand is averred in the bill in a suit in chancery, or in the declaration in an action at law, to be of the requisite amount, this is sufficient to give the court jurisdiction, though the value proved on trial should not be of that amount.

It is said, however, that, in *Griswold* v. *Mather*, 5 *Conn. Rep.* 435. this court held, that " on a bill in chancery for the conveyance of the legal title to mortgaged premises, the jurisdic-

*Middlesex,* tion of the court is determined by the value of such premises;"
July, 1828. and that the same doctrine prevailed in *Watson* & al. v. *Wells,*

Judd
*v.*
Bushnell.

5 *Conn. Rep.* 469. in a suit " for confirmation of a defective title under a mortgage deed." The principle established, in those cases, does not bear at all upon the point now under consideration, because it was very properly admitted in argument, and has not been denied, by any member of the court, that whatever estate *Augustus Bushnell* took under the will, *if it was a conditional or trust estate,* (the great question on the demurrer,) he was bound to pay the plaintiffs the apprized value of the estate devised; and this apprized value is averred in the bill to be 652 dollars, 50 cents. As then, by the concession of all parties, if the bill has merits, the plaintiffs are entitled, under the will, to more than 335 dollars, and have so expressly alleged, the supreme court had jurisdiction; and this objection, therefore, is without force.

2. The defendants insist, that the plaintiffs have remedy at law, if there be any remedy. This remedy, it is said, is on the bond given by *Bushnell,* as executor, to the judge of probate. Waiving the question whether a bond could furnish the remedy sought, or adequate remedy, it does not appear, that any bond was given; but it is averred, that *Augustus Bushnell* was and is insolvent. Moreover, if the views of the plaintiffs are correct, that the estate devised may be followed into the hands of the purchasers with notice, then a court of law could furnish no adequate or proper remedy; for the defendants, the purchasers under *Augustus Bushnell,* must either satisfy the claims of the plaintiffs in proportion to their interest in the land purchased, or surrender it to the plaintiffs as sought in the bill; and, in either case, a court of chancery alone could do justice to the parties.

3. It is objected, that here is a misjoinder of parties plaintiffs, and also of parties defendants. This again depends entirely on the principal question, what estate did *A. Bushnell* take under the will ? If it be an estate in trust, or upon condition that he should pay the plaintiffs that to which they are entitled under the will ; and if these purchasers are to be affected by that trust or condition ; then the objection vanishes. This opens to us the question on which the sufficiency of the bill must turn, *viz.*

4. What estate did *Augustus Bushnell* take under the will of *Ezekiel Jones ?* Three executors are named as devisees of

certain lands of the testator, about which the question arises. One of them died before the testator, *viz. William Chapman.* Another, *Benjamin Chapman,* resided abroad, and has never accepted the trust or acted under the will. *Augustus Bushnell* alone assumed the trust imposed. These being the facts, the counsel for the plaintiffs contend, that *Augustus Bushnell* took only *one* undivided third part of the lands devised agreeably to the doctrine of the Court of Errors in *Treadwell* v. *Bulkley,* 4 *Day* 395. and therefore, they urge, that *Bushnell* could convey nothing in severalty, according to the case of *Griswold* v. *Johnson,* 5 *Conn. Rep.* 363. On this part of the case, an idea has been suggested, which, perhaps, removes any supposed difficulty from that source. It appears on the bill, that the whole land devised by the will to the three executors, has been, by a decree of the court of probate, distributed to *Augustus Bushnell,* and the decree remains in force. Can then this court collaterally regard it otherwise ? Must not that decree be revised, if at all, on an appeal to the superior court, according to the provisions of the statute in relation to decrees of the court of probate ? As the question may be decided without reference to the idea thus suggested, a further consideration of it is waived.

Considering the cause to depend on the same question as though *Augustus Bushnell* were the sole devisee, I enquire what estate did he take ? The rule is undoubted, that if a person gives lands to another by will, with a direction that the devisee shall pay a gross sum out of it, the devisee will take an estate in fee, without any other words. Though the rule is generally applied to questions whether the devisee take an estate in fee or for life, yet it governs in this case. The operative words of the will on this point, are : " And after the foregoing disposition, my other estate, being appraised according to law, one fourth of the same, as *per* inventory, shall be retained and holden in the hands of my executors, who are hereby ordered and directed to pay over annually to my said daughter *Hannah,* the interest of said fourth, during the minority of her children, at the expiration of which, said executors shall pay over said fourth, at inventory prices, in money, into the hands of said children, as soon as they shall come to full age, in equal proportion ; who shall, thereupon, obligate themselves to pay annually the interest of such part as may fall to them, to their mother, during the term of her natural life." As then the de-

*Middlesex,*
July, 1828.

Judd
*v.*
Bushnell.

visees were to pay a gross sum in money, to be ascertained by an appraisal of the land, an estate in fee was given.   6 *Cruise's Dig.* 253.

But was the estate conditional or absolute ?   If the former, it may be pursued into the hands of *bona fide* purchasers with notice.   If the latter, the conveyances were good, and *Augustus Bushnell* was only liable personally to the plaintiffs.   It seems, the testator had four daughters, *Caroline, Lydia, Ethelinda* and *Hannah.*   The first provision of the will in relation to these, his only children, is, that the three former daughters were to receive 117 dollars each, to make them equal to *Hannah.*   Then he directs, that one fourth of his estate shall be holden, by the executors, to pay, in manner above stated, to *Hannah,* the other daughter, and her children.   One of these children, *viz. Hannah,* has received her share under the will. The other two children, *Jehiel* and *Enoch,* with their mother, *Hannah,* are the plaintiffs.   The other three daughters were the wives of the three persons named as executors, and to whom all the rest of his estate was given.   The object of the testator is apparent ; he intended to make all his children equal sharers in his estate ; but in relation to *Hannah,* who had three children, her share was limited to her life, and was then to belong to her children.

The will also shows an intention, that the fourth part devised to the executors, for the benefit of *Hannah* and her children, should be retained, and holden by the executors for that purpose ; and by the rules of law, this intention is to govern.   In the case of *Wheeler* v. *Walker,* 2 *Conn. Rep.* 196. the doctrine on this subject of a conditional fee, devised by will, was fully considered by the court.   " The words, which constitute a condition, may be various.   In particular words there is no magic."   The words, *paying, to pay, so that he pay,* constitute a condition.   The words used by the testator, in this will, are, the fourth part " shall be retained and holden in the hands of my executors, who are hereby ordered and directed to pay," &c.   Again, " said executors shall pay over," &c.   Had the devise of the lands been to them, *to pay,* or *they paying,* or *so that they pay,* or *they paying thereout,* or *to pay thereout,* there could be no doubt.   It seems to me, that the words here used, taken with the context, are equally strong to show a condition.   But let us look at other cases.   In *Jackson* d. *Townsend* v. *Bull,* 10 *Johns. Rep.* 151.   *Kent,* C. J., says : " When

the charge is on the person, the devisee takes the estate, *on* *Middlesex,* *condition of paying the charge ;* and if he die in the life-time of the testator, the charge ceases ; and if he refuse to accept and perform, the devise is void, and the heir may enter." In *Glen* & ux. v. *Fisher,* 6 *Johns. Ch Rep.* 33, 35. the Chancellor recognizes the doctrine, and adds : "He, who accepts a benefit under a will, must *conform to all its provisions,* and renounce every right inconsistent with them." In *Jackson* d. *Ruggles* v. *Martin,* 18 *Johns. Rep.* 31. 35. Ch. J. *Spencer* quotes the decision in 10 *Johns. Rep.* with approbation. In *Cowper* 841., in the latter part of the case of *Doe* v *Fylder,* Lord *Mansfield* observed, that in the cases in which a fee is inferred, because the devisee was charged with the payment of a gross sum, " the doctrine began when the modification of uses was by the way of condition ; and charging a devisee with the payment of a gross sum, was looked upon as a condition, the non-performance of which, amounted to a forfeiture of the estate : The direction was to pay a sum of money by way of condition, and the heir enters for condition broken."

But another difficulty occurs upon the construction, contended for, by the counsel for the defendants. If the charge be not on these executors *in respect of the estate in their hands,* they take only a life-estate. Such is the doctrine of Chancellor *Kent,* in 10 *Johns. Rep.* 157. and 6 *Johns. Ch. Rep.* 33. before cited ; also in 4 *East* 496. 5 *East* 87.

In view of these authorities and the will in question, I am satisfied, that the estate devised is a fee, upon the condition that the devisees performed the directions of the testator in relation to *Hannah* and her children ; and that it is within the power of a court of equity to compel such performance against the executor *Bushnell,* and purchasers with notice ; and, therefore, the demurrer must be overruled, and the bill holden sufficient.

PETERS and LANMAN, Js. were of the same opinion.

HOSMER, Ch. J. dissented.

BRAINARD, J. was absent.

Demurrer overruled.

*Middlesex,*
July, 1828.

Judd
*v.*
Bushnell.

STOW and others *against* WYSE.

To render the vote of an incorporated company valid **as** the **act** of the cor-
poration, the meeting at which it was passed, must have been warned, in
the mode prescribed by the charter or by-laws, or, in the absence of any such
provision, by personal notice to the members.

The general agent of a manufacturing company is not authorized, without a
special power, to transfer, by deed, the real estate of the company.

A party who has executed a deed, is thereby estopped from disputing not only
the deed itself, but every fact which it recites.

Therefore, where a person executed a deed in behalf of a manufacturing
company, and therein declared, that he was empowered, by a vote of the
company, to execute such deed ; it was held, that he was thereby estopped
to deny that he was thus empowered.

All persons claiming under and through the party estopped by a deed, are
bound by the estoppel.

THIS was an action of trespass *quare clausum fregit ;* tried,
on the general issue, at *Middletown, February* term, 1828, be-
fore *Daggett,* J.

It was admitted, that the defendant entered on the premi-
ses, in *May,* 1825, the time specified in the declaration, and con-
tinued in the possession and occupation thereof until the com-
mencement of this suit, claiming right as the tenant of the *Mid-
dletown Bank ;* and the only question was, whether the plain-
tiffs had title to the land, or whether it was in the *Middletown
Bank.* The title of the bank was derived from a mortgage
deed of the *Middletown Manufacturing Company,* dated the
29th of *March,* 1817, to the bank. The title of the plaintiffs
was derived from a mortgage deed, executed by *Arthur W.
Magill,* some years afterwards. *Magill's* title was acquired,
by the regular levy of an execution in his favour against the
*Middletown Manufacturing Company* subsequent to the exe-
cution of the deed to the bank. The *Middletown Manufac-
turing Company* were the undisputed owners of the land
prior to and until their deed of the 29th of *March,* 1817,
above mentioned. That deed was given to the *Middletown
Bank,* by *Arthur W. Magill,* as agent for the *Middletown
Manufacturing Company.* It begins thus : " I, *Arthur W. Ma-
gill,* of the town of *Middletown,* agent for the *Middletown
Manufacturing Company* of said town, being empowered, by a
vote of said company, in pursuance of said power," &c. It
contains the usual covenants of seisin and warranty, thus ex-
pressed : "And I do hereby covenant for and in behalf of said
*Middletown Manufacturing Company,* with the said *President*

*Directors and Company of the Middletown Bank*, that at and until the ensealing of these presents, said *Manufacturing Company* are well seised of the premises, as a good indefeasible estate in fee simple, and have good right to bargain and sell the same ; and that the same is free from all incumbrances; and I do also hereby bind said *Manufacturing Company* to warrant and defend the above granted and bargained premises to the said *President, Directors and Company*, and their assigns, against all claims and demands whatsoever." The authority of *Magill* to execute the deed, was claimed, by virtue of a vote of the company, expressly giving such authority, in connexion with the admitted fact, that the directors, in *May*, 1816, regularly appointed him agent of the company for the year then ensuing, and that he had been agent, by virtue of like appointments, from that time until after the execution of the deed in question. The power of the directors to make such appointment, was derived from the following provision in the 6th section of the charter of incorporation : " The said directors for the time being, or a majority of them, shall have power to appoint such clerks, agents and servants as they judge necessary, and to agree with them, and allow such compensation for their services and labour as they judge reasonable." The vote of the company referred to describes the meeting at which it was passed, thus : "At a meeting of the *Middletown Manufacturing Company*, held at *Middletown*, the 29th of *March*, 1817. Present, the shares of *Thomas Barlow*, represented by *Alexander Wolcott*, being 14, and the shares of *Arthur W Magill*, being 14, and one share belonging to *Henry Wolcott*." The vote was in these words : " Voted, that *Arthur W. Magill*, agent for the company, be, and he hereby is, authorized and directed, for and in behalf of said company, to make, execute and deliver to the *President, Directors and Company of the Middletown Bank*, a good and valid mortgage deed, with warranty, of the real estate of said company, together with the steam engine and its appurtenances, as collateral security to said *President, Directors and Company*, for the payment, at such time as said agent may deem proper, of the debts due from said *Manufacturing Company* to said *President, Directors and Company*."

To shew that the mortgage deed to the *Middletown Bank* was void, the plaintiffs offered parol evidence, to prove, that the persons named in the vote of the 29th of *March*, 1817.

*Middlesex,*
July, 1828.

Stow
*v.*
Wyse.

*Middlesex,* convened and passed that vote, without any notice to the other
July, 1828. members of the *Manufacturing Company;* that the whole
stock of the company consisted of forty shares of 1000 dollars

Stow
*v.*
Wyse.

each; that the persons named in the vote as stockholders own-
ed respectively the number of shares therein stated, and
no more; and that the rest were owned by other persons,
several of whom resided in *Middletown.*

The plaintiffs prayed the court to instruct the jury, that if
they should find these facts proved, the deed given by *Magill*
to the *Middletown Bank,* was void. The defendant insisted,
that if all these facts were true, still the title of the *Middletown
Bank* was good; but he contended, that as the plaintiffs de-
rived their title from *Magill,* they were by law estopped from
shewing any of the facts by them set up in avoidance of *Ma-
gill's* deed; and that the title thereby purported to be convey-
ed to the *Middletown Bank,* was good against *Magill* and all
claiming under him.

The judge charged the jury, that the vote of the directors
appointing *Magill* agent, vested him with no power to mort-
gage the real estate of the *Manufacturing Company;* that if
no notice was given of a meeting of the stockholders, at the
time when the vote mentioned in the deed was passed, it was
not an act of the company, and was wholly void, and confer-
red no power on *Magill* to execute the deed; and that the
plaintiffs were not estopped from shewing these facts in avoid-
ance of the deed.(*a*)

The jury returned a verdict for the plaintiffs; and the de-
fendant moved for a new trial, for a misdirection.

*N. Smith* and *Sherman,* in support of the motion, contended,
1. That *Magill,* as the general agent of the company, had
power to mortgage the property in question. He had been
the general agent of the company, from the commencement of
its operations, and managed all its concerns. There is nothing
in the nature of *land* to exempt it from the scope of his agen-
cy. It will not be denied, that the corporation could borrow
money, and pledge its estate, real or personal, as security.
How is this to be done? Only by its agent. How are the
public to know what are the powers of the agent? If they
appear to be special, let the terms be examined; if general, the

(*a*) The last part of the charge was given merely, that the point might be
raised in this Court.

agent may do every thing in behalf of the corporation, which *Middlesex,* the corporation can do, so far as the right of the opposite party July, 1828. against the corporation, is concerned. According to modern decisions, not in strict accordance with the principles of the ancient common law, a corporation, like an individual, is responsible in the manner in which it permits its agent to hold it out to the world, and is bound, by the acts, which its agent does, under its eye. *Bulkley* & al. v. *The Derby Fishing Company,* 2 *Conn. Rep.* 252. Gross injustice would result from a different rule. *Magill,* as agent of the company, applies for a loan of money to carry on its business. The lender learns that he has general powers, and sees him managing the whole concerns of the company. He lets him have the money, and takes his security on the real estate of the company. Ought he not, in justice, to hold the security thus taken? Who ought to suffer,—if either,—the company, or the lender?

Stow
*v.*
Wyse.

2. That as *Magill* conveyed the premises, stating in his deed a power to convey, he is estopped from denying that power; and the plaintiffs, who claim under him, stand on the same ground. *Willoughby* v. *Brook, Cro. Eliz.* 756. *Strowd* v. *Willis, Cro. Eliz.* 362. *Fairtitle* d. *Mytton* & al. v. *Gilbert* & al. 2 *Term Rep.* 169. 171. *Jewett's* case, 1 *Roll. Rep.* 408. *Com. Dig. tit.* Estoppel. A. 2. *Palmer* v. *Ekins,* 2 *Stra.* 817. *Coe* v. *Talcott,* 5 *Day* 88. In the case last cited, it was held, that an administrator, afterwards coming in by title as heir, and also his assigns, were estopped from denying a title in a deed given by him as administrator, though of a right which he had not power to convey.

A writing estops in two ways; 1st, by the declaration of a fact; 2ndly, by a covenant, to prevent circuity of action. Here *Magill* is estopped on both grounds. He has declared the fact of his having power to convey; and he has rendered himself personally liable, if he had not the power.

That an estoppel is odious, does not mean that the law of estoppels ought to be abrogated, but that it is to be applied strictly—*i. e.* every thing necessary to constitute an estoppel, must appear on the writing. In such case, its effect is highly beneficial.

*Stanley* and *T. S. Williams,* contra, contended, 1. That the vote of the directors appointing *Magill* agent, and his acting in that capacity, did not empower him to convey the real es-

*Middlesex,* tate of the corporation. [On this point the counsel were
July, 1828. stopped by the court.]

Stow
*v.*
Wyse.

2. That the vote of the 29th of *March,* 1817, was not the act of the company, and invested *Magill* with no authority to execute the deed in question ; no notice of the meeting having been given to the stockholders. [This was conceded by the opposing counsel.]

3. That *Magill* was not estopped to say, that no title passed from the *Middletown Manufacturing Company* to the *Middletown Bank.* To make the doctrine of estoppel applicable to a conveyance of land, the person to be estopped must either be the grantor of the land, or he must bind himself personally, by the covenants. In this case, both the grant and the covenants were those of the company, and not *Magill's.* He did not profess to own the land, or attempt to transfer any title of his own. In his individual capacity, he entered into no covenant. He did not receive the consideration. He practised no fraud. He described himself as agent of the company ; and he was such. He referred to his special authority, by virtue of the vote of the 29th of *March,* 1817 ; but he did not covenant or, state, that the meeting was regularly and legally warned. He did not state the vote to be otherwise than it was. For its validity he was no more responsible than the clerk who recorded it. How then can he be estopped ? And if he is not so estopped, the plaintiffs are not.

Estoppels are odious, because they shut out the truth ; and they are never extended to cases, to which they are not clearly and strictly applicable. An indispensable requisite of an estoppel is, that it must be *reciprocal.* *Bradford* v. *Bradford,* 5 *Conn. Rep.* 127. 132. *Shep. Touch.* 277. *Brereton* v. *Evans, Cro. Eliz.* 700. Now, *Magill* could not, by estoppel, treat this as a valid deed. The defendant, then, cannot, by estoppel, make it a valid deed as against *Magill.*

DAGGETT, J. The plaintiffs, who claim under *A. W. Magill's* deed to them, allege, that no title passed, by the deed to the *Middletown Bank ;* for that *Magill* had no authority to bind the *Middletown Manufacturing Company,* and transfer the title. The deed is attempted to be supported, or rather *Magill's* power to make it, on two grounds. The first is the vote of the *Middletown Manufacturing Company,* passed on the 29th day of *March,* 1817, the day of the execution of the

deed, by which he was authorized to make a mortgage to the *Middlesex,*
bank of the premises.   On the other hand, it is insisted, that July, 1828.
the meeting was illegal, and the acts done void.   It is very
clear, that a meeting of the stockholders, constituted as this
was, could do no acts binding on the company.   Though a
meeting regularly warned, would be competent to do any act
within their chartered powers, by a bare majority ; yet if not
thus warned, their act must be void.   If no particular mode of
notifying the stockholders be provided, either in the charter or
in any by-law, yet personal notice might be given ; and this, in
such case, would be indispensable.   The counsel for the de-
fendant do not press this point ; and I think it quite untena-
ble.

The second ground taken in support of the power of *Magill*
to execute the deed, is, that he was the general agent of the
company.   It becomes necessary here to ascertain the extent
of his powers as agent.   By the 6th section of the act incorpo-
rating the *Middletown Manufacturing Company,* the directors
of the company were authorized to appoint such *clerks, agents*
and *servants* as they judge necessary.   *Magill,* when he made
the deed in question, was acting under an appointment made
by the directors of the company, on the 24th of *May,* 1816.   By
this act of the directors, and by this alone, his powers were
conferred.   It is not to be denied, that they are general ; but
still they must be limited, by the duties to be performed, and
the business to be transacted.   This is reasonable, and results
necessarily from the nature of the case, and is analogous to
powers conferred in all similar instances.   It was never
thought before, that a mere agent of a manufacturing company
was authorized to transfer, by deed, the real estate of the com-
pany.   It may be incidental to his power as agent to borrow
money, give promissory notes, and do many other acts, in the
ordinary course of the business of the company ; but the idea is
quite novel, that merely as agent, he might sell or convey the
real estate.   To effect such an object, a specific authority
seems indispensable ; nor is there any principle or precedent in
support of the power set up in this case.   The deed, therefore,
cannot be upheld on either of these grounds ; and thus far, the
charge is strictly correct.

Another position, however, is taken by the counsel for the
defendant, which is fatal to the plaintiffs' title.   *A. W. Magill*

Stow
*v.*
Wyse.

*Middlesex,*
*July, 1828.*

Stow
*v.*
Wyse.

is *estopped,* by his deed to the *Middletown Bank,* to allege that he was not authorized by the *Middletown Manufacturing Company* to convey; and if so, it is not doubted, that his grantees are estopped. On this point the judge charged the jury, *pro forma* merely, and to the end that the question might be settled in this court, and thus future litigation be prevented, that the plaintiffs might recover.

In looking into *Magill's* deed, it appears, that he begins it with a declaration, that he is the agent of the *Middletown Manufacturing Company,* authorized by vote of the company to execute the deed; and in pursuance of the power, he executes it, and, in behalf of the company, covenants, that they are well seised, and that they will warrant and defend the premises. There are high opinions, that if he was not authorized, he is personally bound by the covenants; and that an action might be maintained thereon against him; (*White* & al. v. *Skinner,* 13 *Johns. Rep.* 307. *Skinner* v. *Dayton* & al. 19 *Johns. Rep.* 513.) but waiving the consideration of a point not necessary to be decided, *A. W. Magill* is estopped, by the declaration and covenants in the deed, that he was authorized, ever to deny it. Without multiplying authorities on a point rendered clear by numerous cases, it is sufficient to state, that where a party has solemnly admitted a fact, by deed, under his hand and seal, he is estopped not only from disputing the deed itself, but every fact which it recites. 2 *Stark. Ev.* 30. 1 *Phill. Ev.* 410. *Huntington* v. *Havens,* 5 *Johns. Chan. Rep.* 26 Now, *Magill* has declared under his hand and seal, that he was empowered, by a vote of the company, to execute this deed. Can he ever say, that he was not thus empowered? If, on the next day after the deed to the bank was executed, he had procured a valid deed from the company, and had brought ejectment against the bank, could he have sustained it against the declarations in his deed? I think he must have been estopped. If so, then all persons claiming under and through him are estopped. 1 *Stark. Ev.* 305. *Hoyt* v. *Dimon,* 5 *Day* 483. 1 *Phill. Ev.* 10.

These principles are in entire accordance with the cases of *Fairtitle* d. *Mytton* & al. v. *Gilbert* & al. 2 *Term Rep.* 169. 171. *Palmer* v. *Ekins,* 2 *Stra.* 817. *Com. Dig, tit.* Estoppel. A. 1. 2. 3. and B.

There must, therefore, be a new trial.

The other Judges were of the same opinion, except BRAIN-
ARD, J., who was absent.

New trial to be granted.

———

FRANCIS *against* RAND :

#### IN ERROR.

A judgment in favour of *A.* against *B.* individually, and a judgment in favour
of a copartnership consisting of *B.* and *C.* against *A.*, are not mutual debts ;
and one cannot be set off against the other.

Nor in such case, will an assignment of one of the partner's interest in the
judgment to the other, enable the latter to set off that judgment against the
separate judgment, unless the separate creditor had notice of such assign-
ment, at the time of the commencement of the suit in which the set-off is
sought.

*Qu.* Whether an attorney has any lien on a judgment in favour of his client,
which can be interposed to prevent a set-off between his client and the
judgment debtor.

THIS was a bill in chancery, brought by *Daniel Rand*, against
*Francis*, for a set-off.

At the term of the superior court, in *February*, 1827, *Daniel,
Richard* and *Robert Rand*, partners in trade under the firm of
*R. & D. Rand & Co.*, recovered judgment, in an action of
book debt, against *Francis*, for the sum of 730 dollars, 25 cents.
At the same term, *Francis* recovered judgment, in an action
of trespass, against *Daniel Rand*, for 117 dollars, 56 cents.
*Robert Rand*, on the 8th of *March*, 1827, and *Richard Rand*,
on the 13th of *August*, 1827, assigned and transferred to *Dan-
iel Rand* all the right and interest, which they respectively had
in these judgments. *Francis*, at the time the judgments were
rendered, was, and ever since has been, insolvent and destitute
of property. The bill was brought on the 16th of *August*,
1827, both the judgments being then wholly unsatisfied.

The defendants demurred to the bill ; and the court over-
ruled the demurrer.

The defendant then stated in his answer, that the action of
trespass, on which the judgment in his favour against the pre-
sent plaintiff was rendered, was instituted and prosecuted by
his attorneys, *Roger M. Sherman* and *William Van Duersen*,

*Middlesex,*
July, 1828.

Francis
*v.*
Rand

Esqrs. ; and that to said *Sherman,* for his professional services in said cause, there was justly due from the defendant the sum of 70 dollars, and to said *Van Duersen,* for his professional services and disbursements, there was justly due from the defendant the sum of 50 dollars ; for which sums said *Sherman* and said *Van Duersen,* respectively, had a *lien* on said judgment.

To this answer the plaintiff demurred.

The court sustained the demurrer ; and passed the decree sought. On motion of the defendant, the record was then transmitted to t hisCourt for revision in error.

*Sherman,* for the plaintiff in error, contended, 1. That the judgment in favour of *Francis* against *Daniel Rand* alone, could not be set off against the joint debt of the *Rands* against *Francis.* A separate debt and a joint debt are not *mutual* debts ; and of course, one cannot be set off against the other. *Addis* v. *Knight,* 2 *Meriv.* 121. *Duncan* v. *Lyon,* 3 *Johns. Chan. Rep.* 351 *Dale* & al. v. *Cooke,* 4 *Johns. Chan. Rep.* 11 Ex parte *Hanson,* 18 *Ves.* 232. *Palmer* v. *Green,* 6 *Conn. Rep.* 14. 19. *Stat. Conn.* 43. The assignment by *Richard* and *Robert Rand,* of their interest in the judgment against *Francis,* after *Francis* had obtained his judgment against the *Rands,* made no difference. *Daniel Rand* could set off no debt claimed by assignment, which he could not otherwise set off, unless *Francis* had notice, at the commencement of his action, of such assignment. *Stat.* 44.

2. That attorneys have a lien on the judgment, for professional services in the suit, in which the judgment was obtained ; and that this lien is paramount to the claims of general creditors. *Mitchell* v. *Oldfield,* 4 *Term Rep.* 123. *Read* v. *Dupper,* 6 *Term Rep.* 361. *Randle* v. *Fuller,* 6 *Term Rep.* 456.

*Hungerford,* contra, insisted, 1. That it is not universally true, that joint and separate debts cannot be set off against each other. A set-off of such debts was allowed at law, in *Mitchell* v. *Oldfield,* 4 *Term Rep.* 123. ; and was declared to be admissible in chancery, in *Vulliamy* v. *Noble* & al. 3 *Meriv.* 618. If there may be any exception to the general rule, it would seem to be peculiarly proper, in a case, where the party seeking to set off a joint against a separate debt, is the sole owner of the joint debt. Why should there not be a set-off, in such case ? No one can be injured by it. And here it is not neces-

sary to insist on a right of set-off, by virtue of an assignment *Middlesex,* under the statute. It is within the general powers of a court *July, 1828.* of chancery to grant the relief sought. *Pond* v. *Smith,* & al. 4 *Conn. Rep.* 297. *Hathaway* v. *Russell,* 16 *Mass. Rep.* 473.

*Francis v. Rand.*

2. That the claim of lien interposed, is not sustainable. By a rule of the court of *King's Bench* in *England,* an attorney has a lien on the money recovered by his client, for his bill of costs; but this rule does not prevail in the *Common Pleas. Hall* v. *Ody,* 2 *Bos. & Pull.* 28. *Emden* v. *Darley,* 1 *New Rep.* 22. *Vaughan* v. *Davis,* 2 H. *Bla.* 440. In this state, it has been decided, that an attorney has no lien upon a judgment in favour of his client, which can prevent a set-off between his client and a third person. *Rumrill* v. *Huntington,* 5 *Day* 163. On general principles, an attorney has no superior equity.

HOSMER, Ch. J. I shall waive a decision of the question of lien made in this case, as being unnecessary, and confine my observations to the claim of set off.

By the statute, set-offs are allowed in the case of mutual debts only; and " no debt claimed by assignment shall be set off, unless the plaintiff had notice, at the time of the commencement of the action, that such debt was due to the defendant." *Stat.* 43, 4. The assignment to the plaintiff, of which the defendant had no such notice, must be laid out of the question, as having no effect in this case; and indeed, in the argument, no stress has been laid on this point.

The sole question is, whether a debt due from *Francis* to *Robert, Daniel* and *Richard Rand,* and a debt due from *Daniel Rand* to *Francis,* are mutual debts. The enquiry carries its own answer on the face of it. The debts are in no sense mutual. In *Palmer* v. *Green,* 6 *Conn. Rep.* 14. a joint and separate debt were adjudged not to be mutual debts, and that they could not be set off against each other; and that to authorize this proceeding, they must be necessarily due to and from the same persons, in the same capacity. In this case, the debt due from one individual to another individual is requested to be set off against a debt due from an individual to a mercantile company. This cannot be done, as was determined in the case before cited; and with that decision I am well satisfied.

The other Judges were of the same opinion, except BRAIN-ARD, J., who was absent.

Francis
v.
Rand.

Judgment reversed.

---

### WATROUS and others *against* CHALKER.

*A.* and *B.*, his wife, conveyed her land to *C.*, the daughter of *B.*, and wife of *D.*, by deed of gift; after which *A.* was committed to prison, on an execution in favour of *E.*, and held in close confinement. With a view to obtain his liberation, *C.* agreed with her husband *D.*, that if he would assume the debt to *E.*, by giving his note for the amount, she would pay it from the avails of the land so conveyed to her. *D.* gave his note accordingly, and *A.* was liberated from imprisonment. Immediately afterwards, *C.* died; and *D.*, having paid the note to *E.*, exhibited to the court of probate his claim for the money so paid, against the estate of *C.* Held, 1. that the agreement between *C.* and *D.*, having been executed on one part, was not within the statute of frauds and perjuries, and might be proved by parol; 2. that if *D.* had an equitable claim, which a court of chancery, on suitable process, with the parties in interest before it, could enforce, it was not competent to a court of probate to allow it; but 3. that the agreement, having been made by a feme covert with her husband, without benefit to her, was void, and could not be enforced anywhere.

THIS was an appeal from a decree of the court of probate, in the district of *Saybrook,* allowing the account of *Augustus Chalker,* administrator on the estate of his late wife, *Rhoda Chalker,* and ordering a sale of her real estate sufficient to pay the amount. The principal part of the account, and the only part excepted to, was for " cash paid on note to *Richard W. Hart,*—$424. 86."

On the 29th of *March,* 1819, *Elsie Watrous,* and her husband *Ambrose Watrous,* in her right, being seised and possessed of all the land owned by *Rhoda Chalker* at her death, conveyed it, by deed of gift in fee, to her; she being the daughter of *Elsie Watrous* by a former marriage, and then the wife of *Augustus Chalker.* At the time of this conveyance, *Ambrose Watrous* was involved in debt, particularly to *Richard W. Hart,* who caused him to be committed to prison on an execution for such debt, where he was kept in close confinement. *Rhoda,* being desirous of effecting the liberation of her father-in-law, offered her husband, that if he would assume the debt to *Hart,* by giving his note for the amount, she would pay it out of the land so conveyed to her, which should be

holden for this purpose, and he might, at any time, sell so much *Middlesex,* of it as should be necessary for the payment of the debt, and July, 1828. apply the avails to that use, and she would unite with him in the conveyance. This proposition was acceded to ; and accordingly, *Augustus Chalker* gave his note to *Hart,* who accepted it, and liberated *Watrous* from imprisonment. Shortly afterwards, and before there had been an opportunity of selling the land, *Rhoda* died suddenly, without issue, leaving the appellants and three others her heirs at law. *Hart* then enforced payment of the note against *Augustus Chalker,* who, being appointed administrator on the estate of his late wife, charged the sum paid in his administration account, constituting the item above specified. *Ambrose Watrous* and his wife, and the three heirs who did not join in the appeal, assented to the sale of the land, and the allowance of the claim.

The evidence adduced to prove the agreement above stated, was parol ; to the competency of which the appellants objected. They also insisted, that the agreement, if proved by written evidence, was void. The court sustained the objection ; rejected the evidence ; and reversed the decree of probate. *Chalker,* the administrator, moved for a new trial ; and the case was reserved for the consideration of this Court.

*Sherman* and *Waite,* in support of the motion, contended, 1. That it was the duty of the administrator and the court of probate to adjust and settle all *equitable,* as well as legal claims, against the estate of *Rhoda Chalker.*

2. That the claim in favour of *Augustus Chalker,* was an equitable claim against her estate. A feme covert may contract for the sale of her real estate ; and a court of equity will compel the execution of the contract. *Baker* v. *Child,* 2 *Vern.* 61. 1 *Madd. Chan.* 310. 378. (*N. Y.* ed. 1817.) 2 *Swift's Dig.* 127. & seq. *Livingston* v. *Livingston,* 2 *Johns. Chan. Rep.* 537. If the agreement was not void, the debt to *Hart* was an incumbrance on her estate.

3. That parol evidence was admissible and proper to prove the agreement. *Cady* v. *Cadwell,* 5 *Day* 67. *Clinton* v. *Hooper,* 1 *Ves.* jun. 173. 184.

*Hungerford,* contra, insisted, That the agreement claimed to have been made with *Rhoda Chalker,* was utterly void. In support of this position he urged the following considerations.

*Middlesex,*
July, 1828.

Watrous
*v.*
Chalker.

First, as she was a feme covert, at the time of making the agreement, it would be inconsistent with sound policy to give it effect.

Secondly, it was void by the statute relating to the alienation of real estate by a feme covert. *Stat.* 304. *Butler* v. *Buckingham,* 5 *Day* 492.

Thirdly, it was void by the rules of the common law, and cannot be enforced in chancery. *Dibble* v. *Hutton,* 1 *Day* 221. *Goodwin* v. *Goodwin,* 4 *Day* 343. *Butler* v. *Buckingham,* 5 *Day* 492.

Fourthly, if a court of chancery will, in any case, enforce the contract of a feme covert, in this state, it will be careful to see, that her rights are protected ; and in this case, there was no consideration beneficial to her.

HOSMER, Ch. J. I will first put out of the case certain questions made, arising on facts apparent on the motion, but subserving no purpose, except to encumber the record. It is said, that *Ambrose Watrous* and *Elsie* his wife, and likewise a part of the heirs of *Rhoda Chalker,* are desirous, that the relief granted by the court of probate should be established. The wishes or assent of these persons possess no weight bearing on the case before us. The heirs, who are favourably disposed to the administrator's claim, may, if they please, convey their parts of the estate in question to him ; and in respect of *Ambrose* and *Elsie,* they are strangers to the matter under discussion. Their donation of the land to *Rhoda,* the daughter-in-law of the former, invests them with no right over the donee or the estate given, either at law or in chancery.

I readily admit, that the statute of frauds and perjuries presents no embarrassment in the case. The contract, if such it may be called, has been executed on one part, and is not within the law. *Cady* & al. v. *Cadwell,* 5 *Day* 67. *Downey* v. *Hotchkiss,* 2 *Day* 225.

There are two questions in the case. First, had the court of probate any jurisdiction over the controverted enquiry concerning *Rhoda's* equitable obligation ? If not, the allowance to the administrator of the sum paid on the note to *Richard W. Hart,* was void. And secondly, do the facts shew any obligation on the deceased feme covert, which a court of chancery in this state will recognize and enforce ?

On the first enquiry I entertain no doubt. If the court of

probate was competent, without hearing the parties to be af- <span>*Middlesex,*</span>
fected, to decide the point of equitable obligation against the <span>July, 1828.</span>
deceased, and to allow the administrator the sum paid by him, <span>Watrous</span>
upon the ground of a supposed equitable right, it not only has <span>*v.*</span>
the extreme of chancery jurisdiction, but more than the ex- <span>Chalker.</span>
treme.    The dilemma in which the court was placed, of grant-
ing or refusing the administrator's claim, resulted from his vol-
untary and unauthorized act.    As administrator, he had no
authority to make payment of the promissory note of another
person than the deceased.    It was no debt or claim on the es-
tate ; and a court of chancery, on suitable process, with the
parties in interest before it, was the only tribunal that had cog-
nizance of the matter in question, or that could impart a reme-
dy adapted to the nature of the case.    The jurisdiction of a
court of probate is limited ; and it would be vain to search af-
ter usage, principle or analogy, to warrant its interposition for
the adjudication and settlement of the supposed equitable claim
against the heirs of the deceased.

In respect of the second enquiry, but few observations are
necessary.

I shall not enter into the chancery law of *Westminster-Hall,*
or in the surrounding states, because the occasion does not de-
mand it.    I will barely remark, that over the *separate estate*
of a feme covert, through the medium of a trustee, or of her
husband in that character, if no trustee is appointed, she is held
competent to deal with it as if she were a feme sole.    *Jaques v.
Methodist Episcopal Church,* 17 *Johns. Rep.* 548.    It has, like-
wise, been adjudged, that she may contract with her husband
for a transfer of property from him to her, if it be done *bona
fide* and for valuable consideration.    Lady *Arundell* v. *Phipps,*
10 *Ves.* 139. 145.    *Livingston* v. *Livingston,* 2 *Johns. Chan.
Rep.* 537.    No case, however, has been cited, nor am I aware
that any exists, enforcing against a feme covert an agreement
made with her husband, without either *value* or *benefit* to her-
self; and this I take to be the present case.    Prompted by
feeling, and under no legal or equitable obligation, the feme
requests her husband to give his promissory note, and to make
payment of it out of the avails of her land.    This is the whole
case ; and nothing parallel to it, so far as my information ex-
tends, is to be found in the determination of any court.

I now pass from a subject, which it is no part of my purpose
to discuss, and enquire what is the chancery law of *Connecti-
cut,* applicable to the case before us.

Middlesex,    *Butler* v. *Buckingham*, 5 *Day* 492. decided by this court, by
July, 1828.   the unanimous opinion of nine judges, is in point against the re-
--------      lief granted by the court of probate.   A feme covert, with the
Watrous      consent and approbation of her husband, agreed to sell a lot
v.           of land, for a valuable consideration ; and the consideration
Chalker.     paid, with the like consent, was appropriated to her separate
use.   The intended purchasers entered on the land, erected a
house and store, and were in the lawful possession for twenty
years.   Under these imposing circumstances, the court held
the agreement of the feme covert void, and that chancery
could give no relief   The case is long, and I shall not attempt
an abbreviation of its contents.   The principle established was
this ; that an agreement by a married woman, with the
assent of her husband, for the sale of real estate, and on valua-
ble consideration, is void in law, and that courts of equity will
never enforce such a contract against her.   Our statute de-
clares, expressly, that the estate of a feme covert shall not be
alienable, unless by deed, executed by her, and acknowledged ;
and that without her assent, evinced in this manner, all sales or
alienations of her land shall be, *ipso facto*, void.   *Stat.* 304. *tit.*
56. *sect.* 14.   The learned and able judge, who delivered the
opinion of the court, in the case last cited, said, most forcibly :
" All sales void, and all contracts for sales good !   No, this can-
not be.   If the sale of the estate, unless with the circumstan-
ces above mentioned, be void, every contract to sell at a future
day, must be equally void."   This reasoning, in my opinion, is
invincible.   This case has remained unquestioned to the pre-
sent time ; and in my opinion, the principle on which it was
determined, is unquestionable.   It goes the length of deciding
the one before us, and even beyond it.   If a contract by a mar-
ried woman, for valuable consideration, appropriated to her
use, is by law invalid, and not to be enforced in chancery, *a
fortiori* is an agreeement, without consideration, and without
benefit.

The determination of the judge at the circuit was, undoubt-
edly, correct ; and no new trial is advised to be granted.

The other Judges were of the same opinion, except BRAIN-
ARD, J., who was absent.

New trial not to be granted.

MITCHELL *against* KIRTLAND.

The acquisition of title by execution being a proceeding *in invitum*, the requisites of which are prescribed by positive law, in derogation of the common law, a strict compliance with these requisites is indispensable to a transfer of title.

An appraiser of the land levied on, in such proceeding, between whom and one of the parties the relation of landlord and tenant subsists, is not *indifferent*, within the meaning of the statute.

And if the appraiser, in such case, be agreed on and appointed by the parties, with knowledge of his situation, it will make no difference ; for the agreement of the parties cannot alter the law.

THIS was an action of ejectment for several pieces of land in *Saybrook* ; tried, on the general issue, at *Middletown, February* term, 1828, before *Daggett, J.*

The plaintiff was the owner in fee of the demanded premises until the 6th of *July*, 1824, when the *President, Directors and Company of the Eagle Bank* levied thereon an execution in their favour against the plaintiff ; and the defendant, who had the title of the *Eagle Bank,* entered under that levy and ousted the plaintiff, as alleged in the declaration. The levy was correct in point of form ; and but one objection was made to its validity. This was founded on the fact, that after each of the parties had appointed one appraiser, the third appraiser, appointed by the agreement and concurrent act of both parties, was the tenant of the debtor in the execution, the present plaintiff. This relation existed at the time of the appointment, and was then known to both the parties The officer who levied the execution certified in his return, that the appraisers were all indifferent freeholders of the town of *Saybrook.* The judge instructed the jury, that the levy was void ; and directed them to return a verdict for the plaintiff ; which they accordingly did. The defendant moved for a new trial, for a misdirection.

*Sherman* and *Ingham,* in support of the motion, contended, 1. That the appraiser in question was indifferent The relation of landlord and tenant does not ordinarily create any more bias on the mind, or induce any more partiality, than any other intercourse in business. Would the relation of principal and agent, or of vendor and vendee, or of creditor and debtor, disqualify an appraiser ? To render an appraiser indifferent, there must be either interest, or some relation of consanguinity or affinity.

2. That if there was a disqualification, it was waived, by the agreement of the parties. And here it is conceded, that no agreement of parties will dispense with the express requirements of a statute ; but the statute is silent as to what shall constitute indifference. In *Jesup* v. *Batterson*, 5 *Day* 368. 372. a levy, otherwise bad, was held good, in consequence of an *agreement* among the creditors, that each should take in proportion to his claim. In *Lee* & al. v. *Hinman*, 6 *Conn. Rep.* 165. a similar levy was held good, on the same ground. Jurors, equally with appraisers of land, are required by law to be indifferent ; but if it appears, that the party knew of the disqualification, and made no objection, the court will not set aside the verdict. The record in that case stands right. So it does in this ; and you cannot go out of the record to take an exception contrary to your agreement or acquiescence. It is a frequent practice to take a verdict, by consent of parties, from eleven jurors ; the record is made up in the usual manner ; and it has never been supposed, that it could be afterwards impeached.

*Hungerford*, contra, insisted, 1. That the statute directing the proceedings in the levy of an execution, must be strictly complied with. *Metcalf* v. *Gillet*, 5 *Conn. Rep.* 400    *Hobart* v. *Frisbie*, 5 *Conn. Rep.* 592.    *Mather* v. *Chapman*, 6 *Conn. Rep.* 54.

2. That the statute requires all the appraisers to be indifferent freeholders ; and a tenant is not indifferent, as between his landlord and a third person, within the meaning of the statute. *Stat.* 57. *tit.* 2. *s.* 76.    *Tweedy* v. *Picket*, 1 *Day* 109.    *Fox* v. *Hills*, 1 *Conn. Rep.* 295.

3. That the agreement of the parties in the appointment of an appraiser, cannot dispense with the requisites of the statute.

In the first place, the transfer of title is, by the statute, made to depend upon a compliance with all those requisites.

Secondly, the statute contemplates an appointment of one of three appraisers, by the mutual agreement of the parties, and, at the same time, expressly provides, that all three shall be indifferent.

Thirdly, the point has already been decided.    *Chapman* v. *Griffin*, 1 *Root* 196. recognized in *Metcalf* v. *Gillet*, 5 *Conn. Rep.* 403.

Fourthly, if the requisites of the statute could be waived, by an agreement between the parties, the interest of third persons, as subsequent attaching creditors, might be affected.

Fifthly, the title of the debtor cannot be transferred to the creditor, in part by a parol agreement, and in part by a pro- ceeding under the statute. *Metcalf* v. *Gillet,* 5 *Conn. Rep.* 400. 403.

PETERS, J. The acquisition of title by execution, is a proceeding *in invitum.* The requisites of its validity are prescribed by positive law. It is in derogation of the common law, and *stricti juris.* An omission, therefore, of a statute requisite, is fatal. *Hobart* v. *Frisbie,* 5 *Conn. Rep.* 592 *Parker* v. *Rule's* lessee, 9 *Cranch* 64. "It must not be forgotten," says the Chief Justice, in *Metcalf* v. *Gillet,* 5 *Conn. Rep.* 400. 403. "that the only way in which title can be acquired to land, by the levy of an execution, is by an observance of all the requisites of positive law."

The statute (*p.* 57.) provides, that real estate taken by execution, shall be appraised, by *indifferent* freeholders of the town where the lands lie ; and if not chosen and appointed by the parties, a justice of the peace of the same town, who by law may judge between them, shall appoint. Is a tenant of one of the parties an *indifferent* freeholder ? As a justice or juror, he could not judge between his landlord and another ; and it would be strange indeed, if a man could be an appraiser, who was not impartial enough to appoint one.

But, it is said, that the appraiser was agreed on and appointed by the parties, knowing his situation ; and *consensus tollit errorem.*

In *Chapman* v. *Griffin,* 1 *Root* 196. the plaintiff's title was by the levy of an execution. All the appraisers were agreed upon, by the creditor and debtor. But one of them did not belong to the town where the land lay. But the court said : "The statute is express, that the land shall be appraised, by freeholders of the same town ; and the agreement of the parties cannot alter the law." The authority of this case was recognized, by this Court, in *Metcalf* v. *Gillet,* 5 *Conn. Rep.* 400. 403.; and the Chief Justice, in expressing their opinion, said : "It was correctly adjudged ; and the determination was made on this invincible reason, that the statute is express." The same opinion was expressed, by Lord *Coke,* more than two centuries ago : "The agreement of the parties cannot make that good, which the law maketh void." *Co. Litt.* 51. *b.*

The legislature, in directing that the appraisers should be in-

*Middlesex,* different, must have intended, that there should not be such a
July, 1828. relation between them and the parties, as could bias their minds,
Mitchell and induce them to act with partiality. As the degree of re-
*v.*
Kirtland. lationship is not designated, it is reasonable to adopt the rule
prescribed by statute, *(p.* 148.) as to the cases in which judges
are disqualified to judge between the parties. As this compre-
hends the relationship of the appraiser in question, I think the
execution not duly levied; and that the decision at the circuit
was correct. Vid. *Fox* v. *Hills,* 1 *Conn. Rep.* 295.

LANMAN and DAGGETT, Js., were of the same opinion.

HOSMER, Ch. J., being related to one of the parties in inter-
est, gave no opinion.

BRAINARD, J. was absent.

New trial not to be granted.

———————

BULKLEY and others *against* DOLBEARE.

Though the action of trespass is founded on possession; yet the possession
may be constructive, and need not be actual.
The general property of trees, felled on land in the possession of a tenant for
years, after severance, is in the owner of the land.
Therefore, the owner of land, in the possession of such tenant, may main-
tain trespass *de bonis asportatis,* against a stranger, for the carrying away of
trees, after severance, felled, by the defendant, on such land.

THIS was an action of trespass, in two counts. The first
was trespass *quare clausum fregit,* alleging the cutting and
carrying away of a certain number of trees; the second was
trespass *de bonis asportatis,* alleging the taking and carrying
away of the timber and trees, being in the plaintiffs' possession,
on the land described in the first count.

The cause was tried at *New-London, October* term, 1827,
before *Brainard,* J.

The defendant claimed title to the *locus in quo,* first, by
grant, and secondly, by more than fifteen years adverse pos-
session. He further claimed, that at the time of the alleged
trespass, the plaintiffs were out of possession, and therefore
could not recover in this action. The plaintiffs claimed title

by grant; denied the adverse possession set up by the defend- <span style="float:right">*New-London,*<br>July, 1828.</span>
ant; and claimed to have been in possession. The lands de-
scribed in the grants under which the parties respectively <span style="float:right">Bulkley,<br>*v.*<br>Dolbeare.</span>
claimed, were contiguous; and the question depended on the
dividing line. The judge instructed the jury, that however
they might find the original line to have been; yet if they
should find, that the defendant and those under whom he claim-
ed, had been in the exclusive and uninterrupted possession of
the *locus in quo* for more than fifteen years, they must find the
defendant *not guilty.* The judge further instructed the jury,
that if they should find, that the plaintiffs were owners of the
premises; that they were, at that time, actually in possession,
themselves, or by tenants under them, subject to their direc-
tion and controul; and that the defendant had committed the
acts alleged; they must find for the plaintiffs. And although
they should find, that the plaintiffs were owners of the land, if
they were, at that time, out of possession, having parted with
possession for a limited and ascertained time, without restric-
tion, they could not maintain an action of trespass for cutting
and felling trees and timber on the premises, during that peri-
od; but if they should find, that the plaintiffs were owners of
the land, and that the defendant had carried away the timber
and trees, after they were severed from the soil, they must
find for the plaintiffs, notwithstanding a tenant under them,
and not under their direction and controul, was in possession.
Under this direction the jury returned a verdict for the plain-
tiffs; and the defendant moved for a new trial, for a misdirec-
tion.

*Isham,* in support of the motion, contended, 1. That it was
wholly immaterial whether the tenant in possession, was in for
a *limited time,* or not. If the plaintiffs were out, they could not
maintain trespass; and this was the only question that should
have been submitted on this part of the case.

2. That the latter part of the charge was incorrect.

First, if trees are cut on land not in possession of the owner,
and carried away as soon as cut, the cutting and asportation
being one continued act, the owner cannot recover in any
form of action. The charge makes no distinction; and the
jury might well understand they must find the defendant guil-
ty, if he carried them away at all.

But secondly, if the charge may be understood to mean,

that if the trees were cut at one time, and carried away at a different time, the owner could maintain trespass; this is not warranted by any adjudged case. In all such cases, the form of action has been trover. *Berry* v. *Heard*, Cro. Car. 242. *Lewis Bowles'* case, 11 Co. 82. *b.* *Farrant* v. *Thompson*, 5 *Barn. & Ald.* 836. (7 *Serg. & Lowb* 272.) To shew the difference between trespass and trover, *Ward* v. *Macauley* & al. 4 *Term Rep.* 489. was referred to.

Thirdly, the plaintiffs cannot maintain trespass, in this case, on the ground, that the interest of the tenants ceased, by the severance; for it does not appear but that the tenants were for life, without impeachment of waste. *Co. Litt.* 220. *a.* 11 *Co.* 82. *b.* Such lessee has right to the trees, the moment they are cut down; and therefore, he may have trespass or trover against a stranger. *Pyne* v. *Dor*, 1 *Term Rep.* 56.

*McCurdy*, contra.

Hosmer, Ch. J. I put out of consideration the objection, that trover is sustainable in the proposed case, as not bearing on the point of controversy. It is no legal consequence, because one species of action may be maintained, that therefore a different action cannot be supported. It frequently happens, that trespass, trover and *assumpsit* for money had and received may, either of them, be maintained, on the same facts, at the election of the party bringing the suit.

The case involved in the judge's charge, on which the jury were informed an action of trespass might be maintained, was merely this. *A.* has title to a farm, which he has leased for years to *B.*, or on which *B.* has entered with force and arms, claiming title; and *C.*, while *A.* is out of the actual possession, without licence, cuts down trees, and some time after the severance of them from the soil, conveys them away. There is no doubt that an action of trespass is sustainable by *A.*

The actual possession of the trees, in the supposed case, was not in the person occupying the land; and the enquiry is, who had the constructive possession of the property? The action of trespass is founded on possession; but the possession need not be actual; it is sufficient if it is constructive.

After the trees were severed, in whom was the general property?

The case depends, entirely, on the answer to this question.

It clearly was not in a disseisor, who entered by trespass. It is equally certain, that it was not in a tenant for years ; for as incident to his estate, although he has right to enjoy the benefit of the trees while standing, and to reasonable estovers ; yet when they are felled by another, he has no property in them. The general property of the trees, after severance, was, unquestionably, in the owner of the land ; in other words, in the plaintiffs. *Gordon* v. *Harper,* 7 *Term Rep.* 9. 11.

It is established law, that the person who has the general property in a personal chattel, may maintain trespass for the taking of it, by a stranger, although he never had the possession in fact ; for a general property in a personal chattel, draws to it a possession in law. *Bro. Abr. tit* Trespass. pl. 303. 341. *Latch* 214. 2 *Bulst.* 268. *Bac. Abr.* Trespass. C. 2. 3 *Stark. Ev.* 1439.

The principle is very clearly stated, in the case of *Putnam* v. *Wyley,* 8 *Johns. Rep.* 435., and with this comment upon it, by way of illustration ; that " a plaintiff must have such a right as to be entitled to reduce the goods to actual possession, when he pleases." Of consequence, if they, for a limited time, are in the possession of another, so that the plaintiff has only a reversionary interest, he cannot maintain trespass. *Smith &* al. v. *Milles,* 1 *Term Rep.* 475. *Ward* v. *Macauley,* 4 *Term Rep.* 489. *Gordon* v. *Harper,* 7 *Term Rep.* 9.

The case may be summed up in one proposition, and that is, that the plaintiff having the general property in the trees in question, which were not in the actual possession of any one, at the time of the trespass committed, the law invested him with a constructive possession, and with the right of maintaining trespass for the taking and carrying away of the property.

The cases cited by the defendant have no material bearing on the question before the court. They were enquiries under leases, and depended on the construction of contracts, entered into by the owner of the property in question. Vid. *Lewis Bowles'* case, 11 *Co.* 82 *b.*

The other Judges were of the same opinion.

New trial not to be granted.

BILLINGS and another *against* AVERY :

### IN ERROR.

A bond of recognizance by a party charged with a secret assault, to answer
    to the complaint, and abide the order of the court thereon, will be construed,
    in reference to the law and the subject matter, as requiring an abiding of
    the order of the court in relation to the damages, and as being substantially
    the same as if expressed in the words of the statute.

In a suit on such recognizance, it is no defence, that the bond was not called
    in court, provided the defendant voluntarily appeared and pleaded to the
    complaint.

But such appearance and pleading are not alone sufficient to discharge the
    bond.

A bond of recognizance, by a party charged with a secret assault, to answer
    to the complaint and pay the damages to be awarded, with a stipulation
    superadded *to keep the peace and be of good behaviour*, is altogether invalid.

THIS was a *scire-facias* on a bond of recognizance, entered
into, by *Stephen Billings* as principal, and *Gurdon Bill* as
surety, before *John Brewster*, Esq., a justice of the peace, in
pursuance of a judgment rendered by him, on a *qui tam* com-
plaint, exhibited by *Joseph S. Avery*, against *Billings*, for a se-
cret assault.    The condition of the recognizance was in these
words : " That if the said *Billings* shall appear personally be-
fore the county court to be holden on the first *Thursday* in
*March*, 1826, at *New-London*, in and for the county of *New-
London*, to answer to the complaint of *Joseph S. Avery* against
him the said *Billings*, for a secret assault made upon his body,
contrary to the form of the statute in such case made and pro-
vided, and shall abide the order of said court thereon, and in
the meantime keep the peace and be of good behaviour towards
all the good citizens of this state, and in particular towards the
said *Joseph S. Avery*, then this recognizance is to be void, and
otherwise to remain in full force."    *Billings* was tried before
the county court, at the term mentioned in the recognizance, and
was found guilty, and sentenced to pay *Avery* the sum of 50
dollars damages, and costs, and to the treasurer of the county
of *New-London* a fine of 50 dollars.    The *scire-facias* alleged
as a breach, that " *Billings* neglected and refused to appear
personally before said county court, according to the condition
of said recognizance to answer to said complaint, and abide the
order of said court thereon ; nor hath he ever paid the said
sums," &c.

The defendants pleaded, 1st, that *Billings* was detained in custody before the justice until, by the force and duress of such imprisonment, the defendants entered into and acknowledged the said bond of recognizance ; 2ndly, that at said term of said county court, *Billings* was not, at any time, called or required to appear in said court, or to abide the judgment of the same, nor was the defendant *Bill*, at any time called or required in said court there to have the body of said *Billings ;* but he, the said *Billings*, did appear before said court, and answer to said complaint, and did not avoid the execution of the judgment of the same. To these pleas the plaintiffs demurred ; and the court adjudged them insufficient, and rendered judgment for the plaintiff. On motion of the defendants, the record was transmitted to this court, for revision in error.

*Cleaveland* and *Strong*, for the plaintiffs in error, contended, 1. That the bond of recognizance, in this case, was void ; the justice not having authority by law to require such a bond. First, under the statute relating to secret assaults the justice had no power to require a bond *to keep the peace*. *Stat.* 407. Secondly, the bond required, by that statute, is *to pay the damages*, which may be awarded, by the final judgment. The bond taken was *to abide* the final judgment ; which imposes no obligation *to pay*, and is, therefore, materially variant from the one required by the statute

2 That to sustain an action on such a bond, it must have been *called* in the court below ; and the defendants' default of appearance must have been there entered of record. First, the forms of *scire-facias* on recognizance shew this. *Vose* v. *Deane*, 7 *Mass. Rep.* 280. *Commonwealth* v. *Downey*, 9 *Mass. Rep.* 520. *County Treasurer* v. *Burr* & al. 1 *Root* 392. Secondly, in *Waldo* v. *Spencer*, 4 *Conn. Rep.* 71. the record of the calling of the bond was amended. Why was this done, if it is not necessary to call the bond ? Thirdly, the practice has been to call bonds of recognizance for the appearance of the defendant. *Potter* v. *Kingsbury*, 4 *Day* 98. 1 *Chitt. Crim. Law* 106. (*Lond* ed.)

3. That the pleadings show a compliance with the condition of the bond. The record shows, that *Billings* appeared and answered to the complaint ; and having appeared, he is presumed to continue to appear until the contrary is shewn. The plea further shews, that he did not avoid the execution of the judgment.

Billings
*v.*
Avery.

*Goddard* and *Child*, for the defendant in error, contended, 1. That this bond is, in substance, such an one as is authorized by the statute. The engagement of the defendants that *Billings* should abide the order of the court thereon—*i. e.* on the complaint of the plaintiff—implies no more than an engagement to pay all such damages as should be awarded against him, by the final judgment of the court.

2. That if the defendants have bound themselves to do what the statute requires *and something more*, the whole bond is not, therefore, void. To an obligation, which the statute requires of the defendants, they have superadded an obligation to do—not an unlawful act—but what it is their duty to do. If the latter part of the obligation cannot be enforced, still it does not impair the validity of the former part. Further, such a bond as this has been sanctioned by the court. *Waldo* v. *Spencer*, 4 *Conn. Rep.* 71. *County Treasurer* v. *Burr* & al. 1 *Root* 392.

3. That the plaintiff was under no obligation to call the defendants in court. The defendants were, indeed, bound to come, without being called. But our complaint is—not that they did not come—but that they did not *pay.*

Hosmer, Ch. J. The court having come to a determination that the recognizance in question is void, for a reason that will be stated hereafter, I shall therefore transiently pass over the other objections in the case.

The statute ( *p.* 407.) requires, that the party assaulting shall recognize with surety, to answer to the complaint for secret assault, and pay all such damages as shall be awarded against him. The bond now in question obliges the party to answer to the complaint, and abide the order of the court thereon. Construing this contract in reference to the law and the subject matter, it requires an abiding of the order of the court in relation to the damages, and is substantially the same, as if it was taken in the words of the statute.

To the objection made, that the bond was not *called*, the appearance of the defendant *Billings* and pleading, which the record shows, is a sufficient answer. The object of calling the bond, is to enforce an appearance ; and when the party voluntarily appeared, and was permitted to plead, without objection, the calling of him was quite unnecessary.

By the appearance, however, the condition of the bond was

not discharged.    The recognizance stipulates  not only for an
appearance, but for abiding  the judgment ; and  the former  is
no extinguishment of the  latter.    Thus far no  legal objection
is perceived.

But the taking  of a recognizance that *Billings*  should keep
the peace and be  of good  behaviour, unquestionably, was  an
error, and the stipulation  is a nullity.    On a different  process,
such bond might have been taken, but not in the  case  before
the court.

The  bond  of recognizance being in part legal, and in  part
unauthorized,  what is the  consequence ?    It is altogether in-
valid.    A bond void in part, by being against the positive pro-
visions of a statute, is void *in toto*.    *Norton* v. *Simmes, Hob.*
12. 14.    *Maleverer* v. *Redshaw,* 1 *Mod.* 35.    *Collins* v. *Blan-
tern,* 2 *Wils.* 347. 351.    *Hyslop*  v.  *Clarke* & al. 14 *Johns.
Rep.* 458.    *Austin* & al. v. *Bell,* 20 *Johns. Rep* 442.    Even
at common  law, it is the  better opinion, that  such contract is
utterly void.    *Fermor's* case, 3 *Co.* 78.    *Wimbish* v. *Tailbois,*
1 *Plowd.* 54.    At the same time, it must be admitted, that on
this point the authorities do not  harmonize.    But in respect of
a bond taken against the provisions of a statute, there is no di-
versity of opinion.

Now, in the  case  before us, the  statute directs what bond
shall be taken, and implies a prohibition of every other species
of recognizance.    It is no unreasonable principle, but one oft-
en recognized, that if persons will mix in  a contract good  and
evil together, or right and wrong, courts will not make a  sepa-
ration, but will consider the  whole as incurably tainted.

The other Judges were of the same opinion.

Judgment to be reversed.

*New-London,
July, 1828,*

Billings
*v.*
Avery.

### Ely *against* Peck.

The state courts have no jurisdiction of suits arising on the penal laws of the
    *United States ;* nor can such jurisdiction  be conferred  upon  them, by an
    act of Congress.

Therefore, an action by the owner of  a vessel, against a seaman, on the act  of
    Congress for the government and regulation of seamen  in the  meachants'
    service, to recover the penalty inflicted by that act for  desertion, cannot be
    sustained in the courts of  this state.

*New-London,* The mate of a vessel is not "a seaman or mariner" within the act of Con-
July, 1828.      gress for the government and regulation of seamen in the merchants' serv-
                 ice, nor subject to the penalties inflicted by that act for desertion.
Ely
*v.*             A declaration, in shipping articles, of a voyage from *New-London to Oporto*
Peck.               *and elsewhere,* means a voyage from *New-London* to *Oporto ;* and the word
                    *elsewhere* is to be rejected as being void for uncertainty.

THIS was an action brought on a statute law of the *United
States,* entitled " an act for the government and regulation of
seamen in the merchants' service," to recover the damages,
which the plaintiff, as owner of the schooner *Defiance,* had
sustained, by the desertion of the defendant.   The declaration,
after reciting a part of the 5th section of the act referred to,
stated, That on the 1st of *June,* 1825, the plaintiff hired of
the owners the schooner *Defiance,* for a voyage from *New-
London* to *Oporto* in *Portugal* and elsewhere, by virtue of a
contract of charter-party executed by them and himself ; and
under such contract, he took possession of her, and had her in
his sole possession and under his sole command, until the 18th
of *May,* 1826, when the voyage ended : That the plaintiff, by
the terms of the hiring, was to use, man and victual the schoon-
er, at his own expense, and allow the owners one half of her
earnings, and retain the other half to himself :   That in the
month of *July,* 1825, the plaintiff, being thus the charterer,
and about to be the master, for the voyage above specified, en-
tered in a contract with the defendant as mate, and with others
as crew, on board this vessel ; and the plaintiff, as master, and
the defendant, as mate, signed the *shipping articles,* printed in
the usual form, by which the defendant agreed to perform
said voyage from *New-London* to *Oporto* and elsewhere, as
mate of said vessel for said voyage, for which services, instead
of monthly wages, the defendant was to receive one fourth
part of the freight earned in the voyage : That on the 1st of
*August,* 1825, the plaintiff and defendant sailed in said vessel,
from *New-London,* on said voyage, and under said contract,
and proceeded to *Oporto,* and thence to *Liverpool* in *England ;*
and while at *Liverpool,* while she was preparing to proceed to
*St. Michael's,* one of the *Western Isles,* the defendant absent-
ed himself from said schooner, and deserted therefrom, and
ever afterwards continued absent, and neglected and refused
to do duty on board ; in consequence of which, the schooner
was detained at *Liverpool* until the plaintiff could procure
another mate to perform the voyage : That the plaintiff, after-

wards, at great trouble and expense, procured another mate, in the room of the defendant, and then proceeded to *St. Michael's* and back to *Liverpool,* and again from *Liverpool* to *St. Michael's,* and thence to *New-York,* where the voyage terminated.

*New-London,
July, 1828.*

Ely
*v.*
Peck.

To this declaration the defendant demurred ; and the case, by agreement of parties, was reserved for the advice of this Court.

*Waite* and *Rockwell,* in support of the demurrer, contended, 1. That the state courts have no jurisdiction of suits brought on the penal laws of the *United States ;* and the law of Congress giving them such jurisdiction, is unconstitutional. *United States* v. *Lathrop,* 17 *Johns. Rep.* 4. 261. *Martin* v. *Hunter's Lessee,* 1 *Wheat* 330. 337. The terms of the 3rd article of the constitution of the *United States,* vest the *whole* power in the *United States'* courts. The state courts are not the " inferior courts" referred to in the constitution. Congress does not *constitute* these courts ; nor *ordain and establish* them. The judges cannot be *impeached* before the senate of the *United States.* They receive no compensation from the *United States* for their services. The courts of one sovereignty will not take cognizance of, nor enforce the penal laws of another. *Scoville* v. *Canfield,* 14 *Johns. Rep.* 338.

2. That the plaintiff was not " the *owner* of the vessel," within the meaning of the act of Congress ; and cannot, therefore, maintain this action in *any* court. But if the plaintiff, as charterer, was owner for the voyage, he was not *sole* owner ; for it appears from the declaration, that he was to allow the owners one half of her earnings, and retain the other half himself. It follows, that all the owners must join.

3. That the defendant is not so described as to bring him within the act of Congress, and subject him to this action. He is described as " mate ;" and the term " seaman" or " mariner," is not applicable to the mate or other officers of the ship.

4. That the description of the voyage in the contract " from *New-London* to *Oporto and elsewhere,*" is so uncertain and vague, that the contract cannot be enforced. *Brown* v. *Jones* & al. 2 *Gallis.* 477. 1 *Hall's Am. L. J.* 207.

5. That the contract had been performed, when the defendant left the vessel, as he had been to *Oporto* and *elsewhere, viz* to *Liverpool.*

*Law* and *Brainard*, contra, insisted, 1. That the superior court had jurisdiction. *The Post-Master-General* v. *Early* & al. 12 *Wheat.* 136.

2. That the plaintiff was owner for the voyage. *Pitkin* v. *Brainard* & al. 5 *Conn. Rep.* 456.

3. That the defendant was "a seaman or mariner."

4. That the voyage was sufficiently defined to bind the defendant to his contract.

PETERS, J. The declaration presents three questions. 1. Was the defendant a "seaman or mariner" within the purview of the statute? 2. Does the agreement made by the plaintiff with the defendant sufficiently declare the voyage and time for which he was shipped? 3. Are the facts alleged cognizable by any court of this state?

1. The act of Congress speaks of two classes of persons belonging to vessels, *viz.* officers and crew. Officers are the master and mate. Mate is the first officer under the master, and is thus defined by *Walker:* "The second in subordination, as the master's mate" The crew are styled "seamen or mariners." *Laws U. S. vol.* 1. *p.* 134. As the defendant contracted as mate, and signed the shipping articles as mate, he was not a seaman or mariner within the statute, nor subject to its penalties.

2. But, admitting the defendant was a mariner, the statute required the master, before he proceeded on his voyage, to make an agreement in writing with such mariner, declaring the voyage and time for which he shipped. But this voyage was from *New-London* to *Oporto* and *elsewhere*, without limitation of place or time. "A voyage from *New-York* to *Curacoa* and *elsewhere*," says Chancellor *Kent*, " means, in shipping articles, a voyage from *New-York* to *Curacoa*, and the word *elsewhere*, is rejected, as being void for uncertainty." 3 *Kent's Com.* 143. 1 *Hall's Am. L. J.* 209.

3. The constitution declares, that " the judicial power of the *United States* shall be vested in one supreme court, and in such inferior courts as the Congress may, from time to time, ordain and establish." *Art.* 3. *sect.* 1. And the judicial power shall extend to all cases, in law and equity, arising under the constitution and laws of the *United States*. *Art.* 3. *sect.* 2. This case arises under a law of the *United States ;* and is brought to recover a penalty incurred by the defendant, for a violation of

*New-London,*
July, 1828.

Ely
*v.*
Peck.

the 5th section of an act for the government and regulation of seamen in the merchants' service.  *Vol.* 1. *p.* 134.  This penalty is given to the plaintiff as owner; and he is authorized to recover the same, before any court, or any justice or justices having jurisdiction for the recovery of debts to the value of ten dollars.  By these are understood state courts, and state justices.  This presents the important question, Can Congress vest any part of the judicial power of the *United States* in a state court?  This question has been answered, by the supreme court of the *United States*, in *Martin* v. *Hunter's Lessee*, 1 *Wheat.* 304. 330.  Congress cannot vest any portion of the judicial power of the *United States*, except in a court ordained and established by itself; and no part of the criminal jurisdiction of the *United States* can, consistently with the constitution, be delegated to state tribunals.  The reason of this is obvious.  The state courts are not ordained nor established by Congress, and are not amenable to that body.  The judiciary of a state is a constituent part of another and an independent sovereignty, from which they receive their authority and support; whose laws they are bound to execute.  But they are under no such obligations to the *United States*, whose laws they are bound to obey as citizens, but not to execute as magistrates.  This point has been repeatedly decided, by state tribunals.  Thus, in *Scoville* v. *Canfield*, 14 *Johns. Rep.* 338. the supreme court of *New-York* decided, that they would not enforce a penal statute of *Connecticut*, on the broad principle, that the courts of one state will not enforce the penal laws of another.  So in an action of debt, brought by the *United States*, in the same court, to recover a penalty incurred under the act of Congress for laying a duty on licenses to retailers of wine, &c., passed *August* 2nd, 1812, on a plea to the jurisdiction, *Spencer*, Ch. J., in delivering the opinion of the court, said: "The plea can only be supported, on the ground, that by the constitution of the *United States*, no state court can take cognizance of any writ in behalf of the *United States*, for penalties or forfeitures."  "It cannot be doubted, that a pecuniary penalty for a violation of, or non-conformity to an act of Congress, is as much a punishment for an offence against the laws, as if a corporal penalty had been inflicted; and as regards crimes and offences, made so by legislative enactment, the government of the *United States* stands in the same relation to the state governments, as any foreign government; and it is a fundament-

al maxim, that the courts of one sovereignty will not take cognizance of, nor enforce the penal code of another." *The United States* v. *Lathrop,* 17 *Johns. Rep.* 4. 9. See also the authorities cited in that case.

For these reasons, I am of opinion, that the declaration is insufficient, and advise the superior court to render judgment for the defendant.

The other Judges were of the same opinion, except BRAINARD, J., who was absent.

Declaration insufficient.

———————

### DAVISON *against* CHAMPLIN :

#### IN ERROR.

The state courts have no jurisdiction of suits arising on the penal laws of the *United States ;* nor can jurisdiction be conferred upon them, by an act of Congress.

Therefore, an action to recover the penalty inflicted by the 19th section of the consolidated act regarding the post-office department, approved the 3rd of *March* 1825, for an alleged violation of that act, cannot be sustained in the courts of this state.

And if such action be brought in such court, the defendant may take advantage of the want of jurisdiction, by motion in arrest for the insufficiency of the declaration, after trial on the general issue.

THIS was an action of debt, instituted by *Champlin,* in his own name and in behalf of the *United States,* in the county court of the county of *New-London,* against *Davison,* master of the steam-boat *Fanny,* passing regularly as a packet-boat on the waters between the port of *New-London* and the port of *New-York,* to recover the penalty of fifty dollars for an alleged violation of the 19th section of an act of the Congress of the *United States,* approved the 3rd of *March,* 1825, entitled, "An act to reduce into one the several acts establishing and regulating the post-office department." During the pendency of the cause in the county court, *viz.* on the 7th day of the term, after the pleadings were closed, the plaintiff moved to amend the declaration, by increasing the amount of the debt demanded from 50 to 110 dollars, and by adding two new counts. This amendment was objected to, by the defendant, but the court

allowed it.   The cause was then tried, by the jury, upon the *New-London,*
plea of *owe nothing ;* and a verdict found for the plaintiff.   A    July, 1828.
motion in arrest of judgment was filed by the defendant, on the    Davison
ground of the insufficiency of the declaration ; and by the    Champlin.
county court it was adjudged sufficient, and judgment was
rendered for the plaintiff.   To reverse that judgment, the pre-
sent writ of error was brought in the superior court, and re-
served for the consideration and advice of this court.

*Child,* for the plaintiff in error, contended, 1. That the
county court erred in allowing the amendment made by the
plaintiff ; because it changed both the *form* and the *ground* of
action.

2. That the county court had not jurisdiction of the suit.
First, Congress had no authority to confer any portion of the
judicial power of the *United States* upon a state court.   *Const.
U. S. art.* 3.   1 *Wheat.* 326. 330.   Secondly, the offence
charged in the declaration is cognizable by the judicial power
of the *United States* only.   1 *Wheat.* 337.   *The United States*
v. *Lathrop,* 17 *Johns. Rep.* 4. 9.

*Isham,* for the defendant in error, contended, 1. That the
amendment was properly allowed ; and if otherwise, still the
allowance or refusal of an amendment cannot be assigned for
error.   *Fuller* v. *Hampton,* 5 *Conn. Rep* 416. 425.

2. That the county court had jurisdiction of the suit.   From
the commencement of our government, Congress has exercised
the power of conferring jurisdiction on state courts.   *The
United States* v. *Dodge* & al. 14 *Johns. Rep.* 95.

3. That if the county court had not jurisdiction, the plaintiff
in error cannot avail himself of the want of it, in this way.   He
has submitted to the jurisdiction, by pleading the general issue,
and not pleading to the jurisdiction.   1 *Chitt. Plead.* 426, 7.
*Smith* v. *Elder,* 3 *Johns. Rep.* 105.   If the court has not a gen-
eral jurisdiction of the subject matter, the defendant must plead
to the jurisdiction, and cannot take advantage of it under the
general issue.

DAGGETT, J.   The plaintiff in error urges, as one ground of
reversal, that by the record, it appears, that the county court
allowed an amendment, which, by law, could not be allowed.
On this point I deem it unnecessary to express an opinion, as

*New-London,* another question of great importance, decisive of the case, is
July, 1828. made, and must be settled, without reference to technical ob-
Davison    jections.
*v.*
Champlin.    It is said, by the defendant in error, that a plea to the juris-
diction of the court should have been interposed ; and that,
having gone to issue on the plea of *owe nothing*, the defendant
in the original suit, cannot allege, by way of objection to the
sufficiency of the declaration, a defect of jurisdiction in the
court.    This suggestion is of no force, if the act, on which the
original plaintiff brought his suit, so far as it attempts to confer
jurisdiction on the county court, is void.    To that point, then,
and to that only, will the opinion which I am about to express,
be directed.

By the 37th sect. of the act under consideration, the courts
of the several states (and of course, the courts of this state) are
declared to be vested with the power of holding jurisdiction of
causes of action, arising under the act ; and the same section
enacts, that such "judiciary" *shall* take cognizance thereof.
The Congress having thus attempted to confer jurisdiction, and
enjoined the exercise thereof, the case is invested with great
importance.    Its importance is enhanced, by the fact, that
very early after the government went into operation under the
constitution, the legislature of the Union adopted the practice
of endeavouring to vest the courts of the several states with
judicial power ; and the practice has been followed, by suc-
cessive legislatures, to this day.

It is worthy of particular attention, that the constitution and
the laws of the *United States*, which shall be made *in pursuance
thereof*, are the supreme law of the land ; and the judges in
every state are "bound thereby." *Const. U. S. art.* 6.    Thus,
it is seen, that if the courts of this state refuse cognizance of
causes when thus enjoined, it must be on the sole ground, that
the law enjoining it is not made *in pursuance of the constitution
of the United States*, and is therefore not binding on the judges
of the several states ; and that this court, in the case under
consideration, has a right to decide on the power of the legis-
lature to pass such a law, and pronounce it either valid or void.
In regard to the last position, the right of the court so to decide,
there is now, whatever may have been the case heretofore, no
doubt.    High as the power may be of deciding on the consti-
tutionality of a law of the Congress of the *United States*, it is
believed, that it is now universally conceded to the courts of

the *United States,* and to those of the several states, with the only limitation that it be not exercised *in declaring a law void,* without a sacred regard to the high authority enacting it, and a thorough conviction of the correctness of the decision. The sole enquiry, therefore, is, was the law under consideration made in pursuance of the constitution of the *United States?* Momentous as this question may be, it is the clear duty of the court to decide it, leaving to the party affected by the decision, the constitutional right of revising it in the supreme court of the *United States.*

It is an axiom, that in every well constructed government, the judicial power is coextensive with the legislative. The judicial department receives from the constitution, or the legislature, the power of construing all its laws. This axiom is an important part of the constitution of the *United States.* The third article declares, " that the judicial power shall extend to all cases in law or equity, arising under the constitution, *the laws of the United States,* or treaties made, or which shall be made, under their authority " *Osborne* v. *United States Bank,* 9 *Wheat.* 818, 19. It is difficult to imagine a more explicit and ample grant of power. In what *courts* is this power to be vested ? This question is definitely answered, by the first section of the third article. " The judicial power of the *United States* shall be vested in one supreme court, and in such inferior courts as the Congress may, from time to time, ordain and establish." It would be a violation of the constitution to vest any portion of the power vested in the supreme court, by the constitution, *in any inferior court of the United States,* and more clearly so, *in any court of a state.* A subsequent part of the third article declares the powers of the supreme court, *by original jurisdiction,* as in all cases affecting ambassadors, &c. ; and in all other cases arising under the constitution, &c., the jurisdiction is appellate, " with such exceptions and under such regulations as the Congress shall make." The residue of the judicial power, coextensive, as we have seen, with the legislative, is " vested in such inferior courts as the Congress may, from time to time, ordain and establish." The courts of the several states are not the *inferior courts* mentioned in the constitution. *They* are inferior in the relation they sustain to the supreme court, as depositories of the judicial power of the *United States.* They are not, in any sense, *inferior courts, ordain-*

ed and established by Congress. On the contrary, they are established by the constitution and laws *of the states.* The judges are appointed, the te nure of office fixed, and compensation and responsibility regulated, by the constitution and laws of *the states.* How, then, can it be insisted, that the law under consideration was made *in pursuance of the constitution of the United States ?*

Moreover, this point has been decided, and so conclusively too, that it can hardly be deemed an open question. It has been holden, by Judges *Bland* and *Harrison* of *Maryland, Cheves* of *South Carolina,* and by the General Court of *Virginia,* consisting of nine Judges, that Congress have no power to give to a state court jurisdiction over cases of a penal or criminal nature arising under the laws of the *United States.* 17 *Johns. Rep.* 265.

In *The United States* v. *Lathrop,* 17 *Johns. Rep.* 4. the question was considered very fully, by the supreme court of *New-York,* and an able and satisfactory opinion delivered by Ch. J. *Spencer,* against the jurisdiction of the court of the state, in a case in principle precisely similar to that under consideration.

*Marshall,* Ch. J says : " The state courts are not in any sense of the word *inferior* courts, except in the particular cases, in which an appeal lies from their judgment to this court." " They are not inferior courts, because they emanate from distinct authority, and are the creatures of a distinct government." 4 *Cranch* 97.

In *Martin* v. *Hunter's* lessee, 1 *Wheat. Rep.* 330. in an irresistible argument of the supreme court, by Mr. Justice *Story,* it is declared, that " Congress cannot vest any portion of the judicial power of the *United States,* except in courts ordained and established by itself." Again, (in 1 *Wheat. Rep.* 337.) the court say : " No part of the criminal jurisdiction of the *United States* can, consistently with the constitution, be delegated to state tribunals. It can only be in those cases, where, previous to the constitution, state tribunals possessed jurisdiction, independent of national authority, that they can now exercise a concurrent jurisdiction."

Thus, decisions of the highest authority, bearing directly on the point, are opposed to the jurisdiction of the county court in this case.

No less conclusive is the acknowledged law, that the courts

of one state cannot enforce the penal laws of another state. The courts of *Connecticut*, for example, cannot hold jurisdiction of a suit on a penal law of *Massachusetts* or *New-York*. To this point there is an express decision of the supreme court of the latter state. *Scoville* v. *Canfield*, 14 *Johns. Rep.* 338. And, without the aid of that case, the principle is every where recognized, as established by universal law. Not to speak of the deplorable weakness, necessarily implied in the dependence of a sovereign power on a foreign government to punish violations of penal laws, there are numerous difficulties easily suggested to a reflecting mind. To what treasuries are the forfeitures to belong ? What gaols are to receive those who are to be imprisoned ? To what tribunals are sheriffs amenable for neglect or violation of duty ?

But it may be asked, are not the laws of the *United States* of binding authority on the courts of the several states ? Doubtless they are, when made in pursuance of the constitution. A collector of the port of *New-London* has seized ten hogsheads of sugar for having been landed without a permit, and in violation of the revenue law of the *United States*. In an action of trespass brought before a court of the state for taking the sugar, he justifies by virtue of his office, and the law of the *United States* The court is bound to give full effect to that law.

So, a suit is brought on a promissory note, executed in *Massachusetts*, before a court in *Connecticut*. The defendant shows, under a proper plea, that the note, by the law of *Massachusetts*, is usurious, and therefore void. The court must regard the law of *Massachusetts*, and refuse to enforce the contract. But had the note been paid, and the usurious interest received in *Massachusetts*, could a *qui tam* action be sustained in *Connecticut* for the penalty annexed to their law against usury ? Now, in relation to crimes, made so by the laws of the *United States*, the government of the *United States* is to be regarded in *Connecticut* as foreign to and independent of the government and laws of *Connecticut*. A person cannot be punished, by a court in *Connecticut*, under the statute of the *United States*, for robbing the mail of the *United States* ; nor for an act of piracy on the high seas ; nor can the courts of the *United States* hold jurisdiction of an indictment for burglary or rape, committed within the jurisdiction of *Connecticut*.

Should it be said, that it is a matter of convenience to sustain jurisdiction in cases of this nature : that courts and magis-

<div align="right">

*New-London,*
July, 1828,

Davison
*v.*
Champlin.

</div>

*New-London,* trates are not appointed by the *United States,* to hear and de-
July, 1828. termine these apparently trivial offences ; nor has Congress
Davison   ordained and established such inferior courts as could, with
*v.*   propriety, take cognizance of these offences ; an easy reply can
Champlin. be made.    The Congress have the power.    Let them occupy,
with their courts, the whole judicial ground.    If from any mo-
tives, (and we are not at liberty to enquire at all on that sub-
ject) they omit to ordain and establish inferior courts, or to
vest judicial power in courts already established ; that cannot
justify a court in *Connecticut* in exercising judicial power of the
*United States,* never vested in them by the constitution, nor in
obeying a law not made in pursuance of the constitution.

It seems there is a broad distinction between suits on bonds
given to the *United States,* suits for seamen's wages, &c. &c.
where the courts of the state have a common law juris-
diction, and actions for penalties for the violation of the penal
laws of the *United States.*    These distinctions are well sus-
tained in *The United States* v. *Lathrop,* 17 *Johns. Rep.* 4.

The superior court is advised, that the judgment of the
county court be reversed.

In this opinion the other Judges concurred, except BRAIN-
ARD, J., who was absent.

*7*              Judgment to be reversed.

----

### DART *against* DART and another.

Where a testator devised land to his son *S.,* his heirs and assigns forever,
adding this limitation : " My will further is, that my son *S.* shall not sell
or dispose of such land from his lawful male issue, and in case he should
die without lawful male issue, his land hereby given shall revert, and be-
come the estate of my surviving sons, and their male issue ;" it was held,
that *S.,* under this devise, took an estate in tail male general.
Though in this state, a release deed is a primary conveyance, and regularly
transfers all the right of the releasor to the releasee ; yet if the releasor
have no right at the time of the release made, nothing passes.
The issue of a donee in tail, during the life of such donee, has no right, which
he can transfer, by a release deed.
The deed of release in common use in this state, contains no warranty, ex-
press or implied, and does not estop the releasor to claim the right which it
purports to convey.

*New-London,*
*July, 1828*

Dart
*v.*
Dart.

THIS was an action of ejectment for one undivided fifth part of a piece of land in *Waterford ;* tried at *Norwich, January* term, 1828, before *Lanman,* J.

On the 4th of *July,* 1754, *Roger Dart,* being seised in fee of certain lands, devised them as follows.  1. His farm at *Jordain* to his son *Roger,* his heirs and assigns forever, upon condition that he pay to two of the testator's daughters what their legacies should fall short of £50, old tenor, each.  2. The farm on which the testator then lived, of which the demanded premises are a part, to his sons *William* and *Solomon,* their heirs and assigns forever, upon condition that they pay to the child of his son *Richard* £15, old tenor, adding this limitation, *viz.* "My will further is, that my sons shall not either of them sell or dispose of the land, which I have herein given to each of them, from their lawful male issue ; and in case either of my said sons should die without lawful male issue, in such case, his land hereby given shall revert, and become the estate of my surviving sons, or their male issue "  Upon the death of the testator, *Solomon,* the devisee, having lawful male issue, *viz. Caleb* the plaintiff and *Soloman,* jun., entered and enjoyed his share of the estate until the 2nd of *January* 1794 ; when he and his son *Solomon,* jun., by a quit-claim deed, in the usual form, remised, released, and forever quit-claimed all their right and title to the demised premises to *William Dart,* jun. and *Stedman Dart,* in fee ; and on the 8th of *August* 1794, the plaintiff, by a like deed, remised, released and forever quit-claimed all his right, estate, title and interest in the demised premises to the same releasees in fee.  Under these releases the defendants claimed title. *Solomon,* the father of the plaintiff, died in *December* 1825.  The defendants contended, that the will gave to *Solomon* a life estate in the premises, with remainder to his male heirs.  They also claimed, that the plaintiff was estopped, by his deed, to assert a title in himself.  The judge charged the jury, that the will gave an estate in tail male to *Solomon* ; that on his death, and not before, the title to the premises vested in the plaintiff ; and that consequently, the plaintiff, at the time he gave the quit-claim deed, had no title or interest in the premises ; and further, that the plaintiff was not estopped, by this deed, to assert a title in himself.  The jury returned a verdict for the plaintiff ; and the defendants moved for a new trial, for a misdirection.

*Goddard* and *Isham,* in support of the motion, contended, 1. That by the will of *Roger Dart,* his son *Solomon* took an estate in fee simple.

2. That if *Solomon* did not take a fee, he took an estate for life, and his sons a vested remainder, if born at the time the will was made, or if unborn, it vested the moment a male child was born, defeasible if no such issue were living at his (*Solomon's*) death; and in that case, it would go to the surviving brothers as a contingent remainder. In the first place, it was the intention of the testator, that *Solomon* should have the use, during his life, but not to sell it away from his male issue; so that if he had male issue, they should have it; and if he died without issue, the surviving brothers would have it. Secondly, there are no words of procreation to give an estate tail.

3. That if either of these grounds are maintainable, *Caleb,* the plaintiff, had an interest, on which his release deed could operate, and which was thereby conveyed to the releasees.

4. That if this deed was inoperative as an instrument of conveyance, still the plaintiff is *estopped* to claim against it. It was executed and delivered by him *as a deed;* and the rule of the common law applies, that he shall not be permitted to aver or prove any thing in contradiction to what he has once so solemnly and deliberately avowed. 2 *Bla. Comm.* 295. So universal is this rule, that *fraud* only constitutes an exception. *Porter* v. *Hill,* 9 *Mass. Rep.* 34. *Bliss* v. *Thompson,* 4 *Mass. Rep.* 488. 490. But suppose a release, by the common law of *England,* does not constitute an estoppel; this deed, by the laws of *Connecticut,* does. By our own common law, a quit-claim or release deed is a primary or original instrument of conveyance. 1 *Swift's Dig.* 133. And though it is without covenants of seisin and warranty, it contains a covenant *not to claim any right or title to the premises.*

*Cleaveland* and *Gurley,* contra, insisted, 1. That the interest attempted to be conveyed, by the release deed of the plaintiff, was that of an inheritance before descent cast; and of course, no interest was vested in the releasees. Fee-simple and fee-tail estates are alike estates of inheritance; and it makes no difference, as it regards the present question, whether the estate of *Solomon* was in tail, or in fee-simple. The only interest *Caleb* had, when he gave the release, was that of *heir expectant,* whether in fee simple or fee tail; and in such case,

nothing passes by the deed. *Davis* v. *Hayden* & al. 9 *Mass.* *Rep.* 514. But it was, in truth, an estate in fee-tail male. *Dart* v. *Douglass*, in superior court, on the same will. *Doe* d. *Ellis* v. *Ellis*, 9 *East*, 382.

2. That a release deed will pass no interest not *in ssee* at the time the release is made. *Co. Litt.* 265 *a.* sect. 446. *Lampet's* case, 10 *Rep.* 51. *a.* *Quarles* & al. v. *Quarles*, 4 *Mass. Rep.* 680 688. *McCrackin* v. *Wright*, 14 *Johns. Rep.* 193. *Hastings* v. *Dickinson* & ux. 7 *Mass. Rep.* 153. 155. *Doe* d. *Blacksell* v. *Tompkins*, 11 *East* 185. *Davis* v. *Hayden* & al. 9 *Mass. Rep.* 514.

3. That there being no warranty in the deed, it will not operate as an estoppel. *Co. Litt.* 265. *a. b.* sect 446. *Doe* d. *Blacksell* v. *Tompkins*, 11 *East* 185. *McCrackin* v. *Wright*, 14 *Johns. Rep.* 193. The deed contains no apt or effectual words to make a warranty. *Bac. Abr. tit* Warranty. C.

PETERS, J. This case presents three questions. 1. What estate did *Solomon Dart* the elder take under this devise? 2. What estate passed from the plaintiff to the releasees? 3. Is the plaintiff estopped, by his deed to them?

To answer the first question, we must ascertain the intention of the devisor; and this can be learned only from his will. His first object seems to have been, to provide for his sons, during their lives; the second, to perpetuate his estate in his name and family. This, according to the notions of those days, could be effected only by an entailment. He therefore used expressions, which have always been understood to create an estate tail. In the first place, he created an estate of inheritance in his sons. He then forbade their selling it away from their lawful male issue. And lastly, he provided, that if either of his sons should die without such issue, his land should revert, and become the estate of his surviving sons, or their male issue. This completed the entailment in perpetuity, according to his views; though not according to the modern decisions. *Chappel* v. *Brewster*, *Kirby* 175. *Hamilton* v. *Hempstead*, 3 *Day* 332.

But the defendants claim, that *Solomon*, the devisee, took an estate in fee simple, conditional or in remainder. I am satisfied, upon the authority of many adjudged cases, both *English* and *American*, that he took an estate in tail male general. A reference to a few, which seem to run "*quatuor pedibus*" with the case at bar, will remove all doubt.

"If land," saith *Perkins, (sect.* 173.) "be given by deed unto *J. S. et si contingat ipsum obire sine hærede de corpore suo, quod tunc revertat,* to the donor and his heirs, without any *habendum* in the deed, the donee hath an estate tail."

In *Webb* v. *Hearing, Cro Jac.* 415. the testator devised thus : " To *F.*, my son, my houses in *L.*, after the death of my wife ; and if my three daughters, or either of them, do overlive their mother, and their brother and his heirs, then they to enjoy the houses for the term of their lives, remainder to my sister's sons," &c. The court resolved, that he had but a fee tail ; for by heirs, in this place, i · intended heirs of the body.

So in *Sonday's* case, 9 *Rep.* 127. the testator devised his house to his wife for life, and after her death, his son *William* to have it ; and if *William* marry, and have issue male lawfully begotten, then his son to have it ; remainder to his other sons successively, *totidem verbis ;* and then adds, " If any of his sons, or their heirs males issue of their bodies go about, at any time to alienate or mortgage the house, then the next heir to enter and enjoy it." It was resolved, by the two chief justices and the court of wards, that the sons have an estate tail, to them severally and to the heirs male of their bodies.

In *Price* v. *Smith, Willes' Rep.* 1. the testator devised his estate to his son *Philip* in fee, on condition that he pay £30 to his son *William*, under this limitation, *viz.* " In case any of my said children, unto whom I have bequeathed any of my real estate, shall die without issue, then I give the estate of him or them so dying unto his or their right heirs." " It cannot be doubted," said the court, " after so many solemn resolutions, but that if a man devise an estate to *A.* and his heirs, and afterwards in his will give his estate to another, in case *A.* die without issue, the subsequent words reduce *A.*'s estate only to an estate tail, and restrain the general word *heirs* to signify only heirs of the body. *Vide Altham's* case, 8 *Rep.* 154. *b.* and *Dean* d. *Slater* v. *Slater*, 5 *Term Rep.* 335 and cases there cited.

In *Doe.* d. *Ellis* v. *Ellis*, 9 *East*, 382. the testator devised his estate thus : " To my son *Joseph*, his heirs and assigns ; but in case my son shall die without issue, then I give and devise the same to the child or children with which my wife is now *ensient*, his heir" &c. Lord *Ellenborough* said : " The estate being at first given to *Joseph*, his heirs &c. forever, would have given him the fee. But the premises, however large, may be restrained by the context, as premises however narrow, may

be enlarged by it.    Here then, the testator goes on  to say,
that in case *Joseph* should die without issue, then  he gives it
over, which  clearly gives  *Joseph*  only an estate tail."   And
*Grose,* J. said :  " It is impossible to read this will, without see-
ing,  that  the testator  intended,  that if  *J.* has issue, that issue
should take ;  and if  he died without issue,  the issue of  which
his  second wife was  *ensient,*  should take the estate ;  and this
intention could only be effectuated, by giving *J.* an estate tail."

In   *Hurlburt* v. *Emerson,*  16  *Mass. Rep.*  241.  the testator
devised part of  his estate  to his  son *John,* subject  to the pay-
ment of certain  legacies,  adding,  " that in case my  son *John*
should leave no male issue, then one half of the above bequests
to be equally divided  among  his  children, and  the other half
among all my surviving children."    The court unanimously de-
cided, that the devise to *John,* was an estate in  tail  male gen-
eral.

The  same point  has been  more than once  decided  in  this
state.

In *Dart* v.  *Douglass,* which was an action for another parcel
of the same devise, the same question arose ;  and  it was  deci-
ded, by  the  superior court,  in  *January,*  1816,  whereof  the
late Chief Justice was one, that the devisees took an estate tail.
This decision, though not  binding on this court, is  entitled to
great respect.

In *Peters* v. *Loomis,* in 1800, the  case  was  thus.    In 1758,
*John Thompson* devised his  estate to his  five children in  fee,
and added this clause :  " If any  of my said  children shall die,
his, her or their share, *if heirless,* shall be equally divided among
my surviving  children."    *Ann,* a  daughter, married, and  died
without issue, in 1798:  the plaintiff was the only survivor,—the
rest having previously died leaving issue.    The superior court
decided, that by *heirless,* the testator meant *without  issue,* and
that the plaintiff was entitled to recover

2.  What estate passed from the plaintiff, by his deed  to  the
releasees ?   By  the  common law,  a release  is  a  secondary
conveyance, and is a discharge of a man's right in land or tene-
ments to another, who hath some former  estate  in  possession.
*Shep. Touch.* 318.   2 *Bl. Com* 328   But in this state, a release
is  considered as a primary conveyance, and passes all the right
of the releasor to the releasee, provided no other person be in
possession adversely ;   and operates as a  conveyance without
warranty.    1 *Sw. Dig.* 133.    But if he have no right, nothing

*New-London,* passes, not even a *chose in action.* What estate, then, had the
July, 1828. issue of the first donee in tail, during *his* life ? My answer is,

Dart
*v.*
Dart.

non. The plaintiff could, therefore, convey none. Such is-
sue is only an heir apparent or presumptive. His title is the
bare possibility, or mere chance, of becoming *eventually* the
heir in tail; for the maxim is, " *nemo est haeres viventis.*" And
it is a well settled rule, that a mere possibility cannot be re-
leased or conveyed ; and the reason thereof is, that a release
supposes a right in being. *Shep. Touch.* 319. *Bac. Abr. tit.
Release.* H. Hence, it is holden, that an heir at law cannot
release to his father's disseisor, in the life-time of the father ;
for the heirship of the heir is a contingent thing ; for he may
die in the life-time of his father. *Ibid.* This question was in-
defeasibly answered, by our great master *Littleton,* nearly four
centuries ago. " If there be father and son, and the father be
disseised, and the son (living the father) releaseth by his deed
to the disseisor, the right which he hath, or *may have,* in the
tenements, without clause of warranty, and after the father di-
eth, this son may lawfully enter upon the possession of the
disseisor ; for that he hath no right in the land in his father's
life-time, but the right descended to him after the release made,
by the death of his father ; for no right passeth by a release,
but the right which the releasor hath, at the time of the release
made ; and if he hath no right, the release is void." *Littleton,
sect.* 446. *Lampet's* case, 10 *Rep.* 51. *a.* " And in some ca-
ses," saith *Sheppard,* (*Touch.* 321.) " a release, like a confirm-
ation, doth enure by way of abridgment. But a man can-
not bar himself of a right that shall come to him hereafter ;
and therefore it is held, that these words used in releases, *quæ
quovis modo in futuro habere potero,* are to no purpose." This
is a mere quotation from the text of *Littleton,* (*ubi supra*) which
is there sanctioned, by the commentary of Sir *Edward Coke.*
" But here, in the case which *Littleton* puts, where the son re-
leases in the life-time of his father, this release is void, because
he hath no right at all, at the time of the release made, but all
the right was at that time in the father ; but after the decease
of the father, the son shall enter into the land against his own
release. 1 *Inst.* 265 *a.* And we are informed, by Lord
Chief Justice *Trevor,* in delivering his opinion in *Arthur* v. *Bok-
enham, Fitzgib.* 234. that this text of *Littleton* had never been
contradicted. *Hargrave's* Notes on *Co. Litt.* 265. *a.* n. 212.
The same doctrine was recognized. by the supreme court of

*New-York*, in *McCrackin* v. *Wright*, 14 *Johns. Rep.* 193. wherein it was decided, that no title, not *in esse*, would pass by a deed of bargain and sale and quit-claim, unless it contain a warranty, in which last case, it will operate as an estoppel. And in *Davis* v *Hayden* & al. 9 *Mass. Rep.* 514. it was decided, that nothing passes by a conveyance of land, of which the grantor is only heir apparent.

*New-London,*
*July, 1828.*

*Dart*
*v.*
*Dart.*

3. Is the plaintiff estopped to claim against his own deed? This question is already answered, by the citations from *Littleton, sect.* 446. and the case in 14 *Johns. Rep.* 193. "If there be a warrantie," saith Lord *Coke*, (1 *Inst. ubi supra*) " annexed to the release, then the sonne shall be barred ; for albeit the release cannot barre the right, for the *cause aforesaid*, yet the warrantie may rebut and barre him and his heirs of a future right." But the deed in question, is a mere release or quit-claim, and contains no warranty, express or implied.

I, therefore, do not advise a new trial.

LANMAN and DAGGETT, Js., were of the same opinion.

HOSMER, Ch. J., having heard the case argued in part only, gave no opinion.

BRAINARD, J. was absent.

New trial not to be granted.

———————

## SUMNER *against* UTLEY.

Words spoken falsely and maliciously of a man, in reference to his profession, imputing to him want of skill and good management in his treatment of a particular case, are actionable, without proof of special damage, if, from the nature of the calumny, damage may be inferred as the natural and probable consequence of its publication.

Therefore, where the defendant falsely and maliciously spoke of the plaintiff, in his profession of a physician, in reference to the case of a woman, whom he had assisted in parturition, and who had been delivered of twins, and soon afterwards the mother and both her offspring died, the following words : " He has killed three, and ought to be hung ; damn him. They all died through his mismanagement. I have understood he left the after-birth ; and a man that would do *that*, ought to be hung." And where the defendant, on another occasion, addressing himself to Mrs. *H.*, who had employed the plaintiff as her physician, falsely and maliciously said of him :

*New-London,*
July, 1828.

Sumner
*v.*
Utley.

" He was the means of your sickness, by cutting an artery in your head. Damn him; you ought n t to pay him a cent. If Mr. *H.* had took him up for it, it would have cost him 400 dollars. It ought to be 'put in the newspaper." It was held, that the jury were authorized to infer damage to the plaintiff in his profession, as the natural and probable consequence of such words; and consequently, that the plaintiff was entitled to recover, without proof of special damage.

THIS was an action of slander, tried at *Norwich, January* term, 1828, before *Lanman,* J.

In his declaration the plaintiff averred, that the defendant falsely and maliciously spoke of and concerning him, in his profession of a physician, the following words : " He has killed three, and ought to be hung ; damn him. They all died through his mismanagement. I have understood he left the after-birth ; and a man that would do *that,* ought to be hung." These words, the plaintiff averred, were uttered, by the defendant, in relation to his, the plaintiff's treatment of *Phebe Johnson* and her twin children, in the capacity of an accoucheur. One of the children was dead at its birth ; the other died about two days afterwards ; and the mother about a fortnight afterwards. The declaration also alleged, that the defendant uttered the following words concerning the plaintiff, addressed to a Mrs. *Haynes,* who had employed the plaintiff as her physician : " He was the means of your sickness, by cutting an artery in your head. Damn him ; you ought not to pay him a cent. If Mr. *Haynes* had took him up for it, it would have cost him 400 dollars. It ought to be put in the newspaper." To each set of words was subjoined an *innuendo,* that the defendant meant to charge the plaintiff with having conducted in his profession ignorantly and unskilfully.

The defendant contended, and prayed the court to instruct the jury, that unless they should find, from the evidence before them, that the defendant intended to impute to the plaintiff a felonious homicide or intentional mismanagement, they could not find a verdict in his favour. The judge instructed the jury, that if the words set forth in the declaration, were uttered and published as alleged, of and concerning the plaintiff, by the defendant, falsely and maliciously, with intent to prejudice him as to his skill, diligence, knowledge or good management in his profession, they ought to find the issue for the plaintiff ; and that it was not necessary to such finding, that the jury should believe from the evidence before them, that the defendant in-

*New-London,*
July, 1828.

Sumner
*v.*
Utley.

tended to impute to the plaintiff a felonious homicide, or intentional mismanagement in his profession.

The jury returned a verdict for the plaintiff, with 600 dollars damages ; and the defendant moved for a new trial, for a misdirection.

*Strong* and *McCurdy*, in support of the motion, contended, That to say of a man in reference to his profession, that there was a want of skill or good management in his treatment of a particular case, is not actionable without the averment and proof of special damage.   In support of this position, they cited *Poe* v *Mondford*, *Cro Eliz.* 620.   *Feise* v. *Linder*, 3 *Bos. & Pull.* 372. and *Foot* v. *Brown*, 8 *Johns. Rep.* 64.

*Waite* and *Hungerford*, contra, insisted, 1. That words falsely and maliciously spoken of a physician, reflecting upon his skill, diligence and prudent management, in a particular case or cases, are in themselves actionable.   *Martyn* v. *Burlings, Cro. Eliz.* 589.   *Bac. Abr. tit.* Slander. B.   *Watson* v. *Vanderlash, Het.* 69.   *Tutley* v. *Alewin,* 11 *Mod.* 221.   *Smith* v. *Taylor,* 1 *New Rep.* 196.   *Stark. Sland.* 115. 100.

2. That the words found by the jury to have been spoken, by the defendant, in this case, constitute a charge of ignorance and want of prudent management, on the part of the plaintiff, in his profession generally.

Hosmer, Ch. J.   That words published of a physician, falsely imputing to him general ignorance or want of skill in his profession, are actionable in themselves, on the ground of *presumed damage,* is unquestionable ; nor has it been questioned.   *Stark. Sland.* 100. 110. 115. 10. 12·   *Martyn* v. *Burlings, Cro. Eliz.* 589.   *Bac. Abr. tit.* Slander. B.   *Watson* v. *Vanderlash, Het.* 69.   *Tutley* v. *Alewin,* 11 *Mod.* 221.   *Smith* v. *Taylor,* 1 *New Rep.* 196.

The only objection made rests on this proposition ; that to say of a man in reference to his profession, that there was a want of skill or good management in his treatment of a particular case, is not actionable without an averment of special damage.   It is, therefore, admitted, that the words are actionable, if special damage is proved, and there is presented for decision this single question; whether in this case damages must be established by proof, or by law are presumable.

*New-London,*
July, 1828.

Sumner
*v.*
Utley.

I am unacquainted with the general principle advanced by the defendant ; nor can I find it in any elementary book of authority, or in any case.    On the contrary, it is an established rule, that whenever the natural and probable effect of a false report is immediate and increasing prejudice, the slander in itself affords a strong presumption, that injury has accrued, or will accrue, to the object of it, and the law implies damages. Hence, if words are spoken of another falsely and maliciously, imputing a crime, or a contagious disorder that may exclude him from society, damage is presumed, and special damage need not be averred.    *Stark. Sland.* 10. 12. 17.    I readily admit, that falsehood may be spoken of a physician's practice in a particular case, ascribing to him only such a want of information and good management as is compatible with great general knowledge and skill in his profession ; and that when such a case arises, unless some special damage exists, his character will be considered as unhurt, and no damages will be presumed.    But, on the other hand, it is indisputably clear, that a calumnious report concerning a physician in a particular case, may imply gross ignorance and unskilfulness, and do him irreparable damage.    A physician may mistake the symptoms of a patient ; or may misjudge as to the nature of his disease, and even as to the powers of a medicine ; and yet his error may be of that pardonable kind, that will do him no essential prejudice, because it is rather a proof of human imperfection, than of culpable ignorance or unskilfulness.    On the contrary, a single act or omission of his, may evince gross ignorance, and such a deficiency of skill, as will not fail to injure his reputation, and deprive him of general confidence.    If he were called on to administer to one manifestly intoxicated, and treat his disease as if it were an apoplexy, no person of good sense, after knowledge of this, would employ him in his profession. These remarks have a more striking application to the business of a surgeon or man-wife.    While a physician exercises a profession often beset with great difficulties, the employment of a man-midwife and surgeon, for the most part, is merely mechanical. If a surgeon were requested to take blood from a person, and should proceed to this operation, by opening an artery instead of a vein, by reason of which he should bleed to death ; or if he should amputate a limb, without having applied a tourniquet, or some other compression of the main arteries, and the person practised on should die in his hands from loss of blood : who

would afterwards employ him? So, if a man-midwife should deliver a woman and leave the after-birth, whatever may have been the ancient practice, would it not, in the present state of the art, exhibit such powerful proof of ignorance and want of skill, as greatly to injure his general character? On this subject I cannot doubt, and should not be surprised at the harsh declaration of the defendant, if applied to such an one, that " he ought to be hung." If a surgeon should be such an arrant bungler in his profession, as not to know an artery in the head from a vein, and should puncture the former instead of the latter, would not his reputation as a man of knowledge and skill, receive essential damage? Undoubtedly, in all the cases put, the stigma of gross ignorance and unskilfulness would justly be applied to him; and his character would sink under the reproach.

As a general principle, it can never be admitted, that the practice of a physician or surgeon in a particular case, may be calumniated with impunity, unless special damage is shewn. By confining the slander to particulars, a man may thus be ruined in detail A calumniator might follow the track of the defendant, and begin, by falsely ascribing to a physician the killing of three persons by mismanagement; and then the mistaking of an artery for a vein; and thus might proceed to misrepresent every single case of his practice, until his reputation would be blasted beyond remedy. Instead of murdering character by one stroke, the victim would be cut successively in pieces; and the only difference would consist in the manner of effecting the same result.

The redress proposed on the proof of special damages, is inadequate to the case. Much time may elapse before the fact of damage admits of any evidence; and then the proof will always fall short of the mischief. In the meantime the reputation of the calumniated person languishes and dies. Hence, it is justly said, by *Starkie*, that to facilitate the remedy in slander, the law, applying itself to the urgency of the case, lays aside its usual strictness; and where the presumption of damage is violent, but the difficulty of proving it is considerable, the law supplies the defect, and by converting presumption into proof, rescues the character of the sufferer from the misery of delay, and enables him at once to face the calumny in open court. *Stark. Sland.* 581.

This, then, is the correct principle; that the misrepresenta-

tion of a physician's practice, in a particular case, if it do not warrant the presumption of damage, is not actionable, unless special damages are averred and proved; but if, from the nature of the calumny, damages are inferable, the words are actionable *per se.*

The cases cited for the defendant, do not sustain the position advanced by him.

*Poe* v. Doctor *Mondford, Cro. Eliz.* 620., decided at a time when it was the rule, that words should be construed in *mitiori sensu*, is, at least of doubtful authority. *Bac. Abr. tit.* Slander. B. The matter charged was, that Dr. *Poe* had killed Mr. *Pasfield.* There was no *innuendo* and averment that a felonious killing was intended ; and if the words were of dubious import, and capable of a criminal or innocent meaning, their actionable quality, derived from explanatory circumstances extrinsic of the words, should have been made to appear by suitable averments. *Stark. Sland.* 289. In this view of the subject, perhaps, the determination was correct ; but it is entirely inapplicable to a case, which, like the one before us, is founded on words not of dubious import, but imputing extremely gross and culpable ignorance.

The same remarks, may, with equal force, be applied to *Feise* v. *Linder*, 3 *Bos. & Bull.* 372. and *Foot* v. *Brown*, 8 *Johns. Rep.* 64. The words, in both cases, were of dubious import. In the former case, which imputed to a merchant the having exhibited a false bill of lading, it was said by the court : " Though the words are capable of being construed in a bad sense, yet this declaration contains no sufficient charge to sustain a verdict " And to the latter case the observation is equally applicable. When it was observed by the court, that " the words, as laid, only go to charge the plaintiff with ignorance or want of skill in the particular ejectment suit mentioned, and that such charge is not actionable, without laying and proving special damages," it cannot be intended to lay down a general rule, of which no trace is to be found in our books. The words must be understood *secundum subjectam materiam.* In the case, the words were of dubious import ; and without the aid, by averment and *innuendo*, of any fact or circumstance extrinsic of them, to give them a character.

It is observable with respect to all the cases cited, that they differ most materially from the one before us. The imputation by them was doubtful, and as reconcileable to innocence

as to guilt    Had it been said of Doctor *Poe*, that "he killed Mr. *Pasfield*; damn him; he ought to be hung;" or of *Feise*, that "he exhibited a false bill of lading, and the rascal ought to be put to death;" or of *Foot*, "he knows nothing about the suit, and will lead you on until he has undone you, for which he will richly merit the gallows;" there would have been no doubt whether the words were actionable.

The question, after all, turns on this single enquiry, whether from the words published of the plaintiff the jury were authorized to imply damages, as the natural and probable consequence, resulting from their publication.   If they were not, the words are not actionable, without proof of special damage; and if they were, the words are actionable *per se*.

That the jury did imply damages, and large damages, the record in the case bears testimony; and that they were authorized to imply them, I have not a particle of doubt.   I think that prejudice to the plaintiff in his profession, as the natural and probable consequence of the words, must inevitably result.   That the defendant intended to impute to the plaintiff, by the words spoken, the most monstrous and culpable ignorance and mismanagement, it is impossible for me to doubt. Surely, he would not have execrated him, and declared that he ought to die an ignominious death, and that his practice ought to be published in a newspaper, if he meant nothing more than what the defendant would have the court suppose; that is, to impute to the plaintiff the common imperfections of humanity.   On the contrary, every person of sense or reflection, who should believe the imputations cast upon him, would consider him as a man of ignorance and unskilfulness, and unworthy of confidence    And this impression would be deepened, by the expression, that the plaintiff was liable to heavy damages; for it has often been decided, that nothing short of gross ignorance and want of skill, will authorize a suit against a practising physician.   *Slater* v. *Baker* & al. 2 *Wils*. 359. *Seare* v. *Prentice*, 8 *East* 342.   What woman would trust herself in such hands, with full information, that three persons had perished under his culpable mismanagement?   Or, what person would employ as a surgeon the man, who ought to be hung for cutting an artery?

I would frown on every action of slander brought to gratify a petulant and quarrelsome disposition; but when the reputation of a skillful man is assailed, by wanton calumny, I shall

*New-London, July, 1828.*

Sumner
*v.*
Utley.

*New-London,* ever be disposed to go the full length of principle to afford him
July, 1828. adequate redress.

Sumner
*v.*
Utley.

PETERS and LANMAN, Js. were of the same opinion.

DAGGETT, J. The motion for a new trial is founded upon a supposed error of the judge in his charge to the jury.

The defendant insisted, on the trial in the court below, that if the jury did not believe that the defendant intended to impute to the plaintiff a felonious homicide, or intentional mismanagement in his profession, though the imputation made and proved were false and malicious, yet they ought not to find the defendant guilty. The judge charged in opposition to this request of the defendant ; and this presents the question for consideration.

The counsel for the defendant, contend, that to charge a physician or surgeon with mismanagement in his treatment of a particular case, is not actionable without an averment of special damage,—though false and malicious. Such a charge imputes neither crime, nor such professional ignorance as will sustain an action. The most skillful practitioner may mistake the disease, apply improper remedies, and even destroy life, by mismanagement, and yet be wholly innocent. They therefore, insist, that in this case, the charge was erroneous, inasmuch as it substantially contravened these principles, and instructed the jury, that if the defendant did not impute either crime or intentional mismanagement, which indeed would be a crime, nor gross ignorance in his profession, still the defendant ought to be found guilty, if the charge was false and malicious. In support of these positions taken by the defendant, the cases of *Poe* v. *Dr Mondford, Cro. Eliz.* 620. *Feise* v. *Linder,* 3 *Bos. & Pull.* 372. and *Foot* v. *Brown,* 8 *Johns. Rep.* 64. are cited and relied on.

The words spoken by the defendant were indeed very offensive ; and they are to be taken, within the rule laid down by the judge, to have been false and malicious. A case, then, is presented well calculated to excite a just indignation against the defendant ; but still is he within the limits authorized by law ? Malignant as his heart might have been towards this plaintiff, are the words actionable, qualified as they are with the charge ?

I was not able, at the trial, to resist the argument of the de-

New-London,
July, 1828.

Sumner
v.
Utley.

fendant's counsel, supported by the authorities ; and my diffi-
culties are not removed, by the opinions and reasons of my
brethren.　It appears to me, the distinction taken is solid, and
is based on sound principles.　If the words spoken imputed to
the plaintiff crime, intentional mismanagement or gross igno-
rance in his profession, being false and malicious, then the law
implies damage, and an action is given ; otherwise, special
damage must be alleged and proved.　Here is no allegation of
special damage : none then is to be presumed.　In *Poe* v. *Dr.
Mondford, Cro. Eliz* 620. it was decided, that to charge a
physician with having killed a patient with physic, was not
actionable ; and the distinction between those words and where
the charge was, that he did it knowingly and voluntarily, was
taken.　The same doctrine was recognized, by the whole court
of *Common Pleas*, in *Fiese* v. *Linder*, 3 *Bos. & Pull.* 372.
The words were, "he has brought a forged bill of lading for
half the cargo already."　They were holden, after verdict,
not actionable, unless special damages had been sustained.
Two cases are there cited, in which it was holden not actiona-
ble to say of a man, he had lived upon *forged bonds*, or that
he had recovered 400*l.* by *forgery*.　The decision in 3 *Bos. &
Pull.* was in 1803, since the doctrine has been exploded, that
words were to be taken in *mitiori sensu*.

In a case in 1813, in the supreme court of *New-York, Foot*
v. *Brown*, 8 *Johns. Rep.* 64. the same principles were adopted.
There the plaintiff, an attorney and counsellor at law, was
charged thus : "*Foot* knows nothing about the suit ; (meaning
an ejectment suit, and speaking to *Foot's* clients) and he will
lead you on until he has undone you"　This declaration was
holden bad after verdict ; and the reasoning of the court is
very much in harmony with the argument of the counsel in
this case.

The counsel for the plaintiff refer to several authorities, in
support of the charge.　*Martin* v. *Burlings, Cro. Eliz.* 589.
*Watson* v. *Vanderlash, Het.* 69.　*Tutly* v. *Alewin*, 11 *Mod.*
221.　*Smith* v. *Taylor*, 1 *New Rep.* 196.　I am not satisfied,
that the position taken is supported, by any or all those authori-
ties.　In relation to that in *Cro. Eliz.* the words contained a
charge of gross ignorance against the plaintiff in his profession
of an attorney : " He is the foolishest and simplest attorney
towards the law.　He is a fool and an ass."

In *Tutly* v. *Alewin*, 11 *Mod.* 221. an action against the defend-

ant, an apothecary, the words were : " It is a world of blood he has to answer for, in this town, through his ignorance : he did kill a woman and ten children, at *Southampton* : he did kill *John Prior*, at *Petersfield* ;" it was adjudged, that the action lay. It is fairly implied in these words, that gross ignorance was imputed to the plaintiff. " It is a world of blood he has to answer for, in this town, *through his ignorance.*" But again : " he has to answer *for a world of blood.*" Here, general and indiscriminate mal-practice is ascribed to the plaintiff, and the particular cases are cited as examples. In *Starkie on Slander*, the above case is cited in proof of the proposition, that words spoken of a physician importing want of skill, are actionable. A case in *Cro. Car.* 211. (*Flower's* case,) is of the same import : " Many have perished through his want of skill," implying a want of skill, or ignorance in his profession. The same doctrine is in *Hetley* 69. In none of these cases is the law laid down as contained in this charge. The case cited from 1 *New Rep.* 196. *Smith* v. *Taylor*, contains not a word on this subject. The case turned on a totally different point.

It was, however, urged in opposition to the motion, that the words impute to the plaintiff ignorance or mal-practice, generally, in his profession. I cannot so understand them. They are employed only about his treatment of a pregnant woman and her twin children, one dead at the birth, and the other dying with its mother soon after its birth. As this idea seems to be embraced by my brethren, and to influence their opinions, I have looked with attention into that part of the declaration brought into view by this motion, and it strikes me as entirely silent, except to the plaintiff's management in the case stated ; and not to impute any ignorance, except in the management of this particular case.

I am thus compelled to differ from the other members of the court, and to say, that the charge was incorrect.

BRAINARD, J. was absent.

<div style="text-align:right">New trial not to be granted.</div>

---

## THE STATE OF CONNECTICUT *against* AVERY.

Where a writing in the form of a letter, addressed to the wife of another man, contained words, importing, that she had acted libidinously towards the

writer, had invited him to an adulterous intercourse with her, and had *New-London,* sought opportunities to effect it ; which writing was composed and sent to **July, 1828.** her, with intent to insult and abuse her, to debauch her affections and alien- ate them from her husband, to entice her to commit adultery, and to bring **The State** her into disgrace and contempt ; it was held, that such writing was libellous. *v.* The sending of a letter containing such language, to the person to whom it is **Avery.** addressed, is an offence of a public nature, which may be the subject of an information.

The solicitation of another to commit adultery, is a high crime and misde-meanor, cognizable by the superior court.

THIS was an information against *Asa L. Avery,* for writing and sending, on the 7th of *July,* 1827, to *Jannette White,* the wife of *Alfred White,* a letter in the following terms: " Mrs. *Jannette White.* I think we have played peep-abo long enough; and in my opinion, travelled enough. It is highly ne-cessary for lovers to meet, in order to understand each other's minds. I do believe it was your intention to have met me, a week ago last *Sunday.* I first thought I knew you ; afterwards I found it was you. I believe you have been across twice since. Now, if you will call at my house to-morrow, in the afternoon, at 3 o'clock, or tell me when and where to meet you———————. You, I believe, as well as myself, have run long enough." The meaning of a part of this letter, as ex-plained by an *innuendo,* was, that Mrs. *White* had acted libid-inously towards the defendant, inviting him to an adulterous intercourse and connexion with her, and that she had sought opportunities to effect it. The information averred, that the letter was a false, scandalous and defamatory libel, written and published with intent to injure the reputation of Mrs. *White ;* to insult and abuse her; to debauch her affections, and seduce them from her husband, they being mutually happy in the af-fections of each other ; to entice her to become guilty of the crime of adultery ; and to bring her into disgrace and contempt. To this information the defendant pleaded *not guilty ;* and the jury found him *guilty.* He then moved in arrest of judgment for the insufficiency of the declaration ; and the case was there-upon reserved for the advice of this court.

*Goddard* and *Brainard,* in support of the motion in arrest, contended, 1. That the letter set forth in the information, was not a libel.

2. That there was no publication of it as a libel.

3. That in this state, a libel against an individual is not the subject of an information.

*New-London,*   4. That this was not an offence, of any sort, within the ju-
July, 1828.   risdiction of the superior court.

The State
*v.*
Avery.

    *Isham,* contra, contended, 1. That this was a libel. 2 *Swift's Dig.* 340. 1 *Hawk. P. C.* 352. *Commonwealth v. Clapp,* 4 *Mass. Rep.* 163.

    2. That a letter, written and sent to another person, on an indictment or information, is sufficient proof of a publication. *Phillips* v. *Jansen,* 2 *Esp. Rep.* 625. 3 *Chitt. Crim. Law* 639. *Hick's* case, *Hob.* 215.

    3. That an information for a libel on an individual, is sustainable in this state. *Const. Conn. art.* 1. *s.* 7. *Selleck Osborne's* case, at *Litchfield.*

    4. That the offence charged in the information, is a high crime and misdemeanor. A solicitation to commit a crime is a misdemeanor and indictable. To incite one to commit a felony must be a high misdemeanor. *The King* v. *Higgins,* 2 *East* 5. 21. *The King* v. *Phillips,* 6 *East* 464. 470. *Rex* v. *Vaughan,* 4 *Burr.* 2494. *Rex* v. *Scofield, Cald.* 397. where a case is cited before *Adams, B.* Vid. 2 *East* 14. No act, other than the incitement itself, is necessary to be done. The gist of the offence, is the incitement. 2 *East* 19. *per Grose,* J.

    PETERS, J. Whether the facts stated in this information are a libel, or a solicitation to commit a greater crime, it is not now material to enquire. If they constitute an indictable offence within the jurisdiction of the superior court, it is sufficient.

    A libel is a malicious defamation of any person, made public by printing, writing, signs or pictures, tending to blacken the memory of the dead, with intent to provoke the living, or injure the reputation of the living, provoke him to wrath, and expose him to hatred, contempt or ridicule. 1 *Hawk. P. C. cap.* 73. *sect.* 1. 4 *Bla. Comm.* 150. *Holt* on *Libels* 73. *Hillhouse* v. *Dunning,* 6 *Conn. Rep.* 391.

    Is the writing in question a libel? It is a letter, addressed, by the defendant, to the wife of another man, stating she had "*played peep-abo*" with him long enough; by which the jury have found, that he meant, that she had acted libidinously towards him, and invited him to an adulterous intercourse and connexion with her, and sought opportunities to effect it. It appears by the information, which the jury have found to be

true, that the defendant composed and wrote the letter, and
sent it to her, with intent to insult and abuse her, and to seduce and debauch her affections from her husband, entice her to com-
mit adultery, and bring her into hatred and contempt. Adultery is a detestable crime, especially in a female ; the most disgraceful a woman can commit ; and is punished with great severity, by our law. *Stat. tit.* 22. *sect.* 62. To say of a woman, falsely and maliciously, that she has committed this crime, is a gross slander To say that she is running about the country, seeking opportunities to commit adultery, renders her more contemptible and ridiculous than the crime itself ; and to publish such a story, by printing or writing, is a libel But a libel is a high misdemeanor ; and it may be laid down as law, in all cases, that the allegation of an act, which the law recognizes and punishes as a crime, is libellous. *Holt on Libels* 188, 9. *The King* v. *Wilkes,* 2 *Wils.* 151.

It is said, that the letter in question is not a libel, because it was not published, by the defendant. But it is well settled, that the sending of a letter to the party, filled with abusive language, is an indictable offence, because it tends to a breach of the peace. It has, indeed, been a matter of doubt whether the sending of such a letter to another would support *an action* for a libel, because there is no publication. But the sending of such a letter, without other publication, is clearly an offence of a public nature, and punishable as such, as it tends to create ill-blood, and cause a disturbance of the public peace. *Holt on Libels* 239. 2 *Swift's Dig.* 341. 1 *Hawk. P. C lib.* 1. *cap* 73. *sect.* 11. *Bac. Abr. tit.* Libel. B. *Wooton* v. *Edwards, Poph.* 140. *Hick's* case, *Hob.* 215.

It is said, that a libel against an individual is not a subject of indictment. But there cannot be any doubt, says *Hawkins,* (*ubi supra*) but that a writing, which defames private persons only, is as much a libel, as that which defames persons entrusted with a public capacity ; and Lord *Coke* informs us, that "every libel, which is called *famosus libellus,* is made either against a private man, or against a magistrate or public person. If it be against a private man, it deserves a severe punishment." *The case de Libellis Famosis,* 5 *Rep* 125. The late Ch. J. *Swift* has informed us, that prosecutions of this kind have not been introduced into this state ; but he adds, that "the common law on this subject is in force here." 2 *Swift's Dig.* 340. It is somewhat remarkable, that his Honor should so soon have for-

*New-London* gotten the prosecutions against *Selleck Osborne*, at *Litchfield*,
July, 1828. in 1806, and *Noah A. Phelps*, at *Hartford*, in 1818!

The State     But, admitting that the letter in question is not a libel, it is
  *v.*        certainly a solicitation to commit a greater crime.    It explicit-
Avery.        ly invites Mrs. *White* to make an *assignation* to meet the de-
fendant at his house, or at some other place, to commit adultery
with him.    I have already shewn, that adultery is a very great
crime, *once capital,* now punishable like most other felonies.
*Stat. revis.* 1650. *tit.* Capital Laws. *sect.* 8.—ed. 1808. *p.* 42.
n.—*revis.* 1821. *tit.* 22. *sect.* 62.    And an attempt to commit,
or a solicitation of another to commit such a crime, must be, at
least, a high crime and misdemeanor ; and we have already
said, that a high crime and misdemeanor is nearly allied and
equal in guilt to felony, (*State* v. *Knapp,* 6 *Conn. Rep.* 415.)
whereof the superior court has cognizance, by statute and by
common law.    *Stat. tit.* 22. *sect.* 98.    *State* v. *Danforth.* 3
*Conn. Rep.* 112

In *Rex* v *Higgins,* 2 *East* 5., the defendant was indicted
for soliciting and enticing a servant to steal the goods of his
master ; and the defendant contended, that as nothing was
done, no crime was committed.    The judges delivered their
opinions *seriatim,* and unanimously pronounced it an indictable
offence.    "A solicitation or inciting of another," said *Le Blanc,*
J., " by whatever means it is attempted, is an act done ; and
that such an act done with a criminal intent, is punishable by
indictment, has been clearly established, by the several cases re-
ferred to."  " All such acts or attempts," said *Lawrence,* J., " as
tend to the prejudice of the community, are indictable.    Then
the question is, whether an attempt to incite another to steal,
is not prejudicial to the community ; of which there can be no
doubt."    As to the offence itself, it must be admitted, that an
attempt to commit a felony, is, in many cases at least, a misde-
meanor.    In proof of this, we may instance the common cases
of an attempt to rob or to ravish, which are indictable offences
in every day's practice.    But further, an attempt to commit
even a misdemeanor, has been shewn, in many cases, to be it-
self a misdemeanor.    I close this topic in the language of Lord
*Kenyon,* Ch. J., which, *mutato nomine,* is *ad idem.*    The offence
is of the most serious kind, no less than that for his own wicked
gratification, he solicited and invited a woman to commit adul-
tery ; and can it be a question, in a country professing to have
laws subservient to justice and morality, whether this be an

offence? But it is argued, that a mere intent to commit evil is not indictable, without an act done; but is there not an act done, when it is charged, that the defendant solicited another to commit adultery? The solicitation is an act; and God forbid, that it should not be considered as an offence.

I am of opinion that the information is sufficient; and advise, that the motion in arrest be overruled.

The other Judges were of the same opinion, except BRAIN-ARD, J., who was absent.

*Information sufficient.*

<div style="text-align:right">

*New-London,*
July, 1828.

The State
*v.*
Avery.

</div>

---

### TAINTOR *against* WILLIAMS.

It is essential to the preservation of a lien created by the attachment of personal property, that possession be taken and held; and when this is relinquished, there is a termination of the lien, and the general owner is remitted to his property unencumbered.

The reason of this is, that possession of personal property is the only *indicium* of ownership; and the suffering of the debtor, after the service of an attachment, to retain the possession, is *prima facie* proof, that the attachment is fraudulent in respect of creditors.

Personal property, not in the actual possession of any one, is in the constructive possession of the general owner.

Therefore, where an officer, by attachment, on the 8th of *May*, took the goods of *A.*, in that part of the house which *A.* occupied, and, without removing them, put them into the custody of *B*; on the next day, *C.*, who lived in another part of the same ouse, at the request of the officer, took the goods into his charge, and had the custody of them until the 10th; from that time until the 12th, they remained in *A.'s* part of the house, under the particular charge of no one; on the 12th, the officer removed them into *C.'s* part of the house, and put them into his possession, but he immediately afterwards bade the officer take them away, declaring, that he wished to have nothing to do with them; there they remained, though not in *C.'s* custody, until the 14th, when they were taken and carried away, by a stranger; it was held, in an action of trespass *de bonis asportatis*, brought by the officer against such stranger, that the plaintiff was not entitled to recover.

THIS was an action of trespass *de bonis asportatis;* tried at *Norwich, January* term 1828, before *Lanman*, J.

On the 8th of *May*, 1827, the plaintiff, a deputy sheriff, by virtue of a writ of attachment against *Joseph C. Beckwith*, took the goods mentioned in the declaration, mostly articles

of household furniture, in the house occupied by *Beckwith* and put them in the custody of one *Chappell*, without otherwise removing them from the possession of the debtor. On the next day, the plaintiff requested *Francis Jones* to take charge of the goods ; who did so, and had the custody of them until the 10th of *May*, at noon. They remained under *Beckwith's* roof until the 12th of *May ;* but in whose possession they were from the 10th to the 12th, did not appear. On the 12th, the plaintiff removed them into the *East* part of the same house, and put them into the possession of *Jones.* Immediately afterwards, *Jones* told the plaintiff to take them out of his part of the house, declaring that he wished to have nothing to do with them. They remained there, however, though not in *Jones's* custody, until the 14th of *May*, when the defendant took them and carried them away. The defendant contended, that to enable the defendant to recover, in this action, it must be proved, that *Jones* had the charge and custody of the goods for the plaintiff down to the time when they were taken by the defendant. But the judge charged the jury, that it was immaterial whether *Jones* consented to take the care and charge of the goods for the plaintiff, after the 12th of *May ;* for that the property was out of the possession of *Beckwith*, and of course, he could not dispose of it to defeat the attachment. The jury returned a verdict for the plaintiff; and the defendant moved for a new trial for a misdirection.

*Isham*, in support of the motion.

*Goddard*, contra.

Hosmer, Ch. J. From the detail of facts, in this case, it appears, that after the property was attached, it was suffered to remain in the house occupied by the debtor and others, six days, and, a part of the time, in the room wherein he resided ; that two days, *viz.* from the 10th to the 12th, it was not in the custody of any one ; and that two days more, that is, from the 12th to the 14th, it was not in the actual possession of *Jones*, or under his oversight, nor in the actual possession of any person. Nor is the slightest necessity for this conduct made to appear. It is not stated, that the plaintiff was so much occupied, by other important business, as to be unable to exercise personal attention to the subject, or to procure a person to do

it, or to remove the property ; and yet the exigency of the case required it.   *Jones* refused to be the depositary of the goods ; and of consequence, they were not in the custody of any one.   They, likewise, were within the house, and within the power of the debtor, and all this with the plaintiff's knowledge. The court should have charged the jury, that the lien by attachment had terminated ; and that, on this account, the plaintiff, not having a special property in, or the actual possession of the goods, could not maintain trespass.

The personal estate of every debtor is liable to be taken on process, and held to respond the judgment that may be rendered against him.   This is effected, not by permitting it to remain in his possession, but by fastening upon it with a writ of attachment, and holding it in the custody of the law.   Possession of personal property is the only *indicium* of ownership ; and the suffering of the debtor, after the service of an attachment or an execution, to retain the possession, is *prima facie* proof, that the attachment or execution levy is fraudulent in respect of creditors.   It is of the very essence of a lien by attachment, that possession be taken and held ; and when this is relinquished, there is a termination of the lien, and the general owner is remitted to his property unencumbered.   To this point the decisions of the courts are uniform and numerous. *Chancellor* v. *Phillips,* 4 *Dall.* 213.   *United States* v. *Conyngham* & al. 4 *Dall* 358.   *Barnes* & al. v. *Billington* & al. 4 *Day* 81. n.   *Burrows* v. *Stoddard,* 3 *Conn. Rep.* 160. 164. 431.   The plaintiff, then, having abandoned the possession of the goods attached, the lien upon them was gone, and they were out of the custody of the law, when taken and carried away by the defendant.   Of consequence, the plaintiff had no special property or possession, and cannot sustain the action of trespass.

Instead of charging the jury with the principles before-mentioned, and leading their minds to the enquiry whether the goods attached were in the plaintiff's custody, at the time of the alleged trespass, the judge took from them the consideration of this, the only material question in the case, and assumed a new principle ; one, in my opinion, altogether inadmissible. They were instructed, " That it was immaterial whether *Jones* consented to take the care and charge of said goods for the plaintiff, after the 12th of *May ;* for that the property was out of the possession of *Beckwith ;* and, of course, he could not

dispose of it to defeat the attachment." The charge proceeds upon the hypothesis, that whether the plaintiff had possession of the goods or not, was an irrelevant enquiry, as the defendant did not actually possess them. It seems to have been forgotten, that the plaintiff was bound to establish a title, which he could do only by shewing a legal attachment and the actual custody of the goods under it; and if *Beckwith* had not possession, that it would be of no avail in the plaintiff's favour. *Beckwith*, however, had not only title, but the possession also, in contemplation of law. When personal property is not in the actual possession of any one, by the established law, it is in the constructive possession of the general owner, and he may sell and dispose of it at pleasure. *Bro. Abr. tit.* Trespass. *pl.* 303. 346. *Latch* 214. 2 *Bulstr.* 268. *Bac. Abr. tit.* Trespass. C. 2.

On the whole, there is no doubt, that the charge of the judge in this case was incorrect; and, of consequence, a new trial is advised.

DAGGETT, J. was of the same opinion.

PETERS and LANMAN, Js. dissented.

BRAINARD, J. was absent.

New trial to be granted.

————◆————

TREAT *against* BARBER and another.

Where the question on the trial of an action of trespass *de bonis asportatis*, brought by *A* against *B.*, was, whether a previous sale of the goods from *C.* to *A.* was *bona fide* and for valuable consideration; *A.* claiming, that the consideration was a debt due by note to her from a manufacturing company, which *C.* had received of her, promising to account with her for it, offered *D.* to testify, that he had seen on the note-book of the company, kept by *C.*, as their agent, and from time to time exhibited to them, an entry of such note, particularly describing it; it was held, that the testimony of *D.*, and the books themselves, were inadmissible; the former being in the nature of hearsay, and further exceptionable as going to shew the contents of a writing, and the latter being *res inter alios acta*.

Where the defendant in such action, to repel the proof of consideration adduced by the plaintiff, offered evidence to prove, that a considerable note and mortgage had been given by *C.* to the plaintiff, after the time when, as she claimed, the debt for which the goods were sold, accrued, and before such sale; it was held, that such evidence was admissible, as having a bearing, though a remote one, on the matter in issue.

In trespass for the taking of goods, alleged in the declaration to be of a certain value, the damages to be assessed, if the plaintiff recover, so far as they depend on the value of the goods, are to be restricted to the value alleged.

But the circumstances which accompany and give character to a trespass, may always be proved, to nhance the damages beyond the pecuniary loss sustained by the plaintiff.

Therefore, where it appeared, in an action of trespass *de bonis asportatis*, that the defendant opened the chest of the plaintiff, containing her wearing apparel, and made use of language in relation thereto, that wounded her feelings; it was held, that these circumstances were proper to be considered in assessing the damages.

If *A.* intermingle his goods with those of *B.*, without confusion, in such a manner that *A.* alone can distinguish them, and an attaching creditor of *B.* request *A.* to select his goods, which he refuses to do ; this alone will not justify such creditor in taking *A.*'s goods with those of *B.*

But if *A.*, fraudulently, and with the intention of frustrating the attachment of *B.*'s creditor, intermingle his goods with those of *B.*, so as to be inseparable by such creditor, the latter may justify the taking of them.

*Windham,*
July, 1828.

Treat
*v.*
Barber.

THIS was an action of trespass *de bonis asportatis ;* tried at *Brooklyn, January* term, 1828, before *Lanman, J.*

The plaintiff claimed title to the goods mentioned in the declaration, by purchase from her father, *Amos Treat, bona fide* and for a valuable consideration. The defendant *Barber,* by the instrumentality of the other defendant, an officer, had attached them and removed them, as being still the property of *Amos Treat ;* and claimed, that if he had sold any of them to the plaintiff, the sale was fraudulent as against creditors.

To shew that the sale of the goods from *Amos Treat* to the plaintiff was *bona fide* and for a valuable consideration, the plaintiff stated, that in the year 1815, she took a note against *The Industry Manufacturing Company,* given by her father as agent, for money loaned ; and that in the year 1817, her father received that note from her for his own use, to account with her for the avails. To prove the existence of her debt against the company, the plaintiff offered the testimony of *James Treat,* a member of the company, that he had seen on the note-book of the company, kept by the plaintiff's father, and from time to time by him exhibited to the company, a statement of the date and amount of the note, as due to the plaintiff, and of the time of its payment ; but that he had no other knowledge of the existence of the debt. The note-book was shewn in court. *Amos Treat* was an admissible witness, and was present in court, but was not called on. Under these circumstances, the defendants objected to the testimony of *James Treat ;* but the judge overruled the objection, and admitted it.

To repel the evidence adduced by the plaintiff of her fa-
ther's indebtedness to her, on account of said note, the defend-
ants offered evidence to prove, that on the 28th of *December*,
1825, a short time before the alleged sale, *Amos Treat* gave
his note to the plaintiff for 600 dollars, for a legacy due to her
from him, as executor of *Dorothy Stanton*, and mortgaged his
real estate to secure it. This evidence, on the objection of the
plaintiff, was rejected.

Some of the witnesses having testified, that a part of the
goods named in the declaration were of greater value than
they were therein stated to be ; and the plaintiff having claim-
ed, that the jury should estimate the damages accordingly ; the
defendant claimed and prayed the judge to instruct the jury.
that they were not at liberty, in estimating the damages, to con-
sider such goods as of any greater value than that affixed to
them in the declaration ; but the judge omitted so to charge
the jury.

It appeared, that when the goods were taken by the defend-
ants, they opened a chest of the plaintiff, containing her wear-
ing apparel, without taking therefrom, however, any of the ar-
ticles specified in the declaration ; and that the defendants
then made use of language to the plaintiff. in relation to the
contents of the chest, calculated to wound her feelings. She
therefore claimed, that on account of this transaction, she was
entitled to greater damages. The defendants resisted this
claim, and prayed the judge to instruct the jury, that the plain-
tiff, under the present declaration, could not recover any dama-
ges on this ground. The judge omitted so to instruct the jury.

The defendants introduced evidence to shew, that if the
plaintiff owned *bona fide* any of the goods attached, she had
mingled them with her father's goods, so that she alone could
distinguish them ; and that, at the time of the attachment, the
defendants requested her to select such goods as belonged to
her ; but that she refused to make such selection, claiming the
whole as her own. The defendants, therefore, prayed the
judge to instruct the jury, that if the goods of *Amos Treat* were
so intermixed with the plaintiff's, and she refused to select her
goods, claiming the whole to belong to herself, the defendants
were not liable as trespassers for taking the plaintiff's goods
thus circumstanced. But the judge did not so instruct the jury.

The plaintiff obtained a verdict ; and the defendants moved
for a new trial, for the admission of the evidence offered by the

plaintiff, for the rejection of that offered by the defendant, and *Windham,* for a misdirection.

*Strong* and *Morgan,* in support of the motion, contended, 1. That the testimony of *James Treat* was inadmissible to prove the existence of the debt from the *Industry Manufacturing Company* to the plaintiff; it being but hearsay, so far as the admissions of the members of the company extended; and the entries in their books, though evidence against them, could not be so against the defendants in this action.

2. That the testimony as to the note and mortgage, given by *Amos Treat* to the plaintiff, after the time when it was claimed the debt for which the goods were sold, accrued, and before such sale, should have been admitted; as it *conduced* to prove, that there had been a settlement between them, and so the account for money loaned was extinguished.

3. That the jury should have been instructed, that in the assessment of damages, they could not consider the goods to be of greater value than the plaintiff in her declaration had alleged them to be. It was essential that the declaration should state the goods to be of some value; and even if not essential, the averment being made, the plaintiff was as much limited by it, as by the averment as to the quantity or kind. 1 *Chitt. Plead.* 362, 3. 2 *Chitt. Plead.* 370. n. *Com. Dig. tit.* Pleader. 3 M. 1. 3 *Stark. Ev.* 1531. 1550. 1565.

4. That there being no matters of aggravation alleged in the declaration, nor even the general allegation of *alia enormia,* the plaintiff was not at liberty to claim increased damages on account of any insulting language of the defendants, nor on account of the opening of the chest, the latter being a distinct act of trespass. 1 *Chitt. Plead.* 388. 1 *Swift's Dig.* 652. 1 *Tidd's Pract.* 391.

5. That the plaintiff having wrongfully intermingled her goods with those of *Amos Treat,* which the defendants had right to take, in such a manner that she only could distinguish and separate them; and having refused to make such separation; she cannot claim, that the defendants were trespassers, if, by mistake, they took some of her goods. 2 *Bla. Com.* 405. 1 *Swift's Dig.* 172. *Com. Dig. tit.* Pleader. 3 M. 28.

*Goddard,* contra.

HOSMER, Ch. J.   1. The admission of the testimony of *James Treat* raises the first question in the case.

The presence of *Amos Treat* I lay out of the question.    The plaintiff was under no obligation to rely on his testimony, but had a right to resort to any other, conducing to prove the existence of the debt.    As against the defendants, neither the books of the company, nor the testimony of *James Treat*, was legal evidence.    It stands on no higher ground than mere hearsay.    A case may be supposed, in which the above-mentioned books would be good evidence against *Amos Treat* and the *Industry Manufacturing Company*, as being their recognized act and declaration.    But as against a third person, the books are no more admissible than the parol declarations of the company or of *Treat*.    They are *res inter alios acta*.    It is almost superfluous to say, that those books are not public records, to serve as the memorial of facts ; but they are the private entries of the company.

The testimony of *James Treat*, except to identify the books, was likewise inadmissible, even if *they* were legally competent. They must speak for themselves ; and evidence of what appeared on their pages, could not come from the mouth of a witness.

2. It was next made an objection by the defendant, that the court refused to admit as evidence a note and mortgage, given by *Amos Treat* to the plaintiff, after the time when it was claimed the debt for which the goods were sold, accrued.

Whether some inference might not arise out of this transaction bearing on the matter of controversy, is the question ; and I am inclined to think, that, although remote, it was of this tendency ; and that the facts should have been laid before the jury. *Gibson* & al. v. *Hunter*, 2 *H. Bla.* 187.    The proof, it is true, would not rise high ; but if it conduced to evince any thing in issue, it ought to have been received.

3. Some of the witnesses testified, that the goods in question were of higher value than that which was assigned to them in the plaintiff's declaration ; and the defendant prayed the court to instruct the jury, that in the estimate of damages they could not go beyond the value by the plaintiff alleged ; but on this head the court omitted to charge them.

The plaintiff, if he obtain judgment, can only recover *secundum allegata*, unless his allegation is entirely superfluous.    It is correctly said by *Starkie :* " It seems, indeed, an universal

rule, that a plaintiff or prosecutor shall, in no case, be allowed
to transgress those limits, which, in point of description, limitation and *extent*, he has prescribed for himself ; he selects his
own terms, in order to express the nature and extent of his charge or claim ; he cannot, therefore, justly complain, that he is limited by them." 3 *Stark. Ev.* 1531. The affixing of a value to goods, in an action of trespass, is necessary and not superfluous, although an omission to make this allegation, is cured by verdict. *Strode* v. *Hunt,* 2 *Lee.* 230. *Bertie* v. *Pickering* & ux. 4 *Burr.* 2455. *Wood* v. *Smith, Cro. Jac.* 129 *Usher* v. *Bushel,* 1 *Sid.* 39.

The court should have charged the jury, that beyond the allegation of value affixed in the declaration they could not allow damages, whatever might be the actual value of the goods.

4. At the time of the trespass committed, the defendants opened a chest belonging to the plaintiff, and made use of language in relation to the contents of it, that wounded her feelings ; and the facts having been proved, an increase of damages was demanded on this account. The defendants prayed the court to charge the jury, that they could not augment the damages on this ground ; but the judge omitted to give them any instruction on this subject.

" It is always the practice," said *Le Blanc,* J. in *Bracegirdle* v. *Orford,* 2 *Mau. & Selw.* 79. " to give in evidence the circumstances, which accompany and give a character to a trespass ;" and that is the case relative to the evidence before us. The jury are not bound down to give the mere pecuniary loss sustained by the plaintiff, but may award damages for the malice and insult attending a trespass. In an action for breaking and entering the plaintiff's close, and searching for game, he was permitted to prove, that the defendant, on being warned off the plaintiff's land, used very intemperate language, and threatened to commit him ; (*Merest* v. *Harvey,* 5 *Taun.* 442.) and yet no matter of aggravation was alleged. The same principle was recognized, by this court, in *Edwards* v. *Beach,* 3 *Day* 447. and in *Churchill* v. *Watson,* 5 *Day* 140. There are instances where the damages do not necessarily arise from, or accompany, the act complained of, which, notwithstanding, are allowable, but which, in order to prevent surprise on the defendant, must be particularly alleged in the declaration. 1 *Chitt. Plead.* 386, 7, 8. The abuse to the plaintiff, however,

*Windham,*
July, 1828.

Treat
*v.*
Barber.

by searching her chest, and indulging in improper remark, at the time and in the manner mentioned, was an aggravation of the trespass coetaneously existing with it, and serving to shew the malice, with which her legal rights were violated.

5. The plaintiff, at the time the goods before-mentioned were attached, claimed all that was in her possession, and refused to make a selection between what were really hers, and what were attachable by the defendant *Barber.* This intermingling of the goods that belonged to the plaintiff with those that she held in fraud of creditors, it is contended, justified the defendants in their transgression, as they were incapable of making a separation.

The doctrine of confusion of goods, derived from the civil law, has been referred to, as sanctioning the objection ; but it is not applicable. Confusion, as it is termed, is a mixture of liquids, as wine and wine, or wine and honey, or melted silver and gold. *Wood's Inst.* 158. And within the same reason is the intermixture of money, or coin, or hay, that forms one undistinguishable mass. 2 *Bla. Comm.* 404. But the placing of crockery, china or other articles resembling each other, on the same shelf, is not a confusion of them, within the meaning of the law. Were it so, the defendant *Barber* might have held all the property taken by his attachment, if there were a fraudulent intermixture, as being the goods of his debtor.

If, however, the plaintiff fraudulently, and with the intention of frustrating the defendant's attachment, had caused her goods and those of *Amos Treat* to be intermingled, so as to be inseparable by the attaching creditor, the defendant might justify the taking of them. 2 *Rol. Abr.* 566. *l.* 15. 2 *Bulstr.* 323. *Ward* v. *Ayre, Cro. Jac.* 366. *Gordon* v. *Jenney,* 16 *Mass. Rep.* 465. 470. Otherwise, the plaintiff would derive an advantage from her own wrong. But nothing of this kind appears in the present case. The intermingling, for aught that is stated, was casual or accidental, and without any design of covering the goods.

The specific objection is, that the plaintiff would not make the requested discrimination. As a matter of courtesy, if she had admitted, that part of the goods were not her property, she ought to have done it ; and I think she would be under a moral obligation to do so. But she claimed the whole, and probably thought she had a valid title. The omission to give the requisite information, was neither a fraud, nor the vi-

olation of any obligation by law put upon her. Under the circumstances of the case, the defendants acted at their peril; and the omission to charge the jury, is not the subject of complaint.

On the whole, for the errors specified in the three first objections, a new trial must be granted.

The other Judges were of the same opinion, except BRAINARD, J., who was absent.

New trial to be granted.

---

## SUMNER *against* LYON and others.

Where a farm of land, lying partly in the town of *A.* and partly in the adjoining town of *P.,* was mortgaged, and afterwards an execution was levied on the equity of redemption ; and the equity of redemption in the land in *A.* was appraised at a certain sum, and that in *P.,* at a certain other sum ; and the officer set off to the creditor " such part or proportion of the whole of said equity of redemption in each and every of said described premises, both in *A.* and *P.,* as the execution debt and charges bore to the whole of said equity of redemption ;" it was held, that the creditor acquired no title by virtue of such levy.

THIS was a bill in chancery against the mortgagees of one *Thomas Lyon,* to redeem mortgaged estate. The plaintiff founded his title on the levy of an execution upon the equity of redemption of the mortgagor. The estate mortgaged was a farm of land, consisting of one connected tract, situate in part in the town of *Ashford,* and in part in the adjoining town of *Pomfret.* The equity of redemption in the land within the town of *Pomfret,* was appraised at 415 dollars, 31 cents ; and that within the town of *Ashford,* at 433 dollars, 35 cents. The execution debt, with the costs of levy, amounted to 531 dollars, 85 cents. The officer set off to the execution creditor " such part or proportion of the whole of said equity of redemption in each and every of said described premises, both in said *Pomfret* and in said *Ashford,* as the execution debt and charges bore to the whole of said equity of redemption."

On the hearing, at *Brooklyn, January* term, 1828, before *Lanman,* J., the execution and the officer's return thereon, were offered in evidence, in support of the plaintiff's title ; to the

*Windham,*
July, 1828.

Sumner
*v.*
Lyon.

admission of which the defendants objected; but the court overruled the objection and admitted the evidence; and thereupon a decree was passed in the plaintiff's favour. The defendants then moved for a new trial.

*Strong*, in support of the motion, contended, 1. That an equity of redemption being one and indivisible, the appraisers could not apportion the debt; and no apportionment could be made of the equity of redemption in the land in one town separately from that in the other town    *Scripture* **v.** *Johnson*, 3 *Conn. Rep.* 211.    *Hobart* v. *Frisbie*, 5 *Conn Rep.* 594.

2. That if such appraisal could be made, the plaintiff's title is still invalid, as it appears by the return, that the whole debt has been twice satisfied.

*Goddard* and *Holbrook*, contra.

HOSMER, Ch. J.    The only enquiry in the case regards the plaintiff's title; and the specific question is, whether the execution was duly levied.

It is the appropriate legal duty of the officer to set off to the creditor so much of the estate levied on, as will pay his debt and the levying charges; and if it be done legally, the estate thus appropriated becomes the property of the creditor. Now, it is demonstrably apparent, that the estate set off in this case, is equivalent to a double payment of the execution debt. This will be rendered perfectly obvious, by the statement of a supposed case on the principle of the levy, in which the execution debt and the equity of redemption shall consist of an amount easily remembered.

Suppose *A.* owes *B.* 500 dollars, and to secure it mortgages a farm lying in two towns; the half in value being in one town, and the other half in the other town. The equity of redemption is worth precisely 2000 dollars. It is clear, that the execution ought so to be levied as to convey to the creditor the one fourth part of the equity. Instead of this, the officer sets off to the creditor such proportion of the equity of redemption in one of the towns as the debt and the whole equity of redemption bear to each other, *i. e.* the one fourth part of the mortgagor's estate. By this process, the creditor obtains the full satisfaction of his debt. But not satisfied with this, the officer proceeds. and sets off the same proportion of the equi-

ty of redemption in the other town ; and thus the creditor has payment of his debt a second time ; that is, the creditor obtains the one fourth part of the equity of redemption, by the levy in one town, in full satisfaction of his demand, and then another fourth, in the adjoining town.

The same erroneous proceeding distinguishes this case. The officer set off such proportion of the property in the town of *Ashford,* as the whole debt bore to the whole equity, and then appropriated the same amount of property in the town of *Pomfret.* The expression of his return requires this construction. Having ascertained the proportion of the property set off, by comparing the debt with the whole equity of redemption, he appropriates the property embraced within this comparison to the estate of the mortgagor in the aforesaid equity " in each and every of said described premises both in said *Pomfret* and in said *Ashford ;*" that is, the creditor is to have the proportion defined in the property lying in one of the towns, and then the same proportion in the other. And thus, if the levy were held good, the creditor would obtain a double satisfaction of his demand.

The officer should have set off such a proportion of the equity of redemption, (which is entire and indivisible) as the debt and charges bore to the whole equity ; and there he should have stopped. But instead of this, he twice sets off the above proportion of the equity, evidently and erroneously supposing, that the equity of redemption in one town, was distinct from that in the other. Were it even so, the proceeding would still be erroneous.

It has been suggested, that it was the intention of the officer to set off a sufficiency of the estate to pay the execution debt, and no more. Whether the supposition is well founded is a question of fact, which the court has no means of deciding. The plaintiff's bill contains no such averment, and the point must be put in controversy, and the fact be found, before the court can pronounce on its legal effect.

The plaintiff has no title, by virtue of the execution levy ; and the decision of the court below was manifestly incorrect. A new trial, therefore, is advised.

The other Judges were of the same opinion, except BRAINARD, J., who was absent.

New trial to be granted.

SCOVELL *against* KINGSLEY.

Where a witness, introduced by the plaintiff, in an action of slander, to prove the speaking of the words, was unable to say, whether the words were spoken before or after the commencement of the suit ; it was held, that his testimony was inadmissible.

THIS was an action of slander, tried, under the general issue, at *Brooklyn, January* term, 1828, before *Lanman,* J.

The words alleged as slanderous in the first and third counts of the declaration, were these : " *Amherst Scovell* keeps a false record. In a suit before him between *Lovell Rogers* and *Hubbard Phelps,* he certified in the copies of the record, that the bond for prosecution was ten dollars, whereas in the original it was forty dollars ; and the judgment in that cause was rendered for fifteen dollars damages, whereas in the copies he has certified, that it was for twelve dollars damages. He has made a false certificate of the copies." These words, it was averred, were spoken of the plaintiff, in his office of a justice of the peace, with reference to an action at law, tried before him, in *March* 1822. In support of the allegations in the first and third counts, the plaintiff offered the testimony of *Hezekiah Hartshorne,* that a year or more before the trial, (he could not swear to the precise time) he heard the defendant say, that the plaintiff, as a justice of the peace, kept false records, and altered them, after made, to suit himself. The defendant objected to this testimony, that unless the witness could say, that the words were spoken before this action was brought, it was inadmissible. The judge overruled the objection, and allowed the testimony to go to the jury, observing, that it was " a fit kind of evidence for them to weigh and deliberate upon, in this case." In his charge to the jury, the judge said : " The plaintiff, in this case, as in all others, must prove the matters alleged as the cause of action to have taken place *prior* to the suit for its redress. But it is for the jury to decide, upon the proof before them, whether or not this is made out, by the testimony they have heard, as to the first and third counts, as well as the others. As to the first and third counts, if the jury should be of opinion, that the words proved were not spoken until *after* the date of the writ, their verdict on those counts will be for the defendant." The jury returned a verdict for the plaintiff ; and the defendant moved for a new trial.

*Strong*, in support of the motion, contended, That the jury should have been instructed, that under the testimony of *Hartshorne*, they could not find the defendant guilty, under the counts in support of which it was adduced.

*Goddard*, contra, insisted, That whether the testimony of *Hartshorne* proved the first and third counts, was properly left to the jury, with a charge that the words must be proved to have been spoken before the action was commenced.

DAGGETT, J. It is a very plain principle of law, that the plaintiff could not support the issue joined on either of these counts, unless he proved the words to have been spoken *before* the date and service of the writ. The *time*, then, of speaking the words, became material, and thus far indispensable. The testimony of *Hartshorne* leaves it in entire uncertainty ; and thus it is not, and cannot be ascertained, whether the testimony is relevant and admissible, or irrelevant and therefore improper. Surely, such testimony cannot be legal ; for the rule of law, and the only reasonable principle, is, that he who offers testimony in support of a fact, should show it, pertinent to the issue. But in this instance, upon the principle assumed, the jury must ascertain, *without any proof, when the words were spoken*, and then either reject the testimony, as not bearing on the issue, or admit it, as pertinent. The testimony is to be weighed and deliberated upon, by the jury, as to the point of its legality, and not as to its import. This is manifestly irregular. No principle is better settled, than that the question of the legality of testimony, must be decided by the court ;—its weight, when admitted, is to be ascertained by the jury. Such testimony might have been received to prove *malice*, but not to support the *right* of recovery.

Any further observations on a point so plain, would be superfluous. A new trial, is, therefore, to be granted.

The other Judges were of the same opinion, except BRAINARD, J., who was absent.

New trial to be granted.

HOPKINS *against* The town of PLAINFIELD :

### IN ERROR.

Where the complaint, in a suit by the town, for the maintenance of a bastard child, averred, that such child was a settled inhabitant of the town, and likely to become chargeable thereto, and that no bond or other security had been given to indemnify the town against the expense for the support of the child ; it was held to be sufficiently shewn, by these averments, that the town was interested in the support of the child.

In such suit, it is no objection that the act complained of is not averred to be *contra formam statuti,* nless it appear, that the proceedings are not founded upon the statute, but rest upon the common law

Where the complaint prayed process against the person accused, that he might be arrested, and brought before proper authority, and be dealt with, *as by the statute in such case made and provided is directed,* it was held, that this was equivalent to an express averment, that the complaint was instituted on the statute.

The proper remedy, and the only one known in practice, in favour of a town, against the putative father of a bastard child, for the maintenance of such child, is by complaint and warrant.

A bond given to the treasurer of a town, is, in law, a bond to the town.

It is not a sufficient ground of abatement of the complaint, in a proceeding for the maintenance of a bastard child, that the bond required of, and given by, the defendant, for his appearance, was an improper and invalid one.

Where the defendant in such proceeding appeared before the justice, to whom the complaint was exhibited, and pleaded *not guilty;* and such justice, after examination, found him *guilty,* and bound him over to the county court ; it was held, that such finding, as it included *probable cause,* authorized the binding over, and the proceeding was not, on that account, erroneous.

In such proceeding, it is not a ground of error, that the complaint was exhibited to, and a warrant thereon was issued by, one justice of the peace ; and such warrant was returned to another justice, by whom the complaint was heard, and the defendant bound over.

THIS was a suit for the maintenance of a bastard child, instituted and prosecuted, by the selectmen of the town of *Plainfield,* against *Hopkins,* the person accused of begetting such child.

The complaint was addressed to *Joseph Eaton,* Esq., a justice of the peace, stating, That on the 12th of *April* 1824, *Betsey Hall,* a legal and settled inhabitant of the town of *Plainfield,* was, at said *Plainfield,* delivered of a bastard child, begotten by said *Hopkins;* that said *Betsey* had neglected to bring forward a suit for the maintenance of said child, and to prosecute the same to final judgment ; that said child is a set-

tled inhabitant of said town of *Plainfield*, and likely to become chargeable thereto; and that no bond or other sufficient security had ever been offered to said town of *Plainfield*, to indemnify said town for the support of said child. The complaint concluded thus: " Whereupon the said town of *Plainfield*, by their selectmen, pray process against the said *Hopkins*, that he may be arrested and brought before the proper authority, and be dealt with, as by the statute in such cases made and provided, is directed." To this complaint was annexed a warrant, issued by justice *Eaton*, by virtue of which *Hopkins* was arrested, and brought for examination before *Francis B. Johnson*, Esq., a justice of the peace. There he pleaded *not guilty*; and justice *Johnson*, after hearing the testimony, found him *guilty*, and ordered him to give bond with one sufficient surety, to the treasurer of the town of *Plainfield*, for his appearance before the county court, to answer to the charges in the complaint, and abide the order of said court thereon. The defendant gave bond accordingly.

Before the county court the defendant pleaded in abatement,
1. That the complaint was made to *Joseph Eaton*, Esq., as justice of the peace, and the warrant issued thereon, was issued by him, and it was returned to *Francis B. Johnson*, Esq., another justice of the peace, who heard the complaint and ordered the defendant to be bound over for trial.

2. That justice *Johnson* found the defendant *guilty* of the facts set forth in the complaint, and thereupon ordered the defendant to become bound with one sufficient surety; whereas he should have found, that there was *probable cause*, and ordered the defendant to become *bound with surety*

3. That the bond ordered to be given, and the bond actually given, was to the *treasurer* of the town of *Plainfield*; whereas the bond should have been ordered and taken to the *adverse party, viz.* to the town of *Plainfield*.

To this plea in abatement there was a demurrer. The court adjudged it insufficient, and ordered the defendant to answer over.

He was then tried on the complaint, under the plea of *not guilty*; the court found him *guilty*; and thereupon passed a final order pursuant to the statute. To reverse the judgment of the county court, the defendant brought a writ of error in the superior court; which was reserved for the advice of this court.

*Judson,* for the plaintiff in error, contended, 1. That the complaint was insufficient.

First, it does not allege, that the town of *Plainfield* is interested in the support of the child. If the defendant is liable at all, it is because the statute has made him liable ; and to entitle the plaintiffs to a recovery, they must state all the facts necessary to bring the defendant precisely within the statute. *Morse* v. *The State,* 6 *Conn. Rep.* 9.

Secondly, the act complained of is not alleged as *contra formam statuti.* This is necessary in all cases, where such act was not the ground of an action at common law. 1 *Chitt. Plead.* 360. *Lee* v. *Clarke,* 2 *East* 333.

Thirdly, the remedy authorized by the statute, is a civil action, and not a criminal proceeding like the present. *Hinman* v. *Taylor,* 2 *Conn. Rep.* 357. 360.

2. That the plea in abatement was sufficient.

First, because the complaint was made to one justice, and the proceedings were had before another. The statute requires the justice, to whom the complaint is exhibited, to issue a warrant and cause the person accused to be brought before *him.* *Stat.* 91, 2. Previous to the late revision, the statute was different. *Stat.* 100. *sect.* 2. ed. 1808.

Secondly, because the defendant was found *guilty,* when *probable cause* was the extent of the enquiry, which the justice was authorized to make. *Stat.* 92. *Waldo* & al. v. *Spencer,* 4 *Conn. Rep.* 71.

Thirdly, because the bond was ordered to be given to the *treasurer* of the town, and not to the adverse party, *the town.* *Hollister* v. *White* & al. 2 *Conn. Rep.* 338.


*Eaton,* for the defendants in error.


DAGGETT, J. The objections to the judgment of the county court, and by reason of which, it is insisted, the judgment ought to be reversed, will be briefly noticed, in the order taken by the plaintiff in error.

1. The original complaint is insufficient, because it is not alleged, that the town of *Plainfield* was interested in the support of the illegitimate child. It is said, according to the case of *Morse* v. *State,* 6 *Conn. Rep.* 9. an indictment or information upon a statute must state all the facts necessary to bring the defendant precisely within the statute. There can be no

doubt of the correctness of this principle; but on looking into *Windham,* this complaint, there appears no foundation in fact to sustain July, 1828. the objection. It is averred in the complaint, that the child is Hopkins a bastard, born at *Plainfield ;*—that the mother is a settled in- *v.* habitant of the town ;—that she has neglected to institute any Plainfield. suit for the maintenance of the child ;—that no bond or other security hath been given to indemnify the town against the expense for the support of the child, which is a settled inhabitant of the town and likely to become chargeable thereto. It is difficult to see how the allegations could have been more apt and full to the purpose.

2. The act is not alleged to be "*contra formam statuti.*" To give any force to this objection, it must appear, that the proceedings are not founded upon the statute, but rest upon the common law ; and as this is not an offence at common law, but is merely so by statute, it should have so appeared. The complaint is not only apparently, but by an express averment, instituted upon the statute. Thus, after stating the facts, it concludes : " Whereupon the said town of *Plainfield,* by their selectmen, pray process against the said *William Hopkins,* that he may be arrested, and brought before proper authority, and be dealt with, *as by the statute, in such case made and provided, is directed.*" The statute does not prohibit the begetting of a bastard child ; it simply provides how it shall be supported, and gives to the town interested in its support a peculiar remedy for indemnity. That remedy is here strictly, and "*eo nomine,*" pursued.

3. This is not such an action as the statute authorizes. In support of this objection *Hinman* v. *Taylor,* 2 *Conn. Rep.* 360. is cited. Nothing appears in that case, except that a process upon the statute is a civil suit. It is not there declared what shall be the form of the process ; nor are we furnished by the counsel with any form. It is believed, that the process here adopted is the only one known in practice ; and no solid reasons are suggested, why it is not entirely correct. These objections, therefore, fail.

Sundry matters were pleaded in abatement of this process, before the county court, to which it was returned. The order of these will, in the consideration of them, be reversed.

1. The bond ordered to be given. and the bond given, was to the treasurer of the town of *Plainfield.* whereas the bond

*Windham,* should have been taken to the "adverse party," to wit, the town of *Plainfield.*

July, 1828.

Hopkins
*v.*
Plainfield.

Two obvious and sufficient answers to this ground of abatement present themselves.

First, the bond was, in fact, and in law, ordered and given to the town of *Plainfield,* the adverse party. A bond to the town treasurer, is a bond to the town, and to no one else. *Bradley* v. *Baldwin,* 5 *Conn. Rep.* 288. A bond in this case could only be to the adverse party. Secondly, if it were not so, is this a ground of abatement? What if the defendant were not to be affected by the bond, is the process, therefore, to abate; and even, if it were a cause of abatement, in any case, could the defendant be heard to allege it? Can he be injured or affected by it?

2. The justice of the peace before whom the defendant in the process was brought, upon a hearing, found him *guilty;* whereas by the directions of the statute, he was authorized to order him to be recognized to appear before the county court, if he found *probable cause.* By the record of the justice, it appears, that the defendant before him pleaded " *not guilty;*" and he answered the plea in his judgment, by finding him *guilty.* It was not necessary, that the defendant should have pleaded at all; but as he did, and was found guilty, it is not easy to see why the justice should not bind him over to the county court. He found more than *probable,* even *actual* cause. The case of *Waldo* & al. v. *Spencer,* 4 *Conn. Rep.* 71. cited in support of the objection, proves it unfounded.

3. The last ground of abatement was, that this process was issued by one justice of the peace, *viz. Joseph Eaton,* Esq., and the person charged, was directed to be, and in fact was, brought before another justice, *Francis B. Johnson,* Esq. This is the only ground of error, worthy of consideration; but it is not sufficient to reverse the judgment.

It is said, and truly so, that the statute of 1821 is materially variant from that previously in force. By the former statute [*sec.* 2. of the ed. of 1808.] every assistant or justice of the peace might bind over to the county court, &c. By the act of 1821, it seems, the justice of the peace, to whom the complaint is made, &c., shall issue his warrant to cause the person charged to be brought *before him,* and *he* is to bind over, &c. But this alteration, by the terms of it, affects only the process instituted by the mother, and has no bearing upon that instituted by

the town. *That* is left, precisely where it was, (so far as this question arises) and therefore, it is to be presumed, that the legislature intended no alteration. It is well known, that under the former act, the process by the mother and that instituted by the town might alike be both issued by one justice of the peace, and made returnable before another ; and since there is no alteration in the law of 1821 in relation to the process by the town, either in direct terms, or by fair implication, I think this process is good. This construction of the statute is more readily assented to, because the acts to be done by the justice, are merely ministerial ; and there can be no importance attached to the question, what justice shall perform this merely ministerial act. In *Davis* v. *Salisbury,* 1 *Day* 278. the court of errors held, that a justice of the town interested, might bind over to the county court, the person arrested. That decision has been acquiesced in, recognized, and followed, ever since.

There is, then, no error in the judgment complained of.

The other Judges were of the same opinion, except BRAIN-ARD, J., who was absent.

*Judgment to be affirmed.*

<div align="right">

*Windham,*
July, 1828.

Hopkins
*v.*
Plainfield.

</div>

---

### TINGLEY *against* CUTLER.

In an action of debt to recover a certain sum, as liquidated damages, for the non-performance of an agreement to purchase and pay for real estate, an unrecorded deed to the plaintiff from his immediate grantor, accompanied by possession of the estate, is *prima facie* evidence of title ; and it is unnecessary for the plaintiff, in the first instance, to trace his title farther back.

In an action founded on a written agreement, it is not necessary, that the consideration should be expressed in the writing ; but it may be collected from circumstances, and the evidence submitted to the jury.

Where the defendant agreed to purchase of the plaintiff an estate, and to make payment therefor, by taking up certain outstanding notes of his, and by paying the residue of the purchase money in two and three months, with good security ; and before the expiration of one month, the defendant refused to accept a deed of the estate from the plaintiff, or to take up the plaintiff's notes, or to give security to perform his agreement ; it was held, that such agreement was thereby broken.

Where the defendant agreed to purchase of the plaintiff an estate, and to make payment therefor, in a particular manner ; and further agreed, that if he should fail to perform these stipulations, he would pay the plaintiff the sum of 150 dollars ; it was held, that this was liquidated damages.

*Windham,*
July, 1828.

Tingley
*v.*
Cutler.

THIS was an action of debt, to recover the sum of 150 dollars, commenced in *January,* 1826.

The cause was tried, on the plea of *nil debet,* at *Brooklyn, September* term, 1827, before *Brainard,* J.

The declaration consisted of two counts. In the first, the plaintiff stated, That on the 13th of *December,* 1825, and for a long time previous, he was, and ever since has been, the owner of certain real estate in the town of *Killingly,* [describing it] being the same which the plaintiff bought of *George B. Hutchins,* by deed bearing date *October* 29th, 1825 ; that on said 13th of *December,* there were outstanding against the plaintiff two promissory notes in favour of *Jonathan Cutler,* one for 350 dollars, and the other for 550 dollars, both secured by mortgage on said real estate; that in consideration that the plaintiff, at the special instance and request of the defendant, had promised, by his note or memorandum in writing, of that date, by him signed, to sell to the defendant said real estate for the sum of 1975 dollars, the defendant, by his note or memorandum of that date by him signed, promised to and agreed with the plaintiff, to purchase of him said real estate, for said sum of 1975 dollars, and to make payment therefor, by taking up and cancelling said promissory notes against the plaintiff, and whatever was then due thereon should constitute part payment of said 1975 dollars, 300 dollars to be paid in sixty days, and the remainder by the 1st of *April* then next—with good security ; that the defendant, on the same day, by his note in writing of that date, by him signed, on the back of said first-mentioned note or memorandum, agreed with the plaintiff, that if he, the defendant, did not fulfil his agreement therein contained, he would pay the plaintiff the sum of 150 dollars ; that on the 2nd of *January,* 1826, the plaintiff tendered to the defendant a good warranty deed of said real estate, and demanded of him a fulfilment of said agreement to purchase on his part, but the defendant utterly refused to receive said deed, or to make payment to the plaintiff, as in his said note or memorandum he had agreed to do.

The second count recited the agreement referred to in the first. The face of the note or memorandum was as follows : " *Killingly, December,* 13th, 1825. This may certify, that I, *Elisha Cutler,* have bought of *Elisha Tingley* the house and barn which he now occupies, and the store now occupied by *Isaac T. Hutchins* and *E. D. Tarbox,* for the sum of 1975 dollars :

*Windham,*
July, 1828.

Tingley
*v.*
Cutler.

payment to be made as follows :—Turn *Tingley's* notes paya-
ble to *Jonathan Cutler ;* the remainder, 300 dollars, in sixty
days ; the rest, by the 1st day of *April*—with good security.
*Elisha Cutler.*" The writing on the back of the paper, was
as follows : " *Killingly, December* 13th, 1825. The conside-
ration of the within is such, that if *Elisha Cutler* does not per-
form, according to the within instrument, he shall pay the sum
of 150 dollars. *Elisha Cutler.*" In this count no considera-
tion was stated, except what was implied in the agreement
recited.

The defendant objected to a recovery by the plaintiff, on
the following grounds. 1. That the plaintiff traced his title to
the estate no further back than a deed from his own immediate
grantor, and that unrecorded. 2. That the plaintiff had proved
no consideration ; and the writing did not import a considera-
tion. 3. That there was a variance between the declaration
and the proof ; for in the description of the notes, no mention is
made of their being on interest. 4. That the action was pre-
mature ; as the defendant, if he was bound at all, had until the
1st of *April*, 1826, to perform the contract. 5. That the
damages, from the terms of the contract, are open and unliqui-
dated ; and as the plaintiff has proved no special or actual
damage, he is not entitled to recover any.

On the first point, the judge instructed the jury, that a deed,
although unrecorded, is good as between the parties ; and if
such deed be in the hands of the grantee, and he in possession
of the property, this is *prima facie* evidence of title, especially
where no objection is made to the fulfilment of the contract,
on that account.

In relation to the second point, the judge submitted to the
jury the question of fact, whether the consideration stated in
the first count was proved, instructing them, that although
there was no direct testimony to that point, they might infer a
consideration, if the whole circumstances of the case would, in
their opinion, warrant it. He also instructed them, that the
agreement recited in the second count, implied a consideration.

On the third point the judge instructed the jury, that there
was no material variance between the declaration and the
proof, the dates and amounts of the notes being truly given.

On the fourth point the judge instructed the jury, that if they
should find, that within a reasonable time after the making of
the agreement, the plaintiff offered and tendered to the defend-

ant a proper deed of the premises, and demanded of him performance ; and if they should find, that he did not then comply ; and that thereafter, before the commencement of the suit, he had a reasonable time to comply, and did not ; they might infer a refusal and a breach of his contract.

On the fifth point, the judge instructed the jury, that the damages were fixed and liquidated by the contract.

The jury returned a verdict for the plaintiff, with 150 dollars damages.    The defendant thereupon moved for a new trial.

*Strong*, in support of the motion, contended, 1. That the plaintiff did not shew such a title to the estate in question, as entitled him to recover; but on the contrary, his title was shewn to be imperfect.

2. That the question as to the existence of the considerntion alleged, was submitted to the jury *without any proof.*    The contract in the first and second counts is the same ; and the judge erroneously charged the jury, that such a contract implied a consideration.

3. That the variance between the notes set forth and those proved, was material.

4. That there was no breach, and, of course, no right of action, at the time this suit was commenced.

5. That the damages should have been left to the jury. *Astley* v. *Weldon*, 2 *Bos. & Pull.* 346. 353.

*Goddard* and *Backus*, contra, resisted the claims of the defendant's counsel on the several points in the case.    In relation to the proof of title, they cited 1 *Swift's Dig.* 507. ; to the consideration, 1 *Swift's Dig.* 204. 766.; to a variance, 3 *Stark. Ev.* 1533. 1548.    *Cunningham* v. *Kimball*, 7 *Mass. Rep.* 65. ; to liquidated damages, *Lowe* v. *Peers*, 4 *Burr.* 2225.    *Astley* v. *Weldon*, 2 *Bos. & Pull.* 346.    1 *Swift's Dig.* 680, 1.

PETERS, J.    Upon the trial, the defendants resisted the plaintiff's claim, on five grounds, *viz.*

1. That the plaintiff showed no other title than an unrecorded deed from his *immediate* grantor.

2. That the plaintiff proved no consideration for the defendant's promise.

3. That there was a material variance between the declaration and the testimony in the description of the notes to be taken up by the defendant.

4. That the action was premature, as the defendant was not bound to fulfil said contract, until the 1st day of *April,* 1826.

5. That the damages were unliquidated, and as none were proved, none could be recovered.

The court charged the jury in favour of the plaintiff, and they returned a verdict accordingly

1, An unrecorded deed from the plaintiff's grantor is good between the parties, and would be sufficient for the plaintiff in an action of ejectment against a wrong-doer ; as a valid deed, accompanied by possession, is *prima facie* evidence of title ; and it is unnecessary for the plaintiff, in the first instance, to trace back his title to the origin of titles.  1 *Sw. Dig.* 507.

2. A sufficient consideration for the defendant's promise is alleged in the first count.  The contract is mutual and promise for promise.  1 *Pow.* on *Contr.* 357.  There seems not to have been any direct proof of an express consideration.  But one is strongly implied.  In the first count, the plaintiff avers, that at the request of the defendant, he agreed to sell, and in consideration thereof, the defendant agreed to buy and pay. In the second count, the plaintiff avers, that the defendant agreed to buy and the plaintiff to sell, and recites the *written* evidence of their agreement ; and the evidence on this point was submitted to the jury.  But, says *Powell,* it is not necessary that in contracts or agreements, the consideration should be expressed, it being sufficient if it can be collected out of them from circumstances.  *Pow.* on *Contr.* 368.

3. The suggestion of a variance between the declaration and proof, respecting the notes to be taken up by the defendant, is unfounded, as it no where appears that said notes were on interest.

4. The defendant's contract was broken, when he refused to accept the deed, take up and deliver to the plaintiff his notes to *Jonathan Cutler,* and give security to fulfil his contract.

5. This objection presents the principal question in this case.  Is the debt demanded a penalty, or liquidated damages ?  Where it is agreed, that if a party do or omit something, which may be injurious to another, a sum shall be paid, this sum may be considered liquidated damages, in all cases where the damages are uncertain and depend on the discretion of the jury.  In such cases, the parties may stipulate for the consequences of the breach of contract.  1 *Sw. Dig.* 680.  1 *H.*

*Bla.* 232.    As where a man agreed with a woman not to marry any other, and if he did, to pay her £1000 ; this was holden to be liquidated damages.    *Lowe* v. *Peers,* 4 *Burr.* 2225.    So where two persons agreed to perform certain work in a limited time, or pay £10 a week, for such time as it should remain unfinished, *Buller,* J. said : " This is as strong a case of liquidated damages, as can possibly exist ;" and the court decided accordingly.    *Fletcher* v. *Dyche,* 2 *Term Rep.* 32.

The decision below was correct ; and I do not advise a new trial.

LANMAN and DAGGETT, Js. were of the same opinion.

HOSMER, Ch. J.    The plaintiff has brought an action upon an agreement made by the defendant, that he would purchase of him an estate in land ; in which he has averred title in himself, performance on his part, and non-performance by the defendant.

To sustain this suit, the plaintiff must prove title and a valid contract in writing ; the performance of conditions precedent : and the damages sustained.

My observations will be confined to the non-performance of precedent conditions on the plaintiff's part, and specifically, to the deficiency of his proof of title.

On this point, two enquiries are necessarily presented, *viz.* with what title ought the plaintiff to be invested ; and in what manner is he bound to prove it.

1. The plaintiff, in order to sustain his action for the non-acceptance of his deed, must have a clear undoubted title to the premises in fee simple.    *Sugden,* in his *Law of Vendors and Purchasers,* (*p.* 200.) remarks, that to enable equity to enforce a specific performance against the purchaser, the title to the estate ought, like *Cæsar's* wife, to be free even from suspicion ; for that it would be an extraordinary proceeding for a court of equity to compel a purchaser to take an estate, which it cannot warrant to him.    It hath, therefore, says this author, become a settled and invariable rule, that a purchaser shall not be compelled to take a doubtful title.    *Marlow* v. *Smith,* 2 *P. Wms.* 201.    *Shapland* v. *Smith,* 1 *Bro. C C.* 75.    *Cooper* & al. v. *Denne,* 4 *Bro. C. C.* 80.    1 *Ves.* jun. 565.    *Crewe* v. *Dicken,* 4 *Ves.* jun. 97.    *Rose* v. *Calland,* 5 *Ves.* jun. 186.    *Roake* v. *Kidd,* 5 *Ves.* jun. 647.

It may be said, however, that this doctrine of chancery re- *Windham,* gards the specific execution of an agreement only, and there- July, 1828. fore, that it is inapplicable. To this I reply, no good reason Tingley can be assigned, why a court of law, in an action against a Cutler. vendee for the non-performance of his agreement to purchase land, should not hold the vendor to make out a title equally unquestionable. The principles of natural justice are not varied, by the forum to which application is made to sanction an agreement; and what is held unjust in equity, on this subject, cannot be just in a court of law. The decisions of the law courts fully warrant this observation. It is said by *Sugden,* that when an action is brought for non-performance of an agreement, a court of law will look as anxiously to see that the title is clear of doubt, as a court of equity would. *Sug. Law Vend.* 211. In *Hartley* v. *Peehall, Peake's Ca.* 131. it was remarked, by Lord *Kenyon,* that " Whenever a man buys any commodity, he expects to have a clear indisputable title, and not such a one as may be questionable at least in a court of law. No man is obliged to buy a law-suit." Of consequence, it is a necessary condition precedent to a suit for not performing an agreement to purchase land or real estate, and was so adjudged in *Martin* v. *Smith,* 6 *East* 555., that the plaintiff was seised in fee, and made or tendered a good and satisfactory title to the purchaser.

2. As the plaintiff must have a clear and undoubted title to the land which he contracts to sell, or the defendant is not obliged to go on with the purchase, the question arises, in what manner is he obliged to prove his title at the trial ? The general answer is obvious. The plaintiff must allege in his declaration, that he has title ; and of consequence, he who avers this fact affirmatively, must prove it. 1 *Phil. Ev.* 150. If he omit this allegation, his declaration is defective ; and having made it, it must be sustained, by the same degree of evidence as his other averments. If the title has been acquired, by an exclusive possession of fifteen years, this fact must be established ; if by descent, the requisite facts must appear, including proof of the ancestor's title ; and if the plaintiff claim by deed, the deed must be exhibited and proved, together with the title of the grantor. If it be asked, why should he go beyond the production and proof of his own deed, the conclusive answer is, that the deed, without evidence of the grantor's title, proves nothing, in respect of title, but only a mere fact, that a deed

*Windham,*
July, 1828.

Tingley
*v.*
Cutler.

has been given.   Nor will evidence, that at the time the deed was executed, the grantor was in possession, and that the plaintiff had possessed a few months, add any thing towards the proof of title.   All this may be true, and yet both the grantor and grantee be trespassers.   There is no *prima facie* or presumptive evidence of title arising out of possession of land short of fifteen years exclusive occupancy.   Title to personal estate may be established *prima facie*, by actual possession of a vendee, because possession is the *indicium* of title to this species of property ; but of land the possession of a few months or years, is no *indicium* of title.   The title to land is proved by deeds, or other legal instruments, or by long and exclusive possession.   These principles have been every where established until now, when the exigencies of this case have raised the unexpected question.   The plaintiff must have title ; it is incumbent on him to prove it ; and the evidence of title must be complete, for this plain reason,—in order that the court may see, that no doubtful title is imposed on a purchaser. The citation from 1 *Swift's Dig*. 507. is entirely inapposite to the question under discussion.   The author justly observes, that a valid deed accompanied by possession, is proof sufficient at the outset, in the action of *disseisin*.   Undoubtedly it is ; and it is equally true, that in the action just named the plaintiff's possession alone, and without deed, is evidence enough, unless more is made requisite, by proof on the defendant's part.   The reason is, that in the action of disseisin, strict legal title is not necessarily in question.   Although the plaintiff aver a title in fee simple, it is a decided point, that proof of lawful possession in fact, or of any less estate than the one averred, is *prima facie* sufficient, in this sweeping action of ours ; an action which includes and supplies the place of every form of suit for the recovery of land, real, possessory or mixed.   1 *Conn. Rep*. 79. 470.   6 *Conn. Rep*. 142

That the plaintiff's title, in an action like the one before us, must be strictly proved, is a decided principle.   And the only deviation from it (if such it may be called) is the decision of Lord *Kenyon*, in *Thompson* v. *Miles*, 1 *Esp. Rep*. 184. who held, that the title deeds must be exhibited, but that the proof of their execution, except of the one under which the plaintiff immediately claimed, was unnecessary.   This bears a near resemblance to our practice in permitting the chain of antecedent conveyances to be supplied from the records of deeds by

a town-clerk. *Talcott* v. *Goodwin*, 3 *Day* 264. 267. *Cun-*
*ningham* v. *Tracy*, 1 *Conn. Rep.* 252. We proceed on the
necessity of the case, the title deeds remaining in the possession
of the grantees. Lord *Kenyon*, however, went upon the
principle, that the proof of the title deeds, although in the hands
of the plaintiff, was not expected by the parties. But in a later
case, this opinion was overruled, by *Mansfield*, Ch. J., who
decided, that the vendor of the residue of a term, being the
third or fourth assignee, was bound to prove all the mesne as-
signments. *Crosby* v. *Percy*, 1 *Campb.* 303. After all, the
determination of Lord *Kenyon* does not dispense with strict
proof of title, but it admits the deeds exhibited to be evidence,
without the proof of their execution.

3. The plaintiff being obliged to aver his title, and to prove
it in the same manner as any other fact must be proved, by
the person asserting it ; it remains to consider the proof of his
title in this case.

The land in question is claimed to have been owned by
*George B. Hutchins.* On the 29th of *October*, 1825, *Hutchins*
gave to the plaintiff a deed of the premises, and on the 13th of
*December*, in the same year, the agreement of the parties now
in suit was made. Forty-four days only elapsed from the de-
livery of the above-mentioned deed to the plaintiff, to the date
of the contract in question, during which period the plaintiff
was in possession of the land said to be conveyed to him by
*Hutchins.* This deed is unrecorded, and the exhibition of it
at the trial was the only evidence in relation to the plaintiff's
title. No offer was made to show, that *Hutchins* had acquired
title by inheritance, deed, possession or in any other manner.
The court charged the jury, that such deed alone, accompanied
by the aforesaid possession, was *prima facie* evidence of title,
especially as no objection had been made, on this ground, to
the fulfilment of the contract.

In the first place, I object to the opinion of the court, in
charging the jury, that the deed and the short possession of a
few days, were *prima facie* evidence of title. So far from
this, they were only a small link in the chain of evidence.

The point to be proved was *title*, absolute and clear of all
reasonable doubt. That there was a remote presumption in
favour of the plaintiff's title, was not the question on trial.
The plaintiff had averred in his declaration, that he had
title to the land in question ; and this allegation, in its length

*Windham,* and breadth, he was bound to sustain, by adequate proof.
July, 1828.   If there were a reasonable doubt whether the averment was

Tingley   established by the evidence, the principles of law required,
v.   that the defendant should have had a verdict in his favour.
Cutler.   He was, by his contract, under no obligation to buy a
doubtful title; or one inferred from remote evidence; but
of title he had right to demand clear and convincing proof.

It is perfectly compatible with the plaintiff's testimony, that
*Hutchins* was a disseisor a few days before he made his deed
to the plaintiff; that the plaintiff became a trespasser, by his
entry on the land; and that his deed to the defendant could be
of no possible effect.   The law does not imply, that the plain-
tiff had title, because a deed was given him, perhaps, by a per-
son who had no pretence of right; nor is a title proved, by ev-
idence, that evinces only a small part of a title.   Nor do I un-
derstand what is intended by *prima facie* evidence, in this
case; unless the judge meant to declare, that the title was in-
ferable from two facts, *viz.* the deed and forty-four days pos-
session; or that the law gives a technical efficacy to the proof
adduced, beyond its natural import; for either of which as-
sertions there is no ground.   On the contrary, I am clear, if
any allegation ever required plenary evidence, it is eminently
true of the averment of title made by the plaintiff.   On him
is the *onus* of proof; his title is peculiarly within his own
knowledge; he has affirmed it as the necessary basis of his
action; and hence there is a concurrence of every considera-
tion to impose on him the necessity of full proof.

I likewise object to the qualification of the charge, that the
deed of *Hutchins,* accompanied with the possession a few days,
was sufficient *prima facie,* especially, when no objection was
made to the fulfilment of the contract on that account.   This
silence is no dispensation of the proof requisite to sustain the
plaintiff's allegation of title.   The title is the main pillar of the
plaintiff's action: he must have it; he must aver it; and he
must prove it; and neither the silence of the defendant, nor
even any parol declarations of his, can take away or impair
the obligation resting on the plaintiff to substantiate this indis-
pensable fact.

I have no doubt that the charge of the judge was incorrect;
and that for aught this court can discern, the defendant has a
verdict against him, for not accepting a deed of land, from a

person, who had no interest in it. I would, therefore, grant a new trial.

BRAINARD, J. was absent.

New trial not to be granted.

----◆----

### WYLIE *against* LEWIS.

A blank indorsement, by *A*, of the promissory note of *B.*, payable to *C.*, or order, does not imply a valuable consideration from *C.* to *A.*, and an engagement by *A.*, that *B.* was of ability to pay, and should pay, such note.

THIS was an action of *assumpsit*, brought by *Moses Wylie*, as executor of *John Wylie*, deceased, and tried at *Brooklyn, September* term, 1827, before *Brainard*, J.

The declaration contained three counts ; the two first of which were abandoned at the trial. The third count stated, That on the 2nd of *December*, 1826, *Elisha Tucker* made his note, of that date, for 112 dollars, 66 cents, payable to the plaintiff's testator, or his order, on demand, with interest, for value received : that on the same day, the defendant, by his indorsement of said note, for value received of said *John Wylie*, promised and engaged, that said *Tucker* then was of ability to pay said note, and should continue to be, and should pay said note according to its tenor ; that said *Tucker* then was, and ever since hath been, a bankrupt, which has at all times been known to the defendant ; that nothing has been, or could be collected on said note ; and that the defendant has not performed his promise.

On the trial, the plaintiff proved the execution of the note by *Tucker*, and the indorsement thereof, by the defendant, in blank; and that it was given in satisfaction of an execution in favour of *John Wylie* against *Tucker*, for the same sum ; and claimed to have proved all the other facts in the declaration alleged. It was admitted, that the note was not presented to *Tucker* for payment, and that notice of non-payment was not given to the defendant, at the time, or soon after, it became due ; and that no suit had been commenced upon it against the maker ; but notice was given to the defendant, and demand made of him, before the commencement of this suit. The defendant prayed the judge to instruct the jury, that the law did not im-

ply such a consideration, nor such a contract, as was stated in the declaration. But the judge instructed the jury, that the law did imply such a contract and such a consideration as therein stated ; and if they should find, that when the note fell due, (which was immediately) *Tucker* was a bankrupt, and that coercion would have been unavailing, the holder was excused from presenting the note, giving notice or commencing a suit against the maker, and their verdict ought to be for the plaintiff ; otherwise, for the defendant    The jury returned a verdict for the plaintiff ; and the defendant moved for a new trial.

*Goddard*, in support of the motion, contended, 1. That as the note in question was payable *to order,* it was subject, in relation to demand and notice, to the law of negotiable paper.

2. That if this is a special contract, it must be sued as a joint and several undertaking. *Josselyn* v. *Ames*, 3 *Mass. Rep.* 274. *Hunt* v. *Adams*, 5 *Mass. Rep.* 358. *White* v. *Howland*, 9 *Mass. Rep.* 314.

3. That at any rate, if this is a special contract, the consideration must be stated and proved ; no consideration being implied. *Rann* v. *Hughes*, 7 *Term Rep.* 350. n. *Rob. Frauds* 7. *Fell* on *Guaranty*, 7, 8. *Ballard* v. *Walker*, 3 *Johns. Cas.* 60.

*Judson*, contra, contended, 1. That a blank indorsement imports a valuable consideration. *Swift's Ev.* 339. 1 *Swift's Dig.* 429. *Mandeville* v. *Welch*, 5 *Wheat.* 277.

2. That a blank indorsement of a promissory note imports, also, that the maker shall be of ability to pay, with the use of due diligence. *Swift's Ev.* 342. *Bradley* & al. v. *Phelps*, 2 *Root* 325. 1 *Swift's Dig.* 434. *Welton* v. *Scott*, 4 *Conn. Rep.* 527. *Prentiss* v. *Danielson*, 5 *Conn. Rep.* 175. 179.

3. That due diligence was exercised, in this case, by the fact stated in the declaration and found by the jury, that the maker was utterly insolvent. *Swift's Ev.* 342. *Prentiss* v. *Danielson*, 5 *Conn. Rep.* 179.

4. That a negotiable note, not indorsed, by the promisee, stands on the same footing as a note not negotiable. 1 *Swift's Dig.* 430.

PETERS, J.    The contract of an indorsement on a promissory note, whether negotiable or not, is too well understood to

require arguments to explain its meaning, or authorities to en- *Windham,* force its obligation. It is always a collateral undertaking, *July, 1828.* that the indorser will pay, if the maker do not, provided the holder use due diligence, demanding payment of the maker, in one case ; attaching his person or property, in the other ; and in both, giving reasonable notice of the failure to the indorser. 1 *Swift's Dig.* 435. In one case, we are governed by the *English* decisions under the statute of *Anne,* which we have recently adopted ; and in the other, by our own common law. In the case before us, the note is negotiable, on which the defendant, at the time of its execution, placed his name in blank, but was neither promisee nor indorsee, and therefore, not indorser. *Cui bono?* To what end ? This does not appear. The plaintiff counted on this indorsement, as if it contained an express written contract, subscribed by the defendant ; and the question now is, does this *blank* support an averment ?

A special contract must, in all cases, be precisely laid, and strictly proved ; for a variance is fatal. But such a contract is never implied. The legal import of this indorsement is an absolute engagement to pay, at all events ; though it might have been explained or varied by parol, according to the original agreement of the parties *Beckwith* & al. v. *Angell,* 6 *Conn. Rep.* 315 *Mitchell* v. *Culver,* 7 *Cowen's Rep.* 336. 3 *Kent's Comm.* 68. *Sumner* v. *Gay,* 4 *Pick.* 310. *Tenney* v. *Prince,* 4 *Pick.* 385.

But whether it imports an absolute or a conditional engagement, it certainly does not imply the consideration and contract stated in the declaration. An implied contract is where certain facts are proved, from which the law *ex æquo et bono,* raises a promise, or rather, enables the jury to find one. But in the case before us, the law is made not only to raise an express promise, but a written one ; and it might have been added, with equal propriety, a *sealed* instrument. This, certainly, is a novelty in pleading ;—an " *avis rara in terris, nigroque similima cycno.*"

I advise a new trial.

Lanman and Daggett, Js. were of the same opinion.

Hosmer, Ch. J. dissented.

Brainard, J. was absent.

New trial to be granted.

<div align="right">Wylie<br>v.<br>Lewis.</div>

### MATHER and DANFORTH *against* GODDARD.

A deposition or oral testimony, stating the contents of a paper, which can be shewn to the court, but which is not produced, is inadmissible.

Therefore, where the plaintiff, in an action for money had and received, to prove his title to the money demanded, offered a deposition, in which the deponent referred directly, and in terms, to a bill of lading, as the evidence of the shipment of the money to the plaintiff; but such bill of lading was not produced, nor shewn to be lost, or beyond the plaintiff's reach; it was held, that such deposition was inadmissible.

And it did not render such deposition the less exceptionable, that the court, at the instance of the plaintiff, subsequently instructed the jury, that what was contained in it in relation to the bill of lading should not be considered as evidence; because this would make the deponent say, of his own knowledge, what, by the terms of the deposition, he might have known only by the bill of lading; and besides, as he had sworn to the existence of paper, from which he gained his information, the court had now proof of a fact, sufficient, of itself, to exclude the testimony; and it could not, therefore, be proper to admit illegal testimony, by excluding testimony, which rendered it such.

THIS was an action for money had and received; tried at *Norwich, January* term, 1828, before *Lanman,* J.

The plaintiffs claimed, that the money mentioned in the declaration having been attached, was, by the officer who served the attachment, put into the defendant's hands, to be kept for the plaintiffs' use, and to be returned to them, whenever it should be released or discharged from the attachment, and that the suit in which it was so attached, was afterwards settled by the parties. The defendant claimed, that there was no proof of any notice to him, of any such settlement, or any demand, made by the plaintiffs, of the money, before this action was commenced; and prayed the judge to charge the jury, that without such demand and notice, the plaintiffs were not entitled to recover. But the judge charged the jury, that the plaintiffs might recover, without proof of notice or demand.

As evidence in the cause, the plaintiff introduced the deposition of *Samuel B. Williams,* who testified therein as follows: "On the 4th of *February,* 1825, as appears by the bill of lading hereinafter mentioned, I shipped, at the island of *Trinidad,* on board the brig *Union, Henry Mildman,* master, two bags of specie, in *Spanish* milled dollars, one marked *M. & D. No.*1, and the other *M. & D. No.* 2; and that there were 500 dollars in each bag. And I have, this day, seen a bill of lading,

in the possession of *John L. Lewis*, Esq., dated said 4th day of *February*, 1825, which is the same that I received of Captain *Mildman* previous to his departure from the island of *Trinidad*, and is the same which I remitted to *Mather* and *Danforth*." The plaintiffs did not produce the bill of lading, nor give any other evidence respecting it. The defendant objected to the admission of this deposition, without the production of the bill of lading; but the judge admitted it. Before it went to the jury, however, the plaintiffs prayed the judge to instruct them, that what was contained in it *relative to the bill of lading*, should not be considered as evidence. The defendant insisted, that the deposition, without this, contained no evidence of the plaintiffs' title to the money ; and that it ought not, therefore, to go to the jury as evidence, with such instruction. The judge decided this point against the defendant, and with such instruction committed the deposition to the jury as evidence.

The plaintiffs obtained a verdict ; and the defendant moved for a new trial.

*Goddard* and *Child*, in support of the motion, contended,

1. That the defendant was not liable until the termination of the attachment, by a settlement of the suit, and reasonable notice given and evidence furnished of such settlement, and reasonable demand of the money.

2. That the deposition was not admissible, without the production of the bill of lading ; and the instruction of the judge, instead of removing the difficulty, rendered the testimony still more exceptionable.

*Strong*, contra, insisted, 1. That the defendant having voluntarily, and for his own benefit, taken possession of the plaintiffs' property, " to be kept for their use, and to be returned to them whenever released or discharged from the attachment," he was bound to take notice of the settlement of the suit, whereby the property was so discharged. *Ward* v. *Henry*, 5 *Conn. Rep.* 596.

2. That the deposition was properly admitted. The bill of lading constituted no part of the plaintiffs' title to the money, and was not necessarily to be proved by them. The reference of the witness to it, in confirmation of his testimony, did not render its production necessary.

New-London,
July, 1828.

Mather and
Danforth
v.
Goddard.

DAGGETT, J. The counsel for the defendant, in support of the motion, insist, that the deposition of *Samuel B. Williams* was improperly admitted. The objection to it is, that it describes a bill of lading, and professes to state its contents; and that therefore, the bill of lading should have been produced. It is certainly incorrect to permit a deposition, or oral testimony, to state the contents of a paper, which can be shown to the court; for an inspection of the paper itself would be the more satisfactory evidence, and thus the better evidence would be withholden; which is opposed to a very salutary rule of law, *viz.* that the best evidence which the nature of the case will admit of, shall be produced. On looking at this deposition, it appears to refer directly, and in terms, to the bill of lading, as the evidence of the shipment of this money, " as *per* bill of lading," &c. Had the bill of lading been lost, or beyond the reach of the plaintiffs and the deponent, a different view might have been taken of the testimony; but this same deposition proves, that it was, on the day of the taking of the deposition, within the power of the plaintiffs; and it is not suggested, that there was any notice given, or attempt made to produce it. The deposition, therefore, ought to have been rejected; and of this opinion, it seems, was the judge, at a subsequent stage of the trial; for, at the instance of the plaintiffs, in his charge to the jury, he instructed them to lay out of their consideration what was said therein in relation to the bill of lading. This course, however, was so far from correcting the error, that it rendered it more apparent and injurious; for it gives to the deposition a force and effect to which it would, otherwise, not have been entitled. It makes the deponent say, of his *own knowledge*, what by the terms of the deposition he might have known only by the bill of lading; and, besides, as he had sworn to the *existence* of a paper, from which he gained his information, the court had now proof of a fact, sufficient, of itself, to exclude the testimony; and it could not, therefore, be proper to admit illegal testimony, by excluding testimony which rendered it such. On this ground, therefore, there must be a new trial.

2. It is also urged, that the charge was erroneous, because the jury were instructed, that if the notice to the defendant alleged in the declaration, was not proved, still they might find a verdict for the plaintiffs. This brings into view a question

about which there are some nice distinctions; and as it need <span style="float:right">*New-London,*<br>July, 1828.</span>
not be decided, to dispose of this motion, the consideration of
it is waived.

<span style="float:right">Mather and<br>Danforth<br>*v.*<br>Goddard.</span>

PETERS and LANMAN, Js. were of the same opinion.

HOSMER, Ch. J. and BRAINARD, J. were absent.

<div style="text-align:center">New trial to be granted.</div>

---

<div style="text-align:center">PITKIN <i>against</i> PITKIN and others:</div>

<div style="text-align:center">IN ERROR.</div>

*A.*, *B.* and *C.*, being partners in a manufacturing business, *A.* made his will, by which he directed his interest in this establishment, *viz.* the buildings, machinery, stock, privileges and profits thereof, to be continued therein, for the term of four years after his decease; and that at the expiration of that term, this property and the profits accruing thereon, together with all the testator's other estate, real and personal, should be divided and distributed to *D.* and others. *B.*, the executor of *A.*, after *A.*'s death, carried on the business, in the partnership name, for the term specified. It proved to be a losing concern. A large sum was due from *A.*'s estate to the company beyond his share of the partnership property. A large sum was also due from the company to *C.*, who had paid a part, and would be obliged to pay the residue, of the outstanding debts of the company, which were considerable in amount; *B.* having failed and absconded. Previous to the expiration of the four years, the time limited by the court of probate, for the exhibition of claims against the estate of *A.*, had expired, and the executor had proceeded in the settlement of the estate without reference to the partnership fund, and had caused distribution to be made according to the provisions of the will. On a bill in chancery, brought by *C.* against the executor and devisees of *A.*, seeking satisfaction of his claims out of the general assets of *A.*, it was held, 1. that the partnership creditors had no lien on the estate in the hands of the devisees, by reason of their right to participate, eventually, in the profits of the trade; 2. that the general assets were not liable to the plaintiff's claim, by virtue of the testator's last will; and 3. that the plaintiff's remedy was not in chancery, but by a demand on the executor, to be pursued like other claims of a general nature against the testator's estate.

THIS was a bill in chancery, brought by *Samuel Pitkin* against *Joseph Pitkin* and others, stating the following case. In 1817, and previously, *Samuel Pitkin*, the plaintiff, *Stephen*

*Pitkin* and *Joseph Pitkin* were partners in the business of manufacturing hats, under the firm of *Stephen Pitkin & Co.* On the 7th of *August* in that year, *Stephen Pitkin* made and published his last will, and appointed *Joseph Pitkin* his executor. By this will the testator ordered and directed, That all his interest and concern in the hat manufacturing establishment, as then conducted under said firm, *viz.* the buildings, machinery, stock, privileges and profits thereof, should be continued to operate in the same connexion, for the term of four years after his decease, unless sooner dissolved by the mutual agreement of the proprietors ; and that at the expiration of said term, or on the dissolution of the concern, the same, with such profits as might arise thereon, together with all his other estate, real and personal, not otherwise disposed of, should be divided and distributed, one fourth part to *Edward Pitkin,* two fourth parts to *Hannah Pitkin,* and one fourth part to *Horace L. Pitkin.* On the 11th of *August,* 1817, *Stephen Pitkin* died ; and *Joseph Pitkin,* his executor, accepted the trust, and continued the partnership business with the plaintiff, under the original firm, for the term of four years. In *February,* 1818, the court of probate limited the term of six months for the exhibition of claims against the estate of the deceased ; and the executor proceeded in the settlement of that estate, without reference to the partnership fund, and caused a distribution to be made according to the provisions of the will.

At the death of *Stephen Pitkin,* the partnership was indebted to sundry persons ; and some of the debts were not paid until after the lapse of the time limited for the exhibition of claims.

No settlement or adjustment of the partnership accounts, the bill averred, was, or could be, made, within the prescribed period of four years. The partnership was a losing concern. At the commencement of this suit, debts, considerable in amount, were due to and from the company; and a large sum was due from *Stephen Pitkin's* estate to the company over and above his share of the partnership property. To the plaintiff there was due from the partnership the sum of 4,000 dollars, a considerable part of which ought to come from said estate. *Joseph Pitkin* has assigned his property, and left the state, without settling the partnership accounts ; and the plaintiff has paid a part, and will be obliged to pay the residue of the outstanding company debts.

The bill prayed for an adjustment of the partnership

accounts, and a sale of so much of the real estate of the testa- *Hartford,*
tor as should be necessary to pay the plaintiff's demand, and June, 1829.
the testator's proportion of the partnership debts; or for such
other equitable relief as was adapted to the nature of the case.

Pitkin
*v.*
Pitkin.

The parties joined in a demurrer to the bill; which the
court adjudged to be insufficient; and then, by motion in error,
the case was brought before this court for revision.

*Sherman,* for the plaintiff in error, contended, 1. That the
estate of *Stephen Pitkin* was liable for the debts of the part-
nership during the four years of its continuance after his death.
There are two classes of investments in trade after the decease
of the testator. The first is where a specific limited sum is
to be put into the concern, or continued in it, and the residue
of the estate is otherwise disposed of. In relation to this class,
it has been decided, that only the property directed to be em-
barked in the trade, shall be answerable to the creditors of the
trade. The case of ex parte *Garland*, 10 *Ves.* jun. 110. be-
longs to this class. There the testator, after giving the bulk
of his property to trustees for certain purposes, directed his
trade to be carried on by his widow, until his trustees should
think proper to establish his sons or either of them therein;
and that as long as the business should be carried on by her,
the profits thereof should be applied for her own use, and for
the maintenance and education of his children. He then
directed 600*l.* to be paid by his trustees to her out of his per-
sonal estate, for the purpose of enabling her to carry on the
business; and appointed her and the other trustees his execu-
tors. After the death of the testator, she carried on the busi-
ness for a while, and then became bankrupt; and it was very
properly decided, that the general assets beyond the amount
embarked in the trade, were not liable. The extent to which
the estate was concerned in the trade, was expressly *limited* by
the testator; and he had a right to make such limitation. This
was *severed* from the residue of his estate, which was other-
wise disposed of. He directed the portions to be paid *imme-
diately,* not intending to subject them to the fortunes of the
trade. The second class of cases, is where there is no limita-
tion, but the whole estate is concerned in the trade. There
the whole estate becomes a partner, and is liable to contribute
for losses. The portion of every legatee and devisee is affected
by the results of the trade. Such is the present case. The

testator intended that *all* the estate should be concerned in the trade.    There was to be no distribution until after the dissolution of the concern ; and then the portions were to be paid, with the *profits* accrued.    If the estate were to have the profits, it must be liable for the losses.    Having a right to participate in the profits, it became a partner.

2. That this case is within the jurisdiction of a court of chancery.    This is not an application by an executor for aid in the settlement of the estate, but by a creditor for the payment of his debt.    The objection that the relief sought may disturb the distribution, has no weight.    The plaintiff's claim did not accrue until after the expiration of the four years, which was long after the time limited for the exhibition of the claims.    If distribution had been previously made, the plaintiff, as creditor, was not party to it ; and it cannot affect him.    A creditor has nothing to do with the distribution.    Suppose the testator had given a bond that a bridge should stand ten years, and then died ; would this prevent distribution ; and would not a claim on such bond accruing after distribution, entitle the party to go into chancery against the distributees ?    *Booth* v. *Starr*, 5 *Day*, 419.

*W. W. Ellsworth* and *Toucey*, contra, contended, 1. That the plaintiff had no equity.    By the death of *Stephen Pitkin*, the partnership, generally, was dissolved.    Beyond that period it could not be continued, in any form, or to any extent, except by the express provisions of the will, which are not to have effect beyond their fair import.    Such part of the testator's estate, as he directs to be employed in trade after his death, will be subject to the fortunes of that trade, and nothing more. Now, in this case, the testator directed *a specific portion* of his estate, *viz. his interest in the hat manufactory*, consisting of "the buildings, machinery, stock, privileges and profits thereof," to be continued in the business, for the term of four years after his decease ; and the residue of his estate he gave directly to certain devisees.    The distinction claimed by the counsel for the plaintiff, is, therefore, inapplicable to the *facts* disclosed.    Admitting the soundness of the distinction, the case falls within the first class, and is governed by ex parte *Garland*, 10 *Ves.* jun. 110.    If, according to that decision, "only the property declared to be embarked in the trade, shall be answerable to the creditors of the trade," and the general

assets beyond that fund are not liable, the plaintiff has no claim. The reception of property under a will, not part of the fund directed to be put into trade, does not make the receiver liable in respect of the fund in trade. That fund alone is in partnership. Ex parte *Richardson*, 3 *Mad.* 138. S. C. cited 8 *Com. Dig.* 609. *pl.* 12. (*Hammond's ed.*)

2. That the plaintiff's remedy, if he has any, is not in chancery. He says he has a claim against *Stephen Pitkin's* estate. Then why should he not go, like other creditors, to the court of probate, and there get his claim allowed? Why should it not pass the usual ordeal? In this view of the subject, it is immaterial whether distribution has been made, or not. But it appears from the bill, that distribution has been made ; and a decree here would disturb that distribution. It is now *res adjudicata.*

HOSMER, Ch. J. To the determination below it is made an objection, that the relief requested should have been granted, inasmuch as the general assets of the deceased are liable to the plaintiff. On the other hand, it has been insisted, that the plaintiff has no claim on the general assets, but that his only remedy is against the executor of the deceased.

In respect of the first point for consideration, that is, whether the general assets of the testator are liable to the plaintiff, the case has been argued for him on the principle, that although the devisees, strictly speaking, are not partners, yet that an interest in the profits of the trade subjects the estate in their hands to a lien in favour of the partnership creditors, and of the plaintiff, as if they were partners.

To this argument the answer is direct and obvious.

If the devisees are partners, they are suable in that capacity, and are to be treated, in all respects, as if they sustained that character. This, at once, terminates the specific relief requested, on the estate in their hands.

But that they are not partners, is indisputably clear. The principle that he who enjoys a part of the profits of a partnership, is liable to the creditors of the firm, although unquestionable as a general rule, yet like other general rules, is limited by the reason on which it is founded. By operation of law, in respect of creditors, a person who is not a partner in fact, but who is benefitted by the profits of a partnership, is clothed with that character, when he takes from them a part of that

fund, on which they placed reliance for the payment of their debts. Were it otherwise, the partnership creditors would be injured, and the person alluded to would receive usurious interest for his capital, without its being attended with any risk. *Waugh* v. *Carver,* 2 *H. Bla.* 235. 246. *Grace* v. *Smith,* 2 *Bla. Rep.* 998. 1000. *Cooper* & al .v. *Eyre* & al., 1 *H. Bla.* 37. 43. *Mc Iver* & al. v. *Humble* & *al.,* 16 *East* 169. 174. *Cheap* v. *Cramond,* 4 B. & A. 670. *Gow on Part.* 6. 13. 15. *Chitt.* on *Cont.* 68. But all this is inapplicable to the present case. In this case, the capital is at hazard; and therefore, the reasons derived from the possibility of usury, do not apply; and as to the diminution of the fund to the disadvantage of the creditors, this is impossible. The devisees under the will are entitled to neither capital nor profits, until the dissolution of the partnership. The company concerns must first be attended to; and after the extinguishment of all the debts and expenses, the devisees are to come in for their share of the net surplus, and not before. Hence, the inapplicability of the principle advanced, to this case, under its peculiar circumstances, is perfectly clear; the devisees are in no respect partners, or *quasi* partners; nor from this source is there any ground to infer a lien upon the general assets of the deceased. I think it equally obvious, that if there were a lien in favour of partnership creditors, it would not extend to the claim of the plaintiff. He trusted the partners personally and the fund; but with open eyes and full knowledge of all the facts, he did not credit the devisees, nor the estate devised; nor has he any claim upon the latter, unless on another principle, which will now be considered.

2. Are the general assets of the deceased liable to the plaintiff's demand, *by virtue of the testator's last will?* By the devise, they are not specifically pledged. The question then arises, whether by operation of law, on a true construction of that instrument, they are made liable to the claim advanced. I take it to be established law, that they are not.

The case of *Hankey* v. *Hammond,* 1 *Cooke's Bank. Law,* 67. would seem to lend some aid to the principle advanced by the plaintiff; but this case, the first comprising the doctrines contended for by the plaintiff, was overruled by Lord *Eldon,* in that of *Ex parte Garland,* 10 *Ves.* jun. 110. This determination, in the most lucid and able manner, establishes the doctrine, that under the bankruptcy of an executor or trustee

directed by the last will of a testator, to carry on a trade, and <span><em>Hartford,</em></span>
a limited sum to be paid by the trustees of his estate for that <span>June, 1829.</span>
purpose, the general assets beyond that fund are not liable.
1 *Madd. Chan.* 504. In this case it was decided, that the
executor was to continue the partnership for four years, on the
fund already invested, and beyond this, that there existed no
liability on the general assets.

<div align="right">Pitkin<br><em>v.</em><br>Pitkin.</div>

The principles on which the case *Ex parte Garland* is foun-
ded, are expressed by Lord *Eldon*, at considerable length, and
with great force. I do not mean to recite them; but in a
concise form, shall refer to those, which, in my opinion, are most
material.

To hold the general assets to be liable, would be attended
with great inconvenience. It would prevent their distribution
for a long period, or disturb a distribution already made. The
condition of the executor, it is true, may be attended with
considerable hardship, as he becomes liable to the creditors, in
his person, to the extent of all his property. *Wightman* v.
*Townsend,* 1 *Mau. & Selw.* 412. But in this condition he
voluntarily places himself, in the free exercise of his judgment,
and on full knowledge of the facts, adventures to assume this
sort of responsibility.

In respect of the creditors of the partnership, they are divi-
sible into two classes; those who were such before the testa-
tor's death, and those who became such afterwards. With
respect to the first class of creditors, they have the power and
means of calling forth, after the testator's death, the whole of
his property, in discharge of their demands; and this is all the
security they can wish. And in regard to those comprising
the second class, who become creditors subsequent to the
testator's death, in the first place, they may determine whether
they will be creditors. In the next place, they have the whole
fund embarked in trade to look to. Superadded to this, they
have the personal responsibility of the individual with whom
they deal, the only security in ordinary transactions of debtor
and creditor.

It is, therefore, manifestly less inconvenient, to say, that
those who deal with the executor, must take notice, that the
testator's responsibility is limited by the authority given to the
executor, than to assert, as the executor is authorized to carry
on the trade, that all the other objects of the will must, at any

*Hartford,*
June, 1829.

Pitkin
*v.*
Pitkin.

distance of time, stand still, or that ˙eventually they may be subjected to the claims of the partnership creditors.

On these principles, it was concluded by Lord *Eldon,* that it would be unjust to consider the creditors of the company as having a lien on the testator's general assets; and as a precedent extremely inconvenient to the interests of mankind.

As the creditors of the partnership have no claim on the general assets of the deceased, with much less force of argument can a claim be maintained in favour of the plaintiff.

On the death of the testator, the partnership was by law dissolved. *Gow* on *Part.* 269. *Griswold* v. *Waddington,* 15 *Johns. Rep.* 57. 82. S. C. in error, 16 *Johns. Rep.* 438. 490. *White* v. *Union Insurance Company,* 1 *Nott & McCord* 559. With open eyes on this fact, and with full knowledge of his responsibility and of his legal claims on *Joseph Pitkin* only, the plaintiff thought proper to go on, and incur the further hazard of the partnership. He knew, (for he must be presumed to know the law) that *Joseph Pitkin* was substituted a partner for the deceased; and that the fund employed in the partnership, was, in addition to *his* responsibility, his only resource. With respect to the indebtedness of the deceased, if he was indebted at the time of his death, the plaintiff, after payment, might have contribution from the deceased's estate, by a claim made on his executor. But even in support of such a demand, no ground is laid in the bill. It is only averred, that the company, at the death of *Stephen Pitkin,* was indebted to various persons,—in what sum is not mentioned; and that the plaintiff has been obliged to pay *a part* of the debts of the partnership, without stating to what amount. It is perfectly campatible with all the allegations made in the bill, that at the death of the testator, the partnership was indebted a dollar only; that the funds in the plaintiff's possession comprised many hundreds; and that the only debts paid by him amounted to an inconsiderable sum, and have been paid out of the partnership funds.

3. It is scarcely necessary to observe, that the plaintiff's remedy, (if one exists) is not by an application in chancery, to subject the testator's general assets; but it is by a demand on the executor of *Stephen Pitkin.* He is obliged by law to the extent of all the deceased's estate, to satisfy every debt against it. All the debts of a deceased person constitute demands on his executor. Were there a specific lien, either on a part or on all the testator's property, it might be enforced, by an ap-

propriate suit; but here there is none.   The claim, if any, is *Hartford,*
of a general nature, and to be instituted, as other claims are, June, 1829.
against the executor of *Stephen Pitkin.*

The Court, then, has come to this result ; that the general
assets of the deceased, are not liable to the plaintiff's claim, in
any other sense, than that they are responsible eventually to all
his creditors, through the medium of a demand made on his
executor.   Of consequence, in the judgment of the court be-
low there is no error.

PETERS, DAGGETT, and BISSELL, Js. were of the same opinion,
the former suggesting some doubts.

WILLIAMS, J. gave no opinion, having been of counsel in the
cause.

Judgment affirmed.

------◆------

PITKIN and another *against* PITKIN and others :

#### IN ERROR.

*A.* executed a deed of gift of all his real estate to his children and grand-chil-
dren, retaining it in his hands until his death, when he intended it should
take effect.   At the same time, he made his will, and therein gave all his
estate, not otherwise disposed of, to *B.* and others, mostly the same persons
as were named grantees in the deed, to be equally divided between them,—
they to take care of and provide for a female slave belonging to *A.,*—the
expense to be borne equally by them, or the executor to reserve in his hands
a sufficiency for that purpose.   *B.,* the executor, paid a large sum for her
support, and as she was aged and infirm, large sums would probably be
wanted for her future support.   On a bill in chancery brought by *B.* against
the other devisees of *A.,* stating these facts, and praying for a sale of the
real estate of *A.,* and a reimbursement therefrom of the expenses already
incurred and a provision for future support, it was held, 1. that the facts
stated laid no foundation to decree such reimbursement or provision ; and
2. that the whole business properly pertained to the court of probate in
which this estate was in settlement, and therefore, a court of chancery
would not interfere.

THIS was a bill in bill in chancery, brought by *Samuel Pit-
kin* and *Edward Pitkin,* executors of *Elisha Pitkin,* against
*Joseph Pitkin* and others, heirs and devisees of *Elisha Pitkin,*
stating the following case.   In 1818, *Elisha Pitkin* executed

*Hartford,* a deed of gift of all his real estate lying in this state to the
June, 1829. plaintiffs and to the defendants.  He retained that deed until
his death, when it was his intention that it should take effect.

Pitkin
*v.*
Pitkin.

At the same time, he made his will, and therein gave all his
estate, not otherwise disposed of, to the plaintiffs and *Joseph
Pitkin,* and the heirs of *Timothy Pitkin* then deceased, to be
equally divided between them, they to take care of and provide
for a negro woman called *Flora,* his slave ; the expense to be
borne equally between them ; or his executors to reserve in
their hands a sufficiency for that purpose.  He constituted the
plaintiffs his executors, and died in 1819.   They accepted
the trust, and proved the will ; and in pursuance of the direc-
tions of the will, they paid large sums for the support of said
*Flora* to the amount of 1000 dollars, supposing there was a
sufficiency of estate left for that purpose, by the testator.   Af-
ter the final settlement of the estate, it appeared, that there was
not sufficient property, exclusive of that conveyed by the deed,
to pay the debts of the deceased ; and that a part of the estate
so given by the deed, had been sold for the payment of debts ;
and that all the debts had been paid.   *Flora* is still living ; is
aged and infirm ;   and large sums will probably be wanted for
her future support.   The grantees in the deed and the residu-
ary devisees in the will, with two or three exceptions, are the
same persons, being the children, grand-children and heirs at
law of *Elisha Pitkin,* the testator.   There is no other estate
from which *Flora* can be supported.   The bill prays the court
to order a sale of so much of the real estate of the testator as
will reimburse the expenses already incurred, and will provide
for the future support of *Flora,* for whose support his estate
is liable.

To this bill the defendants demurred ; and the court adjudg-
ed it insufficient.   The plaintiffs then, by motion in error,
brought the case before the Court for revision.

*Sherman* and *Toucey,* for the plaintiffs in error, contended, 1.
That the support of the slave was a charge upon the assets of
*Elisha Pitkin.*   The master, by the common law of *Connecti-
cut,* as well as by statute, is bound to support his slave ; and
he cannot exonerate his estate from this liability, except by
emancipation in the way pointed out by statute.   Where there
is service for life, there must be support for life.

2. That the intention of the testator, apparent from the will,
was, that *Flora* should be supported from his estate.

3. That hence it was the duty of the executors, as far as *Hartford,* assets extended, to furnish her a support, and their right to be *June,* 1829. reimbursed out of the assets.

4. That all the assets remaining are in the hands of these parties under a deed, which, as against this claim, is of no avail. The defendants are *volunteers.* But *Flora* is not a volunteer; nor are the plaintiffs, who have expended money for her support, volunteers. Their equity is superior to the claims of volunteers; and the latter must yield to the former.

5. That the parties who have the estate in their hands being before a court of chancery, it is competent to such court to make such application of the fund as justice and equity require.

*W. W. Ellsworth,* for the defendants, contended, 1. That the will of *Elisha Pitkin* had nothing to do with the question in this case, the support of *Flora* not being an incumbrance charged by the will on the real estate.

2. That the plaintiffs are volunteers, not being obliged as executors or joint grantees, to support this slave. As executors they can have no claim upon real estate. They sustain to it no relation but that arising from the right of applying for the sale of what is inventoried, upon representing the estate to be unable to pay out of the personal fund. At any rate, their duty as executors could not extend beyond the property which they received. As joint grantees, the plaintiffs were not obliged to make the disbursements, for which they seek remuneration. For, in the first place, it does not appear, that *Flora needed* any thing. It is not shewn, that the town in which she resided would or could have been compelled to support her. No debt or incumbrance has existed. And as to the future, the bill only avers, that it is *probable* she will need support, Secondly, the plaintiffs cannot claim this property to belong to the estate of *Elisha Pitkin,* except by claiming the deed to be fraudulent; but can they, as joint grantees, make a debt, and then claim, that their own deed is void? Thirdly, no claim could be made upon the plaintiffs for more than *their shares,* so that they are, at any rate, volunteers as to the residue.

3. That if this land belongs to the estate of *Elisha Pitkin,* it should be inventoried, and proceeded with, as other estates in a regular course of administration. Whatever has been done by the plaintiffs, in their capacity of executors, must be

exhibited to the court of probate, and settled there.    *Bacon* v. *Fairman* & al. 6 *Conn. Rep..* 129.    Their remedy, if they have any, is not in chancery.

DAGGETT, J.    1. An objection is taken to this bill, that it is nowhere alleged, that *Flora* has ever, as yet, stood *in need of any support.*    It is indeed, averrred, that the executors have paid a large sum for her support ; and that being aged and infirm, large sums will probably be wanted for her future support.    These allegations do not lay a foundation to order a reimbursement of money paid out already ;—much less, to make provision for the future.    The court cannot know, that these sums were necessary for her support ; much less can they foresee and provide for the future.    Her support might have been unnecessary ; and the object for which this future provision is sought, may die.    A case is not, therefore, stated, which entitles the plaintiffs to any relief.

2. A less technical and more substantial objection, is, that this whole business properly pertains to the court of probate, in which this estate is in settlement.    It is a principle of our law to confide all matters cognizable by courts of probate, to those courts ; and an appeal is allowed, in every case, to the superior court.    What prevents this estate from being thus settled, and finally settled ?    The charge upon the estate of the support of this slave, if she needed support, was well known to the executors ; and they were authorized to reserve out of the estate sufficient for that purpose.    It was well known, also, to the judge of probate.    It was the clear duty of the executors, in case of a deficiency of personal property, to apply to the judge for an order to sell real estate ; and this Court must presume, that a sale would have been ordered accordingly ; and for aught that appears, that course may now be pursued. It is not alleged, that any of the estate given by the deed, has been granted, by those to whom it has been distributed, if any distribution has been made ; nor is there the slightest reason to believe, from any of the allegations in the bill, that there is any difficulty in directing a sale of property, from time to time, as may be necessary, for the support of *Flora.*

This bill, in this view of it, is an attempt to draw into the superior court, from the appropriate tribunal, the settlement of this estate.    A bill upon the same ground might be brought to authorize the sale of land for the payment of debts allowed by

the court of probate, though a sale for that purpose may be ordered by the judge.

*Hartford, June, 1829.*

Without deciding what the court of probate would or might do in relation to an application founded on the facts stated in this bill, I am well satisfied, that there is no foundation laid *by those facts,* for any interference of the superior court. The demurrer, then, was well taken to this bill ; and there is nothing erroneous in the judgment complained of.

Pitkin
*v.*
Pitkin.

HOSMER, Ch. J., and PETERS and BISSELL, Js., were of the same opinion.

WILLIAMS, J. gave no opinion, having been of counsel in the cause.

Judgment affirmed.

---

NORTON *against* PETTIBONE and another.

Where an officer levying an exection on land, in *March,* 1825, omitted to state in his return, that the certificate of appraisment was delivered to him be_ fore he set off the land ; it was held, that this defect was cured by the confirming act of *May,* 1825.

The declarations of a former proprietor of land, made while he was in possession, against his title, are admissible against others claiming under him, in a suit to which he is not a party.

THIS was an action of ejectment, for four pieces of land in *Burlington ;* tried at *Hartford, September* term, 1827, before *Daggett,* J.

The plaintiff claimed title to the demanded premises, by virtue of the levy of an execution in his favour against *Alva Marks,* made on the 11th of *March,* 1825. The piece of land first described in the declaration, containing four acres, was owned by *Marks* in fee ; and in the others his interest was that of a tenant in common. A copy of the execution, with the return of the officer thereon, was offered in evidence. It was objected to, on the ground that by this return, it did not appear, that the appraisers had delivered to the officer a certificate in writing under their hands of the appraisal and estimate of the first-mentioned piece of land ; and also, that the officer had not certified in his return, that the appraisers made any certificate of their appraisal and estimate of the right and interest of the

debtor in the three last-mentioned pieces, nor delivered any such certificate to the officer, according to the 76th section of the act for the regulation of civil actions. The officer, after stating in his return the appointment of three appraisers, all indifferent freeholders of the town of *Burlington,* and that they were duly sworn, proceeded as follows : " The said appraisers did then and there appraise and estimate the first described ‚piece of land, seised and possessed by the said debtor in fee, at the sum of 68 dollars, as the true and just value of the same, of which valuation they made a certificate under their hands in writing ; and on the same day, I set off to the said creditor the whole of said four acres in part satisfaction of this execution and my fees thereon ; and said appraisers, on said day, did appraise and estimate the right and interest of the said debtor, in three pieces of land owned in common with the heirs of *Alexander Pettibone,* deceased, being one undivided half of the same, at the sum of 851 dollars ; and there remaining due on this execution the sum of 179 dollars, 74 cents, and my fees for executing the same being 10 dollars, 57 cents, making in the whole 190 dollars, 31 cents ; I therefore set off to the creditor therein such part or proportion of the said debtor's right and interest as 190 dollars, 31 cents bears to 851 dollars, the amount of said debtor's interest, as valued by said appraisers in the said land so owned as tenant in common, in full satisfaction of this execution, and of all charges and fees thereon : and on the said 11th day of *March,* I caused the execution, and the indorsement of my said doings thereon, to be recorded in the records of land of the town of *Burlington,* within which said land lies.     Attest.    *Willard Hitchcock,* Constable."

Then followed, immediately below the signature of the officer, the certificate of the justice of the appointment made by him of one of the appraisers, and that he had administered the oath provided by law to them all ; and next to this, the certificate of the appraisers in these words : " We, the subscribers, freeholders of the town of *Burlington,* having been appointed and sworn, as above specified, to appraise the above described pieces of land to be set off on said execution, did appraise and estimate the first described piece of land at the sum of 68 dollars, and the said debtor's right, title and interest in the remaining three pieces of land, being an undivided half of the same, owned by said debtor in common with the heirs of *Alexander*

*Pettibone,* deceased, at the sum of 851 dollars, as the true and just value thereof.

*Burlington, March* 11*th,* 1825.

> *Zenas Hotchkiss,*
> *Lewis Barber,*        } Freeholders under oath."
> *Carlos Hotchkiss,*

The judge overruled the objection made by the defendants, and admitted the evidence in question.

The defendants claimed title to the demanded premises under *Alexander Pettibone,* one of them as his widow, and the other as his sole heir at law. His title was by deed from *Zechariah Marks,* who derived his title from *Alva Marks,* the debtor in the execution levied as aforesaid. The plaintiff insisted, that this deed was made to defraud the creditors of *Alva Marks,* and therefore was void within our statute against fraudulent conveyances, as also upon the principles of the common law. In support of this claim, he offered to prove, by one *Frederick Lewis,* that *Zechariah Marks,* after the execution of the deed to him, and after he had taken actual possession of the premises under it, and previous to the deed to *Alexander Pettibone,* had acknowledged to him, that the deed from *Alva Marks* to him was without consideration, and made to defraud the creditors of the grantor. To the admission of this evidence the defendants objected, on the ground that no declarations of *Zechariah Marks,* though made while holding the land under the deed from *Alva Marks,* tending to shew that such deed was fraudulent and void, could be given in evidence against his grantees, or those holding under them. The judge overruled the objection, and admitted the evidence offered.

The plaintiffs obtained a verdict ; and the defendants moved for a new trial, on the ground that the evidence so offered, excepted to and admitted, was improperly admitted.

*J. Griswold,* in support of the motion, contended, 1. That the officer's return was inadmissible as evidence of a transfer of title, because it does not shew that a certificate in writing was delivered to him by the appraisers before the land was set off. The statute requires, that the appraisers shall make an estimate of the estate levied upon, in writing under their hands, and the same *deliver* to such officer, who shall *thereupon* set out to the creditor, &c. Stat. 57. *tit.* 2. *s.* 76. The transfer of title to real estate by the levy of execution, being authorized

by statute only, and not by common law, all the statutory requisitions must be *strictly* complied with. *Metcalf* v. *Gillet*, 5 *Conn. Rep.* 400. And the return of the officer is the only evidence that the requisitions of the statute have been observed. 5 *Conn. Rep.* 404. Now, in this case, the return shews, that the appraisers *made* a certificate of their appraisement of the first piece ; but it does not shew, that they ever made a certificate of their appraisement of the other pieces; and with regard to all the pieces, it is utterly silent as to the *delivery* of any certificate to the officer. The probable answer to this will be, (and no other can be given) that a certificate is annexed to the return, and is to be considered a part of it. But why should it be considered a part of the return ? It is not incorporated with it ; nor does the officer refer to it. Who knows how it came there ? The appraisers, the justice, a stranger, or even the creditor may have annexed it, after the officer had completed his return. But if it was put there by the officer, it does not appear, that it was delivered to him *before* he set off the land.

2. That no declarations of a person not a party to the suit, can be admitted in evidence against the defendants. *Duckham* v. *Wallis*, 5 *Esp. Rep.* 251. *Kent* v. *Lowen*, 1 *Campb.* 177. *Appleton* v. *Boyd*, 7 *Mass. Rep.* 131. *Barrett* & ux. v. *French*, 1 *Conn. Rep.* 354. 365. *Hatch* & al. v. *Straight*, 3 *Conn. Rep.* 31. *Cook* v. *Swan*, 5 *Conn. Rep.* 140.

*W. W. Ellsworth* and *Toucey*, contra, contended, 1. That the return was sufficient, as it shewed with reasonable certainty, that every requisite of the statute had been complied with. It appears that the certificate of the appraisers was in the hands of the officer ; for he manifestly acted upon it. It was annexed to his indorsement, and recorded with it. He thus made the certificate *a part* of his return. *Williams* v. *Amory*, 14 *Mass. Rep.* 28. It makes no difference whether the certificate be *above* or *below* the signature. A will may be signed, by inserting the name at the beginning, as well as at the end. The items of fees for the levy of an execution on real estate, are generally, if not always, placed below the signature of the officer ; but notwithstanding this, are they not *embraced* by the return ? Were they not so considered, by the legislature, in the confirming act of 1826, and by the Court, in *Beach* v. *Walker*, 6 *Conn. Rep.* 190. ? If a writing annexed is to be

deemed a part of the return for the purpose of *destroying* a title, shall it not be so considered for the purpose of *validating* the proceeding ?

2. That as the levy in this case was made according to the law previously and until *January* 1st, 1822, in force, the defect in the return, if any existed, was cured by the confirming act of 1825. In *Mather* v. *Chapman* & al. 6 *Conn. Rep.* 54. it was decided, that this was a constitutional and valid act ; and the Court gave it effect to cure a more palpable defect than the one relied on to defeat the plaintiff's title in this case.

3. That the declarations of *Zechariah Marks*, after the deed to him, and during his possession under it, against his interest, were admissible evidence against the defendants, holding under him. *Beers* & al. v. *Hawley*, 2 *Conn. Rep.* 467. 472, 3.

DAGGETT, J. On looking into the act of the General Assembly, passed in *May*, 1825, (subsequent to this levy) to confirm levies of executions on real estate, it is found, that the defect in the levy, if it be one, is cured by that act. That this act is constitutional, and therefore of binding authority, was expressly decided, by this Court, in the case of *Mather* v. *Chapman* & al. 6 *Conn. Rep.* 54. The objection is, therefore, properly abandoned, by the counsel, upon its appearing that the defect was embraced and cured by the act in question.

Another objection, however, is made, which will now be considered. This relates to the declarations of *Zechariah Marks*, which were admitted on the trial. That such declarations, so made, are admissible, I had supposed to have been too long and too well settled to be doubted. It has been so ruled more than twenty times within the last forty years. Declarations of a person, while in possession of the premises, against his title, are always admissible, not only against him, but against those who claim under him. To this point the following cases are express. *Walker* v. *Broadstock*, 1 *Esp. Rep.* 458. *Davis* v. *Pierce* & al. 2 *Term Rep.* 53. *Waring* v. *Warren*, 1 *Johns. Rep.* 340. 343. *Jackson* d. *Griswold*, v. *Bard*, 4 *Johns. Rep.* 230. *Jackson* d. *McDonald* v. *McCall*, 10 *Johns. Rep.* 377. In *Beers* & al. v. *Hawley*, 2 *Conn. Rep.* 467. this point was considered, and the whole Court of Errors concurred in the admissibility of the evidence. Three members of the Court gave their opinions *seriatim*—Judges *Swift*, *Hosmer* and *Gould ;* and all recognized, in direct terms, this

*Hartford,*
*June, 1829.*

Norton
*v.*
Pettibone.

doctrine. The latter says: " The declarations of a former proprietor against himself, have always been admitted against those who claim under him." *P.* 472, 3.

The motion, therefore, must be refused.

The other Judges were of the same opinion, except WIL-LIAMS, J., who gave no opinion, having been of counsel in the cause.

New trial not to be granted.

---

### SIGOURNEY *against* MUNN and another.

In winding up the concerns of a partnership, after a dissolution, one partner cannot take the partnership stock at a valuation ; but its value must be ascertained, by a conversion of it into money.

And where, after a dissolution of a partnership, one of the late partners abandoned the partnership concerns, refused to divide the stock, and made no reply to the repeated solicitations of the other partner to come to an amicable settlement of their concerns ; where it appeared further, that in this state, among merchants and traders, the customary mode of winding up the concerns of a solvent partnership, after a dissolution, is to divide the stock of goods on hand between the partners, or for one partner to purchase out the other ; that there is no usage, in such cases, to sell the stock on hand at public auction ; and that when this mode of sale has been resorted to, it has been generally attended with a considerable sacrifice or loss with reference to the appraised value ; and where it appeared also, that the partner in whose sole possession such goods were left, in order to render them most saleable, replenished the stock with new and more saleable goods, and so intermingled the old and new goods that it became impracticable for him to keep a separate account of the sales of the old stock—thus to replenish old stocks being generally practised by regular merchants, and this being the only method that can be adopted, with a prospect of making fair sales ; it was held, that these circumstances did not deliver the case from the operation of the general rule, requiring a sale as a criterion of value.

Whatever is sufficient to put a person on enquiry, is considered in equity as conveying notice.

Where *S.*, one of two partners, executed a release deed of land to himself and *M.*, the other partner, for a nominal consideration, " received of *S.* and *M.*, merchants in trade under the firm of *S. & Co.*," " to be held by them in such proportions as is agreed on between them ;" it was held, that the record of this deed, the singularities of which were calculated to awaken attention, conveyed constructive notice to an incumbrancer under *M.*, that the land was partnership property.

THIS was a bill in chancery, instituted by *Sigourney*, against *Munn*, who was formerly his partner in trade, and against *Hol-*

*brook,* an incumbrancer under *Munn,* claiming a balance due to him, as partner, from *Munn,* on the adjustment of the partnership concerns; and praying that some meet person be appointed to divide the company property, or that so much of it be sold as will, on the winding up of the partnership concerns, pay him such balance, and that all the title which *Munn* ever had in the real estate of the company, be vested in the plaintiff. The case, embracing the facts found by a committee, came before this Court, at the last term in this county; but the finding of the committee was considered as defective, and for that reason, their report was not accepted.(*a*) The subject was referred again to the same committee, who found the following facts, in addition to those contained in their former report.

After notice had been given of the dissolution of the partnership, in the manner before stated, a conversation was had between the parties respecting the mode of disposing of the stock on hand, and particularly, whether it should, or should not, be sold at auction. *Munn* objected to that mode, as being in its consequences ruinous to himself; and *Sigourney* thereupon agreed with him, that it should not be sold at auction. *Munn* claimed, that *Sigourney* ought to take the goods, and account for them *at cost;* but this claim was not acceded to by *Sigourney.*

On the 14th of *December,* 1825, after the notice of dissolution given by *Munn, Sigourney* addressed and delivered a letter to him, wherein, among other things relating to the partnership, he said : " But if, after all, you still prefer to decline this offer, I do not perceive that any other course is left me, but to close the business according to the articles of copartnership, and whatever property may belong to the company on the 1st of *April* next, either to sell in such way as may be deemed most prudent, or divide between us according to our respective interests." To this no answer was given. On the 24th of *April,* 1826, *Sigourney,* with a view to induce *Munn* to act with him in bringing the business to a close, caused a written notice to be delivered to him, then residing in *New-York,* in these words : " Sir, having completed the inventory of the stock of merchandize of the late company of *Charles Sigourney & Co.,* which amounts to 26,228 dollars, 16 cents, I hereby notify you, that I am ready to proceed to make a dividend of the partnership property, according to the articles of copart-

(*a*) Vid. *Sigourney* v. *Munn* & al. ante 11. 21.

nership between us, on your paying one fourth of the late company's debts, and paying, or securing to be paid, to my satisfaction, whatever sums of money may be found due to me, on a settlement of the partnership accounts. [Signed.] *Charles Sigourney."* This notice was never acknowledged by *Munn;* nor did he ever offer to comply with its overtures.

The committee found, that in this state, among merchants and traders, the customary mode of winding up the concerns of a solvent partnership, on dissolution, where a stock of goods remains on hand, is, to divide them between the partners; or, for one to purchase out the other; that there is no usage, in such cases, to sell the stock on hand at public auction; and that generally, when this mode of sale has been resorted to, it has been attended with a considerable sacrifice or loss, comparing the net proceeds with the appraised value.

After the dissolution, *Sigourney,* being satisfied, that the stock of goods on hand must be taken and disposed of by himself, *Munn* having abandoned them, in order to render them most saleable, replenished the stock, by new and more saleable goods, and so intermixed the old and new goods, that it became impracticable for him to keep a separate account of the sales of the old stock. Thus to replenish old stocks, the committee found generally practised, by old and regular merchants; and this is the only method that can be adopted, with any prospect of making fair sales. Hence, they could not find the amount of sales from the company stock, since the dissolution. Such sales as could be ascertained, had been made for a less sum than the appraised value; and the present market value of such of the stock as remains on hand, is below the appraisal. Could the partnership stock be separated from other goods, and sent to auction, there would be, in the opinion of the committee, a great *deficit* in the sales from the appraised value reported.

The whole case was reserved for the advice of this Court as to what decree should be passed.

*Sherman* and *F. Parsons,* for the plaintiff, contended, 1. That whatever might be the general rule, *Munn,* under the circumstances of this case, as disclosed in the second report, could not insist on a sale of the partnership stock as a pre-requisite to an adjustment of the partnership concerns. *Munn* himself objected to a sale at auction; and *Sigourney* agreed, that this

course should not be taken. *Sigourney* then proposed to *Munn* to sell the stock in such way as they should deem most prudent, or to divide it between them in proportion to their in- terests. *Munn* made no reply, and did nothing. He refused all assistance; abandoned the concern; and left the state. What was *Sigourney* to do with this property? He alone could not divide it; and he could not sell it, in the state in which *Munn* left it, because in that state, it was unsaleable. To render it saleable, it was necessary to replenish the stock, and intermingle the new goods with the old. This was in fact done; but it produced a new difficulty. In consequence of the intermixture, it became impracticable for *Sigourney* to keep a separate account of the sales of the old stock. Under these circumstances, a valuation by indifferent appraisers, was the only course left, to ascertain the value of the stock. And this course, the committee find, is sanctioned by usage.

2. That *Holbrook*, when he took the mortgage deed from *Munn*, had equitable notice, that the premises were partnership property; and consequently, his title is subject to the partnership accounts. The rule in equity is, that whatever is sufficient to put a party on enquiry, is considered as conveying notice. *Peters* & al. v. *Goodrich*, 3 *Conn. Rep.* 146. From an inspection of the town records, *Holbrook* must have reasonably inferred, that this property did not belong to *Sigourney* and *Munn* as tenants in common, but as partners. Of this the first indication is, that the original conveyance was from the *grantor himself* and another. The 2d indication is, that the consideration was *merely nominal*, viz. " one dollar," not one five thousandth part of the value of the land. The 3d indication is, that the consideration was received of the grantees as " merchants in trade under the firm of *C. Sigourney & Co.*" The 4th indication is, that there is a *reference* on the face of the deed to some *other agreement*. The premises are " to be held by them (the grantees) in such proportion as is agreed on be tween them." On the whole, it is apparent from the record, that *Sigourney* did not intend to convey land to himself, *as an individual*, for such a conveyance would be inoperative; that the conveyance was to both the grantees, *in the same capacity;* that this capacity was that of *merchants in trade;* that the conveyance was not made on a *sale* of the property; and that the grantees were to hold, not in moieties, as tenants in common would, but in certain proportions specified in an agree-

ment referred to. What is thus referred to, is part of the deed. *Newl. Contr.* 512. If *Holbrook* had notice in relation to the land conveyed by the first deed, he had equal notice with respect to the other small pieces.

*N. Smith* and *W. W. Ellsworth,* contra, contended, 1. That no decree could be passed in favour of the plaintiff, because the account had not been properly adjusted. The court have already decided, that one partner cannot take the partnership property, and convert it to his individual use, at a valuation ; but that the value must be ascertained by a sale. Do the additional facts contained in the second report, deliver the case from the operation of the general rule ? There was *no agreement* of the parties to make a different disposition of the property. The conversation between them about a sale at auction, and *Munn's* objecting to that course, did not dispense with a sale in any way. And it will hardly be claimed, that *Sigourney* acquired any new rights, by writing a letter to *Munn,* which *Munn* never answered. There is no usage, shewn by the committee, which authorizes one partner to take the goods at a valuation, without the assent of the other. The intermixture of the goods with others recently purchased, was *Sigourney's* own act, which cannot affect *Munn's* rights. As to the *impracticability* of keeping a separate account of sales, it is to be observed, that *no facts* are stated, shewing any such impracticability. The court will decide upon the facts found, and not upon the opinions of the committee. It is obvious, that *Sigourney might* have distinguished the company goods, though set upon the same shelf with others, in such a manner as to enable him to keep a separate account; and that the " impracticability" spoken of by the committee, was only a small increase of labour and care. The fact that the land was purchased with a view to erect a block of buildings on it, for the accommodation of the partnership, and that *Munn* afterwards refused to go on and build, gave *Sigourney* no right to take the whole of the property to himself at a valuation. *Munn's* title to the land now is the same as though it had been built upon. A court of chancery may order this property to be divided, or sold for the payment of debts; but in no other way can any court take *Munn's* land from him, and give it to *Sigourney.*

2. That there was nothing in the case, by which the legal security of *Holbrook* could be defeated or postponed. His

equity is, certainly, as good as *Sigourney's,* unless he had no- tice, at the time he took his security, that the land was partner- ship property, and consequently subject to the partnership ac- counts. Land, generally, is not the subject of partnership. The *nature* of the property, therefore, admonished *Holbrook* and the world, that this was not partnership property. 11 *Mass. Rep.* 475. 3 *Bro. Ch. Ca.* 199. The presumption is, that the parties intended to make a conveyance according to the legal effect of the deeds. Now, there is nothing on the face of those instruments leading to a contrary conclusion. [Here the counsel went into a critical examination of the deeds, particularly of that from *Sigourney* to himself and *Munn.*] There is not only nothing in any of the deeds con- veying notice to *Holbrook,* that this land was held by *Sigour- ney* and *Munn,* otherwise than as tenants in common, but there is nothing to excite suspicion to the contrary in the mind of any one—nothing to put him on enquiry after a trust estate. It is very important, that the record should controul : to *that* we are to look, and to nothing else.

HOSMER, Ch. J. On the former hearing, it was determined, that the real estate in question was advanced by *Sigourney* as part of the company's stock, or purchased for the accommoda- tion of the partnership business ; and that these facts made it partnership fund.

The plaintiff has alleged in his bill, that there was a balance due to him, as partner, on the adjustment of the partnership concerns ; and in proof of this, he has relied on a valuation of the goods and estate of the partnership, by the estimate of wit- nesses. This was adjudged to be inadmissible, and no evidence of their value. On the contrary, it was held, that in every case, where equity interferes to wind up the concerns of a partner- ship, it directs the value of the stock to be ascertained in the way in which it can best be done, that is, by a conversion of it into money. On this ground the case was remanded ; and it comes again before the Court, with the addition of further facts in- tended to overcome the adjudged difficulty in the case.

The parties have been heard, not only on the open points in the case, but on those which were closed by the former deter- mination. On full consideration of the subject, I am of opinion, that there exists no reason to question the former decision. It appears to be the most equitable mode of winding up a part-

nership concern ; and is so considered in chancery.    Unless a settlement and division are agreed on, it contravenes every principle of natural justice, to hold, that one partner shall compel the other to accept what, according to valuation, his interest is supposed to be worth.    *Gow on Part.* 316. 17 *Ves.* 309. A fair valuation is opinion merely ; and a separate estimate procured by one of the partners, not unusually, will be attended by false judgment and partiality, which cannot be successfully counteracted.    I am fully aware, that a private sale of the goods and effects of a partnership, on its dissolution, is sometimes detrimental, and perhaps impossible.    Resort, then, must be had to a speedy sale by auction.    Where there is a fair competition, the goods and effects may be sold at their value ; but if they are not, the best test of value is adopted, and the concerns of the partnership (which is some advantage) are speedily closed.    In all events, this is a preferable standard of value to an estimate obtained, by the procurement of one of the partners.    The case of *Marquand* & al. v. *The New-York Manufacturing Company,* 15 *Johns. Rep.* 525. has been cited as establishing a contrary doctrine.    But the question now agitated never arose in that case.    The parties mutually agreed to an inventory and valuation of the partnership stock, and the controversy was, whether its original cost, or the estimate of witnesses, should be the criterion of value.

The only question, as between the partners, is, whether on the facts disclosed in the last report of the committee, the valuation of witnesses, by way of exception from the general rule, ought to be the test in this case.

The abandonment of the partnership concerns by *Munn,* and his refusal to divide the partnership stock, and to answer the repeated solicitations of the plaintiff, amicably to adjust their joint concerns, is the first class of facts demanding attention.

To this the answer is direct and obvious.    The plaintiff was left, by *Munn,* to his own counsel, and with the law for his guide, was authorized to sell the partnership goods, at private sale or at auction ; and this is the only consequence resulting. But in whatever manner their value is to be estimated, is a point not borne upon, by the facts reported.

It is found, that merchants customarily wind up their concerns, by a division of the joint stock ; or by the purchase of it, by one of the partners ; but what this has to do with the

question before the court, it is difficult to discern. Undoubt-<br>
edly, they may enter into any voluntary agreement relative to<br>
their concerns, not prohibited by law. But suppose they will<br>
not. Then, as in this case, they are to deal with the partner-<br>
ship property according to the prescriptions of law ; and this<br>
is the only result.

*Hartford,*
June, 1829.

Sigourney
*v.*
Munn.

It appears from the report of the committee, that there is *no usage* here to sell the stock on hand at public auction ; and that when it has been done, it has eventuated in a considerable sacrifice or loss. These facts have no bearing on the point of discussion. If they proved any thing, it would be merely this, that one partner, at the winding up of the partnership concerns, cannot sell the stock at auction. But they have no relevancy to the question, whether the partnership effects may be valued, by the estimate of witnesses. The rule of equity is not founded on usage, but in the intrinsic propriety and necessity of the thing. Besides, that there has been no usage to sell at auction is a mere negative followed by no legal consequence, and has probably arisen from the good sense and harmony of partners, on the dissolution of their connexion.

It is of no importance that an auction sale is frequently attended with loss. This is not peculiar to us, but pervades all states and countries, probably, in nearly the same degree. A voluntary adjustment of their concerns, by partners, is the better course, and precludes the necessity of any other. But if they do not, and will not agree, some mode of winding up their concerns must be adopted; and perhaps there can be none not attended with loss and disadvantage. A private sale, or sale at auction, becomes indispensable ; and the consequences must be submitted to.

Too much has already been said on a subject that has no bearing on this case. There has been no sale at auction. *Sigourney,* abandoned by his partner, has done what he had a right to do. He has sold the partnership effects at private sale, with the exception of a few goods, remaining on hand ; and in this branch of his proceeding no question has arisen. He, however, has omitted to keep an account of sales ; and whether under the circumstances attending this case, this omission will let in proof of a valuation of the goods and effects of the partnership, by the estimate of witnesses, is the real point of enquiry.

*Hartford,*
June, 1829.

Sigourney
*v.*
Munn.

On general principles, it is clear, that an agent, (and such is a partner) is bound to render a written account, comprising the items of the goods sold, with the sums at which they were disposed of, and to substantiate it, by his oath. *Coop. Eq. Plead.* 277, 8. *Gow on Part.* 121. *Stat.* 33. What, then, creates an exception in this case ?

The committee find, that to render the goods more saleable, the plaintiff replenished the stock, by the purchase of new and more vendible articles, and so intermixed the old goods with his new purchases, that it became impractible for him to keep a separate account of the old stock, owing to the number and condition of the articles. I cannot but think, that they have unintentionally employed a word in their report, which does not convey their meaning, and which no possible state of facts could warrant. The intermingling of the goods might create a *difficulty* in keeping an account of sales, but not an *impracticability.*

But if a strict impracticability of distinguishing the goods, existed, (a supposition put for the sake of the argument only,) whence did it arise ? From the voluntary act of the plaintiff. If the goods were in this condition, he produced it. By what authority was it done ? By no authority. It was neither authorized by *Munn,* nor by any principle of law. The impracticability resulted from an unjustifiable act. And is an established rule of law to bend to the volition and culpable act of Mr. *Sigourney ?* And may he take advantage of his own wrong ?

There is nothing in the case distinguishing it from what it was at the former hearing. If at the election of one of the partners, the voluntary intermingling of goods dispenses with a strict accountability in the usual manner, it is easy to see, that a rule of law is converted into the volition of the party. And of what value is a rule, (falsely so called) over which the person in interest may exercise a dispensing power, at his election ?

Let the subject be placed in a different light. The plaintiff was an agent of the partners, and, as such, was bound to keep and render an account of sales. With open eyes on the consequences, pre-determined and foreseen by him, he voluntarily placed himself in a condition, in which he could not fulfil this duty. What, then, is the reasonable result ? He must submit to the known rule of law, and can derive no advantage from his unauthorized act.

It has been asked with emphasis, are not the concerns of the partnership ever to be settled? I feel myself under no obligation to answer this general question; nor is it at all involved in this case. The plaintiff has exhibited a bill; and every fact indispensable to its support, he must substantiate, by legal evidence. If through carelessness, improvidence or choice, he has placed such proof beyond his power, he cannot, in this manner, impair any obligation essential to the just rights of his partner.

The conduct of Mr. *Sigourney*, it has been said, was, *intentionally*, honourable and just. In this particular, it has not been questioned; and I admit it to be unquestionable. I think, however, it has been heedless, ill-judged, and without a deliberate attention to the obligation resting upon him. His fair intentions cannot deprive *Munn* of his legal rights; nor make that to be law in his case, which ought not to be law in the case of another.

An enquiry has been raised, whether from the recorded deeds, *Holbrook*, the mortgagee of *Munn*, had constructive notice, that the property conveyed to him was partnership fund. The determination of this point is not necessary; but as the Court has come to a result upon it, it is proper that it should be known. The decision, and the reasons on which it is founded, I will state very briefly.

Whatever is sufficient to put a person on enquiry, is considered in equity as conveying notice; as the law imputes to a person the knowledge of a fact, of which the exercise of common prudence and ordinary diligence must have apprised him. *Peters* & al. v. *Goodrich*, 3 *Conn. Rep.* 146. *Newl. on Contr.* 510.

None of the recorded deeds directly show, that the real estate mortgaged to *Holbrook*, was partnership fund. Notwithstanding this, if on the face of either deed there was such an indication of this fact as to place the mortgagee under a reasonable obligation to make enquiry on this subject, he must be deemed to have had constructive notice.

The instrument to which I shall first advert, is a deed of release, in the usual form, from *Charles Sigourney* to himself and *Charles Munn*. The consideration expressed in this instrument, is "*one dollar*, received of *Charles Sigourney* and *Charles Munn*, merchants in trade under the firm of *Charles*

*Sigourney*
*v.*
*Munn.*

*Sigourney & Co. ;"* and the land is released to them, " to be held in such proportion as is agreed on between them."

This writing has a number of striking singularities, calculated to awaken attention. It is a deed from *Sigourney* to *himself* and *Munn,* described as merchants in company ; and as to himself, it conveys no title. It is no far-fetched presumption from the face of this instrument, that it was intended to invest the company with a fund for their partnership purposes. The nominal consideration of one dollar only, strengthens this inference, resulting as it does from the name and description of the company ; a fact both useless and improbable on any other supposition. The presumption is still further enforced, by the nature of the deed, which is a release, and the conveyance of the land to a partner, to be held in proportions that had been agreed on between them. The majority of the Court is of the opinion, that *Holbrook,* who must be presumed to have read this writing, could not fail to observe its peculiarities ; to have his attention awakened and stimulated by them ; and to see the path, that would conduct him to a full knowledge of the rights of the plaintiff. Of consequence, the Court is of opinion, that he had constructive notice, that the land was partnership fund.

The deed of release from *Lloyd* to *Charles Sigourney* and *Charles Munn,* for the consideration of 5942 dollars, 3 cents, received of them, being merchants in company under the firm of *Charles Sigourney & Co.,* has one peculiarity only, and that is, the description of the partnership, by the name of the firm. In all other respects, it has the ordinary appearance of a sale to individuals. The unnecessary and somewhat unusual description of *Sigourney* and *Munn* as partners, unaided by any other consideration, had not so high a tendency to put *Holbrook* on enquiry, or to stimulate him to investigation, as to place him under an obligation to look beyond the deed. Confining himself to the instrument, which neither indicated, that the land was bought with partnership fund, nor appropriated to partnership purposes, he had no reason to believe, that the land belonged to *Sigourney* and *Munn* otherwise than as tenants in common.

The deed of release from *Pratt* to *Charles Sigourney* and *Charles Munn,* and that from *Dimock,* are attended with no peculiarity, and contain no expression pointing to the partnership.

An effort was made in argument to connect the three latter deeds with the one from *Charles Sigourney* to himself and partner, but without any foundation.   The three last deeds comprise separate and distinct pieces of land from the one first referred to ; conveyed by different persons, at different times ; and instead of disclosing a connected transaction, arising under the same agreement, they are disjoined by every consideration applicable to such a subject.   They are not distinguished from any ordinary transaction with individuals acting in their individual capacity, and present no motive for enquiry beyond the deeds themselves.

In conclusion ; for the deficiency of proof, in this case, of the indebtedness of *Munn* to *Sigourney*, the Court advise, that the bill be dismissed.

BISSELL, J. was of the same opinion.

PETERS, J. dissented, so far as regarded the relief sought against *Munn*.

DAGGETT and WILLIAMS, Js., having been of counsel in the cause, gave no opinion.

Bill to be dismissed.

———◆———

### OSBORNE *against* HUMPHREY and another.

In 1742, an ecclesiastical society, to which a tract of land had been previously given for the maintenance of the gospel ministry, in consideration of a gross sum paid by *A.*, leased that land to him and his heirs, for the period of 999 years.   By sundry mesne conveyances, a part of the same land passed to *B.*, who erected buildings thereon, and thereby greatly enhanced its value.   Held, 1. That the land so held by *B.*, was within the provision of the statute of 1702, exempting estates given *in pios usus* from taxation ; 2. that it was immaterial with reference to the operation of this act, whether the original sequestration of the land was before or after its enactment ; 3. that the lease of 1742, though for 999 years, and in consideration of a gross sum, conveyed a less estate than a fee ; 4. that the buildings erected by *B.*, being attached to the land, are to be considered, in this case, as part of the land ; 5. that the clause in the act of 1702, exempting the estates therein mentioned from taxation, was repealed at the revision of the statutes in 1821 ; 6. that such repeal was inoperative as to rights already acquired by virtue of the act, being repugnant to the con-

*Hartford,*
*June, 1829.*

Sigourney
*v.*
Munn.

Osborne
*v.*
Humphrey.

stitution of the *United States,* inasmuch as it impaired the obligation of a contract; and 7. that the land in question is, consequently, still exempt from taxation.

THIS was an action of trespass *de bonis asportatis;* which came on for trial at *Hartford, February* term, 1829; when a case comprising the following facts, was made and agreed to.

Previous to the year 1742, a large tract of land had been granted to the first ecclesiastical society in the ancient town of *Simsbury,* for the maintenance of the gospel ministry. In that year, this tract, for the consideration of 49*l.* 10*s.* 3*d.,* was demised to *Ezekiel Humphrey* and his heirs, for the period of 999 years. It has since been divided, and is now held by divers persons in severalty. A part of it lying in the present town of *Canton,* has passed, by sundry mesne conveyances, to the plaintiff, who received it from his immediate grantor, under a deed of warranty in fee. Since the demise in 1742, the value of the whole tract has been greatly enhanced, by the erection of dwelling-houses and other buildings thereon, it being now worth 4000 dollars. The value of the plaintiff's part has been proportionably enhanced, by the same means; it being now worth 1450 dollars. The assessors of the town of *Canton* inserted it in his list, on which sundry taxes were granted. For the collection of these taxes, warrants were issued, which, by one of the defendants, under the direction of the other, were levied on the goods of the plaintiff specified in the declaration.

The case was reserved for the advice of this Court.

*Sherman* and *P. Miner,* for the plaintiff, after remarking that the property which was made the subject of taxation in this case, was unquestionably within the terms and the meaning of the statute of 1702, contended, 1. That the lease of 1742 did not deprive this property of the privilege, which it was the object of that statute to secure. This lease gave the lessee a term for years only, the fee being still in the society. 2 *Bla. Comm.* 140. & *seq.* For the purpose of continuing the privilege given by the statute, surely it is not necessary that the land should always remain in the possession and occupation of the society. The society can ordinarily appropriate the use of the land to its benefit, in no other way than by putting it into the possession and occupation of a tenant; and it makes no difference whether it be by a short or a long lease. The land in question is still leased out for the support of the gospel min-

istry.   Why should a portion of the consideration of the lease be paid *annually?*   If this land had been leased for the same term, at the rent of 20 dollars a year, there could have been no question.   Now, does it make any difference, whether an annual rent is reserved, or a gross sum be taken in anticipation?   Is not the legal effect of the contract, so far as this case is concerned, the same in one case as in the other?   Does not the land, in both cases, remain equally to the use of the society?

But if the lease of 1742 were a conveyance in fee, it would make no difference.   It is the *land* which is exempted from taxation; and this privilege does not cease or vary, on a change of owners.   If the society sell it, they get the benefit intended, in the consideration, which will be increased by the precise value of the exemption.   In this way, the land, notwithstanding a thousand alienations, remains, and will *forever remain and be continued* to the use to which it was given.

2.  That the privilege of exemption from taxation, given by the statute of 1702, was in the nature of a *contract,* which the legislature could not rescind, without the consent of the other contracting party; and if the omission of the clause declaring the exemption in the revision of 1821, is to be considered as a repeal of that clause, the repeal is unconstitutional with regard to estates given or held under the statute, and, therefore, it is thus far inoperative.   This point was fully considered and settled in *Atwater* v. *Woodbridge,* 6 *Conn. Rep.* 223.   The legislature have made a grant: the faith of the government is pledged: it cannot be taken back.

*W. W. Ellsworth,* for the defendants, after remarking that every man's property, which falls within the description of taxable property, must bear its proportion of the public burthens, unless specially exempted by the legislature, contended,

1.  That for every purpose of taxation, the plaintiff was the entire and exclusive owner of the land assessed and taxed in this case.   The grant for 999 years, for a gross sum, vested *the whole beneficial interest* in the grantee; and the equivalent paid became vested in the society.   Suppose the society had taken another piece of land in exchange for this, or instead of the money; would not the land so taken be exempt from taxes?   May not these funds and sequestrations be put into new investments?   May not new stocks be purchased, or gotten by exchange, without a loss of privilege to the fund?

*Hartford,*
June, 1829.

Osborne
*v.*
Humphrey.

Will not the privilege attach to the new stock or land, while that which is sold loses its privilege ; and this because it is sold ? If otherwise, it will be a very easy thing to draw from the tax list every acre of land in the state ; for a man has only to sell, for full value, for some charitable use, and take back a lease or conveyance for 10,000 years, and he cannot be reached by any tax. An annual income may not be liable to taxation ; but if the capital is sold or exchanged, that which is taken, and which constitutes the property of the society, may be exempt, but that which is sold cannot be.

There is no analogy between the disposition of the property made in this case and an annual rent on a lease. The kinds of rent mentioned in the books, are *rent service, rent charge* and *rent seck.* 2 *Bla. Comm.* 41, 2. These rents are all *annual,* and must be. For rent, too, there may be *distress.* The land may be forfeited : an eviction of part of the premises defeats the whole of the rent : it must issue out of the thing granted. The disposition in question, then, was not a *renting* of the land, but a *sale.*

But were this a lease with an annual rent, still it would be taxable as the property of the plaintiff ; for an interest for 999 years would then be vested in him ; and not less so because he was to make an annual return ; for this might be done, and is done in the state of *New York,* where a lease of the fee, an entire interest, is given upon an annual rent. The old notion that a tenant for years has not a vested interest in the freehold, has been exploded for centuries ; and he is considered in *England* as having an interest therein as much as if he were a lessee of the fee, or for life. 2 *Bla. Comm.* 144. If he be not the owner of the freehold, he has an interest really of equal value in long leases, and as proper to be taxed, as any other.

2. That that the plaintiff is liable to be taxed to the extent of his *buildings* at least. These are his own, removable at pleasure.

3. That the case of *Atwater* v. *Woodbridge,* the only decision relied upon in opposition to the claim of the defendants, is not decisive here. In the first place, so far as that case turned upon the principle that the act of 1702 protected the fund of the *Bethany* society, because it was created upon the security of that statute, it is inapplicable here ; for it does not appear that this sequestration was made after 1702. The town of *Simsbury* was settled in 1647, and incorporated in 1670. Secondly, so far as that case turned upon the principle, that the

assessment does not embrace the species of property in question, it is inapplicable here, because the plaintiff's property is specifically provided for and included in that law. *Stat.* 446. Thirdly, in the case referred to, the estate of the *society* was taxed, while here it is the estate of an individual, who, however honestly he may hold it, does not hold it exclusively for pious uses.

*Hartford,*
*June,* 1829.

Osborne
*v.*
Humphrey.

PETERS, J. The case presents two questions. 1. Was this land exempt from taxation, by the act of 1702? 2. Was it made liable, by the act of 1821? By the statute of 1702, it is provided, " That all such lands, tenements and hereditaments, and other estates, that either *formerly have been,* or hereafter shall be given and granted, either by the General Assembly of this colony, or by any town, village or particular person or persons, for the maintenance of the ministry of the gospel, in any part of this colony, or school of learning, or for the relief of poor people, or for any other public and charitable use, shall forever remain and be continued to the use or uses to which such lands, &c. have been or shall be given and granted, according to the true intent and meaning of the grantors, and to no other use whatsoever, and also be exempted out of the general list of estates, and free from the payment of rates." *Stat. p.* 66. revis. 1702.—*p.* 108. revis. 1750.—*p.* 111.—revis. 1784.—*p.* 252, 3. ed. 1796.—*p.* 433. ed. 1808. The land in question is within the words of the statute, and the appropriation is within the intention of the legislature. It was given and granted for the maintenance of the ministry of the gospel. This case presents the precise question recently decided, by this Court, in *Atwater* v. *Woodbridge,* 6 *Conn. Rep.* 223. wherein it was unanimously holden, that a fund appropriated to the support of the gospel ministry previous to the act of 1821, was not thereby made liable to taxation.

But the defendants contend, that this grant to *Simsbury* was *before* 1702, and so not within the act. This, however, is a mere *gratis dictum.* In the first place, the fact does not appear in the case. Secondly, the statute is retrospective as well as prospective. The words are : " All such estates that either *formerly have been,* or hereafter shall be given and granted," &c. This is not like other retrospective laws, destroying a vested right, but creating and securing one.

It is also said, that the title of the plaintiff, and of those under whom he holds, is a sale or grant, and not a lease, because there is no rent reserved. But a lease may be *for money paid*, or rent reserved, and must be of a less term than the lessor has in in the premises. 1 *Swift's Dig*. 131.

Again, it is said, that the plaintiff has a vested *taxable* interest. He certainly has a vested interest ; and a valuable part of it, is, its exemption from taxation ; and this he obtained for a valuable consideration.

It is emphatically asked, why should not the plaintiff be taxed to the extent of his *buildings?* My answer is, the buildings are attached to the land, which the legislature, having the power and the *right*, have been pleased to exempt from taxation, for the public good, and the special benefit of an institution, which our ancestors considered as the main pillar of civil government.

In the revised statutes of 1821, *tit.* 56. *sec.* 3. (*pp.* 301. 485.) the legislature have been pleased to omit, and, I think, repeal an exemption from taxation of all estates given *in pios usus,* which had been handed down through every revision from 1702 ; and by a subsequent act, (*tit.* 100. *sec.* 2. *p.* 446. revis. 1821.) to direct, that all lands, &c. previously granted for public or pious uses, which had been leased for terms not then expired, at rents merely nominal, should be valued and assessed, &c. These provisions embrace the land in question, and present the main point in this case, *viz.* Have the legislature a constitutional right and power to repeal this exemption, and direct this assessment ? This Court have said No ! And a higher tribunal have said the same.

In *Atwater* v. *Woodbridge*, already cited, which runs on all fours with this case, the only difference being, that the estate in that case was personal and in this real, *Brainard*, J., in giving the unanimous opinion of this Court, thus emphatically speaks : "I cannot, for a moment, believe, that the legislature ever intended to interfere with the rights given and acquired under the first statute. But if they did, I will, with deference, but with boldness, say, they had no constitutional power to affect them. It appears to me, that property given under the statute, so long as it is applied to the uses designated, must forever retain the rights and privileges attached to it, at the time of the grant ; that the government made a contract with all such persons as might be disposed to give their prop-

erty to these religious purposes and charitable uses, that it should forever be exempted from taxation ; and that a right in the grantees, donees, devisees or legatees became vested, which no subsequent legislature could divest."

In 1812, a similar case, upon similar principles, was decided, by the supreme court of the *United States.* In 1758, the legislature of *New-Jersey* and the *Delaware Indians* agreed to exchange lands. The *Indians* were to cede all their lands to the province ; and the legislature were to purchase and cede to the *Indians* other lands, and by statute declared, that the lands so purchased and ceded to the *Indians* should not thereafter be subject to taxation. In virtue of this act, the convention with the *Indians* was executed. In 1801, the *Indians* obtained an act of the legislature authorizing a sale of their lands ; and in 1803, the commissioner under the act conveyed the lands to the plaintiffs. In 1804, the legislature repealed that part of the act of 1758, which exempted the lands from taxation. The lands were then assessed, and the taxes demanded ; for which an action was brought ; and the highest court in the state decided, that the repealing act was valid, and the lands liable to taxation. This decision, on a writ of error in the supreme court of the *United States,* was reversed. In delivering their unanimous opinion, *Marshall,* Ch. J., said : " The question is narrowed to the enquiry, whether in the case stated, a contract existed, and whether that contract is violated, by the act of 1804. Every requisite to the formation of a contract is found in the proceedings between the colony of *New-Jersey* and the *Indians.* The subject was a a purchase, on the part of the government, of extensive claims of the *Indians,* the extinguishment of which would quiet the title to a large portion of the province. A proposition to this effect is made ; the terms stipulated ; the consideration agreed upon, which is a tract of land *with the privilege of exemption from taxation ;* and then, in consideration of the arrangement previously made, one of which this act of Assembly is stated to be, the *Indians* execute their deed of cession. This is certainly a contract. The privilege, though for the benefit of the *Indians,* is annexed, by the terms which create it, *to the land itself,* not to their persons. It is for their advantage that it should be annexed to the land, because, in the event of a sale, on which alone the question could become material, the value would be enhanced by it."—" The land has been sold with the

assent of the state, with all its privileges and immunities.    The purchaser succeeds, with the assent of the state, to all the rights of the *Indians.*    He stands, with respect to this land, in their place, and claims the benefit of their contract.    This contract is certainly impaired, by a law, which would annul this essential part of it."    In formally pronouncing judgment, the Court declare, that the repealing act " is repugnant to the constitution of the *United States,* in as much as it impairs the obligation of a contract, and is, on that account, void."    *New-Jersey* v. *Wilson, 7 Cranch* 164.

In these opinions I entirely concur.    The cases cannot be distinguished from the case before us.    I therefore advise, that judgment be rendered for the plaintiff.

HOSMER, Ch. J. and BISSELL, J., were of the same opinion.

DAGGETT, J. conceiving himself interested in the question, and WILLIAMS, J. having been of counsel in the cause, gave no opinion.

Judgment to be given for plaintiff.

---

## CROCKER *against* HIGGINS and wife.

In chancery, all persons legally or beneficially interested in the subject of a suit, must be made parties; but those who are not thus interested, need not be made parties.

Such interest must be a right in the subject of controversy, which may be affected by a decree in the suit, and not mere desires in relation to such subject.

A person for whose benefit an agreement is made, though not a party to such agreement, may maintain a suit in chancery for its specific performance.

An agreement within the statute of frauds and perjuries, carried into execution on one part, by acts performed with a view to the agreement claimed, is thereby taken out of the statute, and may be proved by parol evidence.

Therefore, where *A.* conveyed land to *B.*, for less than half its value, on condition that *B.* should give a lease of such land to *C.* for life, and deposited the deed with an agent, accompanied by a written *memorandum* directing it to be delivered to *B.*, on payment of the purchase money; *B.* paid the purchase money, and received the deed, and then refused to give a lease to *C.* ; on a bill in chancery brought by *C.* against *B.* to obtain such lease, it was held, 1. that it was not necessary to make *A.* party to the suit; 2. that the suit was properly brought by *C.* ; 3. that the agreement being executed in part, was taken out of the statute of frauds and perjuries, and might be proved by parol evidence ; and 4. that *C.* was entitled to the remedy sought.

On a bill in chancery for the specific performance of an agreement, fraud in the defendant cannot be shewn as the ground of a decree, unless it be substantively averred in the bill.

This was a bill in chancery for the specific performance of an agreement for the demise of land.

The case stated in the bill, and found by the court, was as follows. On the 29th of *July*, 1825, *Charles Higgins*, one of the defendants, applied to *Daniel Wadsworth*, Esq. for the purchase of the land in question. Mr. *Wadsworth* declined selling it, unless the use of it could be secured to *Elizabeth Crocker*, the plaintiff, during her life. It was then agreed between them, that Mr. *Wadsworth* should convey the land in fee to *Lucy R. Crocker*, a daughter of the plaintiff, who was about to be married to *Higgins*, for the sum of 500 dollars, which was less than half the value of the land, to be paid by *Higgins;* and that *Higgins*, immediately after the execution of the deed, should cause a lease of the same land to be executed to the plaintiff. This agreement was soon afterwards performed on the part of Mr. *Wadsworth*, by a conveyance of the land to Miss *Crocker;* she paying no consideration for it. She was afterwards married to *Higgins*, and continues to be his wife. Application was made by the plaintiff to the defendants, for the lease above mentioned, but they refused to give it, denying the plaintiff's right, and threatening to turn her out of the possession of the land.

To prove the agreement before stated, Mr. *Wadsworth* and two other persons were offered as witnesses. To their admission the defendants objected, founding themselves on a written *memorandum*, signed by Mr. *Wadsworth*, and delivered to *Thomas S. Williams*, Esq., in the following terms : " Whereas *Charles Higgins* has given me his two promissory notes, dated 29th *July* 1825, for 250 dollars each, one payable in six months, and one in twelve months from date ; this may certify, that a deed of the place in *Asylum* street, [describing the land in question,] conveying said place to *Lucy R. Crocker*, is made out and lodged in the hands of *Thomas S. Williams*, Esq. to be delivered to her, upon the payment of said notes. *Hartford, August* 1st, 1825.

*Daniel Wadsworth.*"

It appeared, that Mr. *Williams* received the deed as an escrow ; and upon fulfilment of the condition, on the 3rd of

*April* 1826, delivered it to *Higgins.* The court, notwithstanding the objection interposed by the defendants, admitted the evidence ; and after a full hearing, decreed the premises to be vested in the plaintiff during her natural life, in as perfect a manner as *Higgins* and his wife could have effected, by any proper conveyance.

The defendants moved for a new trial ; and the motion was reserved.

*I. Perkins,* in support of the motion, contended, 1. That the proper parties were not before the court. The foundation of the plaintiff's bill is an agreement entered into between *Daniel Wadsworth* and *Charles Higgins.* Mr. *Wadsworth* being a party to the agreement, ought to be a party to the suit to enforce a specific execution of that agreement.

2. That the plaintiff, not being a party to the agreement, cannot sustain a suit upon it, either at law or in equity. The conveyance was not made to her ; she paid nothing ; and has done nothing. *Bartlett* v. *Pickersgill,* 1 *Cox,* 15. cited 4 *East* 577. *Boyd* v. *McLean* & ux. 1 *Johns. Ch. Rep.* 582.

3. That parol evidence was not admissible to prove an agreement by *Higgins* to execute a life lease to the plaintiff. In the first place, the deed executed by Mr. *Wadsworth* must be taken to express the whole contract between the parties. This was an absolute deed, and transferred the entire estate of the grantor to the grantee. An agreement cannot be partly in writing and partly in parol ; for when it is reduced to writing, this is regarded as the best and most certain evidence of its terms and meaning, and every thing before resting in parol becomes thereby extinguished. *Parkhurst* v. *Van Cortlandt,* 1 *Johns. Ch. Rep.* 273. 282. S. C. in error, 14 *Johns. Rep.* 15. 32. *Northrop* v. *Sperry,* 1 *Day* 23. *Movan* & ux. v. *Hays,* 1 *Johns. Ch. Rep.* 339. Secondly, the *memorandum* signed by Mr. *Wadsworth,* related only to the *delivery of the deed,* not to the terms of the agreement. The only condition specified in it, is, that *Higgins* should pay his notes ; and this being done, the estate belongs absolutely to the grantee.

4. That this suit being founded on a contract for the sale of lands, or some interest in or concerning them, is within the statute of frauds and perjuries, and therefore, cannot be sustained. This point is too clear for argument, unless there are some special circumstances in the case to take it out of the statute.

First, will it be said, that fraud, accident and mistake take a case out of the statute ? Be it so. But, in the first place, there is no allegation of either of these incidents, without which the proof was inadmissible. Secondly, the proof admitted did not tend to prove either of them. *Dean* v. *Dean* & al. 6 *Conn. Rep.* 285. *Barkhamsted* v. *Case,* 5 *Conn. Rep.* 528.

*Hartford,*
June, 1829.

Crocker
*v.*
Higgins.

Secondly, will it be claimed, that here was a part performance, by virtue of which the case is delivered from the operation of the statute ? Authorities are not necessary to shew, that reducing an agreement to writing, either partially or wholly, is not part performance. Part performance must be of the identical contract alleged, and by such acts of performance as are necessarily to be imputed to that agreement, and cannot reasonably be imputed to any other cause, or admit of compensation without performance. *Phillips* v. *Thompson* & al. 1 *Johns. Ch. Rep.* 131. 149. *Frame* v. *Dawson,* 14 *Ves.* 386. So it has been held, that payment of money is not part performance. *Clinan* v. *Cooke,* 1 *Scho. & Lef.* 40. 14 *Ves.* 388. Nor is possession and cultivation of land ; nor continuance in possession ; nor refraining from doing acts. *Sug. Vend.* 85. 2 *Vern.* 627.

*Sherman* and *W. W. Ellsworth,* contra, insisted, 1. That there was no necessity of making Mr. *Wadsworth* a party. Whatever his wishes may be, he has no interest in the subject of the suit.

2. That as Mrs. *Crocker* has the sole interest, she is the proper party plaintiff. If one receives money for another, the latter may sue for it. The contrary principle was never true in equity ; nor in law, in a case like this. *Schemerhorn* v. *Vanderheyden,* 1 *Johns. Rep.* 140. *Felton* v. *Dickinson,* 10 *Mass. Rep.* 287. 290. *Arnold* & al. v. *Lyman,* 17 *Mass. Rep.* 400. 405. *Com. Dig. tit.* Action upon the case upon Assumpsit.

3. That the parol evidence offered by the plaintiff, was properly admitted. There are two distinct grounds of objection to this evidence ; one at common law, the other by force of the statute of frauds and perjuries.

First, at common law. The objection on this ground, is, that the evidence contradicts or varies the import of the written agreement. But the written agreement in this case is the deed. How is this to be affected by the evidence in question ? We do not deny that this is an absolute deed. We go on the

ground that it is such ; and it was the intention of all concern-ed, that it should be.    The deed purports to convey the entire estate to *Lucy ;* and we say it did.    Now we propose to go one step further, and shew what *Lucy* was to do on her part ; *viz.* that after the entire and absolute estate was vested in her by the deed, she should execute a life-lease to her mother.    At common law, surely such an agreement might be proved by parol.    In *Dean* v. *Dean* & al. 6 *Conn. Rep*. 285. the evi-dence went to contradict the deed ; to make it a different in-strument from what it purported to be.

Secondly, this case is delivered from the operation of the statute of frauds and perjuries, by part performance.    The deed was executed and delivered to *Lucy*, in faith of her agreement to execute a life-lease to the plaintiff.    To sanc-tion her refusal to perform on her part, would be to promote, and not to prevent, fraud.    *Newl. Contr*. 181. *c.* x.

4. That the fraud of the defendants, in this case, was, of itself, a sufficient ground for the interposition of a court of chancery.

HOSMER, Ch. J.    No fraud is ascribed to the defendants in the plaintiff's bill ; and consequently, none can be imputed to them.    However sustainable the allegation of fraud might be, had it been made, it would be going wide of the issue, and take the defendants by surprise, if it were presumed, or admitted to be proved.    Executors of *Everston* v. *Miles*, 6 *Johns. Rep.* 138.    *Dean* v. *Mason*, 4 *Conn. Rep.* 428.

The case, then, is restricted to the single point, whether the contract, if legally proved, ought to be specifically decreed.

To this three objections have been made by the defendants.

It was first said, that Mr. *Wadsworth* ought to have been made a party to the bill.

It is a well established principle in chancery, that all persons legally or beneficially interested in the subject of a suit, must be made parties.    The converse of the rule is equally clear, that they who are not thus interested need not be made parties. *Coop. Eq. Plead*. 33—39.    *Wendell* v. *Van Rensselaer*, 1 *Johns. Ch. Rep.* 344, 349.    *Wiser* v. *Blachly*, 1 *Johns. Ch. Rep.* 437. *Brown* v. *Ricketts*, 3 *Johns. Ch. Rep.* 553. 555.    By interest, it is observable, is meant something more than is comprised in the most ardent wish or partial feeling.    It implies a *right* in the subject of controversy, which a decree, more nearly or re-motely, may affect.

The question then, arises, what right of Mr. *Wadsworth*, will be affected, by the specific execution requested. He voluntarily. conveyed his whole property in the premises, and claims nothing in the land. By a decree of the court, whether it be for or against the plaintiff, he, neither gains nor loses. Clearly then, he has no interest in the subject of the controversy.

The objection confounds the wishes and feelings of this gentleman with his interest in the question now controverted. As a man of honour and benevolence, he undoubtedly, must be influenced by a desire, that his generous donation to the plaintiff should not be frustrated, and that every ineqitable effort against her, should be unsuccessful. This, however, is not an interest, which, in the case of a witness, would go to his competency, but is a bias only, that would operate on his credibility. I perceive no reason why Mr. *Wadsworth* should be made a party to this suit.

2. It was, in the next place, objected, that the plaintiff, not being a party to the agreement made with Mr. *Wadsworth*, although beneficially interested, could not compel its specific execution.

It is at law a general rule, that the action shall be brought in the name of the party, whose legal right has been affected; and in chancery, that the plaintiff must have an interest in the subject of the suit, or a right to the thing demanded. 1 *Chitt. Plead.* 1. *Coop. Eq. Plead.* 166.

The principle presents this enquiry, whether the plaintiff, on the facts averred by her, has right or title to a lease for life in the premises. Under the circumstances of the case, this is a very unexpected question. Land is conveyed, by Mr. *Wadsworth*, to one of the defendants, for less than half its value; the deed is accepted; and the act of acceptance necessarily comprises a promise, that the grantee will perform the prescribed condition, by giving to the plaintiff a lease for life.

Even in a court of law, where the question is embarrassed, by considerations somewhat artificial and technical, it is now established, that a third person may maintain a suit on a parol promise, made for his benefit, although he is not a party to the contract. *Dutton* v. *Pool*, 2 *Lev.* 210. *Martin* v. *Hind*, *Cowp.* 437, 443. *Company of Feltmakers* v. *Davis*, 1 *Bos. & Pull.* 98. 102. *Schemerhorn* v. *Vanderheyden*, 1 *Johns. Rep.* 139. 140. *Arnold &* al. v. *Lyman*, 17 *Mass. Rep.* 400. 405. *Com. Dig. tit.* Action upon Assumpsit. E. a. In other

*Hartford,*
*June, 1829.*

*Crocker*
*v.*
*Higgins.*

words, it is a decided point, that such person has a legal right or title arising out of the promise. But in equity, where a title or right, if it be *ex æquo et bono,* is fully recognized, it would be passing strange, if the objection were admitted to prevail. The refusal of the defendants to do the stipulated act, is unjust and fraudulent; and the right of demand in the plaintiff is as clear as the principles of natural justice and equity can make it. The delivery of the deed to Miss *Crocker* is precisely analogous to the putting in her hands of a sum of money. Suppose this had been done, on the condition that she should deliver it for use to the plaintiff, for and during her natural life. No doubt would exist that she might sustain the equitable action for money had and received, to recover the money. As little is it to be questioned, that in a proper case, she might maintain her action at law, on the promise made to Mr. *Wadsworth,* for her benefit; or that she may support this bill in chancery for an appropriate remedy in this court.

The cases cited for the defendants evince nothing in their favour. *Bartlett* v. *Pickersgill,* 1 *Cox,* 15. proved only, that parol evidence is inadmissible to show, that a party who agreed for the purchase of an estate, in his own name, had in fact purchased it on the behalf of another person. At the same time, it was declared by the chancellor, if the plaintiff had executed the contract on his part, he would have admitted the evidence; and this makes the case a precedent for the plaintiff. In *Boyd* v. *McLean* & ux. 1 *Johns. Ch. Rep.* 582, it was adjudged, that facts indicating a resulting trust, may be proved by parol. These, the only determinations referred to by the defendants, so far as they have any relevancy, are against them.

The objection made to the plaintiff's right, unquestionably is without support.

Lastly, it was objected, that it is inadmissible to prove the plaintiff's case, by parol evidence. This objection derives no support from the statute of frauds and perjuries; nor has it been much pressed. For the principle is well established, that agreements carried into execution on the one part, where the acts done are performed with a view to the agreement claimed, are not within this statute. *Sug. Vend.* 72. *Newl. Cont.* 181. *Phillips* v. *Thompson* & al. 1 *Johns. Ch. Rep.* 131. *Parkhurst* & al v. *Van Cortlandt,* 1 *Johns. Ch. Rep.* 273. *Clark* v. *Brown* & ux. 1 *Root* 77. *Ives* v. *Gilbert,* 1 *Root* 89. *Noyes* v. *Moore,* 1 *Root* 479. *Downey* v. *Hotchkiss,* 2 *Day* 225. *Cady*

& al. v. *Cadwell,* 5 *Day* 67. And that the contract in this *Hartford,* case was performed precisely with this view and intent, there June, 1829. has not been, nor can there be, any controversy.

The objection to the making out of the plaintiff's case, by parol proof, rests exclusively on this foundation, that the evidence offered is in contravention of the *memorandum* given by Mr. *Wadsworth* to Mr. *Williams,* relative to the delivery of the deed. This writing is supposed, by the defendants, to be an agreement between the parties ; and that the proof offered in establishment of the contract, that a lease for life should be given to the plaintiff, is in opposition to such agreement. If such is the character of the parol proof, undoubtedly it is inadmissible : For the principle is unquestionably established, that parol evidence is never competent to supersede that which is in writing, or to contradict or vary it, in any degree. *Vid.* 3 *Stark. Ev.* 997. *& seq.*

But the transaction was entirely misconceived. In the first place, it was no agreement between the parties. It was merely a precautionary measure, taken by the grantor, Mr. *Wadsworth,* in order to coerce the payment of the consideration money, and to secure himself, by directing his agent not to deliver the deed until the money should be paid.

In the next place, if it were an agreement, there is nothing in the parol evidence, tending, in the slightest degree, to contravene it. The agreements, if such they were, relate to different subjects. The contract on which the plaintiff founds herself, regards the consideration for the land, and nothing else ; while the one supposed to be comprised in the *memorandum,* relates merely to the *delivery* of the deed. The parol evidence does not deny, that the deed was not to be delivered until the promissory notes of *Higgins* were paid ; but it proves, that on the delivery of the deed, *Lucy R. Crocker* was to execute to the plaintiff a lease of the land in question, for and during her natural life.

The objections made by the defendants are entirely without support.

It follows, as an undoubted consequence, that the determination of the court below has done complete justice to the parties, and that a new trial ought not to be granted.

PETERS, DAGGETT and BISSELL, Js., were of the same opinion.

Crocker
*v.*
Higgins.

WILLIAMS, J. gave no opinion, having been of counsel in the cause.

New trial not to be granted.

---

## BOOTH *against* BOOTH.

The act of *May,* 1826, providing that no levy of an execution on real estate, previously made, shall be deemed void, because the officer embraced in his return, as part of the costs of levy, other and greater fees than were by law allowable, is a constitutional and valid act.

To transfer the title to real estate, by levy of execution, every requisite to a valid levy must appear on the return, by express words, or by reasonable construction.

Where the officer certified in his return, that he demanded of the debtor, money, goods or chattels to satisfy the execution, but none were paid or shewn to him; in an action of ejectment by the creditor against the debtor, it was held, that it sufficiently appeared from such return, that personal estate of the debtor could not be found.

Where it appeared from the return, that the right and title of the debtor in the land levied on was appraised, and *that* was set off to the creditor; it was held, that the *land* was well set off.

Where the return omitted to state, that the justice of the peace who appointed an appraiser, *could judge between the parties;* it was held, that such omission was not a fatal defect; it not being necessary to negative any exception to the capacity of a magistrate.

Where the officer certified in the body of his return, that the appraisers were freeholders of the town where the land lies; and the certificate of appraisers, which the officer annexed to his return, below his signature, and caused it to be returned to and recorded in the clerk's office, stated, that they were *indifferent* freeholders; it was held, that the officer thereby *adopted* the certificate of the appraisers, making their averment his own; and consequently, that it sufficiently appeared from the return, that the appraisers were *indifferent freeholders.*

It seems, also, that an averment, by the officer, in his return, that the appraisers were appointed and sworn according to law, implies, that they were indifferent and unexceptionable.

Where the officer certified in the body of his return, that the appraisers appraised the land levied on at a certain sum, and that he thereupon set off the land to the creditor; and he annexed to his return, below his signature, the certificate of the appraisers, and caused it to be returned to and recorded in the clerk's office; it was held, that by fair implication, such certificate was in the possession of the officer, and that too, before he set off the land; because he could not set it off before he knew its value, and he could not know its value but by the certificate; and because every man acting officially is presumed to have done his duty, until the contrary appears.

THIS was an action of ejectment; to which the general issue was pleaded.

The defendant, *Phebe Booth,* claimed title to the demanded premises, by virtue of the levy of an execution in her favour against *Thompson Booth,* the defendant, and two other persons. A copy of the execution and of the officer's return, duly authenticated, being offered in evidence, the defendant objected to the return, on the ground that it did not appear thereby, that the requirements of the statute (*tit.* 2. *s.* 76. *p.* 57.) had been complied with. In this stage of the cause, it was taken from the jury, by consent of parties; and the question as to the admissibility of the return was reserved for the advice of this Court.

The return was as follows: "*Litchfield* county, ss. *New-Milford, December* 15th, 1825. Then, with this execution, I repaired to the within-named *Joseph Booth* and *Daniel Booth,* and made demand of them for money, goods or chattels to satisfy this execution and costs, but none were paid or shown unto me; and on the same day, I repaired to the usual place of abode of the within-named *Thompson Booth,* and there made demand for money, goods or chattels to satisfy this execution, and costs, but none were paid or shewn unto me. Then, by virtue of the within execution, and by direction of the creditor, I, at said *New-Milford,* on the same 15th day of *December* 1825, levied this execution on the following described piece of land, as the property of the within named *Thompson Booth,* situated in said *New-Milford,*" &c. [Here the land was particularly described.] The return proceeded as follows: "The creditor appointed *Levi Morris,* Esq., a freeholder of said *New-Milford,* an appraiser of said land; and I applied to said *Thompson Booth,* and notified him to appoint an appraiser. I then applied to *Joel Sanford,* Esq., the next justice of the peace, of said *New-Milford,* and he appointed *Lewis Frost* and *David Burr,* both freeholders of said *New-Milford,* appraisers of said land; which appraisers were all duly sworn according to law; and they did, under oath, on the 5th day of *January,* 1826, appraise said land at 197 dollars and 26 cents, being the true and just value of all the right and title that the said *Thompson Booth* has in and to said land. I do, therefore, on the 6th day of *January,* 1826, by virtue of this execution, hereby set off to the creditor named in this execution all the right and title, that the said *Thompson* has in and to said piece of land, at the sum of 197

Booth
*v.*
Booth.

dollars and 26 cents, in full satisfaction of this execution and costs.          Attest.

>                        *Almon Treat,* Constable of *New-Milford.*"

Then followed a schedule of the officer's fees, comprising these items among others :

| | |
|---|---|
| "Travel to get appraisers appointed      -      - | $0. 5 |
| Justice's fee for appointing      -      -      -      - | 0. 12 |
| Appraisers' fees -      -      -      -      -      - | 3. 00 |
| Expenses for victualing appraisers      -      -      - | 0. 87½ |
| Chain-bearers      -      -      -      -      -      - | 0. 25 |
| My time with appraisers -      -      -      - | { 0. 19 } { 0. 50" } |

The following certificate was then subjoined :

"*Litchfield* County, ss.   *New-Milford, January* 6th, 1826.

We the subscribers, indifferent freeholders of *New-Milford,* appointed by the creditor and *Joel Sanford,* Esq., Justice of the Peace, to appraise all the right and title, that the within-named *Thompson Booth* has in and to said piece of land, on which this execution has been levied, by *Almon Treat,* constable, a particular description of which may be seen in the foregoing indorsement, we do appraise and value the same to be worth to the creditor 197 dollars and 26 cents, as is described in said *Treat's* endorsement above.

>           *Levi Morris,*
>           *David Burr,*  } Appraisers."
>           *Lewis Frost,*

Next followed the certificate of Justice *Sanford,* dated the 19th of *January,* 1826, that he appointed two of the appraisers and administered the oath to them all.   The certificate of the town-clerk, dated also the 10th of *January,* 1826, that the execution and return had been received for record and recorded by him, and of the clerk of the court, dated the 14th of *January,* 1826, that the same had been filed in his office, completed the document.

The case was first argued before this Court, in *June* 1827, Hosmer, Ch. J. and Peters, Lanman and Daggett, Js., being present, by *J. W. Huntington* and *P. Smith* for the defendant, and by *Sherman* and *D. S. Boardman* for the plaintiff.   The Judges, after consultation, being divided in opinion,(*a*) the case

(*a*) Ch. J. *Hosmer* and Judge *Peters* were of opinion that the officer's return shewed no legal transfer of title : Judges *Lanman* and *Daggett* thought otherwise.

was continued, to be argued again before a full Court.    At the *Litchfield,* term in *June,* 1828, BRAINARD, J. was unable to attend ; and June, 1829. the case was continued to this term ; when it was again argued, before all the present Judges, by *J. W. Huntington* for the defendant, and *D. S. Boardman* and *Bacon* for the plaintiff.

<div style="text-align:right">Booth<br>*v.*<br>Booth.</div>

The counsel for the defendant, after remarking, that the doctrine is now well settled, that every thing required by statute to constitute a valid levy, must appear on the return of the officer, either in express terms or by necessary inference ; and this, first, because the statute requires it, (*p.* 58. *s.* 77.) and secondly, because such is the object of the return, in order that the debtor and third persons may know whether the land is vested in the creditor, contended, 1. That more land was taken and set off upon the execution, than the amount of the debt, costs and lawful charges.    The legislature, in the act regulating salaries and fees, have specified the items of fees which an officer may lawfully take ; and all other items are are expressly prohibited, and are, of course, unlawful. *Stat.* 393.    The levy of an execution on land operating as an entire conveyance of the land, is, in contemplation of law, an indivisible act.    If it is illegal or invalid *in part,* it is, and from the nature of the case it must be, *wholly* so.

As several unauthorised items were included in this return, it will probably be conceded, that the levy is invalid, unless it is aided by the confirmatory act of *May* 25, 1826.    That act is inoperative, being opposed to the constitution of this state, (*art.* 1. *s.* 9.) inasmuch as it deprives a person of his property without due course of law.    Retrospective laws, the object of which is to supply some defect or correct some mistake or informality, have indeed been sanctioned.    But the law in question was not of that character.    At the time it was passed, this land belonged to *Thompson Booth.*    The levy, so far as this point is concerned, was not merely defective or informal, but was absolutely null and void.    If the law is to have effect, it takes, *proprio vigore,* the land of *Thompson Booth,* and gives it to *Phebe Booth.*

2. That it does not appear from the return, that personal property sufficient to satisfy the execution could not be found ; and consequently, the levy on land was unauthorized.    *Stat.*

57.   The officer must either state in terms, that such estate could not be found by him ; or he must state, that he made diligent search for it without success.   To say that he demanded it, and it was not shewn to him, is not equivalent to saying that it could not be found by him.   This essential requisite appears neither by express averment, nor by necessary inference.

3. That the return does not shew, that the land levied on was set off to the creditor, but merely the *right and title* which the debtor had ; and what *that* was, does not appear.   The statute requires the officer to set off, by metes and bounds, so much of the *lands* as may be sufficient, &c.   *Stat.* 57.

4. That it does not appear, that the justice of the peace, by whom two of the appraisers were appointed, and sworn, could by law judge between the parties in civil causes.   This is one of the requisites of the statute ; and its existence must be shewn by the return.   The law has delegated a special authority to a particular class or description of magistrates ; and no other person can legally exercise it.

5. That it does not appear from the return, that the appraisers were *indifferent* freeholders.

To this objection two answers are anticipated.   First, that it is not necessary that this fact should be expressly stated ; as the law will *presume* that they are indifferent, until the contrary appears.   As to those appointed by the justice, this presumption may properly arise, from the fact the justice is to be presumed to have done *his duty*.   But in relation to the appraiser appointed by the *creditor*, no such ground of presumption can exist.   The creditor himself is not indifferent ; and the justice has no discretion to exercise in relation to the appointment. If a person so appointed is presumed to be indifferent, it must be because the law presumes indifference from the mere fact of the appointment.   There is nothing else from which the inference can be drawn.   But it is very obvious, that such a presumption would be most unsafe and dangerous.   On the same ground it may be presumed. that the appraisers were *freeholders ;* for there is the same ground for the presumption ; or that they were freeholders of the *town* where the land lies ; or that they were *sworn.*

Secondly, it may be said, that it does appear from the return of the officer, that the appraisers were indifferent ; for the appraisers have so certified, and their certificate is a part of his

return. It is true, that the appraisers have so certified ; but it is denied, that their certificate, or at any rate, that part of it which contains a statement of their indifference between the parties, constitutes any part of the return of the officer ; and this, it is believed, is susceptible of demonstration. This leads to the consideration of the question, what is the return of the officer ? It is that to which he has *certified ;* that which he has. *attested ;* that which he has made *his own,* either by express terms, or by reference. It is obvious, that nothing can be a part of his return, except what receives his *official sanction ;* and it is very clear, that the statute intended (and such has been the uniform construction,) that the officer, acting as the agent of the law, should, under his oath of office, *attest,* or give his official sanction to, the existence of all the requisites made necessary to constitute a valid levy. To him *alone* is confided the authority to certify the facts ; and he is authorized and required to make such certificate ; and therefore, the statute says the officer shall make his *indorsement* of such appraisal and proceedings. *Stat.* 58. *s.* 77. Now, is a certificate of the appraisers appearing on this execution, to which the officer has *not attested,* and to which he has made *no reference,* adopted by him, and by him certified to be true ? If so, the position must be assumed, that every thing which appears on the execution, constitutes a part of his return, and is to be considered as attested and sanctioned by him, *because* it appears there.

Look at the consequences which would result from such a doctrine.

In the first place, suppose the facts stated in the indorsement of the officer and those stated in the appraisal *differ* in an essential particular ; which is to govern ? Suppose there is a difference as to the amount of the appraisal, or the quantity of land ; would the levy be good ?

Secondly, if this doctrine be true, it necessarily follows, that a levy would be valid, which did not describe the property set off, or state who the appraisers were, or how they were appointed, or the estimated value of the land—provided these facts appeared in the appraisers' certificate.

Thirdly, there being no reference, made by the officer, to the appraisal ; how can the court know, that the one which there appears, was either signed by the appraisers—or that it is the one under which the officer finally acted—or that it is the one which was delivered to him before he set off the land ?

*Litchfield,*
June, 1829.

Booth
*v.*
Booth.

The officer has not identified it as such ; nor from any act of his, is it known how it came there.

Fourthly, the appraisers' certificate is not an essential or necessary part of the officer's return.   If he *certify* to the facts, it is sufficient.   The object of the appraisal is, that the officer may know what quantity of land is to be set off; and the object of the appraisers' certificate is to enable the officer to certify the facts.   Can it then be supposed to be a reasonable construction of the law, that the certificate itself should be sufficient evidence of the facts stated in it, when the very object for which it is required is to enable the officer to certify them ?

But admitting that the certificate of the appraisers appended to the return, constitutes a part of it, as to all the facts to which the appraisers are competent to certify, being within the scope of the power delegated to them ; yet it is no part of their duty to certify that they are *indifferent,* nor are they competent so to certify.

6. That this return is defective, because it does not shew that the appraisal was *in writing*, or *signed* by the appraisers, or *delivered* to the officer.   These are, unquestionably, indispensable requisites under the statute ; and it is obvious to inspection, that in the indorsement preceding the official signature of the officer, none of these facts are stated.   To this objection no other answer can be given than that given to the preceding one, *viz.* that a written certificate is appended to the return, which, by intendment of law, constitutes a *part* of it, and is to be *presumed* to have been delivered to the officer. This reasoning has already been considered.   It has no more solidity with reference to the present objection than the preceding one.

7. That it does not appear from any part of the proceedings indorsed on this execution, that the certificate of appraisal was delivered to the officer *before* he set off the land ; but it does appear, by fair, if not necessary inference, that it was delivered not only after the setting-off was commenced, but after it was completed.

The statute, after requiring the appraisers to deliver their appraisal to the officer, proceeds thus : " Who shall *thereupon* set out to the creditor," &c.   *Stat.* 57. *s.* 76.   Where the words of a statute have a plain meaning, it must be construed according to its words.   Any other rule of construction would make

the judges framers of the law, instead of the expounders. But if we look at the *object* of the law as a guide in the construction, we shall be conducted to the same result. It was to enable the officer, from an authentic document in his own hands, to ascertain what quantity of land was to be set off. His information as to the appraisal was not to rest in parol; and he could not be furnished with a written appraisal, unless it was *delivered* to him. This point has also been settled by judicial decisions. *Bill* v. *Pratt,* 5 *Conn. Rep.* 126, 7. *Metcalf* v. *Gillett,* 5 *Conn. Rep.* 400.

It will be said, however, that it does appear from the officer's return, that previous to the setting-off, the appraisal was delivered to him. This appears neither from the indorsement of the officer, nor from the appraisal itself. Indeed, for aught that appears on these proceedings, there is no evidence that this appraisal was ever attached by the officer, or was ever received by him;—much less, that it was *before* he made his indorsement. All that does appear, is, that it was *recorded* by the town-clerk, and is in the county clerk's office; but whether it was delivered by the appraisers, or the officer;—whether it is an original or a copy, does not appear. Its appearance on the proceedings, now, as well comports with the delivery of it after as before the indorsement was made and signed. Where both the officer and the appraisers are *silent* as to the time of its delivery, and there is nothing from which the court can *fix* the time, there is no room for inference on the subject.

But we go a step further. We insist, that it does appear, by fair, if not necessary inference, that it was not delivered until after the officer had completed his indorsement; for the indorsement is referred to expressly, in the appraisal: "A particular description of which may be seen in the *foregoing indorsement;*"—"as is described in said *Treat's indorsement above.*" Here we have indubitable evidence, that it was not delivered, nor signed, until the indorsement of the officer had been made out and completed.

Our next proposition is, that if the appraisal was not delivered before the officer had completed his indorsement, it was not delivered before the land was *set off* to the creditor. When the officer has made and signed the indorsement, which is his return, he has *set off* the land. For first, he has then completed his official act, with the mere exception of causing it to be recorded, and then returned to the clerk's office. He has

*Litchfield,*
June, 1829.

Booth
*v.*
Booth.

no seisin or possession to deliver.    His indorsement is to shew how much he has appropriated.    Secondly, the statute (*s.* 76.) requires the officer to indorse on the execution the land set out [or *set off*] by him at the appraisal ;—*i. e.* he is to state that it is wholly or partially satisfied by the land which he has thus set off ;—most obviously presupposing, that he has set it off before he makes his indorsement of total or partial satisfaction.    Thirdly, the statute (*s.* 77.) makes it the duty of the officer to cause the execution, with his indorsement of appraisal and proceedings, to be recorded and returned, &c.    This evidently implies, that previous to the record, the officer is to make a written statement or indorsement of his proceedings ; but an important part of his proceedings thus to be indorsed, is the setting off by metes and bounds.    This is his sole act ; neither the town-clerk nor the clerk of the court having any thing to do with it ; and if done at all, it must be done before the execution comes into their hands.

The counsel for the plaintiff remarked, That most of the objections urged against the validity of the proceedings in question are built upon the assumption that the officer must evince his compliance with the requirements of the statute, by technical averments ; that such nicety has not heretofore been required ; that although it is a just principle, that all the requisites of the statute must be complied with, in order to an alienation of the title, it is not a just principle that the officer is bound to state his compliance, with technical skill and precision ; but it is enough, if to the eye of common sense it is apparent from the return that the requirements of the statute have been complied with.    The latter principle is fully supported by the cases of *Brace* v. *Catlin,*(*a*) decided by this Court, in *June,*1813,

---

(*a*) Brace *against* Catlin.

This was an action of ejectment for a tract of land in *Harwinton ;* tried, on the general issue, at *Litchfield, February* term, 1813.

The land demanded was formerly the property of *Nathaniel Brace ;* and the plaintiff claimed title, by virtue of the levy of an execution in his favour against *Nathaniel Brace,* on the 12th of *April,* 1810.    In support of this claim, the plaintiff offered in evidence an authenticated copy of the execution referred to, and of the officer's return thereon.    The latter was as follows : " *Litchfield* county, ss.    *Harwinton,* 12th of *April,* 1810.    Then with this execution I repaired to the last usual place of abode of the within-named debtor, and made search for personal estate whereon to levy this execution, to satisfy the same and my fees, but could not find any ; neither could I find

not reported, *Beach* v. *Camp*, 1 *Root* 241., cited 1 *Swift's Dig.*
155. *Gold* & al. v. *Carrington*, cited 1 *Root* 242. and *Pendle-
ton* v. *Button*, 3 *Conn. Rep.* 406.

They particularly insisted, 1. That if the officer embraced
in his return, as part of the costs of levy, other or greater fees
than were by law allowable, the irregularity was cured, by the

the body of said debtor within my precincts, by the most diligent search.   On
said 12th day of *April*, the creditor ordered me to levy said execution on
one certain piece or parcel of land, lying in said *Harwinton*, as the debtor's
property.   I then made application to *Benjamin Griswold*, Esq., as the next
justice of the peace, to appoint two lawful freeholders of said town of *Har-
winton;* and said justice appointed *Israel Smith* and *Roswell Alford*, free-
holders of said town ; and the creditor appointed *Benjamin Ames*, a freeholder
of said *Harwinton* ; and they appraised the following described piece or par-
cel of land as the debtor's property, [describing the land in question by metes
and bounds] containing five acres, three roods and twenty-five rods of land,
at eighteen dollars *per* acre, amounting to 106 dollars and 26 cents.

" We the subscribers, being appointed to appraise the above described piece
or parcel of land according to law, have appraised the same according to
said description above mentioned.

<div style="text-align:center">*Israel Smith,*
*Benjamin Ames,*
*Roswell Alford.*</div>

" This certifies, that I, *Benjamin Griswold*, Justice of the peace for **Litch-**
*field* county, on said 12th day of *April*, 1810, on application of *Uriah Hop-
kins*, constable, administered the oath provided by law to *Benjamin Ames*,
*Israel Smith* and *Roswell Alford*.

<div style="text-align:center">*Benjamin Griswold*, Justice of Peace.</div>

" And on said 12th day of *April*, 1810, I put the within-named creditor in
possession of the above described land ; whereof my fees are— [Here follows
a list of items, amounting to 13 dollars, 44 cents.]

<div style="text-align:center">*Uriah Hopkins*, Constable.</div>

" Received, *Harwinton, April* 12th, 1810, the above described land in full
of the aforesaid execution.                          *James Brace.*

" Received and recorded, *April* 13th, 1810.

<div style="text-align:center">Teste, *Elijah Gaylord*, Register."</div>

In connexion with this evidence, the plaintiff offered to prove, that *Nathan-
iel Brace* had resided out of the limits of the *United States* more than twenty
years, and had not been within this state within twenty years.   To the ad-
mission of the evidence thus offered by the plaintiff, the defendant objected ;
but the court decided that it was admissible, and it accordingly went to the
jury.

The defendant claimed title to the land, by virtue of an adverse possession
of more than twenty years.   The plaintiff resisted this claim, on the ground
that the defendant took possession, and had continued in possession under a
deed from *Nathaniel Brace*, dated the 11th of *November*, 1788, which was
fraudulent and void, as against the creditors of the grantor ; and to prove the
alleged fraud, the plaintiff offered in evidence certain declarations of the defend-
ant made in the year 1788 ; to the admission of which the defendant objected.
The court admitted the evidence ; and instructed the jury, that if they should

confirming act of *May* 1826. That this is a constitutional and valid act, was decided in *Beach* & al. v. *Walker*, 6 *Conn. Rep*. 190. The levy in question was made previous to the enactment of the law.

2. That the return shews sufficiently, that personal estate of the debtor could not be found. In the first place, a demand

find the conveyance from *Nathaniel Brace* to the defendant fraudulent, as claimed by the plaintiff, no length of possession by the defendant holding under such fraudulent deed, could give the defendant a title by possession, against the the title of a *bona fide* creditor to *Brace*.

In the course of the trial, there were some other questions of law raised, and decided in favour of the plaintiff, which it is not now material to state.

The plaintiff obtained a verdict ; and the defendant moved for a new trial.

*Bacon*, in support of the motion, after remarking, that in this state land is made liable to execution by statute merely, and to acquire a title by execution, the requisitions of the statute must be strictly complied with, contended, 1. That the return is defective, because it does not state, that the execution was ever *levied* on the land.

2. That the return is defective, because it does not state, that the land was appraised by three *indifferent* freeholders. That the appraisers should be indifferent, is a statute qualification as indispensable as that they should be freeholders. *Stat. tit*. 63. *c*. 1. *s*. 7. *p*. 282. *ed*. 1808.

3. That the return is defective, because it does not shew, that the debtor *neglected to choose* an appraiser; and consequently, that the justice had no authority to appoint. This precise objection was taken, and held to be fatal, in *Eddy* v. *Knapp*, 2 *Mass. Rep*. 154.

The force of this objection was felt, on the trial, by the counsel for the plaintiff and by the court ; and it was then considered fatal, unless it could be removed. This was attempted, by offering parol evidence to prove, that the debtor had not been in this state for twenty years. But parol evidence to help out an officer's return, is inadmissible. The title which a creditor acquires to land, by virtue of an execution, is a *record* title ; and, from its nature, the record must be *complete*. It cannot be supplied by extrinsic averment or parol proof.

But if parol evidence is admissible to aid the return, or even if the officer had inserted in his return, that the debtor was not within the *United States*, it would not have been sufficient. This would not be equivalent to saying, that the debtor neglected to choose an appraiser. The averment may be true ; and yet the debtor might have had a known agent here specially authorized to choose an appraiser.

4. That the court erred on the trial, in admitting the parol declarations of the defendant, made twenty-five years before, to destroy the effect of an uninterrupted possession of the land from that time to the present. No reliance can be placed on evidence, which depends upon the recollection of witnesses after the lapse of such a period. Our statutes of limitation are founded on this principle. *Expedit reipublicæ ut sit finis litium*, is a maxim of the common law, which cuts off all stale demands. Sound policy forbids, that an antient deed, accompanied with an uninterrupted possession of more than twenty years, should be attacked and destroyed, by parol evidence.

and a refusal to pay or tender personal property, are stated in the return.   The provision in the statute in regard to the taking of personal property, is in favour of the debtor ; and after having had an opportunity to turn out personal property, *he* cannot complain, whatever the creditor might do.   Secondly, the statute, which requires the *demand* to be endorsed, does

*Gould* and *Sherman*, contra, insisted, 1. That it was not necessary for the officer to say, in *totidem verbis*, that he *levied* the execution on the land ; it being sufficient, if from the whole return, it appears, that this was done ; and that it does so appear in this case, is beyond doubt.

2. That the return was sufficient in regard to the qualifications of the appraisers.   The officer applied to the justice to appoint *lawful* freeholders ; on this application he appointed two of the persons who acted as appraisers. In connexion with this, the return says, that the creditor appointed another. It is not necessary to specify the qualifications and the mode of appointment *in detail*.   In *Sedgwick* v. *Waterman*, 2 *Root*, 434. the return was, that the appraisers were legally appointed and sworn, but did not shew *how* they were appointed ; yet the court held this to be a sufficient return.

3. That the want of notice to the debtor to appoint one of the appraisers, did not vitiate the levy.   It appears from the face of the return, that the debtor had absconded, and could not, by the most diligent search, be found within the officer's precincts.   This was a good excuse for want of notice ; for *lex neminem cogit*, &c.

But it is said, that parol evidence was admitted to eke out the return ; and this is made an additional ground of objection.   In the first place, if the return shewed a sufficient reason for the omission complained of, the parol evidence offered did no hurt, and a new trial will not be granted for its admission. But secondly, the evidence was proper to obviate the defendant's objection. It was, at any rate, consistent with the return.   Such evidence has been frequently received on the circuits.   *Jackson* v. *Burr*, and *Jesup* & al. v. *Batterson*, in *Fairfield* county.

4. That a grantee under a fraudulent conveyance, cannot acquire a title by possession against the creditors of the grantor.   This point was settled in *Beach* v. *Catlin*, 4 *Day*, 284.

5. That it is competent to a creditor, in a suit against such grantee, to shew the alleged fraud or trust, by parol evidence, *at any time.*

SMITH, J.   It appears from the defendant's motion for a new trial, that a variety of questions were made in the court below, which have not been started before this Court.

The plaintiff claims title to the land in question, by virtue of the levy of an execution against *Nathaniel Brace ;* and the defendant's counsel insists, that the officer's return upon the execution is irregular and incomplete, and affords no sufficient evidence of title.

If the law requires all the facts necessary to constitute a title under the levy of an execution to be stated in the return of the officer, with the technical precision of special pleading, I should admit, that the present return is insufficient.   But no such strictness has ever been required ; and certainty to a common intent has always been deemed sufficient.   When, therefore, I look over this return, with a view to put that rational construction upon it, which

not require the officer to indorse a *non est inventus* as to personal property. *Stat.* 56. 57. *sect.* 74. 76. In the case of *Pendleton* v. *Button,* before cited, there was no such fact stated in the return. See the statement of the case, 3 *Conn. Rep.* 406.

3. That the officer acted correctly in setting off the *interest of the debtor* in the land. The words of the return are, " all the right and title that the said *Thompson Booth* has in and to said land." All that a man can have in land, is his *right and title* in it ; and this is all that he can transfer. *Co. Litt.* 345. *b.* The mode pursued in this case, is the common one ; and if the officer, in terms, sets off an interest tantamount to a fee, when the debtor has a less estate, the latter cannot complain ; and the creditor will get such right as the debtor had in the land. *Hitchcock* v. *Hotchkiss,* 1 *Conn. Rep.* 470. *Camp* v. *Smith,* 5 *Conn. Rep.* 80.

4. That the return is not fatally defective, for want of an averment, that the appraisers were *indifferent* freeholders. It is to be observed, in the first place, that this does appear, by way of recital, and informally ; for in the certificate of the appraisers they are stated to be " *indifferent freeholders.*" Secondly, it is not necessary that the officer should certify the fact of the appraisers being indifferent at all. It is enough that he states them to be freeholders of *New-Milford :* the law presumes them to be indifferent ; and their acts are good until impeached by matter *in pais.* This is an universal principle in relation to persons to whom the law assigns duties—*e. g.* jus-

we always feel ourselves at liberty to put on other written instruments, I discover clearly, that the execution has been levied on the land, though the word " levy" is not used in the return. I discover, also, that all the facts necessary to complete a title have been substantially stated, by the officer and the justice whose certificate has been incorporated by the officer with his, and makes a part of the return.

It was said in argument to be an objection to this return, that it does not appear from it, that notice was given to the debtor to choose an appraiser. But from the facts which do appear, this was impossible ; for the officer states in his return, that the debtor could not be found within his precincts ; and it appeared in evidence, as the motion states, that the debtor was actually without the limits of this state, during the whole life of the execution. This was not a case, therefore, which required notice.

The other Judges were of the same opinion, except MITCHELL, Ch. J. and INGERSOLL, J., who dissented.

New trial not to be granted.

tices, jurors, &c. It is not necessary to negate every possible *Litchfield,*
exception, which may go to their disqualification. This point June, 1829.
has been decided, in several cases, by the superior court; and
was directly decided, by this Court, in *Brace* v. *Catlin.* It is
no part of the duty or legal capacity of a constable to certify
the legal qualifications of others. His own acts must appear
from his return; but it is not his province to certify any thing
more. He does not appoint the appraisers; nor can he con-
troul the appointment of them. He cannot even be supposed to
*know* their qualifications, whether they are chosen by the par-
ties, or appointed by a justice of the peace.

5. That the omission in the return of an averment, that the
justice to whom the officer applied to appoint appraisers, was
one who by law could judge between the parties, is not a fatal
defect. Most of the considerations applicable to the preceding
point, are equally applicable to this. The justice will be pre-
sumed qualified to appoint. His act in so doing exceedingly
strengthened that presumption: For if his act in appointing be
sufficient to warrant the inference, that he has appointed prop-
er persons, (*i. e.* freeholders) as it was said to be in *Pendleton*
v. *Button;* surely it will warrant the conclusion that he him-
self is qualified to make the appointment. Judges and justices,
in the discharge of their official duties, are as strictly required
to be *indifferent* as appraisers of land; and yet no lawyer ever
thought of averring in his writ, that the judge or justice could
by law try the cause, and thus negative the exceptions, which
might disqualify him. It may be added, that neither in *Brace*
v. *Catlin,* nor in *Pendleton* v. *Button,* did the return shew,
that the justice was not disqualified, though the clause in the
statute supposed to bear upon this point was the same then as
since the revision of 1821. *Stat.* 282. ed. 1808. *tit.* 63. *c.* 1.
*s.* 7.

6. That the return is not fatally defective for want of an
averment, that the appraisers made an appraisement in wri-
ting, and delivered it to the officer before he set off the land.
In the first place, if it were at all doubtful whether the officer
were furnished with the appraisement before he set off the
land, the law would presume that he was; for in the absence
of evidence, the law will presume the business to have been
done *right.* It is a maxim of law, that "*omnia præsumuntur
rite et solenniter esse acta, donec probetur in contrarium.*" 3

<div align="right">Booth<br>v.<br>Booth.</div>

*Stark. Ev.* 1250. *Croft* v. *Pawlet,* 2 *Stra.* 1109. *Brice* v. *Smith, Willes' Rep.* 1. 3 *Stark. Ev.* 1687. 1693. But secondly, from the return it appears, not indeed by technical and express averment, but by necessary implication, that the officer was furnished with the appraisement in writing, before the setting off of the land. That it was *in writing* is certain ; for of this the most unexceptionable evidence is furnished, it being a part of the return itself, in perfect form, and signed by the appraisers.

That it was furnished *before* the setting-off, is also certain ; for the boundaries and description of the land, as well as its price and quantity, are founded upon it, and could not, by any possibility, have been made without it ; so that whatever point of time in the proceedings, after the appointment of the appraisers, is assumed as that at which the land is *set off,* it must have been posterior to being furnished with the appraisement.

But the counsel contended strenuously, that the land is never set off (or " *set out,*" as the language of the statute is,) until the whole business is consummated, by the final return of the officer to the clerk's office : In other words, the *setting out of the land* is not accomplished but by the concurrence of all the acts necessary to be done, the last of which is the return to the clerk's office. *Stat.* 58. *s.* 77. There is no delivery of possession, either actual or symbolical ; and no point of time before the final act of return can possibly be assumed as that at which the title passes. A deed, how complete soever in all its parts, conveys no title until delivery ; and an execution transfers none until the levy is completed, by the final return. The certificate of appraisement was certainly furnished before this event ; for it is part of what is returned by the officer.

Further, it is not only part of what he returned, but it is, strictly, *a part of his return.* By annexing it to the account of his proceedings, (in technical language called his *return,*) carrying it, so annexed, to the clerk's office, and causing the whole to be recorded together, he *adopted* it, and made it a part of his written statement. In *Williams* v. *Amory,* 14 *Mass. Rep* 28. Ch. J. *Parker,* in delivering the opinion of the supreme court of *Massachusetts,* says, " the certificates of the magistrate and of the appraisers may become a part of the sheriff's return ; and in case of an insufficient certificate by him, may supply the defect " In *Brace* v. *Catlin,* it was decided, by this Court, that the certificate of the magistrate made *a part of the officer's return.* The only difference between that case

and the present, in relation to this point, is, that there the cer- *Litchfield,* tificate was inserted *above* the officer's name, and here it is pla- June, 1829.. ced *below.*     Can this circumstance vary the effect of the instrument ?  Is not the certificate as much *adopted* by the officer, and made a part of his account of the proceedings, in one case as in the other ?  In the case of a mortgage deed, does it make any difference whether the defeasance is inserted above or below the signature of the grantor ?  If entered even on the back of the instrument, would it not still be *a part of it ?*  In the case of a will, does it make any difference whether the testator writes his name at the top, or the bottom, or in the margin ?  An officer levying an execution is required by law to indorse his bill of fees on the same ; which must be authenticated by him as fully as any other part of his return ; and yet the universal and invariable practice has been, to enter the bill of fees *below* the signature.     Who ever doubted the correctness of this course ?

Booth
*v.*
Booth.

DAGGETT, J. Several objections have been raised against the validity of the officer's return, which will now be considered.     Here I admit the principle advanced by the counsel, and adopted by those members of the Court who dissent from the opinion to be given, that every requisite to a valid levy must appear on the return, *by express words, or by reasonable construction.*

1. It is suggested, that several items in the bill of fees charged by the officer, and for which, as well as for the debt, the land was taken, were not provided for, by the statute on this subject.     This is true ; and were this a fatal objection, still it is removed by the confirmatory act of *May,* 1826.     That this act is constitutional, and did embrace this precise objection, was decided, by this Court, in the case of *Beach* & al. v. *Walker,* 6 *Conn. Rep.* 190. ; and the principle of that decision was recognized recently, at *Hartford,* in the case of *Norton* v. *Pettibone* & al. 7 *Conn. Rep.* 319.

2. It is said, that the officer has not returned, that he could not find any personal property whereon to levy, &c.     He has certified, that he demanded of two of the debtors in person, and of the other at his usual place of abode, money to pay the execution, or personal property whereon to levy, and a refusal of the debtors to pay the execution or expose property. What more could have been done ?  Was he bound to search

for property further? In the absence of all proof that personal property of the debtor might have been found, upon the exercise of any reasonable diligence, the officer has done his duty, or at least, he has done enough to shut the mouth of the defendant, according to the 74th and 76th sections of the statute above-mentioned. Let it be remembered, that the debtor, *Thompson Booth*, whose land was taken, sets up this objection,

3. It is objected, that by this return, it does not appear that the *land* was set off to the creditor. The answer is, the land was levied upon, and the right and title of the defendant was appraised, and *that* was set off. This is a statute conveyance of the land. The right and title to land is the whole of the land. It gives to the plaintiff the right to the use, occupation and disposal of it, and of course, the entire ownership of it. *Co. Litt.* 145. *b. Hitchcock* v. *Hotchkiss*, 1 *Conn. Rep.* 470. *Camp* v. *Smith*, 5 *Conn. Rep.* 80.

4. It is not alleged, that the justice of the peace, who appointed an appraiser, *could judge between the parties.* Whoever supposed before, that such an allegation was necessary? It might, with as much propriety, be contended, that it should appear that he was not insane by the visitation of God. It is never necessary, in pleading, to negative the exceptions which may exist against a judge or justice, before whom a suit is commenced.

There are two other objections, which deserve more consideration.

5. It is insisted, that it should appear, by the officer's return, that the appraisers were indifferent freeholders of the town in which the land lies. I concur in this opinion. The statute requires, that where land is set off on an execution, it should be appraised by indifferent freeholders of the town where it lies. The officer, as is agreed, has certified, that they were "freeholders of the town." The only question then, is, does it appear that they were *indifferent?* Now, they have given to the officer a certificate that they were thus indifferent; and he has annexed that certificate to his return, and procured it to be returned and recorded in the office of the clerk of the court. This is an adoption of their certificate, and a virtual averment that they were indifferent freeholders. The Chief Justice, in delivering the opinion of the Court, in *Pendleton* v. *Button*, 3 *Conn. Rep.* 406. says: "The act of the justice in appointing

and swearing an apraiser, implies that he is indifferent and un- *Litchfield,* exceptionable." The officer has annexed not only the certifi- June, 1829. cate of the appraisers above-mentioned, but also the certifi- cate of the justice, that he appointed and administered the oath to those named appraisers. The officer, moreover, has certified, that the appraisers were appointed and duly sworn according to law. This brings this case within the principle of *Pendleton* v. *Button.* The idea that these certificates, thus appended, would remedy the defect in the officer's return, is also fully recognized, by the supreme court of *Massachusetts,* in the case of *Williams* v. *Amory,* 14 *Mass. Rep.* 28. 29.

6. The last objection is, that it does not appear by the return of the officer, that the appraisers delivered a certificate of their appraisal to the officer, or that they ever made any such certificate ; and this objection is said to bring the case directly within the decision of *Metcalf* v. *Gillet,* 5 *Conn. Rep.* 400. I do not so consider it. In that case, no mention was made, by the officer, of any certificate of appraisal. No certificate was appended or annexed ; nor was any intimation made, that one was ever given. To supply this defect, parol evidence was offered, to shew, that such certificate was made by the appraisers. This was very properly rejected. In this case, the certificate made by the appraisers, is annexed to the return, and by the officer lodged with the clerk. A copy is now offered of the whole from the clerk. By fair implication, then, this certificate was in the possession of the officer. But it is said, that it must have been in his possession, by delivery of the appraisers, before he set off the land ; for the statute is, that " *thereupon* (*i. e.* upon the certificate's being delivered to him) he shall set out to the creditor," &c. Suppose this to be the true construction of the act, I insist, that it is but a reasonable construction of his return, that he had it *before* he set out, or set off, the land ; because he could not set it off before he knew its value, and he could not know its value but by the certificate of the appraisers ; but he did set it off, knowing its value ; for he asserts its value in his return. Then take for a guide a plain rule of law, that every man acting officially, shall be presumed to have done his duty until the contrary appears ; it ought to be presumed, that this certificate was delivered to him before he set off the land.

Thus it would stand upon the most rigid construction of the statute. But it is difficult for me to see any force in the sug-

*Litchfield,*
June, 1829.

Booth
*v.*
Booth.

gestion, that these acts of the officer ought to appear to have been done in any certain consecutive order. The land is transferred when certain acts have been done.    These acts, if done at all, will be presumed to have been done in the order required by the statute, unless the contrary appear. *Omnia præsumuntur rite et solenniter esse acta.*    Again ; for what purpose were these certificates annexed by the officer, and carried to the clerk to record, except as parcel of his doings—his return ? By that act, he adopted them, and virtually attested them.    It it is quite immaterial whether his attestation *preceded* or *followed* those certificates.    In either case, he must be deemed to have sanctioned them.    In view of the whole ground presented in this case, I am well satisfied, that the officer's return is sufficient ; and that this advice be given to the superior court.

WILLIAMS and BISSELL, Js. were of the same opinion.

HOSMER, Ch. J. I have the misfortune to differ from the Court, in this case.    I should content myself with the mere declaration of my nonconcurrence, were I not persuaded, that some of the principles advanced tend to jeopardize the title to land, and to produce general inconvenience.    From the officer's return it does not appear, that the land levied on was appraised by *indifferent* freeholders ; nor that before the land was set out, an appraisement in writing was made and delivered to the levying officer.    Both these are indispensable requisites to a legal title.    It was correctly said, in *Hobart* v. *Frisbie* & al. 5 *Conn. Rep.* 592. 595. that "the acquisition of real estate by execution is derived from statute ; it is in derogation of the common law, and is *stricti juris ;*" that "the rigid rules of the *summum jus* ought to be enforced, and an omission of any statute requisite is fatal."    To the same effect was the opinion of the court in *Williams* v. *Amory*, 14 *Mass. Rep.* 20. 29.

The return of the officer on the execution is the legal and only evidence that the prescriptions of law have been complied with.    If *that* is deficient, it never can be aided, by oral testimony, probable presumption, or in any other manner.    Like other legal instruments, it is susceptible of construction ; but this is made only by giving to the words of the return their plain popular meaning, and assuming any fact that appears by a strictly necessary inference. *Hobart* v. *Frisbie* & al. 5 *Conn. Rep.* 400.    *Fisher* v. *Blight*, 2 *Cranch*, 390.    *Curtis* v. *Hurlbut*, 2 *Conn. Rep.* 315. *Williams* v. *Amory*, 14 *Mass. Rep.* 20.

That the return of the officer preceding his official signature, affirms the *indifference* of the freeholders, or the *delivery* to him of a *written* appraisement, does not admit of a plausible pretence. On both these subjects it is profoundly silent. Its invalidity, therefore, is unquestionable, unless it derives aid from certain certificates recited and annexed to it, after the signature of the officer's name, with his official capacity subjoined.

The return was made and signed in the usual form, comprising all the necessary facts, except those before-mentioned. The land is then set out in the accustomed manner. A certificate of appraisement, bearing date the 6th of *January*, 1826, declaring, that the appraisers are *indifferent* freeholders, next succeeds. After this is subjoined the justice's certificate of the administration of the oath, on the 19th of *December*, 1825 ; the entry of the register, that on the 10th of *January*, 1826, he received the execution for record ; and that of the clerk of the superior court, that on the 14th of the same *January*, the execution was returned into his office. These entries and certificates, not referred to by the officer, are all that appears.

I am of opinion, that the certificates before-mentioned, are no part of the officer's return ; and if they were, that they would not aid the defects alluded to.

1. The usual mode of authenticating an officer's return, for centuries, has been, by the *subscription* of his name, and the expression of his official character. The return has always been *subscribed* or *signed ;* words in relation to this and other legal instruments, of equivalent meaning. I have never heard or read of a valid return, not signed or subscribed. This signature is, invariably, at the close of a return, and of all other legal instruments, except those under the statute of frauds ; and to those I am prepared with a distinct answer. Whether the instrument is a deed, a bond, a covenant, or a return, the invariable usage has been, as far back as legal muniments reach, to authenticate them, by subscription. I am not aware that an instance to the contrary has occurred, except the practice under the statute of frauds. From this uniformity of usage, the expression that a contract or a return was *signed*, has hitherto conveyed to the mind an idea as perfectly defined and unequivocal as language can impart.

I admit, that by usage, any mode of authentication may be sanctioned. But I assert, that no usage has ever existed ex-

*Litchfield,* cept the one before-mentioned. It was said in the argument,
June, 1829. that the signature of an officer, whether in the midst, between
the formal return and the certificates subjoined, or any where
else, sanctioned the whole as being his indorsement. In sup-
port of this assertion, neither dictum nor case was adduced, ex-
cept the one of *Williams* v. *Amory,* 14 *Mass. Rep.* 20. 28. That
this decision yields no support to the position advanced, is
clear beyond a question. The certificate *preceded* the sheriff's
return, and was *conformable to usage.* It is called, by Ch. J.
*Parker, " the old practice."* That the official signature of an
officer should be considered as running back beyond the return,
and embracing preceding certificates, is in perfect analogy with
the doctrine that *it is the subscription which authenticates.*
But from this it must not be inferred, that it runs forward, and
without the aid of general usage. It was said by the court, in
the case just cited, that " it might be convenient to continue
the old practice ; (that is, of preceding returns by certificates ;)
"for those certificates *may* become a part of the sheriff's re-
turn, and in case of an insufficient certificate, *may* supply the
defect." The language is very guarded. It is not, that a cer-
tificate prefixed is a part of the return ; but that it *may be.*
Undoubtedly it may, by express reference, or by established
and unequivocal usage ; and in the case, there is nothing in-
compatible with this, as being the intention of the court.

It has been said, that the certificates were subjoined with the
*intent* of making them a part of the return. This assertion, in
my opinion, is wholly gratuitous. The intention is a question
of fact ; and how is this court, a court of law exclusively, to
determine it ? It has not the competency, because it has not the
means of determination. The certificates may have been an-
nexed as paramount evidence, to sustain the officer's return, in
case it should be controverted ; and for this sole purpose. Hence
it is not a necessary inference, that they were intended to be a
part of the return. It was, however, asserted in the argument,
that the intention claimed, appears by *probable presumption.*
But is this court competent to settle the fact, if it presumes it
to be probable ? Certainly not. In short, whether the certifi-
cates were subjoined for one purpose or for another, is a mere
*matter of fact,* and beyond the competency of this court, unless
the inference is strictly a *necessary* result. *Metcalf* v. *Gillet,*
5 *Conn. Rep.* 400. On the point in question, this will not be
pretended. On the contrary, there is much reason for the as-

*Booth*
*v.*
*Booth.*

sertion, that the certificates were appended to render the evi-   *Litchfield,*
dence of certain facts prominent, and not to eke out the re-   June, 1829.
turn.   No officer possessing common sense, makes a return
that he believes to be defective ; and when the return is per-   Booth
fect,—that is, in ninety-nine cases out of a hundred,—the pre-   Booth.
servation of evidence is, necessarily, the only object.

In the argument it was said to have been an universal prac-
tice to annex to an officer's return on an execution, the certifi-
cates of appraisers, and of their appointment and oath.   If this
were the fact, it would be of no avail, unless it was intended to
make them a part of the return.   But the fact is not admitted ;
and for two reasons.   In the first place, as clerk of a court, I
formerly recorded many executions, and to much the greater
part of the returns no certificate was subjoined.   I now have
in possession a book of recorded executions, consisting of more
than a hundred ; and on recurrence to them, I have found
that more than one half are without a certificate appended to
the returns.   From this specimen, as well as from general re-
collection, I am satisfied, that the object was merely the preser-
vation of evidence ; and judging from the known characters of
the officers, I am convinced that the extremely careful and ap-
prehensive alone resorted to this expedient.   In the next place,
I cannot admit the competency of the court to settle this ques-
tion of fact.   It is of a *private* nature, of which the court can-
not, *ex officio,* take judicial cognizance.   1 *Chitt. Plead.* 217.

What the usage of officers has been throughout the state, I
neither know, nor, sitting here, have the means of knowledge.
Usage, like most other facts, might be established by evidence ;
and the instances to support it must be not few or partial, ex-
isting in one or two counties only, or with one or two officers
only ; but there must have been a long, regular and general
practice.   2 *Marshall,* 393.   When such an usage has been
established, by the decision of this court, it may then be recog-
nized without proof ; but not before.

It was observed by the plaintiff's counsel, that in cases un-
der the statute of frauds, by numerous decisions, the person
promising may sign in any part of the instrument.   The principle
was stated imperfectly.   Courts have held, that the signing of
an act or contract required by the statute of frauds, must have
the effect of giving authenticity to the whole instrument ; and
when the name is inserted in such a manner as to have this
effect, that it does not much signify in what part of the instru-

*Litchfield,*
June, 1829.

Booth
*v.*
Booth.

ment it is found. *Hawkins* v. *Holmes,* 1 *P. Wms.* 770. *Newl.* 173. *Sugden* 54. Hence the name of a testator in the introductory clause of a will, or of a person in the commencing clause of an agreement, has been deemed an authentic signature. The doctrine has been carried much further. A subscription as a witness, with knowledge of the agreement ; (*Welford* v. *Beazely,* 3 *Atk.* 503. *Coles* v. *Trecothic,* 9 *Ves.* jun. 234.) and a bill of parcels in which the vendor's name is printed, has been held a sufficient signing. *Saunderson* v. *Jackson* & al. 2 *Bos. & Pull.* 238. *Schneider* & al. v. *Norris,* 2 *Maule* & *Selw.* 286. But I should be very unwilling to apply these determinations to instruments at common law, and reversing the established usage hitherto, to hold, that a bond, covenant or return may be signed at the top, at the bottom, in the middle, in the margin, or in the place of a witness.

To the decisions under the statute of frauds, in their application to this case, I have two objections. In the first place, they never ought to be extended by analogy. So far as they have gone, with some reluctance, I would follow them ; but there I would stop. They had their origin in a boundless latitude of construction, in subversion of language the most clearly defined by familiar usage ; a construction most unwisely indulged in relation to a very beneficial law ; a construction that has impaired, and threatened to destroy the guard which it was the purpose of the law to provide. The word *signing,* taken in its ordinary popular sense, is a complete key to all the other terms in the clause concerning devises ; and yet the construction of this material term has been quite contrary to its import and received interpretation. *Powell,* in his *Essay on Devises,* p. 63. has said : " The word *signing* conveys to a common ear, not versed in technical reasoning, a mere simple idea, *viz.* the writing of the name of the agent at the bottom of the act, thereby formally authenticating it as his. It requires, (he adds,) the ingenuity, therefore, of a schoolman, so far to wrest this word from its natural sense, as to construe it to mean the *recital* of a name in any part of an instrument, where common form or accident may happen to introduce it. Nothing but the strong bent of the times in favour of this mode of alienation, which equally pervaded the courts of law and the people, and which had induced that loose construction of the word *writing* in the statute of wills, that rendered the statute of frauds necessary, could have given colour to the argument

in favour of such a construction. But the disposition to encourage alienation by wills, prevailed so much, at this period, that the ingenuity of the advocate in explaining away, by construction, the excellent provisions made by this clause to prevent fraud, could only be equalled, by the avidity with which courts received and supported such exposition."

In the second place, I observe, that the cases determined under the statute of frauds, are *not analogous* to the one under discussion. When a person begins his last will, by saying, " I, *A. B.*, make this my last will and testament," or commences his contract, by the assertion, " I, *C. D.*, promise in manner following," the nature of the cases, independent of usage, would seem to indicate, that the whole of the writing, of which the name is a part, should constitute the will or agreement intended. They may be said to form one continuous and inseparable instrument. But when a return is made and officially subscribed, it is perfect, complete and exclusive. Certificates subjoined, without any reference to them, are separate instruments, having with each other no necessary connexion, and the signature of the return implies no intent, that it should likewise be a signature of the certificates. If all was intended to make one return, why does not the officer say so ? There is no ground for applying the observation on which the determinations under the statute of frauds rest, that the name was designed to give authenticity to instruments thus distinct and disjoined.

Here, again, has occurred an argument founded on *probable presumption ;* an unusual argument in reference to a return, which the law requires to be certain and complete, either *per se*, or by express reference. This Court is incompetent to settle a fact, on probable evidence. It is the converse of the established rule, that in a return every necessary fact must appear by a fair construction of the expressions used ; and that the exposition of it cannot, operating as it does *in invitum*, outrun the meaning of its words. *Metcalf* v. *Gillet*, 5 *Conn. Rep.* 404.

I entertain no doubt, that the recited certificates are no part of the officer's return.

2. If, however, they are considered as part of the return, the return still is incurably defective.

That the written appraisment reached the hands of the officer as early as the 10th of *January*, is admitted ; for, on that

*Litchfield,*
June, 1829.

Booth
*v.*
Booth.

day, he caused it to be recorded with the execution. But it appears neither by averment nor inference, that he received it before that day; whereas on the 6th of *January*, he set out the land.

It was said in the argument at the bar, that the certificate bearing date on the 6th of *January*, it is a presumption, that it was delivered at its date. What presumption, I ask;—of fact, or of law? Not of fact; for, at most, it is a probable presumption, which this Court has not the competency to draw. Neither is it a presumption of law. The presumption lies the other way; for the law has established, that the return of the officer is the requisite evidence, and that it authorizes no inference, which is not strictly necessary. If it be enquired, why this rigour? I answer, because it is within the power and it is the duty of the officer to speak intelligibly, and to the point. Besides, the person whose land is taken from him, by the strong arm of the law, and creditors who have an interest in the question, have a right to demand clear and undoubted evidence, that every requisite of the law has been observed. For these reasons, it stands on very different ground from the date of a bond, note or other contract. In respect of these, the contractor will take care of himself; and so far is this principle carried, that the construction, if there be any ambiguity, shall be taken most strongly against him.

I, then, assume these facts; that the land was set out on the 6th of *January*, and that the appraisment was not delivered to the officer until four days afterwards.

The statute requires, in so many words, that the estimate of the value of the land shall be delivered to the officer, " who shall thereupon set out the land to the creditor." *Sect.* 76. *p.* 57. In *Metcalf* v. *Gillet*, 5 *Conn. Rep.* 400. this Court decided, that " until the officer is *possessed* of the appraisers' certificate, duly executed, he cannot set out the land on execution ;" and in *Bill* v. *Pratt*, 5 *Conn. Rep.* 123. the same point was adjudged.

In opposition to this reasoning, it was, first contended at the bar, that as the appraisment bears date on the 6th of *January*, the Court will presume that it was delivered on that day. I have endeavoured to answer this position, and to show that the Court cannot presume the fact; that the presumption of law is against it, by its requisitions of a certain return; and that the debtor can be deprived of his land, only by a return, clear,

explicit, and as to every material fact, amounting to a necessary inference.    May not a return bear date on a certain day, and be delivered on a subsequent day ?    How then are we authorized to presume a fact, when the materials of a just presumption are not before us; and a fact, too, which the officer is bound to affirm ?

It was next contended, that the *setting-out* of the land is no one particular act ; but that it is a general proposition, comprising all the acts necessary to make out a title ; of consequence, that it is true, only when the last act creating the title has taken place.    This cannot be correct.    The officer never sets out the title : it is the law that conveys it.    The facts required must appear from the return ; and then the title results as a legal consequence.

The expressions of the statute on this subject, are too clear to be mistaken.    On the reception of the certificate of appraisement, the law declares, " that the officer shall thereupon *set out* to the creditor, by *metes and bounds*, so much of the *lands* as may be sufficient," &c.    It is the *land* that is to be set out ; and that is made the object to which the expression refers.    The land is to be *set out in fact* to the creditor ; that is, it is to be *located* and *indentified*.    But how is this to be done ?    The statute declares, expressly, " *by metes and bounds*."    The meaning of the expression *set out*, when applied to substance, is, " to assign, to allot, to mark by boundaries or distinctions of space."    *Webster's Dict.*    And when the mode of setting out is prescribed to be by " metes and bounds," the intent of the legislature is unfolded with the irresistible force of demonstration.    The time when this is to be done, discloses the reason of the requisition.    It is immediately after the reception of the appraisers' estimate of the value of the land.    Before this, the officer has not the means of determining what quantity of the land must be set out.    He now has the means; and " thereupon," he is required to do the act, identifying the land requisite, by visible monuments.

Such is the plain expression of the statute; and such has been the invariable construction.    It is to be found in all the returns made on executions.    They declare, that on a certain day, the land was set out ; and it was well understood, by the levying officer, in this case.    " I do thereupon," says the officer in his return, " on this 6th day of *January*, 1826, by virtue of this execution, hereby *set off* to the creditor, &c. the above-described piece of land."    The cases of *Bill* v. *Pratt* and

*Metcalf* v. *Gillet,* before cited, fully recognize and assume the meaning I have given to the words commented on.

It was, lastly, claimed by the plaintiff's counsel, that admitting the land to have been set out on the 6th of *January,* the subsequent proceedings of the officer validated the levy, by recognition. I cannot admit this principle. It is the *return* that gives validity to the levy, and not the subsequent parol recognition of the officer. As applicable to this subject, the principle is altogether new. That a person, by ratihabition, may bind himself in a contract, made for his benefit, as if there had been a precedent command, is not disputed; and for this plain reason, that the law has prescribed neither the mode nor the time of declaring his assent. But in the law regarding the levy of executions, this principle has no place. Facts must be returned with certainty, authenticated by an artificial signature; and they must be true at the time when the return is subscribed. This is established law; and a deviation from it, to meet a particular mischief, which may be productive of general inconvenience, in my opinion, is entirely inadmissible. I may be permitted to doubt whether there is any mind of so long and sure a reach as to be able to anticipate the consequences of such a change.

In the expression of my opinion, I am sensible, that I have run to a great, and, perhaps, unreasonable length. But I have been induced to it, by the desire of preserving, so far as is within my power, what I consider to be principles, long and wisely established. The branch of the law relative to returns, is very antient; and it is may ardent wish, that its certainty and simplicity may not be impaired. In this subject the community has a deep stake. It is, comparatively, of little inconvenience to require rigid strictness in the returns of officers on executions. The provisions of the law in relation to their levy are few, simple and easily complied with, except by those, who neglect to read a single section, that concerns the performance of their duty. On the other hand, if persons who search the records of land titles, to ascertain the validity of a levy, cannot rely on the plain meaning of familiar words, authenticated by an official signature, but are driven to investigations, which require the learning and talents of a profound lawyer, I am very apprehensive, that great inconvenience will result.

PETERS, J. was of the same opinion.

Return sufficient.

ABBE *against* GOODWIN.

Where the defendant in a suit in chancery put in a general answer to the bill, that all the facts alleged were untrue, and the court, instead of finding the facts specially, as the statute requires, found generally, that all the facts alleged were untrue, and dismissed the bill ; it was held, in a subsequent suit between the same parties, that such decree was not a bar or estoppel, 1. because the finding embraced the allegation of the value of the matter in demand, and consequently, deprived the court of jurisdiction ; and 2. because the precise point relied upon was not put in issue and decided.

In chancery, a mistake in a deed may be shewn by parol evidence.

Before the time of payment specified in a mortgage deed, chancery will not, on a tender of the principal of the debt, with interest to the stipulated time of payment and costs, allow the mortgagor to redeem, and enjoin against an action at law for possession of the premises ; as this would be to substitute another contract for that which the parties had entered into.

THIS was a bill in chancery to redeem mortgaged premises, and for an injunction against an action of ejectment for such premises, brought by *Goodwin* against *Abbe,* and pending in court. The present suit was commenced in *December,* 1827.

The parties were proprietors of adjoining building lots in the village of *Litchfield;* and the premises consisted of a right in a gang-way and of a strip of land contiguous to it, which *Goodwin* sold to *Abbe,* on the 26th of *January* 1826, for the sum of 900 dollars. To secure the purchase money, *Abbe* gave *Goodwin* four promissory notes, for 225 dollars each, bearing date the same day, and payable one in each year for four successive years, with annual interest, and mortgaged to him the land in controversy. Immediately afterwards, *Abbe* went into possession and erected a new building for an office and druggist's shop, partly on the land which he previously owned, and partly on the premises. In *September,* 1827, *Goodwin* commenced an action of ejectment for the premises, which is still pending. Before the commencement of the present suit, *Abbe* paid to *Goodwin* the amount of the two notes, which had become payable, and tendered to him the principal of the other two notes, together with the interest thereon which had accrued, and which would accrue to the times when they would become due, and the costs in the action of ejectment.

The defendant, in his answer, to rebut the plaintiff's equity, averred a mistake to have happened in the original deed given to the plaintiff, by which more land was conveyed than ought

to have been conveyed, according to the agreement of the parties.

The plaintiff replied to this answer, that the defendant ought to be estopped from alleging any mistake ; for that heretofore the defendant brought his bill before the county court, seeking relief against the same alleged mistake, and upon a hearing of the parties, with their proof, on a general answer to the bill, that all and singular the facts alleged were untrue, the court found them untrue. To this reply the defendant rejoined, setting out the record of the county court *in hisce verbis*. A demurrer by the plaintiff closed the pleadings.

By consent of parties, the superior court heard the cause upon the demurrer, and, at the same time, enquired into the facts in controversy, as though it had been a hearing upon bill and answer.

To prove the mistake as set forth in the answer, the defendant offered parol testimony ; to the admission of which the plaintiff objected. The court decided, that it was admissible ; and on this testimony found the fact of the mistake. It appeared also, that the same testimony was heard in the county court, on the bill brought by *Goodwin* against *Abbe*.

The circumstances of the mistake were stated very minutely, both in the answer of the defendant to the present bill, and in his former bill in the county court ; but it seems not necessary to detail them here. In relation to the former bill, however, it ought to be observed, that it contained an allegation, that " the property and matter in dispute is less in value than 335 dollars."

A case thus made, and presenting the following questions, was reserved for the consideration and advice of this Court : 1. Is the defendant estopped or barred, by the matter appearing in the replication ? 2. May the facts relied on, by the defendant, of the mistake, be proved by parol evidence ? 3. Has the plaintiff any merits ?

*Bacon* and *Sanford*, for the plaintiff, contended, 1. That the determination of the county court is conclusive upon the rights of the parties ; and the defendant is not now at liberty to set up the matter contained in his answer relating to the alleged mistake. The rule is, that a fact which has been once directly tried and decided, by a court of competent jurisdiction, shall not be contested again between the same parties, or their priv-

ies, in the same or any other court. *Swift's Ev.* 10. *Betts* v.
*Starr*, 5 *Conn. Rep.* 550. *Outram* v. *Morewood*, 3 *East* 346.
And there is no difference between a verdict and judgment at
law and a decree in equity. *Hopkins* v. *Lee*, 6 *Wheat.* 113.

First, the *parties* in this suit are the same as in the suit in the county court.

Secondly, the *facts* set up in the defendant's answer in this suit are the same as in his bill in the former suit. The same evidence would support both ; and this is the decisive test of identity. 1 *Stark. Ev.* 198. *Kitchen* & al. v. *Campbell*, 3 *Wils.* 304. 308. The fact now in issue need not be the *only* one in issue upon the former trial ; it is sufficient if it must necessarily have been passed upon, and was essential to the finding. 1 *Stark. Ev.* 200. 6 *Wheat.* 114.

Thirdly, the trial and adjudication were *direct* upon the point now in litigation. The issue in the county court was formed upon the plea, that each and all of the allegations in the bill were untrue ; and the court finds, in the very words of the plea, that they are each and all untrue. The record demonstrates the fact with incontrovertible certainty. 4 *Conn. Rep.* 281.

Fourthly, the adjudication was by a court of *competent* jurisdiction. It will be admitted, that the parties and the subject matter were within the general jurisdiction of the county court ; and that the averment in the bill of the value of the matter in dispute, was sufficient to sustain the jurisdiction of that court.

But it may be said, that the court has found the value of the property to be beyond its jurisdiction. This we deny. The value of the property was not in issue. By pleading to the merits, the jurisdiction was admitted. *Mitf. Plead.* 134, 5. *Trelawney* v. *Williams*, 2 *Vern.* 484. *Barrington* v. *Venables*, *T. Raym.* 34. *Smith* v. *Elder*, 3 *Johns. Rep.* 113. *Underhill* v. *Van Cortlandt*, 2 *Johns. Ch. Rep.* 369, 370. *Newtown* v. *Danbury*, 3 *Conn. Rep.* 553, 558. *Pitkin* v. *Flowers*, 2 *Root*, 42. 5 *Conn. Rep.* 439. *n.* That averment not being in issue, the court had no right to pass upon it ; and if it did, the finding is so far *nugatory.* 1 *Swift's Dig.* 776. 6 *Mass. Rep.* 304. 11 *Mass. Rep.* 358. If it had *incidentally* appeared, upon the trial, that the value exceeded 335 dollars, the court would not have dismissed the suit. The rule upon this subject, is ; If the court has general jurisdiction of the parties and the subject

*Litchfield,*
June, 1829.

Abbe
*v.*
Goodwin.

matter, and may, under any circumstances, take cognizance of the suit; and the existence of these circumstances is averred; if the defendant does not take issue upon that averment by plea, but enters into the defence at large; the court will not dismiss the suit. But if no circumstances can give the court jurisdiction, it will, *ex officio,* dismiss the suit, in any stage of the proceedings. *Mitf. Plead.* 134, 5.

Finally, if the averment respecting value was in issue, and the finding upon it is what the defendant claims, still the court was not ousted of its jurisdiction. The averment in the bill is, that the matter in dispute is of less value than 335 dollars. What if the court has found that averment untrue? The county court has jurisdiction of all suits for relief in equity wherein the matter in demand shall not *exceed* 335 dollars. *Stat.* 140. Now, it does not follow, that because the value is *not less* than 335 dollars, it therefore *exceeds* that sum.

2. That mere parol evidence was neither admissible nor sufficient to shew a mistake in the deed. The general principle in relation to the admissibility of parol evidence to controul, vary or affect a written instrument, is, that it shall not be received, either in courts of law or equity. *Phill. Ev.* 424. 448. *Woollam* v. *Hearn,* 7 *Ves.* jun. 211. cited *Phill. Ev.* 455. & seq. *Mumford* & al. v. *McPherson* & al. 1 *Johns. Rep.* 414. 418. *Dwight* v. *Pomeroy* & al. 17 *Mass. Rep.* 303. Cases, indeed, may be found, in which parol evidence has been admitted to shew a mistake in a written instrument, where the plaintiff comes into equity *to enforce a specific performance;* but that is not the present case.

3. That the plaintiff is entitled to the relief sought. The note and mortgage are constituent parts of one entire contract; and the rights of the parties depend upon the united effect of both. The object of both is payment of the mortgage debt. A mortgage is looked upon as a personal contract, and the mortgagee has no interest beyond his money. *Brown* v. *Gibbs, Prec. Chan.* 99. If he gets possession, it is for the sole purpose of obtaining payment. His right to sue for possession is only one of his remedies for the collection of his debt. 2 *Conn. Rep.* 447. 450. The legal title is vested in him for no other purpose. 2 *Swift's Dig.* 169. 4 *Conn. Rep.* 237. Now, will a court of chancery suffer the mortgagee to wrest the mortgaged premises out of the possession of the mortgagor, against his will, and manage it in his own way, and

at the same time, refuse at the hands of the mortgagor the

money, which is the sole object of his pursuit, and the only object which he can obtain ?    Such a construction of the contract could not have been contemplated by the parties, when it was entered into ; and would be ruinously injurious to the mortgagor, without any legitimate advantage to the mortgagee. When the mortgagee commences his suit to obtain possession, he thereby declares his intention to expedite the payment of the debt.    Then he demands property for the payment of his debt ; and then the mortgagor has a corresponding right to meet this demand with the money.

Courts of equity are in the constant practice of interfering in analogous cases.    Thus : At law a mortgagee in possession may commit waste ; but chancery will restrain him, if the security is sufficient ; otherwise, it will permit him to cut all the timber, applying the proceeds in payment of his debt.    Suppose he commences cutting before the money is due ; will not chancery enjoin him, upon payment of debt and interest ?    It deprives parties of their legal rights, by marshalling assets.    If freehold and leasehold estates are mortgaged, chancery will charge the debt on the freehold estate, in order to enlarge the fund for payment of other debts and legacies.    1 *Madd.* 620. In the case of penal bonds, if the penalty is intended to enforce performance of a collateral object, chancery will grant an injunction against a suit for the penalty, and direct an issue *quantum damnificatus.* 1 *Madd.* 433. Forfeitures of conditions will be relieved against, in every case where compensation can be made.    1 *Madd.* 43.    Upon what principle does chancery interpose in these cases ?    It discovers, that without its interposition, injustice will, and in some cases irreparable mischief may be done, while its interposition will do no injury to any one, but substantial justice to all concerned.    This principle is applicable, in its full extent, to the present case.

The case of *Talbot* v. *Braddill*, 1 *Vern.* 183. 394. cited *Com. Dig. tit.* Chancery, 4 A. 5. where a mortgagor was permitted to redeem, before the day of payment in the deed, is not merely analogous, but *in point.*

*J. W. Huntington* and *T. Smith*, for the defendant, contended,   1. That the decree of the county court in the case of *Goodwin* v. *Abbe*, was not a bar or an estoppel to the matter alleged in the defendant's answer.    In support of this propo-

sition several considerations were urged, the more prominent of which were—First, that in the former suit, issue was not taken on any precise point.    *Church* v. *Leavenworth,* 4 *Day,* 274.    *Manny* v. *Harris,* 2 *Johns. Rep.* 24.    *Bradford* v. *Bradford,* 5 *Conn. Rep.* 132.    *Smith* v. *Sherwood,* 4 *Conn. Rep.* 276.    *Betts* v. *Starr,* 5 *Conn. Rep.* 550.    *Cowles* v. *Hart & al.* 3 *Conn. Rep.* 522.    *Outram* v. *Morewood,* 3 *East,* 352.    *Evelyn* v. *Haynes,* cited 3 *East,* 365.    2 *Stark. Ev.* 190. 200. 202. 205.    Secondly, it appears from the finding of the county court, that it had no jurisdiction ; for the finding is, that *all* the allegations are untrue, one of which is, that the matter in demand was less in value than 335 dollars.    This was a *material* allegation, and was embraced by the general finding.    *Griswold* v. *Mather,* 5 *Conn. Rep.* 435.    *Com. Dig. tit. Estoppel, E.* 1.

2. That parol evidence is admissible to prove the mistake of a scrivener in drawing up an instrument, even in favour of a plaintiff, who is seeking to have the instrument rectified ; *a fortiori,* where the evidence is offered by a defendant, to rebut an equity.

3. That the plaintiff's bill is destitute of merits.    [In consequence of an intimation from the Court in the defendant's favour, the argument on the two last points was not pursued.]

DAGGETT, J.    1. Is the defendant estopped or barred, by the matter appearing in the replication ?    The case is embarrassed, by the decree of the county court.    That court, instead of finding the facts specially, agreeably to the requirements of the statute, founded their decree on the general finding, that none of the facts were true.    The words are : " All and singular the facts are untrue."    This could not have been so ; for there are many of the facts thus found untrue, which the plaintiff now makes the basis of his bill.    This is obvious upon inspection.    It may then be well doubted if such a finding of the county court can avail more than if it had been embraced under the general expression—*all the material facts are untrue*—which would leave it in the power of the county court to decide definitively on the question, what facts are material, and thus preclude a revision by the court above.    The statute on this subject is very particular.    " It shall be the duty of the courts of equity to cause the facts on which they found their decrees to appear on the record, either from the plead-

ings or decree." *Stat.* 196. *sect.* 2.  This clause was intro-
duced into our statutes in 1801, for the purpose of preventing
the evil above suggested.  It may be doubted, then, if such a
finding of facts does necessarily import more than that
certain facts, *essential,* in the opinion of the court, were not
found.  Now, among those facts necessary to be proved, to
give the court jurisdiction, is the fact, that the matter in de-
mand was of less value than 335 dollars.  This fact being by
the county court found untrue, it resulted necessarily, that they
had no jurisdiction ; and then they might well find all the oth-
er facts untrue.

There are two answers attempted to be given to this rea-
soning.  First, it is urged, if the defendant will proceed to try
his cause before a court of general jurisdiction, without availing
himself of a plea to the jurisdiction, he shall not be permitted to
avail himself of it on the merits, or in any subsequent stage of
the proceedings.  This answer comes quite too late.  In *Gris-
wold* v. *Mather,* 5 *Conn. Rep.* 435. and *Wells* v. *Watson,* 5
*Conn. Rep.* 468. the judgments of the superior court were re-
versed, because it did not appear, that the value of the prop-
erty was greater than 335 dollars.

Secondly, it is said, that the court might have had jurisdic-
tion ; for the averment in the bill is only that the value of the
matter or thing in dispute *is less* than 335 dollars ; whereas
the law vests the court with jurisdiction in those cases where
the value of the property *does not exceed* 335 dollars.  This is a
mere *apex* of the law, and the terms, doubtless, are under-
stood as synonymous.

But can this decree of the county court be a bar or an es-
toppel ?  This question appears to be settled, by the decision
in *Smith* v. *Sherwood,* 4 *Conn. Rep.* 278.  " To constitute an
estoppel by a former judgment, the precise point which is to
create the estoppel, must have been put in issue and decided."
Nor is it a bar ; for in *Church* v. *Leavenworth,* 4 *Day* 274. and
*Manny* v. *Harris,* 2 *Johns. Rep.* 24. it was decided, that to
make a verdict evidence, it must appear that the same point
was directly in issue between the parties, and was found by
the jury.

2. Could the fact of the mistake in the deed be proved by
parol evidence ?  This point is so clear, that it cannot be ne-
cessary to illustrate it.  The doctrine ought to be considered
at rest, if repeated decisions, here and elsewhere, can make it

so.  In *Gillespie* & ux. v. *Moon*, 2 *Johns. Ch. Rep.* 585. *Chapman* v. *Allen, Kirby* 400.  *Matson* v. *Parkhurst*, 1 *Root* 404.  *Cook* v. *Preston*, 2 *Root* 78.  *Peters* & al. v. *Goodrich*, 3 *Conn. Rep.* 146. 150.  *Washburn* v. *Merrills*, 1 *Day* 139. and *Avery* & ux. v. *Chappel* & al. 6 *Conn. Rep.* 270. it was decided, that a mistake in a deed or other writing may be shewn, by parol testimony.  The proof, to be sure, must be explicit, and entirely satisfactory.

3. Has the plaintiff any merits?  What is the object of this bill ?  It is to compel the defendant to accept his money before it is due, and relinquish his security.  In other words, it is to substitute another contract for that which the parties have entered into.  It will be in vain to search for authorities to that effect.  None are shewn.  It is opposed to the whole doctrine of contracts.  A solitary case is cited.  *Talbot* v. *Braddill*, 1 *Vern.* 183. 394.  In that case, the Lord Keeper permitted a man to redeem before the day of payment in the deed, on the ground that the bargain was unreasonable, after the lapse of twenty-five years, and when the yearly income of the premises exceeded the interest of the money.  It is surely too bald to insist, that the obligor, by his own act, may discharge the contract before it is due.  We might next expect to be pressed, on some real or imaginary equity, to enforce the payment of money before it is due, or to permit an obligor to be discharged upon payment of fifty *per cent.* of the sum due.

I would, therefore, advise the superior court, that there is no sufficient bar or estoppel set forth; that parol evidence was properly admitted to shew the mistake in the deed ; and that the plaintiff's bill is insufficient, and that it be dismissed with costs.

The other Judges were of the same opinion.

Bill to be dismissed.

---

## THE STATE OF CONNECTICUT *against* DOUD.

The escape from prison of a person lawfully imprisoned for a breach of the peace, without breaking the prison, or any other actual violence, is, at common law, an offence against public justice, punishable by fine and imprisonment.

But the court, for such offence, will not inflict a punishment exceeding that from which the offender escaped.

THIS was an information at common law, filed by the state's attorney, in the superior court, alleging, That *Doud*, in pursuance of a judgment of the court, was, on the 27th of *December*, 1828, lawfully imprisoned in the common gaol of *Litchfield* county, for a certain assault and battery by him before that time committed; and being so imprisoned, did, on said 27th of *December*, with force and arms, wilfully, unlawfully and feloniously escape from and out of said gaol, against the will, and without the licence and consent of the keeper thereof; which doings of said *Doud*, were against the peace, contrary to the laws of this state and of evil example to others in like manner offending. To this information *Doud* demurred; and the superior court reserved the case for the consideration and advice of this Court, both as to the sufficiency of the information and as to the punishment.

*P. Miner*, and *J. W. Huntington*, for the defendant, after remarking, that the act complained of was not the breaking of the prison, but simply departing from it, the doors, for aught that appears to the contrary, being wide open,—contended, 1. That such departure was not an offence at common law. The mere departure from the walls of the prison, where the commitment is for an offence not capital, is not even a misdemeanour. In *England*, it is deemed a *contempt* of the process of the king's courts. 2 *Hawk. Pl. C. c.* 18. *s.* 6. 9. Here it would not be deemed a contempt of court. The *English* law on this subject, is not applicable to our state of society.

2. That if this is not an offence, by the common law of *Connecticut*, the superior court has not jurisdiction, unless the statute approved *June* 4th, 1828, gives it. But this information does not count on the statute; which is necessary where the statute creates the offence. Clearly, this is not a high crime and misdemeanour, and so cognizable by the superior court, independently of the act of 1828. *State* v. *Howard*, 6 *Conn. Rep.* 475. *State* v. *Knapp*, 6 *Conn. Rep.* 415. It is, at most, a mere misdemeanour.

3. That if this is an offence at common law, still it is not punishable by imprisonment in our state prison. The imprisonment from which the defendant escaped, was in a common

gaol, for an assault and battery.    It would be absurd, and wholly unauthorized, to inflict a higher punishment for the escape than that from which he escaped.

*Church*, for the State, insisted, 1. That an escape, with or without prison-breach, is an offence at common law.   1 *Hale's P. C.* 607. 611.  2 *Hawk. P. C. c.* 18.  1 *Russell on Crimes,* 529.  2 *Swift's Dig.* 325–7.  4 *Bla. Com.* 129.

2. That the statute of *May*, 1828, gives the superior court jurisdiction of all offences at common law.

3. That the punishment may be imprisonment in the state prison.    This being a common law offence, it may be punished by a common law punishment, if no statute has repealed the common law.    Confinement in the state prison, is a common law punishment.    *State* v. *Wilson,* 2 *Root* 62.  *State* v. *Danforth,* 3 *Conn. Rep.* 112.    The statute of 1828 does not repeal the common law, but limits the duration of the punishment only. (*a*) *State* v. *Judson,* for prison-breach, at *Litchfield, August* term, 1828, *cor. Daggett,* J.

PETERS, J. By the common law, all immoral acts, which tend to the prejudice of the community, are offences, and punishable by courts of justice.    They are denominated crimes and misdemeanours.    The former comprehend the more aggravated offences, which are nearly allied and equal in guilt to felony, whereof the superior court formerly assumed jurisdiction ; the latter, inferior offences, whereof the superior and inferior courts have occcasionally taken cognizance.    But now, by statute, the superior court alone has jurisdiction of all offences at common law.  *Stat.* 29. ed. 1784.—172. ed. 1821.—191. Sess. 1828.  *Knowles* v. *State,* 3 *Day* 103.  2 *Swift's Syst.* 366. 2 *Swift's Dig.* 257.  *State* v. *Howard,* 6 *Conn. Rep.* 475.  *Rex* v. *Higgins,* 2 *East* 5.

By the ancient common law, prison-breaches were felonies,

(*a*) The statute referred to, provides, in *sect.* 1.  " That the superior court shall have jurisdiction of all offences at common law, of what kind or degree soever, for which the punishment is not prescribed by any statute law of this state.   *Sect.* 2.  " That in all cases where no punishment is by statute fixed for any such common law offence, the court before whom the conviction shall be had, may punish the offender, by fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of such court."

if the party were lawfully imprisoned, for any cause whatever, *Litchfield*, whether civil or criminal, and whether he were actually within June, 1829. the walls of a prison, or only in the stocks, or in the custody of a person who had lawfully arrested him. 2 *Hawk. P. C. c.* 18. *s.* 1.   And it hath been holden, by all the judges of the *King's Bench*, that though a prisoner departs from prison, with the keeper's licence, it is an offence punishable as well in the prisoner as in the keeper.    *Hobert* and *Stroud's* case, *Cro. Car.* 209.    The same doctrine is laid down, by Sir *William Blackstone ;* (4 *Com.* 129.) and it is sanctioned by the late Ch. J. *Swift.* 2 *Sw. Dig.* 325.    The escape of a person lawfully arrested, by eluding the vigilance of his keepers, before he is put in hold or in prison, is an offenee against public justice ; and the party himself is punishable by fine and imprisonment.  For however strong the natural desire of liberty may be, yet every man is bound to submit himself to the restraints of the law.  2 *Sw. Dig.* 325.  4 *Bla. Com.* 129.

State
v.
Doud.

I am, therefore, of opinion, that the information is sufficient ; and as the prisoner is not charged with breaking the prison, or any other actual violence, in effecting his escape, I advise, that he be subjected to the usual common law punishment, fine and imprisonment, one or both, at the discretion of the superior court, not exceeding the punishment from which he escaped.

The other Judges were of the same opinion, WILLIAMS, J. intimating some doubts.

*Information sufficient.*

———◆———

### CRANE *against* DEMING and others.

Where it appeared from a bill in chancery, that a party defendant had had an interest in the subject matter ; and it did not appear clearly, that he had parted with all that interest ; an exception to his being made a party, taken under a general demurrer to the bill, was held not to be sustainable.

But if it does not appear from the bill, that a party defendant has, or ever had, an interest ; such want of interest may be taken advantage of, on a general demurrer.

If a bill against husband and wife shew an interest in the husband, but none in the wife, and both join in a general demurrer, it will be sustained as to her.

To support an objection, that other persons should have been made plaintiffs

*Litchfield,*
June, 1829.

Crane
*v.*
Deming.

in the bill, it is necessary, that this be clearly shewn by the bill, or the defendant must aver it.

Therefore, where it appeared from a bill of foreclosure, that the mortgage was given to the plaintiff, acting in behalf of a turnpike company, but it did not appear who composed the company, whether it was incorporated, or what were its powers; the nonjoinder of such company was held not to be a ground of demurrer.

Where the condition of a mortgage deed, executed by *B.* to *A.*, was, "that if *B.* shall pay to *A.* the sums of money that may be hereafter advanced by *A.* to *B.*, in pursuance of an agreement mentioned in the condition of a certain bond given by *B.* to *A.*, bearing even date herewith, on demand, with interest; and if *B.* shall stand to and perform every other agreement and condition on his part to be kept and performed in the condition of said bond mentioned, and build the bridge therein mentioned, and do all other things therein contained, according to the true intent and meaning of said bond and the condition thereof, without any deduction or defalcation; then said deed and obligation shall be null and void:" it was held, on a bill of foreclosure, brought by the mortgagee against the mortgagor and subsequent incumbrancers, that such mortgage was a valid security, containing in itself reasonable notice of the plaintiff's incumbrances, to be ascertained, by the exercise of ordinary discretion and diligence.

In such case, it is no objection to the validity of the mortgage, that advancements were made after subsequent mortgages.

THIS was a bill in chancery, stating the following case. On the 22d of *April* 1822, *Joel Deming*, one of the defendants, and *Israel Crane*, the plaintiff, entered into a covenant, by which it was agreed, by the former, that he and one *John Bragg* should build a bridge over the *Passaic* river, on the turnpike road, and complete it, by the 1st of *July* following; and by the latter, that he should furnish the timber for the bridge, and to pay the sum of 800 dollars, of which 100 dollars was to be paid on the completion of the bridge, and the residue in three months thereafter. After it was erected, it gave way and fell; in consequence of which, it was not finished by the time limited for that purpose. On the 26th of *October,* 1822, *Crane,* at the request of *Deming,* agreed to give him until the 1st of *June* 1823, to rebuild and complete the bridge, and to make him such pecuniary advances as might be necessary to enable him to go forward in the work, provided he would give *Crane* sufficient security, as well for the completion of the bridge within the time last specified, as for the repayment of the money that might be advanced. Such security *Deming* agreed to give; and accordingly executed a bond to *Crane,* in the sum of 3000 dollars, to which the following condition was annexed: That if the said *Joel Deming* should cause to be

builded and completed the last-mentioned bridge, over the *Litchfield,*
*Passaic* river, at the place designated for that purpose, on or *June, 1829.*
before the 1st of *June* 1823, and should also well and truly
repay to said *Crane*, when requested, all such sums of money
as he, said *Crane*, might advance, for the purpose aforesaid,
with interest thereon ; and should also pay and satisfy said
*Crane* all such losses and damages as the turnpike company, in
whose behalf said *Crane* acted, had sustained, by reason of the
aforesaid failure of said *Deming* and *Bragg ;* and also all loss
sustained by said *Crane*, or by said company, by reason of any
waste or destruction of timber, or other neglect or misman-
agement of said *Deming* or *Bragg*, or either of their workmen,
agents or servants ; and also all such damages as they might
sustain, in case said *Deming* should fail to erect the bridge
within the time last limited ; then the bond was to be void,
otherwise to remain in full force.    Afterwards, on the same
day, *Deming* executed and delivered to *Crane* a deed of a
tract of land in *Salisbury ;* to which deed was annexed the
following condition : " That if the said *Joel Deming*, his
heirs, &c. do and shall well and truly pay, or cause to be paid,
to the said *Israel Crane*, or to his certain attorney, &c. the
sum or sums of money that may be hereafter advanced, by the
said *Israel Crane* to the said *Joel Deming*, in pursuance of an
agreement mentioned and referred to in the condition of a
certain bond given by the said *Joel Deming* to the said *Israel
Crane*, bearing even date herewith, on demand, with interest
for the same ; and if the said *Joel Deming* shall stand to,
perform and fulfil every other agreement and condition, on his
part to be kept and performed, in the condition of said bond
mentioned, and build the bridge therein mentioned, and do all
other things therein contained, according to the true intent and
meaning of the said bond, and the condition thereof, without
any deduction or defalcation for taxes, assessments or any oth-
er impositions whatever ; then and from thenceforth said deed
and obligation to be null and void."

*Deming* failed to fulfil the conditions of the bond and the
deed.    *Crane*, at sundry times between the 26th of *October*
1822, and the 10th of *September* 1823, advanced to *Deming*,
at his request, to enable him to go forward with the work of
rebuilding the bridge, the sum of 1355 dollars ; and *Crane* and
the turnpike company sustained loss, also, by reason of waste
and destruction of timber, to the amount of 410 dollars ; of

*Crane*
*v.*
*Deming.*

which *Deming* had due notice. No part of either of these sums has been repaid.

Previous to the execution of the mortgage deed to *Crane,* *viz.* on the 15th of *February* 1817, *Deming* had executed to one *Henry Fitch* a mortgage deed of a part of the premises, to secure the payment of a promissory note for the sum of 810 dollars, upon which a judgment was rendered, by the superior court, in *August,* 1818, in favour of *Fitch* against *Deming,* for damages and costs. This debt, in *September* 1825, *Fitch* assigned to *Elisha Sterling,* Esq., who is still the owner thereof.

On the 13th of *February,* 1823, and the 21st *September,* 1825, *Joel Deming* and *Sally Deming,* his wife, executed two other mortgage deeds of the premises to said *Sterling,* to secure the payment of the debt and judgment which *Fitch* had assigned to him, and of two notes, one for 1000 dollars, the other for 200 dollars. Afterwards, *viz.* on said 21st of *September,* 1825, *Joel Deming* and wife conveyed the premises to *Buell Deming,* subject to these incumbrances. All the deeds before mentioned were duly recorded.

The premises were averred to be of the value of 5000 dollars.

The bill sought to redeem the premises as against *Sterling,* upon payment of such sum as should be found due to him on the *Fitch* debt, and to foreclose the equity of redemption in *Joel Deming* and his wife, as mortgagors, in *Sterling* as subsequent mortgagee, and in *Buell Deming,* as subsequent grantee.

*Joel Deming* and *Sally,* his wife, *Elisha Sterling* and *Buell Deming,* were made party defendants.

*Joel Deming* and wife demurred generally to the bill ; and the other defendants, having prayed oyer of the condition of the deed referred to in the bill, recited it, and demurred also.

The superior court reserved the case for the consideration and advice of this Court.

*A. Sterling,* in support of the demurrers, contended, 1. That *Joel Deming* and wife had no interest in the subject matter of the bill ; they having sold out all their equity of redemption in the mortgaged premises ; and therefore, they ought not to have been made parties. It does not appear, indeed, that *she* ever had any interest. She could have none, unless the land was hers ; but this is no where averred. At any rate, both have

assigned all the interest that they had.   *Broome* v. *Beers*, 6 *Conn. Rep.* 198. *Swift* v. *Edson* & al. 5 *Conn. Rep.* 531. 2 *Swift's Dig.* 221.

2. That the plaintiff's debt was not so described in his mortgage deed as to give reasonable notice to creditors and subsequent purchasers of the incumbrance.   *Pettibone* v. *Griswold* & al. 4 *Conn. Rep.* 158. *Shepard* v. *Shepard* & al. 6 *Conn. Rep.* 37.   The money part of the mortgage debt, is not a specific sum due, or certainly to become due, but such sum or sums of money as should be thereafter advanced by *Crane* to *Deming*.   The residue of the mortgagee's claim rests in equal uncertainty.   It is, that the mortgagor shall stand to and perform every other agreement and condition on his part to be kept and performed, in the condition of a bond referred to mentioned, and build the bridge therein mentioned.   What the bond and the conditions of it, are, the mortgage does not shew.   But suppose you find the bond ; can you ascertain from it the amount of the incumbrance ?  No money had been advanced ; and the bond discloses no obligation to advance any. If any has been advanced, the bond is silent as to the amount. The other part of the condition is dangerously indefinite.   No creditor or subsequent purchaser, by looking at the bond, can ascertain the amount of the incumbrance, or know that any exists.   *Dey* v. *Dunham*, 2 *Johns. Chan. Rep.* 190. *Frost* & al. v. *Beekman*, 1 *Johns. Chan. Rep.* 288. 299.   By collusion between *Crane* and *Deming*, which might be easily pactised without detection, every creditor might be defeated.

3. That aside from the indefiniteness of the mortgage, the plaintiff's claim ought to be postponed to *Sterling's ;* because *Sterling's* mortgage was recorded before the plaintiff made any advancements to *Deming*.   The advancements made, therefore, were made with *notice* of *Sterling's* lien.   *Pow. Mort.* 536, 7.  *Cason* & al. v. *Round* & al. *Prec. Chan.* 226. *Peters* v. *Goodrich*, 3 *Conn. Rep.* 152. *Frost* & al. v. *Beekman*, 1 *Johns. Chan. Rep.* 288. 298.

*S. Church* and *L. Church*, for the plaintiff, contended, 1. That it is not a ground of defence, but matter in abatement only, (*i. e.* of special demurrer in the nature of a plea in abatement,) that too many persons are made parties to the bill.

2. That *Joel Deming* has an interest in the subject of this suit, being directly interested in having the account properly

taken. If he is made a party to the suit, he will be bound by the decree. As his wife has joined with him in the demurrer, if it is not sustained as to him, it will be overruled as to her also. 1 *Harr. Chan. Prac.* 294.

3. That the demurrers are not well taken, being general, and not expressing the cause of demurrer. 2 *Madd.* 226. *Nash* v. *Smith* & al. 6 *Conn. Rep.* 421. 428. The demurrers are taken to the whole bill; and if there be any part of the bill requiring an answer, the demurrers are bad *in toto,* and will be overruled. 2 *Madd.* 226. The defendants should have answered that part of the bill, which charges the failure to build the bridge; as this is, unquestionably, set forth in the condition with sufficient certainty. If the defendants meant to insist, that the plaintiff ought to be postponed to them, they should have answered, stating the facts on which their superior equity is founded.

4. That the mortgage to the plaintiff, is, in every respect, a valid security. If the record gives the power of knowing the subject matter of the mortgage, or points out a certain object, which may be particularly ascertained, by suitable enquiries, it is sufficient. *Pettibone* v. *Griswold* & al. 4 *Conn. Rep.* 158. *Brinckerhoff* & al. v. *Lansing* & al. 4 *Johns. Chan. Rep.* 65. 75. In the present case, the subject matter mentioned, is the bond of that date, given by *Deming* to *Crane* regarding the building of a bridge and monies to be advanced, the particulars of which might be known, by suitable enquiries. 2 *Kent's Com.* 454. *The United States* v. *Hooe,* 3 *Cranch,* 73. *Hendricks* v. *Robinson* & al. 2 *Johns. Chan. Rep.* 283. 309. *Lyle* v. *Ducomb,* 5 *Binn.* 585. *Livingston* & al. v. *McInlay,* 16 *Johns. Rep.* 165. 167. In the cases of *Pettibone* v. *Griswold,* and *Shepard* v. *Shepard,* the claims did not exist when the mortgage was made; nor was there any subsisting contract, out of which any future obligation or liability could arise. Here the case is otherwise. There was a subsisting obligation, when the mortgage was executed; and this is specified in the condition. *Stoughton* v. *Pasco,* 5 *Conn. Rep.* 421.

*Bacon,* for the defendant, in reply, enforced the exceptions taken by the counsel associated with him, with the additional one, that the turnpike company, in whose behalf the plaintiff contracted, ought to have joined in bringing the bill.

Litchfield,
June, 1829.

Crane
v.
Deming.

WILLIAMS, J. It was claimed, 1. That *Joel Deming* and wife ought not to have been made parties to the bill; they having sold and conveyed their interest in the mortgaged premises. When an exception of this kind is taken, the defendant, who has had an interest, ought to come in and disclaim, or it should clearly appear from the bill he has parted with that interest. Now, in this bill, it is not stated, that these defendants have conveyed *all* their interest, or *all* their equity of redemption; but merely, that they conveyed the premises, subject to the incumbrances. On a general demurrer, therefore, this exception by *Joel Deming*, cannot be sustained.

As it respects Mrs. *Deming*, nothing appears in this bill to show that she ever had any interest in the mortgaged premises; nothing even to make it probable, except the fact that she had joined with her husband in the deed, by which the property is conveyed. The inducement to this we do not know; it may have been done, because it was supposed necessary to bar her of dower; or, it may have been believed she had an interest that did not exist; but there is no allegation of interest in her. No reason is, therefore, shewn, for making her a party; and in *Jerome* v. *Jerome*, 5 *Conn. Rep.* 352. 356. it is said, that it is a general rule, that a bill must show some interest in the defendant; for otherwise, the plaintiff can have no claim against him, and to make him a party is both nugatory and vexatious.

It is said, this cannot be taken advantage of, under a general demurrer. It is admitted, that in *England* the rule of the court is, that every demurrer shall express the causes of demurrer. 1 *Harr. Chan. Prac.* 294. 3 *P. Wms.* 391. But other causes may be insisted upon in the argument; and even after the demurrer is overruled, it is said to be according to the course of practice, that other causes may be assigned at the bar *ore tenus.* 6 *Johns. Ch. Rep.* 149. It seems, therefore, to be a rule of practice, adopted by the courts in *England.* It is, no doubt, a salutary rule; but I am not prepared to apply it to a case where the bill lays no foundation for a decree against one of the parties to it.

Again, it is said, as Mrs. *Deming* has joined in a demurrer with her husband, if it is not sustained as to him, it must also be overruled as to her.

No authority is cited in support of the position, except 1 *Harr. Chan. Prac.* 294. There it is said, on a general demur-

rer to the whole bill, if there is any part as to the relief or discovery to which the defendant ought to put in an answer, the demurrer being entire, ought to be overruled ; or, according to Lord *Redesdale,* " *it is generally considered*" that being entire, it must be overruled.  This is nothing more, then, that when a party has a good case—but in his bill has intermixed claims not defensible,—though a demurrer to those parts of the bill would be sustained, yet a demurrer to the whole bill would not be.

Here Mrs. *Deming* is a married woman, and must answer with her husband, unless there is an application to the court to permit a separate answer. 2 *Madd.* 218.  She is also supposed to be under the direction, if not under the coercion, of her husband. 1 *Salk.* 290.  I should, therefore, require a strict rule to be shewn, before I should be willing she should be deprived of the benefit of her defence, because she had joined with her husband in the demurrer.

But the rules of pleading in chancery, are not so precise and strict as at law ; and are more flexible in their modification, and can be more readily made to suit the equity of the case and the policy of the court.  *Per* Chancellor *Kent. Brincker-hoff* v. *Brown,* 6 *Johns. Chan. Rep.* 157.  As it respects Mrs. *Deming,* therefore, the demurrer is sustained.

An objection was raised, in the closing argument, that other persons should have been made plaintiffs in this bill ; that the plaintiff contracted in behalf of a turnpike company.  The deed upon which a foreclosure is sought, is made to the plaintiff only ; the legal title is in him ; and he asks the court to deprive the defendants of any equitable interest they may have, unless they pay the monies due upon the bond to the plaintiff. Who compose the company referred to in the bond,—whether it be a corporation with power to sue, or such as would be recognized by our laws,—we know not.  But to support the objection, the bill must clearly show, that there are others who ought to be parties, or the defendant must aver it.  To adopt the language of Chancellor *Kent,* in a demurrer for a like cause : " The bill should have been positive on this point, and have left no doubts as to the fact, before the want of a necessary party was made the ground of a demurrer to the bill." 6 *Johns. Chan. Rep.* 158, 9.

2. But it is further claimed, that the condition of the deed is such as to render it inoperative upon subsequent incumbrances, not setting forth with sufficient certainty what the lien created

by it is. This condition of the deed is: That if said *Deming* pay said *Crane* the money that may be hereafter advanced by said *Crane* to said *Deming*, in pursuance of an agreement referred to in the condition of a certain bond or obligation given by said *Deming* to said *Crane,* bearing even date with said deed, on demand, with interest; if said *Deming* shall perform every condition on his part to be kept and performed in the condition of said bond, and *build the bridge therein,* and do all other things therein contained, all according to the intent of said bond, then the deed shall be void. This gives notice, in terms, that the land is mortgaged to secure a bond of the same date, payable on demand and on interest; and that the bond has conditions, one of which is, to build a bridge therein named.

In *Brinckerhoff* v. *Lansing,* 4 *Johns. Chan. Rep.* 75. Chancellor *Kent* says, that the mortgage itself disclosed the nature of the debt secured by the bond, when it stated, that the bond was taken as *collateral security.*

This condition not only shows, that it was taken as collateral security, but that it was taken, specifically, to secure an agreement for *the building of a bridge.*

The penal sum of the bond and the place of building the bridge, are not indeed given. These omissions cannot, surely, nullify this condition;—for if it was a mere agreement to build this bridge, the fact that the supposed expense did not appear, could have no effect upon the contract; and as giving the amount of the bond would not ascertain this, it cannot be void for want of it. As to the place where the bridge is to be built; that must be of still less importance, as the creditor must, in any event, resort to the mortgage to ascertain the amount due; and he might as well object, if a note was payable at bank, that the bank was not specified in the mortgage.

But neither the amount of a penal bond, nor the place of payment, can be necessary, except to identify the bond. But as that is otherwise sufficiently done, in the present case, this objection is not sustained; and if any part of the condition is good against the subsequent incumbrances, the demurrer must be overruled. But as the case has been fully argued on other points, and as the Court have formed an opinion upon them, it may prevent further litigation to express that opinion at this time.

It was objected, that other conditions of the bond were not sufficiently stated in the deed to entitle the mortgagee to a

*Litchfield,*
June, 1829.

Crane
*v.*
Deming.

decree in his favour upon them ; and that, that part of the condition of the bond itself, which provides for future advancements, is void, as to creditors.   And it is claimed, that these objections are supported by the cases of *Pettibone* v. *Griswold* and *Shepard* v. *Shepard.*

As to those decisions, it could never have been contended, that it was necessary to recite in the condition of the mortgage the contract on which it was founded, in the words of it.

The Court say, creditors must have the power of learning from the record *the subject matter* of the mortgage, that these investigations may be guided by something, which will terminate in a certain result, and must be so defined as to prevent the substitution of any thing, which a fraudulent grantee may devise to shield himself from the demands of his creditors. And further it is said, absolute certainty is not to be expected : but there always may and ought to be a *certain object* after which suitable enquiries may be made.   4 *Conn. Rep.* 162.

Again, the Court say, a mortgage may be given to indemnify the surety of another in the office of sheriff or collector, or an administrator on an estate.

" In all these cases, on enquiry, a creditor cannot know from the record, the *precise incumbrance ;* but he has notice of certain *definite facts*, which *point to and guide* him in the necessary investigation on the subject."

A mortgage to secure an unliquidated book debt, or the fidelity of a factor or bailiff, would be good ; and yet there is nothing certain here, but the *subject matter* of the stipulation. *Stoughton* v. *Pasco*, 5 *Conn. Rep.* 449.

In this case, not only the subject matter is given, but the date of the bond, and that it is payable on demand, with interest.   A track is, therefore, pointed out, by which an enquirer can ascertain the facts.   It is said, however, that the mortgagor lives in *New-Jersey*, at a great distance ; and it is not reasonable, that creditors should be sent that distance for information. But as the amount due on the mortgage can only be ascertained in that way, this does not seem to be a solid objection.

The result of the cases in *Connecticut*, as given by an able commentator, is—" That the deed must contain within itself *reasonable notice* of the incumbrances, to be ascertained, by the exercise of ordinary discretion and diligence."   2 *Kent's Comm.* 454.

This deed is of that character : it refers the enquirer to a

certain object—the bond, in the hands of the mortgagee—which, *Litchfield,* by ordinary diligence, he can examine ; and which is identified in such a manner as to prevent the substitution of a fictitious security, by a fraudulent debtor.

But it is also objected, that the bond is to secure *future* advancements ; and that advancements were made after subsequent mortgages.

Such contracts, in the absence of fraud, have certainly been supported. In *The United States* v. *Hooe,* 3 *Cranch* 74. a trust deed to secure his surety against his bond, and also for existing and *future* endorsements at bank, was holden good. It seems also recognized in *Shirras* & al. v. *Daig* & al. 7 *Cranch* 35. So, where a penal bond was given to secure notes drawn, *and about to be drawn,* and secured by mortgage,—it was holden good against subsequent incumbrances. *Lyle* v. *Ducomb,* 5 *Binn.* 585. 588. *Brinckerhoff* v. *Lansing,* 4 *Johns. Chan. Rep.* 65. 74. Chancellor *Kent* speaks of it as no new doctrine, and says, that it is a frequent practice to mortgage property to a creditor as security for a debt *to be* contracted, as well as for one already due. *Hendricks* v. *Robinson,* 2 *Johns. Chan. Rep.* 283. 308, 9. In *Atkinson* v. *Maling* & al. 2 *Term Rep.* 462. this point was pressed in the argument ; but the assignment was held good by the court, without hesitation : indeed, this question does not seem to have been of sufficient importance to engage the attention of the court at all. And in *Badlam* v. *Tucker* & al. 1 *Pick.* 389. 398. the court in *Massachusetts,* speaking of a security for future advances and responsibilities, says : " Such a stipulation may have a fraudulent aspect, or may be satisfactorily explained, *according to the* attending circumstances. Where a mortgage is made merely to secure future advances, without any other consideration at the time, it might be void against creditors, as tending to facilitate collusion, and enabling the mortgagor to get credit on his property, without notice that it was encumbered. But if the object of the mortgage be, to *secure an existing* demand, the addition of a claim protecting *future* advances, would not necessarily avoid the mortgage."

But it is supposed, that the cases in our own court vary the doctrine. It is not believed, that such was the intention of the court ; so far from it, that the Chief Justice says : " I shall not express a definite opinion, as the exigencies of the case do not require it : it may be for existing debts, existing liabilities, *and*

*perhaps for debts to be contracted in future.* But the manner in which it may be done, forms an important consideration." *Pettibone* v. *Griswold*, 4 *Conn. Rep.* 161. It was indeed holden, that a deed to secure *any* notes the grantee might endorse in future, and *any* receipts he might hold, was too indefinite. And in *Shepard* v. *Shepard* & al. 6 *Conn. Rep.* 37. it was held, that a similar condition was not good, though the amount was limited.

In neither of these cases, was there *any obligation* upon the part of the grantee to indorse. But by the bond in question, it appears, that for the purpose of enabling the grantor to carry into effect a contract which he had previously made with the grantee, the latter had bound himself to make the necessary advancements ; and this bond and mortgage are given to enable him to do it with safety. It differs entirely, therefore, from those cases. Here the obligation is as fixed as that of a surety ; and is limited by the necessities of *Deming* in repairing the bridge. These circumstances, therefore, entirely repel any fraudulent aspect attending a general stipulation for future advances, and shew that unless there is some inherent vice in every such agreement, this is one which ought to be supported. And although contracts of this kind should be closely watched, that they may not be made a cover to defraud creditors ; yet when every suspicion of this sort is removed, no principle of law or justice requires that they should be declared void. To adopt such a principle would be to interpose unnecessary embarrassments in the ordinary transactions of business, and to encumber the disposition of property by refinements hitherto unknown. As to the advancements made after the subsequent incumbrances, surely if the contract was a fair one, it was the duty of *Crane* to make these advancements, and he could have been compelled to make them ; indeed, in no other way could he get the advantages, which it was the whole object of the contract to secure. And it is widely different from the cases cited, where a prior mortgage has, under the doctrine of tacking, been postponed as to debts created after the knowledge of a subsequent incumbrance.

I am therefore of opinion, that the plaintiff's bill is sufficient, as against all the parties, except against *Sally Deming ;* and that he is entitled to a decree for all the sums which may be found due on the several breaches of said bond ; and that the superior court be so advised.

The other Judges were of the same opinion.

Demurrer sustained as to Mrs. *Deming*, and overruled as to the merits of the bill.

———◆———

## The inhabitants of the town of LITCHFIELD *against* The inhabitants of the town of FARMINGTON.

Where there are two counts in the declaration, for distinct causes of action, and the plaintiff obtains a verdict on one count and the defendant on the other, the defendant is entitled to his costs.

A NEW trial having been granted, pursuant to the advice of this Court, *ante* 100. 110., the cause was tried again, at *Litchfield, August* term, 1828, when the jury returned a verdict for the plaintiffs on one count in the declaration, and for the defendants on the other. The defendants moved for costs on the count found for them; it being admitted, that this was for a distinct cause of action from that on which the other count was founded. The plaintiffs resisted this motion; and the question which it involved, was reserved for the consideration of the Supreme Court of Errors.

The case was now submitted without argument.

*By the Court.* Where there are two counts in the declaration, for distinct causes of action, and the plaintiff obtains a verdict on one count, and the defendant on the other, the defendant is entitled to his costs.

———◆———

## LYON *against* SUMMERS.

Though a promissory note, not payable to order, is not assignable so as to vest the legal interest in another person, yet the assignment of such note transfers the equitable title, which will be recognized both in a court of equity and in a court of law, and fully protected.

To give effect to this doctrine is the object of the statute of *May* 23rd, 1822, *c.* 12. *s.* 1.

To an action brought in the name of *A.*, against *B.*, on a promissory note made by *B.*, payable to *A.*, the defendant pleaded a *defeasance* given by *A.* to him simultaneously with the execution of the note, and as part of the

*Fairfield,*
June, 1829.

Lyon
*v.*
Summers.

transaction. The plaintiff replied, that soon after the giving of the note, he, for a full and valuable consideration, assigned and delivered it to *C.,* who gave immediate notice thereof to *B.;* that *C.* had ever since owned the note, and had instituted and prosecuted the suit thereon, in the name of *A.,* for *C's.* benefit exclusively; that *A.,* at the date of the note, was in low circumstances in point of property, much in debt, and destitute of pecuniary credit; that *A.* wished to obtain of *B.* his note, that *A.* might use it to pay his creditors, or to raise money, by the sale thereof, and made known his object to *B.;* that it was then agreed between *A.* and *B., with a view to enable A. to commit a fraud on any person to whom he might put off the note, that A. should execute to B. the defeasance mentioned in the plea, that A. might retain it in his possession, and by means thereof, defeat any action which should thereafter be brought on such note, by any owner thereof, in A's. name.* This replication was traversed; on which issue was joined. On the trial, it was admitted, that the note was assigned by *A.,* who was a bankrupt, to *C.,* for its full value, of which due notice was given to *B.; C.* paying for it, partly in money, and partly by his own note to *B.,* which *B.* assigned to *D.* for its full value, both *C.* and *D.* being ignorant of any defeasance or condition to the first-mentioned note. The court instructed the jury, that if they should find, that it was agreed between *B.* and *A.,* when the note and defeasance were executed, *that the defeasance was not to be annexed to the note, but to be kept by B., so that the note might appear valid and unconditional, to enable A. to deceive and delay his creditors, by shewing the same to them,—or, with intent that A. should thereby be enabled to raise money thereon, by selling it to any person who might purchase it, and that thereafter the defeasance should be set up as a defence;* then the transaction was fraudulent, and the defeasance ought not to prevent a recovery on the note. The verdict was for the plaintiff. On a motion by the defendant for a new trial, embracing the preceding matters, and stating, that the plaintiff, on the trial, introduced testimony in support of both the propositions hypothetically stated in the charge, and claimed to have proved them, it was held, 1. That under the issue joined and the charge given, the verdict had established facts sufficient to warrant a recovery by the plaintiff; the great question in the case being, whether the defeasance was fraudulent, and that question being directly answered by the verdict; 2. that as the defendant, at the trial, made no objection to the evidence, on the ground of variance or irrelevancy, he could not avail himself of such objection on this motion.

On a recovery by the plaintiff, in such case, the proper rule of damages, is, the amount of the note in suit and interest; the defendant, who was a party to the fraud, not being entitled to any deduction, on the ground, that *C.,* when sued on his note by *D.,* in the defendant's name, might avoid it.

THIS was an action on a promissory note, made by *Stephen Summers,* dated the 2d day of *November,* 1824, for 609, dollars, 59 cents, payable to *Andrew Lyon,* jun.

The defendant pleaded in bar the matters following. At the time of executing the note in suit, and as part of the transaction, the plaintiff executed and delivered to the defendant a writing in these words: " To all whom it may concern, Know

ye, that I, *Andrew Lyon*, jun. have, this day, received of *Stephen Summers* his note of hand, amounting to 609 dollars, 59 cents, which is the amount of an execution recovered against *Isaac Wakelee*, jun. before the superior court, holden at *Danbury*, on the fourth *Tuesday* of *September*, 1822, in my favour; and provided said *Isaac Wakelee*, jun. shall not recover a judgment and execution in a suit which shall hereafter be commenced against *Abel Hall*, for the amount of said execution, then the aforesaid *Summers'* note shall be void, and not collectable by law: And I also further covenant and agree with said *Summers*, his heirs and assigns, that provided the aforesaid judgment and execution shall be recovered against said *Hall*, then he shall pay to me 350 dollars, with interest, of the above note, and the remainder shall be void, and not collectable by law.    Given under my hand, at *Weston, November* 2d, 1824.

<div style="text-align:right">

*Andrew Lyon*, jun."

</div>

*Fairfield,*
June, 1829.

Lyon
*v.*
Summers.

In *November*, 1819, the plaintiff instituted an action on the case, by writ of attachment, against *Abel Hall, Benjamin Hall* and *Elijah Mosier*, for maliciously causing the plaintiff to be prosecuted for perjury, without probable cause, and, at the term of the superior court, in *September*, 1821, recovered judgment against *Benjamin Hall* and *Mosier*, for 300 dollars damages, and 190 dollars, 69 cents, costs; *Abel Hall* obtaining a verdict in his favour.  *Isaac Wakelee* jun., having given bail for *Benjamin Hall*, who absconded, was subjected, on a *scire-facias* at the suit of the plaintiff, by a judgment of the superior court, in *September*, 1822, in the sum of 519 dollars, 6 cents, damages, and 24 dollars, 25 cents, costs.  These sums, with the interest thereon, and the costs of an execution, constituted the amount of the note in suit; which note and execution are the same as those mentioned in the above recited writing.  At the time this note was given, it was claimed that *Wakelee* gave special bail for *Benjamin Hall*, at the request of *Abel Hall*, and under an agreement that he, *Abel Hall*, would indemnify such bail; and the parties then had it in contemplation to commence a suit, in the name of *Wakelee*, against *Abel Hall*, on such request and agreement; which is the suit referred to in said writing.  *Wakelee* soon afterwards brought his action against *Abel Hall*, founded on the liability of the latter to the former, for having given special bail, and in *December*, 1825, recovered, by the judgment of the superior court, 380 dollars, 6 cents, damages and ——— costs.  This is the only judgment,

which *Wakelee,* notwithstanding his utmost endeavours, has, at any time since the date of the note in suit, been able to recover against *Abel Hall.*

The plaintiff, in his replication, averred, That on the 11th of *November,* 1824, he, for a full and valuable consideration, sold and assigned the note in suit to *Aaron Sanford,* jun., and delivered the same to him, who has ever since held and owned it as his property ; that said *Sanford* instituted, and now prosecutes, this action, in the name of the plaintiff, and for his, said *Sanford's,* sole and exclusive benefit ; that the plaintiff, at the time of the making and delivery of said note, by the defendant, was in low circumstances in point of property, much in debt and destitute of pecuniary credit ; that in this situation, the plaintiff wished to obtain of the defendant his note, that he (the plaintiff) might use the same to pay his creditors, or to raise money, by the sale thereof, for the purpose of relieving himself under his pecuniary embarrassments, and made known his wishes on this subject to the defendant ; that it was then further agreed between the plaintiff and the defendant, with a view to enable the plaintiff to commit a fraud on any person to whom he might put off said note, that the plaintiff should execute to the defendant the writing recited in the plea, that the defendant might retain it in his possession, and by means thereof, defeat any action which should thereafter be brought on such note, by any owner thereof, in the name of the plaintiff, (the same not being negotiable,) and thereby defraud such owner of such sum of money as he should have given for the same. The replication averred, also, that immediately after the assignment of said note, by the plaintiff, to *Sanford,* he (*Sanford,*) gave notice thereof to the defendant.

This replication was traversed, by the defendant ; on which issue was joined.

On this issue, the cause was tried, at *Fairfield, December* term, 1827, before *Daggett,* J.

It was agreed, that the note in suit was, on the 11th of *November,* 1824, sold and assigned, for its full value, to *Aaron Sanford,* jun., who now prosecutes this suit, in conformity with the provisions of the statute, approved *May* 23rd, 1822 ; that he paid for it, by giving his own note, on interest, for 474 dollars, and the residue in money ; that the last-mentioned note was made payable to the present defendant, and was by him immediately thereafter sold and transferred to *John Sherwood,*

who still holds it ; that since such transfer, *Sanford* has paid to *Sherwood*, on the note, 165 dollars, and the residue remains unpaid ; that *Sanford* is a man of abundant property ; and that both he and *Sherwood* were ignorant of the defeasance set up in the plea, or that there was any condition to the note in suit. It was agreed, also, that the defendant was duly notified, on the 2nd of *December*, 1824, of the assignment of the note to *Sanford*.

*Fairfield,*
June, 1829.

Lyon
*v.*
Summers.

The plaintiff claimed, and introduced testimony to prove, that when the note and defeasance were executed, it was fraudulently agreed between the defendant and *Lyon*, that the defeasance should not be annexed to or accompany the note, but should be kept by the defendant, and the note should appear to be a valid and unconditional note, with a view to enable *Lyon* to shew it to his creditors, and thereby satisfy them, that he should have something to pay them at some future time, and thus prevent them from pressing him, or taking any measures to collect their debts ; to enable him, also, to sell the note to any person, who might purchase it, and thereby raise money thereon ; and that the defeasance might be set up, when payment should be sought of the defendant. It was admitted, that *Lyon*, at the time when the note and defeasance were executed, was, and ever since has been, a bankrupt, and that well known to the defendant.

The defendant denied the facts thus alleged, and introduced testimony, tending to disprove them, and to establish the allegations in his plea. The defendant also insisted, as matter of law, that if the jury should find for the plaintiff, still he was not entitled to recover, except for what he had paid on the note in suit, *viz.* the difference between 474 dollars and 609 dollars, 59 cents, and the 165 dollars paid to *Sherwood*, the assignee of the note for 474 dollars ; because the balance due on the last-mentioned note could not be recovered out of *Sanford :* And the defendant prayed the court so to instruct the jury. *Sanford*, on the other hand, insisted, that as *Lyon* had obtained the full amount of the note of 609 dollars, 59 cents, from him and *Sherwood*, the verdict ought to be for the full amount of the note and interest.

The judge instructed the jury, That if they were satisfied from the testimony, that it was agreed between the defendant and *Lyon*, when the note and defeasance were executed, that the defeasance was not to be annexed to the note, but to be

kept by the defendant, so that the note might appear valid and unconditional, to enable *Lyon* to deceive and delay his creditors, by shewing the same to them, or with intent that *Lyon* should thereby be enabled to raise money thereon, by selling it to any person who might purchase the same, and that thereafter the defeasance should be set up as a defence; then the transaction was not honest, but was iniquitous and fraudulent, and the defeasance ought not to prevent a recovery on the note; otherwise, the defendant would be entitled to a verdict: and if they should find for the plaintiff, the amount of the note in suit, with interest, ought to be the rule of damages.

The jury returned a verdict for the plaintiff, with damages to the amount of the note and interest; and the defendant moved for a new trial.

*N. Smith,* in support of the motion, contended, 1. That the direction to the jury was incorrect, inasmuch as the cause was submitted to them on a point not in issue.   The replication states a fraudulent agreement, that the defendant should execute the defeasance that the defendant might *retain it in his possession,* and by means thereof *defeat any action* which should thereafter be brought on the note.   The agreement submitted to the jury is a very different one.   In the first place, it is *in the alternative;* and in the next place, it *differs,* in both branches of the alternative, from that stated in the replication.   The agreement stated in the first branch of the alternative, is, that the defeasance was to be kept by the defendants, *to enable Lyon to deceive and delay his creditors, by shewing it to them.*   In the other branch, the agreement is described or referred to, as having been made *with intent that Lyon should thereby be enabled to raise money* on the note.   The replication is silent as to any *intent to deceive or delay Lyon's creditors,* or *to enable him to raise money* on the note.   And here it is immaterial whether greater or less fraud might be effected, by means of the agreement put to the jury.   It is sufficient that it is *not the agreement in issue.*   The parties have a right to have the matter *in issue* tried, and not a matter *foreign* to the issue.

The correctness of the charge on this point, may be tested thus.   If the plaintiff, in proof of the agreement stated in his replication, had offered evidence of the agreement specified in the charge; and the defendant had objected to it, on the ground of a variance; would not the court have rejected it on

that ground ? If there had been no other evidence, must not *Fairfield,* the issue have been found against the plaintiff? And yet, accord- June, 1829. ing to the charge, the plaintiff was entitled to, and had, a ver-

Lyon
*v.*
Summers.

dict, on such evidence.

2. That in the event of a verdict for the plaintiff, the rule of damages must be the money paid by *Sanford.* This case is to be regarded, under the statute, as a suit in equity, with *Sanford, Lyon* and *Summers* before the court. The statute protects *Sanford* to the amount of the injury, which he has sustained ; and so far only. The same facts which establish the plaintiff's right of recovery in this case, will constitute a defence to a suit on the note for 474 dollars. Is it eqitable, then, that *Sanford* should be compensated for an injury which he has not sustained, and from which he is fully protected ?

*Sherman* and *Osborne,* contra, contended, 1. That the matter in issue was put to the jury in an unexceptionable manner. The plaintiff brings his action on a promissory note. The defendant sets up a defeasance as a defence. The plaintiff replies, that this defeasance was taken *fraudulently ;* on which issue is joined. The *gravamen* of the replication is, that you, the defendant, gave this note to a bankrupt, to carry into the world, and cheat with ; and therefore your pocket defeasance shall not protect you. The *fraud* is the substance. The agreement is not to be proved *as such.* It is only one of the circumstances attending the fraud, or at most the *instrument* of effecting it. It is not necessary to prove it, with the same precision, as where it is described in the declaration and made the foundation of the action. The charge submits to the jury substantially the same fraud, which is stated in the replication. *Lyon* would, of course, have the custody and controul of the note ; and might shew it to his creditors, to deceive them, or sell it to raise money. It is a well founded presumption, that the defendant *intended* the natural and probable consequences of the power, with which he armed this bankrupt.

2. That if the objection has in itself any solidity, it comes *too late.* The charge, unquestionably, required proof of a sufficient fraud to avoid the defeasance. If the defendant meant to avail himself of any variance between the fraud proved and that alleged in the replication, he should have made the point at the trial, either by objecting to the evidence before it went to the jury, or by praying the court to instruct the jury to disregard it.

Lyon
*v.*
Summers.

**3.** That if the plaintiff is entitled to recover any thing on the note in suit, the face of the note must be the rule of damages. *Sanford* paid for it its full value, in money and his own note. The court will grant relief commensurate with the injury sustained ; and this can be done only by giving the amount of the note and interest.   The only objection to this, is, that *Sanford,* when sued on his note for 474 dollars, may avoid it, on the same ground on which he now avoids the defeasance in the defendant's hands.   But can the defendant, a party to the fraud, interpose this objection ? Can he avail himself thus of his own fraud ? Shall he be permitted to say to *Sanford,* " I have cheated you in such a way, that you may get rid of your note ; and therefore, I will have the benefit of my own fraud, in this action ?" In *Montefiori* v. *Montefiori,* 1 *W. Bla.* 363. it was decided, that a note given fraudulently, to carry on a marriage treaty, was good against the maker, though given without consideration ; and Lord *Mansfield,* in delivering the opinion of the court, lays it down as a general proposition, that " no man shall set up his own iniquity as a defence, any more than as a cause of action."   Before the court will allow the defence in question, they will look at the consequence ; and that will be, not merely to give the defendant the benefit of his own fraud, but to throw the loss on to *Sherwood,* an innocent purchaser. Will a court of equity do this ?

DAGGETT, J.   It is not easy for any intelligent judge to look at this case, and not suspect, that this note was executed to enable the holder to practice a fraud.   It is true, that the note is not negotiable, not being payable to order.   By the rules of the common law, therefore, it cannot be assigned so as to vest the *legal* interest in any other person.   Still the assignment of such a note, transfers the equitable title, which will be recognized in a court of equity, and also in a court of law, and fully protected.   It must be sued in the name of the promisee, and is liable to all the equity which subsisted between the original parties.   Thus far and no farther, it is a note to *Andrew Lyon,* jr.   These principles are peculiar to our courts, and were considered and well illustrated, in the case of *Colbourn* v. *Rossiter,* 2 *Conn. Rep.* 503.   Our late statute, *May* 1822, page 19. is designed to give effect to this doctrine.

It appeared, that on the 2d of *November,* 1824, the defendant made the note ;—that the promisee was then " in low circumstances in point of property, much in debt, and destitute of pe-

cuniary credit ;" that it was *Lyon's* wish to raise money on the note, to relieve himself from his embarrassments, and that known to the defendant ; that *Sanford*, by virtue of the statute above cited, prosecutes the suit for his benefit, in the name of *Lyon;* and that both he and *Sherwood*, who took the note of *Sanford* by assignment, were ignorant of the defeasance set up. But a defeasance is set up ; and *that* with the facts pleaded, are said to constitute a bar to the suit. Here, an honest mind naturally inquires, why was not the defeasance annexed to the body of the note ? Why did it not assume the shape of a condition ? It is difficult to answer the question, without impeaching the integrity of the transaction.

<div align="right">*Fairfield,*<br>June, 1829.<br><br>Lyon<br>*v.*<br>Summers.</div>

But let us come nearer to the points made by the counsel for the defendant. Here, it is urged, that the charge of the judge does not present for the decision of the jury, the facts put in issue by the pleadings. Let us examine this position. The facts in issue are, substantially, whether *A. Lyon,* jr., being in low circumstances and destitute of credit, and that well known to the defendant, obtained this note to raise money and relieve himself from embarrassment : and whether the defeasance was fraudulently executed, to the end that it might be set up as a bar to a suit brought thereon, by any owner thereof. The court finds, as a fact agreed by the parties, that *Lyon* was a bankrupt, and the defendant knew it. The charge then proceeds, if the jury were satisfied from the testimony, that the defeasance was not to be annexed to the note, but kept by the defendant, so that *Lyon* might show an unconditional note to his creditors, to deceive and delay them ; *or* with the intent that he should raise money thereon, by a sale thereof ; and that the defeasance should be set up to defeat a recovery on the note ; then the transaction was not honest, but iniquitous ; and in that case, their verdict should be for the plaintiff.

The strength of the objection lies in this, *viz.* that the charge is in the disjunctive ;—either the note was made and the defeasance concealed to *deceive creditors, or* to enable *Lyon* to *sell the note* as unconditional, and the defeasance to be set up to prevent a recovery. Now, it is said, that by the pleadings, the latter fact only was put in issue, *viz.* whether the note was made unconditional to enable *Lyon* to *sell it,* and the jury might not have found that fact consistent with the charge, but simply the fact that it was made unconditional to *deceive and delay creditors.*

*Fairfield,*
June, 1829.

Lyon
*v.*
Summers.

The answer to this objection is, that the defeasance was fraudulent and ought not to prevail, if *either* of the purposes was to be effected. This is not denied in argument.

But this objection cannot now prevail, because this motion finds, that testimony was introduced, by the plaintiff, in support of *both* alternatives; and the controversy between the parties was, whether *either* of them was proved. To this testimony there was no objection. If the defendant had supposed, that from the state of the pleadings, any testimony was irrelevant to the issue, he should have objected to it; or, if casually introduced, he ought to have prayed the court to instruct the jury, that it did not bear on the issue. This is an obvious course. But is it to be endured, that when parties have been fully heard upon a material point, (for it is conceded that each of the alternatives was material, and, if found affirmatively, sufficient to destroy the defeasance) they are at liberty, on the ground of some technical rule, to try their cause again? In my view of the charge and the issue, the jury have found a fact sufficient to warrant a recovery for the plaintiff. Besides, to prevent such an evil as would be let in, by a practice of this kind, this Court adopted a rule, in 1826, (6 *Conn. Rep.* 327.) in these words: " In all motions for a new trial, the precise point *made by the party*, and the *precise opinion expressed by the court*, shall appear upon the face of the motion." No point like that now made, was made in the court below. Moreover, the great question was, whether the defeasance was fraudulent:—if so, it ought not to protect the defendant. That question is directly answered by the verdict.

Another ground alleged for a new trial, is, that the plaintiff is not entitled, on any principle, to recover the whole face of the note, but only the sum which he has paid; but that the court instructed the jury, that if they should find for the plaintiff, they ought to find the whole amount of the note. On a recurrence to facts, it appears, that when *Sanford*, the real plaintiff, bought the note of *Lyon*, he paid him for it, by his own note, 474 dollars, and the residue in money; and that he is a man of abundant property. The note for 474 dollars was given to *A. Lyon*, jr., and by him immediately thereafter sold to *John Sherwood*, who *paid Lyon the full value thereof;* and on the 26th of *November*, 1824, the real plaintiff paid on the note 165 dollars, both *Sanford* and *Sherwood being ignorant of the defeasance.* The only reason alleged why *Sanford* should not

recover the whole sum promised in the note to be paid, is, that he will not be obliged to pay any part of what now remains due on the note, if sued therefor. Suppose he does, it then follows, that the loss is thrown from one innocent man (*Sanford*) on to another (*Sherwood*), and that too by him who gave the note, and fraudulently attempted to avail himself of a private defeasance, taken and pocketed by the defendant, who aided *Lyon* in practising the fraud. This cannot be law, nor equity.

<div align="right"><em>Fairfield,</em><br>June, 1829.<br><br>Lyon<br><em>v.</em><br>Summers.</div>

" In all cases," says Chief Baron *Comyns,* "where a man has a temporal loss or damage, by the wrong of another, he may have an action upon the case to be repaired in damages." That principle would authorise a recovery in favour of *Sherwood* against the defendant, for the money paid to *Lyon,* through the fraud of the defendant. If so, I see not why *Sanford* should not recover it of the defendant, in this action on the note ; and in that case, he doubtless must pay his note to *Sherwood.* In this way, complete justice is done.

It seems to me, also, that no principle of analogy will uphold this claim of the defendant. If *A.* were to sue *B.* for fraud in the sale of a horse, it would be a bald defence, that *A.* sold the horse for a full price to *C.,* even though *C.* took the horse at his own risque. If the fraud, in such case, was proved, there must be a recovery to the extent of the injury.

The motion for a new trial must be denied.

HOSMER, Ch. J. and WILLIAMS, J. were of the same opinion.

PETERS, J. having been absent when the case was argued, and BISSELL, J. having been of counsel in the cause, gave no opinion.

<div align="right">New trial not to be granted.</div>

———◆———

The inhabitants of the town of READING *against* The inhabitants of the town of WESTON.

An absolute deed of land, given to secure the repayment of money loaned on usurious interest, may, as between the parties to such deed, be avoided, by parol proof of the usury.

But no person other than the oppressed party to a usurious contract, can avoid such contract, on the ground of usury.

*Fairfield,*
*June, 1829.*

Reading
*v.*
Weston.

A new trial having been granted, pursuant to the determination of this Court, *ante* 143, 149., the cause was tried again, at *Danbury, September* term, 1828, before *Peters*, J.

On this trial, as on the former, the case turned on the settlement of *Lucy Darling.* The absolute deed from *Joseph Burr* to her, dated the 19th of *March*, 1808, of a tract of land in *Reading*, of the value of 800 dollars, and the writing which she immediately gave back to him, as stated in the case made on the former trial, appeared in evidence. It appeared, also, that she immediately removed into the town of *Reading*, and there occupied a part of the estate so conveyed to her, and *Burr* the other part, for the term of five years.

The plaintiffs claimed and offered testimony to prove, 1st, that the part of the estate possessed by *Lucy Darling*, was of less value than 100 dollars ; 2ndly, that she occupied as tenant of *Burr*, and not in her own right ; 3rdly, that at the time of executing said deed and writing, it was usuriously and corruptly agreed, by the parties to those instruments, that she should loan to him the sum of 800 dollars, for the term of three years, and that he should repay it within that term, with lawful interest, and that, in addition to such interest, he should give her, for such loan and forbearance, the use of that part of the estate occupied by her, and keep her cow ; and that to secure the fulfilment of such usurious and corrupt agreement, and for no other consideration, *Burr* executed and delivered the deed. To the admission of this testimony the defendants objected, on these grounds : 1st, because the deed was absolute ; and 2dly, because the agreement could not be proved between the present parties. The judge admitted the testimony offered, and instructed the jury, that if such corrupt agreement was made, and the deed was given in fulfilment of it, they ought to return a verdict for the plaintiffs.

The jury found for the plaintiffs ; and the defendants moved for a new trial.

*N. Smith* and *Swift*, in support of the motion, contended, 1. That parol evidence is inadmissible, to shew, that an absolute deed is a mortgage. This results, first, from the principles of the common law. The contract being reduced to writing, the writing will be considered as embracing the *whole* contract ; and it cannot be *enlarged* or *varied* by parol. This is not a case of mistake. There was no deviation from the intention of

the parties. Secondly, the subject of the deed being an interest in land, a parol agreement concerning it is void by the statute of frauds and perjuries.

2. That this being an absolute deed, proof of usury was inadmissible to invalidate it. The rules of evidence are not altered, by the statute against usury. To make out usury in this case, you must prove a loan of money—and that it is secured by this deed. To do this, you must alter the nature of the instrument; you must convert one contract into another. You might as well change a deed into a lease, or a will, or a power of attorney. *Flint* v. *Sheldon,* 13 *Mass. Rep.* 443. In all cases of illegal considerations, you prove the illegality, and destroy the contract *as it is,* and not change it into a different one for this purpose.

3. That these parties cannot avail themselves of the usury, not being parties or privies to the contract. *Green* v. *Kemp,* 13 *Mass. Rep.* 515. *Bearce* v. *Barstow,* 9 *Mass. Rep.* 45. 48. *Bridge* & al. v. *Hubbard,* 15 *Mass. Rep.* 96, 103. *Whelpdale's* case, 5 *Rep.* 117. *Bac. Abr. tit.* Usury. E. *Bull. N. P.* 224. The party to the security must come in, and avoid it, by plea; otherwise no advantage can be taken of the usury.

*Sherman* and *Booth,* contra, insisted, 1. That parol testimony, notwithstanding the form of the deed, was admissible, to shew, that the land was conveyed to *Lucy Darling,* on a usurious consideration, and to secure a usurious loan. The opinion of the court given by *Jackson,* J. in *Flint* v. *Sheldon,* 13 *Mass. Rep.* 443. they denied to be law; and relied upon the decision of the Supreme Court of Errors of this state, in *Mitchell* v. *Preston,* 5 *Day* 100.

Admitting explicitly, that a usurious contract is voidable only, at the pleasure of the borrower, and not void; and that strangers to the contract cannot avoid it; they insisted, that an estate voidable at the will of the party creating it, is not such " a right in the fee of a real estate" as is contemplated by the statute. *Stat.* 280. *tit.* 51. *s.* 3. The object of the act was, to make the persons inhabitants of towns, who had the means of support, and would not, therefore, be likely to become chargeable. If *A.* should convey to *B.* in fee an estate of competent value, but should reserve to himself a right of entry, at any time within a given period, to avoid the estate; *B.,* although a tenant in fee, would not have such an estate in the

land as would confer a settlement under the statute, as his support, so far as it depended on the land, would be at the will of the grantor. In that case no stranger could take advantage of the right of entry; it would not be void, but voidable only; nevertheless, as it would not give a settlement, the town might shew the reservation. The deed in question, being usurious, conveys a title equally frail. The grantor may avoid the estate at pleasure. The title of *Lucy Darling*, depending on his will, is not such a right as in any manner satisfies the intent of the legislature. She has, by virtue of it, no support, of which *Burr* may not, at any time, deprive her. If this be so, the plaintiffs may prove the usury, not for the purpose of avoiding the deed, but to shew, that her estate was not of such a character as to give her a settlement in the town of *Reading*.

The counsel for the defendants, in reply, commented minutely on the case of *Mitchell* v. *Preston*. In that case, they observed, the court admit, that a contract, to be usurious, must be such as could be enforced aside from the statute against usury. They also insisted, that it must be such as could be enforced *in the same form ;*—not such as might be enforced, when changed into a different form. It would not then be the same contract. Now, how could the contract in question be enforced, laying usury out of the case ? Not as a mortgage ; for you cannot have a parol mortgage. The borrower can do nothing to resist this deed or any claim under it. By this decision, you must first prove a contract capable of being enforced ; and then you may prevent its being enforced, by proof of usury. It is a security, the court say, because the land is of more value than the money paid : the grantee has got the usurious interest already. Admit that he has ; the excess only can be recovered back.

HOSMER, Ch. J. The first objection made assumes the broad ground, that as between the parties to the deed, usury is an inadmissible plea, because the deed is absolute.

Considering it as absolute, (whether it be so or not) I am of opinion, that the testimony was admissible as between the parties to the deed, notwithstanding the determination in *Flint* v. *Sheldon*, 13 *Mass. Rep.* 443. in a neighbouring state, to which I cannot subscribe.

The words of the statute prohibiting usury are very broad.

The law invalidates not only " all bonds and contracts" made *Fairfield,* for the payment of usury, but " all mortgages and assurances." June, 1829. An absolute deed is both a contract and an assurance ; (2 *Bla.* *Comm.* 294.) and therefore, is within the letter of the law. That it is within the object of it, is equally unquestionable· The act was made to prevent usurious oppression in every case, regardless of the face or form of a transaction, with whatever garb it may be clothed, and whatever device it may assume. *Lowe* v. *Waller, Doug.* 736. *Jestons* v. *Brooke, Cowp.* 793. 796. *Massa* v. *Dauling,* 2 *Stra.* 1243. *Tate* v. *Wellings,* 3 *Term Rep.* 521, 538. *Rich* v. *Topping,* 1 *Esp. Rep.* 176. *Atkinson* v. *Scott,* 1 *Bay* 303. *Carter* q. t. v. *Brand,* 1 *Cam. & Nor.* 28. 5 *Rep.* 69 *b.* Many evasions of the statute have been attempted ; but the courts have uniformly supported its spirit, by stripping off every disguise, however plausible or specious, and unveiling the corrupt transaction.

Absolute conveyances, both of land and personal property, have been invalidated on proof of usury. *Bro. tit.* Usury. *pl.* 1. *Carter* and *Claycole's* case, 1 *Leon.* 307. *Peterson's* case, *Cro. Eliz.* 104. *Doe* d. *Davidson* v. *Barnard,* 1 *Esp. Rep.* 11. And in *Mitchell* v *Preston,* 5 *Day* 100. it was determined, by this Court, that an absolute deed of land, made to secure an usurious loan, was void.

As between the parties, then, the testimony offered would be admissible ; but the plaintiffs, in this case, were not a party.

This raises the question, whether those who are not a party to an usurious transaction, may be admitted to invalidate a deed, for the usury, with which such persons have not been, and could not be, oppressed.

It has been long and uniformly established law, that one not a party to an usurious contract, may not, for this cause, invalidate it. *Whelpdale's* case, 5 *Rep.* 119. *Bull. N. P.* 224. *Carter* and *Claycole's* case, 1 *Leon.* 307. *Ord* on *Usury* 105. 110. *Bearce* v. *Barstow,* 9 *Mass. Rep.* 45. *Green* v. *Kemp* 15 *Mass. Rep.* 515. The reason is extremely obvious. The' law of usury was made to prevent oppression, and to rescue the party oppressed ; but it never was intended for the benefit of those, who are not, and cannot be, injured, by an usurious transaction. It falls within that class of statutes, in which, although a contract is declared to be utterly void, it is voidable only, at the election of the oppressed party. *Lincoln College* case, 3 *Rep.* 58. *Whelpdale's* case, 5 *Rep.* 119. To actions

*Fairfield,*
June, 1829.

Reading
*v.*
Weston.

of this sort applies the maxim, *Quisquis potest renunciare juri pro se introducto.*   In cases of small oppression, an individual, influenced by a principle of justice, or a nice sense of honour, may waive the benefit of avoiding an usurious contract, as being utterly disproportioned to the meditated wrong.   Why should he not be permitted to do it?   And on what good reason may a stranger to an usurious agreement be suffered to do what the party in interest may consider as incompatible with honour and integrity?

I think it extremely clear, that the evidence offered was in-admissible *in behalf of the plaintiffs;* and for this cause, that a new trial ought to be advised.

The other Judges were of the same opinion, except DAG-GETT, J., who gave no opinion, having been of counsel in the cause.

New trial to be granted.

---

THE STATE OF CONNECTICUT *against* BENHAM:

IN ERROR.

The having in one's possession several forged bank notes of different banks, at one time, with intent to pass them, and thereby to defraud the person who shall take them, constitutes but one offence.

And if there be several informations, charging, that the several bills so held in possession, were held with intent to defraud the several banks, by which they were issued, as well as the person who should take them, there is still but one offence charged.

A verdict of *guilty*, on which judgment impends, on one such information, is a bar to a subsequent information, founded on the possession of any part of the same parcel of bills.

THIS was an information, charging the prisoner, *Amos Benham*, with having in his possession, on the 26th of *December*, 1828, a forged bank note or bill of the *Troy Bank*, with intention to alter and pass the same, and with intention to defraud the said *Bank of Troy*, and also him or them to whom he should utter or pass the same, knowing it to be forged.

To this information the prisoner pleaded a former information filed against him, at the same term, for having in his possession a bank note of the *Mechanics' Bank* in the city of *New-York*, with intent to utter and pass the same, and with intent

to defraud the said *Mechanics' Bank,* and also him or them to whom he should pass the same; upon which last information, the plea averred, trial had been had, the prisoner had been found *guilty,* and judgment thereon impends.   The plea also averred, that the offence charged in the information, upon which the prisoner had been convicted, is the same offence wherewith he is charged in the present information; and that the said bank note specified in that information, was held, by the prisoner, on said 26th day of *December,* 1828, at the same time and place, and with the same intent, and with the same knowledge of its being forged; and that it was in the same parcel, and was finally taken, at the same time, from his possession, and was never, at any different time, in his possession.

To this plea there was a demurrer.   The court adjudged the plea sufficient; and to revise that decision, the attorney for the state, by motion in error, brought the case before this Court.

*N. Smith* and *S. H. Miner,* for the plaintiff in error, contended, 1. That the having in one's possession the bills of different banks, with intent to defraud different institutions, constituted distinct offences, although such bills were contained in the same parcel, and were possessed, by the accused, at the same time and place.

2. That a former verdict finding the prisoner guilty, without any judgment thereon, is not a bar.

*Sherman* and *Betts,* for the defendant in error, insisted, 1. That the act of possessing one parcel of bills, at the same time, with intention to pass the same, and thereby to defraud any person or corporation, was an indivisible act, and constituted but one offence.   Both informations contain an averment, that the prisoner possessed the bill with intention to defraud him or them to whom he should pass the same.   This lays a sufficient foundation for the averment in the plea, that the intent, in both cases, was the same.   The demurrer admits the truth of this averment, if it can be true, consistently with the other matters disclosed.   What is said of an intent to defraud the several banks, may be rejected as superfluous.   This is then precisely analogous to the case of a person's *stealing* several bills, or pieces of coin, or articles of property, at the same time, and by the same act.   It will not be claimed, that such an act would constitute more than one offence.

2. That where a person has once been *convicted* of an offence,

<div style="text-align: right">
*Fairfield,*
June, 1829.

State,
*v.*
Benham.
</div>

whether judgment has been actually rendered or still impends, he cannot be tried again for the same offence. The principle is, that no man shall be *in peril* more than once for the same offence. 1 *Chitt. C. L.* 368.

WILLIAMS, J. The statute, upon which this information is founded, enacts : " That if any person shall have in possession, or receive from any other person, any forged or counterfeited promissory note or bill, for the payment of money, with intention to utter or pass the same, or to permit, cause or procure the same to be uttered or passed, with intention to defraud any person, or body politic or corporate, knowing the same to be forged or counterfeited; every such person, so offending, being thereof duly convicted, shall suffer imprisonment," &c. *Stat.* 157. *tit.* 22. *s.* 35. The prisoner had in his possession, at one time, several bank notes or bills of different banks, which were taken from him at one time. He has been tried for having one of them in his possession, and convicted ; and the question now is, whether he can be again tried and convicted for possessing each of the other notes of the different banks, which he had at that time : In other words, is the possession of each bill or note, holden at one and the same time, a distinct offence, and punishable as a distinct crime ?

Until the late revision of our statutes, it was not punishable by statute, to have in one's possession forged notes or counterfeited coin. The offence consisted in uttering or putting them off. Now the possession is punishable in the same manner as the offence of uttering them is. But it cannot be supposed, that the legislature intended to punish the offence of possessing such bills or notes, or coin, more severely than the crime of putting them off; or that they should punish the man, who barely intended to defraud, but had not yet offered to, more severely than the one, who had put that intent into execution. And if *Benham* had put off these two notes to one person, at one time, it cannot be claimed, that he could be convicted of more than one offence. And yet it is claimed, that having them in his possession, although he has never offered to put them off, he may be punished for more than one offence.

In support of this, it is said, that the notes are issued by different banks, and the intent charged is, to defraud the two different banks specified, *viz.* the *Troy Bank* and the *Mechanics' Bank,* as well as the persons to whom the notes might be put

off. If a charge of defrauding the several banks constitutes two distinct offences, then the offence of uttering these two notes to the same person, at the same time, would be two offences ; because the intent might properly be charged as an intent to defraud each of the banks, as well as the persons to whom they were put off.

But, as in that case, the putting off a note, with intent to defraud the persons to whom it was put off, would be sufficient to convict, whether there was any attempt to defraud the bank or not, as was recently decided in *England*, by the twelve judges; so in this case, as it is charged in both informations, that the intention was to defraud the persons to whom the notes might be put off, *that* would be sufficient to justify the conviction ; and all that is necessary to constitute the identity of the offence, is, that the same evidence would convict. Here the same evidence of possession exists in both cases;—the same general attempt to defraud the persons to whom they may be passed. The act of possessing the several notes, then, must be one and the same offence, as much as the act of stealing a number of articles, at the same time and place.

It was admitted in argument, that he who had counterfeit coins in his possession, could not, under the 32nd section, be punished as for distinct offences, for each piece of counterfeit coin he might have. The offence is, certainly, of the same character with this ; and it is difficult to believe, that the legislature intended to punish them in so different a manner. It is true, that in that section the statute speaks of gold and silver *coins ;* but it will hardly be contended, that if a person has a single counterfeit eagle in his possession, with intent to pass it, knowing that it is counterfeit, he is not within the statute. The difference in phraseology, therefore, it is believed, will make no difference in the construction. The object of the legislature, in both cases, is to prevent a person from altering or having in his possession base money. And it has been decided, that a person indicted for stealing nine one-pound notes, may be convicted upon proof of stealing only one. *Rex* v. *Johnson,* 3 *Mau. & Selw.* 539. 548. *Rex* v. *Clark,* 1 *Brod. & Bing.* 473. There the substance of the offence is stealing notes : here the substance of the offence is having in possession counterfeit bills or notes. The number may add to the evidence of guilt, but not to the number of the offences. In an action for the penalty for insuring tickets in the lottery, where ten tickets were

insured at one and the same time, Lord *Kenyon* held, that but one penalty could be recovered.   *Holland* q. t. v. *Duffin*, *Peake's Ca.* 58.

This information might have specified each note, which the prisoner had in his possession, as was done in several cases cited in *The King* v. *Sutton, Ca. tem. Hardw.* 372.   Had that been done, it would hardly be claimed, that there could have been several punishments.   The offence, then, is one and the same offence.

Another objection was made to this plea, but not much insisted on, that if this is the same offence, it is not pleaded so as to avail the defendant.   The plea is, that a verdict was rendered, and judgment now impends.   And here it must be admitted, that a previous acquittal, conviction or attainder, is a good bar; but what shall be the evidence of such conviction, is the enquiry.

That a person had been *arraigned* for the same offence, was early held to be no bar to a subsequent indictment.   *Withipole's* case, *Cro. Car.* 147.   Nor that a *nolle prosequi* had been entered by the attorney for the government.   *Commonwealth* v. *Wheeler* & al. 2 *Mass. Rep.* 272.   Nor that the jury had been discharged, at the request of the prisoner.   *Rex* v. *Kinlock*, 1 *Wils.* 157.   Nor even where the jury have been discharged because they could not agree, without consent of the prisoner.   *State* v. *Woodruff*, 2 *Day*, 504.   *The People* v. *Olcott*, 2 *Johns. Ca.* 301.   Nor can the *pendency* of another indictment be pleaded in abatement, as it may in case of a prosecution for a penalty.   *Rex* v. *Stratton, Doug.* 240.   *Regina* v. *Goddard* & al. 2 *Ld. Raym.* 920.   S. C. 3 *Salk.* 171. Nor can a conviction or an acquittal be pleaded, if the former indictment was not sufficient to authorize punishment, if a conviction had ensued.   *The King* v. *Taylor*, 3 *B. & C.* 502.   4 *Co.* 45.   1 *Chitt. Cr. L.* 462.   And it has been said, that if the defendant remains after conviction, without requesting judgment, or praying for clergy, he could not plead such conviction to a new indictment.   2 *Hale's P. C.* 252.   *Stark. C. L.* 364.

That no one, however, shall be put in jeopardy twice for the same offence, is a universal maxim, (4 *Bla. Comm.* 329.) thought worthy to be incorporated, to a certain extent, into the constitution of the *United States*.   And that an acquittal or conviction, by a court having jurisdiction, on a sufficient indictment

or information, is, in all cases whatsoever, a bar, is equally *Fairfield,* clear.  2 *Hawk. P. C. b.* 2. *c.* 30. *s.* 1.   2 *Leon.* 161.   Still *June, 1829.* the question returns, what is sufficient evidence ?  Is it the verdict, or the verdict and judgment ?   It is said by *Chitty,* that there must be a legal acquittal by judgment upon trial, by verdict of a petty jury or by battle.  1 *Chitt. C. L.* 457.  *Tucker,* in his notes to *Blackstone,* says ; the plea must state the indictment, arraignment, plea and judgment *legitimo modo.*   4 *Bla. Comm.* 336. by *Tucker.*   And in the forms of pleading, a judgment is set out, or that the defendant has had his clergy. *Stark. C. L.* 352.   And the general rule certainly is, that a verdict without a judgment is not evidence, as it may be arrested.   The record of the judgment, therefore, must be adduced, to exclude a witness.  *Swift's Ev.* 18.  1 *Stark. Ev.* 183. 246. 2 *Stark. Ev.* 716.  *Lee* v. *Gansel, Cowp.* 3.  *The Commonwealth* v. *Green,* 17 *Mass. Rep.* 537.   So proof of conviction of the principal, on the trial of the accessory, must be by judgment upon a verdict or confession, or by outlawry.   4 *Co.* 43.  *Goff* v. *Byby* & al. *Cro. Eliz.* 540.

On the other hand, it is said, in 4 *Bla. Comm.* 335. that when one is found *not guilty,* on an indictment or other prosecution, he may plead such acquittal in bar of any subsequent prosecution.   And an acquittal has been held sufficient to entitle bail to their discharge before judgment is entered.  *Rex* v. *Spenser,* 1 *Wils.* 315.   And in the case of *The Queen* v. *Goddard,* 2 *Ld. Raym.* 921.   S. C. 3 *Salk.* 172.  *Holt,* Ch. J. says, that another indictment pending could not be pleaded in abatement, even after the accused had been found guilty upon it, but it must be pleaded in bar.  And Judge *Dane,* after citing an authority to shew, that a judgment is necessary, makes a *quære ;* for, says he, when the defendant has once stood trial for his life, he has been clearly once in jeopardy, though there has been no judgment or clergy.   6 *Dane's Abr.* 531.   And in *Brooke's* case, 4 *Co.* 40. after verdict of *guilty,* on an appeal and motion in arrest, on an indictment at the suit of the king, it was claimed, that the defendant could not be charged again, and it was resolved, that " if the count had been sufficient, then being convicted at the suit of the party, he should not be again convicted at the suit of the king :" and the same principle is recognized, in *Vaux's* case, 4 *Co.* 45.  1 *Chitt. C. L.* 462. 464. & seq..   Had not a verdict been sufficient, it is not easy to see how the sufficiency of the count came to be considered.   And in *Withipole's* case, *Cro. Car.* 147. the court

*Fairfield,*
June, 1829.

State
*v.*
Benham.

quashed one of two indictments, lest the prisoner should be questioned on both.  And in *Rex* v. *Kinlock,* 1 *Wils.* 157. *Wright,* J., against the other Judges, held, that to call a new jury would be to put the prisoner twice in jeopardy, although the former jury was discharged at his request; and upon report thereof, the prisoner was pardoned.

An accessory may be put on trial before judgment against the principal, but cannot be sentenced until after judgment against the principal; as in the recent case of *Elsie Whipple,* 9 *Cowen* 707.  And in a civil case, where a judgment was not rendered, but a verdict taken before a justice, was pleaded in bar, it was held a valid bar, as the justice could not arrest the judgment, or grant a new trial.  *Felter* v. *Mulliner,* 2 *Johns. Rep.* 181.

When, then, we consider the extreme jealousy, which the common law evinces on this subject, supported by the provisions of the constitution; when we find no case where a prosecution has been sustained after verdict upon a sufficient count; and amidst so much doubt whether the legal principle as to the necessity of a judgment, has been extended to cases of this kind; when we further find, that both these prosecutions are in the same court, and no claim is made that judgment cannot be rendered upon the first verdict, I think the more correct rule to adopt is, that under such circumstances, a second information ought not to be supported, although judgment had not been actually entered upon the first, at the time of pleading.

I would, therefore, affirm the judgment of the superior court.

The other Judges were of the same opinion; PETERS, J. doubting.

Judgment affirmed.

---

## CORNWALL *against* HOYT.

It seems to be the better opinion, that a chose in action accruing to the wife during coverture, vests absolutely in the husband, and can be sued only by him or his representatives.

But where the husband, a citizen of this state, during the revolutionary war, abandoned his country, and joined with its enemies; in consequence of which his estate was confiscated according to law; out of which an allowance was made to his wife, who continued to reside in this state; and in 1789, a writing was given to her, while her husband remained abroad, to

secure to her the payment of an annual sum of money, during her life, for the rent of the estate so allotted to her; in a suit brought by her on such writing, after the death of her husband, it was held, 1. that such suit was sustainable; 2. that the treaty of peace between *Great Britain* and the *United States* did not affect the capacity of the wife; and 3. that lapse of time, after the making of the promise and before the several annuities became due, afforded no presumption of payment or relinquishment of the contract, although seventeen years, unexplained, might be evidence that all sums payable so long before the date of the writ, had been paid.

Writings given as leases of land, though not executed so as to transfer a title or interest in land, may be received in evidence, to shew, that the defendant and others under him, occupied the land, by permission of the plaintiff.

THIS was an action on a note or writing in the following terms : " I, *Moses Hoyt*, of *New-Fairfield*, promise to pay to *Mary Cornwall*, of *New-Fairfield* aforesaid, the sum of forty shillings, lawfully money of this state, annually, during the term of her natural life, payable in any sort of produce of this state, or merchants' goods, at the common market price, to be delivered to her, or her order, at the place where said *Hoyt* now dwells in *New-Fairfield*; it being for the use or rent of a certain piece of land, leased to the said *Moses Hoyt*, by said *Mary Cornwall*; and if said land shall be taken from said *Hoyt*, by lawful authority, the above obligation to be null and void, otherwise to be in full force and virtue. In witness whereof, I have hereunto set my hand, this 3d day of *May*, 1789.

[Signed.] *Moses Hoyt.*"

The defendant pleaded, 1st, the general issue; 2ndly, full payment.

The cause was tried at *Fairfield*, at an adjourned term in *April*, 1829, before *Daggett*, J.

On the trial, the plaintiff, after proving the execution of the note, gave in evidence a lease from her to the defendant, of the land mentioned in the note, of even date therewith, accompanied with proof that the defendant entered upon and occupied the premises until *February* 1795, when he removed to the city of *New-York*, where he has ever since resided. The plaintiff also gave in evidence a writing signed by the defendant, not under seal or acknowledged or recorded, dated *February* 24th, 1795, purporting to be a lease of the premises, to *William Wakeman*, during the life of the plaintiff, accompanied with proof, that *Wakeman* entered upon and occupied the premises until the 11th of *June*, 1803; that he then leased them to *Eliphalet Bradley*, by a lease of that date produced in court, during the life of the plaintiff; that under this lease,

*Fairfield,*
June, 1829.

Cornwall
*v.*
Hoyt.

*Bradley* entered upon and occupied the premises until his death in 1819 ; and that his son and executor had occupied them since. To the admission of these documents, particularly, the writing given by the defendant to *Wakeman,* the defendant objected ; but the judge admitted them.

The plaintiff also proved, by sundry records of the county court for *Fairfield* county, and of the court of probate for the district of *Danbury,* that during the war of the revolution, and before the month of *September* 1778, *John Cornwall,* then the husband of the plaintiff, left the *United States* and joined himself to their enemies ; that all his real estate, including the premises, was confiscated pursuant to laws then existing, and became vested in this state ; and that a portion thereof, being the premises, was, by the court of probate, set off to the plaintiff and her then minor children ;(*a*) that the plaintiff continued to

(*a*) In *May,* 1778, the General Assembly of this State passed an act, providing, in the 1st paragraph : " That all estates real and personal, lying and being within this State, which belong to any person or persons whatever, who have heretofore, voluntarily gone over to, joined with and screened themselves under the protection of, the enemies of the *United States* of *America* ; or have aided and assisted them in their hostile measures against said States, and have continued so to do, until the passing of this act ; or who shall hereafter voluntarily go over to, join with, and screen themselves under the protection of, or shall aid, abet and assist said enemies in their measures as aforesaid ; shall be forfeited to and for the use of this State : to be proceeded with, confiscated, held and improved as in this act is hereafter directed." The act then made it the duty of the select-men of the several towns in this State to give information to the next assistant or justice of the peace of persons owning estates within this State, which were, or ought to be, forfeited, by the conduct of their owners ; and directed such assistant or justice of the peace to summon the party informed against to appear before the county court, to shew reasons why such estate should not be adjudged forfeit. After providing for the service of the process, the act proceeded thus : " Which said court, at any session thereof, are authorized, impowered and directed to take cognizance thereof, and proceed duly to enquire into the truth of the facts alleged ; and on finding the same to be justly founded and true, shall give judgment and sentence, that all the estate, real and personal, of such person shall be forfeited to and for the use of this State : a copy of which judgment shall be, by the clerk of such court, forthwith transmitted and certified to the court of probate of the district wherein the estate so adjudged forfeit, or the greatest part thereof, shall be ; which court shall thereupon, as soon as may be, grant administration of such estate to some faithful and meet person or persons, taking sufficient bond with surety, as in case of intestate estates, for a due and faithful performance of his or their duty as administrator according to law ; and said administrator shall, within twenty days after such appointment, exhibit to said court an inventory of all the estate, which shall come to his knowledge, that belonged to such inimical

reside in *New-Fairfield,* for several years after the execution of the note, and then went to her husband in *Canada,* where she has ever since resided, and where she now resides ; that her husband died there in 1817, having never returned to the *United States.*

It was admitted, that the defendant paid the stipulated rent until *May* 1794, and that no payment had been made thereon since ; though it was proved, that the defendant had said, since the service of the writ, that " he had paid the rent for four or five years, but had paid none since—that there was no agent to pay the rent to—and that the claim was a devilish forty years old thing, hatched up against him."

Upon these facts the plaintiff claimed to recover. The defendant insisted, that, from the lapse of time the jury ought to presume the note paid, and her title to the annuity extinguished ; that as she was a feme covert, when the note was given, no right of action thereon ever vested in her ; that the note was invalid for want of consideration ; and that, by the treaty of peace of 1783, *John Cornwall* was restored to all his rights ; and therefore, the plaintiff could not recover ; and the defendant prayed the court so to charge the jury. The court charged the jury, that the plaintiff might recover ; for the note, upon the testimony, ought not to be presumed to be paid ; as the defendant had always since its date, except for a few of the first years, resided out of this state, and had, within two or three years past, acknowledged its existence, and that he had paid the stipulated rent only for three or four years ; and as *John Cornwall,* the husband, had no right or interest in the land, but the title thereto was, by the laws of *Connecticut,* vested in her : that in estimating the damages, however, the jury might consider the annuity paid up to a period seventeen years before the date of the writ.

<div style="margin-left:2em">

*Fairfield,*
June, 1829.

Cornwall
*v.*
Hoyt.

</div>

person, and as appraised by such persons under oath as shall be appointed by said judge."

By a subsequent paragraph of this act, it was provided : " That said judge of probate shall, at the time of granting such administration, appoint two or more judicious, disinterested persons commissioners to examine and adjust the claims of the creditors to such estate, who shall proceed in the same way, have the same powers and be under the same regulations, as commissioners on insolvent estates by law have and are ; and shall make return of their doings to said court, in such time as said judge shall limit. And on such return, said judge of probate *shall make such allowance to the wife and family* of such person (if such there be) as, *on consideration of their circumstances,* shall appear reasonable and just."

*Fairfield,*
June, 1829.

Cornwall
*v.*
Hoyt.

The jury returned a verdict for the plaintiff; and the defendant moved for a new trial, on the ground that the evidence objected to was improperly admitted, and that the charge was erroneous.

*M. B. Whittlesey* and *Sherman,* in support of the motion, contended,  1. That the note in suit, as soon as it was given, became the property of the husband; and consequently, on his death, it went to his personal representatives, and did not survive to his wife. *Barlow* v. *Bishop,* 1 *East* 432.  1 *Swift's Dig.* 28.  *Reeve's Dom. Rel.* 127.  *Griswold* v. *Penniman* & al. 2 *Conn. Rep.* 564.  *Fitch* v. *Ayer,* 2 *Conn. Rep.* 143.

2. That there was nothing in the peculiar circumstances of this case to deliver it from the general rule.  The husband was guilty of no crime or breach of duty towards his wife.  He went away leaving her in possession of his estate.  Here was *no desertion* of *her.*  Nor had he been exiled or banished, by the government.  As to an *abjuration of the realm,* there is not, and since the time of *James* I. there cannot be, any such thing.  There is nothing here in favour of the plaintiff to distinguish the case from *Bogget* v. *Frier* & al. 11 *East* 301.

3. That by the treaty of peace, in 1783, and the treaty in 1794, the condition of *John Cornwall* (whatever it might have been before) became what it would have been, had he been born in *Canada,* and had not taken up arms against this country.(*b*)

(*b*) The 5th article of the treaty between *Great Britain* and the *United States* of *America,* concluded at *Paris, September* 3rd, 1783, usually called the *treaty of peace,* contained the following provisions : " Art. 5. It is agreed that the congress shall earnestly recommend it to the legislatures of the respective states, to provide for the restitution of all estates, rights and properties, which have been confiscated, belonging to real *British* subjects, and also of the estates, rights and properties of persons resident in districts in possession of His Majesty's arms, and who have not borne arms against the *United States.*"

The 6th article of the same treaty is as follows : "Art. 6. That there shall be no future confiscations made, nor any prosecutions commenced against any person or persons, for or by reason of the part, which he or they may have taken in the present war ; and that no person shall, on that account, suffer any future loss or damage, either in his person, liberty or property ; and that those who may be in confinement on such charges, at the time of the ratification of the treaty in *America,* shall be immediately set at liberty, and the prosecutions so commenced be discontinued."

The 9th article of the treaty between the same parties, concluded at *London, November* 19th, 1794, usually called *Jay's treaty,* is as follows : "Art. 9. It is agreed, that *British* subjects, who now hold lands in the territories of the

His condition was not different from that of any other *British* subject.   But a *foreigner* has the same rights in relation to his wife's estate, that a citizen has.

4. That the lapse of time, *viz.* from 1794 to 1826, afforded a sufficient presumption of payment, and so the jury should have been instructed.   The defendant's living in *New-York*, was no impediment to the collection of the note.

5. That the writings given in evidence by the plaintiff, were improperly admitted, as they were not executed in such a manner as to transfer a title, and they were irrelevant for any other purpose.   [This point was not much insisted on.]

*N. Smith* and *Betts*, contra, contended,   1. That as the contract in question was an express one, made to the wife, and as she was the meritorious cause of action ; the right of action survives to her.   1 *Chitt. Plead.* 16. 17. 20.   *Philliskirk* & ux. v. *Pluckwell*, 2 *Mau. & Selw.* 393.   *Draper* v. *Jackson* & ux. 16 *Mass. Rep.* 480.

2. That under the peculiar circumstances of this case, the plaintiff is, at all events, entitled to the money.   When the note was given, the husband was disabled to sue in her right, and was *civiliter mortuus*.   If she could not sue, what was to become of her ?   2 *Stark. Ev.* 690. and n. *y. z.*   1 *Pow. Cont.* 75.   *Gregory* v. *Paul*, 15 *Mass. Rep.* 31. 34.   But this case is much stronger than where the husband is banished or transported.   The husband of the plaintiff was in the situation of a convicted traitor.   He became not merely an outlaw, but an alien enemy.

Further ; aside from the disability of the husband, the act of *May*, 1778, in direct terms, gave the property in question to the wife.   It was an allowance made to her, by the judge of probate, under the statute.   The title was vested in her absolutely, by express statutory provision.   This, of course, gave her all the power necessary for the enjoyment of the property.

3. That neither the treaty of peace, nor *Jay's* treaty, had any effect on this case.   In the first place, there is no provis-

*United States*, and *American* citizens, who now hold lands in the dominions of His Majesty, shall continue to hold them according to the nature and tenure of their respective estates and titles therein ; and may grant, sell, or devise the same to whom they please, in like manner as if they were natives ; and that neither they, nor their heirs or assigns shall, so far as may respect the said lands and the legal remedies incident thereto, be regarded as aliens,"

*Fairfield,*
June, 1829.

Cornwall
*v.*
Hoyt.

ion in either of these documents applicable to persons in the situation of *John Cornwall.* Secondly, there is no provision making restitution of the forfeited rights of any class of persons. Thirdly, *John Cornwall* has done nothing to avail himself of any provision in his favour.

4. That the charge was unexceptionable in regard to presumption of payment from lapse of time. Surely, no presumption of payment could arise until the money became due ; and as to all the annuities which had been due seventeen years, the court did leave it to the jury to presume them paid. Lapse of time is not a bar, nor conclusive evidence of payment.

5. That the documents given in evidence by the plaintiff, were properly admitted.

PETERS, J. I. It has long been a moot point, whether a note or bond given to a wife, was suable in the name of the husband, or whether she may join in the action. If the property be his, she cannot join : if it be hers, she *must* join. By the common law, the chattels personal of the wife, are vested in the husband *absolutely*, but choses in action *conditionally,—i. e.* they are his, if he reduce them to possession during the coverture ; otherwise, they revert to her, or her representatives. There are a multitude of cases wherein the same rule has been applied to choses in action given to the wife during the coverture, especially where she is the meritorious cause of action— *i. e.* where the consideration of the promise arises from her property or personal labour,—though it is a truism, that a wife has no personal property, and that all her earnings vest in her husband. *Pratt* & ux. v. *Taylor, Cro. Eliz.* 61. *Cookston* & ux. v. *Castline, Cro. Eliz.* 96. *Brashford* v. *Buckingham* & ux. *Cro. Jac.* 77. *Philliskirk* & ux. v. *Pluckwell,* 2 *Mau. & Selw.* 393. 1 *Chitt. Plead.* 19. and the cases there cited. But it seems to be the better opinion, that a note to a wife, is payable to the husband, and can be sued by him or his representatives only ; and so it was decided in *Barlow* v. *Bishop,* 1 *East,* 432. where a note was given to the wife, indorsed by her, and sued by the indorsee. The court said : " It is clear, that the delivery of the note to the wife vested the interest in her husband." The authority of the case is recognized, by this Court, in *Griswold* v. *Penniman,* 2 *Conn. Rep.* 564. 566. wherein the late Chief Justice, in delivering their unanimous opinion, *inter alia,* said : " As to the property of the wife accruing dur-

ing coverture, the same rule [*ut ante*] is applicable, excepting
in regard to choses in action. These vest absolutely in the husband." "Where a bond or note is given to the wife, the
husband can maintain an action in his own name." A similar opinion was expressed, by the same Court, in *Fitch* v. *Ayer*, 2 *Conn. Rep.* 143. 145. where a legacy was given to the wife during coverture. "It is, in effect, and by law, a gift to the husband himself." Vid. 1 *Swift's Dig.* 28.

But a decision of this question is, perhaps, unnecessary ; as it appears of record, and may be reviewed, by writ of error.

2. Whatever may be the law relative to a chose in action accruing to the wife during the coverture, in ordinary cases, it cannot affect the plaintiff. Her husband abandoned his country, and joined with its enemies *bello flagrante*, and thereby became not an alien, but a traitor. *McIlvaine* v. *Coxe's Lessee*, 4 *Cranch* 209. And the question now is, what effect did this have upon the capacity of his wife ? Before this event, she could neither sue, nor be sued, *ex contractu ;* as her legal existence was merged in that of her husband. *Co. Litt.* 112. 1 *Bla. Comm.* 442. By the common law, when a husband is banished, abjures the realm or goes into exile, he becomes *civiliter mortuus ;* and the wife's power of contracting, suing and being sued, revives. *Derry* v. Duchess of *Mazarine*, 1 *Ld. Raym.* 147. Lady *Belknap's* case, *Co. Litt.* 132. *b.* The case of *Margerie de Mose*, wife of *Thomas* of *Wayland*, *Co. Litt.* 133. *a.* And I can perceive no difference between alien enemies and a traitor who has joined them. "Under *banishment*," says the late Ch. J. *Swift*, "is comprehended what, in more modern times, would be called *transportation ;* and it has been determined, that where a husband has been banished for a limited time, which had not expired, the wife might be sued as a feme sole." 1 *Swift's Dig.* 36. *Gregory* v. *Paul*, 15 *Mass. Rep.* 31. 33. "On the same principle," he proceeds, where a husband has been sentenced to new-gate, or any of the public prisons in the *United States*, for life, or even for a shorter time, it would seem the wife ought to have the same power to make contracts and to sue and be sued, as a feme sole ; for there is the same reason and the same necessity, as in the case of banishment. It is sufficient if the husband was in banishment, when the contract was made ; or if it had expired, that he had not returned. *De Gaillon* v. *L'Aigle*, 1 *Bos. & Pull.* 357. *Bogget* v. *Frier* & al. 11 *East*, 301.

*Fairfield,*
June, 1829.

Cornwall
*v.*
Hoyt.

3. The treaty did not restore the rights of *John Cornwall.* It stipulates, indeed, that Congress shall recommend the restitution of all confiscated estates belonging to *real British* subjects and others resident in districts protected by His Majesty's arms, who had not borne arms against the *United States.* But this man was not a *British* subject, but a rebellious citizen ; and the presumption is, that he bore arms against the *United States;* for he joined with their enemies, and never requested restitution, which Congress did recommend, but had no power to enforce.

4. The statute of limitations had no effect on the plaintiff's claim. This is probably the first time, that a debt was supposed to be outlawed before it became due. This is a continuing annuity, and never can be presumed paid, during the life of the annuitant, although seventeen years, unexplained, may be evidence, that all sums payable so long before the date of the writ, had been paid. But on this point I give no opinion.

5. The documents given in evidence by the plaintiff, and admitted by the court, were not offered to prove title or interest in land, but merely to evince, that the defendant and others under him, occupied the premises by the permission of the plaintiff. Parol evidence would have been equally admissible, and would have had the same effect.

I am, therefore, of opinion, that the decisions at the circuit were perfectly correct, excepting only the application of the statute of limitations to a part of this note ; but of this the defendant cannot complain ; and therefore, I do not advise a new trial.

The other Judges were of the same opinion.

New trial not to be granted.

———◆———

## THE STATE OF CONNECTICUT *against* SMITH.

On an information, by a public prosecutor, charging the defendant with having erected a stone wall in and upon a highway, whereby such highway was narrowed and obstructed ; it was held, that the offence charged was an offence at common law, for which the punishment is prescribed by the statute regarding nuisances ; (p. 361.) and, therefore, that the superior court had not jurisdiction, by virtue of the statute of 1828.

THIS was an information against *Josiah Smith,* filed by the

state's attorney, in the superior court, charging the defendant <span><i>Fairfield,</i></span>
with having erected and continued a stone-wall in and upon a <span><i>June,</i> 1829.</span>
public highway in the town of *Stamford*, whereby said high-
way was greatly narrowed, straightened and obstructed.

The defendant moved to quash the information, on the
ground that the superior court had no jurisdiction over it, nor
any right by law to take cognizance of it. This motion was
reserved for the consideration and advice of the Supreme
Court of Errors.

*Hawley*, in support of the motion, contended, 1. That aside
from the statute, approved *June* 4th, 1828, (*c*. 12. *p*. 191.) the
superior court had no jurisdiction of the offence charged. This
point was decided and settled in *The State* v. *Knapp*, 6 *Conn*.
*Rep*. 415.—a case precisely like the present.

2. That the statute of 1828 confers no jurisdiction, because
the statute for the prevention and removal of nuisances, (*p*. 361.
*tit*. 71. *s*. 1, 2, 3.) prescribes a punishment for this offence ; and
the statute of 1828, by the terms of it, is applicable to such of-
fences only, "for which the punishment is not prescribed by
any statute law of this state." The 1st section of the statute
regarding nuisances, declares, that if any person shall lay in
any highway any stones, or any other thing, by which such
highway shall, in any way, be incumbered, the same shall be a
common nuisance, liable to be removed as such ; and the per-
son so offending shall forfeit the sum of four dollars, one half
to the prosecutor, and the other half to the town treasury. By
the 2nd section, if any person shall take any part of a highway
into his inclosure, or erect any fence thereon, in such manner
that the highway is made narrower than before, provision is
made for the removal of the encroachment, by the person who
made it, or at his expense. The 3rd section inflicts a penalty
of seven dollars for renewing the encroachment, *toties quoties*,
one half to the prosecutor, the other half to the county trea-
sury. The only question, then, is, on this part of the case,
whether the forfeiture of a sum of money, or the incurring of
a pecuniary penalty, payable half to the prosecutor and half to
a public treasury, is a *punishment*. In the first place, this term
does not necessarily include any corporal suffering. *Jacob's
Law Dict. verb*. Punishment. Secondly, the destination of the
forfeiture does not alter its nature. If one half goes to a com-
mon informer, it is not in the nature of a satisfaction to the par-

ty injured, but a punishment of the offender.  *Bac. Abr.* tit. Statute K.  But where a common informer has not already commenced a *qui tam* suit for the penalty, the state may recover the whole, on an information brought by a public prosecutor.  *Rex* v. *Hymen,* 7 *Term Rep.* 536.  1 *Swift's Dig.* 586.

3. That the 2nd section of the statute of 1828, gives no court power to inflict any punishment in the present case ; as it is not a case within the scope of that section.

*Sherman* and *S. H. Miner,* for the state, contended, 1. That the offence charged in this information, was an offence at common law.

2. That the statute regarding nuisances, is in affirmance of the common law.  It gave an additional remedy, but left the offence at common law as it was before.  Common law offences do not cease to be such, because they are punishable by statute.

3. That the object of the statute of 1828, was, to give the superior court jurisdiction of all prosecutions at common law, for common law offences, and where, in case of conviction, the common law punishment is to be inflicted.  The mischief which that statute sought to remedy, was the difficulty of defining high crimes and misdemeanours, and of distinguishing them from mere misdemeanours.  To obviate this difficulty, the legislature gave to one tribunal the jurisdiction of them all, when prosecuted as offences at common law.  The act in question was passed at the next session of the General Assembly after the decision in *The State* v. *Knapp,* which took from the superior court the cognizance of encroachments on highways ; and the design of the legislature was, to restore that subject of jurisdiction, by comprehending it in the terms of a general rule.

BISSELL, J.   The question raised upon the record, and now submitted for decision, is, whether the superior court has jurisdiction of the offence charged in the information.   In the case of *The State* v. *Knapp,* 6 *Conn. Rep.* 415, it was decided, that this is not a high crime and misdemeanour, cognizable by the superior court.   If then that court has jurisdiction of the case before us, it must be by virtue of the statute of 1828.  That statute enacts:  " That the superior court shall have jurisdiction of all offences at common law, of what kind and " degree soever, for which the punishment is not prescribed by

"any statute law of this state." That this is an offence at *Fairfield,* common law, is not doubted. Is the punishment for it "*pre- scribed by any statute law of this state*"? The statute, *tit.* 71. provides for the removal of nuisances and encroachments on highways, directs the mode of prosecution, and inflicts a penalty on the offender. Is the penalty inflicted by this statute, a punishment "*prescribed*" for the offence? The answer would seem to be implied in the very terms of the question; the definition of punishment, being "the penalty for transgressing the law."

Again: the statute of 1828 provides, "That in all cases "*where no punishment* is, by statute, fixed for any such com- "mon law offence, the court, before whom the conviction shall "be had, may punish the offence, by fine not exceeding five "hundred dollars, or by imprisonment not exceeding one year, "or both, at the discretion of such court." From this provision it is, I think, very apparent, that when *any punishment is fixed,* by statute, for a common law offence, none other than the statute punishment can be inflicted. In the case before us, it is very clear, that the superior court cannot inflict the punishment prescribed by the statute; and as no other can be inflicted, the offence charged in the information is not punishable by that court. This is conclusive on the question of its jurisdiction. I would, therefore, advise, that the superior court adjudge the motion to quash sufficient; and that the cause be dismissed.

The other Judges were of the same opinion.

<div align="center">Motion to quash sufficient.</div>

---

<div align="center">LOCKWOOD *against* JONES:</div>

<div align="center">IN ERROR.</div>

*A.,* having brought an action of book debt against *B.* in the county court, recovered a judgment in that court against *B.;* whereupon *B.* appealed the cause to the superior court, and *C.* entered into a recognizance, that *B. should prosecute his said appeal to effect, and answer all damages in case he should make not his plea good.* In the superior court, *B.* recovered a judgment, in the cause so appealed, against *A.,* for damages and costs. At the same time, *A.* filed his petition for a new trial, which was granted; and, on a second trial in the superior court, *A.* recovered judgment for damages and costs against *B.,* for which execution issued against *B.,* and was re-

*Fairfield,*
**June, 1829.**

Lockwood
*v,*
Jones

turned *non est inventus.* In a *scire-facias* brought by *A.,* against *C.,* on his recognizance, it was held, that such recognizance was not discharged, by the first judgment in the superior court, but that it extended to the judgment ultimately recovered by *A.,* and consequently, that *A.* was entitled to recover.

Tнɪs was an action of *scire-facias,* stating the following case. *Horatio Lockwood,* the present plaintiff, brought an action of debt on book against *Lewis S. Lockwood,* to the county court of *Fairfield* county, held in *February,* 1822, which, by continuances, came before the same court, in *February,* 1823 ; at which court he recovered judgment in such action against the defendant therein ; who appealed the cause to the superior court, held at *Danbury,* on the fourth *Tuesday* of *September,* 1823 ; and on such appeal, *Enos Jones,* the present defendant, entered into a recognizance, in the sum of 200 dollars, payable to the plaintiff, if the appellant should fail to prosecute his said appeal to effect, and answer all damages in case he should make not his plea good. The cause appealed was entered in the docket of the superior court, and came, by continuances, to the term of that court in *September,* 1824, when the said *Lewis S. Lockwood* recovered judgment against the plaintiff for 158 dollars, 77 cents, damages, and ——— costs. At the same court, the plaintiff filed his petition for a new trial of the cause, which was continued to *December* term, 1826, when it was granted. The plaintiff's action of debt on book again came to trial before the superior court, in *September* 1827, when he recovered judgment against the defendant in that action, for 324 dollars, 25 cents, damages, and for 351 dollars, 96 cents, costs. Execution having issued on this judgment, it was returned *non est inventus ;* the judgment remains unpaid and in force ; *Lewis S. Lockwood* is a bankrupt ; and this *scire-facias* is brought against the defendant to enforce his recognizance on the appeal.

In bar of this action the defendant pleaded the judgment of the superior court, rendered for *Lewis S. Lockwood* in *September* 1824, concluding thus : "And so the said *Lewis S.* did prosecute his said appeal to effect, and did make his plea in said action good." To this plea the plaintiff demurred. The court adjudged the plea sufficient ; and now, on motion in error, by the plaintiff, the record is brought before this Court, to revise that decision.

*Sherman,* for the plaintiff, contended, That the judgment re-

covered by *Lewis S. Lockwood*, in the superior court, *September* term 1824, did not, under the circumstances of this case, fulfil the condition of the recognizance, entered into, on the appeal, and discharge the recognizors.    This point depends on the question, whether the suit in which the plaintiff recovered judgment in *September* 1827, was the *same* suit in which the recognizance was given.    If it was, *Lewis S. Lockwood* manifestly failed to prosecute his appeal to effect and to make his plea good.    After the granting of a new trial, no new suit is instituted.    There is no new writ, or declaration, or duty, or service.    If the process was by attachment, or if the plaintiff lived out of the state, no new bond for prosecution is necessary.    If the cause has been appealed from a lower court, no new recognizance on the appeal can be required.    If the bond or recognizance originally given, does not extend to the ultimate judgment rendered, the adverse party is deprived of his security ; and this without any reason for its discontinuance, arising from the nature of the case, or from any fault on his part.    A judgment vacated clearly furnishes no reason for depriving the appellee of his security.    Nor is any fault to be imputed to the appellee, that the vacated judgment was against him ; for if he had been in fault, a new trial would not have been granted.

The case of bail is not at all analogous to the present case. Every thing which discharges the principal from the custody of the bail, discharges the bail from his obligation.    Now, a judgment in favour of the principal absolves the bail, because the string is thereby cut, by which the bail held the principal. The setting aside of that judgment and the rendering of a different judgment afterwards, do not repossess the bail of the principal.    His security is gone forever.    This is not the situation of a bondsman on an appeal.    He has the same powers and remedy after the first judgment as before.

The counsel then proceeded to anticipate and answer objections.    He commented particularly on the case of *Ainsworth* v. *Peabody*, 1 *Root* 469. insisting, that it was entitled to no consideration as an authority, as there was no adjudication in the case, but a mere intimation of an opinion, which induced the plaintiff to withdraw his action.    He adverted also to the law of *Massachusetts*, contending that it had no bearing on the contract of the defendant in this case.

*Fairfield,*
June, 1829.

Lockwood
*v.*
Jones.

*Hawley,* for the defendant, contended, That *Lewis S. Lockwood,* by recovering judgment on the first trial in the superior court, had fulfilled the condition of the recognizance and discharged the bail. That judgment was a termination of the suit. The proceeding might, indeed, be *revived,* by the granting of a new trial; but the prevailing party had prosecuted to effect and made his plea good. A judgment so recovered, has always been considered a *final* judgment. *Fleming* exr. v. *Lord,* 1 *Root* 214. *Butler* v. *Bissel,* 1 *Root* 102. *Ainsworth* v. *Peabody,* 1 *Root* 469. 2 *Swift's Syst.* 175, 6.

New trials in this state were originally granted by the General Assembly only, as an exercise of its *equitable* powers. 1 *Swift's Dig.* 786. It was, in reality, a mere interference of a court of chancery. The judgment at law, was, in all respects, *final.* If unrighteous, a new trial was the relief, which chancery would afford. The *nature* of a new trial, since the courts of law have been authorized to grant it, is not changed. It is still a mere equitable interposition.

*Ainsworth* v. *Peabody,* 1 *Root* 469. is a case directly in point. Though no judgment was rendered in the suit, yet it is apparent, that the court considered the question as then *at rest.* The opinion expressed by them has been considered as settled law ever since—a period of nearly forty years.

The rule contended for, by the plaintiff, will, in many instances, produce great hardship and inconvenience. After judgment for the principal, the surety gives up his security;— or the principal becomes insolvent, or removes out of the state; towards the close of the three years limited for that purpose, a petition for a new trial is brought and granted; ought the surety to be still holden? So in the case of bail; he is lulled to sleep by the judgment in favour of the principal; he lets his security go, or the principal absconds; is he to be subjected three years afterwards? *Bingham* v. *Pepoon,* 9 *Mass. Rep.* 339. *Clapp* v. *Bell,* 4 *Mass. Rep.* 99.

Where land is attached, the execution must be levied within four months after the first judgment recovered by the plaintiff. Suppose the plaintiff lets the four months expire, but within three years gets a new trial, and recovers greater damages; his original attachment or lien certainly does not continue.

Judge *Gould,* in his lectures to his students, states the law thus: " A judgment in favour of the appellant is final as to the surety on appeal, though on a new trial, judgment is given for the other party." *M. S.*

" *A.* sues *B.*, for whom *C.* gives bonds; verdict for *B.* ; *A.* then obtains a new trial, Now, *C.* was discharged, by the first verdict. The new trial is granted as a favour to *A.* ; and he must submit to the inconvenience of having no security for *B.'s* appearance." *Reeve on New Trials.*

HOSMER, Ch. J. The principle of the defence set up to this action, is simply this ; that the judgment recovered by *Lewis S. Lockwood* was not only a final judgment as contradistinguished from one that is interlocutory, but was *the* final judgment, which fulfilled the stipulation of the recognizance ; and by recovering it, that he, within the true intent and meaning of the defendant's contract, had prosecuted his appeal to effect, and made his plea good. On the other hand, the plaintiff insists, that it was not the final judgment on which the recognizance was suspended ; but that both by the letter and spirit of the contract, the judgment referred to in the bond, was the *last* or *ultimate* final judgment in the suit.

The construction of the contract advanced by the plaintiff, is, in my opinion, correct. This will appear from the words of the contract, construed with reference to its subject matter. It will be my purpose to establish this proposition, and then to answer the analogies, determinations and supposed consequences of the construction urged by the defendant.

1. In the first place, what is the fair intendment of the recognizance arising from its words ? Before my answer is given to this question, I observe, that the defendant is a surety, and as such is never answerable beyond the clear scope of his engagement. *Ludlow* v. *Simond,* 2 *Caines Ca. Err.* 1. *Elmendorph* v. *Tappen* & al. 5 *Johns. Rep.* 176. *Walsh & Beekman* v. *Bailie,* 10 *Johns. Rep.* 180. *Wright* v. *Russell,* 3 *Wils.* 530. 2 *Wms. Saund.* 415. n. (5). *Smedes* v. *The Utica Bank,* 20 *Johns. Rep.* 372. 383. But to the extent of his contract, expounded by the expressions employed and the object intended, he is responsible.

I further remark, that neither from my own experience, nor from enquiries made of others, do I find, that there has been any practical exposition of the matter in question.

The words of the recognizance, taken in their established popular meaning, are clear and unambiguous. The bond was broken, *if the appellant did not prosecute his appeal to effect, and make his plea good.* The word *plea,* as used, is obviously

*Fairfield,*
June, 1829.

Lockwood
*v.*
Jones.

commensurate with the term *defence;* in converting the nega-tive stipulation into its correspondent affirmative, it necessari-ly comprises this position; *that the appellant shall effectually prosecute his appeal.* In other words, that at the final termin-ation of the controversy between the parties, he shall be suc-cessful in his defence;—not that at some period of the contest, he shall obtain a judgment, erroneously and against the merits of his case, which shall appear to be final, in the strict sense of the term, but that ultimately his defence shall be crowned with success.

The words, unquestionably, reach to this extent; and their construction is made indisputable, by two clearly established principles. The first of them is, that if there be any ambigui-ty, the words of a contract shall be expounded most strongly against the contractor. *Verba fortius accipiuntur contra præf-erentem.* But without a recurrence to this principle, the result will be the same. It is well established as a rule of construc-tion, that an indefinite or general expression, shall be under-stood *universally, or according to the full latitude of its terms,* unless restrained by some special subsequent words, or by the subject matter of the contract. *Co. Litt.* 42. *Shep. Touch.*88. 1 *Sw. Dig.* 226. Now, the stipulation in the recognizance is general and indefinite; the full latitude of its terms alludes to and embraces the last or *ultimate* final judgment in the suit; it is not restrained by any subsequent words; nor, as I shall show hereafter, by the subject matter of the engagement. A limitation of the meaning may be supposed, on a principle not contended for; and that is, that after a new trial is granted, the original suit, in contemplation of law, is at an end, and a *new* suit is substituted. But the opposite of this is true. A new trial vacates the judgment complained of, and puts the parties in the state, in which they were, immediately before the judgment was rendered; *and this is its whole effect.* The orig-inal suit is entered in the docket, and the first and only cause of action, on the first and only writ, is tried again, at a future day. By the operation of the new trial, the cause, in contem-plation of law, is precisely in the same condition, as if no judg-ment had ever been rendered; so that the action is, in no sense, *new,* but is identically the original suit. *Fleming* exr. of *McDonald* v. *Lord,* 1 *Root* 214. *Magill* v. *Lyman* & al. 6 *Conn. Rep.* 59. *Lyman* v. *Magill,* 6 *Conn. Rep.* 69. The error is extirpated, and every thing else is in *statu quo.*

2. The extent of the words being unquestionable, I will now consider the recognizance, in reference to its subject matter. What was the object of the parties ; or in other words, what was the spirit and intent of the contract ?  I answer ; *it was security for all the costs that should arise, by reason of the appeal, and until the termination of the plaintiff's suit.*

This is proved, by the expression of the contract, already discussed ; the most convincing evidence of the intent.

It is equally established, by the reason and nature of the case.   By a judgment against the appellant, he, *prima facie*, was a debtor, and in the sum assessed ; and the legislature have thought it unreasonable, that the judgment debtor should be allowed an appeal, and a rehearing, without giving bonds to secure to the adverse party, his costs of suit.   A recognizance suspended on the condition, that the appellant should prosecute his suit to a *temporary* effect, and that, at some period of the cause, he should erroneously obtain a final judgment in his favour, that would not be the *ultimate* termination of it, would almost seem ludicrous.   It is admitted to have been the right of the plaintiff to demand, and the duty of the appellant to give, security for the costs, if the plaintiff should prevail against him. But if his recognizance was to secure any costs to the plaintiff, what reason can be assigned, why the whole costs, at the termination of the controversy, should not be made sure ?  All the costs are within the same reason.   The reason was, *that the plaintiff should be dragged no farther in controversy, unless his costs were made secure.*   Less than this, would not attain the only conceivable object of requiring bonds ; for, there is the same reason for security of the whole of the costs, that there is, for the security of part of them.   And that a judgment rendered for the appellant, and afterwards set aside for error, *because it never ought to have been rendered ;* that this nullity in law, which was always unjust, and against the merits of the case, should be followed up, by stripping the injured plaintiff of his security, and giving an important benefit to the appellant, is peculiarly unfounded.   Not less strange does it appear, that a recognizance to secure the plaintiff his costs, should be suspended, by the parties, on an event, to happen *in the midst of their controversy ;* and not at its termination.   It is said for the defendant, that it would be unjust to hold him responsible, after he had once obtained a final judgment in his favour ; and that, therefore, such a construction of the recognizance, would be irrational.   If, said he, I am held beyond this period, so

that at any time within three years, a new trial is obtained, and judgment for the plaintiff, my security, if I ever had any, is gone. The property, for instance, delivered to me for my indemnity, is given up, and however reluctant I might be, I was bound to surrender it ; and even if there was no *actual* security given, my responsibility, is unjustly prolonged.

This, the principal argument of the defendant, admits of two obvious and sufficient answers.

The first is, that the person recognizing, never need be in the condition supposed. He can always guard himself, by a competent indemnity. If he is unwilling to confide in the personal responsibility of his principal, he may demand property, *with such stipulations* as will effectually protect him, until the possibility of damage has passed by. The indemnity, if taken out of his hands, is occasioned by his own neglect, by his not guarding himself, and subjecting it to a lien, until the three years have elapsed. There is neither impossibility nor difficulty in the case.

I reply, secondly, that the contract and condition of the defendant, are *altogether voluntary.* He foresaw the legal possibility of the facts, which have happened in this case, and entered into a recognizance, on such security as he pleased. It is a law maxim, *Volenti non fit injuria.* In the case of ex parte *Garland,* (10 *Ves.* jun. 110.) in which the inconveniences to an executor, authorized by last will to carry on a partnership, were strongly pressed, and admitted by Lord *Eldon* ; he contented himself with this, as a conclusive answer, that he *voluntarily* put himself in such condition. The same principle was adopted, and by this Court applied, in a similar manner, in *Pitkin* v. *Pitkin* & al. 7 *Conn. Rep.* 307. There is, then, no hardship in the case ; as the bondsman has the full benefit of his contract, and is subjected only to his voluntary engagement.

To the supposed consequences pressed on the defendant's part, let the effect of the construction advanced by him, on the plaintiff, and on others in like situation, be attended to. In the first place, the plaintiff has taken all the security the law admits, by the acceptance of a recognizance, expressed in the most sweeping and unlimited terms. Now, if a final judgment, set aside and not ultimately final, extinguishes the bond ; a judgment erroneous, against the merits of the case, and for that reason vacated ; the plaintiff is unjustly deprived of the secu-

rity, for which the recognizance was given.    He has been sub-  *Fairfield,*
jected to great costs ; the appellant is a bankrupt ; the plain-  <u>June, 1829.</u>
tiff ever had a just cause of action, and by error only had it   Lockwood
doubted, for a short time ; and yet of his security he is utterly   *v.*
defeated !    What construction can be more hard and unjust ?   Jones.

When the general operation of the defendant's principle of
exposition is regarded, it becomes the more exceptionable.    It
applies to bonds for prosecution in all cases, whether given by
a plaintiff in commencing his suit, or by an appellant.    On the
principle advanced by the defendant, if the plaintiff recover a
final judgment in the superior court, which is afterwards va-
cated for error, the defendant has lost his security for costs.
The doctrine, for aught that I can see, is equally applicable to
motions for new trials, as to petitions.    By our practice, judg-
ment is not *suspended,* as it is in *England* and elsewhere, by a
motion for a new trial; (3 *Bla. Comm.* 387, 395.    2 *Tidd's
Prac.* 813. & seq.) but final judgment is first actually ren-
dered, and after this, the motion is allowed.    Hence, by a gen-
eral rule of this Court, of *June* 1810, (4 *Day* 468.) execution
only is stayed; and by the rule of *July* 1809, (4 *Day* 120.) if a
new trial is not granted, interest is directed to be computed on
the judgment already rendered.    Now, if a final judgment, al-
though afterwards vacated on motion, extinguishes a bond for
prosecution, it is easy to perceive, that the consequences may
be both extensive and pernicious.

On the whole, I entertain no doubt that the argument *ab in-
convenienti,* derived from the hardship of the construction,
greatly preponderates against the defendant.    I am also of
opinion, that this consideration has been pressed altogether be-
yond its proper bearing.    *Jura adaptantur ad ea quœ fre-
quentius accidunt.*    The question discussed will seldom arise.
In my experience and observation, it never has arisen, until the
present case.

3. I will now attend to the analogies and decisions, on which
the defendant has placed reliance.

The determinations regarding *special bail,* have been first
referred to ; and an analogy between these and bonds and re-
cognizances for prosecution, has been much insisted on.    In
this state, it has been decided, that an erroneous judgment re-
versed for error, or annulled by the granting of a new trial, is
*the final judgment* for the exoneration of bail.    *Fleming,* ex'r.
of *Mc Donald* v. *Lord,* 1 *Root* 214.    *Butler* v. *Bissel,* 1 *Root,*
102.    2 *Swift's Syst.* 175, 6.

*Fairfield,*
June, 1829.

Lockwood
*v.*
Jones,

The law I admit; but the analogy I deny. What is meant by an analogous determination? Not merely a remote resemblance, but such a real similitude, that the cases compared stand on the same reason. In comparing recognizances for prosecution, whether of an action or an appeal, with bail to the action or special bail, the mind is naturally led, first, to consider the expressions in which the respective bonds are conceived. The bondsman for prosecution stipulates, that his principal shall prosecute his action or appeal to effect, and answer all damages, if he fail to make the same good; while he who becomes special bail, merely contracts, that his principal shall appear in the action and abide final judgment. *Tidd's Pract. Forms* 74. The one who binds himself in a recognizance for prosecution, agrees, on a certain event, to pay a sum of money; but the bail merely agrees to surrender the body.

The words of these bonds are very dissimilar. The great discrimination, however, between the cases, consists in this. The bondsman for prosecution has no indemnity, except what arises out of contract between him and his principal; and *the law never interposes to make this security less.* But the bail has a legal indemnity; his principal is presumed to be in his custody; he may take him when and where he pleases, and detain him or surrender him in court, or into the custody of the sheriff, who has process against him; or if he believes, that he meditates flight, he may cause him to be imprisoned in the common gaol of the county, and exonerate himself from his obligation. *Parker* v. *Bidwell*, 3 *Conn. Rep.* 84. *Ruggles* v. *Corey*, 3 *Conn. Rep.* 419.

In the event of a final judgment in favour of the principal, he is not, by law, taken out of the custody of his bondsman for prosecution; *for he never was in his custody;* but in such case, the principal is, by law, taken out of the custody of his bail; the string is severed, and the right of the bail over his principal, is at an end.

Here then, is a marked dissimilarity between the cases. The technical final judgment, before the termination of the suit, ought not, in any respect, to impair the right of the bondsman for prosecution; but by this event, the right of the bail over his principal, is destroyed. He has stipulated to surrender him; but the law steps in, and makes the surrendering of the principal, by the bail, *impossible.* After this, the law is not so unjust, as to require of the bail, to perform an impossibility

of its own creation, but it effectually protects him, by its estab- *Fairfield,*
lished principle; that, " in all cases, where a condition of a June, 1829.
bond, recognizance, &c. is possible at the time of the making
of the condition, and before the same can be performed, the
*condition becomes impossible*, by the act of God, *or of the
law*, &c., there the obligation &c. is saved." *Co. Litt.* 206. *a.*
2 *Bla. Comm.* 341. On this principle, unquestionably, the be-
fore cited determinations in favour of bail, are founded.

Now, I ask, where is the analogy? *The act of law* has
taken from the bail his security; but at the same time, has
made it unnecessary, by his exoneration. But, in the case of a
bond for prosecution, the law has neither taken away, nor im-
paired the bondsman's security; and therefore, it has not dis-
charged him from his obligation. There is, then, no analogy,
but a marked discrimination between the above cases.

The determinations cited for the defendant, from the state of
*Massachusetts*, have not any bearing on this case. It is true,
that they give the meaning of the expression "*final judgment*,"
as used in certain of their statutes. But it must be recollected,
that " final judgments, (strictly speaking,) are such as put an end
" to the action;" (3 *Black. Comm.* 398.) and yet when they pro-
nounce on the merits of a cause, they are technically final, as
contradistinguished from judgments, which are interlocutory,
although the cause is not terminated. In this latter sense, the
judgment of a county court, on verdict or demurrer, is final;
and yet by appeal, the cause is carried up for rehearing, *ut res
nova*. Now, when the expression *final judgment*, is found in
a statute, it is always the subject of enquiry, in which of the
two former senses the terms are used. In the cases cited, from
the words, the subject matter, the effects and consequences,
and in one of them, from the antecedent and now varied ex-
pressions of the same law in substance, the court was of opin-
ion, that by *final judgment*, a judgment technically final was in-
tended, although it did not terminate the cause. To derive
any aid from these decisions, it becomes necessary to show,
that the reasons and principles of construction were identical
with those which apply to this case. *Clapp* v *Bell*, 4 *Mass.
Rep.* 99. *Swett* & *al.* v. *Sullivan*, 7 *Mass. Rep.* 342. *Bing-
ham* v. *Pepoon* & *al.* 9 *Mass. Rep.* 339. But, on recurrence
to the determinations, it will be found, that they are altogether
different. I forbear to add to my reasons, a comment on the
cases; nor is it necessary. Those who would press the deter-

Lockwood
*v.*
Jones.

minations into their service, are bound to show their applicability to this case, which, in my judgment, cannot be done. For it is certain, that the words *final judgment* in any law, do not *per se* settle the enquiry, in which of two established senses, they were used.

With some surprise I have heard the citation of determinations in *Westminster-Hall* concerning bail in error. On writ of error in *England,* bail is required, with condition to prosecute *the action* to effect. It is observable, that the bail *is not* to pursue to effect all writs of error, which may in future be brought, to revise the same subject ; but it expressly is, to prosecute *the specific action,* in which the bond is given. 2 *Tidd's Pract.* 1074. Hence, it is established law, if the judgment of the common pleas is affirmed, on error brought to the king's bench, or the exchequer chamber, that on a writ of error preferred to the house of lords, the recognizance on the former writ is no security for the costs in the latter ; and why ? Because the bond was given, in so many words, to secure the costs, on the first writ of error only ; and the second and future writ must derive similar security from a new bond, given for that purpose. The question before us, is, whether a final judgment of the superior court, in the technical sense of the terms, which has been vacated for error, and thus effectively struck out of existence, is matter in bar of a judgment, afterwards rendered *in the same suit.* But the enquiry in *Westminster-Hall,* in the cases alluded to, was merely this ; whether a bond for prosecution of one suit, was in law, a bond for the prosecution of a future, contingent, and different suit. The question, which of two final judgments *in the same suit,* the one technically final and reversed, and the other actually final and existing, never occurred in *Westminster-Hall.* The cases are *toto cælo* different. The *English* determinations, are alone applicable to cases like the following. A writ of error is brought to the superior court from the determination of the county court, and the judgment below is affirmed. Error is then brought in the Supreme Court of Errors, to revise the decision of the superior court. Now, if a question is made, whether the bond given to prosecute the first writ of error, is a bond for the prosecution of the second writ of error, the law of *Westminster-Hall* is in point ; but it bears in no other direction.

4. The case of *Ainsworth* v. *Peabody,* 1 *Root,* 469. has been

cited for the defendant ; and I admit, that the opinion thrown out by the court, while the cause was on trial, (for there was no decision,) is in point. The appellant recovered in the case cited, and afterwards a new trial was granted, and final judgment was rendered in favour of the appellee. The court expressed an opinion, that by the first judgment in behalf of the appellant, his bondsman was exonerated. Immediately on this, the plaintiff withdrew his action. I cannot consider this case, as possessing any authority. In the first place, there was no determination, but a mere opinion expressed, and apparently with little deliberation. Independent of this, however, the opinion was solely founded on the case of *Butler* v. *Bissell*, 1 *Root*, 202. in which it was held, that *bail* is exonerated by a final judgment in favour of his principal, although the judgment was afterwards reversed for error. In this case, there *was not bail*, but a bond for prosecution, neither expressed in the same language as a bail bond is, nor founded on the same reason. The court hastily conceived there was an analogy where no analogy exists ; and from the report it appears, that there was no argument of counsel, and no discussion by the court. I trust it has been shown, that the ground assumed by the court was entirely fallacious.

On the whole, I am clear, that, by the words, and spirit, and intent of the contract, bonds of prosecution are suspended, on the last or ultimate final judgment of the court ; that this opinion does not outrun the equity of the case ; that public convenience requires it, inasmuch as the costs of a suit, in the instances prescribed by law, ought to be made secure throughout, and until its termination, especially as the party has done his utmost to secure himself, by taking a bond in the most unlimited and comprehensive terms ; and finally, as the bondsman has given a recognizance, which, *in terminis*, authorises the plaintiff's demand.

The plea, therefore, in this case, is, in my view, manifestly insufficient, and the judgment below, erroneous.

PETERS, J., though inclined at first to a different opinion, ultimately concurred.

DAGGETT, J. The only question is, whether the recognizance entered into by the defendant, is discharged by the first judgment of the superior court ; and manifestly, that must de-

pend on the decision of another question, *viz.* whether the judgment of the superior court rendered in *September,* 1824, in the case of *Horatio Lockwood* v. *Lewis S. Lockwood,* was a *final* judgment. I shall attempt to shew, that it was ; and that the recognizance was thereby discharged.

Here I would premise, that it is a principle well established, that " bail is highly favoured in law, and statutes for their saving should be liberally expounded."

It is conceded by the counsel for the plaintiff, and by my brethren who constitute a majority of the Court, that the *special bail* is discharged the moment the first judgment in chief is rendered for the defendant ; and that the lien on land and personal property created by attachment, is removed by such judgment in favour of the defendant. It is also agreed, that if the principal had pledged money or any other property with the surety, to indemnify him for becoming bound as special bail, or for prosecution, or for an appeal, it must be returned to the pledgor, on the rendition of a judgment in chief ; and if it be not so returned, an action will *immediately* lie in his favour against the pledgee. These principles were conceded in the argument, and are not now denied. They have been too long established to be questioned. *Butler* v. *Bissel,* 1 *Root* 102. *Fleming* exr. of *McDonald* v. *Lord,* 1 *Root* 214. 2 *Swift's Syst.* 175, 6. *Clap* v. *Bell,* 4 *Mass. Rep.* 99. *Bingham* v. *Pepoon* & al., 9 *Mass. Rep.* 339. Their force and application to this case are attempted to be evaded ;—with what reason I shall shew hereafter.

In *Clap* v. *Bell,* 4 *Mass. Rep.* 99. the plaintiff brought a writ of replevin, to replevy certain chattels, which the defendant, who was a deputy-sheriff, had attached as the property of the plaintiff. It was proved, that *Brazier* and *Davis* commenced a suit against *Clap,* in *February,* 1803. On the 8th of *January,* 1806, a verdict was given for *Clap* in that suit, and judgment thereon was rendered for costs against the then plaintiffs. On the 13th of *February* then following, *Brazier* and *Davis* sued a writ of review of that judgment, which was served on *Clap,* on the 21st of the same *February,* and was pending when this suit in replevin was brought. *Clap* sued the writ of replevin, on the 15th of *October* 1806, having previously demanded the goods of *Bell,* the deputy-sheriff, who refused to deliver them, but held them, by direction of *Brazier* and *Davis,* they claiming a right to hold them under the attach-

ment until the determination of the review. The counsel for *Fairfield,* the defendant contended, that a review was a *continuation* of June, 1829. the original suit,being confined to the same pleading &c., and not ──────── an original suit. They likened it to a judgment of an inferior Lockwood court, from which there lies an appeal, in which case goods *v.* attached are still holden to respond the judgment of the court Jones. having the appellate jurisdiction. *Parsons,* Ch. J., in delivering the opinion of the Court, says : " We are all of the opinion, that when goods or estate are attached, by virtue of an original suit, to secure the judgment which the plaintiff may recover, if on the appeal, judgment be rendered for the defendant, the attachment is *ipso facto* dissolved, and the sheriff can no longer hold the property attached against the demand of the defendant." There would seem to be some colour for the argument of the defendant in that case ; for by the law of *Massachusetts,* the plaintiff has *a right* to review his cause, and have it tried a second time. Our petitions for new trials are original suits to all intents and purposes, and a new trial is never granted of course, or *ex debito justitiœ,* as will be more fully shewn hereafter.

The same doctrine was holden, by the supreme court of *Massachusetts,* in the case of *Swett* & al. v. *Sullivan,* 7 *Mass. Rep.* 242. This was a suit against the defendant as special bail for *Abraham Ogden.* The defendant *Ogden* prevailed on the first trial ; the plaintiff reviewed the cause, and obtained judgment for a large sum against *Ogden ;* and then instituted his *scire-facias* against *Sullivan* as his bail. *Parsons,* Ch. J., in giving the opinion of the court, says : " If the *final judgment* mentioned in the last statute [1786. *c.* 66. *s.* 1.] should be taken to be the judgment on review, great mischiefs would be the consequence. Either party might review at any time within two years after entering judgment on the appeal. The bail might, therefore, be holden for several years, when the situation and property of the principal might be essentially changed ; and a party arrested might find it impracticable to procure bail." *P.* 347, 8. And again : " It is therefore our opinion, that the *final judgment* mentioned in the statute of 1784, [*c.* 10. *s.* 3.] is the first judgment on which the plaintiff may sue out an execution. If no appeal lies from the judgment of the common pleas, or if none is made, that judgment is final ; or if there is an appeal, then the judgment on the appeal is final ; for on either of these judgments execution may issue." *P.* 348. The bail was held to be discharged.

It is impossible for me to discover why these concessions and decisions are not binding as to the point now in judgment. Let me examine the recognizance entered into by the special bail, and compare its obligation with that entered into by the defendant on the appeal. The condition in the recognizance of special bail, is, "that the defendant [in the suit] shall appear and abide final judgment, and answer all damages in case he should not make his plea good." 2 *Swift's Dig.* 491, 2. On the appeal in this cause the recognizance set forth in the declaration has this condition : " That if the said *Lewis S. Lockwood* should fail to prosecute his appeal to effect, and answer all damages in case he make not his plea good," then &c. So the recognizance entered into, in a replevin of goods attached, is, that the plaintiff shall prosecute his suit of replevin to effect, and in case he make not his plea good, answer all damages, &c ; yet if the defendant recover a judgment in the suit on which the goods replevied were attached, all agree, and so is the case of *Clap* v. *Bell* above cited, the goods are discharged from the lien, and of course, the recognizance in the replevin is also discharged. If the obligation incurred is the same, and I beg, if it is not, that the difference may be pointed out, then a *final* judgment in favour of the party for whom the surety undertakes, will operate a discharge in all these cases.

It is however, said, that the recognizance for the appeal is more *extensive* than that of special bail. I still must be allowed to ask wherein ? How is this made to appear ? Do they not both depend on the question, whether the defendant has made his plea good, or in other words, whether he has obtained a *final* judgment ? But it is suggested, that a judgment may be *final*, so as to discharge the *special bail* and the *property attached*, and yet not be an *ultimate* judgment so as to discharge the recognizance on the appeal. An *ultimate* judgment, in my opinion, is not a judgment for which the surety is, or can be responsible ; for it is unknown in law. "Judgments," says Sir *William Blackstone*, " are either *interlocutory* or *final*. Interlocutory judgments are such as are given in the middle of a cause, upon some plea, proceeding or default, which is only intermediate, and does not finally determine or complete the suit." " Final are such as at once put an end to the action, by declaring, that the plaintiff has either entitled himself, or has not, to recover the the remedy he sued for." 3 *Bla. Com.* 396, 398. When the defendant recovered against the plaintiff, and the

plaintiff did not recover against the defendant, in *September* 1824, was not that judgment *final* within the definition above given ? If then the defendant "makes his plea good," by a final judgment in his favour, is not the surety for him that he should " make his plea good," discharged ? The objector says " yes, in case of special bail, but not in case of bail for the appeal." I ask, why not ? I ask, is there not a *final* judgment ? There is a *final* judgment, if Sir *William Blackstone* and Chief Justice *Parsons* knew what a *final* judgment was. But neither of them knew probably what in law language an *ultimate* judgment was ; nor am I bound to understand it. Soon we shall have *penultimate* judgments. The granting of the petition for a new trial in this cause, which preceded the *ultimate* judgment, might perhaps be denominated a *penultimate* judgment : it was *almost* the last.

It is again insisted, that the reason why special bail is discharged, is, that he cannot surrender the principal in discharge of himself, as he might have done before final judgment : he has him not " upon the string." So, in the case of property attached, it can be *no longer* holden than till final judgment ; and the law compels no man to do impossibilities. But may it not be asked, why the bail has not the principal upon the string ? Why the property attached cannot be holden after final judgment ? Why the surety in replevin is exonerated, when judgment is rendered in favour of his principal ? Is it not because the judgment is a discharge of the principal ; and the lien on the property is destroyed by it, and the surety in replevin has fulfilled the condition of his recognizance ? Why then is not the defendant discharged, by *Lewis S. Lockwood's* having prosecuted his appeal to effect ?

Is it after all to be said, that the recognizance for the appeal is *more extensive* than that entered into by the special bail ; and the only reason assigned, is, that *it is* more extensive ? An assertion that a proposition of this kind is true, may be always countervailed, by a contrary assertion, that the proposition is not true ; and an enquiring mind waits for the reasons.

Again ; by the statute (*p.* 63. ed. 1821.) it is provided, that in bonds given for the prosecution of an action or appeal, the surety or sureties shall be liable to satisfy the cost that shall be recovered against the principal, *if it cannot be had out of his estate.* An execution, then, must have been taken out against *Lewis S. Lockwood ;* and the fact must be shewn

*Fairfield,*
June, 1829.

Lockwood
*v.*
Jones.

to the court, that the cost could not be obtained from him. This will not be denied. It is averred in the declaration, that an execution was taken out, and a *non est inventus* (as to property, and *that* was all that was necessary) regularly returned. But from *September* 1824 to *September* 1827, a period of three years, no execution could have been taken out against *Lewis S. Lockwood*, for this very substantial reason, that there was no judgment against him, but a final judgment in his favour; and yet while the principal was thus discharged, his bail, the present defendant, was all the time liable, or rather has, after the lapse of three years, during all which time the principal was discharged, now become liable, by the doctrine, I suppose, of a kind of *postliminium*, or perhaps *springing uses*. If there be a case in which the principal is discharged, and yet the surety is liable, I am ignorant of it. A surety, *ex vi termini*, is correlate, and cannot exist without a principal. No decision or *dictum* favours such an idea. Let it not be here said, that if the defendant, *Lewis S. Lockwood*, was discharged, yet he might be, and regularly was, subjected to the payment of all the costs, both antecedent and subsequent to the new trial. This is doubtless true, (unless the court had granted a new trial upon different terms, which it might have done) but it is obvious that this liability did not arise at all from the recognizance, but from his situation as defendant. He would have been equally liable, had no bond been given.

It has been further suggested, that if the doctrine for which I contend had been adopted, the bond for prosecution, for an appeal and for special bail will be discharged, on the allowance of a motion for a new trial. This objection is susceptible of a very easy and satisfactory answer. A *motion* for a new trial, is, in no respect, like a *petition* for a new trial. The latter is an original suit. A duty must have been paid upon it, before the late law abolishing all duties was passed. It must have been served on the adverse party; and it had not the effect of suspending the judgment or staying the execution. A motion for a new trial was substituted, for a bill of exceptions, by the superior court, in *May* 1807. By the rules then adopted, they were to be filed within forty-eight hours after verdict, and during the session of the court, and were by the court to be reserved for the consideration of the Supreme Court of Errors, with or without stay of execution, *at their discretion.* 3 *Day* 28. This motion for a new trial, is analogous, in many re-

spects, to the practice in *England*, where it is said, it operates to *suspend* the judgment. 3 *Bla. Com.* 387. No new suit is brought ; and the parties are, during the pendency of it, sup- posed to be in court. The motion is for a rule to shew cause why a new trial should not be granted. If allowed, the rule is made absolute, and a new trial granted. If not allowed, the rule is discharged. If execution is stayed upon the reservation of the motion, as is generally the case, the special bail, the bond for prosecution and the recognizance for the appeal, are not, in any manner, affected by it. This is the well known and established practice under the rule ; and therefore, the motion cannot be likened to a petition for a new trial. In support of this doctrine, I avail myself with pleasure of the strong and expressive language of the Chief Justice, in the case of *Magill* v. *Lyman* & al. 6 *Conn. Rep.* 62. " A petition for a new trial to set aside a judgment by a court of law, is an action. The plaintiff in error has *confounded* a motion for a new trial with the petition, as if they were identical ; and on this position the stress of the argument has been placed. What, then, is a motion ? Any proposition or request, formal or informal, addressed to a court, which can affect a cause, whether by obtaining the continuance of it, a reference of it to men, the exhibition of documents, the granting of a *venire-facias de novo*, or any thing else bearing upon the suit however remotely. But an action is a legal process by writ, duly signed by a magistrate, whereon a duty is paid, commanding the appearance of a defendant in court to answer a specified cause of complaint, served and returned by a legal officer, the subject of pleading, of the law of limitation, of a decree and of error. A petition for a new trial has all these properties ; and by its properties a thing is distinguished." And again, page 64. of the same opinion : " From this brief history the essential difference between petitions and motions strikingly appears. The latter is no suit, and has no resemblance to a petition, except in the effect of granting a new trial ; a fact, which, as has been shewn, is no evidence of common nature or denomination. But a petition for a new trial is a suit at law, with all the properties of an action, terminated by a formal decree,—from this time *functus officio*,—and liable to reversal, at any time within three years, by writ of error. I conclude, then, that a petition is an action, and essentially distinguishable from a motion." I am aware, that the Chief Justice differed from a majority of the

*Fairfield,*
June, 1829.

Lockwood
*v.*
Jones,

Court in that case ; but in the opinion of the Court delivered by Judge *Peters*, there is not an expression in opposition to the observations above quoted. The point decided by the Court, was, that the granting or refusal of a new trial, on a petition for that purpose, is a matter of *discretion*, and not the subject of error.

I will now cite some authorities bearing directly on the poin. In *Ainsworth* v. *Peabody*, 1 *Root* 469. the point was distinctly made to the superior court, in a *scire-facias* on a bond for an appeal. Judgment had been rendered for the defendant, a new trial granted, and then a verdict for the plaintiff. The court compared it with the decisions respecting special bail, cited cases in support of the position, and the plaintiff, finding the opinion of the court against him, withdrew his action. Before this case is overruled, it will be requisite to shew, that it is not strictly analogous to cases of special bail ; and this, 1 apprehend, cannot be done.

By the *British* statute, 3 *James* I., bail is required to be given on the allowance of a writ of error, to be a *supersedeas*, with one or more sureties, in double the sum of the judgment sought to be reversed. The condition of the recognizance or bond, is, that the plaintiff shall prosecute the writ of error with effect, and pay all such debt, damages and costs as appear on the judgment, and also all damages and costs to be awarded for the delay of execution. It has been repeatedly decided, under that statute, that if error be brought in the Exchequer Chamber, on a judgment in the King's Bench, and the judgment be affirmed, and then error brought returnable in Parliament, *there must be a new or fresh bail. Tilly* v. *Richardson,* 1 *Salk.* 97. S. C. 2 *Ld. Raym.* 840. *Colebrook* v. *Diggs,* 1 *Stra.* 527. S. C. 8 *Mod.* 79. *Anon.* 7 *Mod.* 120. *Com. Dig. tit.* Bail. N.

In this case, it is admitted, that the recognizance entered into, is, in every respect, like a bond for the prosecution of a suit ; nay, that is an express ground of argument ;—it is to prosecute an appeal to effect. The same rules must govern as would govern a bond to prosecute a writ of error, brought on a judgment of the county court to the superior court. The judgment is affirmed. A writ of error is brought on this judgment to the Supreme Court of Errors. Must there not be a new bond ; or is the bond given on the taking out of the writ of error to the superior court operative beyond the court to which it is returnable ? Immemorial usage may answer the

question. Lord *Holt* says : " The recognizance entered into, upon the allowance of the writ of error, in the Common Pleas, goes only to the writ of of error that is then brought ; and it is true, if the judgment affirmed here be reversed by the Lords, it will discharge that recognizance ; but in case it be affirmed, here is a delay of execution, and costs that the plaintiff is put to, and *the recognizance of the Common Pleas does not reach them."* *Anon.* 7 *Mod.* 121. Hence he and the other judges said, that there must be fresh bail to render the execution a *supersedeas.* Moreover, the argument *ab inconvenienti* is very strong. The surety never can be safe until, as the case may be, the lapse of four, five, or even six years. On the last day of three years after the rendition of the judgment, a writ of error or a petition for a new trial may be brought. This may continue, and if we may judge from what occurred in this case, it probably will, three years more. In the mean time, he has been compelled to relinquish property given to him as an indemnity, and then after the lapse of six years, to pay a bill of costs, from which he supposed himself exonerated, by the terms of his recognizance ; for the defendant had prosecuted his appeal to effect, by obtaining a final judgment against the plaintiff. The defendant may well say, *In hœc foedera non veni.* Chief Justice *Parsons* lays much stress on this argument *ab inconvenienti,* in the case cited from 7 *Mass. Rep.* 342.

I have already said, that it was conceded in the argument, and not denied by any member of the Court, that if *Lewis S. Lockwood* had delivered to the plaintiff property of any description to indemnify him against any loss for entering into this recognizance, he could not have held it after the judgment in chief in 1824. Had it been money, *indebitatus assumpsit* might have been maintained ; or trover would have lain for any other articles of personal property. This seemed irresistibly to result from the principle, that the lien created by the attachment, is, *ipso facto,* removed, by a final judgment, as well as from the doctrine never doubted, that special bail was in such case discharged. We have, then, a case, in which the defendant, *Enos Jones,* might have been sued, at any time between *September* 1824 and *September* 1827, for 400 dollars in money put into his hands by *Lewis S. Lockwood* to indemnify him for becoming his surety, and the money recovered from him on the ground that he was discharged from his suretyship ; and thereafter, in 1829, this sum was recovered from

*Fairfield,*
*June, 1829.*

Lockwood
*v.*
Jones.

*Enos Jones,* by *Horatio Lockwood,* on the ground that he *was not discharged from his suretyship.* If this be not an absurdity, I know not what can be.

It was also said, that if the bondsman on the appeal is discharged on rendition of the judgment in the superior court, it will operate very injuriously to the plaintiff; for he may be remediless for all his costs both before and after the granting of the new trial. Precisely so, if the special bail is discharged; if the bond in replevin is discharged; if the lien on real and personal property is removed,—the plaintiff may lose the fruits of his judgment. What then? The question,—and the sole question—still recurs, is the recognizance or bond satisfied, or the attachmment of property *ipso facto* dissolved, by a final judgment? I think it demonstrable from repeated decisions, as well as from the reason and nature of the case, that such is the law. The judgment, therefore, is, in my opinion, correct, and ought to be affirmed.

WILLIAMS, J. conceiving himself interested in the question, and BISSELL, J. having been of counsel in the cause, gave no opinion.

Judgment reversed.

---

THE STATE OF CONNECTICUT *against* LEACH.

A person confined in gaol, by virtue of a void warrant, may lawfully liberate himself, by breaking the prison, using no more force than is necessary to accomplish this object.

Nor is it a crime or misdemeanour in such person, that while his sole object was to liberate himself, other persons lawfully confined for atrocious crimes in the same room with him, in consequence of such prison-breach, made their escape.

THIS was an information against *Stoddard Leach* in two counts. In the first, it was alleged, that on the 15th of *June* 1828, the defendant, being a lawful prisoner in the common gaol of *New-Haven* county, confined by virtue of a warrant particularly described, with *William Hunt, William N. Williams* and sundry other persons legally confined in said gaol, for having committed divers atrocious crimes and misdemeanours, with force and arms, and with intent to effect his own

escape, and for the purpose of effecting the escape of said <span style="float:right">*New-Haven,*</span>
other prisoners, wickedly and feloniously sawed off the iron <span style="float:right">July, 1829.</span>
grates and bars to the windows of said gaol, and removed large <span style="float:right">State</span>
quantities of the stone from the walls of said gaol. In the <span style="float:right">*v.*<br>Leach.</span>
second count there was no allegation, that the defendant was
confined in gaol; but it was alleged, that he broke the prison,
wickedly and feloniously, with the felonious intent that certain
persons confined in the gaol for certain atrocious crimes,
should make their escape. The offence in each count, was
charged as a high crime and misdemeanour at common law.

On the trial, at *New-Haven, January* term, 1829, before
*Peters,* J., it was proved, that at the time mentioned in the
information, the defendant was confined in the same room in
the gaol with the other prisoners; and it was admitted, that
he in no other way attempted to effect their escape, than as a
consequence of the attempt to effect his own escape.

From the judgment upon which the warrant mentioned in the
information was issued, adduced in evidence by the defendant,
it appeared, that such warrant was issued on the complaint of
*Alanson Clark* of *Orange,* alleging, that " the said *Stoddard
Leach,* on the 9th of *May,* 1828, at said *Orange,* with force
and arms, did unlawfully and feloniously break and enter into
the dwelling-house of *Amos Clarke,* situated in said *Orange,*
in the day-time, to wit, about 3 o'clock in the afternoon, and
did then and there feloniously steal, take and carry away from
the said house a large sum of money, to wit, the sum of 25 dol-
lars in specie, the property of *Ira Clarke* of said *Orange,* against
the peace, and contrary to the statute in such case made and
provided;" that the defendant, being brought before *Daniel
Treat* Esq., justice of the peace, and required to make answer
to this complaint, pleaded *guilty;* and that said justice, having
found the facts alleged in the complaint to be true, and that the
amount of the money stolen was 25 dollars, ordered the defend-
ant to become bound in a recognizance, with surety, to appear
before the county court of *New-Haven* county, and answer to
the matters in said complaint alleged, and in default of such
recognizance, to be committed to the common gaol in *New-
Haven* county, therein to be held until discharged by due order
of law. It was proved, that the complaint was made by *Alan-
son Clark,* in the capacity of a private person, and not as an
informing officer.

Upon these facts, the defendant, by his counsel, claimed, and

New-Haven, prayed the judge to instruct the jury, that his imprisonment
July, 1829. under such warrant was illegal, and that he had a right to do
the acts charged in the information. The judge instructed the
State jury, that the warrant was illegal; yet if they should find, that
*v.* the defendant was confined in gaol under such warrant, and
Leach. that he did the other acts charged in the information, they
ought to find him *guilty.* The jury found the defendant guilty
accordingly; and he moved for a new trial, for a misdirection.

*Chapman* and *Harrison,* in support of the motion, contend-
ed, 1. That in order to convict a person of prison-breach, it
must be averred in the information, and proved on the trial,
that the defendant was *lawfully* confined. *Arch. Crim. Pl.*
19. 22. 306. 1 *Russell on Crimes* 547. 551. 555. 2 *Swift's
Syst.* 373. A person imprisoned under a void warrant, as this
was, is unlawfully imprisoned, and may rightfully use the
force necessary to effect his liberation.

2. That as this information alleges a *lawful imprisonment* of
the defendant, it was, at any rate, necessary, in this case, to
prove such allegation. All the facts, circumstances, intent,
&c. must be proved as laid. 2 *Swift's Dig.* 405. 1 *Chitt. C.
L.* 559. *Arch. Cr. Pl.* 19. 22.

3. That if the act of the defendant in effecting his own
escape, was lawful, he is not answerable for the consequences.
It was not his fault that he was put into a room with prisoners
legally confined, and that when he came out, they escaped with
him. The motion explicitly states, that the defendant in no
other way attempted to do the acts charged, than to effect his
own escape. This precludes the idea of any *intention* in the
defendant to effect the escape of the other prisoners, except as
a necessary consequence of his own liberation.

*N. Smith* and *J. M. Edwards,* contra, contended, 1. That
the defendant, being confined under a process apparently regu-
lar and legal, could not forcibly break the prison; but it was
his duty to apply for a writ of *habeas corpus,* on which he
might be discharged. At any rate, he must conduct reasona-
bly. Though a man may repel force by force, when assaulted,
he may not *repay* force with force. He must make demand to
be admitted to his liberty, before he proceeds to acts of vio-
lence. He may not, in the first instance, knock down the
gaoler, or break down the gaol, to get out.

2. That the defendant was liable to conviction on the second count, which does not allege a lawful commitment, for letting out the other prisoners. The jury, under the charge, must have found *an intent* to liberate the other prisoners. This is explicitly alleged in the information ; and the judge submits to the jury the question whether the defendant did the acts so alleged. Now, if the defendant had a right to liberate himself, still he had no right, *intentionally*, to let out other prisoners lawfully confined. The admission that the defendant effected the escape of the other prisoners in no other way than as a consequence of his own escape, is not inconsistent with an intention in him to effect their escape. Suppose it had been his *sole object* to effect their escape ; in what way could he better do it than by breaking the prison and going out first himself, thus shewing them the way, and leaving them to follow ? What other act would be necessary than what the defendant did in this case ?

In reply, the counsel for the defendant said, that no previous demand on the gaoler to be liberated, was necessary. This is not like the case of an officer coming with a warrant to make an arrest. A man is not bound to know, that an officer is one, or that he has a warrant, until he shews his authority. But here the warrant was void on the face of it. This the magistrate who issued it, the officer who served it, and the gaoler who held the defendant under it, must be taken to have known : all knew that the defendant was illegally confined and entitled to an immediate discharge.

DAGGETT, J. It appears from the motion, that the prisoner was confined in gaol ; and that he attempted to effect the escape of the other prisoners, in no other way or manner, than as a consequence of the attempt to effect his own escape. By this we are doubtless to understand, that the only object of the prisoner was to free himself from confinement, and if, in effecting this object, persons legally imprisoned escaped, he disregarded such consequences.

The statute creating the offence with which the prisoner was charged, and for which he was committed, was repealed before the acts alleged to be a crime, were done ;(*a*) the complaint on

(*a*) The statute referred to, is the 41st section of the " act concerning crimes and punishments," revision of 1821, which was repealed in *May* 1825.

*New-Haven.*
*July, 1829.*

State
*v.*
Leach.

which the warrant for his arrest issued, was illegal, not being made by an informing officer ; and the court before which the prisoner was committed to appear, had no jurisdiction of the crime charged.

I am of opinion that the direction to the jury was erroneous. The act of the prisoner in question was so far from being a high crime and misdemeanour, that it was justifiable. And here it is not intended to suggest, that a prisoner might not do acts which would be unjustifiable, in order to escape from unlawful imprisonment. He might not, for example, kill the gaoler, or set the prison on fire, or totally demolish it ; for none of these acts might be at all necessary to effect his object. But he might lawfully free himself from this imprisonment ; since it is confessed to have been illegal. It appears, that all the proceedings were void. A void process is no process. The complainant,—the justice of the peace who ordered him to be committed,—the sheriff who executed the pretended warrant,— and the gaoler who held him under it,—are all liable for false imprisonment. This is the undoubted doctrine of the common law from the time of the *Marshalsea* case, 10 *Co.* 68. to this day. It hence results, that the keeper of the gaol is vested with no authority ; the building in which the prisoner was confined, is not a gaol, but as to him, a mere private building ; and hence he might regain that liberty of which he was unjustly deprived ; and it is no part of the case that he made use of more force than was necessary to accomplish this object. Nor does the fact that he was confined with certain atrocious offenders, render it less proper for him to effect his escape.

There must, therefore, be a new trial.

The other Judges were of the same opinion ; PETERS, J. at first dissenting, but ultimately concurring.

New trial to be granted.

———◆———

## THE UNITED SOCIETY *against* THE PRESIDENT, DIRECTORS AND COMPANY OF THE EAGLE BANK OF NEW-HAVEN.

Where an ecclesiastical society had subscribed for shares in the *Eagle Bank*, by virtue of the provision for such subscription in the charter of the bank ; the bank afterwards became insolvent ; and such society thereupon gave

due notice of its intention to withdraw the shares so subscribed; it was *New-Haven*, held, that such society, by virtue of its subscription, became a stockholder July, 1829. in the bank, and part of the corporation, and consequently, after the insolv- ──────── ency of the bank, was incapable of withdrawing its shares, or of recovering United Society the amount as a debt against the bank. *v.* Eagle Bank.

THIS was an action of *assumpsit*, in two counts; the first, general, for money had and received for the plaintiffs' use; the second, special, for the amount of 72 shares of stock, subscribed by the plaintiffs, and demanded of the defendants, after six months notice of their intention to withdraw them.

The plaintiffs are, and for more than twenty years past, have been, an ecclesiastical society, duly incorporated, and located in *New-Haven* in this state. In pursuance of the provisions in the charter of the *Eagle Bank*, authorizing subscriptions from the funds of any ecclesiastical society in this state, and on the terms therein prescribed, the plaintiffs, at the several times specified in the second count of their declaration, subscribed, and paid from their funds, for seventy-two shares, at the rate of 100 dollars for each share; which subscriptions and payments were received by the defendants. The plaintiffs afterwards received the dividends, semi-annually declared, by the defendants, on these shares, at the rate of six *per cent. per annum* and upwards, until the 20th of *September*, 1825; when the plaintiffs gave notice to the directors of the *Eagle Bank*, that they should withdraw their shares and the money paid thereon, at the expiration of six months from that time. At the expiration of said six months, the plaintiffs demanded payment of said shares, at the rate at which they had been received; and the defendants, then, and have at all times since, refused payment. Previous to the 20th of *September*, 1825, the defendants became, and have ever since been, insolvent, and wholly unable to pay their bills and the deposites in the bank.

At the session of the General Assembly of this state, in *October*, 1811, the defendants were constituted a body politic and corporate. By the 1st section of the charter of incorporation, it was enacted: " That it shall be lawful to establish a bank at *New-Haven*, the capital stock whereof shall be divided into shares of one hundred dollars each, which shall be transferable according to such rules as may be established by the directors; and the subscribers to the same, their successors and assigns, shall be, and are hereby constituted a body politic and corporate, by the name of *The President, Directors and Com-*

*New-Haven,*
*July, 1829.*

*United Society*
*v.*
*Eagle Bank.*

*pany of the Eagle Bank at New-Haven."*    The 2nd article of the 2d section contained the following provision :   " All stockholders shall be entitled to vote at any general meeting, in person or by proxy ;  and one vote shall be allowed for each share ;  but no transfer  shall  be  allowed  of  any  share until the  expiration  of  six  months from the time of subscription."   By the 6th article of the 2nd section, it was declared, that bills or notes of the corporation " shall be  obligatory on the  corporation, according to the tenor thereof."   By the 3rd section, it was provided : " That the capital stock of said bank shall consist of  five thousand shares ; and  the stockholders, at a general meeting, may authorize the directors  to  open new subscriptions,  for such amount  as  they may deem  expedient, not exceeding two thousand five hundred shares."   By the 6th section, it was provided : " That in addition to the subscription before authorized, the state of *Connecticut* shall have a right, at any time, to subscribe to the said bank, at the rate of one hundred dollars for each share ;  and whenever the state shall have subscribed five  hundred shares, and paid for the  same, they shall have  a right of  appointing two  additional directors of said bank."    And by the 7th section, it was enacted :  " That in further addition to  the  subscriptions  before authorized, the said bank shall, at all times, be open for subscriptions, at the rate of one hundred dollars for each share, from the school fund of of this state, or from the funds of any college, ecclesiastical society,  school or corporation for charitable purposes within this state.   Provided, nevertheless, that shares so subscribed shall not  be  transferable, but may,  at any time, be withdrawn, on six months notice to the directors."    The  8th and last section provided : " That no  share  or shares  shall give to any stockholder  a  right to vote, unless the same  shall have stood in his name, on the books of the bank, at least three calendar months previous to the time of voting. (*a*)

A case embracing the facts above stated, in connexion with the charter of the *Eagle Bank,* was made and reserved for the consideration of this Court.

*N. Smith* and *R. S. Baldwin,* for the plaintiffs, after remarking that the case must be decided with reference to the original charter of the *Eagle Bank*, which, though reduced in form, at

(*a*) The references here made, are to the *original* charter, as entered upon the public records, and printed with the laws  of *October* session 1811, **and** not to the *abridgment* in the statute book, revision of 1821.

the revision of 1821, for the mere purpose of saving letter-press and paper, was not varied in substance, contended, 1. That whatever the relation of ecclesiastical societies to the *Eagle Bank* may be, they constitute no part of the corporation. By the 1st section, the holders of the transferable stock are constituted the members of the corporation; and to these stockholders all the general powers of a corporation are given. By the 2nd article of the 2nd section, the power of voting is limited to the holders of transferable stock. The provisions of the 3rd, 6th, 7th and 8th sections tend to confirm the proposition, that the holders of transferable stock constitute the body politic. On them exclusively are bestowed all the powers, rights, privileges and immunities, which are necessary and proper for a bank. The charter confers on ecclesiastical societies no one corporate function; but simply gives them the privilege of making subscriptions at pleasure, and withdrawing them on six months notice. This privilege was not thought to be an unreasonable one. A bank managing its business prudently, and acting up to the intent of its creation, would always preserve its capital entire. Its stock would not be materially diminished by losses, because its loans would be well secured; nor would it be augmented, because its profits would be regularly divided among its stockholders. This being the case, the share withdrawn is of precisely the same value as the share subscribed. The legislature, not foreseeing or suspecting the catastrophe, which has since taken place, did not deem it necessary to make any provision in relation to it. The expression " shares may be withdrawn," is slightly figurative, the representative being put for the thing represented. Hence the phrases in the charters of the several banks in this state, allowing societies, &c. to " withdraw the shares so subscribed"—" the money so subscribed"—" their moneys so subscribed"—" moneys for such shares"—" moneys subscribed and paid in" &c.—are convertible terms, and import the same thing.

These bank charters, in reference to the provision which they make for investing the funds of religious, literary and charitable institutions, have all one common purpose in view, the advancement of the public interest, by promoting the objects of those institutions. The various charters, therefore, *quoad* this privilege, are literally and technically *in pari materia*. *Rex* v. *Loxdale* & al. 1 *Burr* 447. *Doug.* 30. 1 *Term Rep.* 53. 3 *Term Rep.* 135. 1 *Swift's Dig.* 11.

*New-Haven,*
*July, 1829.*

United Society
*v.*
Eagle Bank.

The withdrawing of the funds of these privileged institutions has always been understood to import a withdrawing of the money invested. Such invariably has been the practical construction. All the banks have adopted and been guided by it. The rule on this subject, has, in practice been a uniform one, regardless of the variations of phraseology in the several charters.

It is a decisive objection to the construction claimed by the defendants, that it is *utterly impracticable.* If a holder of one of the transferable shares could lawfully withdraw *his share*, it would break up the institution as a bank. It would be necessary to ascertain the precise condition of the bank ; as the withdrawing stockholder would take only a proportionable part of the effects of the bank after its debts were paid. This would render it necessary to sell the real estate ; to collect the credits ; and in short, to convert the whole property of the bank into cash. This might be required every day in the year. Besides, the societies having no voice in the corporation, no right of access to its books, and no right to transfer their shares, if they could not withdraw the amount of their subscriptions, would be continually exposed to the rapacity of dishonest men, without possibility of redress.

The only practicable and consistent interpretation of the charter, is that which considers the societies as enabled to *lend*, and the corporation as obliged to *borrow* their funds, and in lieu of interest, to pay them such dividends as the stockholders receive, and to repay the principal at any time, on six months' notice. *This* confers a *favour* on the societies, and onerates the bank with such a *burden* as was deemed, by the legislature that granted, and the corporation that accepted the charter, a reasonable *bonus* for the monopoly simultaneously given.

2. That the giving of notice to the bank of an intention to withdraw, from that time converts the original investment into a legal debt. It then becomes money had and received for the use of the institution that invested it. Other creditors of the bank cannot complain ; for they dealt with it, knowing all the provisions of the charter.

3. That if the plaintiffs are creditors of the bank, and not stockholders merely, they are entitled to recover the *par* value of the shares, without reference to the condition of the bank This results from the *nature* of the claim. It is a right of tak-

ing back what had been put in.    Such too has been the practi-

cal construction.    This point will hardly be contested.

*Sherman* and *Hitchcock*, for the defendants, contended,
That the plaintiffs having subscribed for shares in the *Eagle
Bank*, pursuant to the charter, such shares constituted a part
of the capital stock, and the owners became members of the
corporation, and not its creditors.    At common law, they re-
marked, an association of men who are entitled to share the
profits of any business, are partners, and jointly liable to all the
creditors of the concern.    They may make such rules as they
please, in regard to the division of their common stock, as be-
tween each other ; but no one of them, by their mutual com-
pact, can be elevated to the rank or privileges of a creditor, but
all must contribute to the payment of debts.    Such, conse-
quently, would be the condition of all the proprietors of the
stock of this bank, associated on the very terms they now are,
were they unincorporated.    This rule of law is founded in nat-
ural justice: *Qui sentit commodum, sentire debet et onus.*  Nothing
could be more unjust, than that one individual of a joint concern
should enjoy the chance of gain, without sustaining the hazard
of loss ;—that he should receive the profits, and not contribute
to the losses of a common trade.

As all charters, containing provisions of doubtful construc-
tion, are to be interpreted according to the common law in
analogous cases ; the rule of interpretation must be adopted
here, if the terms of the charter are, in this respect, of equivo-
cal import.

That the *shares* taken by virtue of the provision in the 9th
section of the charter,(*b*) constitute a part of the *capital stock*
of the bank, is expressly declared in the 2d section, which
enacts, " that the *capital stock* shall *consist* of five thousand
shares of 100 dollars each, which shall be transferable, accord-
ing to such rules as shall be established by the directors ; *to-
gether with* such *shares* as have been or *shall be* subscribed
by the state of *Connecticut*, the school fund, any ecclesiastical
society, college," &c.    Thus, by the express language of the
statute, this class of subscribers *own shares* of the *capital stock.*

(*b*) Here, an d throughout the argument of the counsel for the defendants,
the charter is referred to, as it appears in the statute-book, revision of 1821.

New-Haven, That they are *stockholders*, then, is not an inference, but a
July, 1829. mere identical proposition. They compose a component part
United Society of the corporation.
v.
Eagle Bank. This is settled by the first section of the act, which pre-
scribes " that the *stockholders* of the *Eagle Bank*, their succes-
sors and assigns, shall be and remain a body politic," &c. It
being thus unequivocally settled, by the charter, that those so-
cieties, &c. equally with other stockholders, are a component
part of the corporation, we should reasonably expect some ve-
ry explicit provision to exempt their stock from the common
liability for debts due from the bank, if any such exemption
were intended by the legislature. Without some provision to
that effect, it will be admitted, that no such exemption can
exist. But we find no such ; nor, so far as we can discern,
any which will warrant the slightest implication of the kind.
On the contrary, it is expressly enacted in the 6th section,
" that bills or notes of the corporation, signed by the president,
&c. shall be obligatory *on the corporation ;*" by which the body
politic, as such, wholly and equally, without any distinction in
favour of a class of stockholders, is subjected to the debts there
specified.

But it has been said, that the right of societies to withdraw
their " *shares*," on giving six months notice, is evidence of an
*intent* in the legislature, that they should sustain no loss ; for
they are clearly entitled to withdraw their *whole* shares. Had
the provision been, that they might withdraw *all the money*
paid in upon their subscriptions, it would admit of no doubt.
But what is a " *share ?*" It is such a proportion of the *real
capital* of the bank, as one hundred dollars bears to the whole
*nominal* capital. The precision of this definition would not be
denied, if the subscribers for the 500,000 dollars were the *only*
stockholders. To say that the word *shares* has a different defi-
nition, when applied to the particular class of stockholders now
in question, is to assume the point in controversy, unless some
other part of the act is shown to warrant the distinction.
This resort to other parts of the act, would admit, that *this*
section does not contain evidence of an intent, which it has been
adduced to prove. But this provision, taken by itself, and
without the strong corroborations which other parts of the
statute furnish, aptly limits and establishes the rights reserved
to these societies, to withdraw their proportion of the *real
capital* for the time being. If that has been augmented 10 *per*

*New-Haven*, July, 1829.

United Society
*v.*
Eagle Bank.

*cent.*, they will be entitled to withdraw 110 dollars for each share ;—if diminished 50 *per cent.*, 50 dollars only to a share can be reclaimed. The right of a stockholder to withdraw a " *share*" is, *ex vi termini*, a right to withdraw his *proportion* of the *real* capital, and nothing more or less. If the charter were revoked, all the stockholders might withdraw their " *shares*" of the *capital stock*, which, if one half were lost, would be equal to 50 dollars each. The privileged stockholders may do, at any time, precisely what the rest may do at the revocation of the charter.

But it has been said, that it would be difficult, if not impossible, to determine the amount of the shares of such corporations as might give notice to withdraw, as it would require an ascertainment of the state of the bank. The capital might in part consist of doubtful debts, or forfeited mortgages, or other property of uncertain value. But the statute assumes, that the state of the bank may be ascertained, and is, in fact, understood, by those who manage its concerns, at all times. This is evident from the provision in the 7th section, that " dividends of such parts of the *profits* as the directors may judge proper, shall be made semi-annually." By *profits* must be understood, the surplus of the property of the bank above its nominal capital. When the *real* capital is below the *nominal*, no dividend can be lawfully made ; and when the real capital exceeds the nominal, the amount of that excess must be ascertained, to determine *how much* may be divided. It is evident, therefore, that the legislature did not consider the difficulty of coming at this fact, as insurmountable.

In the common concerns of society, similar instances are of daily occurrence. In the distribution of estates, and innumerable other cases, the amount of shares paid in money, is ascertained, by the valuation of property and of credits ; and where no board is vested with the power of deciding the point, it must, if the parties cannot agree, be settled, as in other cases, by a court of justice. It is as practicable to decide how much must be paid, by the bank, to a stockholder withdrawing his share, by an estimate of all its funds, as to ascertain the semi-annual amount of dividends ; for the *data* are the same in both cases. The directors are expressly bound, at the end of every half year, to possess all the knowledge of the state of the bank, for the object specified, which is requisite for this, and which would enable them, without further enquiry, to apart to any stock-

*New-Haven,*
July, 1829.
UnitedSociety
*v.*
Eagle Bank.

holder, the proportion in cash of the capital stock to which he is entitled.

It has been said, that the legislature intended to *favour* these societies; and hence it has been inferred, that they are not to be subjected to the responsibilities of stockholders. That the legislature intended to favour them, cannot be doubted; but to what extent can only be known by the terms of the charter. The bestowment of the common rights of stockholders would, of itself, be sufficient evidence of such an intent; for it is well known, with what eagerness *those* rights have been contended for, in applications for grants and in the distribution of stock. The obligations on banks to receive such subscriptions, has been considered as a sort of *bonus;* and the original stockholders have justly deemed it a great burthen on their charter, to be compelled to submit to the doubling of their capital, by such subscriptions. But from the general intent to favour these societies, we can no more conclude, that they were to be preferred to other stockholders, than that they were to be preferred to all other creditors. To infer a specific right, from a general intent to promote their interest, would be to make a conclusion so loose and indefinite, that it might be extended to supersede the rights of bill-holders and depositors, as well as those of other stockholders. The legislature intended to confer advantages on *all* the stockholders; but our knowledge of this intent will not save us the necessity of resorting to the charter to ascertain the nature and extent of those advantages.

It has been further said, that these societies, are denied the privilege of voting, which other stockholders possess. Were it so, it would be well for them to consider it duly before investing their money in the bank. But the conclusion would not follow, that they were to be creditors, and not stockholders. Suppose, as is the fact in some corporations, that a certain number of shares were necessary to entitle a stockholder to vote; we could not infer, that the proprietor of a less number, would be entitled to any preference in the division of the capital stock; much less, that he would have the rights of a creditor of the corporation. But, although no inference can be made from this consideration either way, we would remark, that it has never been decided, that these societies have not the right to vote. Such a right would not be inconsistent with their character as corporations; and if they were original stockholders, would not be questioned. It has already been

New-Haven,
July, 1829.

UnitedSociety
v.
Eagle Bank.

shown, that they are *stockholders;* and no clause in the charter prohibits them. On the contrary, it is expressly enacted in in the 1st section, that "all stockholders shall be allowed to vote in general meeting, in person or by proxy, and one vote shall be allowed for *each share.*" If, in some respects, they are in a worse condition than other stockholders, in others, they are in a better. If, on the one hand, to prevent the abuse of their privilege of taking stock at all times *at par,* they are prohibited selling it, in order to prevent unjust speculation—they have the right, on the other, even when the value of stock is *under par,* to withdraw their shares, and, if the bank is sound, receive the nominal amount. However great the current dividends, or excessive the premium, they may take the stock, *ad libitum,* till they have doubled the capital of the bank, without paying any premium at all. The mass of stockholders are not apprized of the declining state of a bank, until it becomes a fact of general notoriety. In that case, such is the impression on the public mind, that the stock will generally fall below its just value ; and it is better to withdraw than to sell. While the original stockholders must either sell at a great sacrifice upon the real worth of their stock, or " patiently witness the destruction of their property," this privileged class of subscribers, unless the decline be so rapid as to forbid all hope, may attain better justice, by availing themselves of their exclusive right to withdraw. On justly counterbalancing the advantages and disadvantages of this description of stockholders, the result will be greatly in their favour, and we shall not be obliged to make them creditors, in order to shew that *some* benefit was conferred, as well as intended. From these considerations, however, nothing is to be inferred relative to the present question. Each provision in the charter distinguishing these societies from other stockholders, like that which prohibits alienation, is founded on some obvious reasons peculiar to their circumstances, and will afford no criterion by which to ascertain the amount they are entitled to withdraw. The express provisions which have made them *stockholders,* and *as such* acthorized them to withdraw their *shares,* are the only touchstone by which to test the nature and relative value of their rights.

It has been said or intimated, that the charter of 1811 defines the rights of subscribers differently from that of 1821, to which we have hitherto alluded. We will not reply to this objection

to the foregoing remarks, by saying, that if this difference does exist, the *last* act must be of paramount authority ; for no such difference in the charters can be discerned.    The rights of the favoured corporations are placed on the same ground in the original charter as in that of 1821.    This is evident from many of its provisions.    In the latter part of section 2. article 6., it is enacted, " that the debts of the corporation, whether by bill, bond, or note, shall not, at any time, exceed 50 *per cent.* over and above the total amount of its *capital stock* actually paid in, and of the moneys deposited in the bank for safe-keeping."    It will not be denied, that if the subscriptions of the state and of corporations should equal the residue of the bank, as by this charter they may, so that the whole would amount to one million, it would be lawful to contract debts to the amount of one million and a half ; and it will not be contended, that the sums paid on such subscriptions are " moneys deposited for safe-keeping."    In this clause, therefore, they are denominated " capital stock," and their owners are, consequently, *stockholders,* in the view of the legislature, or, in other words, members of the corporation, and subject, for the reasons before assigned, to all its liabilities.    In the original charter, the word "shares" is used in its appropriate sense, as well as in that of 1821, and signifies such a proportion of the real capital of the bank, for the time being, as 100 dollars bears to the whole nominal amount.    It has the same import in the *seventh* section, when applied to the interests of charitable and religious corporations, as in the *first* section, relating to the original stockholders.    The enactment in the *third* section, " that the *capital stock* shall consist of *five thousand shares,*" means, that it shall *at present* consist of that number *at least ;* and not that the twenty-five hundred authorized in the same section, or those mentioned in the *seventh,* are not equally to be deemed part of the *capital stock,* whenever they shall be subscribed.

If these privileged subscribers, instead of paying the debts of the bank, are permitted to come in as creditors, and increase their amount, the legislature are not only chargeable with having authorized a violation of the fundamental principles of the common law adopted in all analogous cases, but must have intended particular and gross injustice.    If their subscriptions had augmented the trading capital to a million, and the bank had lawfully contracted debts to the amount of fifteen hundred thousand ;—if its debtors had then failed to the amount of more

than a million, as in this case they actually have, these subscri- *New-Haven*, July, 1829.
bers might retire with half the capital, and leave innocent
creditors to sustain the loss of more than half a million, con- United Society *v.* Eagle Bank.
tracted on the credit of this capital, and for the emolument of
those by whom it is withdrawn. They may first receive in-
terest on bills issued, and then withdraw the capital on which
they are issued, and which is pledged for their redemption.
This injustice is aggravated by the consideration, that the mere
bill-holder has no dealings with the bank. He is not like one
who contracts to build a banking-house, but he receives the
paper as he receives specie—as current money, of *intrinsic*
value. Having no contract with the bank, he is not presumed
to know its charter, which is not a public, but a private act.
He should be guarded from all the hazards assumed by every
contracting party, who reposes a *voluntary* confidence in the
solvency of his debtor. The public faith in establishing such
an institution is of peculiar sacredness. But upon the princi-
ple assumed by the plaintiffs, the legislature might as well au-
thorize the withdrawment of all the capital as a part, and leave
bill-holders, in all cases, to the mere courtesy of the corpora-
tion, without any legal power to enforce their demands.

But it has been insisted, that the first section of the original
charter of 1811, has, in terms, constituted those individuals a
body politic, who are proprietors of the *kind* of shares there
specified, *viz. transferable* shares ;—has made *them* "The
President, Directors and Company of the *Eagle Bank*," and
conferred on them, their successors and assigns only, all the
*corporate* powers specified in the act. Hence, it is inferred,
that they only are the stockholders of the corporation, or
proprietors of that portion of the capital of the bank, which is
liable for debts.

It is readily admitted, that all corporate powers are, by the
first section, conferred on the proprietors of transferable stock
alone. It must, indeed, be farther admitted, that when the
first 5000 shares are distributed, by the commissioners, among
subscribers, those subscribers *alone* become vested with *all* the
powers of the corporation. But it is denied, that this leads to
the conclusion, that proprietors of other shares, admitted pur-
suant to subsequent provisions in the charter, will not, when
those provisions are complied with, become members of the
same corporation and stockholders therein. Because the sub-
scribers for the first 5000 shares are invested with *all* corpo-

rate powers, and their stock liable to every demand upon the bank, before any other stock is added, does it follow, that the proprietors of the 2500 transferable shares, mentioned in the third section, will not, when the powers given in that section are executed, become stockholders too, and partake, equally with the first, of the powers and liabilities of the body politic ? Such a consequence will not be contended for, by the plaintiffs. No difference, however, is perceived, between the new stockholders to be admitted by the third section, and those entitled by the seventh. Because the former may cease to be stockholders, by the *transfer,* and the latter, by the *withdrawment* of their shares, it would not seem to follow, that the latter were not stockholders, while they held their stock, nor members of the corporation before they withdrew.

Reference has been had to the charters of the other banks in this state ; and it has been insisted, as all bank charters are parts of the banking system, and the provisions made in all for religious and charitable corporations are parts of the same system of legislative beneficence towards those institutions, that these acts are in *pari materia ;* and that the language in all is to be considered in ascertaining the intent of each, as if they were but one act. To this it may be replied, first, that they are not public, but private acts, establishing distinct private corporations, and, therefore, do not admit this principle of interpretation, any more than a contract between *A.* and *B.,* may be interpreted by another contract, made at another time, between *A.* and *C.* But, secondly, if we resort to the other charters, we shall find, that these societies take *shares* in them as well as in this, and are *stockholders* in them all. The expression in some of the charters, that they may withdraw " their money," implies no more than we admit, and does not define *how much* their money is. That is left to be ascertained by the state of the bank. Should a charter expire or be revoked, every stockholder might withdraw " his money ;" but if the trade of the bank had been unfortunate, its amount would be proportionally reduced.

Hosmer, Ch. J. The contestation of the parties is merely this. The plaintiffs contend, that they, by virtue of their subscription, became neither stockholders in the *Eagle Bank,* nor a part of the body politic or corporation ; but on their giving notice of their intention to withdraw their shares, their original

investment, from that time at least, was converted into a legal debt.    On the other hand, the defendants insist, that the plain- tiffs, by their subscription, became stockholders, and a part of the body politic or corporation ; and of consequence, the bank being utterly insolvent, they were incapable of withdrawing their shares.

The solution of the controversy depends on a construction of the defendants' charter.    Between that, however, and the act of *May* session 1821, there is no essential difference; the latter varying the method only, and explicitly declaring what the former clearly implied.

We will first bring into view the material clauses of the charter, and then attend to their construction.    [Here the Chief Justice referred to the 1st section, the 2nd and 6th arti- cles of the 2d section, and the 3rd, 6th, 7th, and 8th sections.]

The charter being thus brought before us, we will now pro- ceed to an exposition of it.    In doing this, we shall not forget, that a statute ought to be expounded according to its intent ; (*Com. Dig. tit.* Parliament. R. 10. b.) at the same time re- membering, what is often forgotten, that in many, perhaps in most cases, the plain meaning of the language used, is the best evidence of intention.    *Curtis* v. *Hurlburt,* 2 *Conn. Rep.* 309.

For the purpose of simplifying the case, we will put out of consideration certain principles insisted on, as they reflect no light on the construction of the charter.

The plaintiffs have recurred to the charters of several banks, in which subscribers are permitted to withdraw " their sub- scriptions" and " their moneys," after six months' notice.  These expressions are supposed to denote the same right, which the plaintiffs claim, by the words " to withdraw their shares," and to give a construction to them, on the ground that the laws are *in pari materia*.    I am of opinion that the acts referred to are not in *pari materia ;* but that they are distinct and irrelevant to each other.    Statutes are *in pari materia,* which relate to the same person or thing, or to the same class of persons or things.    The word *par* must not be confounded with the term *similis*.    It is used in opposition to it, as in the expression "*magis pares sunt quam similes ;*" intimating not likeness merely, but identity.    It is a phrase applicable to public stat- utes or general laws, made at different times, and in reference to the same subject.    Thus, the *English* laws concerning pau- pers and their bankrupt acts, are construed together, as if they

were one statute, and as forming a united system ; otherwise the system might, and probably would be unharmonious and inconsistent. Such laws are *in pari materia*. But private acts of the legislature, conferring distinct rights on different individuals, which never can be considered as being one statute, or the parts of a general system, are not to be interpreted, by a mutual reference to each other. As well might a contract between two persons be construed by the terms of another contract between different persons. The obligation of a contract cannot be impaired, by this indirect proceeding.

If, however, the acts were *in pari materia*, it would not avail the plaintiffs. When it is provided, that subscriptions or moneys may be withdrawn, the meaning is the same as that there may be a withdrawal of shares; for the latter can only be withdrawn by money, which is the common standard of value.

It was insisted, by the plaintiffs, that by a practical construction of the banks, shares have usually been withdrawn at their *par* value. While sitting in this court, we have not the means of ascertaining the fact advanced, concerning which the motion is silent. But admitting it, for the sake of argument, I do not deem it of much importance. If the charter of the defendants is clear and unambiguous, it must be construed by its provisions. A mistaken practical construction cannot destroy the unquestionable rights of the parties. In *Cooke* v. *Booth*, *Cowp.* 819. the contrary was decided ; but this determination has frequently been disapproved of, and a different rule is now established. *Baynham* v. *Guy's Hospital*, 3 *Ves.* jun. 298. *Eaton* v. *Lyon*, 3 *Ves.* jun. 694. *Iggulden* v. *May*, 9 *Ves.* jun. 333. " It cannot be a legal rule of construction," said the master of the rolls, " that the party who has done an act, which he was not bound to do, or from mistake, should therefore be bound forever, without the power of retracting." *Moore* v. *Foley*, 6 *Ves.* jun. 238. These considerations I put out of the case, as possessing no essential importance.

1. In the first place, I am of opinion, that the plaintiffs, by their subscription, became *stockholders*.

Each hundred dollars subscribed, by the express provision of the charter, entitled them to *a share* in the *Eagle Bank*. What is intended by the word *share?* In its popular and familiar meaning, it denotes a part or portion of a thing owned in common. By the 1st section of the charter, it is provided, that

*New-Haven,*
July, 1829.

UnitedSociety
*v.*
Eagle Bank.

"the capital stock shall be divided into shares;" and by the 3rd section, that "the capital stock of said bank shall consist of five thousand shares." These expressions are precisely synonymous with the assertion, that each share shall be a part of the capital stock. It is impossible, that language should be more definite and unequivocal. The word *share* having thus been defined, it is invariably used with the same meaning throughout the charter. Thus, it is said, that "one vote shall be allowed for every *share* ;" that "for two thousand five hundred [additional] *shares*" a new subscription may be opened ; and that the state and ecclesiastical societies may subscribe "*for shares.*" Shares of what ? Undoubtedly, shares of the *capital stock*. This correlative of the word *shares*, had been expressly declared in the charter ; and after this, a certain subject of reference having been given, it became unnecessary to repeat it. When, therefore, it was provided, that the state and ecclesiastical societies might subscribe for *shares*, it was equivalent to the assertion, *shares of the capital stock.* It is impossible to doubt it. In a statute or formal instrument, the same words regarding the same subject matter, must be taken to import the same signification. This is a self-evident principle, without the admission of which there is no rule to find out the true and genuine sense of language. By the *stock* of a company is intended its fund or capital. He who owns a share of the stock or capital, is a share-holder or stock-holder, words of equivalent meaning, unless all the stock is owned by a single person.

The meaning of the term under discussion, would scarcely have been questioned, were it not for the proviso to the section, under which the plaintiffs made their subscription. The proviso, however, so far from countenancing a different meaning of the word *shares*, affirms that which I have adopted. It declares, that the shares "shall not be transferable." If the plaintiffs' shares could not become a part of the capital stock, why this provision ? It would have been entirely superfluous. A right to a sum of money is a chose in action, and incapable of transfer. It was because the shares were to be part of the capital, and, if unrestrained, transferable stock, that the provision was made.

In opposition to the meaning of a familiar word, whose signification is likewise defined, by the plain provisions of the charter, the plaintiffs have founded themselves on a supposed

object of the legislature in authorizing their subscription. It was intended, they assert, to confer on them a privilege ; but that, on the defendants' construction, they are placed in a worse condition than any other persons interested in the bank. The privilege, they add, was by rendering them creditors, and not stockholders ; in this manner preserving them from responsibility and loss.

It is admitted, by the parties, that a privilege was intended the plaintiffs. It devolves, then, on the plaintiffs, to show, that on the defendants' construction, they had no privilege, but the reverse of one ; and that the intended boon was to render them creditors, and not stockholders.

That their subscription, if they became stockholders, was not a privilege, is supposed to result from their incapacity to transfer their stock, and their subjection to the debts and responsibilities of the bank. On this part of the case, the ground taken in argument was too narrow. All the advantages and disadvantages of the plaintiffs' condition should be recurred to, and then, on comparison made with the other stockholders, their relative situation will be discerned.

In the first place, without asking the consent of any one, they had a legal right to subscribe for shares at their pleasure, on the advancement of one hundred dollars for each share. Thus far, their privilege was peculiarly great. They might become interested in any bank within the state, and, at par value, take the benefit of its prosperous condition. To prevent pernicious stock-jobbing, they were not permitted to transfer their shares. This disadvantage was countervailed, in some measure, by allowing them to withdraw them, on six months' notice. This, it is believed, is not as valuable as the unrestrained right of transfer. At the same time, it did not greatly impair the value of the plaintiffs' privilege. If, as a general truth, the insolvency of our banks is a rare occurrence, and from the apparent signs of danger to the solvency of those institutions, a prudent and discerning man may look ahead a few months, and render himself secure ; both of which suppositions are believed to be true ; there is little abatement to be made from the before-mentioned privilege, by reason of the non-transferability of shares. On the other hand, those who become stockholders, by purchase, must wait for an opportunity of investing their money, and when it arrives, must pay the price above par, which stock bears in the market. I en-

tertain no doubt, that the right of transfer, when they become <span style="float:right">*New-Haven,*<br>July, 1829.</span>
purchasers, does not place them, in point of privilege, on a level with those who can always buy at par, and force themselves <span style="float:right">United Society<br>*v.*<br>Eagle Bank.</span>
on the most prosperous banks; and, as soon as they please, on the delay of six months, can retire with their share of the capital.

The plaintiffs asserted in the argument, that not only a privilege was intended, but that no loss should happen to them, except that which attends ordinary depositors. The assertion was made; but how was it supported? To me it appears to have been wholly *gratuitous.* The words of the charter give no intimation of such intent; nor has any ground been referred to, from which it can be implied.

It has been asserted, that the plaintiffs had not the right of voting in the corporate meetings, and that this was a diminution of a general and important privilege. For this remark, I discern no just foundation. If the plaintiffs were stockholders, they were voters, by the express provision of the charter.

A more serious objection has been made. It has been insisted, that the defendants' construction is impracticable; that it renders necessary the winding up of the concerns of the bank, on every notice to withdraw a share. The remark is founded on the principle, that the value of a share can in no other manner be ascertained.

That the legislature viewed the subject in a different light, is unquestionable. They have provided, that such part of the profits of the bank as the directors may judge proper, shall be divided semiannually. By *profits* is intended the acquisitions of the bank beyond the nominal capital. The condition of the bank must be ascertained, or how can the profits be known? But the means of ascertainment, for this ordinary six months' operation, are precisely those, and no other, that the directors have, in determining the value of a share. On the point in question, a defect has arisen in the omission to distinguish between a mathematical and a moral certainty. The semiannual profits to the stockholders, as a general truth, cannot be ascertained with mathematical precision; nor is it expected. But the means of moral certainty are possessed; the principle by which most of the concerns in human life, are regulated; and the value of a share may be estimated as nearly as other probabilities are, on which men act with a conciousness of safety.

On the whole, I entertain no doubt that the plaintiffs are stockholders, and onerated with the responsibilities of such ; nor can I consider them as creditors, unless by the indulgence of a latitude of construction, which more resembles legislation than judicial decision.

The shares of the plaintiffs may be withdrawn, if they exist. But the capital of the corporation is bound to creditors, and if the debts against it surmount the capital, there are virtually no shares.    The capital has perished, and the shares with it.

On the clearest principles of natural justice, the case demands this construction.    It is in analogy with the maxim of the common law—*Qui sentit commodum, sentire debet et onus.* To the favoured stockholders no injustice is done, who, in the day of the bank's prosperity, received profits, perhaps great profits, on their investments.    On the other hand, the justice due to the creditors of the bank, imperiously requires it.    They trusted the capital of the bank ; that capital, which the plaintiffs with others put forward as an inducement to the trust. That the plaintiffs, under such circumstances, should be permitted to withdraw the value of their shares, and thus deepen the loss of the creditors, is too inequitable to justify the belief, that such could have been the legislative intent.

2. I come now to the question, whether the plaintiffs were part of the corporation or body politic, and subject to its debts.

They were stockholders ; and, by a clear consequence, it would seem to follow, that they were a part of the corporation.    An incorporation, generally speaking, is instituted for, and comprises, those who are owners of the capital, for the benefit of which the body politic was created.    It is said, by the plaintiffs, that the legislature has limited the incorporation to the five thousand shares of transferable stock, with which the bank was to commence its operations.    On this subject, I do not question the legal omnipotence of the legislature ; but it may be reasonably demanded, that the supposed limitation, so much at war, as it is, with all observation and experience, should be clearly established.    The charter, in its 1st section, provides, that " the capital stock shall be divided into shares of one hundred dollars each, which shall be transferable, &c. and the subscribers to the same &c. shall be and are hereby constituted a body politic and corporate ;" and by the 3rd section, the capital stock is to consist of five thousand shares.    By the *letter* of the act, thus far, the corporation appears to be limited

to this original transferable stock ; but in my opinion, it is much *New-Haven,* July, 1829.
too narrow an exposition of the charter. The spirit and in-
tent of the law, taking into view all its provisions, is widely United Society *v.* Eagle Bank.
different. It was undoubtedly intended, at all times, to cover
the whole capital. The reason of the case shows it. At its
commencement, the bank was made to consist of a capital of
five thousand transferable shares ; and referring to these, the
corporation expressly covered them. But it was on the com-
mon principle, that the subscribers to the capital, and stock-
holders, should constitute the persons incorporated. By a sub-
sequent provision of the law, twenty-five hundred transferable
shares might be added. Was it the intent of the charter, that
the owners of these shares should be excluded from the incor-
poration ? I cannot believe it. They are within the same
reason as the first subscribers ; and they equally need the ad-
vantage of being a part of the body politic, and aiding in the
superintendence of their own property. The state is, like-
wise, authorized, in a certain event, to appoint directors ; but
are they thus to manage the concerns of the bank, while they
are no part of the corporation ? The construction for which
the plaintiffs contend, in my opinion, is obnoxious to the impli-
ed censure of the maxim, *Qui hæret in litera, hæret in cortice.*

But even the letter of the charter, when the whole of it is
surveyed, has been misapprehended ; for by the 2nd article of
the 2nd section, the point in question is settled. " All stock-
holders shall be entitled to vote ;" that is, every stockholder is
a member of the corporation, and *may exercise this act of a
corporator.*

To obviate this, it was said, that no transfer shall be allowed
of any share, until the expiration of six months from the time of
subscription, and therefore, that the power of voting was lim-
ited to transferable stock. By no means. We discern no re-
lation between the premises and the inference. Besides, a sus-
pension of the right of transfer, or a prohibition of it, or even a
suspension of the right of voting, for a limited period, are not
incompatible with a right of membership in a corporation.
On the contrary, they presuppose it.

In conclusion, I entertain no doubt, that by their subscrip-
tion, the plaintiffs became stockholders in the *Eagle Bank,* and
a part of the body politic or corporation. Of consequence, I
am of opinion, that judgment must be rendered for the de-
fendants.

*New-Haven,*
*July, 1829.*

BISSELL, J. was of the same opinion.

United Society
*v.*
Eagle Bank.

PETERS, J. being interested in the event of the suit, and DAGGETT and WILLIAMS, Js., having been of counsel in the cause, gave no opinion.

Judgment to be for defendants. (*a*)

(*a*) By an act of the General Assembly, passed *May* session, 1829, it was provided, " That in all suits in law or chancery, depending in the Supreme Court of Errors in this state, where any three of the Judges of said Court are, or shall be, by reason of interest or otherwise, legally disqualified from acting or sitting in judgment, the other two Judges of said Court shall constitute a quorum, and shall be empowered to hear and determine said suits, and render judgment therein."

---

THE TRUSTEES FOR RECEIVING DONATIONS FOR THE SUPPORT
OF THE BISHOP *against* THE PRESIDENT, DIRECTORS AND
COMPANY OF THE EAGLE BANK OF NEW-HAVEN.

The Trustees for receiving donations for the support of the Bishop, are a corporation for charitable purposes, within the meaning of the 7th section of the original charter of the *Eagle Bank*.

Where a corporation for charitable purposes had subscribed for shares in the *Eagle Bank*, by virtue of the provision for such subscription in the charter of the bank ; the bank afterwards became insolvent ; and such charitable corporation thereupon gave due notice of its intention to withdraw the shares so subscribed ; it was held, that such corporation, by virtue of its subscription, became a stockholder in the bank and part of the corporation, and consequently, after the insolvency of the bank, was incapable of withdrawing its shares, or of recovering the amount as a debt against the bank.

THIS was an action of *assumpsit,* to recover the amount of 65 shares of stock, subscribed by the plaintiffs, on the 1st of *January,* 1822, and demanded of the defendants, on the 28th of *March,* 1826, after having given to the directors six months notice of their intention to withdraw them.

The facts in this case, were, in all material respects, the same as in the preceding case of *The United Society* v. *The Eagle Bank,* except so far as the right of the plaintiffs depended on the nature of their institution. Their charter of incorporation, granted, by the General Assembly, in *May,* 1799, is as follows: "Upon the memorial of the protestant episcopal societies in the state of *Connecticut,* representing, that by the constitution of

their system of divine worship, it is indispensably necessary <span>*New-Haven,*</span>
that they have a bishop to preside over them, a part of whose <span>July, 1829.</span>
duty it is, to visit the respective churches under his charge ; Bishop's Fund
that some compensation for his services it is their duty to ren- <span>*v.*</span>
der ; and that this compensation, by way of a partial support Eagle Bank.
for him, has heretofore been raised, by means of a voluntary
contribution ; that many well-disposed persons, who have the
happiness of their *Christian* brethren at heart, would willing-
ly make donations for the support of a bishop, which would
relieve the memorialists from a considerable burthen ; pray-
ing for an act of incorporation to invest a number of persons
and their successors with power to receive donations for the
support of a bishop :

"Resolved by this Assembly, that *Bela Hubbard, Jonathan
Ingersoll,* &c., and their successors, be, and they are hereby
incorporated, by the name of *The Trustees for receiving do-
nations for the support of the Bishop,* with all the powers and
immunities incident to an aggregate corporation ; by which
name to sue and be sued, and continue its succession, by elec-
ting such persons as said corporation shall deem proper to fill
such vacancies as may happen, by death, resignation or other-
wise. *Provided,* that said corporation shall not have power, at
any time, to hold property, the annual product of which ex-
ceeds the sum of one thousand dollars. And said corporation
shall continue during the pleasure of the General Assembly."

The case was reserved for the consideration of this Court.

*N. Smith* and *Seeley,* for the plaintiffs.

*Sherman* and *Hitchcock,* for the defendants.

HOSMER, Ch. J. The facts in this case are substantially
like those in the preceding case of *The United Society* v. *Eagle
Bank ;* and, of consequence, the result must be the same.

It was suggested at the bar, but not strongly pressed, that
the plaintiffs are not a charitable society, within the meaning
of the law. If this were so, it would form a fatal objection to
their action. Their suit is founded on their being a charitable
society, and by the charter of the defendants, authorized to sub-
scribe for shares in the *Eagle Bank,* at their pleasure.

That they, however, are a charitable society, within the in-
tendment of the law, admits not of a question. The trust as-

*New-Haven,*
*July, 1829.*

*Bishop's Fund*
*v.*
*Eagle Bank.*

sumed by the plaintiffs, is, to receive donations for the support of a bishop ; and if the promotion of public objects of utility is a charity, of which I entertain no doubt, *a fortiori* are donations to support an officer in the *Episcopal* church, essential, in the opinion of that church, to their organization. *The American Asylum* v. *The Phœnix Bank,* 4 *Conn. Rep.* 172. Nor can it be controverted, that the trustees appointed to receive donations, in the fulfilment of their trust, are authorized to subscribe for shares in a bank, to secure the funds thus obtained, and render them productive.

But as the plaintiffs, by their subscription, became stockholders in the *Eagle Bank,* and part of the corporation ; on the insolvency of this institution, their part of its capital, pledged to the creditors of the bank, they have no legal authority to withdraw.

I am, therefore, of opinion, that the issue be found for the defendants.

BISSELL, J. was of the same opinion.

PETERS, J. being interested in the event of the suit, and DAGGETT and WILLIAMS, Js., having been of counsel in the cause, gave no opinion.

Judgment to be for defendants.(*a*)

(*a*) See note to preceding case, *p.* 476.

---

### HOMER and others *against* THE SAVINGS BANK OF NEW-HAVEN and others.

Where collateral security is given, or property assigned, for the better protection or payment of a debt, chancery will make it effectual for that purpose, not only to the immediate party to the security, but to others who are entitled to the debt.

But where the *Eagle Bank,* shortly after its failure, assigned property to trustees, to secure, indemnify and protect *H.* against any indorsment of his on the post-notes of the *Eagle Bank,* to an amount not exceeding 20,000 dollars ; and it appeared, that at the time of the assignment, there were outstanding post-notes of the *Eagle Bank,* indorsed by *H.,* to the amount of more than 100,000 dollars ; that *H.* was indebted to the *Eagle Bank* in more than 500,000 dollars, and was insolvent ; and that he had paid nothing on his indorsements of post-notes ; on a bill in chancery brought by holders of such post-notes to the amount of 69,000 dollars, for the benefit

of the property so assigned, it was held, that the trust was not created for the payment of *Eagle Bank* post-notes, but for the mere indemnity of *H.*; that *H.* could have no claim to this fund but on the ground of payments actually made upon his indorsements ; that the plaintiffs could claim the benefits of the trust only through *H.*, and claiming through him, must stand in his place and be subject to the same equity to which he would be subjected, were he claiming the execution of the trust ; and consequently, that the plaintiffs were not entitled to the relief sought.

<div align="right">

*New-Haven,*

July, 1829.

Homer
*v.*
Savings Bank.

</div>

THIS was a case reserved, by the superior court, sitting in chancery, for the consideration of this Court, on a cross-bill filed by the plaintiffs, against the original bill of the *Savings Bank*, sundry depositors and creditors of the *Eagle Bank* and the *Eagle Bank* ; which was tried before *Bissell*, J., at an adjourned term of the superior court, at *New-Haven*, in *June*, 1829.

On the 19th of *September*, 1825, *William C. Holly* and *Normand Dexter*, being largely indebted to the *Eagle Bank*, made an assignment of 3500 tons of iron to *George Hoadly*, the president of the bank, in part payment of their debt. On the 21st of the same month, *Hoadly* assigned the same iron to *William W. Woolsey* and *George Griswold*, in trust, that after having sold it and converted it into money, and having paid and reimbursed the charges and costs incident to the trust, they should, in the first place, by and with the proceeds, or any moneys to be procured therewith, secure, indemnify and protect *William C. Holly* against and concerning any indorsements of his on the post-notes of the *Eagle Bank*, to an amount not exceeding 20,000 dollars ; and in the second place, pay the creditors of the *Eagle Bank*, in the order and according to the priority following; *viz.* 1st, to pay to the *Savings Bank* the full amount of all moneys, deposited by that institution, in the *Eagle Bank*, supposed to be about 90,000 dollars ; 2dly, to pay all other persons, who had ordinary or special deposites of money in the *Eagle Bank*, the full amount of such deposites respectively ; or if the said proceeds should prove insufficient to pay such depositors in full, then to distribute the proceeds among them according to the amounts of their respective deposites ; and 3dly, to pay and distribute whatever balance might remain of said proceeds, among the remaining creditors of the *Eagle Bank*, *pari passu*, according to the amounts of their respective just claims. *Woolsey* and *Griswold* accepted the trust ; and such proceedings were had, that the sum of 56,182 dollars, and 95 cents, proceeds of the iron so assigned, was paid into court to the credit of the cause.

To obtain that part of this fund in which *Holly* is supposed to have an interest, was the object of the present bill.

The plaintiffs stated, that they were the owners of all the *Eagle Bank* post-notes indorsed by *William C. Holly*, which were then out-standing and unpaid ; that they were the persons for whose use and benefit said sum of 20,000 dollars was provided for the payment of post-notes, and were beneficially interested in that sum ; and that *Holly* had no other interest therein than to have it applied on the post-notes indorsed by him, which he is liable, but wholly unable, to pay.

The court found, that the plaintiffs were the holders and owners of the post-notes of the *Eagle Bank*, to the amount of 69,000 dollars, indorsed by *Dexter* and *Holly* ; that when these notes came to maturity, they were presented for payment at the *Eagle Bank*, were regularly protested, and due notice of non-payment was given to the indorsers ; and that the *Eagle Bank, Dexter* and *Holly* have failed and become insolvent. The court also found, that other post-notes of the *Eagle Bank*, indorsed by *William C. Holly*, to the amount of 32,980 dollars, were outstanding, at the time of the failure of the bank, which were subsequently received by the agents of the bank, and are now in their hands : but in relation to the greater part of these, there was no proof of demand or notice. The court further found, that on the 19th of *September*, 1825, the date of said assignment, *Holly* was indebted to the *Eagle Bank* in the sum of more than 500,000 dollars, which debt is still due and unpaid ; that at the time of the assignment, *Holly* represented, that of the 3500 tons of iron, assigned, by him and *Dexter*, to *Hoadly*, for the *Eagle Bank*, 2700 tons were in the town of *Stamford* ; and that he and *Dexter* had more than 3000 tons of iron in the city of *New-York*, free from any lien or pledge, and from which the remaining 800 tons assigned could and would be received ; that the representations so made by *Holly* were false, and known by him to be so ; that the trustees obtained all the iron at *Stamford*, which was in fact owned by *Holly*, and this, together with what they were able to obtain in the city of *New York*, amounted to 890 tons only : the difference in value between the 3500 tons assigned and what the trustees in fact received under the assignment, being 240,000 dollars. The court also found, that *Holly* had become liable to the *Eagle Bank*, since its failure, by obtaining possession of its notes, without its consent, to the amount of 52,000 dollars ;

and it did not appear, that he had ever paid any thing on his indorsements of the post-notes of the *Eagle Bank*.

*New-Haven,*
*July, 1829.*

Homer
*v.*
Savings Bank.

*Staples* and *G. C. Goddard*, for the plaintiffs, after premising, that the iron, at the date of the assignment, was the property of the *Eagle Bank*, and that institution had a right to assign it in trust for the payment of the creditors therein named; that the *Eagle Bank*, by such assignment, directed a certain portion of the avails of this iron to be applied, in the first place, to secure, indemnify and protect *Holly* against his indorsements of the post-notes of the *Eagle Bank* to an amount not exceeding 20,000 dollars; and that, by this conveyance, the holders of the *Eagle Bank* post-notes indorsed by *Holly*, became interested in the fund, and the assignees became their trustees, and they the *cestuy que trusts*, contended, That a creditor may demand the fund provided for the secuty of the indorser or surety, either in his hands, or in the hands of a trustee, and require that it shall be paid directly to him; and a court of equity will enforce the demand. *Maure* v. *Harrison*, 1 *Eq. Ca. Abr.* 93. *Moses* & al. v. *Murgatroyd* & al. 1 *Johns. Chan. Rep.* 119. 131. *Russell* v. *Clark's* exrs. & al. 7 *Cranch* 69. *The United States* v. *Sturges* & al. 1 *Paine's C. C. Rep.* 525. *Phillips* v. *Thompson*, 2 *Johns. Chan. Rep.* 418. 422. *Kip* v. *The Bank of New-York*, 10 *Johns. Rep.* 63. 65. *Miller* & al. v. *Ord*, 2 *Binn.* 382. *Mayhew* v. *Cuckold*, 2 *Swans.* 200. 1 *Madd. Prac.* 235. *Hayes* v. *Ward*, 4 *Johns. Chan. Rep.* 129. *Parsons* & al. v. *Briddock* & al. 2 *Vern.* 608. Ex parte *Rushforth*, 10 *Ves.* jun. 422. Ex parte *Crisp*, 1 *Atk.* 135. *Wright* v. *Morley*, 11 *Ves.* jun. 12. 22. *Glossop* v. *Harrison* & al. *Coop. Rep.* 61. These authorities shew, that the security follows the debt; and that equity will give to the creditor the benefit of all securities made to the surety of the debtor, to protect that surety against the debt. The security is a trust; and in equity, the avails of it will be applied to the use of the person beneficially interested; because it is just, and to avoid circuity of action. Instead of requiring *Holly* to sue the trustees, and the plaintiffs to sue *Holly*, equity will give the money at once to the plaintiffs. It fulfils the intention of the assignment in the shortest and best manner. That the *cestuy que trusts*, in this case, were *ignorant* of the provision in their favour, at the time it was made, is no objection to their having the benefit of it

now.    They may affirm the trusts whenever it comes to their knowledge.    *Neilson* v. *Blight*, 1 *Johns. Ca.* 205.    *Moses* v. *Murgatroyd*, 1 *Johns. Chan. Rep.* 121.

The plaintiffs, then, are entitled to the money, unless they are debarred, 1st, by the fraudulent representations of *Holly*; 2ndly, by his indebtedness to the *Eagle Bank*; or 3rdly, by his having taken 52,000 dollars of *Eagle Bank* post-notes since the assignment.

First, the representations made by *Holly*, cannot prejudice the rights of the post-note holders any more than the other *cestuy que trusts*.    If *Holly's* fraud in conveying to the bank, or its agents, can be visited upon these preferred creditors beyond what the iron falls short of paying them, it must equally affect them all, and defeat the whole assignment.    If the assignment stands good, it must avail according to the terms of it; for it is the law between the parties.    Because the bank did not obtain as much as they had a right to expect, under the conveyance to them, is no reason why the trustees should not apply the avails of what they have received according to the terms of the contract, as far as they will go.    Further, the representations were merely *idle*.    The assignment on the part of *Holly*, was voluntary.    He received no discharge for it.    It was immaterial to him, whether the 20,000 dollars went to pay post-notes, or to diminish his liability to the bank.

Secondly, *Holly's* being largely indebted to the *Eagle Bank* and insolvent, is no reason why the holders of the post-notes should not be paid according to the terms of the assignment.

Thirdly, if *Holly*, after the failure of the *Eagle Bank*, took 52,000 dollars of its notes, without its consent, either fraudulently or forcibly, it is not perceived how this can affect the rights of the trustees, or the *cestuy que trusts*, under this assignment.    If *Holly*, by fraud or force, could defeat this assignment made between the bank and its creditors, he must have the power of doing great injustice, where, it would seem, the law cannot restrain him.

*N. Smith* and *Hitchcock*, for the defendants, after remarking, that the plaintiffs claim title to this fund through *Holly*, and can have no higher equity than he has, as a court of equity never creates any new rights, but at most it only transfers existing rights,—contended, 1. That *Holly* could have no claim on this fund, if he were solvent and not indebted to the *Eagle*

*Bank,* until he had *paid* the post-notes which he had indorsed. The assignment was made to *indemnify* him. It is a condi- tion precedent that he should be *damnified,* before he can call for an indemnity from the fund in question. Mere liability is not sufficient. *Shepard* v. *Shepard* & al. 6 *Conn. Rep.* 37. *Booth* v. *Starr* & al. 1 *Conn. Rep.* 244.

2. That if *Holly* had paid the whole of these post-notes, he would not be entitled to this fund, because he is already indem- nified, by holding the funds of the *Eagle Bank* to ten times the amount. This provision was made in contemplation of *Hol- ly's* being a *creditor* of the bank. It turns out, that his relation to the bank, is of a different character.

3. That the trust is void, because *Holly* obtained this provision in the assignment for his own benefit, by gross fraud, and on a consideration, which has wholly failed.

4. That even if *Holly* is entitled to the benefit of this fund, it is not a conceded point, nor is it clear, that the *plaintiffs* can claim it. In the first place, the finding of the court seems to repel the idea, that the assignment was made for the benefit of the holders of these post-notes. The intention was to favour *Holly,* and not them. Secondly, the general doctrine, which constitutes the foundation of the plaintiffs' claim, is of doubt- ful authority. It was first broached in *Maure* v. *Harrison,* in 1692; and seems to have derived little support from subse- quent determinations in *England.* Chancellor *Kent's* remarks in *Moses* v. *Murgatroyd,* 1 *Johns. Chan. Rep.* 129. are found- ed upon *Maure* v. *Harrison.* So far from its having been re- cognized in this state, the contrary was expressly decided, in the case of *Clark* & al. v. *Miner* & al., superior court, *New- Haven* county, *January* term 1825, *cor. Chapman,* J.

BISSELL, J. The right of the plaintiffs to have any part of the fund in question applied to their benefit, must depend upon a construction of the assignment, and upon the facts found in the case. Before, however, attending to these, it may be prop- er, very briefly, to review the authorities relied on, by the plaintiffs, in support of their claim, and to see how far the prin- ciple established by those authorities is applicable to the case before us.

In *Maure* v. *Harrison,* 1 *Eq. Ca. Abr.* 93. it was adjudged, that a bond creditor " shall in chancery have the benefit of all the counter bonds or collateral securities, given by the princi-

pal, to the surety ;"—" as if *A.* owes *B.* money, and he and *C.* are bound for it, and *A.* gives *C.* a mortgage or bond to indemnify him, *B.* shall have the benefit of it *to recover his debt.*" In *Russell* v. *Clark's* executors, 7 *Cranch,* 69. 94. 97. the same doctrine was admitted. The court, in that case, declare, that the person, for whose benefit a trust is created, who is ultimately to recover the money, may sustain a suit in equity to have it paid directly to himself. In *Phelps* v. *Thompson,* 2 *Johns. Ch. Rep.* 418. the holder of a promissory note was held entitled to the benefit of a collateral security of the debt, given by the maker to the indorser for his indemnity. And in the case ex parte *Rushworth,* 10 *Ves.* 411. and in *Wright* v. *Morley,* 11 *Ves.* 13. and in numerous other cases, the same general principle is recognized. In *Miller* v. *Ord,* 2 *Binn.* 202. it was distinctly stated, that where the principal assigns a fund to trustees to pay *the debt of a creditor,* and *his surety pays the debt,* he is entitled to the benefit of the fund. In the case of *Moses* v. *Murgatroyd,* 2 *Johns. Chan. Rep.* 219. an assignment was made to secure an indorser, against the payment of certain promissory notes ; and the maker having become insolvent, and the indorser having died, without making payment, it was decided, that the holders of these notes were entitled, in equity, to the benefit of the assignment. In giving his opinion, in that case, Chancellor *Kent* remarks :—" The plaintiffs, as holders of the notes, are entitled to the benefit of this *collateral security,* given by the principal debtor to his surety ; and the case of *Maure* v. *Harrison* is directly to this point. These collateral securities are, *in fact,* trusts executed *for the better protection of the debt ;* and it is the duty of the court to see, that they fulfil the design." In the case of *Kip* v. *The Bank of New-York,* 10 *Johns. Rep.* 65. it was decided, that where an assignment of property was made to secure an indorser against certain notes, indorsed by him, and he had sold and converted the property assigned, into money, and become insolvent, (the notes being unpaid, and the maker also insolvent,) that the money being kept separate from the other property of the bankrupt, did not pass to his assignees,—but that a court of chancery would follow the fund and apply it to the payment of the notes, for the *discharge of which the trust was created.*

The principle to be extracted from these cases, is this—that when collateral security is given, or property assigned, for *the better protection or payment of a debt,* it shall be made effectu-

al *for that purpose,*—and that not only to the *immediate party* <span style="float:right">New-Haven,<br>July, 1829.</span> *to the security,* but to others, *who are entitled to the debt.* And to make them thus effectual, a court of chancery will lend its aid. And the reason is, *that such is the intent of the transac-* *tion.* "They are trusts," says the late Chancellor *Kent,* in the case already cited, "executed *for the better protection of the debt ; and a court of chancery will see, that they fulfil their design.*"

<div align="right">Homer<br>v.<br>Savings Bank.</div>

Beyond this principle, however, it is believed, no case has gone. No court of chancery, it is believed, has interposed to grant *relief* in any case not falling within this well established principle of equity. Does the case before us fall within this principle ? And can the plaintiffs derive from it any aid whatever ? Was here a debt due from the bank to *William C. Holly,* which it was the object to secure, by this assignment ? So far from this being the fact, the case finds, that he was indebted to the bank to a very large amount. Was it the object of this assignment to make provision for the payment of *Eagle Bank* post-notes, generally, or of such as had been indorsed by *William C. Holly ?* It is impossible to draw that inference either from the language of the instrument, the objects of the assignment, or the facts connected with it and found in the case. What is the language of the deed of assignment, so far as it is applicable to this case ? The trustees are "to *secure, indemnify and protect William C. Holly* against and concerning any indorsments of the said *William C. Holly,* on the post-notes of the said *Eagle Bank,* to an amount not exceeding twenty thousand dollars." It is, I think, very apparent from the language here used, that the benefits of this assignment, so far as regards the post-notes, were intended to be personal to *William C. Holly.* It was to *indemnify, protect,* and *secure* him. This intent could hardly have been more obvious, had the parties expressly provided, that if *Holly* should be subjected on his indorsements, he should be indemnified to a certain amount.

Again ; what were the general objects of this trust ? They doubtless were to give a preference to a certain class of favoured creditors. Was it intended to give the holders of post-notes such preference ? Why should this be done; and what should entitle these creditors to a priority to other bill-holders? Like them they had received these notes, as currency, in the course of circulation ; and who these holders were, the bank

New-Haven,
July, 1829.

Homer
v.
Savings Bank.

neither did nor could know. Besides, this was a numerous class of creditors. It is found, that there were then post-notes outstanding to the amount of more than one hundred thousand dollars, indorsed by *Holly.* Why should twenty thousand dollars have been set apart, for the holders of these notes, without designating to which of them it should go, and without providing that it should be divided *pro rata* among them ? And here I should remark, that it is found, that more than thirty thousand dollars in these notes, which were never in the hands of these plaintiffs, were outstanding at the failure of the *Eagle Bank,* and have since been taken in, by the agents. What superior equity have these plaintiffs over the holders of these notes ? These facts not only furnish strong reasons against the plaintiffs' equity,—but they also go strongly to show, that the benefits of this trust, were intended to be personal to *William C. Holly.*

In further illustration of this remark, suppose that the trustees had paid out this fund to the plaintiffs, and *William C. Holly* should be afterwards subjected to the same amount, on his indorsements on the other post-notes, and should come into chancery for the fund ;—would it be any answer for the trustees to say, that they had paid it out, on the other notes, which he had indeed indorsed, but on which he had never been subjected ? And a court of chancery will not, surely, compel the trustees to make a payment, which, if made voluntarily, would afford them no protection.

There are other considerations, which might be successfully urged ;—but those which have been suggested, are, it is believed, sufficient to evince, that the trust in question was not created for the payment of *Eagle Bank* post-notes, but for the mere indemnity of *William C. Holly.* If this conclusion be correct, it is most obvious, that the cases cited and relied upon, are wholly inapplicable. It as clearly follows, that *Holly* can have no claim to this fund, but on the ground of payments actually made upon his indorsements. *Shepard* v. *Shepard &* al. 6 *Conn. Rep.* 37. It also follows, that no third person can claim the benefits of this trust, but through *William C. Holly,* —and claiming through him, must stand in his place, and be subject to the same equity, to which he would be subjected, were he now claiming the execution of this trust. What that equity is, the facts found in the case, sufficiently disclose. It cannot be necessary to advert to them. It is sufficient to ob-

serve, that equity would require of him to pay to the *Eagle Bank* at least half a million of dollars, before the shadow of a claim would exist in his favour.

It has been emphatically asked, What becomes of this sum of twenty thousand dollars, if [the plaintiffs are not entitled to it ? It is not necessary to answer this enquiry, to show that *it does not belong to them.* The enquiry, however, is susceptible of an easy and perfectly satisfactory answer. It sinks into a *residuum.* 2 *Mad. Ch.* 81. *Willes* 293.

I think that the plaintiffs are not entitled to the relief sought by their bill ; and would therefore advise the superior court,that it be dismissed with costs.

HOSMER, Ch. J., was of the same opinion.

PETERS, J., being interested in the event of the suit, and DAGGETT and WILLIAMS, Js. having been of counsel for other claimants under the same assignment, gave no opinion.

Bill to be dismissed.(*a*)

(*a*) See note to *United Society* v. *Eagle Bank*, ante, 476.

*New-Haven, July, 1829.*

Homer
*v.*
Savings Bank

---

CATLIN *against* THE SAVINGS BANK OF NEW-HAVEN and others.

On the 13th of *January* 1824, *A.,* a citizen of *New-York*, offered at the counter of the *Eagle Bank* in *New-Haven*, a certain amount of the bills of that bank, and demanded payment thereof in specie. The officers of the bank offered to redeem these bills, by giving a draft for the amount on a bank in the city of *New-York ;* which was refused. The bills were then left with the officers of the *Eagle Bank*, to be counted and paid. Two days afterwards, the president of the *Eagle Bank* forwarded a draft to an agent in *New-York*, with directions to tender the amount of the bills in specie to *A.* the next morning. This was accordingly done ; and the money was refused, on the ground that two days' interest was then due. Within a day or two afterwards, *A.* again demanded payment of the bills, at the *Eagle Bank ;* which was refused,on the ground of an alleged payment in *New-York ;* and then he demanded the bills themselves,which were also refused,and were purposely mingled with the redeemed circulation of the bank. In *March* 1824, *A.* sued the *Eagle Bank*, in an action for money had and received, and ultimately (in 1827) recovered judgment for the amount of the bills and interest. On the 31st of *August,* 1825, the affairs of the *Eagle Bank* being desperate, the funds provided in *New-York* for the payment of the bills, were withdrawn, and an entry thereof was made on the books of the bank. On the 19th of *September* 1825, the bank failed. On the 21st, the

*New-Haven,*
July, 1829.

Catlin
*v.*
Savings Bank.

president assigned a quantity of iron to trustees, first, to secure, to a certain amount, an indorser of the post-notes of the bank, and then, after paying the *Savings Bank* the amount of its deposites, " to pay all other persons who had ordinary or special deposites with the *Eagle Bank* the full amount of such deposites respectively." On a bill in chancery brought by *A.*, to obtain the benefits of the assignment, as a creditor of the *Eagle Bank*, by reason of an ordinary or special deposite of money with such bank, it was held, that the plaintiff did not sustain that character, and was, therefore, not entitled to the relief sought.

DURING the pendency of a bill in chancery, brought by the *Savings Bank*, the *Eagle Bank* and sundry depositors and creditors of the *Eagle Bank*, against *William W. Woolsey* and others, *Lynde Catlin* filed a cross-bill, which, in connexion with the cross-bill of *Homer* and others,(a) was tried before *Bissell*, J., at an adjourned term of the superior court at *New-Haven*, in *June*, 1829.

The case, as it appeared from the finding of the court, was this.    On the 13th of *January*, 1824, the plaintiff, by his agent *Thomas Wiswall*, offered at the counter of the *Eagle Bank* in *New-Haven*, the sum of 91,762 dollars, 41 cents, in bills and notes of that bank, and demanded payment thereof in specie. An offer was made, by the officers of the bank, to redeem these bills, by giving a draft for the amount on the *Union Bank* in the city of *New-York*.    This offer was refused.    The bills were then left with the officers of the bank, for the purpose of being counted and paid.    On the 15th of *January*, (the bills having then been counted) the offer to give the draft was repeated, and again refused.    On the same day, the president of the *Eagle Bank* forwarded to *Prime, Ward & Sands*, its agents in the city of *New-York*, a draft on the *Union Bank* for 91,762 dollars, 41 cents, with directions to tender that sum in specie to the plaintiff early on the morning of the following day. This was accordingly done; and the money was refused, on the ground that two days' interest was then due.    On the 16th of *January*, the plaintiff's agent demanded payment of said bills, at the *Eagle Bank*, which was refused; the reason assigned for such refusal being, that payment had been made to the plaintiff in the city of *New-York*.    The agent then demanded, that the bills should be returned.    This was also refused; and the bills were, purposely, mingled with the redeemed circulation of the bank.    The moneys tendered to the plaintiff in

(a) Ante, p. 478.

*New-York,* remained in the hands of the agents of the bank, subject to his order, provided he would receive them in full of his demand, until the 31st of *August,* 1825, when they were withdrawn, and an entry thereof was made on the books of the bank, as follows : "Cash Dr. To sundry accounts.

*August* 31, 1825. *Lynde Catlin* for *New-York* banks, *Dpt.* (*b*) $91,762 $\frac{41}{100}$ths. Check on *Union,* remitted *January* 15th, 1824."

This entry was transferred to the ledger thus :

" Lynde Catlin, Cr.

*August* 31, 1825.    By Cash—$91,762 $\frac{41}{100}$ths."

On the 2nd of *March,* 1824, the plaintiff brought his action for money had and received against the *Eagle Bank,* to recover said sum of 91,672 dollars, 41 cents, and interest thereon ; and at the term of the superior court for *New-Haven* county, in *January,* 1827, he recovered judgment for the sum of 108, 371 dollars, 41 cents, damages, and his costs.

On the 31st of *August,* 1825, the affairs of the *Eagle Bank* were desperate ; and on the 19th of *September* following, it failed, and ever since has been, and now is, deeply insolvent.

On the 21st of *September,* 1825, *George Hoadly,* president of the *Eagle Bank,* assigned a quantity of iron to *William W. Woolsey* and *George Griswold,* in trust, that after having sold it and converted it into money, and having paid and reimbursed the charges and costs incident to the trust, they should, in the first place, by and with the proceeds, or any moneys to be procured therewith, secure, indemnify and protect *William C. Holly* against and concerning any indorsements of his on the post-notes of the *Eagle Bank,* to an amount not exceeding 20,000 dollars ; and in the second place, pay the creditors of the *Eagle Bank* in the order and according to the priority following, *viz.* 1st, to pay to the *Savings Bank* the full amount of all moneys deposited, by that institution, in the *Eagle Bank ;* 2ndly, to pay all other persons who had ordinary or special deposites with the *Eagle Bank,* the full amount of such deposites respectively, or if the proceeds should prove insufficient to pay and satisfy the last-mentioned depositors in full, then to pay and distribute the proceeds among such depositors according to the amounts of their respective deposites ; 3rdly, to pay and dis-

(*b*) It appeared, that the letters "*Dpt.*" were customarily used, by the clerks of the bank, as an abbreviation of the word *deposite.*

*New-Haven,* tribute the balance among the general creditors of the bank,
July, 1829.  *pari passu.*

Catlin          The plaintiff claimed to stand in the predicament of a per-
*v.*
Savings Bank. son having an ordinary or special deposite with the *Eagle
Bank;* and the object of his bill was to obtain such share of
the trust fund, so created, as a person in that predicament
would be entitled to.

The case was reserved for the consideration of this Court.

*Sherman* and *R. S. Baldwin,* for the plaintiff, contended,
That he was entitled to the benefit of the assignment, made by
the president of the *Eagle Bank,* to pay all persons having or-
dinary or special deposites of money with that institution.   In
support of this general proposition, they urged the following
considerations.

1. Wherever the property of an individual is by him intrusted
to the custody of a bank, under such circumstances, that no in-
terest in that property is acquired by the bank, and no right to
retain it against the demand of the owner, nor any obligation
incurred, *by reason of its being left,* other than that of keeping
it safely, it is a special deposite.   The bank, by receiving it,
assume towards the owner, all the obligation of a *depositary.*

When a deposite has once been made and received, no sub-
sequent act of the depositary, unless authorized by the owner,
can change or affect the rights or obligations of the parties.

If the depositor, at the time of making his deposite, or after-
wards, consented that the depositary might become the owner of
the thing deposited, upon the performance of some future act,
as for example, the delivery of some other thing, when demand-
ed, in lieu of it, it would still continue to be a deposite until the
equivalent was received.

If these positions are correct, the plaintiff, when the *Eagle
Bank* bills were left, by his agent, to be counted, preparatory
to a future exchange for specie, became, during the time those
bills were in the course of being counted, a special depositor.

The bank acquired no interest in the bills, in consequence of
their being left to be counted.   The counting was for their own
security, not for the benefit of the plaintiff.   Although they
were entitled to a reasonable time for that purpose, they could
not require of the plaintiff, that during that time, the bills should
be left in their custody.   He might have remained at their

counter, and retained the possession of his bills, during the
process of counting.

As they were voluntarily entrusted, by him, to their custody,
the bank assumed the obligation of keeping them safely, using
ordinary care for that purpose. The bills continued to be the
property of the plaintiff; and if the bank had been *robbed,*
while they remained unmixed with its other redeemed circu-
lation, the loss would have been his. As the bills never were
in fact returned or paid for, the bank continued responsible to
the plaintiff, as for a special deposite, down to the period
when the assignment was made. A tender not accepted,
could not vest the title to the bills in the bank. The fact that
they had mingled these bills with their own, and had refused to
redeliver them when demanded, could not alter the character
of the original transaction, although it might subject them to
the payment of interest on the deposite, to which otherwise
they would not have been liable.

The bank, in creating a trust for the payment of *special de-
positors,* must have had in view, cases where they had disabled
themselves, by making use of the deposite,from a redelivery of
it specifically ; otherwise, the provision was wholly unnecessary
and useless ; since each depositor, if his deposite remained in
specie, was entitled to reclaim it.

2. If it be not admitted that the plaintiff was a *special* de-
positor, he is clearly entitled to claim under the assignment as
an *ordinary* depositor.

It will not be denied, that at the time of the assignment, the
*Eagle Bank* owed the plaintiff a *debt,* for money before that
time received to his use ; but it may be said, that that debt
was not a *deposite.*

What then is it, that distinguishes, by giving to them the
name of depositors, one class of the creditors of a bank from
another ? The bank is equally indebted to both, and aside
from circumstances like those which exist in the present case,
it makes no difference with respect to the security of the cred-
itor, whether his debt is regarded as a deposite or not.

We are not, therefore, in ascertaining the meaning of the
term *deposite,* to regard it as indicating a debt of any higher
obligation than any other debt. Every bill-holder has as really
money in the bank to his use, as he who has made a deposite
there ; and both debts are of equal obligation. The only differ-
ence is, that one has an ascertained credit with the bank, for

which he has a right to draw;—whereas the other is entitled to no credit, and can only receive pay upon producing his bills.

In keeping the accounts of a bank, it is necessary, that all its indebtedness should, in some form or other, appear on its books.    But it is impossible, that its books can indicate who all its creditors are.    Those who hold bills or other securities of the bank, cannot, of course, be individually credited on its books; since they might, at the next moment, cease to be creditors, by paying away their notes.    It would be the same if they had presented their bills, and had the amount ascertained;—if they still retained them in their possession, they would not be entitled to a credit.

The only account which a bank can keep with bill-holders, is in the aggregate, in which the bank is made " *Dr. to circulation.*"

But those to whom a bank is indebted for money in a liquidated amount, who hold none of its securities to represent their debt, are, and must be, entitled to a credit on its books; and these, by the usage of banks, are termed *depositors*.

An ordinary deposite, then, as distinguished from the other debts due from a bank, may be defined to be " any ascertained debt due from a bank to an individual or other corporation, for which such individual or corporation has, or ought to have, a credit for money on its books, and a right to draw at pleasure."

Every person whose money is intermingled with the general funds of the bank, to an ascertained amount; who is acknowledged, by the bank, to be a creditor to that amount; who is under no obligation to permit it to remain there, and who holds no security to represent it, is entitled to a credit on its books, to draw out the amount at pleasure, and whether actually credited or not, to be treated as a depositor.    This accords with the well known usage of banks.    All these requisites exist in the case of the plaintiff.    1. He has a *debt;* 2. of an ascertained amount; 3. for which he has a right to demand payment at any time; and 4. for which he holds no security, which can be negotiated to the prejudice of the bank.    In addition to the foregoing, in *August*, 1825, the plaintiff was credited with cash to the amount of 91,762 dollars, 41 cents, on the books of the *Eagle Bank*, and was treated in the account of the bank, like any other depositor.

There was no dispute between him and the bank as to the *amount* of his *deposite*.    The only difference between them was, whether by the tender, they had disabled him from claiming interest.

The books of the bank were before the directors, when they made and ratified the assignment. They are necessarily re- ferred to, in that instrument ; and we have a right to regard it as their intention to place the plaintiff's debt on the same foot- ing with that of their other depositors.

The object of the assignment was to give a preference to those creditors, who had no transferable securities to represent their debts, and who were therefore exposed to greater loss than the bill-holders, who might sell at the market value.

The plaintiff never dissented to the entry on the books of the bank. When a trust is created, or an act done for the benefit of a third person without his knowledge, he may after- wards affirm and enforce it. The plaintiff, as soon as he knew of it, came to enforce it.

*N. Smith* and *Hitchcock*, for the defendants, resisted the claim of the plaintiff, insisting, that he was not entitled to the benefit of the assignment, either as a *special* or an *ordinary* depositor.

A bank deposite, they remarked, is a credit, which a person voluntarily takes with a bank, with its consent, and for which no note, bond or other similar evidence of debt, is holden : Or, it arises when the relation of debtor and creditor is mutually agreed to be assumed by the parties, and no note &c. is holden therefor, by the depositor. In either case, it is essential to constitute a deposite, that the depositor actually placed his money with the bank for safe-keeping. A general or ordinary deposite entitles the depositor to claim of the bank its bills or specie, on demand first made, in payment of his claim, without condition or limitation. A special deposite is a specific thing entrusted to the bank for safe-keeping only, and to be specific- ally returned.

They then contended, That the facts found did not disclose the relation of either *ordinary* or *special* depositor. In the first place, the plaintiff came for pay only as a hostile creditor. Secondly, he refused pay, when offered, except in specie. Thirdly, the plaintiff demanded interest for a delay of payment two days. Fourthly, the plaintiff, refusing his pay, demanded his bills ; and then sued the bank, and and recovered judgment for the debt and interest. Fifthly, the bank received the bills to count and pay only. If the bank fulfilled that engagement, it became the owner of the bills ; if it did not fulfil, the bills were the plaintiff's. Sixthly, before the bills were demand-

ed, the bank had intentionally mixed them with its own. From these facts it is apparent, that the bank did *not receive* the bills as an ordinary or special deposite ; and that the plaintiff did not *consider* himself as having any such deposite with the bank, until long after the relation of the parties, and the rights growing out of that relation, were fixed. There are no facts in the case in conflict with this understanding of the parties ; but, on the contrary, all the facts are in perfect harmony with it. The entries made by the clerks in the books of the bank, were only for the purpose of keeping the account of their cash, and did not affect the relation of the parties.

From the whole case it appears, that the plaintiff is now entitled only as a bill-holder, who has recovered judgment for his debt and interest.

BISSELL, J. The question arising upon the facts in this case, is, whether the plaintiff is entitled to the benefits of the assignment, as a creditor of the *Eagle Bank, by reason of an ordinary or special deposite of money in the bank ?* And here it is obvious to remark, that this assignment was not *intended* for the benefit of the plaintiff. The leading object of the assignors, was, to secure what was deemed by them to be a meritorious class of creditors ; such as had reposed a special trust and confidence in the bank. And it is very apparent, that the plaintiff could in no sense be considered, by them, as falling within this class of creditors. It is equally certain, that he did not regard his claim on the bank as growing out of a deposite of moneys therein. Every fact in the case precludes such an idea. Every proceeding on his part was of a decidedly hostile character. The object, in the first instance, was, obviously, to produce, what is called *a run* upon the bank. His refusal to accept the draft, to receive the money when tendered, and the following up that refusal, by a suit at law ; all exhibit him in the character of a hostile creditor only. Such was his attitude when the assignment in question was executed. If then, he be entitled to come in as a favoured creditor, upon this fund, contrary to the intentions of the assignors, and opposed to the character, which he had uniformly sustained, in relation to the bank, it must be by force of some technical magic in the term *deposite*. I do not think there is any such magic in the term. And although the plaintiff may have been, and doubtless was, a *creditor* of the bank ; yet he was not

such, by reason of any special or ordinary deposite of moveys
therein.

Was he a creditor by reason of a *special* deposite ? A special deposite of money in a bank, I understand to be, where moneys (as bills in packages, or specie in boxes, for example,) are entrusted to the bank, not to be used, but to be kept safely, and specifically returned. There was clearly no such deposite. The bills were not left for safe-keeping ; nor were they to be returned specifically. The object was payment ;—and the counting was merely incidental to this. The mingling of the bills with the redeemed circulation of the bank, cannot affect the principle. This, under the circumstances, might have been, and probably was, a tortious conversion, and trover might have been maintained.

It has, indeed, been urged, that the moment the money was delivered to be counted, it became a special deposite, and so remained when the assignment was executed. It is sufficient, in answer to this argument, to observe, that it requires us to affix a meaning to the term, *special deposite,* not sanctioned by usage ; and at the same time, by thus extending its meaning, to defeat the manifest intention of the parties to the instrument. This I do not think, we are at liberty to do.

Again : The charter of the *Eagle Bank* provides, that "The debts of the corporation, whether by bill, bond, or note, shall not, at any time, exceed fifty *per cent.* over and above the total amount of capital stock actually paid in, and of the moneys deposited in the bank for safe-keeping." Now, can it be contended, upon a sound construction of the charter, that the bank would have had a right to make this sum of 91,762 dollars, 41 cents, the basis of indebtedness to fifty *per cent.* beyond its amount ? This surely cannot be contended for. This, therefore, was not a *special* deposite.

And there is still less ground to contend, that the plaintiff was a creditor, *by reason of an ordinary deposite of moneys in the bank.* An ordinary bank deposite is where a voluntary credit is taken with a bank ; and for which no bank note, bill, or similar evidence of debt is given ; and for which there exists a right to draw unconditionally. In every such case, a special trust and confidence is reposed in the bank. The assent of both parties is essential to such a deposite ; it carries no interest ; and no action lies for it, until demand made and refusal. Now, every fact in the case before us, decidedly ne-

gatives the idea of such a deposite. There was no confidence reposed. The plaintiff never, voluntarily, took a credit with the bank. He demanded, and eventually recovered interest upon his claim.

The assignment was made pending a suit, brought by the plaintiff against the bank, and when both parties, in relation to each other, maintained the attitude of determined hostility. It is very clear, then, that on the 21st of *September*, when the deed of assignment was made, the plaintiff was not a creditor, *by reason of an ordinary deposite of moneys in the bank*, unless he became such by the entry made on the books of the bank on the 31st of *August* preceding. That entry, surely, could not have the effect of changing the nature of the plaintiff's demand. It was not made with that view. He never consented, that it should do so. On the contrary, he continues to prosecute his action, and eventually recovers judgment for the amount of his demand, with interest. Not having reaped the fruits of that judgment; he now asks to change his character from that of a hostile, to that of a favoured and confidential creditor ; and thus to be let in upon a fund, obviously never created for his benefit. This, in my opinion, cannot be done. I would, therefore, advise the superior court, that the plaintiff's bill be dismissed with costs.

HOSMER, Ch. J., was of the same opinion.

PETERS, J. being interested in the event of the suit, and DAGGETT and WILLIAMS, Js., having been of counsel for other claimants under the same assignment, gave no opinion.

Bill to be dismissed.(*c*)

(*c*)See note to *United Society* v. *Eagle Bank*, ante, 476.

---

SKINNER and another *against* BAILEY :

### IN ERROR.

In a suit in chancery, the value of the matter in demand, which determines the jurisdiction of the court, is to be ascertained by the claim made by the plaintiff in his bill, and not by the finding of the court.

Therefore, where a bill for the reconveyance of land, stated, that the defend- *Middlesex*, ant obtained a deed of such land from the plaintiff improperly, and with- July, 1829. out consideration, and that the land was of greater value than 400 dollars ; and the court did not find the value of the land, but only that a lease of it for the life of the plaintiff, was worth 200 dollars ; it was held, that the superior court had jurisdiction of the suit.

Where a bill in chancery stated, that the plaintiff made and acknowledged a deed of land to the defendant, with a view to deliver it, under an agreement with the defendant, that he would execute a lease thereof to the plaintiff during her life ; and that the defendant fraudulently procured the deed without the plaintiff's knowledge, and then refused to give the lease, and fraudulently conveyed the land to a third person ; and the court found, that the plaintiff conveyed the land to the defendant, by the deed, but found the other facts stated in the bill to be true ; it was held, 1. that upon the facts *found*, the interposition of a court of chancery was unnecessary, as the plaintiff could have no claim upon the land itself, having voluntarily conveyed it to the defendant, and so far as she was entitled to damages, she had adequate remedy at law ; 2. that upon the facts *stated*, she did not need the aid of a court of chancery, because according to her statement, no title passed to the defendant, and of course, he could convey none ; 3. that the principal fact stated being found against the plaintiff, she was not entitled to a decree in her favour, although other facts were found, which, if found on a bill adapted to the case, might be a ground of relief.

In a suit in chancery, the facts stated in the bill, constitute the only ground of relief.

<div align="right">Skinner<br>*v.*<br>Bailey.</div>

THIS was a bill in chancery, brought by *Rhoda Bailey* against *Ira Skinner* and *Eunice Cone*, before the superior court, in which it was alleged, that said *Bailey* agreed to convey about sixteen acres of land in *Haddam*, to the said *Skinner*, in consideration of which *Skinner* was to give her a lease of the premises during her life ; that she immediately executed the deed, and soon afterwards acknowledged it, with a view to deliver it ; that *Skinner* fraudulently, and without her knowledge, procured such deed, and caused it to be recorded ; but that he has, at all times, refused to execute a life-lease, according to his agreement ; and that he afterwards combined with *Eunice Cone*, the other defendant, to injure the plaintiff, and conveyed the premises to said *Eunice*, who had full knowledge of all these facts. The land was averred to be worth 400 dollars. The bill sought a reconveyance of the premises and an injunction. There was also a general prayer for relief.

The facts charged in the bill were denied by the defendants. The court found the agreement for the deed and life-lease, as stated in the bill ; but also found, that the plaintiff conveyed the land to *Skinner*, by her deed ; and that *Skinner* fraudulent-

*Middlesex,*
July, 1829.

Skinner
*v.*
Bailey.

ly refused to give the lease, and fraudulently conveyed the premises to Mrs. *Cone.* The court further found, that Mrs. *Cone* had no knowledge of *Skinner's* fraud, and did not combine with him. As against *Skinner* the prayer of the bill was granted ; and it was decreed, that he should pay the plaintiff the sum of 200 dollars, which was found to be the value of the premises during the life of the plaintiff, with costs. To reverse that decree, the present writ of error was brought.

The case was now submitted without argument.

WILLIAMS, J. It is first objected, that the superior court had no jurisdiction. The bill states, that the defendant, *Skinner,* obtained the deed of the plaintiff, improperly and without consideration ; and that the land is of greater value than 400 dollars ; and prays a reconveyance. Upon the face of the bill, then, the case is within the jurisdiction of the superior court. But the court have not found the value of the land ; (only the value of a life estate in it ;) and it is claimed, that the averment of its value in the bill is not sufficient to give jurisdiction.

At law, the rule has been settled, by a long course of decisions, that the claim in the declaration gives the jurisdiction, not the sum actually found due ;—and these decisions have lately been recognized by this Court. *Newtown* v. *Danbury,* 3 *Conn. Rep.* 558. And the words of the statutes authorizing appeals and regulating the number of attorneys are very similar to the statutes giving jurisdiction in chancery to the superior court.

Appeals may be taken to the county courts, when *the sum demanded* exceeds 7 dollars ; and to the superior court, when *the debt, damage or matter* in dispute exceeds 70 dollars. *Stat.* 41. 51. Two attorneys are allowed when the sum in demand exceeds 40 dollars. *Stat.* 141.

The statute under which jurisdiction is claimed, in this case, gives it to the superior court in all cases, where *the value of the thing* or *matter* in demand, *exceeds* 335 dollars. *Stat.* 138.

When the statutes are so similar in phraseology, it is difficult to see why a similar construction should not be given to them ; and as in the three first cases, it is well settled, that the matter in demand is to be ascertained by the claim made by the plaintiff, the same principle must be adopted in the latter case.

This was done, by the superior court, many years since, in the case of *Pitkin* v. *Flowers,* 2 *Root* 42. The same principle

was recognized, by this Court, in *Griswold* v. *Mather,* 5 *Conn. Rep.* 436. There was, indeed, a difference of opinion in that case, *according to the report,*—upon the question whether the allegation of value was to be found in that bill. The whole discussion on this point proceeded upon the principle, that if such an allegation was in the bill, the court would have had jurisdiction. And in the more recent case of *Judd* v. *Bushnell,* 7 *Conn. Rep.* 209., *Pitkin* v. *Flowers* is recognized as law. The superior court, therefore, had jurisdiction.

It is said, in the next place, that there is adequate remedy at law. If we take the facts *found* by the court, and consider the decree thereon as the proper decree, it is certainly difficult to see what necessity is shown for the interposition of a court of chancery. There is no claim that any other than the ordinary common law proof is wanted ; and if the remedy is only in damages, a court of law, with the aid of a jury, is the most proper forum. And upon the state of facts *as found,* the plaintiff could have no claim for the land itself, as she had voluntarily conveyed it to *Skinner,* and thus enabled him to convey it to a third person, who was ignorant of his engagements.

If, on the other hand, we look at the *facts stated* in the bill, it would seem, that she could have no occasion to resort to a court of chancery ; for she alleges she never delivered the deed at all ; of course, the defendant had no title, and could convey none, any more than if the deed had been forged.

If the plaintiff's claim was, that her title was embarrassed, by an outstanding deed appearing upon record, and relief was sought upon that ground ; this might furnish a proper ground of relief. That, however, does not seem to be the object of the bill ; and if it was, this decree is improper, not being in pursuance of it, but is for the value of her estate in the land ; which, in such case, is not the proper mode of relief ; as was decided in the case of *Coe* & al. v. *Turner* & ux. 5 *Conn. Rep.* 86.

Again ; this decree is not authorized, by the facts found, upon other grounds.

The bill states, that *Rhoda Bailey* made and acknowledged the deed, under an agreement with the defendant, *Skinner,* that he would execute a lease, and that he fraudulently *procured the deed without her knowledge,* and refuses to give the lease.

Middlesex,
July, 1829.

Skinner
v.
Bailey.

The court find, that she in fact *conveyed the land to him.* The principal fact, therefore, stated as a ground of relief, is not true. And shall the prayer of the bill be granted, when the principal fact on which it rests is not true, because other facts which might have been a ground of relief, if stated, are found true ?

It is a first principle, that the bill must state the right of the complainant, the injury of which he complains, and what he seeks of the court, for the purpose of informing the court and apprising the opposite party of what he means to prove, that he may have a fair opportunity to answer it. *Coop. Eq. Plead.* 5. And every fact and circumstance necessary to make out his claim, must be distinctly and clearly alleged, with all convenient certainty. *Mitf.* 40. 2 *Swift's Dig.* 203. And every decree must be *secundum allegata et probata ;* (3 *Atk.* 126.) or in the words of *Thompson,* J., in *English* & al. v. *Foxall,* 2 *Pet. U. S. Rep.* 612. " the relief must be agreeable to the case made by the bill ;" or in the language of our own court, in *Gaylord* v. *Couch,* 5 *Day,* 230. "the facts stated in the petition, and the rights and duties resulting from these facts, are, and must be, the only basis of the decree."

This decree cannot, therefore, be supported ; and the judgment must be reversed.

The other Judges were of the same opinion.

Decree reversed.

---

#### Alsop *against* Swathel and others.

Where the question to be tried was, whether certain shares in the *Hartford Stage Company* were the property of *A.,* at the time of his death ; the plaintiff claimed, that they were bought by *B.,* for *A.,* and paid for, by the income from them ; the defendant claimed, that they were bought by *B.,* not for *A.* as his property, but with the intent of permitting him to receive the dividends, during his life, and after his death, of conveying them to his family for their support ; the court charged the jury, that if they should find, that the shares were bought for *A.,* with the view of their being his property, their verdict must be for the plaintiff ; and the jury found for the defendant ; it was held, that the verdict, under this charge, established the fact, that the shares were not bought for *A.,* as his property, but by *B.,* for the benefit of *A.'s* family ; and that the charge, so far as the plaintiff was concerned, was unexceptionable.

*Middlesex,*
July, 1829.

Alsop
*v.*
Swathel.

A written instrument takes effect only by and from its delivery.

And although no particular form of delivery is requisite, it is necessary, that by some expression or act, the party executing the instrument put it into the possession of the other party.

Where the maker of a bill of sale of personal property, placed it in the hands of a third person, to keep, or to hold it subject to the order of the depositor; it was held, that there was no delivery, actual or constructive, to the other party.

In a charge to the jury, it is sufficient for the court to express its opinion upon the questions raised, by the parties, on the trial; and it is no ground for a new trial, that the court omitted to give any direction upon other points, which the evidence might present.

THIS was an action on a bond, given to the plaintiff, as judge of probate, by the defendants, as administrators of the estate of *William R. Swathel* deceased, to secure a faithful performance of their trust.

The cause was tried, on a traverse, by the defendants, of the plaintiff's replication, at *Haddam, August* term, 1828, before *Lanman,* J.

The plaintiff claimed, that *William R. Swathel*, at the time of his death, was the owner of three shares of stock in the *Hartford Stage Company,* of the amount and value of 1,000 dollars each; which the defendants had refused to inventory.

The defendants admitted, that no inventory of these shares had been made; but claimed, and on that ground rested their defence, that they were not the property of the intestate; and whether they were or were not, was the only question to be tried.

They were formerly the property of *John Babcock.* Of him they were bought, in 1815, by *John Swathel,* at the price of 3000 dollars, for which he gave his promissory notes, and took a bill of sale thereof to himself. The dividends which accrued on these shares, after the purchase, he appropriated to the payment of such notes, until they were fully paid; and thereupon they were given up. At a subsequent time, he made a bill of sale of the shares to *William R. Swathel,* his brother, and placed it in the hands of *Nancy Spelman.* The object of the deposite was a subject of some controversy between the parties. The plaintiff claimed, that it was simply " *to keep.*" The defendants claimed, that *John Swathel* gave express directions to the depositary to retain the shares subject to his order, without suffering *William* to receive them, but at the same time informed her, that the income from them might be paid to *Wil-*

*liam,* during his life, and after his death, the shares might be transferred to his family for their support. After this transaction, *John* directed the company to pay the dividends on these shares to *William ;* which was accordingly done, until near the time of *William's* death. At the occasional meetings of the company, *William* attended, upon notice given to him, and was treated, by the company, as the proprietor of the stock. Eventually, the bill of sale was destroyed, by Miss *Spelman.* After the intestate's death, the shares, by direction of *John,* were transferred to *Harriet M. Swathel,* the widow of the deceased.

The judge instructed the jury, that if they should find, that the shares were purchased for *William,* with a view to be his property ; or, that the dividends were paid to him, by authority of *John,* to hold him out to the public, in order to obtain credit thereby, such transaction would be fraudulent against creditors ; and in either case, the jury would return a verdict for the plaintiff. But as every instrument or grant takes effect from its delivery ; and its delivery cannot be operative or presumed against the express consent of the grantor ; if the jury should find, that *William* had never paid for the stock ; and that *John* directed Miss *Spelman* not to deliver the bill of sale during the life of *William ;* that he was ignorant of it ; and that she, as his trustee, was only to deal out to him the income of it, in his life-time, for the relief of his family ; they would find the issue for the defendants.

The jury returned a verdict for the defendants ; and the plaintiff moved for a new trial for a misdirection.

*Hungerford* and *Barnes,* in support of the motion.

*N. Smith* and *Sherman,* contra.

Hosmer, Ch. J. 1. It was first insisted, by the plaintiff, that the shares were bought by *John Swathel,* for his brother *William,* and paid for, by the income arising upon them. On the other hand, the defendants claimed, that they were not purchased for *William,* but with the intent of permitting him to receive the dividends for the sustenance of his family, during his life, and after this, of conveying them to the same family, for their support. The court charged the jury, that if they should find, that the shares were purchased for *William,* with

the view of their being his property, their verdict must be for the plaintiff. In reference to the plaintiff, it is too clear to be made a question, that the charge was unexceptionable. It does not appear, that the shares were purchased, by a co-operation with *William ;* or that they were ever paid for, or agreed to be paid for, by him. The case was placed on the most favourable ground for the plaintiff. If the purchase was intended for *William's* benefit, or in other words, was made with the view of the shares becoming his, abstracted from every other enquiry, the jury were to find a verdict for the plaintiff. Under a charge, on the plaintiff's part, free from all objection, the verdict proves, that the purchase was not made for *William R. Swathel,* but by *John Swathel,* for the benefit of *William's* family.

*Middlesex,*
July, 1829.

Alsop
*v.*
Swathel.

2. The plaintiff next claimed, that the shares were conveyed to *William,* by the bill of sale deposited with Miss *Spelman.* This instrument had never been actually delivered to the intestate, but was put into the hands of the lady last named, as the plaintiff admitted, " to keep," and as the defendants insisted, what from the fact conceded is clearly implied, to hold subject to the order of *John Swathel.* The jury were charged, that every instrument takes effect from its delivery ; and that such delivery cannot be presumed against the consent of the grantor. These principles have often been clearly established, and are incontrovertible.

A deed is a writing sealed and *delivered ;* (Co. *Litt.* 171. *b.* 356.) and although no particular form of delivery is requisite, it *is* necessary, that by some expression or act, the obligor indicate his intention to put the deed into the possession of the other party. *Co. Litt.* 36. *Jackson* d. *McCrea* v. *Dunlap,* 1 *Johns. Ca.* 114. *Goodrich* v. *Walker,* 1 *Johns. Ca.* 250. *Jackson* d. *Eames* v. *Phillips,* 12 *Johns. Rep.* 418. *Jackson* d. *Wadsworth* v. *Wendell,* 12 *Johns. Rep.* 355. *Ward's* exrs. v. *Ward,* 2 *Hayw.* 226. And so far is this principle carried, that even a court of equity will not interfere to give effect to a deed not delivered, but considers it as being inchoate or imperfect. 12 *Ves.* jun. 39. 1 *Madd. Chan.* 176. There is no ground for the suggestion, that the deed was *constructively* delivered. Had it been deposited with Miss *Spelman for the use of the grantee,* there would have been a delivery of it in construction of law. *Belden* & al. v. *Carter,* 4 *Day,* 66. 2 *Stark. Ev.* 477. n. (1). But the terms of the deposite exclude this

*Middlesex,*
July, 1829.

Alsop
*v.*
Swathel.

idea ; the direction being *to keep,* or to hold the deed subject to the order of *John Swathel.*

3. It was next contended by the plaintiff, that the dividends were paid to *William,* by authority of *John Swathel,* in order that he might obtain credit ; and that such transaction was fraudulent in respect of creditors. What effect a fraud of this nature would have on the property in question, it is unnecessary to decide. Suffice it to observe, that the charge on this point was in the plaintiff's favour.

By the closing expression of the judge's charge, the jury are instructed as to the grounds on which their verdict must be given for the defendants. They were informed, that if Miss *Spelman* was directed not to deliver the bill of sale to *William,* but was only a trustee, to deal out the income to him during his life, and afterwards to his family ; and if he had never paid for the shares ; on the concurrence of these facts, the defendants were entitled to their verdict. To this part of the charge no exception has been, or could be, made.

4. It was lastly insisted, that the judge did not fully submit the case to the jury, particularly on the question of fraud. For this suggestion there exists no foundation. The jury were distinctly charged on every question raised at the trial. If the fact were otherwise, it should have been stated. No specific charge was requested, by either party. "It is sufficient," says *Story,* J. " that the court has given no erroneous directions. If either party deems any point presented by the evidence to be omitted in the charge, it is competent for such party to require an opinion from the court upon that point. If he does not, it is a waiver of it. The court cannot be presumed to do more, in ordinary cases, than to express its opinions upon the questions, which the parties themselves have raised at the trial." *Pennock* & al. v. *Dialogue,* 2 *Pet. U. S. Rep.* 15, 16.

The other Judges were of the same opinion, except Dag- gett, J., who gave no opinion, having been of counsel in the cause.

<div style="text-align: right;">New trial not to be granted.</div>

## IVES *against* LYNN.

*Middlesex*,
July, 1829.

Personal notice to a tax-debtor to pay the tax, as a prerequisite to making distress therefor, was not required, by the statute providing for the collection of taxes, as revised in 1821; but under that statute, a publication on the sign-post in the town where the land lies, and in a newspaper printed in the same county, was sufficient notice.

Nor is a personal demand of the tax-debtor for personal property to satisfy the tax, necessary, before the sale of real estate for that purpose.

It is a legal presumption in relation to the official acts of a public officer, that he has done his duty.

Therefore, where a collector of state taxes, who had sold the land of the plaintiff to satisfy a tax against him, stated in his return on the warrant, that he sold to the defendant, at public auction, the whole of a certain tract of land, (he offering to take no less quantity,) for the amount of the tax and lawful charges; and where the collector afterwards, in a deed executed by him to the defendant, stated, that he sold, at public auction, *sufficient* of said land to pay the tax and the legal charges, to the defendant, he being the highest bidder; it was held, that the legal presumption was, that the collector acted with fairness in the sale, and sold *no more* land than was sufficient to satisfy the tax and charges; and consequently, the sale was valid.

It is not by law necessary, that a deed of land, sold, by a collector, for the payment of a tax, be executed within twelve months after the tax falls due.

But, as the statute allows the tax-debtor twelve months from the sale for redemption; and requires the deed to lie in the town-clerk's office, twelve months, unrecorded, for the purpose of giving notice to the tax-debtor, that he may redeem; it is necessary that the deed be executed, and lodged with the town-clerk, with all convenient despatch after the sale.

Therefore, where land was sold at the sign-post, for the payment of a tax, on the 29th of *July* 1822, and a deed of such land was executed on the 1st of *April* 1826; it was held, that such deed was invalid.

THIS was an action of trespass *quare clausum fregit;* tried at *Middletown, February* term, 1829, before *Hosmer*, Ch. J.

The *locus in quo* was a tract of land in *Durham*, containing about twenty acres. The question of title was the only one in controversy. The defendant claimed title, by a deed from *Joseph Chidsey*, a constable of *Durham*, and collector of the state tax for the year 1821. To establish the validity of this deed, the defendant adduced in evidence, 1. a warrant from the treasurer of the state, directed to *Chidsey*, for the collection of a tax of one cent on the dollar, granted by the General Assembly, in *May* 1821, payable into the treasury by the 20th of *February* 1822; 2. *Chidsey's* return on such warrant; and 3. the deed in question. The treasurer's warrant was in the usual form. The collector's return was as follows:

" *Middlesex County, ss. Durham, July* 29, 1822.

By virtue of this warrant, to me directed, having previously advertised in the *Middlesex Gazette*, printed in said county, and also by posting up an advertisement on the public sign-post in said *Durham*, a time and place for receiving the tax herein named, and reasonable notice and opportunity having been given to *Levi Ives*, a person named in the schedule hereunto annexed, and he having neglected to pay the tax standing against his name, and there being no goods or chattels of said *Ives*, to be found in my precincts; I, on the 20th day of *May* last past, levied this warrant on a piece of land herein after described, belonging to said *Ives*, at the time of making up the list whereon said tax arose and was levied. And on the said 20th day of *May* last past, I advertised on the sign-post in *Durham*, where said land lies, that on the 29th day of *July*, so much of said land (the whole containing by estimation about 20 acres) as would be sufficient for the payment of said tax and all necessary charges; and further, three consecutive weeks, six weeks before the said 29th day of *July*, (that being the day of sale,) I published the same advertisement in said *Middlesex Gazette*, printed in *Middletown* in this state, and afterwards, to wit, on the said 29th day of *July*, at the sign-post aforesaid, I, at public auction, within one year after said tax became due, sold to *Samuel Lynn*, of said *Durham*, the whole of said land, (he offering at the same time to take no less quantity,) for the sum of sixty cents, the amount of said tax and lawful charges and costs arising thereon; said land is bounded, &c. And afterwards, to wit, on the 3rd day of *August*, 1822, I acknowledged and delivered a deed, with warranty, of said twenty acres, to the said *Lynn*, bounded as aforesaid; and the sum of ten cents, being a part of the aforesaid sum of sixty cents, I paid over to the treasurer of the state, as by this warrant I was commanded.        Attest.

*Joseph Chidsey*, Constable, and Collector of State Tax."

The deed given by *Chidsey* was as follows:

" *To all people to whom these presents shall come*—Greeting:

" Whereas, I, *Joseph Chidsey*, of the town of *Durham*, in the county of *Middlesex*, a constable of the town of *Durham*, and collector of the state tax for the year 1821, duly and legally appointed and sworn, by virtue of a warrant to me directed, dated the 13th day of *June, A. D.* 1821, signed by *Isaac Spencer*, Treasurer of the state of *Connecticut*, me the said

collector requiring and commanding to collect of the inhabitants of the town of *Durham,* one cent on the dollar on the list of 1820, amounting to 216 dollars and 25 cents, with all additions made thereto, out of the goods or estate of the said inhabitants, and to settle my accounts with said Treasurer by the 20th day of *February* then next ; and for want of goods or chattels of *Levi Ives,* a person named in the list annexed to said warrant, and a non-resident proprietor of land in said town of *Durham,* and charged with a tax in said list, of ten cents, to be had or found, although diligent search was made by me therefor, whereupon to make distress for said tax against said *Levi Ives* in said warrant, or list thereto annexed, mentioned, and none being tendered to me ; and said *Levi Ives* having failed to pay said tax against him, or any part thereof, although I had appointed a time and place for receiving said tax, *viz.* the 11th of *February,* 1822, at the house of *Daniel Bates,* in said *Durham ;* and had given said *Levi Ives* notice thereof, and reasonable warning and opportunity to pay the same ; that is to say, by posting the aforesaid notice of time and place, on the public sign-post in said *Durham,* and by publishing the same in the *Middlesex Gazette,* so called—did, on the 20th day of *May* A. D. 1822, levy said warrant on a certain piece of land, or real estate of the said *Levi Ives,* situate and lying in said town of *Durham,* bounded and described as follows, *viz.* bounded &c. containing, by estimation, twenty acres—and did thereupon, afterwards, advertise in a public newspaper printed in *Middletown,* in *Middlesex* county, called the *Middlesex Gazette,* three weeks successively, six weeks before the 29th day of *July,* 1822, that so much of said land as would be sufficient to pay said tax against said *Levi Ives,* with necessary and legal costs and charges thereon, would be sold at public auction, at the sign-post in said town of *Durham,* on said 29th day of *July, A. D.* 1822, at one o'clock in the afternoon of said day ; and having also advertised on said sign-post in said *Durham,* the time and place of selling the same, as and for the purposes aforesaid ; and whereas, I, the said *Joseph Chidsey,* collector aforesaid, did, at the said time and place when and where said land was so advertised to be sold as aforesaid, sell at public auction *sufficient* of said land or real estate, to pay said tax against said *Levi Ives,* and the legal costs and charges thereon ;—that is to say, the said piece of land above-mentioned and described, and all thereof, unto *Samuel Lynn,* of said *Durham,* at and for the

*Middlesex,*
July, 1829.

Ives
*v.*
Lynn.

price of sixty cents, whereof the sum of ten cents was tax, and the sum of fifty cents was charges, the said *Samuel Lynn* then and there being the highest bidder for the same, and paid the sum of sixty cents, being the highest sum bid on and for the same, whereby the said *Samuel Lynn* then and there became the purchaser thereof; which sum of sixty cents was then and there paid to the collector as aforesaid, by said *Samuel Lynn* therefor. Now, therefore, I, the said *Joseph Chidsey*, in consideration of the premises, and the said sum of sixty cents, paid to me as aforesaid, do hereby grant, bargain, sell, and convey, unto the said *Samuel Lynn*, and to his heirs and assigns forever, the said piece of land above described and mentioned, and all thereof, that is to say, twenty acres by estimation, bounded, &c.—To HAVE AND TO HOLD the same, and the appurtenances thereunto belonging, unto him the said *Samuel Lynn*, his heirs and assigns forever; and I, the said *Joseph Chidsey*, do for myself and my heirs, executors, and administrators, covenant with the said *Samuel Lynn*, his heirs and assigns, to warrant and defend said described and bargained premises, to said *Samuel Lynn*, his heirs and assigns, against all lawful claims and demands whatsoever. In witness whereof, I have hereunto set my seal, and subscribed my name and office, this first day of *April, A. D.* 1826.

<div align="right">

*Joseph Chidsey.* [A Seal.]

</div>

Signed, sealed and delivered, in presence of *James Tibbals, W. J. Trench.*

<div align="center">*Middlesex County ss. Middletown, April 1st*, 1826.</div>

Personally appeared, *Joseph Chidsey*, signer and sealer of this instrument, and acknowledged the same to be his free act and deed, before me,    *Augustus Cook*, Justice of Peace.

*April* 17th, 1826. Recorded from the original instrument, being therewith compared.  *W. G. Chauncey*, Town Clerk."

To the admission of these documents, thus offered in evidence by the defendant, the plaintiff objected,

1. Because the notice was given to the plaintiff, who lived in *Wallingford*, to pay the tax, only by a publication on the sign-post in *Durham* and in the *Middlesex Gazette ;* whereas *personal* notice should have been given to him. The court decided, that the notice was sufficient.

2. Because personal demand was not made, by the collector, of the plaintiff personally, or at his usual abode in *Wallingford*, before the sale of the land, for personal estate, to satisfy

the tax, costs and charges.    The court decided, that although a collector may collect taxes in any town in the state, by special provision of law ; (*Stat.* 455. *s.* 18.) and although, if goods or chattels are tendered, or can be found, a collector may not levy his warrant on real estate ; (*Stat.* 455. *s.* 19.) yet he is not obliged to make personal demand for them, or to go out of the town in which he resides, to search for them.

3. Because it does not appear, by the collector's return, or by the deed in question, that a sale of *all* the tract disposed of, was necessary to raise the sum for which it was sold ; or that a part of the land was first offered for sale, and found to be insufficient.    The court decided, in the first place, that this objection was not warranted by the facts apparent on the return ; and secondly, that the presumption of law is, that the collector performed his duty faithfully, until the plaintiff shews the contrary, which he is at liberty to do.

4. Because the deed was not executed within a year after the tax fell due ; and that it was not lodged in the town-clerk's office, without being recorded, for a period of twelve months. The court decided, as to the first branch of the objection, that the law under which the sale was made, on the 29th of *July,* 1822, does not require, that a deed shall be executed within twelve months after the tax falls due ; (*Stat.* 456. *s.* 20.) and as to the second branch, that although the law admits of a redemption of the estate sold within twelve months from the time of sale, and declares that the deed shall remain unrecorded twelve months, yet the deed is not rendered void, by the premature record of it ; and where, as in this case, the deed was not given until the period of redemption had elapsed, there is no legal prohibition against its being recorded without delay.

These objections being thus overruled, the evidence offered was permitted to go to the jury, and the plaintiff obtained a verdict.    The defendant moved for a new trial, on the ground that such evidence ought to have been rejected.

*N. Smith* and *Stanley,* in support of the motion, after premising, that he who seeks to take another man's estate from him against his will, must shew, that the proceedings, by virtue of which he claims title, are strictly conformable to law, contended, 1. That no legal notice was given to the tax-debtor to pay the tax.    First, the tax-debtor is entitled to *actual* notice. This is implied in the term "*warning.*"    It is also implied in

the provision of the statute, that the tax-debtor shall have " *opportunity to pay*" the tax. *Stat.* 455. *s.* 19. Secondly, if other than actual or personal notice is sufficient, it must at least be " *reasonable*" notice. But an advertisement printed in a *Middletown* newspaper, and posted on the sign-post in *Durham*, is not *reasonable* notice to an inhabitant of *Wallingford ;* because it cannot be *reasonably* inferred, that he would derive therefrom any " warning," or " opportunity to pay" the tax. If any circumstances existed, which made this reasonable notice, those circumstances ought to appear in the return, that the court may be enabled to decide the point. Thirdly, if the notice given in this case, is sufficient, then the act approved *June* 1st, 1824, was *unnecessary.* The passing of that act was equivalent to a declaration by the legislature, that such notice was, previously, insufficient.

2. That the collector must make a demand for personal property of the tax-debtor in person, or at his usual abode, before he can levy on his land. It will be conceded, that this is indispensable in the case of an ordinary execution. What ground of discrimination is there between the cases ? Should not the rights of the citizen be as well guarded against a tax-gatherer as against a creditor ? The reason in both cases is the same ; the powers of the officers are the same ; their fees are the same. In *Allen* v. *Gleason,* 4 *Day,* 382. it was taken for granted, by the court, " that collectors of taxes have the powers, and must proceed generally in the same manner to collect, as officers having executions."

3. That it does not appear, by the return or by the deed, that it was *necessary* to sell *the whole* of this land ; and if not necessary, a sale of twenty acres, to raise sixty cents, was oppressive and illegal. A collector can only sell enough to satisfy the tax and charges ; and *non constat*, that a single square rod would not be enough for this purpose. *Stead's* exrs. v. *Course,* 4 *Cranch,* 403. 414.

4. That the plaintiff had a right to have the deed made out immediately, or within a reasonable time, after the sale, and lodged in the town-clerk's office for record ; and then he, and those who claim under him, were entitled to twelve months to redeem it in, during which period the deed was to remain unrecorded. *Stat.* 456, *s.* 20. The statute does not say, in express terms, that the deed shall be lodged in the town-clerk's office *immediately after the sale* ; but it does say, that the tax-

debtor shall have twelve months to redeem his land in, "from the
time of the *sale ;*" and that the deed shall remain in the town-
clerk's office unrecorded twelve months.   The tax-debtor is
strictly entitled to the benefit of both these provisions.   But of
what use is it to him to have a deed lie unrecorded in the town-
clerk's office, after his time of redemption has expired ?   The
only consistent construction is that which makes the twelve
months in relation to both subjects *run together ;* and as the
period of redemption is reckoned from *the sale*, the other pe-
riod must be reckoned from the same point.   In this case, the
time of the sale, was the 29th of *July* 1822, and the date of the
deed, was the 1st of *April*, 1826.

*Middlesex,*
*July, 1829.*

*Ives*
*v.*
*Lynn.*

*Sherman* and *Hungerford,* contra, contended, 1.  That the
notice given to the plaintiff to pay the tax, was sufficient.  The
statute did not require *personal* notice, but " reasonable warn-
ing and opportunity to pay the tax;" and such warning and
opportunity the plaintiff had.   To require the collector to go,
in the first place, to all the proprietors of land in the town, resi-
dents and non-residents, and give them notice to pay the tax,
and then to go again and make demand of personal property,
would be an intolerable inconvenience.   Can he charge travel
fees for giving notice that a tax is due ?   Every owner of land is
presumed to be conusant of the fact, that he owes a tax on it.
If the plaintiff, in this case, had not actual notice, it is at least
incumbent upon him to shew it ;  which he has not done.

2.  That for similar reasons, a collector is not obliged by law
to make personal demand of the tax-debtor for chattels, or to
go out of the town in which he resides to search for them.

3.  That the sale was regularly and legally made.  It ap-
pears, both by the collector's return and by the deed, that the
plaintiff was properly notified of the time and place of sale, by
advertisement and posting.   In the return, it is averred, that
the collector, on the 29th of *July*, 1822, (that being the ap-
pointed day of sale,) sold, at the sign-post, *at public auction,*
to *Samuel Lynn* the whole of said land, he offering at the same
time to take no less quantity, for the amount of the tax and
charges.   A sale at public auction implies, *ex vi termini,* that
the vendee was the *highest bidder.*   The deed is still more ex-
plicit.   It avers, that the collector did, at the time and place
when and where the land was advertised to be sold, *sell,* at
*public auction*, SUFFICIENT of said land to pay the tax and

charges, *i. e.* the piece of land described, to *Samuel Lynn, he being the highest bidder.* The deed is in the nature of a return, and is evidence of the collector's proceedings. The law does not require the collector to make his return on the back of his warrant ; but he may state the proceedings in his deed. There is nothing in the return, which goes to impair or detract from the averment in the deed ; and that averment is clearly sufficient.

4. That the deed executed by the collector, on the 1st of *April,* 1826, conveyed a valid title to the defendant. The *sale* took place, when the land was bid off at the sign-post ; and was *prima facie* evidence of title in the purchaser. *Bryan & al.* v. *Hinman,* 5 *Day* 211. The instrument of conveyance is a different thing. This may be executed at a different time and place ; and there is no law requiring its execution within a year.

HOSMER, Ch. J. The plaintiff brought an action of trespass *quare clausum fregit* against the defendant, and at the trial, made a *prima facie* case. The defence is title, by a deed from a collector of state taxes, on sale of the property in question ; and the validity of such defence will appear, by attention to the objections made to it, on the part of the plaintiff.

1. It was first objected, that personal notice or other reasonable and sufficient warning to the plaintiff to pay the tax, was not given ; nor was demand made of him for payment.

By the 19th section of the act providing for the collection of taxes, (*p.* 455. *s.* 19. revis. 1821.) it is enacted, that the collectors of taxes shall appoint a time and place for receiving them, and shall give to every person reasonable warning for paying such taxes ; and in failure of payment, that they shall make distress.

The notice given in this case, was not personal, but was by a publication on the sign-post in *Durham,* where the land lies, and in the *Middlesex Gazette.* Such notification was all that the law requires. Personal notice and demand are not prescribed by the statute ; and the inconvenience of them would be intolerable. The law, by contemporaneous and uniform construction, has been long settled, and the notice in this case, sanctioned, by universal usage.

2. It was next objected, that personal demand was not made of the plaintiff, by the collector, or at his usual abode in *Wal-*

*lingford, before the sale of the land,* for goods and personal estate, to satisfy the tax.

The statute concerning the collection of taxes, is complete in itself; and it is sufficient if the prescriptions have been complied with. It requires three weeks advertisement of the time and place, at least six weeks before the time of sale, in some public newspaper printed in the county where the land lies, or an adjoining county, and *then* directs the sale of the land at public auction. *Stat.* 455. *tit.* 100.*c.* 2. *s.* 20. The return of the collector shews, that these requisitions were observed. The personal notice and demand, constituting the objection made, are not by law required.

3. It was next objected, that it does not appear, by the return of the officer, or the deed in question, that the sale of all the land disposed of, was necessary to raise the sum for which it was sold; or that a part of the land was first offered for sale, and found to be insufficient. The validity of this objection depends on the collector's return. From that and the deed just mentioned, it appears, that the collector sold to *Samuel Lynn* the land in question, (he having offered to take no less quantity,) for the amount of the tax and lawful charges; and that he sold sufficient to pay the tax and costs; *Lynn* being the highest bidder.

It is a presumption of law, that the collector did his duty; and if he did not, it rests on the objector to prove the obliquity of his conduct. No proof has been offered to establish the fact alluded to.

It is required of the collector, that he act with fairness, and sell no more property than is requisite to pay the tax and charges. But the specific mode in which he is to act, the law does not prescribe. When he says, as he does in his return, that he sold the whole of the land in question, the purchaser having offered to take no less quantity, the legal presumption is, that he sold what was necessary, and no more; and when he affirms, as he does, that he sold *sufficient* to pay the tax and charges, the inference is equally clear, that he disposed of no more than was sufficient. A different construction can alone be founded on a new principle; that is, that returns are to be expounded most strictly against the officer, on the unheard of presumption, that he did not do his duty. On the contrary, the inference is legal, that the auction was fairly and properly conducted; and the presumption of fact derived from the defend-

ant's silence, in respect of proof, terminates in the same result.

4. The last objection requiring notice, is, that the deed to the defendant was not executed within a year after the tax fell due, nor lodged pursuant to law, for twelve months, in the town-clerk's office, *without being recorded.*

As to the first branch of the objection, the law of *May* 1821, under which the sale was made, does not require, that a deed shall be executed within twelve months after the tax falls due. There is, however, a point of view arising on the facts display-ed, that clearly shews the defendant's deed to be invalid.

The land in question was sold at public auction, by the col-lector, on the 29th day of *July* 1822 ; and the deed exhibited in evidence, founded on that sale, was not executed until the 1st day of *April* 1826. This was not in conformity with the requisitions of the statute. By this act, the collector is to sell the estate of the tax-debtor at auction, and "to give to the purchaser a deed of warranty thereof, to be lodged in the office of the town-clerk where the land lies, to remain unrecorded twelve months : and if the owner, from whom the tax was due, or any purchaser, mortgagee, creditor of such owner, or person claiming any interest in the land, shall, within twelve months from the time of sale, pay or tender to the purchaser from the collector, the purchase money, with twelve *per cent.* interest, such deed shall be void, and shall be delivered up to the person paying or tendering the money ; who shall hold such land or estate as a security, in nature of a mortgage, for the money paid and twelve *per cent.* interest." *Stat.* 456. *tit.* 100. *c.* 2. *s.* 20. This systematic provision must be so con-strued, that all its parts may take effect according to the intent of the law.

The first subject in the natural order of events, is the exe-cution of the deed. The law is not explicit as to the period of its execution, but the nature of the subject indicates it, with sufficient clearness. The estate sold is redeemable at any time within twelve months *from the sale ;* and to give con-structive notice of the facts requisite to be known, by those who have a legal right to redeem, the collector's deed is to be filed with the town-clerk, to remain twelve months unrecord-ed. In order to carry the whole law into effect, the deed must be executed with all convenient speed after the sale, and lodged with the town-clerk ; otherwise, the right of redemp-tion cannot, or at least may not, be exercised, for deficiency of

notice.   Neither the owner of the land, nor a purchaser, mortgagee or creditor is bound to look any where but at the town-clerk's office, to get the requisite information of the facts, in order to decide on the necessity or propriety of redeeming the estate sold.   The deed in question was not executed until nearly four years after the sale of the land, by the collector. The validity of the deed depending on positive law not complied with, it is, undoubtedly, void.

The determination at the circuit, was incorrect ; and a new trial is advised.

The other Judges were of the same opinion.

New trial to be granted.

*Middlesex*,
July, 1829.

Ives
*v.*
Lynn.

———◆———

GODDARD *against* SELDEN.

SELDEN *against* GODDARD :

IN ERROR.

Where the condition of a bond executed by *A.* to *B.* in *September* 1820, secured by a mortgage of land, was, that *A.* should pay to *B.* all such sums of money as *B.* should thereafter advance to *A* ; in *May* 1823, *B.* advanced to *A.* the sum of 300 dollars, for which he took *A's* promissory note, indorsed by *C.*; in *September* 1823, after such note had become due, *B.* brought a bill of foreclosure on the mortgage so given, and obtained a decree, finding the sum of 1161 dollars due on the bond, and limiting a period of redemption ; immediately after the expiration of this period, the money not being paid, *B.* entered into possession of the mortgaged premises, the value of which did not exceed 1200 dollars ; in an action subsequently brought by *B.* against *C.* on his indorsement of *A's* note for 300 dollars, to which *C.* set up as a defence the decree of foreclosure and the possession of *B.* under it, it was held, that the amount of the note was not *necessarily* secured by the mortgage, nor included in the sum found due thereon ; that it was competent *for B.* to shew, by parol evidence, that the fact was otherwise ; and that this being shewn, the defence relied upon was unsupported and unavailing.

THIS was an action of *assumpsit,* brought by *Hezekiah Goddard,* as indorsee of a promissory note, against *Erastus Selden,* the indorser.   The note declared on was made by *John C. Ely,* for 300 dollars, dated *May* 13th, 1823, payable to the de-

fendant, or order, at the *Union Bank* in *New-London*, 60 days from date, and indorsed by the defendant. There were two additional counts, one for money had and received by the defendant, and one for money lent and advanced to the defendant, at his special interest and request.

The defendant pleaded, 1st, the general issue ; 2ndly, a special plea, stating the following facts : That the several counts in the declaration were for the recovery of the same sum of money for which the note described in the first count was given ; that on the 29th of *September*, 1820, *John C. Ely*, named in the plaintiff's declaration, executed and delivered to the plaintiff his bond, of that date, in the penal sum of 1200 dollars, conditioned, that he, *Ely*, should pay to the plaintiff all such sums of money as the plaintiff should thereafter advance to him ; that *Ely*, at the same time, mortgaged to the plaintiff three parcels of land in *Lyme*, to secure the fulfilment of the condition of such bond ; that on the 13th of *May*, 1823, the plaintiff advanced to *Ely* the amount of the note mentioned in the declaration, for which that note was given ; that on the 18th of *September*, 1823, the plaintiff brought a bill of foreclosure, against *Ely*, on the mortgage, to the superior court, alleging a breach of the condition of the bond and of the mortgage, and thereupon the superior court, in *January*, 1824, passed a decree, finding that there was due on the bond the sum of 1161 dollars, 30 cents, and directing that the defendant in the suit should be barred of all equity of redemption, unless that sum with interest thereon and the costs of suit, should be paid to the plaintiff, on or before the first *Monday* of *July* 1824 ; that the money was not paid, and immediately after the expiration of the time limited, the plaintiff entered into possession of the mortgaged premises, and has ever since retained the possession thereof, taking the rents and profits to himself ; that said note was given solely for the money so advanced by the plaintiff to *Ely*, and was indorsed, by the defendant, for the accommodation and benefit of *Ely*, which was, at the time, well known to the plaintiff ; and that said money so advanced, was covered by and embraced in the condition of said bond and of said mortgage deed, and was advanced upon the security of said bond and deed.

These last allegations were traversed by the plaintiff ; on which issue was joined.

The cause was tried, on this issue and the general issue, at *New-London*, *October* term, 1828, before *Daggett*, J.

On the trial, the matters stated in the special plea, and not traversed, were admitted as facts, under both issues. It was, moreover, agreed, that the value of the mortgaged premises did not exceed 1200 dollars.

The plaintiff claimed, that the note in suit was not in fact embraced in the sum found due upon the mortgage, but that it was composed of three other notes signed by *Ely* and several small orders drawn by *Ely* upon the plaintiff; and offered to prove these facts, by parol evidence. To the admission of such evidence the defendant objected, claiming, that the plaintiff could not prove, by parol testimony, what items did, and what did not, compose the mortgage debt found due. The court overruled the objection, and admitted the evidence offered.

The defendant then claimed, that as it was an admitted fact, that the plaintiff had advanced to *Ely* the money for which the note in suit was given, and taken this note before his bill of foreclosure was brought, and held it, with the other notes, when the decree was passed, he could not by law appropriate the mortgaged premises in payment of a part of such notes, and afterwards collect the residue ; and prayed the judge so to instruct the jury. The judge did not so instruct the jury, but instructed them in conformity with the claim of the plaintiff, in whose favour the jury returned a verdict. The defendant then moved for judgment *veredicto non obstante ;* which was overruled by the court. He then filed a motion in error, assigning for error, that the court ought to have rendered judgment in his favour. He also moved for a new trial, for the admission of improper evidence, and for a misdirection.

*Hungerford* and *Waite,* for the plaintiff in error, and in support of the motion, contended, 1. That the terms of the condition of the bond and mortgage were broad enough to embrace the debt now sought to be recovered. This was a sum of money subsequently advanced by the plaintiff to *Ely ;* and was a part of the mortgage debt.

2. That as the judge, on the trial, took from the jury the question whether this debt was *in fact* included in the sum found due on the mortgage, and directed them to give a verdict for the plaintiff, it must be taken, that it *was in fact included.*

3. That aside from the question of fact, as such, the finding

of the superior court, in contemplation of law, will be considered as having embraced the *whole* mortgage debt. In the first place, the finding that a certain sum is due on the mortgage, implies, that that sum is *all* that is due. Secondly, a mortgage debt, though made up of several items, originating at different times, is, in its nature, an *indivisible* thing. *Bunnell* v. *Pinto*, 2 *Conn. Rep.* 431. If all the items were expressly detailed in the condition of the mortgage, it is clear beyond controversy, that they would constitute but one claim.

4. That a decree of foreclosure and the taking of possession under it, constitute an appropriation of the pledge and a satisfaction of the debt. The *Derby Bank* v. *Landon*, 3 *Conn. Rep.* 62. *Ely* has paid the penalty of his bond. He owes the plaintiff nothing which that bond covered.

*J. W. Huntington*, contra, not deeming it necessary to controvert the position, that this claim *might* have been secured by the mortgage, contended, 1. That a decree of foreclosure is not conclusive evidence, under all circumstances, that the plaintiff in the bill has appropriated the pledge as a satisfaction of every existing debt or claim, which the condition of the mortgage was capable of embracing. The rule on this subject contemplates a *voluntary* or *intentional* appropriation. If in any case it appears, that the mortgagee did not intend to accept the pledge as a satisfaction of the debt,—as *e. g.* where the debt is secured by mortgages in different jurisdictions,—a decree of foreclosure in one jurisdiction will not extinguish the debt. So where there are *distinct* debts secured by mortgage of the same land, a foreclosure as to one debt, will not extinguish the other. In the present case, the claim in question has had, from its origin, no connexion with the mortgage debt. It is for a sum of money advanced *on a different security, viz.* the *indorsement* of the defendant. If the defence set up is to prevail, the plaintiff will be deprived of that security, without any fault on his part.

2. That if this claim was not *necessarily* embraced by the mortgage, and extinguished by the decree of foreclosure, parol evidence was admissible, to shew, that it was not exhibited to the court, nor included in the sum found due. Such evidence has always been received in analogous cases. *Seddon* & al. v. *Tutop*, 7 *Term Rep.* 607. *Ravee* v. *Farmer*, 4 *Term Rep.* 146. 1 *Stark. Evid.* 200. and notes. In no other way could

it be proved, under a condition to a mortgage deed expressed
in such general terms as the one in question. And there can
be no objection to such evidence *on principle ;* for in no sense
does it impugn or contradict the deed or the decree.

In reply, the counsel for the plaintiff in error, said, that the
principle recognized in *Seddon* v. *Tutop* and that class of
cases, is inapplicable to this case ; because in those cases, the
causes of action were distinct and embraced in different
counts. If any evidence had been offered in support of each
count, the judgment would have been a bar to any claim which
might have been enforced in the action ; *e. g.* book debt or
*assumpsit* for goods sold and delivered, where only a part of
the items are recovered. In this case, the cause of action is
one and indivisible in its nature, *viz.* the *bond,* which cannot be
enforced for a part, in one suit, and for part in another.

DAGGETT, J.  Parol testimony having been admitted, by the
court, to shew, that the note on which &c. was not taken into
the account in making up the sum upon which the decree of
foreclosure was passed, and the judge having charged the jury,
that the plaintiff was entitled to a verdict, the defendant moved
for a new trial for the supposed errors in the admission of the
testimony and in the charge. The motion in error is founded
upon the supposition, that the motion made by the defendant,
that judgment should be entered up for him *veredicto non ob-
stante,* ought to have prevailed.

The principal ground here suggested, is, that the decree of
foreclosure *must* have included the note on which &c., and
therefore, according to the doctrine in *The Derby Bank* v.
*Landon,* 3 *Conn. Rep.* 62. that as the taking possession of
mortgaged premises by the mortgagee under a decree of fore-
closure, is, by operation of law, an extinguishment of the mort-
gage debt, it ought to bar the plaintiff of a recovery. It is quite
obvious, that this defence applies with equal force on the pray-
er for a new trial and the motion in error. If it be sound, the
judge should have charged the jury, that the plaintiff could not
recover, or he should have allowed the motion for judgment in
favour of the defendant *veredicto non obstante.* Let us, then,
look into the case.

The suit is by the plaintiff, as indorser of a note made by
one *John C. Ely,* in common form of negotiable notes, and in-

New-London, dorsed by the defendant to the plaintiff. There are other
July, 1829. counts in the declaration; but *this note* only is the foundation
Goddard of the plaintiff's action. The note is dated 13th of *May* 1823.
v.
Selden. The defendant, besides the general issue of *non assumpsit*,
pleads specially, in substance as follows:—That previous to the
making of this note, *viz.* on the 29th of *September* 1820, *John C.
Ely* executed his bond to the plaintiff, in the penal sum of 1200
dollars, conditioned that he should pay to the plaintiff all such
sums of money as he should thereafter advance to *Ely*, and at
the same time mortgaged certain lands for the fulfilment of the
condition. After this, in *May* 1823, the plaintiff advanced the
amount of the note, on which this action is brought; and there-
after, in *September*, 1823, brought a bill of foreclosure upon
the mortgage, to the superior court, who passed a decree, find-
ing there was due on the bond 1161 dollars, 30 cents, and di-
recting that the defendant in that suit should be barred of all
equity of redemption, unless that sum and interest and costs
should be paid, on or before the first *Monday* of *July*, 1824.
The money was not paid; and immediately after the time lim-
ited had expired, the plaintiff entered into possession of the
mortgaged premises. The plea concludes with the general
allegation, that the money advanced on the note was *covered
by and embraced in the condition of the bond, and was secured
by said deed.* This last allegation is traversed, by the
plaintiff; and thus the issue between the parties is formed
and tried. The defendant offers no testimony in support of
the position that this note was covered by the bond and mort-
gage, and has thus been paid, by an appropriation of the
pledge, but insists, that this is the legal effect of the foreclosure.

He must say, and he does say, that a recovery in an action
of debt on this bond, would be, *per se*, a bar to an action on
the note. Can this be so? The note is not, and could not
have been, mentioned or referred to, in the bond;—it is not for
the same sum;—it was made three years after the bond.
Other advancements and debts *must* have been included in the
bond; for the court found, in *February* 1824, less than a year
after the making of the note, the sum of 1161 dollars, 30 cents
due, whereas the note and interest would not have amounted
to more than 320 dollars. Besides, it appears, that the bond
and mortgage were given to secure the plaintiff for advance-
ments to be made to *John C. Ely;* and, I think, upon his indi-
vidual responsibility. The transaction seems to speak such a

language. He would not advance, in *May* 1823, money on the bond and mortgage of 1820, but insisted on further security ; and accordingly, the defendant became his indorser. This is the natural import of the transaction. But the defendant not only does not produce any testimony to prove, that the note was embraced in the bond and mortgage, but objects to parol testimony to shew, that it was not included. This proof, if admissible, shews, that the note was no part of the sum of 1161 dollars, 30 cents, which was received by the appropriation of the pledge ; and by what rule of law is it to be excluded ? Must not, in many cases, such proof be received ?

It is, however, insisted, that as it *might have been embraced,* then, when a recovery has been had, the court are bound to consider it *as embraced.* This proposition cannot be sustained. The doctrine of *Seddon* & al. v. *Tutop,* 6 *Term Rep.* 607. is in direct opposition to that idea. There, the plaintiffs declared on a promissory note, and for goods sold. There was a plea of a former recovery of 71*l.* 10*s.* for damages the plaintiffs had sustained for not performing the identical promises. Replication, that the promises were not the same. Issue was closed on that fact. It appeared, that in a former action, judgment was by default ; and on executing the writ of enquiry, there being a count on a promissory note and for goods sold, the plaintiffs not being prepared with proof as to the goods, took a verdict only on the note. It was objected, that as the plaintiffs might have recovered in a former suit for the goods sold, they ought not to recover in this suit. But the court directed a verdict for the plaintiffs, with liberty to the defendant to move to enter a nonsuit, if the court should be of opinion, that the plaintiffs were not entitled to recover. On a full discussion, the court of king's bench held, that the action was sustainable. The ground taken by the court, was, that the claim for the goods there made was not *now* made, though it is apparent it might have been. The court cite the case of *Hitchin* & al. v. *Campbell,* 3 *Wils.* 304., where to an action of *assumpsit* by the assignees of a bankrupt, the defendant pleaded a former judgment in an action of trover, brought by the plaintiffs against the defendant for the goods, for the money produced by the sale of which this action was brought : and on an examination of the facts, the court held it a bar, because the same question, *viz.* the right of the plaintiffs to the goods, had been tried and decided against them. They cite also two other cases, *Ravee* v. *Far-*

*mer*, 4 *Term Rep.* 146. and *Golightly* v. *Jellicoe*, 4 *Term Rep.* 147. n. in which awards were pleaded in bar of the plaintiff's demands. In both cases all matters *in difference* were submitted, but the claims now made were not then in controversy, and of course, were not submitted to the arbitrator. In neither case, was the award holden a bar.

Now, in all these cases, parol proof was received; the facts examined; and the decisions made on such proof.

Indeed, we have a case in 2 *Conn. Rep.* 431. which was well considered, and in which the true doctrine is laid down. *Bunnel* brought an action of debt by book against *Pinto*. The defendant pleaded in bar an award in pursuance of a submission of the book accounts of the parties. The plaintiff replied his action was brought for the recovery of certain articles of book account, which were not considered, awarded upon, or finally decided, by the arbitrator. To this replication the defendant demurred. It was adjudged sufficient, by the superior court; and that judgment was affirmed in this court. The court say, that "a book account is an indivisible claim, as much so as a promissory note." Again, commenting on the case of *Seddon* v. *Tutop*, above cited: "A person is not bound in an action at law, to unite different causes of action; and if he has done it, he may support one count, and omit to give evidence in relation to another."

I think it also quite clear, that had there been a judgment on this bond, as the bond did not mention or refer to the note, it could not operate to bar an action on the note. Nay, had the condition of the bond been, that this note and *other notes*, should be paid, it would be only another security, and might not operate a payment. Moreover, as the bill of foreclosure is silent as to the debts for which the pledge is to be appropriated, it would be very unjust to say, that this note was included in it, and thus paid; especially, as it appears, that the debts of the plaintiff against *John C. Ely*, the mortgagor, exclusive of this, were equal in amount to the value of the land.

I am, therefore well satisfied, that no new trial ought to be had; and that there is nothing erroneous in the judgment.

The other Judges were of the same opinion.

New trial not to be granted;
And judgment affirmed.

BREED *against* HILLHOUSE.

*New-London,*
July, 1829.

Where the plaintiff, in an action against *B.*, on his guaranty of *A.'s* note, averred in the declaration, that " in consideration *the plaintiff would delay the collection of said note,* and not exact payment thereof, for four years thereafter, and of *the plaintiff's promise of forbearance* to collect the same for that time," the defendant promised, &c.; it was held, that this was a sufficient allegation of consideration for the defendant's engagement, and adapted to proof of an agreement on the part of the plaintiff to forbear.

Where the payee of a promissory note, after it became due, accepted the guaranty of a third person, for a certain period, and actually forbore suit during that period; it was held, that these facts afforded *prima facie* evidence of an agreement by the plaintiff to forbear suit.

If, after the dishonour of a note, the indorser promise to pay it, such promise is presumptive evidence of due demand and notice.

And this rule is applicable to the case of a third person, who has guarantied the payment of the note.

Where a third person guarantied the payment of a note, by an indorsement, in these words—" I hereby guaranty the payment of this note, within four years from this date ;"—it was held, that this was an absolute engagement on the part of the guarantor, that the note should be paid within the time specified, by the maker or by himself; and that demand and notice were not necessary.

THIS was an action of *assumpsit* against *Samuel Hillhouse,* on his guaranty of a promissory note, made by *Nathaniel Hillhouse,* for 122 dollars, 19 cents, dated the 15th of *March* 1822, payable to the plaintiff, or order, on demand, with interest. The declaration contained several counts, stating the case with some variations, on which no question arose. The promise of the defendant, and the consideration on which it was founded, were thus stated : "That on the 1st of *March* 1823, said note being then due and unpaid, in consideration that the plaintiff would wait and delay the collection of said note, and not exact payment thereof, for four years thereafter, and of the plaintiff's promise of forbearance to collect the same for that time, the defendant, in and by a certain writing or indorsement on the back of said note, promised and guarantied the payment of said note in four years from said 1st day of *March,* 1823 ; which said indorsement was and is in the words and figures following, viz. "*Norwich,* 1st of *March* 1823. I hereby guaranty the payment of this note within four years from this date. *Samuel Hillhouse.*" The declaration then averred, " that the plaintiff did wait and delay the collection of said note, and did not exact payment thereof, for four years after the date of said indorsement."

The cause was tried, on the general issue, at *Norwich, January* term, 1829, before *Hosmer,* Ch. J.

The making and non-payment of the note, and the guaranty of the defendant, as stated in the declaration, were admitted. To shew that the plaintiff agreed, in consideration of the guaranty, to forbear the collection of the note, the plaintiff relied on his acceptance of the guaranty, and on his actual forbearance for the stipulated time,—these facts not being disputed. No direct testimony of a demand on the maker of the note for the money due on it at the expiration of the guaranty, or of notice thereof to the defendant and a demand of him, was given ; but it was proved, that in *July* 1827, an agent of the plaintiff requested payment of the defendant ; and that the defendant, in reply, promised, that in the course of the then next week, he would get the money and pay the note. The defendant made two objections to the plaintiff's recovery :— first, that there was no consideration for the guaranty moving from the plaintiff, and that the plaintiff's declaration was not adapted to the admission of any proof of consideration ; secondly, that there was no proof of demand and notice. The Chief Justice instructed the jury, 1. that proof of consideration was necessary, but that the plaintiff's receiving the guaranty, and his actual forbearance consequent thereon, for the stipulated time, was *prima facie*, and being unrepelled, sufficient proof of consideration ; and that the plaintiff's declaration was well adapted to such proof ; 2. that the promise of the defendant, in *July* 1827, to pay the note, was presumptive evidence, that it had been duly presented to the maker for payment, that it had been dishonoured, and that due notice thereof had been given to the defendant.

The jury returned a verdict for the plaintiff ; and the defendant moved for a new trial.

*Hill* and *Mc Curdy,* in support of the motion, contended, 1. That there was no evidence of the consideration alleged, proper to go to the jury. First, the plaintiff's acceptance of a guaranty, afforded no presumption of an agreement made by him to forbear suit. Presumptive evidence is founded on the connexion, which experience has shewn to exist, between a given fact or series of facts, and the fact to be inferred. 1 *Stark. Ev.* 478. 3 *Stark. Ev.* 1234. & seq. Now, there is no necessary or usual connexion between a man's accepting a

New-London,
July, 1829.

Breed
v.
Hillhouse.

guaranty and promising to forbear suit. A guaranty is not distinguishable, in this respect, from any other security. Does a man's taking a *mortgage*, prove an agreement, on his part, not to collect the debt? A debtor may have sufficient inducements to give security, without such agreement. He might naturally *expect more favour*, because it would remove one object of a suit, *viz.* to obtain security ; and is not this sufficient to account for the fact? If so, it neither proves, nor tends to prove, any thing more.

But admit, that the taking of a guaranty, by the creditor, furnishes a presumption that he agreed to give the debtor a further day of payment, does it prove, or raise a presumption, that he agreed to wait *four years?* This is the fact, which the plaintiff has alleged in his declaration, and which he is bound to prove. The law holds a party to strict proof of the consideration of a special agreement. He must prove it precisely as he has stated it.

Secondly, the plaintiff's not suing, is no evidence of an agreement not to sue. If it were, then the omission of a man to put all his notes and book accounts in suit, would be evidence of an agreement not to sue. Common sense revolts at such an idea. All experience is opposed to it. The reason why the plaintiff did not sue, was not because he had *agreed* not to sue, but because he had got security, and he therefore suffered the debt to lie. This is an entirely satisfactory explanation of the transaction, conformable to every day's experience. It is, therefore, unphilosophical and unlawyerlike to go in search of any other reason.

Thirdly, the plaintiff's receiving the guaranty and his forbearance to sue, *united*, raise no presumption of an agreement. It is obvious, that if each of these facts, separately, is susceptible of a natural and satisfactory explanation, without resorting to the more remote and less probable supposition of an agreement, the combining of these facts will have no effect. Indeed, the charge seems to consider these facts as consecutive, rather than as combined. There is, first, the guaranty ; then, the forbearance *consequent thereon ;* and from these premises the conclusion is deduced, that the plaintiff *agreed* to forbear. This is a palpable *non-sequitur.*

2. That the promise of the defendant to pay the note, made after the expiration of the time limited in the guaranty, afforded no presumptive evidence that demand and notice had been

regularly made and given ; as it did not appear, that he had any knowledge of the plaintiff's laches.   A subsequent promise of the indorser is binding only on the ground of its being a waiver of demand and notice ; and to constitute a waiver, it is indispensable that the indorser was apprised of the want of due diligence.   1 *Swift's Dig.* 432.  *Chitt. Bills* 163.   He waives his right to demand and notice only when, with a full knowledge of all the facts, he voluntarily promises to pay. And it is incumbent on the plaintiff to show affirmatively and clearly, that the indorser had such knowledge, at the time he made the promise.   His knowledge cannot be inferred from his promise.   *Trimble* v. *Thorne,* 16 *Johns. Rep.* 152. 154.

Further, it may well be doubted, whether if the promise was made by the defendant, with full knowledge of all the facts, and that shewn to the court, it would bind him in this case.   It is certain, that the cases in which the doctrine of waiver has been recognized, are all cases of regular indorsements of negotiable paper.   The court now, for the first time, is called upon to apply that doctrine to a special contract of a very different description.

On any other ground than that of waiver, the promise of the defendant is manifestly insufficient to support a recovery by the plaintiff ; first, because being made after the defendant was discharged from his liability, it was without consideration ; and secondly, because being to pay the debt of another person, and not in writing, it was within the statute of frauds and perjuries. *Huntington* v. *Harvey,* 4 *Conn. Rep.* 125.

*H. Strong* and *J. W. Huntington,* contra, insisted, 1. That the principle of presumptive evidence laid down by *Starkie,* was applicable to this case ; and the facts submitted to the jury were proper for their consideration.   The note had become due ; and the plaintiff had a right to call for his money. Does not the fact of his then taking a guaranty of the debt from a third person for four years, in connexion with the further fact that he did forbear suit for that period, according to the common experience of mankind, incline the mind to believe, that he had *consented* or *agreed* to give such forbearance ?   If so, it vindicates the charge on this point.

2. That the undertaking of the defendant, in this case, was *absolute,* and demand and notice, therefore, were unnecessary. The term *guaranty* has a definite meaning, well established ;

which is, that either the principal or the guarantor shall, un-
conditionally, pay the debt, when due. *Allen* v. *Rightmere,*
12 *Johns. Rep.* 365. *Upham* v. *Prince,* 12 *Mass. Rep.* 14.

3. That whether the term *guaranty* import an absolute or
conditional undertaking, the responsibility of the defendant is
not that, and that merely, of a regular indorser of negotiable
paper ; and consequently, the demand and notice requisite in
such case, are not necessary here. The plaintiff, under this
special agreement, could not be required to exercise stricter
diligence than the indorsee of a note not negotiable ; but it is
well settled, that in such case, the demand and notice of the
law merchant, are not requisite. *Bradley* v. *Phelps,* 2 *Root*
325. *Phelps* v. *Blood,* 2 *Root,* 518. *Sheldon* v. *Ackley,* 4 *Day,*
458. *Huntington* v. *Harvey,* 4 *Conn. Rep.* 124. *Welton* v.
*Scott,* 4 *Conn. Rep.* 527. *Prentiss* v. *Danielson,* 5 *Conn.*
*Rep.* 175.

4. That if demand and notice were necessary in this case,
the subsequent promise of the defendant was presumptive evi-
dence that he had waived them. *Lundie* v. *Robertson,* 7 *East,*
331. *Gibbon* v. *Coggon,* 2 *Campb.* 188. *Hopkins* v. *Liswell,*
12 *Mass. Rep.* 52. *Stevens* v. *Lynch,* 12 *East,* 38. *Hopes* v.
*Alder,* 6 *East,* 16. n.

5. That at any rate, the promise of the defendant is an ac-
knowledgment on his part, that every thing requisite had been
done, and consequently, the court will not set aside the
verdict.

*Hill,* in reply, referred to *Sage* v. *Wilcox,* 6 *Conn. Rep.* 481
to shew, that the guaranty of a note imports a conditional en-
gagement, requiring demand and notice.

HOSMER, Ch. J. Although an agreement to forbear is not
specifically averred, otherwise than by the allegation that the
plaintiff accepted the guaranty and actually forbore, yet under
this declaration such agreement is provable. This mode of
declaring is sanctioned by *Wentworth, Chitty* and almost all
the approved writers on pleading ; (2 *Chitt. Plead.* 83.) and
an averment of an agreement to forbear, has ever been con-
sidered as necessarily implied from the above allegations. In
*Lent* & al. v. *Paddleford,* 10 *Mass. Rep.* 230. the above point
was explicitly made and decided.

The agreement in question to forbear, was clearly proved, on a principle of probable presumption, which harmonizes with common sense and is conformed to experience ; and both reason and experience bear concurrent testimony to the infer-ence of a consideration in this case. The acceptance of the indorsed guaranty, by the plaintiff, and his consequent forbearance, prove the agreement in question, and are incompatible with any other supposition.

In respect of the demand and notice, the defendant's promise to pay the note is sufficient evidence of these facts ; and stands good until the contrary is made to appear. *Lundie* v. *Robertson*, 7 *East* 231. *Gibbon* v. *Coggon*, 2 *Campb.* 188. *Wood* v. *Brown*, 1 *Stark. Rep.* 217. *Pierson* v. *Hooker*, 3 *Johns. Rep.* 68. *Hopkins* v. *Liswell*, 12 *Mass. Rep.* 52. *Greenway* & al. v. *Hindley*, 4 *Campb.* 52. The case of *Trimble* v. *Thorne*, 16 *Johns. Rep.* 152. is opposed to these decisions ; but so far as my knowledge extends, it stands alone and unsupported. It is a presumption of reason, sustained by the common experience of mankind, that "a man will not pay a debt which is not due, nor acknowledge the existence of a debt, to which he is not liable." 3 *Stark. Ev.* 1253.

Besides, if a party entitled to notice, has knowledge of the want of due diligence, on the part of the holder of a note or bill, and promises to pay the debt, this is a waiver of the want of notice. *Goodall* & al. v. *Dolley*, 1 *Term Rep.* 712. *Hopes* v. *Alder*, 6 *East*, 16 n. *Lundie* v. *Robertson*, 7 *East* 231. *Borradaile* & al. v. *Lowe*, 4 *Taun.* 93. *Stevens* v. *Lynch*, 2 *Campb.* 332. *Miller* v. *Hack*, 5 *Johns. Rep.* 375. *Martin* v. *Winslow*, 2 *Mason* 241. *Thornton* v. *Wynn*, 12 *Wheat.* 183. *Fotheringham* v. *Price's* Exrs. 1 *Bay* 288. 291. *Chitt. Bills* 301—309. Now, if there was a want of due notice, the defendant knew it ; for he was the person to be notified.

After all, the above questions, in this case, are merely speculative. The defendant's guaranty was absolute, that the note should be paid within four years, by the maker, or that he would pay it himself ; and demand and notice were not necessary in this, any more than in all other cases of absolute and unconditional engagements. The indebtedness of the defendant arose on the non-payment of the note ; and at this time, he became legally liable to pay it. *Mason* v. *Pritchard*, 12 *East* 227. *Campbell* v. *Butler*, 14 *Johns. Rep.* 349. *Allen* v.

*Rightmere*, 20 *Johns. Rep.* 365. *Upham* v. *Prince*, 12 *Mass.* <span style="float:right">*New-London,*<br>July, 1829.</span>
*Rep.* 14. The result is, that a new trial is not by me advised.

<div style="text-align:right">Breed<br><i>v.</i><br>Hillhouse.</div>

The other Judges were of the same opinion.

<div style="text-align:center">New trial not to be granted.</div>

—⧫—

<div style="text-align:center">The town of NORWICH <i>against</i> HYDE :</div>

<div style="text-align:center">IN ERROR.</div>

For the support of a prisoner in gaol, committed in pursuance of a convic-
tion of a crime or matter of delinquency, before a justice of the peace, the
town in which such conviction was had, is not liable.
The costs of prosecution, for which such town may eventually be liable, in-
clude only the taxable costs.

THIS was an action of *assumpsit*, brought originally before
a justice of the peace, by *Augustus Hyde*, keeper of the
county gaol in *Norwich*, against the town of *Norwich*, to re-
cover for support furnished, by the plaintiff, to *James Hazard*
and *John Blake*, prisoners in such gaol, from the 8th of *Octo-
ber* to the 27th of *November*, 1827. The declaration stated,
That on the 8th of *October* 1827, in the town of *Norwich*,
*Hazard* and *Blake* were severally tried for and convicted of
a breach of the peace in that town, before *Asa Roath*, Esq., a
justice of the peace for *New-London* county, and were senten-
ced to pay a fine of seven dollars to the treasury of the town
of *Norwich*, to pay also the costs of prosecution, taxed at 4
dollars, 45 cents, and be imprisoned in the common gaol for the
term of one month ; that by virtue of warrants issued on these
judgments, *Hazard* and *Blake* were, on the same day, commit-
ted to the county gaol in *Norwich*, of which the plaintiff was
the keeper, and there remained, until the 27th of *November*
following, when one of the select-men of *Norwich* took their
notes, respectively, for the fines and taxed costs, and discharg-
ed them ; and that during this period, the plaintiff furnished
them with necessary food, drink and washing, to the amount of
10 dollars ; of all which the defendants, on said 27th of *No-
vember*, and also on the 25th of *December*, 1827, had notice.
The cause was appealed to the county court, and was tried be-

*New-London,* fore that court, on the general issue, in *June*, 1828; when the
July, 1829. plaintiff obtained a verdict for the amount of his claim.   The
Norwich    defendants filed a motion in arrest for the insufficiency of the
*v.*       declaration ; which was overruled, by the court ; and judg-
Hyde.      ment was rendered on the verdict. (*a*)   The defendants then
brought a writ of error in the superior court ; which was re-
served for the advice of this Court.

*J. W. Huntington*, for the plaintiffs in error, contended,
That a town in which a conviction for a public offence is had,
is not liable for the subsequent support of the offender in gaol.
At common law, a town is no more liable than any other civil
corporation, for the support of paupers within its limits.   If the
town of *Norwich* is liable, in this case, it must be by express
statutory provision.   It cannot be liable for the support of
*these prisoners*, by virtue of the general provisions of our poor
laws ; for it does not appear, that either of them had a settle-
ment in *Norwich*.   If this town is liable at all, it must be by
virtue of the 115th section of the act concerning crimes and
punishments. *Stat.* 175.   That section provides, that if, in
case of the conviction of any person prosecuted for a crime,
the *costs of prosecution* cannot be had out of his estate, *such
costs*, if the trial be before a justice of the peace, shall be paid
out of the treasury of the town wherein the prosecution is had.
The case, then, is narrowed to the question, whether the " ne-
cessary food, drink and washing," furnished by the plaintiff, to
these prisoners, were " costs of prosecution," within the mean-
ing of the statute referred to.   That they were not, is evident,
First, from the terms used in the same section, which go to ex-
plain the terms in question.   The proceeding intended by that
expression is thus described : " Every person who shall be *in-
formed against, complained of, indicted*, or in any lawful man-
ner *prosecuted*, for any crime or matter of delinquency."   The
proceeding, in every variety of form here specified, terminates
with the rendering of final judgment.   The last clause " in any
lawful manner prosecuted," is evidently meant to extend as far
as, and no farther than, the previous expressions.

(*a*) There was also a bill of exceptions filed to the charge of the court, the
object of which was, to bring up the question, whether the plaintiff, if enti-
tled to recover at all, was not limited to the sum of one dollar per week for
the support of each prisoner ; but the ultimate decision in the case having
superseded this question, the statement necessary to present it, is omitted.

*New-London,*
*July, 1829.*

Norwich
*v.*
Hyde.

Secondly, the *costs of prosecution* intended by this statute, are such as the justice may draw for *immediately* after the trial ; and he can draw for none, except such as he may draw for immediately. This excludes any costs subsequent to the determination of the prosecution.

Thirdly, from the use of the expression " costs of prosecution" in the statute concerning work-houses, (*Stat.* 481. *tit.* 109. *s.* 5.) where it is used in contradistinction from the *support* of the prisoner. " The earnings of any prisoner more than sufficient to pay for *his support* and the *costs of prosecution* against him," &c.

Fourthly, from the provision in the 114th section of the act concerning crimes, (*p.* 175.) that the expense of " doing exe- " cution, shall be taxed as a part of the costs against the delinquent." This provision would be unnecessary, if the costs of prosecution extended beyond the judgment.

Fifthly, from the consideration that in the statute concerning gaols, (*p.* 252. *s.* 9.) special provision is made for subjecting the prisoner to the expenses of commitment and support. This provision also would be unnecessary, if the costs of prosecution included such expenses.

Sixthly, from the regulations regarding work-houses. By the 6th section of the principal statute (*p.* 481. *s.* 6.) persons committed to work-houses are to be taken care of, at the expense of the town where they belong. By an act passed in 1823, on convictions of theft and breaches of the peace, a justice is authorized, at his discretion, to sentence the delinquent to the work-house of the town in which the conviction was had. Now, upon the plaintiff's construction, if the delinquent is sentenced to imprisonment in the county gaol, the town in which the conviction was had, is liable for his support ; if to a workhouse, or to the gaol as a work-house, the town to which he belongs. Did the legislature intend to make such a distinction ; and to leave it to the *discretion* of the justice, whether the burden of support shall fall on his own town or another ?

Lastly, from the general acceptation of the terms—*costs of prosecution.* These, in relation to a criminal proceeding are precisely equivalent to *costs of suit* in a civil cause. In neither case, have they ever been understood to include expenses subsequent to the judgment and execution. Why should the words be wrested from their ordinary signification ?

If it be asked, who is to pay this expense, if the town where

*New-London,*
July, 1829.
_____
Norwich
*v.*
Hyde.

the conviction was had is not liable; we answer, in the first place, that we are not to be subjected, merely because no one else can be. But, in the next place, it is reasonable to presume, that the state, by whose direction the expense was incurred, will provide for its reimbursement.

*H. Strong,* contra, after premising, that the gaoler is bound by law to furnish support to delinquents committed on criminal prosecutions, and is not to be regarded as a volunteer in so doing, as in case of commitments on civil process, insisted, 1. That the convictions in this case having been had in the town of *Norwich,* and the fine being payable to that town, it is liable to pay *the costs arising upon the prosecution. Stat.* 175. *tit.* 22. *s.* 115. A different form of expression is subsequently used, *viz.* " costs of prosecution ;" but this refers to the former, and evidently means the same thing.

2. That the expression *costs arising upon the prosecution,* as here used and with reference to this subject, includes the support of the delinquent after conviction. *Tyler* v. *Brooklyn,* 5 *Conn. Rep.* 185,6. Such support is a necessary expense arising upon the prosecution. It requires no strained construction to bring it within the very *terms* of the statute. It is certainly within its *spirit. Ex concessis,* the board of the prisoner down to the time of judgment rendered, is to be paid for out of the town treasury, as this expense is included in the bill of costs *taxed ;* but why should the prisoner's support before and after judgment, an expense arising upon the same prosecution, be paid from different funds? Indeed, if the town in which the conviction was had, and into whose treasury the fine goes, is not to pay, it may well be asked, who is? No other town or other corporation is liable. Is the gaoler, acting in the faithful discharge of his duty, to be remediless ?

The counsel, in conclusion, relied much on the *practical* construction of the statute ; insisting, that it had been a long continued and general practice for the gaoler to obtain satisfaction for the prisoner's support after conviction, out of the treasury of the town in which the conviction was had.

WILLIAMS, J. The question arising upon this record, is simply, whether the town of *Norwich* is liable to the gaoler for the support of a person not an inhabitant,—who has been convicted of a breach of the peace in that town, and ordered to pay a

fine to the treasury of the town of *Norwich*, and finally dis-
charged by one of the select-men of the town of *Norwich*.

The support of the poor in every community must be by
voluntary aid, or under positive enactments of the legislature.
A town, as such, is under no more obligation to support the
poor in it, than a county, or parish, or school district.    That it
is right and proper, that those who reside in the vicinity, and
may be supposed to be best acquainted with the wants of the
poor, and can most readily supply them, should by law be de-
signated for that purpose, I am not disposed to question.

The duty, however, so far as it is a legal one, must depend
upon the statute provisions.    And the enquiry is—is the town
of *Norwich* liable, by virtue of any statute ?

It has not been contended, that the town is liable under the
general law regarding paupers ;—nor can such a claim be sup-
ported, particularly, when no notice has been given to the se-
lect-men, that such a person required support.    But it is said,
that the town of *Norwich* ought to furnish the support, because
the fine goes to that town, and because they are expressly made
liable to the costs of prosecution.

As to the first, it cannot, of itself be a reason, why the town
should pay the support of the prisoner, any more than that the
county should support a prisoner, when the fine goes into the
county treasury.    Indeed, this is not claimed to be conclusive ;
but this is drawn in to aid the argument that it was the inten-
tion of the legislature.

The act relied on is the 115th sect. of the statute concerning
crimes and punishments ; (*p.* 175.) by which it is enacted,
that he who is convicted of any crime, " shall pay all the neces-
sary costs arising upon such prosecution before he shall be dis-
charged ; but if the costs of prosecution cannot be obtained
out of his estate, such costs, if the prosecution be in the county
or superior court, shall be paid out of the state treasury,—
and, if before a justice of the peace, out of the treasury of the
town where the trial was had."    And the question now to be
decided, is, whether the support in prison after conviction, is a
part of the costs of prosecution.

It is believed, that the words " all the necessary costs *arising
upon such prosecution*," must be construed to mean the same
as the *costs of prosecution ;* because provision had been made
in another statute, that criminals should pay for their *support*
in prison ; (*Stat. tit.* Gaols, *sect.* 9. *p.* 252.) and because the

New-London,
July, 1829.

Norwich
*v.*
Hyde.

*New-London,* very next sentence (which it is claimed subjects the town)
*July, 1829.* speaks only of the *costs of prosecution.* The town is sub-
Norwich    jected only to pay the *costs of prosecution :* what, then, is in-
*v.* cluded in that phrase ? The terms *costs of suit* and *costs of*
Hyde. *prosecution* have a known technical meaning, as well under-
stood by lawyers as the term *suit* or *prosecution.* The ex-
pression does not mean all the expenses incurred ; but it means
the expenses *pending the suit,* as allowed or taxed by the
court. Lord *Coke* says, costs are *expensae lites,* and shall be
allowed for expenses *pending the suit. Pelford's* case, 10 *Co.*
117. Even the officer's fees on execution or warrant, are not
included in the costs, properly so called ;—but the officer is di-
rected to levy to satisfy damages and costs and *his own fees.*
And in the 114th sect. of the same statute regarding crimes
and punishments, a special provision exists,—that reasonable
satisfaction shall be made to the officer, as the court or justice
shall allow, and shall be taxed as part of the costs, and shall be
paid as provided by law for the payment of other charges of
prosecution. But this provision would have been entirely un-
necessary, if this was part of the costs of prosecution.

In the 5th sect. of the act concerning work-houses, (*p.* 481.)
persons committed, if unable to support themselves, must be
provided for, at the expense of the town where they belong.
And for certain offences justices have a right, at their discre-
tion, to commit to the work-house or gaol. (*Stat. vol.* 2. *p.* 30.)
It certainly would be very strange, if a person, for the same
offence, and tried by the same court, should be required to be
supported by the town where he belonged, or by the town
where he was tried, according to the *discretion* of the justice
who tried the cause. Besides, under the old law, all our gaols
were, or might be, work-houses. Under that law, then, (ac-
cording to the claim of the gaoler) if one was convicted and
sent to the gaol as a work-house, or house of correction, he
must be supported by the town to which he belonged ; but if
sent generally to the same place, as a gaol, he must be sup-
ported by the town where the conviction was had. Such a
construction cannot be adopted.

Further, by the statute under which the claim is made, the
justice may draw on the town treasury, *immediately* after the
prosecution is determined, for the amount of *such costs.* It
would seem, that the legislature could have had in view only
the costs *before* conviction, and not costs or expenses arising af-

terwards; for the justice is authorized to draw but *once*, and that *immediately*, and then for the *costs* of prosecution. They have here made no provision for costs or expenses arising afterwards; nor is the court informed of any usage, that will authorize the construction contended for.

It is said, indeed, that when similar language is used, the superior and county courts allow and tax support, and draw on the state treasury therefor. This is true ; and the practice is easily accounted for. All agree, that it is the duty of the gaoler, by law, to provide support for criminals or delinquents, who cannot provide for themselves. And if the state has imposed this as a duty upon one of their officers, it would be derogatory to their honour, to suppose, that they would not reimburse him for this service, if they have provided no other means of payment for him. Accordingly, in convictions by the county and superior courts, no question has arisen. It has been conceded, that the man who was employed, by the state, to furnish their support, should be paid by them. But how should the amount of his claim be ascertained ? The comptroller and treasurer were often in a distant part of the state, and had no means of ascertaining the amount of claim, except by the party, or from the court. A certificate, therefore, from the court who convicted, or an order for this purpose, was the best evidence these officers could have ; and I apprehend, this practice has thus arisen. But the practice cannot authorize a justice of the peace to draw on the town treasury in the same manner, unless it is first proved, that the town are liable; which is the very point in dispute.

But it is said, that we have the authority of the Chief Justice, in the case of *Tyler* v. *Brooklyn*, 5 *Conn. Rep.* 185. It might be enough to say, that in that case, this point was not before the court ; as the suit was not against the town where the conviction was had. It is, therefore, an opinion which could not be binding on this court. But it ought further to be remarked, that the Chief Justice does not mean to give an opinion upon that point. He suggests, indeed, that *perhaps* it would not be too liberal a construction of the statute ; and that *he is inclined* to the opinion ; but lest it should be claimed as an authority, he says further, " upon this subject I would not decisively speak." Under these circumstances, there is no reason why the court should not give to the statute its proper construction.

It is asked, however, if *Norwich* is not liable, who is ? where

*New-London,*
*July, 1829.*

Norwich
*v.*
Hyde.

*New-London,*
*July, 1829.*

Norwich
*v.*
Hyde.

shall we go? The gaoler is entitled to a reimbursement. I answer, if the legislature have not pointed out a place for him to receive his money, it is not for the court to do it. But if they have imposed upon him a burthen, it is not to be believed, that upon suitable application, they will refuse a recompense.

I am, therefore, of opinion, that the superior court be advised, that there is error in the judgment complained of.

The other Judges were of the same opinion.

Judgment to be reversed.

---

BROWN *against* GREEN and NOYES:

IN ERROR.

Where an award is within the submission, a court of chancery will not set it aside, except for partiality and corruption in the arbitrators, mistakes on their own principles, or fraud and misbehaviour in the parties.

THIS was a bill in chancery, brought by *Brown* against *Green* and *Noyes,* to set aside an award of arbitrators, and to stay proceedings at law on two promissory notes given to enforce performance of such award. Both the submission and the award were in writing, and were set forth at length in the plaintiff's bill. The submission was as follows: " This agreement made and entered into by and between *Samuel Green* of *New-London* and *William Noyes,* jun. of *Lyme,* on the one part, and *Robert Brown* of *Waterford,* on the other part, *witnesseth,*

" That whereas diverse controversies have arisen between the parties, in relation to *Niantic* bridge, and an award has been made between the said *Green* and the said *Brown,* and also an award between the said *Noyes* and the said *Brown,* and a suit commenced in favour of the said *Noyes* upon the last mentioned award, which suit was withdrawn, upon entering into a new submission, by the parties hereto, which last submission is claimed, by the said *Noyes* and *Green,* to have been revoked, by the said *Brown.*

" Now, therefore, for the purpose of putting an end to said controversies, the parties hereby agree to submit the same, and

all costs in said suit, and the costs and damages upon said sub-mission, and all other matters in dispute between the parties, of every name, nature and description relating to said bridge, between the said *Brown* and the said *Green* and *Noyes*, and each of them, to the award, arbitrament and final determination of *Moses Warren*, *Charles J. McCurdy* and *Joseph Chadwick*, Esqrs., arbitrators mutually agreed on between the parties.

<div style="text-align:right">*New-London,* July, 1829.

Brown *v.* Green and Noyes.</div>

" And the parties hereby agree, that the said arbitrators shall not be concluded by the aforesaid award, but may examine and settle all matters in dispute between the parties in relation to said bridge ; that they shall appraise that part of said bridge claimed by said *Green* and *Noyes*, and shall examine and settle all accounts relative to the re-building and repairing of said bridge, and the rents and profits of the same, as well before as subsequent to the making of said award ; and in case a balance shall be found in favour of said *Brown*, the same shall be deducted from the value of the part of said bridge claimed by said *Green* and *Noyes*; and if the balance shall be in favour of said *Green* and *Noyes*, or either of them, the same shall be added to the value of said part of said bridge ; and said arbitrators shall also determine the matter of costs in said suit, and also the matter of costs and damages upon said submission, and also the costs of the arbitration ; and the part of said bridge claimed by said *Green* and *Noyes*, shall be conveyed to the said *Brown*, and the said *Brown* shall pay the said *Green* and *Noyes* therefor, according to the award of said arbitrators.

" And for the purpose of more effectually carrying into execution this agreement, the said *Brown* shall make and execute a joint and several note, signed by himself and his brother *Henry Brown*, payable to said *Green* and *Noyes*, on demand, with interest, in the sum of 200 dollars, and also his the said *Brown's* note for 500 dollars, payable on demand with interest, and shall deposite said notes in the hands of *Charles J. Mc-Curdy*, one of the said arbitrators, on or before the 19th day of *April* inst. And the said *Green* and *Noyes*, on their part, shall execute to the said *Brown* their joint and several note, payable to the said *Brown*, on demand, with interest, in the sum of 700 dollars, and shall deposite the same with said *Mc Curdy*, on or before the 23rd of *April* inst. And in case said arbitrators shall find a balance in favour of said *Brown* over and above said *Green* and *Noyes's* part of said bridge, as

claimed by them, they shall indorse said *Green* and *Noyes's* note down to said balance, and shall thereupon deliver said note to said *Brown;* and the said *Green* and *Noyes* shall also convey to said *Brown* their said part of said bridge. On the other hand, in case said arbitrators shall find a balance in favour of said *Green* and *Noyes,* or either of them, including the part of said bridge claimed by them, the said arbitrators shall indorse the said *Brown's* notes down to said balance, and shall thereupon deliver the same to said *Noyes* and *Green,* together with their note ; and in case said arbitrators shall find in favour of said *Green* and *Noyes,* or either of them, a greater sum than 200 dollars, no indorsement shall be made upon the said *Robert* and *Henry's* note, but whatever indorsement may be made, shall be made upon the said *Robert's* own note.

"The said *Green* and *Noyes* shall, upon the making of said award, and notice to them, convey to the said *Brown* one quarter of said bridge, by a quit-claim deed from said *Noyes,* and a deed with warranty from said *Green,* under the incumbrance of the mortgage to said *Noyes,* and the said *Brown* shall thereupon immediately mortgage the said quarter back to the said *Green* and *Noyes* to secure the payment of his said notes according to their tenor and effect. And said *Green* and *Noyes* shall not be required to give said conveyance to said *Brown* until he is ready immediately thereupon to give said mortgage ; nor shall they be required to give said conveyance, unless said *Brown* is ready and willing to perform this agreement respecting said mortgage within thirty days from the making of said award.

"In case the said *Robert* shall neglect or refuse to fulfil this submission, the note signed by himself and said *Henry* shall be considered and holden as security for all damages the said *Green* and *Noyes* may sustain, by reason of the non-fulfilment or non-performance of this agreement.

"The arbitrators shall meet at the dwelling-house of *Avery Smith* in *Waterford,* on the 24th of *April* inst. at 10 o'clock A. M., or at any other time and place they may appoint, between the date hereof and the 29th of *April* inst., and may make and publish their award, in writing or by parol, at their pleasure, at any time between the date hereof and the 29th of *April* inst.

"In case the said *Noyes* and *Green* shall neglect and refuse to perform and fulfil this agreement on their part, they shall be

liable on their note for all damages the said *Robert* may sustain, by means of the non-fulfilment or non-performance of this agreement.

"An award from the said arbitrators, or any two of them, shall be binding and conclusive upon the parties; and said arbitrators may examine and settle the account about the building and repairs of said bridge, and the rents and profits of the same, as though no award had heretofore been made relating to them.

"In witness whereof, we, the parties, have hereto set our hands, this 17th day of *April*, 1828.

> *Robert Brown,*
> *William Noyes, jun.*
> *Samuel Green.*"

The arbitrators met within the time and at the place mentioned in the submission, and having heard the parties, made and published the following award: "We, the subscribers, having been appointed arbitrators, to determine certain controversies between *Samuel Green* and *William Noyes*, jun., and each of them, on the one part, and *Robert Brown*, on the other part, relative to *Niantic* bridge, and divers matters connected therewith, as may more particularly appear by their submission, dated the 17th of *April*, 1828; and having taken upon us the burden of said arbitration, and having met and heard the parties and their counsel, and examined their exhibits, at the time and place mentioned in said submission, and having adjourned to meet at the office of *Charles J. McCurdy* in *Lyme*, this 28th day of *April* 1828, do now, on the subject matter of said submission, find,

" 1. That on the account relating to the rebuilding and repairing of said bridge, and the rents and profits of the same, as well before as subsequent to the making of certain awards, as mentioned in said submission, and which we have examined and settled, as if no such awards had heretofore been made, there is a balance of 102 dollars, 69 cents, due from the said *Brown* to the said *Green* and *Noyes*, and either of them.

" 2. We appraise that part of said bridge claimed by said *Green* and *Noyes*, being the one fourth part, and which part we find they own, at the sum of 325 dollars; which last sum, added to the balance of account, as above found, amounts to the sum of 427 dollars, 69 cents. And we thereupon order and award, that the said *Brown* pay to them, the said *Green* and *Noyes*, the last aforesaid sum of 427 dollars, 69 cents.

"3. We decide, adjudge and award, that the said *Brown* pay to the said *Noyes*, his the said *Noyes's* costs in the suit mentioned in the said submission, being the sum of 16 dollars ; likewise his costs and damages on a former submission mentioned in said submission, being the sum of 8 dollars ; as also his costs in this arbitration, being (exclusive of our fees and expenses) the sum of 41 dollars, 39 cents ; amounting in the whole to the sum of 65 dollars, 39 cents.

"4. The parties having deposited with the said *Mc Curdy*, one of the arbitrators, their notes, as agreed in said submission, and within the time therein required, and we having found a balance in favour of said *Green* and *Noyes*, which, including the part of the bridge claimed by them, amounts to the sum of 427 dollars, 39 cents ; we, therefore, in pursuance of said submission, leave the joint note of *Robert Brown* and *Henry Brown*, mentioned in said submission, payable in full, and indorse the said note of the said *Robert Brown* down to the sum of 227 dollars, 39 cents, that being the excess of said sum of 427 dollars, 69 cents, over the said joint note, at this time.

"Further, in pursuance of said submission, we direct, order and award, that the said *Green* and *Noyes* shall, upon the making of this award, and notice to them, convey to the said *Robert Brown* one quarter of said bridge, by a quit-claim deed from said *Noyes*, and a deed with warranty from said *Green*, under the incumbrance of the mortgage to said *Noyes;* and the said *Brown* shall thereupon immediately mortgage the said quarter back to the said *Noyes* and *Green* to secure the payment of his notes according to their tenor and effect.   And the said *Green* and *Noyes* shall not be required to give said conveyances to said *Brown* until the said *Brown* is ready immediately thereupon to give said mortgage ; nor shall they be required to give said conveyances, unless said *Brown* is ready and willing to perform the agreement respecting said mortgage, as contained in said submission, within thirty days from the making of this award.

"Made and published, this 28th day of *April,* 1828.

> Moses Warren,
> Joseph Chadwick,          } Arbitrators."
> Charles J. Mc Curdy,

The plaintiff averred in his bill, as grounds of relief, that there never was, in point of fact, nor was it claimed before the arbitrators that there had ever been, any common interest be-

tween *Green* and *Noyes*, in any claim against the plaintiff; that there were no other matters in controversy before the arbitrators than the ownership of one fourth part of the bridge, as claimed by *Green*, and the rents, profits and expenses thereof; that *Noyes* never had, or claimed before the arbitrators to have, any interest in the bridge, except as mortgagee under a mortgage deed of one fourth part from *Green* to him; that in truth, *Green* had no interest whatever in the bridge, and that the only evidence of any title, which he exhibited before the arbitrators, was a deed to him from one *Downer* of a certain part of the bridge, but there was no proof, nor is the fact so, that *Downer* himself ever had any title to any part of the bridge; that the plaintiff claimed title to the whole of the bridge, not under *Downer*, but adversely to him; nevertheless, the arbitrators found the title to one fourth part in *Green*, on no other evidence than *Downer's* deed; that *Niantic* bridge is real estate, consisting of land on each side of *Niantic* river connected by a bridge; that on the submission, for the revocation of which 8 dollars damages were awarded to *Noyes*, one of the arbitrators refused to act; that *Green* and *Noyes* have commenced suits by attachment, against the plaintiff, on the arbitration notes, which are pending in court, &c.

To this bill there was a general demurrer; and the superior court sustained the demurrer, and dismissed the bill with costs. On motion of the plaintiff, the cause was then removed to this Court, for revision in error.

*Isham*, for the plaintiff, after premising, that where the demurrer is general, and there is any fact to which the defendant ought to answer, the demurrer must be overruled, (2 *Swift's Dig.* 216. *Coop. Plead.* 112) contended, 1. That if the arbitrators are mistaken in a plain point of law, or of law and fact combined, it is a good ground for setting aside an award. *Ridout* v. *Pain*, 3 *Atk.* 494. *Kyd* 350. *Metcalf* v. *Ives*, 1 *Atk.* 64. *Corneforth* v. *Geer*, 2 *Vern.* 705. In this case, the arbitrators decided against a plain point of law, First, in admitting *Downer's* deed at all. Secondly, they decided without and against evidence, by considering *Downer's* deed, and that alone, sufficient evidence of title. Thirdly, they committed a similar mistake in awarding damages to *Noyes*, on the ground of a revocation, when it is expressly averred, as a reason why the submission was not followed, that one of the

*New-London, July, 1829.*

*Brown v. Green and Noyes.*

*New-London,* arbitrators refused to act.   Fourthly, they clearly mistook the
July, 1829.   law, in awarding upon the title to real estate.   Here was an
Brown   excessive assumption of power.   1 *Swift's Dig.* 466.   They
*v.*   also committed a plain mistake of law, in finding the title in
Green and   *Green* and *Noyes* jointly, whereas *Noyes* had no title except as
Noyes.   mortgagee.

  2. That if *Green* and *Noyes* cannot sustain their actions at
law on the notes, on account of any legal defects in the award,
a court of chancery will grant an injunction to stay proceed-
ings in the suits.   *Kyd* 329. (ed. 1808.)

   *Law* and *Waite,* contra, were stopped by the Court.

  BISSELL, J.   It is apparent from an examination of the sub-
mission and the award, that the arbitrators did not mistake or
exceed their powers.   Every thing awarded on by them, is
clearly within the terms of the submission.   No corruption is
imputed to them ; nor is it alleged, that the award was procur-
ed, by the fraud or misbehaviour of the adverse party.   The
*gravamen* of the plaintiff's complaint, is, that the arbitrators
found the facts, which form the basis of their award, upon in-
sufficient testimony.   But it is, surely, too late to contend, that
an award is to be set aside, because the arbitrators have formed
a false estimate of the weight of evidence, or have drawn in-
correct conclusions from the facts before them.   If this were
so, the controversy, in every case, might be opened, and the
merits of the award re-examined.   This would be a departure
from well settled principles, and directly opposed to the uni-
form course of decisions on the subject.   The only grounds on
which a court of chancery can interfere and set aside an
award, are partiality and corruption in the arbitrators, mistakes
on their own principles, or fraud and misbehaviour in the par-
ties.   *Morgan* v. *Mather,* 2 *Ves.* jun. 15.   *Tittenson* v. *Peat,*
3 *Atk.* 529.   *Allen* v. *Ranney,* 1 *Conn. Rep.* 569.   *Perkins* &
ux. v. *Wing* & al. 10 *Johns. Rep.* 143.   It cannot be necessa-
ry to multiply authorities on a point so long and so well set-
tled.   I am of opinion, that there is nothing erroneous in the
judgment of the superior court.

  The other Judges were of the same opinion.

                   Judgment affirmed.

The inhabitants of the town of MONTVILLE *against* HAUGHTON and another.

Where a town tax was voted, by the town, in *November* 1823, on the list of 1823, and in *August* 1824, after such list was perfected according to law, a rate-bill was made out thereon, which, with a warrant annexed, was put into the hands of the collector for collection ; it was held, that this was a legal tax.

The enactment of an explicit provision on a given subject, does not, of itself, prove, that the law on that subject, was different before ; as such enactment may have been made in affirmance of the existing law, and to remove doubts.

Where a bond was executed to the select men of a town and their successors in office, by a collector of town taxes, to secure such town from loss, by any unfaithfulness in the official duty of the obligor ; it was held, that the town, being the sole party in interest, was the proper party plaintiff to a suit in chancery for relief on such bond.

A collector of town taxes being an authorized agent to collect moneys due the town, it is lawful for such town to take a bond, with surety, from such collector, for the faithful performance of his duty.

Nor will such bond be regarded in chancery as a voluntary agreement, but as founded upon a sufficient consideration, not illegal or opposed to sound policy.

A court of chancery will, therefore, enforce such bond against principal and surety ; especially, if the surety be fully indemnified.

If in the execution of an instrument intended as a bond, the seal be omitted, by mistake, chancery will supply the defect.

Though the party named as obligee in such instrument may sue thereon at law, it does not follow, that he has adequate remedy at law ; for he is entitled to a security, the consideration of which cannot be enquired into at law.

It seems, therefore, that a seal is necessary to give an instrument, in other respects sufficient, the full effect of a deed.

THIS was a bill in chancery, to obtain the correction of a mistake in a bond executed by the defendants, and to compel payment of the amount due on such bond according to the condition thereof.

On the 17th of *November,* 1823, *John W. Haughton* was appointed, by the town of *Montville,* collector of the town taxes in that town. On the same day, a tax of three cents on the dollar on the list of 1823, was voted. In *August,* 1824, after the list was perfected according to law, a rate-bill was made out and delivered to him, with a warrant annexed, duly signed, requiring him to collect and pay over the tax, amounting to 713 dollars. Before the delivery of a rate-bill, however, the select-men required of him a bond, with surety, that he would faithfully collect and pay over such tax ; and thereupon

the defendants, *Haughton* as principal, and *Burrell Thompson* as surety, executed to the select-men of the town, (naming them) for the use of the town, their bond, in the penal sum of 2000 dollars, payable to such select-men and their successors in office ; to which was annexed a condition in these words : " That if the above-bounden *John W. Haughton* shall truly and faithfully collect and pay over all the state and town taxes legally put into his hands on the levy of said town for the year 1823, and save said town of *Montville* harmless from all expense that shall accrue on account of his not collecting and paying over as aforesaid, then this obligation to be null and void, else to remain in full force." The bond was signed by the obligors, and attested thus :   " Signed, *sealed* and delivered, in presence of *Robert Comstock, Nathaniel Parish.*" It was agreed, by the parties, that this instrument should be sealed, but by mistake and accident, no seal was thereto affixed.   *Haughton* proceeded to collect the tax; and the whole of it was paid to him ; but he paid over to the town the sum of 400 dollars only.   He afterwards became insolvent, conveyed away his estate and removed out of the state.   About the time of his failure, he conveyed to *Thompson*, his surety, the other defendant, by mortgage, property sufficient to indemnify him from all loss, by reason of his suretyship.

The case was reserved for the advice of this Court as to what decree should be passed.

*Isham* and *H. Strong*, for the plaintiffs, contended, 1. That the tax voted in *November* 1823, on the list of 1823, in connexion with the rate-bill or apportionment of the tax made out and delivered to the collector in *August* 1824, was a legal tax. A tax may be laid by a town before the completion of the assessment ; but it must be completed before the rate bill is made out.   *Stat.* 454. *tit.* 100. *c.* 2. *s.* 14.   And this position cannot be overthrown, by any inference from the act of 1826, empowering towns, at their annual meetings, to grant taxes on the assessment list, which shall next thereafter be completed.   *Stat. vol.* 2. *p.* 95.   For, in the first place, this act may have been passed merely to remove doubts, and not to alter, but to confirm, the pre-existing law.   Secondly, the act may have been passed with reference to taxes granted in *October*, (as they may be) before the lists have been given in to the assessors. Thirdly, the act still leaves it optional with the town to grant

the tax on the list next to be completed, or on the one already <span style="float:right">*New-London,*<br>July, 1829.</span> completed.

2. That if the tax was not legally laid, a rate-bill for such tax <span style="float:right">Montville<br>*v.*<br>Haughton.</span> having been regularly made out and delivered to the collector, and the money having been actually collected by him, neither the collector nor his surety can withhold the money so collected. The bond expressly provides, (and it is a joint bond) that *Haughton* shall faithfully collect and pay over the money ; and his not paying over, is a breach of the bond. The warrant was regular on the face of it, and justified the collector in collecting the tax. Can he now pocket the money ? And *Thompson*, the surety, can have no better defence ; he having received a full indemnity from *Haughton.*

3. That the omission of a seal, by mistake or accident, may be corrected in chancery. 2 *Swift's Dig.* 92. 96. *Crosby* v. *Middleton* & al. *Prec. Chan.* 309. *Skip* v. *Huey* & al. 3 *Atk.* 93. *Smith* v. *Chapman* & al. 4 *Conn. Rep.* 344. 346. *Watson* & al. v. *Wells,* 5 *Conn. Rep.* 468. *Peters* & al. v. *Goodrich,* 3 *Conn. Rep.* 146. *Wadsworth* v. *Wendell* & al. 5 *Johns. Chan. Rep.* 224. 228. In the case last cited, the mistake was the omission of *a seal* to a deed, which the Chancellor corrected, by treating the instrument as it was *intended* to be, not merely an agreement to convey, but an actual present conveyance.

*Gurley* and *J. W. Huntington*, contra, insisted, I. That the laying of the tax in 1823 and the proceedings thereon, were not authorized by law. A town tax can be laid only on the assessment list *as made and corrected by the assessors and board of relief.* *Stat.* 450. *tit.* 100. *c.* 1. *s.* 14. By the 14th section of the act providing for the collection of taxes, (*p.*154.) the rate-bill is to be made out, " containing the proportion of each individual to pay according to the list *made and completed ;*" and thereupon a warrant is to be issued, commanding the collector to collect such tax *according to the grant.* To remedy some apprehended evil or inconvenience from the want of power to lay a tax in any other way, the legislature interfered, as to towns, in 1826, and as to ecclesiastical societies, in 1828, and enabled those communities to grant taxes on the assessment list which shall *next thereafter be completed* by the assessors and board of relief. *Stat. vol.* 2. *pp.* 95. 202. If

New-London, the same thing could be done before, why were these acts
July, 1829.  passed?

Montville
v.
Haughton.

    There are good reasons why towns should not have the power of laying a tax before the list is completed. In the first place, they cannot know, until then, what tax to lay. Secondly, if they can lay a tax prospectively, they may lay it upon a list ten years in advance. This, with reference to our floating population, would be insufferable. And it is observable, that the legislature, when they conferred this power, in 1826 and 1828, virtually declared its exercise, without limitation, unsafe, by expressly limiting it to one year from the time of the vote.

    2. That if the tax was lawfully granted, still this bond (admitting it to be such) cannot be enforced, because the collector is a public officer, not required by law to give bond, and the select-men are not authorized to take one. The moment a town has exercised its power of appointing a collector, he has a right to proceed to the collection of the tax. The law prescribes his duties. The town cannot superadd the burden of a bond. The bond given by the defendants, in this case, was purely *voluntary* on one part, and *oppressive* on the other. The law has provided other remedies for the town. *Stat.* 454. *tit.* 100. *c.* 2. *s.* 15. 16. Further, if the town could lawfully require a bond, yet in this case, the town did not act on the subject. The select-men acted without any authority from the town. It was no part of their duty, as select-men, to do what they did. Now, equity will not interfere to enforce a claim founded on no valuable or meritorious consideration; but it will leave the parties where it finds them. *Com. Dig. tit.* Chancery. 4 D. 15. *Minturn* v. *Seymour*, 4 *Johns. Chan. Rep.* 497.

    4. That if the plaintiffs are entitled to relief, they have adequate remedy at law. The instrument in question is valid and effectual to lay the foundation of a recovery for all that could have been recovered, if it had been originally sealed. If the plaintiffs had a right to take the instrument, there was a sufficient consideration to support it; and *assumpsit* or debt on simple contract would lie. *Warren* v. *Lynch*, 5 *Johns. Rep.* 238. At any rate, it does not appear, that there was not a sufficient consideration; and it is incumbent on the plaintiffs to shew, that they are without adequate remedy at law; otherwise, chancery will not entertain jurisdiction.

5. That if a suit in chancery is sustainable, it should be brought in the name of the select-men, and not by the town, the instrument in question being payable *to the select-men and their successors in office.*

DAGGETT, J. The defendants urge several objections to the bill. They will now be examined and disposed of.

I. It is said, this tax was illegal:—it could not have been laid on the list of 1823 ; for the list of that year was not, and could not by law be, perfected, till several months after the tax was laid. The statute (*p.* 444—5.) provides, that the taxable inhabitants shall give in to the assessors, by the 20th of *October* in each year, a correct list of all their property subject to taxation. The assessors may add such assessments to the lists as they judge proper. The board of relief, in *January* following, may add to or reduce the list of any person. After this, the general list of each town (*p.* 449—450.) is to be transmitted to the comptroller, who, with the treasurer, in *March* following, may, on examination, add to or deduct therefrom such sums *per cent.* as they may judge will equalize the same, when compared with the valuation in other towns; and by the 10th of *April* thereafter, notify the clerks of the respective towns of such alterations. The town-clerk may then alter the list, within twenty days, and deduct from or add to it, according to the opinion of the comptroller and treasurer. This process with respect to the list, furnishes the ground for the supposition, that the tax was illegal ; for it does not appear, that the list was perfected when the tax was imposed. It does, however, appear, that the rate-bill was made out in *August* 1824, after the process for correcting the list was completed.

Stress, however, is laid on the 14th section of the act for the assessment of taxes, (*p.* 450.) which declares, in substance, that the assessment list of each town, as the same shall be made and corrected by the assessors and board of relief, shall be the rule of apportionment of all taxes. I believe, in some cases, the tax is laid on the list *last perfected ;* but I do not see the reason of it. Taxes are laid for the current expenses of the year. The basis of them should be, therefore, the taxable estate of the year. This idea is enforced, by the 9th section of the " act concerning towns." (*P.* 450.) This section provides, that the towns shall grant annual taxes on the assessment list made out according to law, sufficient to defray all

lawful and necessary expense *incurred by them ;* and if they neglect or refuse, the select-men are authorized to assess the inhabitants, and make a rate-bill upon the list last completed. Here, the expression is definite ; because it is a tax for expense *already incurred.* If the tax was laid in *November* 1823, on the list of 1823, and the rate-bill made out immediately, there would be force in the argument ; but it is, in the case under consideration, laid on the list of 1823. The rate-bill or apportionment was made out in *August,* after the list was completed. In this view of the subject, the objection that the tax is illegal, fails.

It is still insisted, that as the legislature, in *May,* 1826, (*Stat. vol.* 2. *p.* 487.) enacted, that towns, at their annual meetings, might grant taxes on the assessment list, which should *next thereafter be completed by the assessors ;* and also, in *May* 1828, vested ecclesiastical societies with the same power ; it is to be inferred, that taxes could not be laid in this manner *before.* It would be unsafe to proceed upon this idea. The statute might have been made in affirmance of the existing usage, and to prevent all objection to it. If doubts existed, it was proper they should be removed.

Moreover, these taxes might have been granted at the annual town meetings in *October,* before the lists were presented to the assessors.

Hence, in my judgment, the tax was legally imposed ; and this opinion supersedes the necessity of examining a position taken at the bar, that if the tax was illegal, yet as the collector had received the amount, neither he nor his surety can allege this objection.

2. The defendants further insist, that the select-men should have been parties, as they were obligees in the instrument, and not the town. It is clear, that the town is the sole party in interest. The select-men were merely agents. If a loss is incurred, it must be borne by the town, and not by the select-men. The undisputed rule in equity, is, that all persons concerned, or who may be affected by the relief prayed for, ought to be parties. *Mitf.* 39.

3. The collector is not required to give a bond ; nor are the select-men authorized to take such bond. There is, indeed, no law directing that a bond shall be taken in such case ; nor is there any law against it. It is not illegal in its nature, nor founded upon any illegal consideration.

A collector is an authorized agent to collect moneys due the
town. What forbids, then, the giving and taking a bond to secure the town? Surely, any corporation or individual employing a person to collect moneys for them, may take a bond with surety for the faithful discharge of his duty. There is a good and sufficient consideration for such a contract; nor is it opposed to any rule of public policy.

These remarks dispose of another objection, suggested, by the counsel for the defendants, that this *voluntary* agreement ought not to be enforced, by a court of chancery. The obvious answer is, the instrument is not voluntary. It is founded upon a sufficient consideration. More especially, ought this agreement to be enforced, as the surety is fully indemnified against all loss.

4. The remaining objection is, that the plaintiffs have adequate remedy at law. It is one of the established powers of a court of equity to relieve against mistake and accident. It is found by the court, that the seal was omitted, in this case, by mere *mistake* and *accident*. If the plaintiffs might sue on this instrument at law, it does not follow, that they may not have relief in equity. The plaintiffs are entitled to a bond, the consideration of which cannot be enquired into at law. The remedy might not be adequate. In this stage of the proceedings, therefore, I incline against this objection.

The plaintiffs, then, are entitled to the relief sought, if it be competent to a court of chancery to afford it. That it is competent to relieve against mistakes in deeds, bonds, &c. is abundantly etablished in our own courts; and it is a settled rule in chancery. *Crosby* v. *Middleton* & al. *Prec. in Chan.* 309. *Skip.* v. *Huey* & al. 3 *Atk.* 93. *Wadsworth* v. *Wendell* & al. 5 *Johns. Chan. Rep.* 224.—a case identical with the present. *Smith* v. *Chapman* & al. 4 *Conn. Rep.* 344. 346. *Watson* & al. v. *Wells*, 5 *Conn. Rep.* 468. *Peters* & al. v. *Goodrich*, 3 *Conn. Rep.* 146.

I would advise the superior court to grant the relief sought.

The other Judges were of the same opinion.

Relief sought to be decreed.

*New-London,*
*July, 1829.*

Thames Man-
ufacturing Co.
*v.*
Lathrop.

THE THAMES MANUFACTURING COMPANY *against* LATHROP
and others.

As the power of taxation is derived exclusively from statutory provision, the requirements of the law must be strictly complied with.

Therefore, where the assessors, in the year 1827, omitted to lodge an abstract of the assessment lists in the town-clerk's office, by the 1st day of *December* in that year, though they lodged it on the 20th of that month, ten days before the meeting of the board of relief; it was held, that such assessment lists, by reason of such omission, were invalid, and no tax could be lawfully laid and collected thereon.

To a statute explicitly retrospective, to a certain extent, and for a certain purpose, the court will not, by construction, give a retroactive operation, to any greater extent, or for any other purpose.

Therefore, where it was provided, by a legislative act, that " in all cases in which the assessors in any town had theretofore omitted to lodge an abstract of the assessment lists of such town in the town-clerk's office, by the 1st day of *December*, such assessment lists should not, for such cause, be considered or adjudged void; but all taxes, which had been theretofore, or should be thereafter, laid and imposed according to such assessment lists, might, notwithstanding, be levied and collected;" it was held, that although such act might have effect so as to authorize the levy and collection of taxes previously laid on assessment lists thus defective, which *had not*, at the time of its enactment, *been levied and collected*, it could not be extended, by construction, so as to affect a suit, previously brought and then pending, against the select-men of a town, for the taking of property, under a warrant from them, to satisfy a tax, laid on such defective assessment lists.

Though a ministerial officer is protected, while acting within legal authority; yet if the select-men of a town make out a rate-bill on assessments, which are illegal and void, and cause a warrant to be issued thereon, they are responsible to those whose property is taken under such warrant; and the injury being immediate, *trespass* is the proper remedy.

THIS was an action of trespass *de bonis asportatis,* tried at *Norwich, January* term 1829, before *Hosmer,* Ch. J.

The following are the material facts in the case. The town of *Bozrah* voted a tax upon the list of 1827. A list of assessments was duly made out ; but an abstract of it was not left with the town-clerk until the 20th of *December,* 1827. After the 1st day of that month, the plaintiffs repeatedly called at the town-clerk's office to inspect their list ; but the abstract was not there. The board of relief, after having given ten days public notice pursuant to law, met on the last *Monday* of *December ;* but the plaintiffs did not attend, nor apply to the board for relief against the assessment. The defendants, who were the select-men of *Bozrah,* procured a rate-bill to be made out on such list of assessments, in which rate-bill the plaintiffs were

included, and the sum of 65 dollars, 85 cents, was specified, as the tax payable by them. They likewise obtained a warrant for the collection of the taxes comprised in the rate-bill, and delivered it to the collector, with direction to collect the taxes therein specified ; and by virtue of this warrant, the collector took the goods of the plaintiffs and sold them.

*New-London,*
July, 1829.

Thames Man-
ufacturing Co.
*v.*
Lathrop.

The plaintiffs contended, that the tax was illegal, for the omission of the assessors, to leave an abstract of the assessment lists with the town-clerk, by the 1st of *December ;* that consequently, the warrant was unauthorized, and constituted no justification to the defendants ; and that as the collector acted by their authority, they were made trespassers. The defendants resisted these positions. The Chief Justice instructed the jury, that the act of the collector, if done by the procurement of the defendants, was in law, their act ; that it was unwarranted, by reason of the invalidity of the tax, the assessment list not having been returned to the town-clerk's office by the 1st of *December* ; and that the levy on the plaintiffs' goods, by the defendants' command, was a trespass for which they were responsible.

The jury returned a verdict for the plaintiffs ; and the defendants moved for a new trial for a misdirection.

*Isham* and *Hill,* in support of the motion, contended, 1. That the assessment was not rendered void and the tax illegal, as the law then was, by the omission of the assessors to lodge an abstract of the assessments in the town-clerk's office by the 1st of *December.* Here it is to be observed, in the first place, that the *object* of the law was satisfied ; its *spirit* was complied with ; for the abstract was returned to the town-clerk's office ten days before the meeting of the board of relief ; and the plaintiffs had ample opportunity to examine it, for the purpose of applying for relief. It also operated as a check on the assessors as much as though it had been returned by the 1st of the month. In the next place, the statute does not declare, that the assessment shall be void, if the abstract is not left by the time specified. It is merely *directory* to the assessors, declaring it to be their *duty* to take this step in the course of their proceedings. *Stat.* 445. *tit.* 100. *c.* 1. *s.* 1. It is not necessary to declare the assessment void and the tax illegal, in order to compel the assessors to do their duty ; for the same statute (*p.* 450. *s.* 13.) has provided, that if any assessor shall refuse

*New-London,*  to perform the duties of his office, he shall forfeit to the town
July, 1829.  treasury the sum of 30 dollars.   The statute, in terms equally
Thames Man-  imperative, requires the town-clerk to transmit to the comp-
ufacturing Co.  troller an abstract of the lists, by the 1st day of *March* in each
*v.*
Lathrop.  year; but if this is not done, may it not be returned after-
wards, and may not a tax then be lawfully laid and collected
on such assessment lists?

2. That if there was any infirmity attending this assessment,
previous to the act of 1829, it was healed by that act.(*a*)   In
the most explicit terms, it extends to all cases in which the
assessors *had theretofore* omitted to lodge an abstract of the
assessment lists in the town-clerk's office, by the 1st day of
*December* in any year; and declares, that such assessment lists
shall not, for such cause, be considered void.   If this is a valid
act, there is no escape from the conclusion, that the assessment
list in question is not void.   The defendants do not call upon
the court to give a retroactive effect to this law, *by construc-
tion;* for there is no room for construction.   This case comes
within the rule established in *Goshen* v. *Stonington,* 4 *Conn.
Rep.* 209.   It is explicitly retrospective; it is not unjust or
unreasonable; and is eminently conducive to the general good,
by preventing wide-spread mischief.   This rule has been re-
peatedly recognized since; and is now to be regarded as set-
tled law.   *Mather* v. *Chapman* & al. 6 *Conn. Rep.* 54.   *Beach*
& al. v. *Walker,* 6 *Conn. Rep.* 190.

3. That if the assessment list was void, still the defendants,
the *select-men* of the town, were *not liable in trespass.*   They
act *ministerially,* and cannot be liable for any act done in pur-
suance of their duty.   1 *Swift's Dig.* 529.   *Badkin* v. *Powell*
& al. *Cowp.* 476. 479.   Where an officer only does what be-

(*a*) The act referred to was approved *June* 5th, 1829, and is in these
words: "That in all cases in which the assessors in any of the towns in this
state, have heretofore neglected or omitted to sign or return an abstract of
the assessment lists of their respective towns by them made, and to lodge the
same in the town-clerk's office of said towns, by the first day of *December* in
any year; and in all cases in which said assessors have heretofore neglected
or omitted to fill out lists at three-fold the rate *per cent.* or amount of the
same, as by law required; and in all cases in which said assessors, or the
members of the board of relief, in said towns, have neglected or omitted to
take the oath prescribed by law; such assessment lists shall not, for such
causes, be considered or adjudged void; but all taxes which have been here-
tofore, or shall be hereafter laid and imposed according to such assessment
lists, may, notwithstanding, be levied and collected."

longs to his office, he shall not be liable for any precedent tortious act, of which he could know nothing. 2 *Jones* 214. cited by *Aston,* J. *Cowp.* 479. If a person is taxed for more than he ought to be, through error of the assessors, where they have authority to assess some taxes, it is clear, that he cannot maintain trespass, but must pursue the statute remedy. If, in this case, any persons are liable, it must be the *assessors ;* and they can be sued only in *case.* The statute makes the act of lodging the abstract in question with the town-clerk *their* duty ; and if the plaintiffs have sustained any injury, it has resulted from the neglect of this duty.

*New-London, July, 1829.*

*Thames Manufacturing Co. v. Lathrop.*

The decisions in *Massachusetts* cannot govern this case ; because the laws of that state and of this, in relation to this subject, are very different. There, the assessors make the assessment and grant the warrant.

*H. Strong* and *J. W. Huntington,* contra, insisted, **1.** That the tax was not, at the time, legally laid ; and no warrant could lawfully issue to collect it. The right to take a man's property from him, by way of taxation, is created and regulated by the positive provisions of statutory law ; and if those provisions are not strictly complied with, the right fails. If a single step in the prescribed course, be omitted ; and that step, too, be one of which neither the necessity nor the use is apparent ; it is not for a court of law to say, that it may be dispensed with. But the provision of the statute requiring an abstract of the assessment lists to be lodged in the town-clerk's office, by the 1st of *December,* is of manifest importance. It operates as a salutary check upon the assessors ; and it is necessary to give notice of the assessments to the persons assessed, that in case they are aggrieved thereby, they may make the proper application for relief. And the *time* prescribed is material, because no person is bound to make enquiry *after* that time. The legislature manifestly intended to hold those concerned in laying a tax to a *strict* compliance with the requirements of law. By the last section of the act providing for the assessment of taxes, it is declared, that " the assessment list in each town, *as the same shall be annually made and corrected by the assessors and board of relief, according to the provisions of this act,* shall be the rule" of taxation. *Stat.* 450. *tit.* 100. *c.* 1. *s.* 14. By the 14th section of the act providing for the collection of taxes, the select-men are to make out a rate-bill " containing the pro-

New-London, portion of each individual to pay, according to the list *made*
July, 1829. *and completed according to law.*"

Thames Manufacturing Co.
  *v.*
Lathrop.

2. That the proceedings in question were not validated and the tax legalized, by the act of *May* session 1829. If this act is susceptible of a construction, which will not make it operate retrospectively, such construction will, unquestionably, be given to it. Now, take the whole act together, it is apparent, that the legislature did not intend to affect suits previously commenced and pending in relation to taxes already levied and collected. It was in fact, and was intended to be, a *confirming* act. The legislature intended to heal the infirmities of former assessment lists—*to a certain extent*, or *for a certain purpose*,—*viz. to authorize the future levy and collection of taxes thereon.* The act comprises but one sentence ; and the full meaning is not brought out until the last clause, which qualifies and limits all that precedes it.—" Such assessment lists shall not, for such causes, be considered or adjudged void ; but all taxes which have been heretofore, or shall be hereafter, laid and imposed according to such assessment lists, *may be levied and collected.*" The substance of the enactment is this—and merely this—that such assessment lists shall not be considered or adjudged void *so as to prevent the future levy and collection of the taxes* laid according to such assessment lists. Thus far the legislature have gone. To consider the proceedings as valid *ab initio, to all intents and purposes,* so as to affect suits previously commenced relative to taxes *already levied and collected,* would be to give the act a retrospective effect, *by construction.* Couch q. t. v. *Jeffries,* 4 *Burr.* 2460. *Dash* v. *Van Kleeck,* 7 *Johns. Rep.* 477. *Goshen* v. *Stonington,* 4 *Conn. Rep.* 220.

3. That the defendants are *liable* for the acts of the collector, done by their order, on the familiar principle, *Qui facit per alium, facit per se.* 1 *Swift's Dig.* 547. *Stetson* v. *Kempton* & al. 13 *Mass. Rep.* 272. the principle of which is applicable to the present case, because the assessors in *Massachusetts,* in relation to this subject, do the duty of our selectmen.

4. That *trespass,* and not case, is the proper remedy. *Agry* v. *Young,* & al. 11 *Mass. Rep.* 220. Lord *Amherst* v. Lord *Somers* & al. 2 *Term Rep.* 372. *Williams* v. *Brace,* 5 *Conn. Rep.* 190.

*Nw-London,*
July, 1829.

**Hosmer, Ch. J.** The first enquiry regards the validity of the tax.

A general statute applicable to all our towns, has been made for the assessment of taxes. *Stat.* 444.

Thames Man-
ufacturing Co
*v.*
Lathrop.

By this law, assessors are to be chosen, whose duty it is to receive the lists of all the inhabitants; and having perfected them, by adding property omitted, by valuation of the items, and by the requisite assessments, to return an abstract of the lists to the town-clerk, on or before the 1st of *December* in each year. The lists and valuations the town-clerk is directed to submit, when requested, to the inspection of every person liable to pay taxes.

A board of relief is constituted, to hear appeals from the doings of the assessors; and having given not less than ten days notice, they are to meet, on or before the first *Monday* of *January* in each year, to determine the appeals made to them. The assessment list, as annually made and corrected, is the rule for the apportionment of taxes to individuals.

From this view of the law, it appears to be a positive provision, that the lists shall be returned to the office of the town-clerk, on or before the 1st of *December* in each year. This direction is imperative, and is alone alterable by the legislature. The court must take the law as they find it, and cannot say, that a return after the 1st of *December* is valid, unless they assume the character of law-makers.

The reason of this legislative provision, is very apparent. It is for the general benefit of every inhabitant of our towns, that each may inspect the list of his estate, and if he believes that injustice is done him, that he may appeal for its correction, to the board of review. That a time for the return of the lists should be limited, the general convenience demands; and that it should be sufficiently early, for universal inspection, and preparation for a future hearing before the board of review, is perfectly obvious. On this principle, the legislature appointed the 1st of *December,* as the ultimate period of the return. This branch of the law is as imperative and as unchangeable by the court, as any other; and were it within their competency, it would be difficult to assign a period more reasonable.

That the return should punctually be made, is indispensable. A different principle would nullify the law, and produce the general inconvenience arising from an unlimited return. No

*New-London,* person, in such case, could know, when he might inspect his
July, 1829. list ; and if the return was late, no time either for reflection,
Thames Man- or preparation for a review, could be had.
ufacturing Co.
*v.*           If the legislature, in a charter of incorporation, had author-
Lathrop.   ized the laying of taxes upon lists returned to a public office
at a specified time, the necessity of a strict observance of the
limitation would not admit of a question. *Head & Amory* v.
*Providence Insurance Company,* 2 *Cranch* 127. *Broughton
& al.* v. *Manchester and Salford Waterworks,* 3 *Barn. & Ald.*
1. *Slark* v. *Highgate Archway Company,* 5 *Taun.* 792. *New
York Firemen Insurance Company* v. *Ely & Parsons,* 5 *Conn.
Rep.* 560. The case before us, is strictly analogous to the one
supposed. The general law is an enabling act to all our
towns ; it has prescribed the subjects of taxation, and the
mode ; and as there is no authority to tax, except what is con-
ferred by the law, it must be strictly observed.

It has been enquired, whether the returns of the abstract
of the lists, by the town-clerk, to the comptroller, must be by
the 1st of *March* in each year, according to the provision of
the act in question ; and if not, whether the legislature are
precluded from laying taxes upon the assessment list. Un-
questionably, they are not. The case put, and the one under
discussion, are, in no respect, analogous. The abstract assess-
ment lists of the towns, must be strictly returned to the town-
clerks, or there is no legal assessment ; but if a town-clerk
does not return to the comptroller, an abstract of the assess-
ment lists, pursuant to the provision of law, the lists are not
invalidated, but *he* is subjected to a penalty.

The omission to return an abstract of the assessment lists
to the town-clerk of *Bozrah,* was a fatal error. It follows, that
no legal assessment was made ; and of consequence, that there
was no rule for the apportioning of taxes.

2. By an act of the General Assembly, passed *May* session,
1829, (*Stat. vol.* 2. *p.* 237.) it was provided, that when asses-
sors have neglected or omitted to return an abstract of the as-
sessment lists to the town-clerks, in their respective towns, by
the 1st day of *December,* such lists shall not be adjudged void ;
but that all taxes laid upon them, may be levied and collected.
It has been argued, that this law cures the difficulty, in the
present case ; but the error of the supposition is obvious. The
act relates exclusively to taxes *not levied or collected.* It can-
not be affirmed, that the case before us, is within the terms of

the act.   It is said, however, that it is within the reason of it ; <span>New-London,</span>
and that the law ought to have a retrospective construction. <span>July, 1829.</span>
But to this it is a conclusive reply, that acts of the legislature, <span>Thames Man-<br>ufacturing Co.</span>
although in certain cases an explicit provision may retrospect, <span>v.</span>
by construction, can never have given to them a retrospective <span>Lathrop.</span>
operation.   *Dash* v. *Van Kleeck,* 7 *Johns. Rep.* 477. *Goshen*
v. *Stonington,* 4 *Conn. Rep.* 220.   Where a new rule of law
is declared, it never looks backwards, unless it is so enacted
in the most unequivocal manner.

It is clear, then, that the act of *May* session, 1829, has not
healed the infirmity of this case.

3. The assessment being invalid, and not helped by the late
law, it has become a third enquiry ; whether the defendants
are liable in trespass, for the act done by their command.

In their behalf, it has been said, that they acted in pursuance
of their legal duty ;  for that the law (*Stat.* 454. § 14.) has
imposed on them the burden of making out rate-bills, and pro-
curing warrants, for the collection of taxes.   The true con-
struction of the act in question, is, that the select-men are en-
joined to make out rate-bills, on legal assessments.   But if an
assessment is illegal and void, it would be absurd to consider
the law, as requiring of the select-men to cause a rate-bill to
be made upon it, and a warrant to be issued for its enforce-
ment.   A void assessment renders the warrant upon it equally
void ;  and both together constitute no justification to the act-
ors in the illegal proceeding.   *Stetson* v. *Kempton* & al. 13
*Mass. Rep.* 272. 282.   The act of the collector, in taking the
plaintiffs' property, in contemplation of law, was the act of
the defendants, who commanded it ; and although the collec-
tor was justified, by his warrant, (*Stetson* v. *Kempton* & al. 13
*Mass. Rep.* 272.) yet the defendants have no justification.

There is no other rule than this, that a ministerial officer(and
certainly, in this case, the defendants rank no higher,) is pro-
tected while acting within legal authority.  1 *Sw. Dig.* 547.
Even a pound-keeper, who is obliged to take what is brought
to pound, at the peril of the person who brings it, "if he goes
one jot beyond his duty, and assents to a trespass," becomes a
trespasser.   *Baldwin* v. *Powel, Cowp,* 478.

An illegal and void assessment is no assessment at all ; it is
a nullity ; and authorises no person to act under or enforce it.
Lord *Amherst* v. Lord *Somers* & al. 2 *Term Rep.* 372. *Cole-
man* v. *Anderson,* 10 *Mass. Rep.* 17.   *Agry* v. *Young,* 11

*Mass. Rep.* 220.    *Stetson* v. *Kempton,* 13 *Mass. Rep.* 282. *Lilly* v. *Burnham,* 15 *Mass. Rep.* 144.    The principle was settled, by this Court, in *Williams* v. *Brace,* 5 *Conn. Rep.* 190. The injury complained of was *immediate,* and not consequential ; and hence, *trespass* is the proper remedy.    *Gates* v. *Miles,* 3 *Conn. Rep.* 64.

On the whole, the determination at the circuit was manifestly correct, and no new trial is by me advised.

The other Judges were of the same opinion.

New trial not to be granted.

———◆———

## PERKINS *against* PERKINS :

### IN ERROR.

If a statute be not, in its terms, explicitly retrospective, the court will not, by construction, give it a retrospective operation.

Therefore, where a statute provided, that " whenever any action *shall be brought* to recover a penalty," &c. if on the trial of such action the title to land shall be in dispute, and a record thereof be made, an appeal shall be allowed in such action ; it was held, that no right of appeal was acquired, by virtue of such statute, in an action *commenced* a few days *before* it became a law, although such action was in other respects within the statute, and the trial and motion to appeal took place afterwards.

If in an appealed cause, it appear on the face of the record, that the court had not jurisdiction, the cause not being appealable, the appearance of a party and his proceeding to trial on the merits, will not preclude him from taking advantage of such want of jurisdiction, on a motion in arrest of judgment ; but the court will dismiss the suit, at any time, and in any stage of the proceedings.

The commencement of an action is at the service of the writ ; and of this the officer's return alone, if uncontradicted, is sufficient evidence.

Public statutes, in the absence of any provision expressly fixing a different time, take effect from the rising of the General Assembly ; of which the court will take judicial notice.

THIS was an action of debt, brought by *Francis A. Perkins,* treasurer of the city of *Norwich,* prosecuting for the use and benefit of said city, against *Joseph Perkins,* to recover of the defendant, the penalties incurred by the breach of certain by-laws of the city.    The writ was dated the 27th of *May* 1828, was served on the 28th, and was made returnable, and return-

ed, to the city court of the city of *Norwich,* held on the second
*Monday* of *June* 1828.

The declaration contained two counts for distinct offences. In the first, the defendant was charged with having erected, on the 1st of *February* 1828, in and upon a public street and highway in said city, leading from the new banking-house of the *Thames Bank* to the market, a certain wooden building, one story high, covering one rod of said street or highway, which the defendant continued and suffered to remain there, for more than two months, in contravention of a by-law of the city, by which it was, among other things, ordained, that if any person, without permission in writing from the court of common council, shall erect, continue or suffer to remain in or upon any public street or highway, &c. any building of any kind, or any thing which shall be an encroachment or incumbrance, in or upon any such street, highway, &c. the same shall be a common nuisance ; and the person so offending shall forfeit and pay, for the use of said city, the sum of 30 dollars, and the further sum of 30 dollars, for every thirty days thereafter, every such nuisance shall be continued. In the second count the defendant was charged with a violation of another section of the same by-law, by which it was, among other things, ordained, that if any person shall lay, place, continue or suffer to remain any stone or stones in or upon any street or highway in said city, the same shall be deemed a common nuisance, and the person so offending shall forfeit and pay, for the use of said city, the sum of 15 dollars, for every twenty-four hours any such nuisance is continued or suffered to remain.

The defendant pleaded *nil debet ;* and on this issue the cause was tried in the city court, in *August,* 1828, when the plaintiff obtained a verdict on both counts, with 30 dollars damages on the first, and 15 dollars on the second. On motion of the defendant, the court caused a record to be made, that the title of the land on which the alleged nuisances were placed, was in question on the trial; and the defendant thereupon appealed the cause to the superior court. In the superior court, the plaintiff moved to erase the cause from the docket, on the ground that it was not appealable. This motion was overruled ; and the cause was tried before that court, *January* term, 1829, when the jury found the issue on the first count for the defendant, and for the plaintiff on the second, with 15 dollars damages. The plaintiff then moved in arrest of judgment,

New-London,
July, 1829.
_____

Perkins
v.
Perkins.

on the ground that the superior court had not jurisdiction of the cause, and the same was not appealable from the city court; alleging, that by the charter of said city, it is provided, that in actions brought to the city court of said city, to recover the forfeitures and penalties incurred, by a violation of the by-laws of said city, no appeal shall be allowed; that this action was brought to said city court to recover the penalties incurred, by the defendant's violation of the by-laws of said citiy; that the General Assembly of this state, which commenced its session at *New-Haven,* on the first *Wednesday* of *May,* 1828, continued its session until the 4th day of *June,* 1828; and that the statute law of this state, entitled " An act in addition to and alteration of an act, entitled an act to prevent and remove nuisances in highways, rivers and water-courses," passed at said session, did not become a law until said 4th day of *June,* which was after the date and service of the plaintiff's writ, and after the commencement of this suit.    This motion being demurred to,(*a*) the court adjudged it sufficient; and judgment was arrested accordingly.    The record, on motion of the defendant, was then transmitted to this Court, for revision in error.

*H. Strong* and *Hungerford,* for the plaintiff in error, contended, That the superior court had jurisdiction of the cause, and judgment ought not to have been arrested.    In support of this proposition, they insisted, 1. That the cause was appealable, by virtue of the act of the General Assembly passed in *May* session, 1828,(*b*) expressly authorizing the appeal of an

(*a*) The copy of record, from which this statement of the case is made, and which came into the reporter's hands from a member of the court, does not show any answer in writing, by the defendant, to the plaintiff's motion in arrest; but the record of the judgment, after stating the verdict, proceeds thus : " And thereupon the plaintiff made his motion to arrest the judgment of this court upon said verdict, and to set said verdict aside, as on file; and *the parties being fully heard* on said motion, this court is of opinion, that the same and the matters therein contained are *sufficient in the law;* and thereupon judgment is arrested, and said verdict of the jury is set aside."    It is on the authority of this record, that the reporter has stated, that *the motion was demurred to.*    At any rate, the facts must either have been conceded by the defendant, or found by the court.        *R.*

(*b*) This act is as follows : "*Be it enacted,* &c. That whenever any action shall be brought to recover a penalty for the erection or continuance of any nuisance upon any public highway, imposed by the act, to which this is an addition, or by the by-laws of any city or borough, if on the trial of such

action like the present. And here it is not necessary to agitate the question as to the validity of retroactive laws. The act in question is undoubtedly prospective, and is to operate on any case of appeal within its purview, when it may happen. This cause was tried in the city court and appealed, in *August* 1828, more than two months after the act was passed and published. Admit, for the present, that the action was commenced before the passing of the act, the plaintiff had acquired thereby no *vested right* of having the ulterior proceedings in the suit regulated by the then existing laws. What relates to the *remedy* merely, may be changed, at the pleasure of the legislature ; and a person's having commenced an action under the old law, does not deliver it from the future operation of the new law. When this action was commenced, it could be tried only in the city court ; but the city court could not try *the title of land ;* and yet it was apparent, that this was in reality the only matter in controversy between the parties. The legislature then thought proper to remedy the evil in this and all similar cases, (as much for the benefit of the plaintiff as of the defendant,) by providing that an appeal should be allowed to the superior court, as in other cases, any law to the contrary notwithstanding.

2. That it does not appear from the record before the court, that this suit was commenced before the act in question became a law. All that appears as to the commencement of the suit, is the officer's return of service. This is merely *evidence*— and that *prima facie* only—of the matter stated in such return. There is no finding of the fact, or admission of it in

action, the defendant shall justify himself, by reason of his title to the land upon, or adjoining to which, such nuisance is claimed to exist, and such title shall be in dispute, it shall be the duty of the court, before which such action is pending, on application of either party, to cause a record to be made that the title of land was in question in such action, and thereupon, if such action shall be pending before a justice of the peace, an appeal shall be allowed to the county court, or if before an alderman, to the city court, or if before a city or county court, to the superior court, as in other cases, any law to the contrary notwithstanding.

<div align="center">

EBENEZER YOUNG,
Speaker of the House of Representatives.
JOHN S. PETERS,
President of the Senate.

</div>

June 4th, 1828—Approved.

<div align="center">

GIDEON TOMLINSON."

</div>

*New-London,* pleading; nor is there any evidence of it possessing the verity of a record.

July, 1829.

Perkins
*v.*
Perkins.

3. That as the plaintiff appeared in the superior court after the appeal, and proceeded in the cause to a trial on the merits, he thereby submitted to the jurisdiction of the court, and waived all exceptions to it. *Co. Litt.* 303. *a.* 1 *Chitt. Plead.* 426. & seq. *Longueville* v. *Thistleworth,* 2 *Ld. Raym.* 969. *Jennings* v. *Hankyn, Carth.* 11. *Barrington* v. *Venables,* Sir *T. Raym.* 34. *Com. Dig. tit.* Abatement. J. 16. 21. 2 *Lill. Prac. Reg.* 121. *Denslow* v. *Moore,* 2 *Day* 12. *Sanford* v. *Sanford,* 5 *Day* 353. 358. *Fletcher* v. *Wells,* 6 *Taun.* 191.

*Goddard* and *Child,* for the defendant in error, contended, 1. That the record, without the motion in arrest, shews when the suit was commenced; the officer's return being part of the record. It is at least *prima facie* evidence of the facts stated in it; (*Butts* v. *Francis,* 4 *Conn. Rep.* 424.) and this is as good evidence as any other, until it is contradicted.

2. That the act in question furnishes evidence on the face of it, that it became a law on the 4th of *June* 1828, a week after the commencement of the suit. But if it does not, the court is bound to take judicial notice of the time of the rising of the General Assembly, which is the time when public statutes take effect. *Stat.* 258. *tit.* 43. *s.* 5. *Birt* q. t. v. *Rothwell,* 1 *Ld. Raym.* 343. 1 *Chitt. Plead.* 219. and cases cited *ibidem.*

3. That this act cannot affect a suit commenced before, and pending at the time, the act was passed. In the first place, such a suit is not embraced by the terms of the act. The words are—" whenever any action *shall be* brought," &c.; and all the subsequent clauses refer to "such action." Secondly, if the act be not exclusively prospective in its terms, still the court will not give it a retrospective effect by construction. *Wilkinson* v. *Meyer,* 2 *Ld. Raym.* 1350. *Gillmore* v. *Shooter's* exr. 2 *Mod.* 310. *Couch* q. t. v. *Jeffries,* 4 *Burr.* 2460. *Dash* v. *Van Kleeck,* 7 *Johns. Rep.* 477. *Ogden* admr. v. *Blackledge,* 2 *Cranch* 272. *Goshen* v. *Stonington,* 4 *Conn. Rep.* 225.

4. That where it appears from the face of the proceedings, that the court had not jurisdiction, the submission of a party will not give the court jurisdiction. *Martin* v. *Commonwealth* & al. 1 *Mass. Rep.* 347. *Lawrence* v. *Smith* & al. 5 *Mass. Rep.* 362. *Lockwood* v. *Knapp,* 4 *Conn. Rep.* 257. Further,

in this case, the plaintiff did not voluntarily submit to the ju- *New-London,* risdiction of the court, but as soon as the cause was entered in July, 1829. the superior court, moved to erase it from the docket, on the ground that it was not appealable. This motion being overrul- ed, he could do no otherwise than proceed to trial.

Hosmer, Ch. J. Whether the suit in question was appeala- ble, is the sole enquiry. If it was not, the superior court had no jurisdiction of the cause ; and the judgment was legally ar- rested.

If the determination of the court below is to be tested by the charter of the city of *Norwich* alone, there arises no possible question. The provision is express, that in actions brought by the city treasurer for the recovery of a penalty arising under a by-law of the city, no appeal shall be allowed. *Stat.* 120. The defendant, however, claims a right of appeal, by virtue of the act of the General Assembly, passed in *May* 1828 ; and this right must be conceded, if the law is operative in this case. For, by this act, appeals are allowed to be made to the su- perior court in actions brought to recover penalties for the breach of a city by-law, if, as in this case, the title of the de- fendant's land is in question.

The act alluded to, on the fairest principles of construction, authorizes appeals in cases *posterior* to the time of its legal commencement, and in no other. The expression of it is fu- ture and prospective. "Whenever an action *shall be brought* to recover a penalty," is its phraseology. Had the legislature intended it, it were easy and natural for them to have said, *in all actions for penalties,* appeals shall be allowed ; and the only assignable reason why they did not, is most obvious ; they had no such intention. They made, and intended to make pro- vision for the future only, and permitted the past to remain un- der the dominion of the former law.

A construction of the act that should cause it to retrospect, has been contended for, notwithstanding the expression of it is merely prospective and in relation to the future. But by this Court, in *The Thames Manufacturing Company* v. *Lathrop &* al. (ante, *p.* 550.) it was explicitly decided, that an act of the General Assembly ought not to have a retrospective operation, unless so declared in the most unequivocal manner. Such is the general strain of judicial decisions on this subject. 2 *Inst.* 292. 6 *Bac. Abr.* 370. (*Gwil.* ed.) *Helmore* v. *Shuter &* al.

2 *Show.* 17. S. C. by the name of *Gillmore* v. Executors of *Shooter,* 2 *Mod.* 310. S. C. 1 *Vent.* 330. *Couch,* q. t. v. *Jeffries,* 4 *Burr.* 2460. 1 *Bla. Comm.* 44. *Wilkinson* v. *Meyer,* 2 *Ld. Raym.* 1350. *Ogden,* admr. v. *Blackledge,* 2 *Cranch,* 272 . *Dash* v. *Van Kleeck,* 7 *Johns. Rep.* 477. Hence, it said, by Sir *William Blackstone,* that all laws are to commence *in futuro,* and operate prospectively ; (1 *Bla. Comm.* 46.) and to this rule we have subjoined this exception ; *unless they are clearly expressed to be of retroactive effect.*

Assuming, then, the act of *May* session, 1828, to be a prospective regulation merely, it remains to enquire, when was the plaintiff's action brought, and at what time did the law commence.

On the 28th of *May* 1828, the plaintiff instituted his action, by the service of his writ. *Spalding* v. *Butts* & al. 6 *Conn. Rep.* 28. This is the date of the officer's return ; and the return is *prima facie* evidence of the facts certified. *Butts* & al. v. *Francis,* 4 *Conn. Rep.* 424. *Booth* v. *Booth,* 7 *Conn. Rep.* 350.

The act in question of *May* session 1828, was signed and approved by the governor, on the 4th day of the succeeding *June ;* and could not have had an earlier commencement than this. By the constitution of the state (*art.* 4. *sect.* 12.) every bill, which shall have passed both houses of the General Assembly, must be presented to the governor, and if he approves, he is to sign it and transmit it to the secretary. Then, and not before, it becomes a law. On the 4th*of *June,* 1828, the act was signed and approved.

On a principle of common law, the court judicially know the time when the legislature terminated its session. The commencement and close of the General Assembly, and other facts of the same public and general nature, are of judicial cognizance. 1 *Chitt. Plead.* 219. *Birt.* q. t. v. *Rothwell,* 1 *Ld. Raym.* 210. 343. *Eliz. Shipden's* case v. Dr. *Redman,* 1 *Lev.* 296. *The Bishop of Norwich's* case, *Moore* 551. *Bac. Abr. tit.* Statute. L 5. And at least, it is an indisputable fact, that the session of *May* 1828, did not terminate before the 4th day of *June* before mentioned.(*b*)

_____

(*b*) From the imperfection of the copy of record furnished me, I am unable to determine, whether *all the facts* stated in the plaintiff's motion in arrest were *found to be true ;* a fact, which I believe exists ; and that would have saved the trouble of the preceding discussion. [Note by the Chief Justice.] See note by reporter, *ante,* *p.* 560.

It is a statute provision, that all public acts of the General Assembly take effect from its rising, unless it is otherwise provided. *Stat.* 258 *tit.* 43. *s.* 5.

From the premises it necessarily results, that the General Assembly terminated its session on the 4th of *June* 1828, and that the plaintiff's action was commenced six days before ; that is, the 28th day of *May.* The act in question, then, is inapplicable to this case, and it is affected by the charter of the city alone, which inhibits an appeal.

It was suggested in the argument, that the want of jurisdiction cannot now be taken advantage of, on the ground that the parties, by proceeding to trial on the merits, have submitted to the jurisdiction. Undoubtedly, it is true, that where the court has a general jurisdiction over any subject, until the want of it is demonstrated by extrinsic facts, they must be duly pleaded. But where the jurisdiction of a court is limited, (a legal truth in respect of all our courts) and the want of jurisdiction appears from the face of the record, the court not only *may,* but *ought,* to dismiss the suit, at any time, and in any stage of it. The court, who are to decide according to law, are not concluded by the admission of the parties. *Bac. Abr. tit.* Abatement. K.    *Lockwood* v. *Knapp,* 4 *Conn. Rep.* 258. *Martin* v. *Commonwealth* & al. 1 *Mass. Rep.* 347.    *Lawrence* v. *Smith* & al. 5 *Mass. Rep.* 362.

I am of opinion, that the superior court had not jurisdiction of the plaintiff's action, and that the arrest of judgment was correct.

PETERS, J.    Several subordinate questions have been discussed in this case, which it is not necessary to decide or consider, as a decision of the principal one is final. Was this cause appealable, or within the jurisdiction of the superior court ? If it was not, our labour is in vain ; for a judgment *coram non judice* is a nullity.

By the charter of this city, which is a public law, in force when this action was commenced, the city court had cognizance of all causes (wherein the title of land was not concerned) cognizable by the county court, provided the cause of action arose, and one or both of the parties lived, within the city. And in actions brought to the city court for penalties under the by-laws, no appeal was allowed. *Stat.* 112. 120. *tit.* 15. *c.* 1. *s.* 8. 20.    The defendant, however, claims, that

New-London,
July, 1829.

Perkins
*v.*
Perkins.

the act of the legislature, approved *June* 4, 1828, has enabled him to plead title, and made this cause appealable, and of course, cognizable by the superior court. But this act was passed after the commencement of this suit ; and it is in terms *prospective*. The words are : "Whenever any action *shall be brought* to recover a penalty for the erection or continuance of any nuisance upon any public highway &c. and the defendant shall justify," &c.   *Stat. vol.* 2. *p.* 196, 7.   This certainly could not relate to actions *already* brought and *then* pending.   And such has been the construction of a similar expression in the statute of frauds, 29 *Car.* 2. *c.* 3. which enacts, " that from and after the 24th of *June*, 1677, no action shall be brought to charge any person on any agreement made in consideration of marriage, unless such agreement be in writing."   It was said by the court, that it could not be presumed, that the act had a retrospect to take away an action, to which the plaintiff was then entitled.   *Gillmore* v. *Shooter's* exr. 2 *Mod.* 310.   So that we may safely leave the question whether the judiciary may declare a retrospective law, operating on vested rights, void, where the Chief Justice has left it in *Goshen* v. *Stonington*, 4 *Conn. Rep.* 225., and adopt the opinion of Mr. Justice *Thompson* in *Dash* v. *Van Kleeck*, 7 *Johns. Rep.* 477. 493. & seq. that a law ought not to have a retrospective operation, unless so declared, in the most unequivocal manner. A similar opinion was expressed, by this Court, in *Goshen* v. *Stonington*, 4 *Conn. Rep.* 222, 3.   " A statute is not to be construed as having a retrospect.   Such a construction ought never to be given, unless the expression of the law imperiously requires it."

I dissented from the opinion of the Court in the case last cited ; but not on this point.   I then thought and still think, that a retrospective statute (it is not a law) affecting vested rights, is utterly void ; and that the judiciary not only *may*, but *must*, declare it so.   So thought Ch. J. *Kent*, in *Dash* v. *Van Kleeck*.   The marginal summary is : " It is a principle of universal jurisprudence, that laws, civil or criminal, must be *prospective*, and cannot have a retroactive effect."   So thought Mr. Justice *Story*, in *The Society for the propagation of the Gospel* &c. v. *Wheeler* & al. 2 *Gal.* 105.   So thought the supreme court of the *United States*, in *Ogden* v. *Blackledge*, 2 *Cranch* 272., who considered the point too plain for argument, and said, that a statute could not retrospect so as to take away

New-London,
July, 1829.

Perkins
v.
Perkins.

a vested right.   And so said the court of *King's Bench*, in *Couch q. t. v. Jeffries*, 4 *Burr.* 2460. wherein the question was, whether a statute passed after the commencement of a suit could affect such suit ; and they unanimously determined it could not.   " It can never be the construction of this act," said Lord *Mansfield*, " to take away this vested right, and punish the innocent pursuer of it with costs."   But I forbear.— This Court have repeatedly decided otherwise ; and I submit. Vide *Hills* v. *Thrall*, in this Court, in 1801.   *Goshen* v. *Stonington*, 4 *Conn. Rep.* 209.   *Mather* v. *Chapman*, 6 *Conn. Rep.* 54.

But it is said, that there is no evidence, that the suit was commenced before the passage of the statute in question.   It appears by the sheriff's return, which is a part of the record, that the process was served *May* 28th, and that the statute authorizing an appeal was approved *June* 4th, 1828.   It is a well settled rule, that the return of an officer is *prima facie* evidence of the facts therein stated.   This statute is a public law, whereof we are bound to take notice.   *Butts* & al. v. *Francis*, 4 *Conn. Rep.* 424.   *Slayton* v. *Chester*, 4 *Mass. Rep.* 478.   1 *Bla. Comm.* 85.

It is also said, that the appearance of the plaintiff after the appeal, and submitting to the jurisdiction of the court, by proceeding to trial on the merits, are equivalent to a waiver of all exceptions to the appeal and to the jurisdiction of the court ; and so is the law, when the want of jurisdiction arises from the want of legal notice.   But when the want of jurisdiction appears of record, the defect cannot be supplied by the submission of the party ; for the agreement of the parties cannot alter the law, nor make that good which the law makes void. *Aldrich* v. *Kinney*, 4 *Conn. Rep.* 380.   *Mitchell* v. *Kirtland*, 7 *Conn. Rep.* 229. and the authorities there cited.

I am, therefore, of opinion, that there is no error in the judgment complained of.

The other Judges were of the same opinion.

Judgment affirmed.

PHILLIPS *against* MEDBURY.

In 1823, *A.* made his will, by which he gave to his wife *L.* the use and improvement of one half of all the real estate he should die seised and possessed of, until his son *J.* should arrive at the age of twenty-one years, should she so long remain his widow ; and when his son *J.* should become twenty-one years of age, then his said wife should have the use and improvement of only one third of his real estate, so long as he should remain his widow ; she to support his two children *P.* and *J.* until they should respectively arrive to the age of twenty-one years. By the same will, the testator gave to his son *J.* and his heirs and assigns forever, when he should arrive at the age of twenty-one years, the lands so given to his wife, subject to the incumbrance of her dower. He then gave all the residue of his estate, real and personal, to his son *C.,* under the incumbrance of the aforesaid provision for his wife. The testator died soon afterwards, leaving three sons and four daughters, of whom *P.* and *J.* were minors. *L.,* the widow, intermarried with *M.,* in *February,* 1827. *J.* died in *September,* 1827, at thirteen years of age. *P.* is still living and a minor. In an action of ejectment brought by *C.* against *M.,* to recover the estate so given to *L.,* it was held, that the limitation of such estate was not void as being a restraint upon marriage ; the rule declaring such limitations void on this ground, not being applicable to real estate or to a widow ; and consequently, that *L.,* by her intermarriage with *M.,* forfeited her right in such estate ; and *C.,* either as residuary devisee, or as heir at law of *J.* in common with his brother and sisters, was entitled to recover the whole against one having no right.

THIS was an action of ejectment for two parcels of land in *Plainfield ;* tried, on the general issue, at *Brooklyn, January* term, 1829, before *Daggett,* J.

The jury returned a special verdict, presenting the following case. On the 19th of *April* 1823, *Asa Phillips* made his last will, and soon afterwards died, leaving a widow, three sons, *Asa, Charles* and *John,* and four daughters, *Mary,* the wife of *Samuel Dow, Abigail,* the wife of *Caleb Clark, Thirza Clark* and *Patty Phillips.*

After giving pecuniary legacies to each of his daughters, the testator proceeded thus : " *Item,* I give and bequeath to my beloved wife, *Lois,* one good cow, all my in-door moveables, and also the use and improvement of one half of all the real estate I shall die seised and possessed of, together with the use and improvement of the whole of that part of the dwelling-house I now live in, being the *East* half of said dwelling-house, and the whole of the small barn *South-east* of said house, and half of the other out-buildings, until my son *John* arrives to the age of twenty-one years, should she so long remain my widow ; and when my said son *John* becomes twenty-one years of age, then

my said wife is to have the use and improvement of one third only of all the real estate I shall die seised of, so long as she remains my widow ; she to support our two children *Patty* and *John*, until they each of them arrive at the age of twenty-one years." The testator then made a devise to *John* in these words : " *Item*, I give and devise to my son *John*, when he shall arrive to the age of twenty-one years, the one half of the home-farm where I now dwell, with the whole of that part of the dwelling-house I shall die seised of, and the whole of my flat-rock wood lot, (so called) under the incumbrance of my widow's thirds, to him and his heirs and assigns forever." He then made provision for *Charles* as follows: " Lastly, I give, bequeath and devise to my son *Charles* all the rest and residue of my real and personal estate, which I shall die seised and possessed of, under the incumbrance of the aforesaid provision made for my said wife and widow ; to him and his heirs and assigns forever, on condition that he pay all my just debts and funeral charges, and the legacies and bequests aforesaid and the cost of settling my estate."

*Charles* was appointed executor ; the will was proved and established, in *October* 1824 ; and shortly afterwards, distribution of the estate was made pursuant to the will. *Lois Phillips*, the widow of the testator, in *February* 1827, intermarried with *David Medbury*, the defendant. *John* died in *September* 1827, being then about thirteen years of age. The other children are all living ; *Patty*, the youngest daughter, being a minor, about fifteen years of age. The debts against the testator's estate have been paid, except only a note for about 20 dollars, which he signed as surety for his son *Asa*, who is of ability to pay it ; but the legacies given by his will, have not been paid ; and no settlement of the estate has been made at the court of probate.

The action was brought by *Charles Phillips*, in *March* 1828, for the lands devised in one clause of the will, to *Lois*, and in another, to *John*. At the commencement of the suit, the defendant was in possession of the premises, which he had refused to surrender to the plaintiff, on a demand thereof previously made.

The questions of law, submitted, by the special verdict, to the court, were, whether the plaintiff was entitled to recover the whole, or one sixth or no part whatever, of the demanded premises. Previous to any decision, the case was reserved for

<div style="text-align: right">

*Windham*,
July, 1829.

Phillips
*v.*
Medbury.

</div>

*Windham,*
July, 1829.

Phillips
*v.*
Medbury.

the advice of this Court as to what judgment should be rendered upon the verdict.

*H. Strong* and *Frost,* for the plaintiff, contended, 1. That by the terms of the will, the estate of *Lois* was forfeited, by her intermarriage with the defendant ; and the plaintiff is entitled to the whole estate as residuary devisee.   The testator made her a reasonable proposition in the alternative, leaving it perfectly optional with her to take that alternative which she preferred.   She might reject the provision made by the will, if she disliked the condition attached to it, and claim her dower.   There can be no doubt as to the intention of the testator.   He surely did not intend, that she should have the estate any longer than while she remained his widow.   The court, then, will give effect to such intention, if it may consistently with the rules of law.

The objection is, that the restriction is void as opposed to sound policy.

In the first place, a devise to *a widow,* subject to a restraint on her future marriage, will be forfeited, if she marry.   The law allows a man to place this guard about his children to prevent their going into the hands of a stranger for education. *Godolph. Orph. Leg.* 45.   *Reeve's Dom. Rel.* 222.   *Scott* v. *Tyler,* 2 *Bro. Ch. Rep.* 488.   2 *Cruise's Dig.* 32, 3.

Secondly, a condition in a will in restraint of marriage is good, if there be *a devise over.*   *Creagh* & ux. v. *Wilson* & al.   2 *Vern.* 572.   *Amos* v. *Horner,* 1 *Eq. Ca. Abr.* 112. *Scott* v. *Tyler,* 2 *Bro. Ch. Rep.* 431.   *Swinb.* 481. (*Lond. ed.* 1803.)   A devise over can evidently make no difference except only as it is *evidence of intention.*   *Willes' Rep.* 96.   A devise over of the *general residue* is sufficient for this purpose.

Thirdly, the doctrine that a condition in restraint of marriage is void, is not applicable to *a devise of land.*   The rule relied upon, is derived from the *civil* law, which related only to *legacies.*   It certainly has not been *extended,* by the common law of *England,* or by the chancery decisions of that country or of this.   *Harvey* & al. v. *Aston* & al. *Com. Rep.* 726. S. C. 1 *Atk.* 361. 375. 379. 380.   S. C. *Willes' Rep.* 83. *Pulling* v. *Reddy,* 1 *Wils.* 21. *Swinb.* 488. note by *Powell.* 2 *P. Wms.* 628. note by *Cox.*

2. That if the plaintiff was not entitled to recover the whole estate as devisee of the *residuum,* he was clearly entitled to one sixth part, as one of the six heirs of *John.*

*Goddard,* for the defendant, after premising, that *Lois* could not be deprived of her interest in this estate under the will, except by a condition subsequent; and that a condition subsequent, which divests an estate, is *not favoured* generally; contended, 1. That a condition in restraint of marriage generally, unless there is a devise over *immediately,* is void. This is a rule of policy, involving the best interests of society, not of a local or temporary nature. It was a rule of the civil law, and has been incorporated into the jurisprudence of *England* and of this country. That marriage should be left free, is at least as important here, as in *England* or *Rome. Gulliver* d. *Corrie* v. *Ashby* & al. 4 *Burr.* 1938. *Long* v. *Dennis,* 4 *Burr.* 2055. *Lowe* v. *Peers,* 4 *Burr.* 2225. *Doe* v. *Freeman* & ux. 1 *Term Rep.* 389. *Parsons* & ux. v. *Winslow,* 6 *Mass. Rep.* 169. 1 *Swift's Dig.* 141. In *Doe* v. *Freeman* & ux. *Ashhurst,* J. states the law on this subject thus: " It is a settled principle, that limitations in restraint of marriage, are not to be favoured. Wherever an estate is given to a widow for life, provided she shall not marry, unless there be a devise over *immediately,* it is merely *in terrorem."* 1 *Term Rep.* 392, 3.

First, the devise over within the rule, must be *an express devise over :* the devise of a general *residuum* will not answer the purpose. *Wheeler* v. *Bingham,* 3 *Atk.* 364. S. C. 1 *Wils.* 135. 137, 8. *Garrett* & ux. v. *Pritty* & al. 2 *Vern.* 293. *Parsons* & ux. v. *Winslow,* 6 *Mass. Rep.* 180.

Secondly, the devise over must be *immediate,* so as to take effect *at the time of the marriage.* This proposition is supported by the same authorities, particularly *Doe* v. *Freeman* & ux. 1 *Term Rep.* 389. 392, 3. and *Parsons* & ux. v. *Winslow,* 6 *Mass. Rep.* 180, 1. But by the provisions of the present will, it is clear, that the estate was not to go immediately to *Charles,* on the marriage of the widow, provided *John* should then be living; and it is a part of the case, that the marriage took place several months before the death of *John.*

Thirdly, the rule is equally applicable to *real* and *personal* estate. The general terms in which the rule is laid down, and the reasons on which it is founded, concur in establishing this position. See the observations of Lord *Mansfield* in *Long* v. *Dennis,* 4 *Burr.* 2055, 6. and the authorities before cited.

Fourthly, if the rule is restricted to personal estate, it is still not inapplicable to this case; for as the estate was given to the widow in trust to support *Patty* and *John* until they should

respectively arrive to the age of twenty-one years, she had but a chattel interest. *Daley* & ux. v. *Desbouverie* & al. 2 *Atk.* 261. 265. *Goodtitle* d. *Hayward* v. *Whitby,* 1 *Burr.* 228. 230.

2. That if these positions cannot be sustained, *Lois* had no estate whatever in the demanded premises, but a personal trust or confidence ; and the estate was vested in *John,* to be enjoyed by him, when he should arrive to the age of twenty-one years ; and consequently, it was not the subject of forfeiture by her, on her marriage. *Everts* v. *Chittendon,* 2 *Day* 338.

3. That the plaintiff cannot recover under the will, because he has not complied with the condition, by paying the debts and legacies. He has paid none of the legacies, and not all of the debts.

4. That if *Lois* had an estate, which she could and did forfeit, by the marriage, still as *John* lived beyond the marriage, he took the estate under the will, and the plaintiff can recover only one sixth part as the heir of *John.*

DAGGETT, J.   *Charles Phillips,* the plaintiff, claims the demanded premises, as residuary devisee under the will. He also insists, that as heir at law to his brother *John,* he is entitled to one sixth of the lands demanded, if not under the residuary devise.

The defendant urges, that the plaintiff cannot recover under the will, because he has not complied with the condition, by paying the debts, legacies, &c. ; and also, that no part of the estate devised to *John* passed under the will of the father, but was vested in *John,* to be by him *enjoyed,* when he arrived at the age of twenty-one years.

In my judgment, it is not *necessary* nor *proper* to decide either of those points last suggested. It is not *necessary,* because if the widow, by her intermarriage, forfeited all right to the land in question, then the plaintiff is entitled to judgment on this special verdict for the whole ; for she is a stranger, and her husband, the defendant, also ; and the plaintiff at least is entitled, as heir at law, to one sixth, as tenant in common with his brother and sisters. This being his condition, he can recover the whole against one who has no right ; and the recovery shall enure to the benefit of himself and his co-tenants. This is the doctrine of our courts. *Barrett* & ux. v. *French,* 1 *Conn. Rep.* 354.

It is also improper to decide, whether the plaintiff can recover under the residuary devise, because that might affect his brothers and sisters, who are not parties to this record, so that a decision would not bind them.

The only question, then, now to decide, is, whether all the right of the widow under this devise, is gone, by her intermarriage.

If the intention of the testator is to govern, there can be no doubt. That intention is very clearly manifested. *One half* the real estate mentioned is given to her until *John* arrives at the age of twenty-one years, " *should she so long remain my widow ;*" then and after that, she is to have the use and improvement of only *one third* " *so long as she remains my widow.*" The limitation is repeated in explicit language, to the end that there might remain no doubt of his intention. It also appears, that he had, by the same clause of the will, given to her, absolutely, one cow and all his *in-door moveables.* The option, then, of taking under the will, subject to a limitation that she should not marry, or if declining to accept the provision made by the will agreeable to the 4th section of the statute, (*p.* 181. *tit.* 26.) and be at liberty to marry, was fairly presented to her. She chose the first alternative. Why should she not be bound by it ?

It is, however, insisted by the counsel for the defendant, that limitations of this kind, when introduced into a will, are merely *in terrorem*, and shall not work a forfeiture of the estate devised. They are also compared to bonds given not to marry, which are always void on the ground of public policy. A bond not to marry, or not to marry any one except the obligee, is doubtless void. Marriage should be free ; should proceed from choice, not from compulsion. This is a salutary rule of the common law. *Lowe* v. *Peers,* 4 *Burr.* 2225. Hence, also, all marriage-brokage contracts are discountenanced. But declaring restraints upon marriages in wills void, as made *in terrorem*, is another and different doctrine. It is not a doctrine of the common law, but introduced into the court of chancery in *England* from the canon law. As that court is considered as possessing the power over legacies, it has adopted the rule of the canon law to a certain extent. It has declared, for example, in many cases where the devisor has imposed an unreasonable restraint upon a young male or female, and annexed it to a devise, that it should be deemed

*Windham,*
*July, 1829.*

Phillips
*v.*
Medbury.

*in terrorem ;* and therefore, that the devise should, notwithstanding, take effect.    But in all these cases, it is admitted, that this power is not given by the common law ; nor is it ever exercised in relation to real estate, but only as to personal estate, which is, in the case of legacies, subject to the controul of a court of chancery.   Nor is it applied to a widow.   It would seem very reasonable, that a man leaving a widow with seven children, as is the present case, should be permitted to encourage her, by suitable provision in his will, to remain single, and not subject his own offspring to the probable evils of a step-father, to waste her substance, and thereby render her less able to support and educate them..   Indeed, it entirely accords with reason, as it appears to me, that she should have an option to take such provision, and remain unmarried, or refuse it, and be thrown upon the general provision of law,—her dower.   Nor have I been able to find any case, or any *dictum* of any judge or chancellor, in opposition to these principles.   In *Amos* v. *Horner,* 1 *Eq. Ca. Abr.* 112. and in *Scott* v. *Tyler,* 2 *Bro. Chan. Rep.* 487, 8. they are expressly recognized.   In the latter case, Lord *Thurlow,* after a very elaborate discussion, by very able counsel, in which all the cases are examined, declares the result to be, that " a condition that a widow shall not marry, is not unlawful.   An annuity during widowhood,—a condition to marry or not to marry *Titius,* is good."

I am satisfied, therefore, that *Lois Phillips,* by her intermarriage with the defendant, lost all her right in the land devised ; and that the superior court be advised, that judgment be given for the plaintiff to recover the whole of the demanded premises.

The other Judges were of the same opinion.

Judgment to be given for the plaintiff,
for the whole of the demanded
premises.

The following opinion of the Hon. *James Kent,* late Chancellor of the State of *New-York,* upon the principal points agitated in the case of *The Company for erecting and supporting a Toll Bridge with Locks from Enfield to Suffield* v. *The Connecticut River Company,* ante 28—54. is inserted here, as an appendix to that case.

### CASE.

The *Connecticut River Company* have submitted for my inspection the following documents, *viz* :

I. The various acts and resolutions of the general assembly of *Connecticut,* relating to *Enfield Bridge* and *Falls.* These acts and resolutions are, 1. The act of the date of the 2d *Thursday* of *October,* 1798, which incorporates *The Company for erecting and supporting a toll bridge with locks from Enfield to Suffield.* 2. The act or resolution of the assembly, in *May* 1805, prolonging the time allowed for finishing the bridge. 3. The act or resolution in *May* 1806. 4. The act or resolution in *May* 1808. 5. The like. 6. The petition of the company, in *October,* 1808 ; and a grant of the prayer of the petition. 7. A resolution of the legislature, in *October* 1808. 8. Resolution of the assembly of *May,* 1809. 9. A report of a committee on the subject of *Enfield Falls,* and the acceptance of the same, in *October* 1809. 10. Resolution of the general assembly of *October* 1809. 11. An act to incorporate *J. L. Sullivan* and his associates, in *October* 1818. 12. An act in addition thereto, in *May* 1819. 13. An act to incorporate *The Connecticut River Company,* in *May* 1824. 14. An act or resolution of *May* 1826.

II. The copy of the answer in chancery in the suit of *The Enfield Bridge Company* v. *Alfred Smith & others,* in the superior court of *September* 1827.

III. A certified copy of several votes of *The Company for erecting and supporting a toll bridge with locks from Enfield to Suffield,* at their annual meeting, the 14th of *January* 1822.

IV. A large map of part of *Connecticut River,* including *Enfield Falls,* and certified by commissioners upon oath, the 20th *June* 1827. Map of *Enfield* upper falls, on a scale of four chains to an inch.

Upon these documents the following questions have been submitted for my opinion :

1. Do the existing rights of the *Enfield Bridge Company* present a constitutional obstacle to the making and using of the canal undertaken by *The Connecticut River Company* ?

2. Is this a case for an injunction in favour of the *Bridge Company,* while they have neither made, nor commenced making, locks ?

### OPINION.

In answer to the first question, I would preliminarily observe, that I was consulted by the *Enfield Toll Bridge and Lock Company,* in *August* 1826, and such parts of the acts and resolutions of the legislature of *Connecticut* as are referred to in 1. 2. 3. 4. 5. 8. 9. 10 and 14. of the first branch of the preceding case, were the ground of an opinion that I then gave, in which it appeared to

me, that the *Enfield Company* were still entitled to erect the two locks at *Mad Tom* and *Surf Bars*, mentioned in the acts referred to; and that the right had not been destroyed or impaired.

Whether that opinion would have been given, if I had seen, or had my attention directed to all the documents now referred to, in the above case, may be questionable. I presume, I intended to found it entirely upon the documents which I stated in the case I drew. Some of the documents now referred to under the first head, and which, by being in print, are brought more readily and accurately to a comprehensive view, and particularly the document referred to as III., being the resolution of the company in 1822, do undoubtedly present a different view of the subject.

But I neither wish nor intend to weaken or impair the force of the opinion which I formerly gave, *in reference to the documents upon which it was founded.* The case now before me may be considered in coincidence with my former opinion; and my present opinion will be grounded on the entire new state of the case, and questions and rights altogether distinct from the former.

1. *Question.*—Do the existing rights of the *Enfield Bridge Company* present a constitutional obstacle to the making and using of the canal undertaken by *The Connecticut River Company?*

*Answer.*—The *Enfield Company* rights had reference, essentially, to a *bridge* across the *Connecticut River*, and toll for passing it as a compensation. The locks at *Mad Tom* and *Surf Bars* were consequences of the original grant, and intended to be auxiliary to it. They were rather *appurtenances* to the right to build the bridge, than *principal* privileges. All the acts of the legislature, and all the petitions and reports connected with those acts, shew this. The locks were rather considered as *burdens* annexed to a *favour;* and it is very apparent, that the company for a long time so considered them.

But now, by the act of 1824, a company is created for a different purpose, and on a much larger scale, and for public objects of great general utility. The primary object of the new company is the *navigation of the river*, and not a *passage bridge.* It is to surmount and evade all the whole inconvient navigation over rapids, rips and bars, for several miles; and the construction of this grant is to be taken liberally, and the right to lock *Mad Tom Bar* to be taken more strictly.

I decline giving any opinion as to the inquiry whether the rights of the *Enfield Bridge Company* to make locks at *Mad Tom* and *Surf Bars* have expired, by non-user or limitation. But I go upon the ground of the assumption of the existence of the right of the *Enfield Company* to go on, and build their locks, as appurtenant to their toll-bridge. Still I do not think that right bars the legislature from allowing a *canal from still water to still water* on the *west* side of the river. It would probably disturb the *The Enfield Bridge Company* privilege, if erected on the *east* side. I therefore lay emphasis on the fact of its being on the *west* side; and then I think that narrow privilege cannot bar a great and larger privilege in a different place, though it might indirectly take away the custom. Such a construction would be most mischievous and monstrous. It might be extended to destroy the right to run a canal from *Northampton* to *New-Haven;* for that, if successful, would diminish, at least very greatly, the custom at the *Mad Bar* and *Surf* locks.

I have no idea of pushing a monopoly to that extent; and I think that these extensive privileges (though sacred within their limits) are to be taken strictly as against the public improvement in other places. To erect a new

bridge, or ferry, or fair, of the same kind, so near to another as to draw away its custom, would be a fraudulent evasion of its rights and privileges. It would be a nuisance; and this is all the principle that can be urged and applied in this case, in opposition to a canal on the *west* side of the river; and I think it does not apply. If there be an exclusive ferry from *A.* to *B.*, it does not prevent persons from going by any other boat from *A.* directly to *C.*, though it lies near to *B., provided it be not done fraudulently, and as a pretence* for avoiding the regular ferry. *Tripp* v. *Frank,* 4 *Term Rep.* 666.

*2d Question.*—Is this a case for an injunction in favour of *The Enfield Bridge Company,* while they have neither made, nor commenced making, locks?

*Answer.*—I am very clearly of the opinion, that it is not a proper case for an injunction. *The Enfield Bridge Company* are not in the exercise and enjoyment of their locks at *Mad Tom* and *Surf Bars.* They have not erected them; and have omitted to do it, for the enormous lapse of thirty years. There never was an injunction granted upon a monopoly privilege so rusty by non-user. They are not granted but to maintain rights in *full enjoyment and exercise. The Enfield Company* ought first to erect their locks and finish them as the law intended, before they are entitled to such a summary and extraordinary remedy as an injunction. Besides, the injunction might of itself work irreparable mischief, by suspending the canal operations; and if eventually, on review, the right of *The Enfield Company* should be found imperfect, how are *The Connecticut Company* to be indemnified? The doctrine is, that the party calling for an injunction, must have exclusive possession. He must be in actual enjoyment of his franchise; and if not so, he must first establish his title *at law* before *equity* will help him in this way. *Hill* v. *Thompson* &. al. 3 *Meriv.* 622. 624. *Livingston* v. *Van Ingen,* 9 *Johns. Rep.* 586. *Sullivan* v. *Redfield* &. al. 1 *Paine's Rep.* 441.

Upon the whole, I have no doubt that in taking all the circumstances of the case into view, it would be a novel and extraordinary exercise of equity power, to award an injunction, at present, against the exercise of such an improvement on the canal, in favour of such a claim as that to lock *Mad Tom Bar,* when the right has lain unexecuted thirty years, and remains so still.

JAMES KENT.

*New-York, June 7th,* 1828.